**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **Roger Wright,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 1:06-CV- 647-WKW** |
| | ) | |
| **Pemco World Air Services, Inc.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S EVIDENTIARY SUBMISSION IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant Pemco World Air Services, Inc., and submits the following as

evidence in support of its motion for summary judgment in the above-styled matter:

1.    Deposition of Plaintiff Roger Wright.

2.    Declaration of Francis X. Henry, including exhibit.

3.    Declaration of Dennis Johnson, including exhibit.

4.    Deposition of Dennis Johnson.

5.    Deposition of Clarke E. Briody, including relevant exhibit.

6.    Deposition of Jackie Tindle.

7.    Deposition of Richard Miller.

8.    Deposition of Ted Ball.

Respectfully submitted,


 *s/ John B. Holmes, III*
JEFFREY A. LEE
JOHN B. HOLMES, III
Attorneys for Defendant

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama  35203-2618
Telephone:     205.254.1000
Facsimile:     205.254.1999
Emails:         jlee@maynardcooper.com
                    jholmes@maynardcooper.com


**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Elizabeth B. Glasgow
Farmer, Price, Hornsby & Weatherford, L.L.P.
100 Adris Place (36303)
Post Office Drawer 2228
Dothan, Alabama  36302


*s/ John B. Holmes, III*
OF COUNSEL

# EXHIBIT 1

FREEDOM COURT REPORTING

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

ROGER WRIGHT,

      Plaintiff,

vs.                CASE NO. 1:06-cv-647-WKW

PEMCO WORLD
AIR SERVICES, INC.,

      Defendant.


\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF ROGER MAXWELL WRIGHT, taken

pursuant to stipulation and agreement before Sherry

McCaskey, Court Reporter and Commissioner for the

State of Alabama at Large, in the Law Offices of

Farmer, Price, Hornsby & Weatherford, 100 Adris Place,

Dothan, Alabama, on July 11, 2007, commencing at

approximately 1:20 p.m.

\* \* \* \* \* \* \* \* \* \*

d9d551f9-8c62-4a25-b4df-524ec3da3039

## Page 2

1  APPEARANCES
2  FOR THE PLAINTIFF:
3  Ms. Elizabeth B. Glasgow
   FARMER, PRICE, HORNSBY & WEATHERFORD, L.L.P.
4  Attorneys at Law
   100 Adris Place
5  Dothan, Alabama 36302
6  FOR THE DEFENDANT:
7  Mr. John B. Holmes, III
   MAYNARD COOPER & GALE, P.C.
8  Attorneys at Law
   1901 Sixth Avenue North
9  2400 AmSouth/Harbert Place
   Birmingham, Alabama 35203-2618
10
11         * * * * * * * * * * *
12     EXAMINATION INDEX
13 ROGER MAXWELL WRIGHT
      BY MR. HOLMES              4
14    BY MS. GLASGOW           142
      BY MR. HOLMES            143
15
16      EXHIBIT INDEX
17 DEFENDANT'S EXHIBIT NO.:
18  1   List of jobs applied for        64
19
20
21
22
23

## Page 3

1         STIPULATIONS
2      It is hereby stipulated and agreed by and
3  between counsel representing the parties that the
4  deposition of ROGER MAXWELL WRIGHT is taken pursuant
5  to the Federal Rules of Civil Procedure and that said
6  deposition may be taken before Sherry McCaskey, Court
7  Reporter and Commissioner for the State of Alabama at
8  Large, without the formality of a commission; that
9  objections to questions other than objections as to
10 the form of the questions need not be made at this
11 time but may be reserved for a ruling at such time as
12 the deposition may be offered in evidence or used for
13 any other purpose as provided for by the Federal Rules
14 of Civil Procedure.
15     It is further stipulated and agreed by and
16 between counsel representing the parties in this case
17 that said deposition may be introduced at the trial of
18 this case or used in any manner by either party hereto
19 provided for by the Federal Rules of Civil Procedure.
20
21
22
23

## Page 4

1         ROGER MAXWELL WRIGHT
2      The witness, having first been duly sworn to
3  speak the truth, the whole truth, and nothing but the
4  truth, testified as follows:
5              EXAMINATION
6  BY MR. HOLMES:
7  Q.  Mr. Wright, please, state your full name for
8      the record.
9  A.  Roger Maxwell Wright.
10 Q.  We met a moment ago.  And, again, my name is
11     John Holmes.  And we're here today to talk
12     about the lawsuit that you have against Pemco.
13     I represent Pemco, and today is my day to ask
14     you questions about the claims that you're
15     making.
16         Have you ever given a deposition before?
17 A.  No, sir.
18 Q.  Well, I'm sure Libby explained to you that
19     I'll be asking questions and looking for
20     answers out loud.  And the court reporter is
21     here to take down everything that is said in
22     the room.  And I'll do my best not to talk
23     over you and let you get all your answer out

## Page 5

1  before I ask you another question.  And if
2  you'll do the same for me and let me get all
3  my question out before you start answering,
4  that way the record will be clear.
5      If at any point I ask a bad question or
6  you don't understand me or my question is
7  garbled because I've got a cough drop in my
8  mouth, just ask me restate it because if you
9  answer, I'll assume -- and we'll all assume
10 that you understood my question.
11     If at any point, you want to take a
12 break, just let us know, and we'll do our best
13 to accommodate that.  But if there's a
14 question on the table, we'll be looking for an
15 answer before we take a break.
16     Are you on any medication today that
17 might impair your ability to hear me or
18 understand my questions?
19 A.  No, not really.
20 Q.  No?
21 A.  No.
22 Q.  Okay.  And your current residential address?
23 A.  3919 County Road 73, Midland City, Alabama,

2 (Pages 2 to 5)

FREEDOM COURT REPORTING

Page 6

1       36350.
2    Q.  And your date of birth is November 28, 1949?
3    A.  Yes.
4    Q.  Have you ever been in a dispute with an
5       employer other than Pemco?
6    A.  No, sir.
7    Q.  Have you ever seen the complaint filed in this
8       case?
9    A.  Yes, sir.
10   Q.  How far did you get in school, Mr. Wright?
11   A.  I graduated. I've got probably a year
12       in -- in Wallace College EMT training. I was
13       intermediate EMT. I went on through some
14       various training through Pemco, management
15       training. I don't know exact quarters or
16       whatever on that.
17   Q.  What kind of management training did you
18       receive at Pemco?
19   A.  Modern management. I don't remember the exact
20       name of the course, but it was two different
21       courses at Wallace.
22   Q.  The management training was at Wallace as
23       well?

Page 7

1    A.  Yes.
2    Q.  In addition to the EMT training?
3    A.  Yes, sir.
4    Q.  Do you have any certificates or degrees beyond
5       high school?
6    A.  No, sir.
7    Q.  Any other training that you received at Pemco
8       other than modern management or EMT training?
9    A.  They have sexual harassment classes off and
10       on, drug classes.
11   Q.  And those were put on by the Human Resources
12       Department?
13   A.  Yes, sir. Or either someone would come down
14       from Birmingham, I think, on several occasions
15       to have a -- a class.
16   Q.  And did the sexual harassment training, did
17       that also cover anti-discrimination?
18   A.  I think so. Not sure.
19   Q.  And how often did you have that kind of
20       training from either someone in HR or somebody
21       from Birmingham?
22   A.  It was supposed to have been yearly.
23       Sometimes they were and sometimes they weren't.

Page 8

1    Q.  When you were employed at Pemco, did you
2       understand that they had an
3       anti-discrimination policy?
4    A.  Yes, sir.
5    Q.  And did you, at some point, receive training
6       on that policy?
7    A.  Like I say, we went through short classes on
8       it, no in-depth training.
9    Q.  But you knew that Pemco had a policy that
10       said, we do not discriminate against people on
11       the basis of their age and race?
12   A.  I knew they had a policy.
13   Q.  Did you ever see a copy of the policy?
14   A.  In the DSP.
15   Q.  What is that?
16   A.  Divisional Standard Practice.
17   Q.  Did you have a practice of reviewing the DSP?
18   A.  We were supposed to review it. It was more
19       less read it on your own.
20   Q.  And when you say "we," are you referring to
21       the management of employees?
22   A.  Management. Yes, sir. Yes, sir.
23   Q.  So as part of your duties as a management

Page 9

1       employee, you were responsible for being aware
2       of various policies and procedures at Pemco?
3    A.  Yes, sir.
4    Q.  Have you ever been terminated from a position
5       with any employer other than Pemco?
6    A.  No, sir.
7    Q.  When did you graduate high school?
8    A.  1968.
9    Q.  If it's easy to do, can you walk me through,
10       just generally, the chronology of jobs that
11       you've had prior to working for Pemco?
12   A.  Okay. I worked with a -- is that from now
13       back or from Pemco back?
14   Q.  We can go -- we can do it -- whatever is
15       easiest for you, but maybe from high school
16       going forward, if that works.
17   A.  Okay. I hired on with Hayes Aircraft in
18       1968. I worked four years to 1972.
19   Q.  And what did you do at Hayes?
20   A.  Flight line B mechanic on aircraft.
21   Q.  And was that in Dothan?
22   A.  Yes, sir.
23   Q.  Is that where Pemco is now?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

| Page 10 | Page 12 |
|---|---|
| 1  A. Pemco bought Hayes out.<br>2  Q. Right. Same facility?<br>3  A. Same facility.<br>4  Q. Okay. And what happened in 1972?<br>5  A. I went to Daniel Construction at Farley<br>6     Nuclear Plant.<br>7  Q. Why did you leave Hayes?<br>8  A. More money.<br>9  Q. And what were you doing at Daniel<br>10    Construction?<br>11  A. I started off as a beginner carpenter, worked<br>12    on up to a journeyman carpenter.<br>13  Q. And how long were you with Daniel<br>14    Construction?<br>15  A. '72 to -- '72 to '78.<br>16  Q. And what happened in 1978?<br>17  A. The job was finishing up over there. The<br>18    plant was getting complete.<br>19  Q. And where did you go next?<br>20  A. I was in business for myself. I had a small<br>21    convenience store.<br>22  Q. Did you open that in 1978?<br>23  A. I actually opened it in 1977 I think it was. | 1  Q. And what changed in 1984?<br>2  A. We were also finishing that job. I came back<br>3    to Dothan with Faulkner Construction.<br>4  Q. Where was the job out of town with Daniel?<br>5  A. One was in Prattville. One -- no, that wasn't<br>6    Daniel. I'm sorry. Selma was Daniel's.<br>7  Q. And what were you doing for Faulkner?<br>8  A. Hired on as carpenter.<br>9  Q. And how long did you work for Faulkner?<br>10  A. Till 1989.<br>11  Q. And were you a carpenter the whole time you<br>12    were at Faulkner?<br>13  A. Well, you work with them, you do all of it.<br>14    It's just -- you know, it was -- it was<br>15    carpenter work mainly. But then you -- you<br>16    may be digging ditches or whatever. It was<br>17    everything.<br>18  Q. Was it hourly work?<br>19  A. Yes, sir.<br>20  Q. And what happened in 1989?<br>21  A. Well, we got to a -- or they got to a slump<br>22    really. Building around here was slow. They<br>23    laid me off. |

| Page 11 | Page 13 |
|---|---|
| 1  Q. And how long did you have a convenience store?<br>2  A. 1980.<br>3  Q. Did you have any other employees who worked<br>4    for you at the convenience store?<br>5  A. My wife, my mother-in-law. And I had one<br>6    other lady Hellen Perry. She's -- I don't<br>7    even know where she lives now. She's moved<br>8    away.<br>9  Q. And did you work there full-time yourself?<br>10  A. No, sir.<br>11  Q. What did you do for employment?<br>12  A. I subcontract on the side, remodeling.<br>13  Q. Continued your work as a journeyman carpenter?<br>14  A. Yes.<br>15  Q. And how long did you continue doing that?<br>16  A. I think it was '81. I went on the road with<br>17    Daniel Construction again.<br>18  Q. And what job did you have at Daniel in 1981?<br>19  A. Certified sheet metal and insulator.<br>20  Q. Did you get your certification through Daniel?<br>21  A. Yes, sir.<br>22  Q. And how long did you work in that capacity?<br>23  A. Let's see. '84. | 1  Q. From a lack of work?<br>2  A. Yes, sir.<br>3  Q. Were you the only person laid off?<br>4  A. No. There was four or five of us, laborers<br>5    included.<br>6  Q. And what did you do in 1989 after being laid<br>7    off?<br>8  A. I hired on with Pemco.<br>9  Q. So in the interim, Pemco has purchased Hayes<br>10    Aircraft?<br>11  A. Yes, sir.<br>12  Q. And was that in 1989 when you hired on with<br>13    Pemco?<br>14  A. I think it was March or January, January or<br>15    March, one of the other. I'm not sure.<br>16  Q. Of 1989?<br>17  A. Yes, sir.<br>18  Q. And what position did you have when you hired<br>19    on at Pemco in 1989?<br>20  A. Plant mechanic for one month.<br>21  Q. What does a plant mechanic do?<br>22  A. Carpenter work, brick mason, pipe fitter,<br>23    janitorial, electrician. There was just a |

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 14

1    thin line between plant mechanic and
2    maintenance mechanic at that time.
3    Q.   Was that an hourly position?
4    A.   Yes, sir.
5    Q.   Who was your supervisor?
6    A.   Roy A. Woodham.
7    Q.   And you mentioned you were only in that
8    position for a month?
9    A.   Yes, sir.
10   Q.   Did you switch to a different job?
11   A.   I was offered a supervisor of facilities.
12   Q.   During the month that you worked as a plant
13   mechanic, were you eligible to join the union?
14   A.   Yes, sir.
15   Q.   Did you?
16   A.   No.
17   Q.   And the supervisor of facilities position that
18   you were offered, was that -- had that been
19   vacated by somebody else?
20   A.   They were increasing the department. They had
21   two supervisors already. They made me
22   supervisor, and I went to second shift.
23   Q.   So it was a new position?

Page 15

1    A.   Yes, sir.
2    Q.   Were you supervising anybody as supervisor of
3    facilities?
4    A.   Would you --
5    Q.   Were you supervising anybody -- I'm sorry --
6    in that position?
7    A.   Oh, yes. We had a -- I think I had 14 men on
8    second shift at that time. Also, at that
9    time, we did most the office cleaning,
10   custodians.
11   Q.   Was that the first time that you'd had a
12   position where you were responsible for
13   supervising other employees?
14   A.   Well, I was called a supervisor, you know,
15   yes. No. Faulkner, I was more like a lead
16   man, but they didn't classify me as a lead
17   man, lead carpenter, whatever you want to call
18   it. But I had show other -- others what to
19   do, four or five others, keep them working.
20   Q.   At Pemco, when you were supervisor of
21   facilities on the second shift, did you start
22   getting paid a salary?
23   A.   Yes, sir.

Page 16

1    Q.   Were you an exempt employee for overtime
2    purposes?
3         MS. GLASGOW: I'm going to object to
4    that. That's kind of a legal
5    conclusion.
6         Do you know what he's
7    talking about?
8    Q.   You can answer, if you know.
9         MS. GLASGOW: Do you know what he's
10   talking about, exempt for
11   overtime?
12   Q.   Were you paid overtime?
13   A.   We --
14       MS. GLASGOW: Ask your question.
15   Q.   Were you paid overtime?
16   A.   Yes.
17   Q.   How long were you the supervisor of facilities
18   on second shift?
19   A.   I think it was two and a half years, something
20   like that.
21   Q.   Did you have any problems with your employment
22   during that two and a half year period?
23   A.   No, sir.

Page 17

1    Q.   And who was your supervisor during that two
2    and a half year period?
3    A.   I reported to the manager of facilities then.
4    Q.   And who was that?
5    A.   Glenda Crumpler.
6         MS. GLASGOW: Crumper?
7         THE WITNESS: Crumper.
8         MS. GLASGOW: Crumper.
9    Q.   And did she supervise you throughout that two
10   and a half year period?
11   A.   Yes, sir.
12   Q.   Any problems with Glenda?
13   A.   No.
14   Q.   Did you have any issues with employees that
15   you supervised during that time period?
16   A.   No, sir.
17   Q.   What happened after two and a half years in
18   that position?
19   A.   Mr. Woodham resigned, and I was moved to first
20   shift. An additional mechanic that worked for
21   me on second shift was made supervisor for
22   second shift.
23   Q.   Did you have a role in deciding who would

5 (Pages 14 to 17)

FREEDOM COURT REPORTING

Page 18

1    replace you on second shift?
2    A.   I was asked for any info on them.
3    Q.   Your opinion?
4    A.   I thought he'd do good.
5    Q.   And who was that?
6    A.   Rick Andre.
7    Q.   Were you happy to be moving to first shift?
8    A.   Sure.
9    Q.   What were the hours of first shift versus
10    second shift?
11    A.   Second shift, I had to report in around three
12    o'clock.  And I lead from midnight to
13    daylight.  It was supposed to have been
14    eight-hour shift.  And it varied on what we
15    had going on, stand repair or building, and
16    the schedule of the aircraft.
17    Q.   Is it fair to say that in your experience the
18    work at Pemco was pretty dependent on the
19    schedule of the aircrafts?
20    A.   Yes, sir.
21    Q.   On day shift, what was your schedule?
22    A.   It varied also from five o'clock in the
23    morning till four or five.  And, also, again,

Page 19

1    that was due -- was due -- was subject to
2    change from our production of work stands.
3    We modified and built work stands to
4    support the production on the aircraft, and
5    also any special painting to do in the hangers
6    or whatever.
7    Q.   What are the work stands made of?
8    A.   Some are made out of scaffold jacks.  Some are
9    made out of 2-inch tubing.  Some are made out
10    of 3-inch thick-wall tubing, expanding metal,
11    heavy-duty casters, blocks, safety nets around
12    the top, guardrail and stairs going up them.
13    Q.   It's a lot of welding work involved?
14    A.   Sure.  Yes, sir.
15    Q.   And were you paid overtime the entire two and
16    a half years you were on second shift as
17    supervisor of facilities?
18    A.   No, sir.  A lot of times, I didn't even file
19    for it.  I'd either swap out some, you know,
20    maybe some time, couple hours or whatever or
21    day, you know, just swap out the time.
22    Q.   Do you know if other supervisors were being
23    paid overtime?

Page 20

1    A.   They -- they said they were.  You get paid
2    the -- your base pay.  There's no over -- it's
3    not time and a half whatever.  It was base
4    pay.
5    Q.   You got the same pay no matter how many hours
6    you worked?
7    A.   Yes, sir.
8    Q.   And was that true also when you went to day
9    shift?
10    A.   Yes, sir.
11    Q.   And were you getting paid more than you had
12    been working as a plant mechanic?
13    A.   Yes, sir, there was a increase.
14    Q.   And how much were you making as a supervisor
15    of facilities?
16    A.   At that time?
17    Q.   Yes, sir.
18    A.   $11 an hour.
19    Q.   Based on 40 hours a week?
20    A.   They base theirs on 45.
21         MS. GLASGOW:  Could we go off the
22         record for just a second?
23         MR. MARTIN:  Sure.

Page 21

1         (Off-the-record discussion)
2    Q.   How long were you on day shift as a supervisor
3    of facilities?
4    A.   Well, I've been on day shift ever since then,
5    ever since the time I moved from second shift.
6    Q.   Which would have been sometime in 2001?
7    A.   Yes, sir.
8    Q.   I'm sorry.  1991?
9    A.   '90 -- '91.
10    Q.   Yeah.  Sorry about that.
11         (Brief interruption)
12    Q.   Was Glenda Crumpler still your supervisor when
13    you moved to day shift?
14    A.   Yes, sir.
15    Q.   And how long did she supervise you?
16    A.   I think she left in '95.
17    Q.   And who was her supervisor before she left?
18    A.   She reported to the president.
19    Q.   Did she ever issue you any discipline during
20    the time she supervised you?
21    A.   No.  No, sir.
22    Q.   Did she ever write you up for any performance
23    issues?

6   (Pages 18 to 21)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

| Page 22 |
| --- |

1   A.   No, sir.
2   Q.   Who became your supervisor after Glenda
3        retired or left in 1995?
4   A.   Dick Young.
5   Q.   Did you apply for her job after she retired?
6   A.   No, sir.
7   Q.   Had Dick Young been working at Pemco prior to
8        1995?
9   A.   Dick Young was more like the vice president,
10       and Joe Walter was the president that came in
11       at that time.
12  Q.   So there was a change in management --
13  A.   Yes, sir.
14  Q.   -- above you?
15  A.   Dean White took over manager of facilities.
16  Q.   Did your job duties change at all
17       during -- from 1991 through the time that you
18       were last supervisor of facilities?
19  A.   Well, the department was divided. Dean was
20       over what they call facilities, and I was over
21       production support. I would take care of the
22       ground equipment, work stands. He was more
23       less over the building part.

| Page 23 |
| --- |

1   Q.   And did you report to him?
2   A.   No, sir. We worked together. As far as him
3        being over me, no, sir.
4   Q.   Y'all were equals?
5   A.   Yes, sir.
6   Q.   And what was your job title?
7   A.   Production support manager.
8   Q.   When did you become production support
9        manager?
10  A.   I don't remember what year it was.
11  Q.   Sometime after 1995?
12  A.   Yes, sir.
13  Q.   Do you remember how long you were in that
14       position?
15  A.   Again, I don't remember what year. It was a
16       couple of years. Dean left and they put the
17       departments back together again. And I
18       reported to Greg Phillips also when Dick Young
19       was not there. Dick Young was the one I had
20       to report my budget to and also report to Greg
21       Phillips.
22  Q.   Who was Greg Phillips?
23  A.   He was over material control at that time or

| Page 24 |
| --- |

1        purchasing. Material control.
2   Q.   When you became production support manager,
3        did you have additional people that you were
4        supervising?
5   A.   Again, the department was split. We were just
6        about equal in personnel.
7   Q.   How many people did you supervise when you
8        were production support manager?
9   A.   I think it was 16.
10  Q.   So you had 16 and Dean White had, roughly, 16?
11  A.   Yes, sir.
12  Q.   And were any of the people that you supervised
13       also management employees?
14  A.   I still had a second shift supervisor.
15  Q.   Were the employees that you were supervising,
16       the hourly employees, bargaining unit members?
17  A.   Yes, sir.
18  Q.   So were you familiar with the Collective
19       Bargaining Agreement and labor issues?
20  A.   Yes, sir.
21  Q.   What other duties and responsibilities did you
22       have other than the ground equipment as a
23       production support manager?

| Page 25 |
| --- |

1   A.   We -- we worked together. Dean and I worked
2        together also with the waste water treatment
3        facility. That was the conditioning of the
4        aircrafts, washing, stripping. And then I was
5        still to repair the work stands, maintain
6        those.
7   Q.   And as the manager, were you doing any of this
8        work yourself, or were you primarily
9        supervising the work of the hourly folks?
10  A.   At sometimes I would help a person out.
11  Q.   Was the union pretty protective of the hourly
12       work?
13  A.   Well, second shift was a different world than
14       first shift was. You could, you know, more
15       less do what you had to do help out.
16  Q.   But on first shift, you let the hourly
17       employees do the work?
18  A.   Well, I also helped out on first shift. I've
19       helped hold a piece of metal up for them to
20       start welding. I've tied down work stands due
21       to the weather. I've closed hanger doors.
22       I've done whatever was necessary to take care
23       of the facility.

7 (Pages 22 to 25)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  Q.  Did you ever have any grievances filed against
2      you while you were production support manager?
3  A.  I don't believe so.
4  Q.  Did you have a good relationship with the
5      folks you supervised?
6  A.  Yes, sir.
7  Q.  I want to make sure I've got this right. I'm
8      not clear on -- and I think because you're not
9      clear on the dates. You were production
10     support manager for at least a year, maybe two
11     years?
12 A.  I'm not -- yes, it was that long at least.
13 Q.  Do you remember what your next position was?
14 A.  After Dean left, Dan Hatcher, the vice
15     president then, asked me to take the position
16     of facilities manager -- manager of
17     facilities. I'm sorry.
18 Q.  Do you know why Dean left?
19 A.  He went to Arkansas. They started a new
20     aircraft refurbish plant up there, and he left
21     to go there.
22 Q.  Do you have any idea when you became the
23     manager of facilities?

**Page 28**

1      responsibilities?
2  A.  Waste water facility; all the ground support
3      equipment; test stands for the aircraft, test
4      stands in the hydraulic shop, have those on
5      maintenance schedule; maintain a schedule to
6      change filters and all this; outside vendors,
7      contact those for any help that we may need
8      for any special work; Alabama Power, deal with
9      those.
10 Q.  Would you describe this work as maintenance
11     work, or is that something that's different?
12 A.  Well, you got to maintain the building.
13     That -- that's dealing with Alabama Power and
14     outsides vendors, you know. The rest of it --
15     most everything we try to do ourselves
16     in-house to save money, you know.
17 Q.  And this is all indirect work?
18 A.  Yes.
19 Q.  So none of the work that you were doing or
20     overseeing was ever billed to a customer for
21     being done to an airplane?
22 A.  Until these last few years, they were going
23     into Malaysia contract. We fabricated sling

| Page 27 | Page 29 |
|---|---|

**Page 27**

1  A.  No, sir, I don't.
2  Q.  And were you in that position up until 2005?
3  A.  Yes, sir.
4  Q.  Did anything change with your job title
5      between sometime in the late 90s to 2005?
6  A.  Like I say, I don't know what -- what year it
7      was that he asked me to take the facilities
8      manager -- manager of facilities. I just
9      don't know.
10 Q.  Let's assume it was in the 1990s. Was there
11     anything different? Did you have any other
12     job titles other than manager of facilities up
13     until 2005?
14 A.  No, sir.
15 Q.  What were you job duties as manager of
16     facilities?
17 A.  Requisition material, maintain a -- a budget,
18     also calculate the budget, work stands,
19     construct, fabricate.
20 Q.  Was that work-stand work any different than
21     what you had done as the production manager?
22 A.  Not really.
23 Q.  Did you also have waste water

**Page 29**

1      which we sold to them, door project.
2      Most -- that was about all -- that was
3      recently that we had done for the outside
4      customer.
5  Q.  But almost all of your work was indirect work?
6  A.  Yes.
7  Q.  And when you became manager of facilities, did
8      somebody take the production support manager
9      job?
10 A.  It was done away with. The department was put
11     back together.
12 Q.  How many supervisors or people did you have
13     reporting directly to you as manager of
14     facilities?
15 A.  I had two to begin with, and then it got down
16     to one.
17 Q.  Who were the two you had to begin with?
18 A.  Rick Andre, second shift, then Richard Miller.
19 Q.  How old is Rick Andre?
20 A.  Probably 35 at that time. I don't -- I don't
21     really know.
22 Q.  What about Richard Miller? Do you know how
23     old he is?

8 (Pages 26 to 29)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

| | Page 30 |
|---|---|
| 1 | A. I think he's around my age. |
| 2 | Q. And you said at some point you got down to one |
| 3 | supervisor reporting to you as manager of |
| 4 | facilities. |
| 5 | Did one of those two leave? |
| 6 | A. Andre left. |
| 7 | Q. And how did that come about? |
| 8 | A. Well, he was an old shrimp fisherman, also oil |
| 9 | rig worker. I think he went back to |
| 10 | Louisiana. |
| 11 | Q. And did anybody replace him on the second |
| 12 | shift? |
| 13 | A. Miller. |
| 14 | Q. Was Andre the second shift supervisor? He |
| 15 | left? Richard had been -- or first shift |
| 16 | supervisor and then he became second-shift |
| 17 | supervisor? |
| 18 | A. Yes, sir. |
| 19 | Q. And did anybody take Richard's spot? |
| 20 | A. No, sir. I took care of that. |
| 21 | Q. Do you remember when that happened? |
| 22 | A. No, I don't. |
| 23 | Q. Was that before 2005? |

| | Page 31 |
|---|---|
| 1 | A. Yes, sir. |
| 2 | Q. Do you know if it was several years before |
| 3 | 2005? |
| 4 | A. Probably at least three years. |
| 5 | Q. How was Richard Miller as an employee? |
| 6 | A. Good. |
| 7 | Q. Did you ever have any problems with him? |
| 8 | A. Some. |
| 9 | Q. Tell me about that. |
| 10 | A. Understanding what instruction I had given |
| 11 | him. |
| 12 | Q. Did you ever discipline him for his lack of |
| 13 | understanding? |
| 14 | A. Nothing but personally talking to him is all. |
| 15 | No written. |
| 16 | Q. Just verbal? |
| 17 | A. Verbal. |
| 18 | Q. Were you responsible for doing his performance |
| 19 | evaluations? |
| 20 | A. Yes, sir. |
| 21 | Q. Did you give him good performance evaluations? |
| 22 | A. In some areas. |
| 23 | Q. At what point did Henry Ward come to Pemco or |

| | Page 32 |
|---|---|
| 1 | start supervising you? |
| 2 | A. Henry was the production support director. I |
| 3 | was put under him at that time. |
| 4 | Q. Just to be clear, when you say, "at that |
| 5 | time," was that when you became manager of |
| 6 | facilities? |
| 7 | A. Yeah. |
| 8 | Q. He had been the production support director |
| 9 | when Dan Hatcher asked you to become the |
| 10 | manager? |
| 11 | A. Yes, sir. |
| 12 | Q. Had you had any dealings with Henry prior to |
| 13 | becoming manager of facilities? |
| 14 | A. Well, I worked with him, you know, in the |
| 15 | capacity of taking care of the aircraft, |
| 16 | supporting the aircraft. |
| 17 | Q. Did you ever have any issues with Henry? |
| 18 | A. No, sir. |
| 19 | Q. Were y'all friends? |
| 20 | A. Yes, sir. |
| 21 | Q. Did y'all socialize together outside of work? |
| 22 | A. No, sir. |
| 23 | Q. But you were friendly at work? |

| | Page 33 |
|---|---|
| 1 | A. Just friendly at work. |
| 2 | Q. Was Richard Miller the second shift supervisor |
| 3 | up until 2005? |
| 4 | A. Still is as far as I know. |
| 5 | Q. Is that a yes? |
| 6 | A. Yes. I'm sorry. |
| 7 | Q. Prior to 2005, did you ever observe any |
| 8 | discriminatory behavior at Pemco? |
| 9 | A. Yes, sir. |
| 10 | Q. Tell me about that. |
| 11 | A. I think that's one reason that Ms. Crumpler |
| 12 | and Mr. Crumpler and Bobbie [sic] Goodson left |
| 13 | was for -- yeah, left. |
| 14 | Q. And what kind of behavior did you observe |
| 15 | specifically? |
| 16 | A. Well, they were removed, you know. That's |
| 17 | when Dean took over. I don't know the full |
| 18 | subject there. |
| 19 | Q. You weren't involved? |
| 20 | A. No, sir. |
| 21 | Q. And did their leaving affect you in any way? |
| 22 | A. No. |
| 23 | Q. In what way were those three people you named |

9 (Pages 30 to 33)

FREEDOM COURT REPORTING

Page 34

1    discriminated against?
2    A. She was a woman. She was vocal. She would
3      get in the meetings and from -- this is
4      hearsay. You don't want hearsay, do you?
5    Q. I want to know what you know from your
6      firsthand knowledge.
7    A. Okay. She was vocal. That's all I know.
8    Q. What about the other two folks?
9    A. Same way.
10   Q. They were vocal?
11   A. Yes.
12   Q. It was Glenda's husband?
13   A. Yes.
14   Q. Prior to 2005, did you feel like you had ever
15     been discriminated against?
16   A. No, sir.
17   Q. So all the issues that we have that we're here
18     about in this lawsuit are from 2005 forward?
19   A. Yes, sir.
20   Q. Other than the three folks who were let go or
21     left when Dean White came aboard, was there
22     any other discriminatory behavior that you
23     observed prior to 2005?

Page 35

1    A. Just some that was vocal between some of the
2      supervisors and employees. I don't know the
3      names. I have -- I had seen it before in the
4      past, and I think some grievances was filed on
5      that issue, whether they was cursing the
6      employee or not.
7    Q. Was this race-related complaints?
8    A. Some of it.
9    Q. Some of it just --
10   A. And some of it was just cursing, you know.
11   Q. Just cursing?
12   A. Yeah. Shouldn't do.
13   Q. Were you involved in any of that?
14   A. No, sir.
15   Q. Did you personally observe any behavior like
16     that?
17   A. Quite a few years ago, I had but I -- you
18     know, I wasn't -- I was just, you know,
19     passing by and heard it. And then heard later
20     on they had filed a grievance on it. But I
21     wasn't involved.
22   Q. Was this before you became manager of
23     facilities?

Page 36

1    A. Yes, sir.
2    Q. How much interaction did you have with Human
3      Resources as manager of facilities?
4    A. Can you clarify that?
5    Q. How frequently did you talk to folks in Human
6      Resources? How often did you go to the
7      offices?
8    A. Almost every day.
9    Q. And what kinds of interaction did you have
10     with HR?
11   A. Well, we were -- you know, I got along -- I
12     try to get along with everybody.
13   Q. Well, were you there for business reasons --
14   A. Business.
15   Q. -- or just saying hello?
16   A. Just business.
17   Q. And what kind of matters did you go to HR
18     about?
19   A. Well, like telephone go out, intercom system,
20     lighting, whatever, you know, air
21     conditioning.
22   Q. You were there if they had an issue with a
23     piece of equipment or something like that?

Page 37

1    A. Yes, sir. And they were always wanting new
2      carpet. So --
3    Q. Did you ever get the sense that the folks in
4      HR were discriminating against Pemco
5      employees?
6    A. No.
7    Q. I'm sorry. Do you want to take a break, or
8      was there something you want to say?
9    A. No. No, sir.
10        MR. HOLMES: You want to keep going,
11       or do you want to take a break?
12        MS. GLASGOW: Yeah. Okay.
13         Are you okay?
14        THE WITNESS: Yeah.
15   Q. All right. Henry Ward -- and just to let you
16     know kind of what I'm trying to get a picture
17     of is who all your supervisors were and the
18     folks that you supervised during the last few
19     years of your employment at Pemco.
20       So Henry Ward was the production support
21     director?
22   A. Yes, sir.
23   Q. Up until the point when he retired?

10 (Pages 34 to 37)

FREEDOM COURT REPORTING

Page 38

1  A.  No, not for production support.  Greg Phillips
2      was production support.
3  Q.  Director?
4  A.  No.  He was -- he was director of material
5      control.
6  Q.  Greg was?
7  A.  Greg was.
8  Q.  Okay.
9  A.  And I also reported to Dick -- Dick Young.  He
10     worked with me on the financial part, the
11     budgetary part.  Greg would oversee production
12     support.  I reported to him and to Dick
13     Young.
14 Q.  And did Greg report to Henry?
15 A.  No.  Facilities had been yanked around several
16     times.  Henry was -- was the production --
17     director of production.  Okay.  I was under
18     him.  We were taking out from under him, put
19     under Greg and Dick Young.  Henry went to the
20     full military project, H-3 program.  I think
21     Chorba came in as director of production at
22     that time.
23 Q.  I'm sorry.  Who is that, that last one?

Page 39

1  A.  Chorba, Bob Chorba.  Henry moved up to H-3
2      program.  He stayed there until the project --
3      program was completed.  At that time, before
4      it was completed, I was put back under Henry's
5      supervision, him still in the H-3 program.
6      After the H-3 program was complete, they moved
7      Henry back down to director of facilities.
8      And I was still maintained as manager of
9      facilities.
10 Q.  So while they're folks moving around above you
11     and who you report to, your position and title
12     was consistent as manager of facilities?
13 A.  Yes, sir.
14 Q.  And the folks who reported to you, the
15     supervisors or supervisor and the hourly
16     folks, all --
17 A.  Remained the same.
18 Q.  -- remained the same for you?
19 A.  Yes, sir.
20 Q.  And the work load that was going on at Pemco
21     prior to 2005 -- or let's just say during the
22     time you were manager of facilities, was it
23     consistent?

Page 40

1  A.  No, sir.
2  Q.  The work fluctuated?
3  A.  Yes, sir.
4  Q.  And did that happen on an annual basis?
5  A.  Not annual, no.
6  Q.  Monthly basis?
7  A.  No.  It was according to the contracts.
8  Q.  And do you have any involvement in the
9      contracts, negotiating the contracts or --
10 A.  No, sir.
11 Q.  -- anything like that?
12 A.  No, sir.
13 Q.  You just knew what the contracts were when
14     y'all got them and what the planes would --
15     when they'd be coming in?
16 A.  That's right.  Yes, sir.
17 Q.  And there were times when there were more
18     planes coming in and times when fewer planes
19     were coming in?
20 A.  Yes, sir.
21 Q.  And was there a lot of turnover in the hourly
22     production side?
23 A.  Yes, sir.

Page 41

1  Q.  Was there a lot of turnover on the indirect
2      side?
3  A.  Not as much so.
4  Q.  Did you ever experience, prior to 2005, a
5      series of layoffs in the indirect side?
6  A.  Frank Tucci was there as the president before
7      Raymond Bennett.  He took care of production,
8      would transfer from 20 to 40, whatever
9      required, people over to my department.
10     We would set up work order, charge
11     numbers, and they would charge that, such as
12     painting buildings, painting work stands and
13     all that or whatever, cutting grass.  I've had
14     10 to 12 people cut grass before.
15     But he took care of the production people
16     as much as he could until it got to an extreme
17     point.  Then he would lay off.
18 Q.  And those are production folks.
19     What about the indirect folks?  Were
20     there any layoffs of indirect folks prior to
21     2005 that you're aware of?
22 A.  Well, they were short-term.
23 Q.  I'm sorry?

11 (Pages 38 to 41)

FREEDOM COURT REPORTING

Page 42

1  A.  Short-term.
2  Q.  How many times did you that happen, short-term
3      layoffs?
4  A.  Probably about every contract.
5  Q.  And the short-term layoffs for the indirect
6      folks, was that the same situation you
7      described with Frank Tucci taking care of the
8      production folks?
9  A.  Yes, sir.
10 Q.  That company did everything they could to keep
11     folks on until they got to an extreme point,
12     and then they had temporary layoffs?
13 A.  Yes, sir.
14 Q.  Were you ever laid off prior to 2005?
15 A.  No, sir.
16 Q.  Did you ever have to lay anybody off prior to
17     2005?
18 A.  Yes, sir.
19 Q.  And are those the short-term layoffs you were
20     describing?
21 A.  I think they was probably -- maybe a month,
22     something like that.
23 Q.  And were you responsible for selecting the

Page 43

1      folks who would be laid off?
2  A.  Seniority wise.
3  Q.  So these are hourly people?
4  A.  Yes, sir.
5  Q.  Did you ever lay off a supervisor reporting to
6      you?
7  A.  No, sir.
8  Q.  In some of these short-term layoffs, were
9      there ever supervisors who were laid off?
10 A.  I think probably so, in production.
11 Q.  Right. Not necessarily in your department?
12 A.  Not in my department. Yeah, the production.
13 Q.  And are you aware of any discriminatory
14     behavior in the selection of supervisors for
15     layoff?
16 A.  It -- no, sir. It was coming -- no, sir.
17 Q.  Did you ever take any leave while you were
18     manager of facilities?
19 A.  Take any leave?
20 Q.  Did you ever take any time off work?
21 A.  I had vacation, and ever once in a while I had
22     a sick day.
23 Q.  Did you ever have an on-the-job injury at

Page 44

1      Pemco?
2  A.  No, sir.
3  Q.  Prior to 2005, had you ever taken disability
4      leave?
5  A.  No, sir.
6  Q.  Before being manager of facilities, had you
7      ever taken any kind of --
8  A.  No, sir.
9  Q.  -- sick leave or disability?
10 A.  Nothing -- maybe, like I said, just a day or
11     so but nothing other than that.
12 Q.  Prior to 2005, had you ever taken FMLA leave?
13 A.  No, sir.
14 Q.  Had you ever had any employees who worked
15     under you, either hourly or the supervisors,
16     take any kind of FMLA leave or disability
17     leave?
18 A.  Yes, sir.
19 Q.  And did they have any problems coming back to
20     work after taking that leave?
21 A.  No, sir.
22 Q.  Did you ever have any issues taking vacation
23     prior to 2005 as far as taking it when you

Page 45

1      wanted to, coming back without incident?
2  A.  No, sir. It might work out to where I'd have
3      to take it before the year ended or you lose,
4      you know. But, no, there wasn't a problem.
5  Q.  Nobody ever told you, you can't take vacation;
6      or if you take it, I'm going to get you, or
7      something like that?
8  A.  No, sir.
9  Q.  Let's go back, if we can, to the supervision
10     above you. And you've described for me that
11     Henry Ward went to the H-3 program and then
12     came back, and at some point, Bob Chorba was
13     responsible for your supervision.
14         Can you walk me through up until 2005
15     when you left Pemco who your supervisors were?
16 A.  I think 2003, I was put under Henry, Mr. Ward.
17     Want me to go back further than him?
18 Q.  I mean, at some point, you indicated you were
19     supervised by more than one person. You were
20     with Phillip --
21 A.  Oh, Greg Phillips.
22 Q.  Greg Phillips.
23 A.  That was in production support when I was

12  (Pages 42 to 45)

FREEDOM COURT REPORTING

Page 46

1    under him.
2    Q.  In 2003 you were reporting to Henry Ward?
3    A.  Yes, sir.
4    Q.  Anybody else?  Did you have a direct report to
5        anybody other than Henry --
6    A.  No, sir.
7    Q.  -- from 2003 until Henry left?
8    A.  No, sir.
9    Q.  You testified earlier about Frank Tucci.  When
10       did he leave?
11   A.  I'm not sure.  I think it was early part of
12       2005.
13   Q.  Did you like Mr. Tucci?
14   A.  Yes, sir.  He's a fine person.
15   Q.  And he was succeeded by Ray Bennett?
16   A.  Yes, sir.
17   Q.  And did things change for you once Ray Bennett
18       took the helm?
19   A.  Not until I took my -- I took my sick leave.
20   Q.  Do you know Dennis Johnson?
21   A.  Yes, sir.
22   Q.  And you know him from Pemco?
23   A.  Yes, sir.

Page 47

1    Q.  Do you know how long Dennis has been at Pemco?
2    A.  Probably three years.  Probably three years.
3        I'm not sure.
4    Q.  Prior to taking your sick leave in 2005, did
5        you have any problems with Dennis Johnson?
6    A.  No, sir.  We didn't make that much contact.
7        Mr. Ward attended all the meetings and would
8        come review with me what we needed to do, and
9        I'd carry out the rest.
10   Q.  Is it safe to say that you didn't have any
11       problems with Pemco on any level up until you
12       took your sick leave in 2005?
13   A.  Yes, sir.  Not to my knowledge, I didn't.
14   Q.  Did you personally dislike anyone at Pemco?
15   A.  No, sir.
16   Q.  Did anyone at Pemco personally dislike you, to
17       your knowledge?
18   A.  Probably.
19   Q.  I'm sorry?
20   A.  Probably.
21   Q.  Can you think of anybody?
22   A.  No.
23   Q.  I mean, as we sit here today, you don't know

Page 48

1    of any names of somebody that --
2    A.  No, I don't.
3    Q.  Has any Pemco manager ever said anything to
4        you about the claims that you're making in
5        this lawsuit?
6    A.  No, sir.
7    Q.  What about any non-management employees at
8        Pemco?
9    A.  No, sir.
10   Q.  You state in your complaint that Pemco began
11       cutting back on labor in 2005, and I know
12       we've talked a little bit about that.
13           Tell me specifically about what was going
14       on in 2005.
15   A.  Well, work was getting slack again.  Also, the
16       labor was coming back up.
17   Q.  The labor contract?
18   A.  Yes, sir.
19   Q.  It was about to expire?
20   A.  Yes, sir.
21   Q.  And as far as the work getting slack, do you
22       have any idea what kind of drop-off there
23       was?  I mean, for example, there were 40

Page 49

1    planes in 2004 and 10 planes in 2005, or do
2    y'all think about it that way?
3    A.  I think some of it was due to the contract
4        coming up, the labor contract coming up.  They
5        were holding back, not trying to get any new
6        contracts in until after the labor dispute was
7        settled.
8    Q.  And I want to hear more about that.  But as
9        far as percentage of work decrease, do you
10       have any in mind, a figure in mind, of how
11       much the work was slacking off?
12   A.  No, I don't.
13   Q.  And you said that you thought that this was a
14       strategic move on the part of the company to
15       not have any contracts?
16   A.  Yes, sir.  It had been done before.
17   Q.  What evidence do you have to support that
18       belief that Pemco --
19   A.  None.
20   Q.  I'm sorry?
21   A.  None.  Not as far as statistics or any
22       figures, whatever, on that.
23   Q.  Had you heard this idea from somewhere?

13 (Pages 46 to 49)

d9d551f9-8c62-4a25-b4df-524ec3da3039

## FREEDOM COURT REPORTING

Page 50

1  A. It was the talk of the supervisors. Again, I
2     wasn't in any -- any high management meetings
3     to know exactly what was going on.
4  Q. Was this something that Henry was telling you
5     about?
6  A. No. It's just -- I heard from supervisors,
7     production supervisors.
8  Q. And when the work gets slack for the
9     production folks, how does that affect
10    facilities in your department?
11 A. Well, we had done pretty good till the last
12    few years. I hadn't laid anybody off until
13    then, you know, had to cut back. We got down
14    to cut back some of the custodians. And then
15    the plant mechanics, we moved down to
16    custodians to take over their positions. I
17    think probably four or five people is all I
18    had to lay off for a short time.
19 Q. And do you remember when this was in 2005 that
20    you had to lay off four or five people?
21 A. It was prior to 2005. It was a few years
22    back. I don't remember exactly.
23 Q. I gotcha. Yeah. And I want to focus now on

Page 51

1     2005, if we can, and go back to the point I
2     was trying to get to earlier about your
3     complaint states that labor was being cut back
4     in 2005.
5        And was that -- what affect did that have
6     on your department in 2005?
7  A. I don't think I had laid anybody off at that
8     time.
9  Q. Were you always the person to lay someone off
10    in your department, or was somebody else able
11    to do that in addition to you?
12 A. It was worked through Human Resources. They
13    would fill out the paperwork. But Henry and I
14    would talk -- like, again, it would go by
15    seniority. It was not, you know --
16 Q. You weren't selecting who was going to be
17    picked?
18 A. No.
19 Q. It was just based on --
20 A. Seniority.
21 Q. -- seniority?
22 A. And, usually, that came from higher above.
23 Q. Y'all just knew that a certain number of

Page 52

1     people had to be laid off, and it went that
2     way?
3  A. Yes, sir. In years prior, they'd tell us we
4     had to get rid of the custodians. That would
5     be four or five people. And we'd do that, and
6     then they'd hire back on a few weeks later.
7  Q. In 2005 when Pemco began cutting back on
8     labor, did that affect both direct and
9     indirect employees?
10 A. I wasn't there after June. I don't know how
11    they -- what all came off.
12 Q. Well, I'm talking about before you left.
13 A. Okay.
14 Q. And during that time.
15 A. Well, they had started laying some people off.
16 Q. Not just the production direct folks, but also
17    indirect folks?
18 A. Yes, sir.
19 Q. And did you know those folks who were being
20    affected by the layoffs?
21 A. Some were control monitors like control
22    monitors that worked in the control centers,
23    shuffling out paperwork.

Page 53

1  Q. I --
2  A. Some was in supply. They already started
3     laying some off in there.
4  Q. Any other areas of indirect employees?
5  A. And some of the offices upstairs were cutting
6     back, in administration.
7  Q. Did you know any of the individuals who were
8     being laid off?
9  A. I'm sure but I don't -- I don't remember their
10    name right now.
11 Q. Do you have any complaints about how the other
12    indirect employees who were laid off were
13    selected for layoff?
14       MS. GLASGOW: At what period of
15       time?
16 Q. 2005.
17 A. No. I don't have -- you know, I wasn't
18    involved with them. You know, I don't --
19 Q. Do you know how many people were laid off in
20    2005?
21 A. No, sir.
22 Q. Do you know if there were people of different
23    ages and races and gender?

14  (Pages 50 to 53)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 54

1    A.  I'm sure they had to be.
2    Q.  Do you know if there were any indirect
3        employees who had taken medical leave or had
4        disabilities who were laid off in 2005?
5    A.  No, I don't.
6    Q.  If Pemco says that your job position was
7        eliminated in June or July of 2005 due to
8        economic conditions, do you have any
9        information or evidence that that statement is
10       not true?
11            MS. GLASGOW:  Let's repeat the
12            question again, please.
13   A.  Yeah, please.
14   Q.  Oh, sorry.  If Pemco says that your job was
15       eliminated due to economic conditions, do you
16       have any evidence to prove that that's not
17       true?
18   A.  You got a manager in there now doing my job.
19   Q.  Is that Clarke Briody?
20   A.  Yes, sir.
21   Q.  We'll talk about that, Mr. Briody, in just a
22       little bit.
23            Other than the fact that he's still at

Page 55

1        Pemco doing your job, according to you, what
2        other evidence do you have that -- well,
3        strike that.
4            Just so I'm clear, you're saying that
5        your job was not eliminated?
6    A.  I don't believe so.
7            MS. GLASGOW:  We've been going
8            awhile.  You want to take a
9            break, get up and walk around?
10           Is that okay?
11           MR. HOLMES:  Sure.
12           (Brief recess)
13   Q.  Mr. Wright, I want to shift gears now and talk
14       about where you have worked since June of
15       2005.
16   A.  Okay.
17   Q.  And talk about your employment history over
18       the last couple of years.
19   A.  Okay.
20   Q.  So if you'll start with where you first worked
21       after leaving Pemco.
22   A.  Golden Peanut, Headland, Alabama.
23   Q.  Did you apply for unemployment?

Page 56

1    A.  Yes, sir.  From them or Pemco?
2    Q.  I'm sorry.  From Pemco.  I'm going back on
3        you, and I apologize.
4    A.  Pemco, yeah.
5    Q.  And were you awarded unemployment benefits?
6    A.  Yes, sir.
7    Q.  And how long did you draw unemployment?
8    A.  I exhausted it.
9    Q.  And do you remember what the benefit amount
10       was?
11   A.  A hundred and 60-something dollars I think it
12       was.
13   Q.  Was that per week?
14   A.  Yes, sir.
15   Q.  For 26 weeks?
16   A.  Yes, sir.
17   Q.  And was it after you exhausted your
18       unemployment benefits that you went to work
19       for Golden Peanut?
20   A.  No, sir.  I had applied -- I think it was 12
21       or 13 different places, trying to find a job.
22   Q.  But the first place you worked was Golden
23       Peanut?

Page 57

1    A.  Yes, sir.
2    Q.  And it was after you exhausted your
3        unemployment benefits before you started
4        working for Golden Peanut?
5    A.  Yes, sir.
6    Q.  And I have your list here of the places you
7        applied.  And we'll talk about some of these.
8            What job did you take at Golden Peanut?
9    A.  Operator.
10   Q.  And what did you do as an operator?
11   A.  I was in the Peanut Shell Department which we
12       ran large rollers, which pressed the hull out
13       into a pen-sized -- fountain pen sized
14       capsule.
15           Also, taking this job, I was told or
16       offered a management job in Damascus, Georgia,
17       over that facility.  But they wanted me to
18       learn the process first, so I took the job as
19       operator to learn the process.  I worked there
20       a month.
21           In the meantime while I was there, they
22       brought a new guy, a young guy in and -- and
23       walked through the facility where I was

15  (Pages 54 to 57)

FREEDOM COURT REPORTING

Page 58

1  working in. And they said, this is the new
2  manager of Damascus, Georgia.
3  Q. He got your job?
4  A. Yes, sir. My operator job turned out to be
5  I -- I trained on operating the press, but I
6  operated the sheller more than I did the
7  press.
8  Q. Do you know the name of the new, young manager
9  that came in --
10  A. No, sir.
11  Q. -- and took your job?
12  A. Never -- never was introduced to him.
13  Q. Do you know how old he is?
14  A. No, sir.
15  Q. How do you know he was younger?
16  A. He looked about 35 or 40 years old.
17  Q. Did you have any kind of agreement in writing
18  with Golden Peanut that the Damascus, Georgia,
19  job was yours after you completed training and
20  learning the process?
21  A. No, sir.
22  Q. Have you filed an EEOC charge alleging age
23  discrimination against Golden Peanut?

Page 59

1  A. No, sir.
2  Q. Why not?
3  A. I just -- I --
4  Q. Let me ask you this. Did it occur to you to
5  file an EEOC charge?
6  A. No, it didn't.
7  Q. Did you discuss it at anytime with anybody?
8  A. No.
9  Q. And how long were you actually employed as an
10  operator at Golden Peanut?
11  A. A month. I left January the 31st, I think it
12  was, 06.
13  Q. And did you apply for unemployment again?
14  A. No, sir.
15  Q. Okay. And what did you do next?
16  A. Put in a call to Petrey Wholesale. I heard
17  they were hiring out of Montgomery.
18  Q. I think I have this information. I think
19  y'all provided it.
20  But can you roughly tell me how much you
21  got paid during the month you were an operator
22  at Golden Peanut?
23  A. $10 an hour.

Page 60

1  Q. Did you work overtime?
2  A. No, sir. I went in at six and got off at two.
3  Q. But it was a regular, full-time job?
4  A. Yes, sir.
5  Q. Did you have any benefits while you were
6  there?
7  A. No, sir.
8  Q. And did you quit?
9  A. Yes.
10  Q. You weren't fired or laid off?
11  A. No, I quit. The job was just so strenuous. I
12  couldn't continue to lift that big shovel with
13  the hulls in it. And it was continuously all
14  day long.
15  Q. When you say, "I couldn't continue to lift,"
16  was that due to physical limitation or just it
17  was hard work and --
18  A. It was --
19  Q. -- you chose not to do it?
20  A. It was hard work.
21  Q. You didn't have a work restriction or
22  something where a doctor was saying you
23  couldn't do it?

Page 61

1  A. No. No.
2  Q. So you heard Petrey Wholesale in Montgomery
3  was hiring?
4  A. Yes, sir.
5  Q. And when did you seek employment with Petrey?
6  A. I hired on with Petrey in March.
7  Q. Did you have any income between January 31st,
8  2006, and March 2006?
9  A. No, sir.
10  Q. Were you still drawing your retirement from
11  Pemco?
12  A. Yes, sir.
13  Q. Is your retirement benefit -- I think y'all
14  sent me that yesterday. Is that about $313?
15  A. 315.01 I think it is.
16  Q. And is that per month?
17  A. Yes, sir.
18  Q. And are you still drawing that today?
19  A. Yes, sir.
20  Q. And that began in August 1, 2005?
21  A. I think that's right. Yes, sir.
22  Q. What job did you take at Petrey?
23  A. Service tech.

16  (Pages 58 to 61)

FREEDOM COURT REPORTING

Page 62

1   Q.  And what did you do as a service tech?
2   A.  I service the cappuccino, coffee, tea,
3       Alligator Ice machines.  I do new setups in
4       Georgia, part of Georgia, part of Florida, and
5       Troy down this way, Alabama.
6   Q.  And have you worked for them continuously
7       since March 2006?
8   A.  Yes.
9   Q.  And do you still have the service tech
10      position?
11  A.  Yes, sir.
12  Q.  And is that an hourly position?
13  A.  Salary.
14  Q.  Salary?  Has it always been a salaried
15      position?
16  A.  Yes, sir.
17  Q.  And what is your salary?
18  A.  Six hundred per week.
19  Q.  What benefits do you have at Petrey?
20  A.  BlueCross BlueShield.  I mean, I pay the
21      premium.
22          THE WITNESS:  Is that what he is
23      talking about?

Page 63

1   Q.  Yes, sir.
2   A.  I have a week's vacation, and I have sick --
3       six sick leave days per year, four holidays.
4   Q.  And I assume you travel in your position?
5   A.  Yes.
6   Q.  Do you have a company vehicle that you drive?
7   A.  Yes, they furnish a company van.
8   Q.  And do you always use that to travel for work?
9   A.  Yes, sir.
10  Q.  Do you have in mind how much longer you want
11      to work there?
12  A.  As long as they'll keep me.
13  Q.  You're not planning to leave anytime?
14  A.  No, sir.  They've been good to me.
15  Q.  Do you expect any promotional opportunities at
16      Petrey?
17  A.  No, sir.
18  Q.  Your attorney provided me a list yesterday of
19      the jobs that you've applied for.
20          Are you familiar with this?
21  A.  Yes, sir.
22          MR. HOLMES:  I'm not going to mark
23      this as an exhibit.

Page 64

1   Q.  And you've testified today that you've applied
2       for jobs at a number of different places.
3   A.  Yes, sir.
4   Q.  Did any of these places go beyond -- did the
5       application process get beyond you submitting
6       an application?
7   A.  No, sir.
8   Q.  Did you have any interviews at any of the
9       places that you applied for?
10  A.  The --
11          MS. GLASGOW:  Do you need to look at
12      that, Roger?
13          MR. HOLMES:  We can mark that.  I'm
14      going to ask him about it.  Just
15      mark it.
16          (Defendant's Exhibit 1 was marked
17      for identification.)
18  A.  I had an interview with Jerry Tidwell
19      Construction.  He was out of Georgia,
20      construction of chicken house truss -- trusses
21      on top of the building.
22  Q.  And just for the record, I've marked this
23      piece of paper we've been discussing, the jobs

Page 65

1       applied for, as Defendant's Exhibit 1 to your
2       deposition.
3           And this is the document that you've
4       prepared that list all the jobs you've applied
5       for since working for Pemco in 2005?
6   A.  I had interview with Faulkner Construction.
7   Q.  But before we talk -- in that a yes?  I'm
8       sorry.  Is this document something you
9       prepared?
10  A.  Yes, sir.  Yes, sir.
11  Q.  And these are all the jobs you've applied for
12      since working at Pemco?
13  A.  Yes, sir.
14  Q.  And we can move now to the places where you
15      had the interviews.
16  A.  Okay.  Faulkner Construction, Shelley Office
17      Supply.
18  Q.  Let's talk about Faulkner.  What position were
19      you applying for?
20  A.  Supervisor.
21  Q.  And was that a vacant position that they were
22      seeking to fill?
23  A.  They were going -- as soon as things picked

17 (Pages 62 to 65)

FREEDOM COURT REPORTING

Page 66

1    up, they were -- I talked with Mr. Faulkner.
2    He said, as soon as things picked up, he would
3    give me a call.
4  Q.  And did that ever happen?
5  A.  No, sir. I went back to him again. That
6    position had been filled. And I could hire on
7    as a carpenter.
8  Q.  Do you know who filled the supervisor
9    position?
10  A.  No, sir, I don't.
11  Q.  Do you believe that you were discriminated
12    against in that decision, to fill the
13    supervisor position with someone else?
14  A.  I don't know. I never met the guy. I don't
15    know how old he is or what he is.
16  Q.  All right. Where else did you interview?
17  A.  Jerry Tidwell Construction. I met him in
18    Eufaula, Alabama. They were going to set up a
19    new plant there, which I don't know whether
20    that's ever come about either or not.
21  Q.  No followup since your interview?
22  A.  No. He was to let me know.
23  Q.  And when did you talk with Mr. Faulkner?

Page 67

1  A.  I don't know the date. I don't remember the
2    date.
3  Q.  You think it was in 2005?
4  A.  Oh, yes, sir. It was, yes, sir.
5  Q.  Are all of these from 2005?
6  A.  Yes, sir.
7  Q.  And I think you also mentioned Shelley Office
8    Supply?
9  A.  Yes, sir. I talked with Mr. Shelley over the
10    phone. He said all he had was a warehouse
11    attendant opening.
12  Q.  An hourly position?
13  A.  Yes, sir.
14  Q.  Stocking in the warehouse?
15  A.  Lifting the heavy desks, stacking those. They
16    had no equipment to lift them, you know. And
17    it paid, I think, $5 and something an hour.
18  Q.  Any other places on here that you would've
19    applied for and gotten an interview, other
20    than what you've already talked about?
21  A.  I interviewed at TRW -- TRA. I'm sorry.
22  Q.  In what position?
23  A.  And Sanders Transportation.

Page 68

1    Maintenance person. He had one person to
2    take care of the two facilities. He had one
3    at Midland City at the -- not Twitchell, but
4    the Michelin plant. And, also, he had one on
5    231 North up there, which I think it's closed
6    down now.
7  Q.  And did you interview for those positions?
8  A.  Yes.
9  Q.  And I take it you weren't selected?
10  A.  He kept the same guy he had. He was -- he was
11    going quit or whatever, or he was going to let
12    him go after he -- he was buying out his
13    uncle, merging together. He was going to let
14    the other guy go, and it never did develop.
15    He kept him.
16  Q.  Do you have any reason to believe that you
17    were discriminated against in that decision?
18  A.  No, sir.
19  Q.  Do you have any kind of retirement benefits
20    with Petrey?
21  A.  No, sir.
22    MS. GLASGOW: Not currently, right?
23    THE WITNESS: Not currently, no.

Page 69

1  Q.  Do they have a retirement plan that you're not
2    eligible for yet?
3  A.  They've got a 401K is all. I think it's
4    coming up sometime in September or something.
5    They're supposed to have a meeting on that.
6  Q.  Mr. Wright, you provide in your complaint in
7    this lawsuit that at some point in 2005, after
8    or during the time Pemco began to cut back on
9    its labor, your immediate supervisor, Henry
10    Ward, was leaving at some point. That's
11    not what -- I can read this.
12    It says that, "Wright's immediate
13    supervisor was the director of facilities,
14    Henry Ward. Wright was informed that the
15    initial plan was to do away with the
16    director's position and keep the manager of
17    facilities position."
18    Was that accurate?
19  A.  Yes, sir.
20  Q.  Who informed you of the initial plan?
21  A.  Mr. Ward.
22  Q.  And tell me about the -- what I'll call the
23    "Henry Ward situation."

18  (Pages 66 to 69)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 70

1   A.  Okay.  I had went to Columbus for my
2       myelogram.  This was May 31st I think it was,
3       something like that.  And then when I got
4       back, Henry told me that they had had a
5       meeting in my absence and that they had agreed
6       to keep me as manager.  They wanted to cut him
7       back to manager and me back to supervisor.
8       Instead, he said he would go ahead and retire
9       to keep my position like it was.
10          And that's -- that's from -- from him.
11      And that's -- that's -- I wasn't in any
12      meetings or anything -- anything to do with
13      that, you know.  So I don't know any more.
14  Q.  And when you said you went Columbus for your
15      myelogram, that's related to your back?
16  A.  Yes, sir.
17  Q.  And I want to talk about your back condition.
18      Did that become an issue for you at some point
19      in 2005, or had it been a problem prior to
20      that?
21  A.  Not at work it hadn't been a problem, but it
22      had been a problem to me personally.
23  Q.  All right.  Before we go to the back, I want

Page 71

1       to come back to the conversation that you had
2       with Henry.
3           Did he tell you anything more about the
4       meeting that was held when you were gone?
5   A.  No.  He just told me that, you know, they had
6       a meeting, him and Mr. Bennett.  And I think
7       Mr. Johnson was there.  I'm not sure.  But
8       said they wanted to cut me back to supervisor
9       and him back to manager.  And him, at his age,
10      he was going to go ahead and retire.  He had
11      been there 45 years.
12  Q.  Did Henry tell you if they provided any
13      explanation as to why they wanted to roll
14      y'all back?
15  A.  It was due to the layoffs, I guess.
16  Q.  It was your understanding that the decision to
17      roll y'all back was related to the amount of
18      work at Pemco --
19  A.  Yes, sir.
20  Q.  -- at that time?
21  A.  Yes, sir.
22  Q.  And had Mr. Ward been considering retiring
23      prior to this time, to your knowledge?

Page 72

1   A.  I think he said, in a year or so.
2   Q.  Does that mean he was thinking about 2006?
3   A.  Yes, sir.
4   Q.  And it just happened a little earlier with
5       this change?
6   A.  Yes, sir.  He did that for my benefit.
7   Q.  And was it your understanding from him that
8       Ray and Dennis were agreeable to keeping you
9       in the manager position if he would retire?
10  A.  Yes, sir.
11  Q.  Did you ever have any discussions with Dennis
12      or Ray or anyone else about that?
13  A.  No, sir.
14  Q.  At anytime?
15  A.  No, sir.
16  Q.  Do you have any reason to believe that
17      Mr. Ward was discriminated against?
18          THE WITNESS:  I don't know how to
19      answer that.
20          MS. GLASGOW:  Just tell him.
21  A.  I don't really know how to answer that.  I
22      mean, he -- he did that for my benefit, to
23      save my job, or to keep from having to cut me

Page 73

1       back, rather.  And he was just tired.
2   Q.  Let me ask it this way.  Do you think that
3       there was anything discriminatory about the
4       way that his retirement was handled?
5   A.  I don't know.
6   Q.  You don't have any evidence --
7   A.  No.
8   Q.  -- of discrimination?
9   A.  No.
10  Q.  Let's talk about your back.  And, if you
11      would, tell me about when -- just about your
12      condition and when that began and the course
13      of treatment.
14  A.  Okay.  It began really in 2004.  My mother was
15      in the hospital.  She got out.  I brought her
16      to my house to take care of her.  And I was
17      pulling her up -- and she doesn't know this.
18      I don't want her to know this.  I was pulling
19      her up the stairs in a wheelchair, and it
20      snapped on me -- snapped on me.  And then I
21      couldn't get out of bed the next morning.
22      From there it progressed.
23          I kept on hurting down my left leg,

19 (Pages 70 to 73)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 74

1  dragging it around for the next year, doing my
2  job. And I went to various doctors here in
3  Dothan. I had two epidurals, one foramal
4  (sic).
5      And I went to Dr. Sherrer. He give me
6  several injections to deaden the pain, you
7  know, for a while. But it didn't -- it
8  didn't -- it didn't last. And the epidural
9  didn't last.
10     After I had gone to these physicians here
11  in Dothan, I wanted a second opinion. I had
12  to -- you know, I had to have some relief
13  somewhere. So I called Dr. Bernard and made
14  appointment in Columbus.
15     He put me through several tests of nerve
16  reflex which is pins sticking all over you and
17  set me up to scans. And then wound up, I
18  think it was, May the 31st when I took my
19  myelogram. He got results from that. Told me
20  I would have to have surgery sooner rather
21  than later or I'd have permanent damage.
22  Q. Can you tell what the diagnosis was, why you
23  were going to have to have surgery?

Page 75

1  A. I had the lower, I think, two, three, four,
2  something like that. My lower back was
3  flattened out. He removed one disk, fused
4  three of them together with part of my hip
5  bone, my left hip bone.
6      And I stayed out of work the next day.
7  He -- he suggested I should stay out -- out of
8  work the next day. So I went back the rest of
9  June -- let's see -- June the 2nd I think it
10  was.
11     And I got a call from Hughston Hospital.
12  Told me that I would -- my surgery was set up
13  for June the 8th.
14     And I went back the next day and
15  informed -- well, that day I called -- I
16  informed management that I was going to have
17  surgery. I talked to HR and told Henry, you
18  know, that I was going to have surgery.
19  Q. Who all did you talk to?
20  A. I talked to HR and talked to Ms. Gerri Paulk.
21  I talked to Kim there. I talked to -- I think
22  I saw Jim Batcher also.
23  Q. Did any of the people you told about having to

Page 76

1  have surgery give you any problems about that?
2  A. No.
3  Q. Did you talk to Dennis Johnson before you had
4  your surgery?
5  A. Yes, sir.
6  Q. And did --
7  A. I went back the next day, Friday, the 3rd, or
8  whatever it was. Mr. Johnson and I rode
9  around in his truck, looking at various things
10  to clean up. And I discussed with him the
11  surgery, that it would be four weeks, and I
12  was going to take my sick live.
13     And I had suggested that Richard Miller
14  come from second shift to first to take my
15  place, which was okay, until later that day.
16  He called me back and told me that Clarke
17  Briody was going to stand in for me, and I was
18  to tie in with him. This was on a Friday.
19     So the next Monday, the 6th ad 7th, I
20  tied in with Clarke. I left a written work
21  scope of what I had going on and what needed
22  to be done. Then my surgery was the 8th.
23     Oh, on the way out that afternoon, Clarke

Page 77

1  told me that when I returned, things would be
2  180 degrees out, which I didn't know what he
3  was talking about.
4  Q. Things would be 180 degrees out?
5  A. Yes, sir.
6  Q. And you didn't know what that meant, than
7  didn't mean anything to you?
8  A. No.
9  Q. Does that mean anything to you now?
10  A. Oh, yeah.
11  Q. What does it mean to you now?
12  A. It means, I don't have a job there; he's got
13  my position.
14  Q. And you think Clarke knew that the day you
15  left for surgery?
16  A. I'm pretty sure he did.
17  Q. I think you said when you were riding with
18  Dennis Johnson, looking at different issues
19  and you mentioned your surgery, you said that
20  you would take sick leave?
21  A. Yes, sir. I had four weeks sick leave built
22  up.
23  Q. And is that paid sick leave?

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

| | Page 78 |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  Did you discuss that with Gerri Paulk? |
| 3 | A.  Yes, sir. |
| 4 | Q.  And is that different from disability leave? |
| 5 | A.  I had paid disability insurance since 1989 |
| 6 | when I first hired on. |
| 7 | Q.  But is that what you're referring to, the four |
| 8 | weeks of disability leave, or is that |
| 9 | something different? |
| 10 | A.  It's something different. |
| 11 | Q.  Okay.  So the paid sick leave was just days |
| 12 | that you had that you had accrued over time? |
| 13 | A.  The years -- the years I had worked there and |
| 14 | built there, it carried over and over.  That's |
| 15 | how many days I had -- you know, I had built |
| 16 | up, was four weeks. |
| 17 | Q.  And when you told Dennis Johnson that you |
| 18 | would take your sick leave, at that time, you |
| 19 | had contemplated using your four weeks of paid |
| 20 | sick leave? |
| 21 | A.  Yes, sir. |
| 22 | Q.  Any other leave? |
| 23 | A.  I had two weeks of vacation left. |

| | Page 79 |
|---|---|
| 1 | Q.  Did you ever discuss FMLA leave with Dennis |
| 2 | Johnson? |
| 3 | A.  No, sir. |
| 4 | Q.  What about any of the folks in HR? |
| 5 | A.  No, sir. |
| 6 | Q.  What did you talk to Gerri Paulk about, just |
| 7 | that you were going to be out? |
| 8 | A.  Yes, sir. |
| 9 | Q.  Anything else discussed when you met with her? |
| 10 | A.  No, sir, nothing -- nothing else was offered |
| 11 | or whatever. |
| 12 | Q.  And what about Henry?  When you told Henry you |
| 13 | were going to have surgery, was he retired at |
| 14 | that point or was he -- |
| 15 | A.  He was going -- he was -- was still there.  He |
| 16 | was going to stay as far as I knew. |
| 17 | Q.  Did his retirement issue happen before you |
| 18 | went to have your surgery? |
| 19 | A.  Yes, sir.  I went up there the 31st.  When I |
| 20 | came back, I took the next day off, which was |
| 21 | the 1st of June.  I came back the 2nd.  That's |
| 22 | when he told me, it had gone since I was up |
| 23 | there. |

| | Page 80 |
|---|---|
| 1 | Q.  Gotcha.  On the day you were off work when you |
| 2 | were at the doctor? |
| 3 | A.  Yes, sir. |
| 4 | Q.  In talking with Dr. Bernard, did you know how |
| 5 | long you were going to be out following the |
| 6 | surgery? |
| 7 | A.  He said at least four weeks, and that's what I |
| 8 | had planned on. |
| 9 | Q.  And was he going to be doing the procedure? |
| 10 | A.  Yes, sir. |
| 11 | Q.  And what kind of doctor is he?  Do you know |
| 12 | what his specialty is? |
| 13 | A.  Back. |
| 14 | MS. GLASGOW: Orthopedic? |
| 15 | THE WITNESS: Orthopedic?  Okay. |
| 16 | MS. GLASGOW: I don't know. |
| 17 | A.  They have several.  Some do the shoulders. |
| 18 | Some do knees.  Some do back.  He does the |
| 19 | spine, though.  He does the neck and the lower |
| 20 | back. |
| 21 | Q.  At this point when you're leaving the next day |
| 22 | to have your surgery, do you have any |
| 23 | complaints at all about how Pemco has handled |

| | Page 81 |
|---|---|
| 1 | your situation? |
| 2 | A.  No. |
| 3 | Q.  Tell me a little bit more about the training |
| 4 | or the interaction you had with Clarke Briody |
| 5 | on June 6 and 7. |
| 6 | A.  Okay.  I tried to explain to him what was |
| 7 | going on in our department.  He was -- you |
| 8 | know, he was unaware.  He had worked over in |
| 9 | hanger two, helping to -- or supervising the |
| 10 | tool marking of employees' tools, which was |
| 11 | FAA reg to -- to their last four numbers of |
| 12 | their social security number or whatever. |
| 13 | Q.  He'd been a tool crib supervisor? |
| 14 | A.  No. |
| 15 | Q.  Or is this a different -- |
| 16 | A.  It was just different.  He was just working |
| 17 | there in hanger two, getting all the |
| 18 | production workers in there, supervising them |
| 19 | to make sure they mark their tools.  Also, he |
| 20 | was taking up any excess tools they had, which |
| 21 | he would come get me and ask me.  And we would |
| 22 | take them back to the tool crib. |
| 23 | Q.  You had interacted with him before? |

21 (Pages 78 to 81)

FREEDOM COURT REPORTING

Page 82

1  A.  This was a couple of months before or
2      whatever.
3  Q.  All right.
4  A.  And I told him -- I told him what I could in
5      two days time.  I mean, you know, I worked
6      there till four o'clock that Tuesday afternoon
7      before I went to Columbus the next morning.  I
8      had wrote a tie-in of what we had going on.
9      We had stand modifications, whatever, you
10     know, and we had the monthly printouts for the
11     update of the equipment.
12         And my administrative assistant was
13     supposed to got all of that for him.  And I
14     had asked my people -- several of my guys to
15     do what they could to help him out, take care
16     of the facility until I returned.
17 Q.  Did you get along with Clarke in the time that
18     you'd spent with him the months before and on
19     those two days?
20 A.  Yes, I -- I got along.
21 Q.  You didn't have any problems with him?
22 A.  No.  He just didn't know what was going on,
23     the main thing.

Page 83

1  Q.  Your complaint says that he's younger.  Do you
2      know how old he is?
3  A.  No, sir.
4  Q.  Can you guess how old he is?
5  A.  I'd say late 40s.
6  Q.  And you indicated you'd had some interaction
7      with him in the couple months before.  At that
8      time, did you know anything about his work
9      experience?
10        MS. GLASGOW:  At what time, John?
11 Q.  I'm sorry.  On the days of June 6 and 7 when
12     you were telling him about what your job was,
13     what did you know about his work experience?
14 A.  From listening to him, he hadn't been in
15     facilities.  He didn't know what really, you
16     know, what was what, which you can't -- you
17     can't learn it in two days.  It's too much to
18     do.  It's not an eight-hour job, not eight
19     hours a day.
20 Q.  Do you know what kind of work experience he
21     had other than facilities work?
22 A.  Aircraft.
23 Q.  Do you know how long he had been at Pemco?

Page 84

1  A.  Now or then?
2  Q.  Then.
3  A.  Probably a year or so.  Right after Dennis
4      came there, Mr. Johnson came there.
5  Q.  Other than the interaction that you've already
6      talked about, had you worked with Clarke at
7      all?
8  A.  I don't remember.  I worked with -- during
9      different time, years, layoffs, whatever, I
10     had almost every supervisor out there working
11     for me at one time or another.  And I don't
12     know whether the past year I had -- I think he
13     would spend me somebody to work when they got
14     slack, you know, during the day or whatever,
15     send them over to work.  But -- and -- and I
16     don't think so.  No.
17 Q.  Did you have an opinion about whether or not
18     he was a good worker?
19 A.  I had no idea.
20 Q.  And your impression after talking with him for
21     those next two days was that he didn't have
22     any experience in facilities work?
23 A.  Yes, sir.  He wanted me to hurry and get back,

Page 85

1      is what he said.
2  Q.  When did he tell you he wanted you to hurry up
3      and get back?
4  A.  Before I left.
5  Q.  Was that before or after he told you about 180
6      degrees out?
7  A.  Before.
8  Q.  Do you remember anything else he told you?
9  A.  That he really didn't want to be over there,
10     that he'd rather be in aircraft.
11 Q.  Did you understand from him that he wasn't
12     going to have any aircraft responsibility
13     while he was in facilities?
14 A.  Well, he didn't say that much.  He -- he had
15     to go to a meeting every afternoon, you know,
16     as far as being up to date on the aircraft.
17 Q.  Did you know whether or not he would be
18     pulling double duty?
19 A.  No.
20 Q.  Did you have any conversations with Richard
21     Miller before you left for your surgery?
22 A.  Just to say goodbye.
23 Q.  Did you tell him that you had recommended him

22  (Pages 82 to 85)

FREEDOM COURT REPORTING

Page 86

1    to cover for you while you were out?
2    A.  I don't believe I did.
3    Q.  Did you have any concern that Clarke Briody
4        was going to be covering for you while you
5        were out and not Richard?
6    A.  Well, I was worried about the department.  I
7        wanted everything to run smooth while I was
8        gone, you know.
9    Q.  Did you tell anybody about your worry about
10       the department?
11   A.  I had spoke to a couple of my men or three or
12       four of them and asked them to help take care
13       of it, make sure everything run smooth as it
14       could.
15   Q.  Did you tell them that Clarke was going to be
16       handling it and he didn't know what he was
17       doing?
18   A.  No, sir.
19   Q.  Did you have any further discussion with
20       Dennis Johnson about his selection of Clarke
21       Briody over Richard Miller?
22   A.  No, sir.  At that time, he was superior to me.
23   Q.  Do you now know more about Clarke Briody's

Page 87

1    work experience than you did at that time?
2    A.  In facilities?
3    Q.  Yes.
4    A.  Just from what I've heard.
5    Q.  And what have you heard?
6    A.  He's still lost.  He has to run to Dennis
7        Johnson to ask him everything to do.
8    Q.  What else have you heard?
9    A.  That's all.
10   Q.  And who -- I'm sorry.  Go ahead.
11   A.  That's all.
12   Q.  Who did you hear that from?
13   A.  I've heard it from some people in QA, quality
14       control.  And I haven't talked to any of my
15       people except for maybe one or -- once or
16       twice since then.  And I heard it from some of
17       those that I had talked to.
18   Q.  Are these the hourly facilities guys?
19   A.  Yes, sir.
20   Q.  And who are those individuals that you've
21       talked to, the hourly facilities folks?
22   A.  Mickey Burkett, Dewayne Riley.  I'm trying to
23       think of that guy in QA that told me.

Page 88

1    Q.  Do you remember his position?
2    A.  Inspector, aircraft inspection.  I don't
3        remember his name.  He had went to Iraq and
4        came back.
5    Q.  And did both Mickey and Dewayne tell you that
6        Clarke Briody is still lost, or was that from
7        the inspector?
8    A.  All -- all three of them.  And like I said,
9        this is right after I got out of my surgery
10       and maybe a couple or three weeks or month
11       later.  And I haven't talked to them since
12       then.
13   Q.  All right.  I wasn't clear on that.
14   A.  Time frame is year and a half ago.  Like I
15       say, I haven't talked to them.
16   Q.  So this is all in 2005 --
17   A.  Yes, sir.
18   Q.  -- when you had the discussions with Mickey
19       Burkett, Dewayne Riley, and the inspector in
20       quality control?
21   A.  Yes, sir.
22   Q.  Do you know anything about Clarke Briody's
23       work performance at Pemco since August 2005?

Page 89

1    A.  No, sir.
2    Q.  Did you keep a diary or a notebook while you
3        were employed at Pemco?
4    A.  I had it on my daily calendar on my desk, but
5        I don't have it now.
6    Q.  What kind of things did you keep in your diary
7        or your daily calendar?
8    A.  I wrote down what we were doing that day, and
9        I'd jump forward to what was going on -- to go
10       on the next day.
11   Q.  So primarily work assignments?
12   A.  Yes.
13   Q.  Did you ever have any personal notes or
14       anything on there?
15   A.  No.
16   Q.  Did you have any complications with your back
17       surgery?
18   A.  No, sir.
19   Q.  And you described for me the procedure that
20       you had with the removal of a disk, fusing
21       three together, and using part of your hip
22       bone.  Was that the extent of it?
23   A.  Yes, sir.

23  (Pages 86 to 89)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 90

1  Q.  And tell me about the recovery process.
2  A.  Okay.  Four weeks, I was do exercise, walk so
3      much every day.  And that was about the extent
4      of what I was to do -- I could do.
5  Q.  Did you have any physical therapy sessions?
6  A.  No, sir.  Nothing but exercise he gave me,
7      sheets of exercises to do.
8  Q.  And did you do those?
9  A.  Yes, I did.
10 Q.  And were you getting your paycheck from Pemco
11     while you were out?
12 A.  For sick leave, yes.
13 Q.  During that time period that you were out, did
14     you have any interaction, either in person
15     and/or the telephone or in writing, with any
16     Pemco employees?
17 A.  I think Burkett came by to see me one time in
18     the four weeks time, you know.  Other than
19     that, that's -- no.
20 Q.  Did you talk to anybody about how you were
21     doing, when you were coming back, how you were
22     progressing, anything like that?
23 A.  I think I may have talked to Ms. Paulk about

Page 91

1      when I was supposed to go back for my four
2      week checkup.  And I would know, you know,
3      fully then what, you know, about
4      return -- return time.
5          I think in -- also, that time I was off,
6      I had called Connie Goodson who was the
7      administrative assistant in our office.  And
8      she asked how I was doing, and I asked how the
9      facilities were coming along.
10 Q.  And what did Connie report?
11 A.  That she was doing all she could, you know,
12     help what she could to take care of things.
13 Q.  Did you have any interaction with Clarke
14     Briody?
15 A.  I'm not sure whether I spoke to him or not.
16 Q.  What about Dennis Johnson?
17 A.  I'm not sure I spoke with him in that time
18     frame either.
19 Q.  But as far as you knew, everybody knew you
20     were out for at least four weeks?
21 A.  Yes, sir.
22 Q.  And that after that four-week period, you'd
23     see the doctor and then see where you were?

Page 92

1  A.  Be returning, yes, hopefully.
2  Q.  Your complaint says that you went to your
3      four-week doctor's appointment on July 6th,
4      2005; is that right?
5  A.  It sounds -- sounds like the date, yes.  Yes,
6      sir, it was the 6th.
7  Q.  And the complaint goes on to say that you
8      requested that you be allowed to go back to
9      work two weeks early.
10         Tell me --
11 A.  He --
12 Q.  -- about that.
13 A.  -- did an x-ray that day and said the surgery
14     looked successful and I was healing real
15     well.  And I asked him when could I go back to
16     work.
17         And he said, when do you want to go back?
18         I said, Monday, which would've been the
19     11th.
20         He really didn't like the idea, but we
21     discussed what I had to do or -- there was no
22     lifting involved, you know, no manual labor or
23     whatever.  And he was -- he was really

Page 93

1      concerned about that.  So he reluctantly
2      okayed me to go back.
3          So I came back that afternoon.  I called
4      Mr. Johnson.
5  Q.  Let me stop you there before -- we're going to
6      get to that.
7          Why did you want to go back on July 11?
8  A.  That was the following Monday; it had been
9      four weeks, you know.  He was going to put me
10     on limited duty of six hours per day for two
11     weeks with limited stair climbing.  I wanted
12     to return to my job.  I -- laying around the
13     house wasn't for me.
14 Q.  Were you worried about losing your job?
15 A.  No.  I just wanted to return.
16 Q.  Four weeks at home was enough?
17 A.  Yes.
18 Q.  Did you have any work restrictions from the
19     doctor other than the amount of hours that you
20     could work?
21 A.  Just limited to stair climbing.  I explained
22     to them about the stairs at the administration
23     building, that maybe I'd have to go up them

24  (Pages 90 to 93)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 94

1   once or twice a day. And there were, I think
2   at that time, 28 steps up.
3 Q. And no elevator?
4 A. No elevator.
5 Q. The complaint says that you phoned Johnson on
6   that day, July 6th, 2005, and informed him
7   that you would be back to work on July 11 with
8   restricted status.
9     Do you remember that?
10 A. July the 6th, you're talking about?
11 Q. Yes, sir.
12 A. Yes, sir. The day I got back from Columbus,
13   back from my four-week checkup, I called him
14   and told him I could go back to work the 11th.
15 Q. And what did you tell you?
16 A. He told me I would probably have to have a
17   drug screen or test.
18     I said, fine. I haven't taken anything
19   for pain for two weeks, which I had a
20   prescription for Darvocet.
21     So he said I would need to contact Human
22   Resources about what I would have to do, if
23   I'd have to have a test or not. And like I

Page 95

1   said, this was after -- around four o'clock or
2   something that afternoon.
3     The next morning, I called -- no. I went
4   to HR. I talked to Ms. Gerri Paul. She said
5   a drug test wasn't required, found out I
6   didn't have to have one, you know, whatever.
7   I showed them my prescription. And so --
8 Q. So that wasn't unusual, that Mr. Johnson told
9   you that you might have to have a drug screen?
10 A. No, I don't think so.
11 Q. Had you had any pain in your back in those two
12   weeks where you had stopped taking pain
13   killers?
14 A. I had -- how did he call it -- spasms which
15   was -- they just jump on you and start, you
16   know, all of a sudden and they quit, you
17   know. And like I said, I wasn't doing
18   anything but walking, laying around, sat
19   around, whatever. And that's all I was
20   doing. So I would stay off of those as much
21   as I could. I didn't -- I didn't like having
22   to take medicine, so I wouldn't take it.
23 Q. When you told Mr. Johnson that you were going

Page 96

1   to be able to come back on the 11th but that
2   you had restricted status, did he say anything
3   to you negatively about the limited number of
4   work hours?
5 A. No. I -- I had -- excuse me just a minute.
6   We discussed that after I had -- go the next
7   morning to HR, which I did. Then he came down
8   in about 10 or 15 minutes and asked Ms. Paulk,
9   can we have somewhere we could talk. So we
10   went in the conference room.
11 Q. Can I stop you here just for a second?
12 A. Okay.
13 Q. And go back to the phone call that you had the
14   day before?
15 A. Okay.
16 Q. Did he say anything to you at that time, on
17   the phone call, when he was telling you, you
18   may have to have a drug screen, that there was
19   any problem with you coming back on restricted
20   status?
21 A. No.
22 Q. We can go back to the morning of the 7th.
23 A. Okay. I went to HR, talked with Ms. Paulk.

Page 97

1   No drug test was required.
2 Q. Did y'all talk about anything else?
3 A. No.
4 Q. Did she get on the phone and let somebody know
5   that you were there?
6 A. She called Mr. Johnson, and he was to come
7   down in 10 or 15 minutes, 15 or 20 or
8   whatever, and talk to me. So, later, he came
9   down, asked her for -- if there was somewhere
10   he and I could have a conversation. And she
11   said, the conference room.
12     So at that time, we went into the
13   conference room, which was halfway down the
14   hallway between her office and the accounting
15   office.
16 Q. The training room?
17 A. It was a training room, conference room. They
18   were all made together, you know.
19 Q. Okay. All right. What happened next?
20 A. He told me there had been some realignment
21   since -- in our department since I had been
22   gone, and that Pemco's payroll didn't have
23   enough for two managers in facility, that

25 (Pages 94 to 97)

FREEDOM COURT REPORTING

| Page 98 |
|---|
| 1   Clarke Briody was going to assume the -- the |
| 2   manager position. |
| 3        I told him, he had a manager, myself. |
| 4        And he said, I knew it was going to be |
| 5   tough to swallow. |
| 6        But then he made me an offer of a |
| 7   facilities special tooling supervisor at $3.77 |
| 8   an hour cut rate.  So I told him to let me |
| 9   think about it and I would call him back that |
| 10  day. |
| 11       So I went by the bank where my wife |
| 12  worked, and we talked things over.  And I |
| 13  called him back around four o'clock that |
| 14  afternoon.  Told him I would accept the |
| 15  position he had offered, but I would like to |
| 16  take my other two weeks vacation, to come back |
| 17  full eight hours, full capacity. |
| 18       He said, fine, fine, everything is okay. |
| 19       So I signed a vacation slip there |
| 20  before -- at Human Resources before I left.  I |
| 21  don't know whether he signed it or who signed |
| 22  the slip for me.  But I signed in -- for my |
| 23  other two weeks vacation. |

| Page 99 |
|---|
| 1   Q.  So you went back to HR after calling him on |
| 2       the phone at four o'clock? |
| 3   A.  No. |
| 4   Q.  Or did you call him from HR? |
| 5   A.  That was the day we was -- we was in HR at |
| 6       that time when he told me this.  It wasn't on |
| 7       the phone. |
| 8   Q.  I'm sorry.  I thought that -- I guess you left |
| 9       me.  I got lost when you were at the bank with |
| 10      your wife and that you had decided that you |
| 11      were going to take the job. |
| 12          How did you communicate that you were |
| 13      going to take the job? |
| 14  A.  Oh, that -- that afternoon, I called him back |
| 15      on the phone. |
| 16  Q.  Right. |
| 17  A.  And told him I would accept -- accept the |
| 18      job. |
| 19  Q.  Okay.  And then at some point, you went to HR |
| 20      to fill out a vacation form? |
| 21  A.  Yes.  I think it was the next day I stopped by |
| 22      there or something. |
| 23  Q.  All right.  Let me go back and ask you a |

| Page 100 |
|---|
| 1   couple questions about your conversation. |
| 2        Did Dennis go into any more detail about |
| 3   the payroll limitations and why there was not |
| 4   enough payroll for two managers? |
| 5   A.  No.  He just told me it was realignment, there |
| 6       weren't no payroll, and Clarke was going to |
| 7       stay in the position he was -- he was in. |
| 8   Q.  Did you say anything to him about Clarke not |
| 9       being qualified or you being more qualified -- |
| 10  A.  No, I didn't. |
| 11  Q.  -- or anything like that? |
| 12          And you understood that the facilities |
| 13      supervisor position was going to be a |
| 14      demotion? |
| 15  A.  I understood that? |
| 16  Q.  Yes. |
| 17  A.  Yes. |
| 18  Q.  And did you discuss any other personnel in the |
| 19      facilities department? |
| 20  A.  No. |
| 21  Q.  Do you have any reason to doubt that the |
| 22      department was being realigned or had been |
| 23      realigned? |

| Page 101 |
|---|
| 1   A.  No. |
| 2   Q.  Did you know that, at that point, Pemco was |
| 3       laying off indirect employees? |
| 4   A.  Yes. |
| 5   Q.  And just to be clear, the facilities |
| 6       department is indirect work? |
| 7   A.  Yes. |
| 8   Q.  Apart from the Malaysian contract you |
| 9       described earlier; is that right? |
| 10  A.  Yes, sir. |
| 11  Q.  Did you think that, at that point, you were |
| 12      being discriminated against? |
| 13  A.  After this conversation with Mr. Johnson? |
| 14  Q.  Yes. |
| 15  A.  Yes. |
| 16  Q.  And what's the basis for that opinion? |
| 17  A.  For me to try to train a younger person in two |
| 18      days to how to take over my position. |
| 19  Q.  Your primary concern was that Clarke Briody |
| 20      was younger than you? |
| 21  A.  Yes. |
| 22  Q.  Any other reason you felt like you were being |
| 23      discriminated against, other than age, at that |

26 (Pages 98 to 101)

FREEDOM COURT REPORTING

Page 102

1    time?
2    A.  Well, it -- like I said, you can't learn it in
3        two days.  I just, you know, --
4    Q.  Well, do you think the fact that you had back
5        surgery had anything to do with it?
6    A.  I think it was a consideration.  Then put me
7        on limited duty, say, well, you know, for --
8        even for two weeks, then what's going to
9        happen after two weeks or a month?
10   Q.  When you and your wife discussed the job offer
11       of the facilities supervisor position, did you
12       consider not taking it?
13   A.  No.
14   Q.  Were you having to convince her that you were
15       going to take it?
16   A.  No, I just wanted to discuss it.  We discuss
17       everything we do with each other.
18   Q.  You mentioned that when you told Dennis that
19       you would accept the position, that you wanted
20       to take two weeks of vacation?
21   A.  Yes, sir.
22   Q.  Why did you want to do that?
23   A.  I didn't feel comfortable with going back six

Page 103

1        hours a day.  I didn't feel like it was right
2        for the company.  I couldn't serve in my full
3        capacity.  So I thought, I'd take the two
4        weeks to, you know, to get back to full
5        capacity and satisfy my doctor also, which he
6        wanted six or eight weeks.  And I just
7        didn't -- didn't feel right, you know, going
8        back that way.
9    Q.  You felt bad about coming back in a part-time
10       status as opposed to being able to work a full
11       eight hours?
12   A.  Yes, sir.
13   Q.  Would you have taken vacation if you were
14       coming back as the manager of facilities?
15   A.  At some point.
16       Or right then?  What is the question?
17   Q.  I'm asking about right then.  I'm not asking
18       about use it or lose it at the end of the
19       year.  And here's what I'm getting at.
20       Prior to July 7, you're planning on
21       coming back to work on July 11th, back on
22       restricted duty?
23   A.  Yeah.

Page 104

1    Q.  And you think you're coming back into your
2        manager position and you're going to work that
3        restricted duty?
4    A.  Uh-huh (positive response).
5    Q.  But something changed, and then you decided
6        that you wanted to take two weeks of vacation?
7    A.  I thought if I stayed -- if I came back -- if
8        I came back as manager of facilities, it
9        would've been easier on me than, I figured,
10       tooling supervisor which is standing on a tool
11       crib, which it had one desk and one chair or
12       whatever, you know.  The environment would
13       have been a lot better on me, you know, being
14       able to sit down and all when I wanted to
15       instead of having to be out running around all
16       the time, you know.
17   Q.  Did you discuss the differences that you
18       perceived between the two jobs with Dennis
19       Johnson?
20   A.  No.
21   Q.  Did you talk to your doctor about it?
22   A.  Yes, sir.
23   Q.  Did you talk to Gerri Paulk about it or

Page 105

1        anybody in HR?
2            MS. GLASGOW:  Talk to Gerri Paulk
3                about what?
4    Q.  About the differences between the two jobs?
5    A.  No.
6    Q.  And you never asked to come back to that
7        facilities supervisor position on limited
8        duty?
9    A.  No.  I was coming back in two weeks after I'm
10       on vacation in full capacity on that job that
11       was offered to me.
12   Q.  And it makes sense that you never asked for
13       any kind of accommodation because you were
14       planning on using two weeks of vacation rather
15       than work in a limited fashion?
16   A.  Yes, sir.
17   Q.  At that point, did you ask anybody in HR or
18       Dennis about taking FMLA leave instead of
19       vacation?
20   A.  No.
21   Q.  What about the short-term disability leave?
22   A.  I had received two weeks on that.
23   Q.  I'm sorry?

27  (Pages 102 to 105)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 106

1  A.  I had received two weeks on disability,
2      short-term disability.
3  Q.  You had already?
4  A.  Yes.
5  Q.  During your four-week period --
6  A.  Yes.
7  Q.  -- that you were out?
8  A.  Uh-huh (positive response).
9  Q.  So did that mean, you weren't eligible for any
10     more time?
11 A.  Not actually.  The doctor said I could go back
12     to work.
13 Q.  Gotcha.
14 A.  And once he said I could go back the 11th,
15     that was it.
16 Q.  Did you tell Dennis why you wanted to take
17     vacation?
18 A.  I think I did.
19 Q.  Or did you just tell him that you will take
20     the position but wanted to take two weeks of
21     vacation, if you know?
22 A.  I don't remember.
23 Q.  Either way, Dennis agreed for you to take two

Page 107

1      weeks of vacation?
2  A.  Yes, sir.  Yes, sir.
3  Q.  And then you did that; you took two weeks of
4      vacation?
5  A.  I went on two-week vacation leave on the 14th
6      of July.  Ms. Ramona Seigler called me, said
7      I'd been put on indefinite layoff and I'd
8      being getting a letter in the mail.
9          I received the letter the 15th, telling
10     me that I was on indefinite layoff and I would
11     receive two weeks severance pay.  So I went
12     out to Pemco --
13 Q.  Let me -- before we get there, if I can, let
14     me stop you.
15         What did you do between the time you
16     started vacation and July 14?
17 A.  I started vacation on -- what was it, the
18     7th?
19 Q.  Or the 11th, whatever that day is.  I'm just
20     asking, what did you do on those days that you
21     were on vacation before you got the phone call
22     from Ramona?
23 A.  Well, I was on vacation then.  I had taken my

Page 108

1      vacation then.
2  Q.  And what did you do?
3  A.  I just piddled around the house.
4  Q.  Were you doing your exercises?
5  A.  Oh, I -- I continued doing those.
6  Q.  Did you have any interaction with anybody at
7      Pemco while you were on vacation before Ramona
8      called you?
9  A.  No, sir.
10 Q.  Did you have any idea whether or not layoffs
11     were ongoing at Pemco?
12 A.  I had no contact with them.
13 Q.  Was there anything in the newspaper or on the
14     news about job situation out at Pemco?
15 A.  I don't get the newspaper.  I watch the news,
16     but I don't remember any flashes being on it.
17 Q.  So you weren't aware of anything that was
18     going on at Pemco until you get the phone
19     call from Ramona?
20 A.  That's right.
21 Q.  All right.
22 A.  As far as I knew, I had a job, which was
23     special tooling supervisor, starting the 25th

Page 109

1      of January -- I mean, July.  I'm sorry.  Not
2      January.
3  Q.  And tell me -- you described for me already,
4      generally, what Ramona told you on July 14
5      about being on indefinite layoff.
6          Did you have any further conversation
7      with her about that?
8  A.  I don't remember what -- just that she told me
9      we was going to be on -- I was going to be on
10     indefinite layoff and I'd be receiving some
11     paperwork in the mail.
12 Q.  Did you ask her why?
13 A.  She said -- I don't know.  I don't remember.
14 Q.  Do you remember if she told you why?
15 A.  No.
16 Q.  Did you get upset with her?
17 A.  No, not her.
18 Q.  Did you call anybody at Pemco?
19 A.  No, sir.
20 Q.  Did you make any effort to find out why you
21     had been laid off, other than what Ramona told
22     you?
23 A.  No, sir.

28  (Pages 106 to 109)

FREEDOM COURT REPORTING

Page 110

1 Q. You mentioned that you got, the next day, the
2    letter?
3 A. Yes, sir, I received it in the mail.
4 Q. Do you remember what you did after you got the
5    letter?
6 A. I went to Pemco, got my clearance
7    sheet -- clearance form. I don't remember the
8    form number. Went to the tool crib, cleared
9    what tools I had checked out in. They signed
10   my paperwork there. I got my return-tool
11   slips, and I went to the facilities office. I
12   turned in my keys, my pager, my cell phone
13   that I had but Henry Ward was using. And
14   Clarke Briody signed my clearance sheet for
15   me. And he wrote on there, I returned all
16   that stuff. And I got what little bit of --
17   maybe pictures of the kids, grandkids,
18   whatever out. And I left.
19 Q. Personal effects?
20 A. Yes.
21 Q. Did you have any conversation with anybody
22   about your layoff?
23 A. No.

Page 111

1 Q. You didn't try to go to HR and talk to Jim
2    Batcher or call Dennis Johnson or Clarke
3    Briody or talk to anybody?
4 A. No.
5 Q. Why not?
6 A. I didn't figure there was any use to.
7 Q. Had you had any interaction with Ray Bennett
8    before?
9       MS. GLASGOW: Before what? I'm
10      sorry.
11 Q. Before you had been laid off.
12 A. The day before I left for my surgery, I was in
13   hanger three -- well, hanger three is our
14   mechanic shop up there. He came through
15   escorting someone.
16      He said, I thought you were having
17   surgery.
18      I said, it's tomorrow.
19      And that's the last time I spoke with
20   him.
21 Q. Did you consider calling Mr. Bennett and ask
22   for your job back?
23 A. No, sir.

Page 112

1 Q. And indefinite layoff was different than the
2    temporary layoffs that you had experienced?
3 A. Yes, sir. Indefinite, you clear out totally.
4    Temporary, you don't have to -- you don't
5    clear tools out and whatever, you know.
6 Q. When you were at Pemco on the 15th, going
7    through the clearance process, was there
8    anybody else there who was also doing the same
9    thing?
10 A. I didn't see anyone.
11 Q. And just to be clear, you don't know why
12   Ramona -- you don't know what Ramona said
13   about the reason for you being laid off?
14 A. No.
15 Q. Do you remember thinking -- I mean, I know you
16   don't remember what she said, but do you
17   remember yourself having a reaction, thinking
18   that she was lying to you?
19 A. No, I believed her.
20 Q. When did you first contact an attorney about
21   your layoff?
22 A. I don't remember what day it was.
23 Q. Within days?

Page 113

1 A. I'd say -- I'd say a couple weeks probably.
2    I'm not sure.
3 Q. By the time you had contacted an attorney, had
4    you decided that you didn't want to go back to
5    work at Pemco?
6 A. I don't understand, wanted to go back. At
7    what time, after the indefinite layoff?
8 Q. Yes, sir. Did you want to go back to Pemco?
9 A. I wanted my job. Yes, I wanted my job.
10 Q. Do you want your job today?
11 A. I would take it, but I couldn't work there,
12   I'm sure.
13 Q. What do you mean by that?
14 A. I don't think Mr. Johnson and I would get
15   along. That's probably the reason I left to
16   begin with. I still have Pemco -- Pemco at
17   heart.
18 Q. Tell me what you mean by, that's probably the
19   reason you left in the first place?
20 A. Well, he put Clarke in over me, which he
21   could've demoted Clarke instead of keeping him
22   in the facilities job. And you got Ted Ball
23   in there -- or did have Ted Ball in there also

FREEDOM COURT REPORTING

Page 114

1    helping out, which that's two people doing
2    one -- what I was doing by myself.
3    Q.  Have you seen a copy of the letter that Libby
4    sent to Pemco after you had retained her to
5    represent you?
6    A.  Which letter is that?
7    Q.  July 20, 2005, letter sent to Ramona?
8    A.  Is that it?  May I see it?
9    Q.  Sure.
10          (Brief pause)
11   A.  Yes, I've seen that.
12   Q.  Now, I know you didn't write this, but this
13    states that you were interested in working out
14    an appropriate severance package.
15   A.  Yes, sir.
16   Q.  I interpret that as meaning, you wanted what
17    you deemed to be a fair severance but not go
18    back to work.
19         MS. GLASGOW:  I object to the form.
20         It's not my question.
21         MR. HOLMES:  Right.
22   Q.  Is it your testimony that you were trying to
23    get your job back, or did you just want a

Page 115

1    severance that you felt was more fair than the
2    two weeks you got?
3   A.  At that time, I wanted severance more than two
4    weeks, because like I say, I don't feel
5    there's any use for me to go back to Pemco.
6   Q.  And so it is fair to say that in feeling that
7    there was no use in you going back to Pemco,
8    that you did not want to go back?
9         MS. GLASGOW:  Object to the form.
10   Q.  You can answer.
11         MS. GLASGOW:  You understand what
12         he's asking you?
13         THE WITNESS:  No.
14   Q.  Did you want to go back to Pemco or not --
15   A.  I had --
16   Q.  -- after you were laid off?
17   A.  I had accepted the job.
18      Oh, after I was laid off?
19   Q.  Yes, sir.  After you received the indefinite
20    layoff notice, you didn't want to go back to
21    Pemco, did you?
22         MS. GLASGOW:  Object to the form.
23         You can answer it.  Go ahead.

Page 116

1   A.  Yes, I wanted to go back.
2   Q.  You applied for your pension with Pemco in
3    that same time period, your retirement
4    benefits?
5   A.  Yes.
6   Q.  To be effective August 1, 2005, right?
7   A.  Yes, sir.
8   Q.  And in your mind, were you retiring from
9    Pemco?
10         MS. GLASGOW:  Object to the form.
11         Go ahead.  You can answer.
12   A.  At that time, I needed money coming in.  I
13    didn't figure -- on indefinite layoff, they're
14    not going to call you back.  And so I got two
15    weeks of severance pay.  My vacation had run
16    out.  I needed money to start coming in, so I
17    filed for my retirement.
18      And everyone in Birmingham that I talked
19    to just jumped on and was willing to help me.
20    I have no reason why.  I have no idea.
21   Q.  I asked you earlier, if Pemco offered you a
22    job, if you would come back, and you stated
23    that you didn't know if you could work if

Page 117

1    Dennis Johnson were there.
2   A.  If he leaves, I'll come back.
3   Q.  But as long as he's there, you won't?
4   A.  I don't feel they're going to offer me a job
5    anyway.
6   Q.  I'm sorry?
7   A.  I don't feel they're offer me a job anyway.
8   Q.  You testified earlier that you had read your
9    complaint that had been filed in this case.
10   A.  Yes.
11   Q.  And I can show it to you.  But as far you
12    know, without looking at it, does it contain
13    all the clams you're making in this lawsuit?
14   A.  Yes.
15   Q.  Your complaint alleges that Pemco violated the
16    Family and Medical Leave Act.  You're aware of
17    that?
18   A.  Yes.
19   Q.  Tell me what evidence that you have that Pemco
20    violated the FMLA?
21   A.  There were no forms given to me whatsoever or
22    offered to me to carry to my doctor to have
23    filled out and brought back to them.  My job

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 118

1   wasn't returned to me after I returned.
2   Q. You testified earlier that you never discussed
3       the FMLA before you left, before you had your
4       surgery with anybody.
5           Were you aware that you were entitled to
6       FMLA leave?
7               MS. GLASGOW: At what point in
8               time?
9   Q. At anytime.
10  A. I didn't figure I needed it. I mean, I
11      didn't -- I didn't ask and nobody offered it
12      to me.
13  Q. But you --
14  A. So I figured, you know, four weeks of my sick
15      leave, I'd have to use it anyway before
16      anything would kick in. And I would be back
17      to work.
18  Q. You were aware that Pemco has an FMLA policy?
19  A. Yes.
20  Q. And as a manager, you're familiar with the
21      policies and procedures at Pemco?
22  A. Well, not fully. I don't figure anybody
23      can -- can go through and explain all that's

Page 119

1       in the DSP.
2   Q. Well, at a minimum, you knew there was an FMLA
3       policy?
4   A. Yes.
5   Q. Had you had any employees that you supervised
6       go out on FMLA leave?
7   A. Yes.
8   Q. So you were familiar with the FMLA leave
9       process, at least in the context of having --
10  A. I knew that they went to Human Resources, and
11      I didn't know what went on after that.
12  Q. And the job that you claim that you -- that
13      you didn't return to, is that the manager of
14      facilities job?
15  A. Yes, sir.
16  Q. And is it your contention that Pemco
17      intentionally violated the FMLA?
18  A. I have no idea.
19  Q. Do you have any evidence that they
20      intentionally violated the FMLA by not giving
21      you forms and not returning to your job?
22  A. I have no idea.
23  Q. Have you seen a psychologist or psychiatrist

Page 120

1       since leaving Pemco in 2005?
2   A. No, sir.
3   Q. Have you had any treatment at all for your
4       emotional state?
5   A. No, sir.
6   Q. Are you aware that count two of your complaint
7       alleges that Pemco intentionally inflicted
8       emotional distress on you?
9   A. Yes, sir.
10  Q. And can you tell me what evidence you have to
11      support that claim?
12              MS. GLASGOW: Object to the form.
13              Do you mean his mental anguish
14              or --
15          MR. HOLMES: I do.
16              MS. GLASGOW: I mean, are you asking
17              him to describe his mental
18              anguish? I'm not trying to ask
19              your questions for you.
20          MR. HOLMES: Yeah.
21  Q. I mean, I want to know what the basis is of
22      your claim that Pemco intentionally inflicted
23      emotional distress on you.

Page 121

1   A. I've lost weight. I've lost sleep. I've
2       worried about it. I -- just day in and day
3       out. I've had a -- I've got a lower paying
4       job which I've had to sell some of my assets.
5       And I've just about excluded my savings.
6   Q. Are you married?
7   A. Yes, sir.
8   Q. Is your wife living --
9   A. Yes, sir.
10  Q. -- with you?
11  A. Yes, sir.
12  Q. Does she work?
13  A. Yes, sir.
14  Q. And what does she do?
15  A. He's head clerk at Commercial Bank of Ozark,
16      Southdale branch.
17  Q. And has she had that job --
18  A. Twelve years.
19  Q. -- for a while?
20      So y'all have her income as well?
21  A. Yes, sir.
22  Q. How much weight have you lost?
23  A. About 27 pounds.

31 (Pages 118 to 121)

FREEDOM COURT REPORTING

Page 122

1    Q.   And have you seen a doctor due to your weight
2         loss?
3    A.   No.  No, sir.
4    Q.   And how much sleep would you say you've lost,
5         I mean, on average?
6    A.   I don't know.  I don't sleep any night
7         throughout.
8    Q.   And that's related to your termination?
9    A.   I think so.
10   Q.   Did you have any sleeping problems prior to
11        June 2005?
12   A.   Not -- not that often.
13   Q.   Did you have any sleeping problems when you
14        were recovering from back surgery?
15   A.   Well, pain would wake me up.
16   Q.   Is your back condition fully resolved now?
17   A.   No.  It still hurts me.
18   Q.   Ongoing issues with your back?
19   A.   Yes.  But I think that's due to having to
20        shovel those peanuts for a month over there.
21   Q.   You think your work for Golden Peanut made
22        your back worse?
23   A.   Well, and the continuous work I'm doing also.

Page 123

1         It's more strenuous than what I was doing at
2         Pemco.
3    Q.   Did you have any kind of injury while working
4         at Golden Peanut?
5    A.   No.
6    Q.   Have you talked to your back doctor about any
7         of these other issues that you are having?
8    A.   You mean about the sleep and all this?
9    Q.   Yes, sir.  Sleep, stress, weight?
10   A.   No.
11   Q.   He hadn't prescribed anything for you?
12   A.   No, sir.  All I take was Darvocet for pain.
13   Q.   And do you think that there was someone at
14        Pemco who was out to hurt you personally?
15   A.   I don't know.
16   Q.   Do you think the other people laid off in 2005
17        were also victims of infliction of emotional
18        distress?
19   A.   I don't know.
20   Q.   Have you talked to anybody else who's been
21        laid off?
22   A.   No, sir.  My contacts are in Georgia and
23        Florida.  I don't make contact with people in

Page 124

1         Alabama very often, especially the ones I've
2         worked with in the past.  I leave at seven in
3         the morning, and I get home at five or six or
4         whatever at night.  And I don't see them on
5         the weekends.
6    Q.   Do you know how old Dennis Johnson is?
7    A.   No, sir, I don't.
8    Q.   Do you know how old Greg Bennett is?
9    A.   No, sir.
10   Q.   Jim Batcher?
11   A.   No, sir.
12   Q.   And I think you've testified earlier that
13        Richard Miller, you'd guess, is about your
14        age.
15   A.   I think he was, probably.
16   Q.   What about Gerri Paulk?
17   A.   I have no idea.
18   Q.   Ramona Seigler?
19   A.   I don't know.
20   Q.   The age discrimination claim that you're
21        making is based on Clarke Briody taking your
22        old job, right?
23        I can ask it another way if that wasn't

Page 125

1    clear.
2    A.   Ask me -- repeat that one.
3    Q.   Sure.  My understanding, based on your
4         testimony today, is that your age claim -- the
5         evidence of your age claim is that Clarke
6         Briody is doing the job that you once held and
7         that's he's younger than you.
8    A.   Yes.
9    Q.   Do you have any other evidence, other than
10        that contention, to support your age
11        discrimination claim?
12   A.   No.
13   Q.   Did anybody ever make a comment to you about
14        your age while you were at Pemco?
15   A.   No.
16   Q.   Did Dennis Johnson ever say anything to you
17        about your age?
18   A.   I had very little contact with him.  No, sir.
19   Q.   And I believe you testified earlier that
20        Clarke Briody, you think, is in his 40s?
21   A.   I think so.
22   Q.   I just want to be clear what your position is,
23        that he's younger than you, probably in his

32 (Pages 122 to 125)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 126

1    40s?
2    A.  And probably a lot more inexperienced.
3    Q.  Other than his age and his experience level,
4       any other things you have to say about Clarke
5       Briody?
6    A.  No.
7    Q.  Count four of your complaint alleges violation
8       of the Americans with Disabilities Act.
9       You're aware of that?
10   A.  Yes.
11   Q.  Tell me what your disability claim is.
12           MS. GLASGOW:  Object to the form.
13               Do you understand the
14               question?
15           THE WITNESS:  No.
16   Q.  Do you know why you're making disability
17       claim?
18           MS. GLASGOW:  I'm going to object to
19               the form, too.  That's
20               mischaracterization of the
21               complaint.
22   Q.  Do you consider yourself to be disabled?
23   A.  No.

Page 127

1    Q.  And you're currently working?
2    A.  Yes.
3    Q.  Has anyone at Pemco ever told you that they
4       consider you to be disabled?
5    A.  No.
6    Q.  Do you have any evidence to support your claim
7       that Pemco violated the Americans with
8       Disabilities Act?
9    A.  No.
10   Q.  Do you have any physical impairments?
11   A.  Such as?
12   Q.  Are you impaired physically in any way?
13   A.  No.
14   Q.  Do you have any evidence that Pemco regarded
15      you as being disabled?
16   A.  No.
17   Q.  Count five of your complaint alleges a
18      violation of the Employee Retirement Income
19      Security Act.
20      Are you aware of that, an ERISA claim?
21   A.  Yes, sir.
22   Q.  And your complaint says that Pemco violated
23      ERISA by interfering with the benefit to which

Page 128

1    you would otherwise be entitled.  And I assume
2    that your claim is, that by being laid off
3    indefinitely, you have missed out on the
4    retirement that you would've gotten but for
5    being laid off.
6    A.  Yes, sir.
7    Q.  Is there any other claim that you're making
8       other than that?
9    A.  It's also affected my social security.
10   Q.  Do you have any evidence that Pemco had the
11      specific intent or intentionally meant to
12      interfere with your ERISA rights?
13   A.  I believe it was all planned to begin with, to
14      get rid of Henry and myself.  And that
15      would --
16   Q.  Did anybody -- I'm sorry.
17   A.  That would solve the -- go into the --
18      (Brief pause)
19           MS. GLASGOW:  You want to come back
20               to it?
21           THE WITNESS:  Yes.
22   Q.  Did anybody tell you that you were being laid
23      off because you had participated in an

Page 129

1    employee benefit plan?
2    A.  No.
3    Q.  Do you have any evidence that participating in
4       Pemco's benefit plan was even a factor in the
5       decision to lay you off?
6    A.  No.
7    Q.  You mentioned that it had affected your social
8       security.  Tell me what you mean by that.
9    A.  They've already reduced my monthly -- or I got
10      a statement that shows what you would draw at
11      66 or whatever, and it's already dropped $50
12      per month due to my income.
13   Q.  Because your income has dropped?
14   A.  Yes, sir.
15   Q.  Your social security has dropped?
16   A.  Yes.
17   Q.  You were about to say something a couple
18      minutes ago about that you believe this was
19      all planned in advance to get rid of you and
20      Henry.  And I'd like to know what you mean by
21      that.
22   A.  I think it was all planned to get rid of Henry
23      and me and put Clarke in there.

33  (Pages 126 to 129)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

| Page 130 |
|---|

1  Q.  And what do you mean by, "it was all planned?"
2  A.  I think it was just from the -- from the
3      get-go to put a friend and a younger guy in my
4      position.
5  Q.  So you think that Dennis Johnson took
6      advantage of your back surgery and the time
7      that you were out in order to get rid of you?
8  A.  Yes, sir.
9  Q.  I mean, he had nothing to do with your back?
10 A.  No.
11 Q.  And where does Henry come into this?
12 A.  I think they knew how Henry felt, that he
13     would leave before disrupting what I had
14     worked hard for.
15         THE WITNESS:  Can I take a recess
16         for the restroom?
17     MS. GLASGOW:  Yeah, sure.
18         (Brief recess)
19 Q.  Mr. Wright, before we took a break, you had
20     indicated that you felt like this was all
21     planned, your layoff and Henry's layoff.  And
22     you were explaining to me the basis for your
23     feeling for that, and I want to make sure that

| Page 131 |
|---|

1      I understand that.
2          You testified that you had agreed that --
3      or at least it's your position that Pemco took
4      advantage of you being out for your back
5      surgery as a way to get rid of you; is that
6      right?
7          I don't want to put words in your mouth.
8      I want to hear your version of what happened.
9  A.  Well, I think that after I came back, that I
10     accepted a lower paying job.  And then they
11     didn't give me a chance to come back.  Well, I
12     was wondering why, you know.
13         I mean, if it was due to finances, looks
14     like somebody would have been gone before I
15     came back in our department.  Instead, there
16     was two more put in there.
17 Q.  Clarke Briody being one person?
18 A.  Ted Ball another.
19 Q.  You mentioned his name earlier.  Tell me, who
20     is Ted Ball?
21 A.  In my opinion, he's the top production manager
22     out there or supervisor.
23 Q.  Was he in --

| Page 132 |
|---|

1  A.  In years past, when an aircraft got in trouble
2      and they couldn't pull it out on schedule or
3      whatever, Ted was transferred over there.
4      And, yet, he was put under facilities, which
5      he knew very little about, instead of on
6      aircraft.
7  Q.  Do you know if he was doing facilities work in
8      addition to working on aircraft?
9  A.  No.
10 Q.  Do you know if Clarke Briody is doing
11     facilities in addition to working on aircraft?
12 A.  If he's doing facilities work, he won't have
13     time to do aircraft.
14 Q.  Is that a, no, you don't know?
15 A.  No.  No.
16 Q.  Do you know how old Ted Ball is?
17 A.  No, sir, I don't.
18 Q.  Is he closer to Clarke's age or your age, or
19     do you even know?
20 A.  I don't know how old he is.
21 Q.  And what is your understanding of what Clarke
22     Briody's job is?
23 A.  Manager of facilities.

| Page 133 |
|---|

1  Q.  And nothing else?
2  A.  I don't know.
3  Q.  And what is Ted Ball's job?
4  A.  Last I heard, he was in tooling -- over
5      tooling.
6  Q.  As a manager, supervisor?
7  A.  I'm sure he's still supervising.
8  Q.  Do you equate length of service with
9      experience?
10 A.  Well, it adds to it.
11 Q.  Is it your contention that you are better
12     qualified than Clarke Briody for the
13     facilities work?
14 A.  Yes.
15 Q.  Are you better qualified than Ted Ball for the
16     job he's doing?
17 A.  Yes.
18 Q.  And what evidence do you have that you are
19     better qualified than Clarke Briody?
20 A.  None.  None.
21         MS. GLASGOW:  I'm sorry.  What was
22         the question?
23         MR. HOLMES:  Will you read that

34  (Pages 130 to 133)

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

Page 134

1    back, please?
2    (The court reporter read from the
3    record.)
4    MS. GLASGOW:  Do you understand the
5    question?  Are you better
6    qualified than Clarke Briody?
7    A.  Oh, I -- yeah, I think I am, yes.
8    Q.  And you stated that.  And I said, what
9    evidence do you have do demonstrate that?
10   A.  Well, I have 16 and a half years out there of
11   dedicated work in construction -- all the
12   construction going on and all this, which I
13   don't think he has any experience in that.
14   Q.  Any other basis for your opinion that you're
15   better qualified than Clarke Briody?
16   A.  No.
17   Q.  I'm sorry?
18   A.  No.
19   Q.  Same question for Ted Ball.  What evidence do
20   you have to support your belief that you're
21   better qualified than Ted Ball to do his job?
22   A.  If he's still in facilities, I'm sure I am.
23   Q.  Do you know anything about Ted Ball's work

Page 135

1    experience?
2    A.  No.
3    Q.  Mr. Wright, today is my day to ask you about
4    your case, and I want to hear everything that
5    you have say about the case.  You've already
6    given me a lot, and I appreciate you working
7    hard to give me the answer to my questions.
8    Other than what you've already told me,
9    can you tell me how you've been damaged by the
10   actions that are spelled out in your
11   complaint?
12   A.  Is that physically, mentally --
13   Q.  I want everything.
14   A.  -- financially?
15   Q.  All of them.  Those are three good places to
16   start.
17   A.  Is that your question?
18   Q.  Yes.
19   A.  Okay.  I've been damaged by worrying,
20   sleepless, finances, selling of my property,
21   and the time there.  I felt like I was worthy
22   of a job because of my job.
23   Q.  Is that a current feeling that you have?

Page 136

1    A.  Then and still some now.
2    Q.  What else can you tell me about how you've
3    been damaged?
4    And I know y'all gave me figures.  I
5    don't need the monetary --
6    A.  Good.
7    Q.  -- things, but can you -- I've got the money
8    part I believe.
9    Any other way that you've been damaged?
10   A.  I don't know how to answer -- I don't have an
11   answer.
12   MS. GLASGOW:  That's fine.
13   A.  I don't have an answer to that.
14   Q.  Can you tell me what, if anything, Jim Batcher
15   knows about your case?
16   A.  I have no idea.  I haven't talked to Jim.
17   Q.  Was he a witness to anything that happened to
18   you that's the basis of your lawsuit?
19   A.  He was a director of Human Resources.  I'm
20   sure he's aware.
21   Q.  Do you believe that Jim discriminated against
22   you in any way?
23   A.  I think the company did -- company did.

Page 137

1    Q.  Do you associate that with any individual or
2    just the company?
3    A.  Company.
4    Q.  What does Gerri Paulk know about your lawsuit?
5    A.  I don't have any idea.
6    Q.  What involvement did she have, if any, other
7    than what we've talked about and the
8    conversations you had with her?
9    A.  All I dealt with her was just insurance and
10   my -- my sick leave.
11   Q.  And just so I'm -- I want to go back and make
12   sure I'm clear on this, that the sick -- that
13   the four weeks of sick leave that you took, at
14   one point you testified earlier that you had
15   taken two weeks of disability leave or had
16   applied for two weeks of disability leave?
17   A.  Yes.
18   Q.  What was that overlapping or at the same time?
19   A.  Same time.
20   Q.  So you were getting paid sick leave from
21   Pemco, but you also applied for short-term
22   disability with the insurance company?
23   A.  Yes.

FREEDOM COURT REPORTING

| | Page 138 |
|---|---|
| 1 | Q.  Which you was accepted and you received two |
| 2 | weeks of benefits? |
| 3 | A.  I'm not sure. |
| 4 | Q.  Do you know if you received any short-term |
| 5 | disability benefits during that time you were |
| 6 | out? |
| 7 | A.  I think I was approved for two weeks. |
| 8 | Q.  Okay.  And the paperwork for filling that |
| 9 | application out for the benefits would have |
| 10 | been -- you would have been dealt with Gerri |
| 11 | for that? |
| 12 | A.  Yes, she would have done that. |
| 13 | Q.  And do you know if she would have been the |
| 14 | person deciding whether or not you were |
| 15 | eligible for that? |
| 16 | A.  I think it's by the number of hours or |
| 17 | whatever you've got in at that time.  I'm not |
| 18 | sure. |
| 19 | Q.  Are you complaining in any way in your lawsuit |
| 20 | about the benefits that you've received or |
| 21 | didn't get enough? |
| 22 | A.  No. |
| 23 | Q.  What does Doris Sewell know about your |

| | Page 139 |
|---|---|
| 1 | lawsuit? |
| 2 | A.  I don't know.  I'm sure she knows all. |
| 3 | Q.  Do you know if she had any involvement at all |
| 4 | in your layoff? |
| 5 | A.  I have no idea. |
| 6 | Q.  What about Ray Bennett? |
| 7 | A.  He should've known but I don't know. |
| 8 | Q.  About the layoff? |
| 9 | A.  Yes. |
| 10 | Q.  And you indicated already that he knew you |
| 11 | were going out for surgery. |
| 12 | A.  Yes. |
| 13 | Q.  Have you been in touch with Ray about your |
| 14 | case? |
| 15 | A.  No, sir. |
| 16 | Q.  Does Ted Ball know anything about your |
| 17 | lawsuit, as far as you know? |
| 18 | A.  Not to my knowledge. |
| 19 | Q.  He would be a witness in that he's in a |
| 20 | position at Pemco that you, at least at some |
| 21 | point, thought was yours? |
| 22 | A.  I don't understand. |
| 23 | Q.  Is there any reason why he's included on your |

| | Page 140 |
|---|---|
| 1 | witness list? |
| 2 | A.  I'm sure he's has something to say about his |
| 3 | position. |
| 4 | THE WITNESS:  Right? |
| 5 | Q.  What about Grady Mixon?  What does Grady know |
| 6 | about your lawsuit? |
| 7 | A.  I don't know. |
| 8 | Q.  Is there a reason why he's listed as a |
| 9 | witness? |
| 10 | THE WITNESS:  Can I refer to you? |
| 11 | MS. GLASGOW:  Yeah.  The witness |
| 12 | list was prepared by me as |
| 13 | attorney for Roger. |
| 14 | MR. HOLMES:  Right. |
| 15 | Q.  Do you know what, if anything, Grady Mixon |
| 16 | knows about your case? |
| 17 | A.  I don't know. |
| 18 | Q.  Have you been in touch with Grady? |
| 19 | A.  No, sir. |
| 20 | Q.  Who is Grady Mixon? |
| 21 | A.  He was director or senior director, whatever, |
| 22 | over contracts. |
| 23 | Q.  Your doctor is also listed as a witness.  And |

| | Page 141 |
|---|---|
| 1 | I assume that's related to your back? |
| 2 | A.  Yes. |
| 3 | Q.  Have you talked to your doctor at all about |
| 4 | your layoff? |
| 5 | A.  Yes. |
| 6 | Q.  Anything more than to report that it had |
| 7 | happened? |
| 8 | A.  No. |
| 9 | Q.  Other than what we've covered today, do you |
| 10 | have any other evidence to support the claims |
| 11 | that you're making in this lawsuit against |
| 12 | Pemco? |
| 13 | A.  You'd have to refer to my attorney. |
| 14 | Q.  I'm just saying, as far as you know, as we sit |
| 15 | here today -- today is my day to ask you |
| 16 | questions about your case.  Is there anything |
| 17 | that you haven't told me that -- |
| 18 | A.  Oh, no, no. |
| 19 | MR. HOLMES:  Let's take a quick |
| 20 | break. |
| 21 | MS. GLASGOW:  Yeah.  Let me clear |
| 22 | one thing up.  You may want to |
| 23 | ask some more questions after |

36 (Pages 138 to 141)

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

d9d551f9-8c62-4a25-b4df-524ec3da3039

FREEDOM COURT REPORTING

| Page 142 |
|---|
| 1       this. Right? Is that all |
| 2       right? |
| 3           MR. HOLMES: Yeah. Okay. That's |
| 4       fine. |
| 5           EXAMINATION |
| 6   BY MS. GLASGOW: |
| 7   Q.   Roger, Mr. Holmes asked you earlier about |
| 8       whether you had any physical impairments. Do |
| 9       you know what the word "physical impairment" |
| 10      means? |
| 11   A.   Well, I thought he meant disabilities. |
| 12       Impairments? Glasses, my neck injury, my back |
| 13       injury? Is that -- |
| 14   Q.   Yeah. Do you want to tell him about those |
| 15       medical conditions that you have? |
| 16   A.   Okay. Yes. Yes, I do. |
| 17   Q.   Can you just briefly list them for him? |
| 18   A.   January of this year, I had surgery on my |
| 19       neck. I had vertebras collapsing up there. |
| 20       They went in and put the stainless collar on. |
| 21       I've had lower back surgeries and wear |
| 22       glasses. |
| 23   Q.   Do you have high blood pressure? |

| Page 143 |
|---|
| 1   A.   High blood pressure. |
| 2   Q.   Anything else significant? |
| 3   A.   No, that's it. |
| 4           EXAMINATION |
| 5   BY MR. HOLMES: |
| 6   Q.   You said four back surgeries? |
| 7   A.   No. I've had lower back surgery. |
| 8   Q.   Lower back. |
| 9   A.   Upper spine in January of this year. |
| 10   Q.   You said lower; I thought you said four. |
| 11   A.   Lower back. |
| 12   Q.   Lower back. The neck surgery procedure that |
| 13       you had happened this year? |
| 14   A.   Yes. |
| 15   Q.   In 2007? |
| 16   A.   Yes. |
| 17   Q.   And even with all of these physical conditions |
| 18       that you have, you're currently working a |
| 19       full-time job? |
| 20   A.   Yes. |
| 21   Q.   You're able to drive your car and commute to |
| 22       the different places where you work? |
| 23   A.   Yes. Painful but, yes. |

| Page 144 |
|---|
| 1   Q.   Are you physically able to do the manager of |
| 2       facilities job at Pemco as you know it to be |
| 3       the facilities manager's job? |
| 4   A.   Yes, |
| 5           MR. HOLMES: Won't you just give us |
| 6       a minute? |
| 7           MS. GLASGOW: Sure. Go ahead. |
| 8       (Brief recess) |
| 9   Q.   Mr. Wright, I have no further questions at |
| 10      this time. Thank you. |
| 11       (Deposition recessed at 5:02 p.m.) |
| 12       * * * * * * * * * * |
| 13       FURTHER DEPONENT SAITH NOT |
| 14       * * * * * * * * * * |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |

37 (Pages 142 to 144)

d9d551f9-8c62-4a25-b4df-524ec3da3039

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| Roger Wright, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No.: 1:06-CV- 647-WKW |
| | ) |
| Pemco World Air Services, Inc. | ) |
| | ) |
|     Defendant. | ) |

## DECLARATION OF FRANCIS X. HENRY

My name is Francis X. Henry. I am over the age of 21 years. I declare under the penalty of perjury that the matters contained herein are true and correct:

1.      I am the Director of Human Resources at Pemco World Air Services, Inc. ("Pemco"). Pemco is in the business of performing maintenance work on commercial aircraft. I am familiar with Pemco policies and procedures and have access to business records.

2.      The International Association of Machinists and Aerospace Workers, AFL-CIO, Local No. 1632 (the "Union") represents the bargaining unit employees at Pemco. From August 19, 2000 until August 9, 2005, the Union had a Collective Bargaining Agreement ("CBA") with Pemco. According to business records, that particular CBA expired on August 9, 2005.

3.      At Pemco, employees who work directly on the aircraft and whose manhours are billed to the customer are called "direct" employees and makeup the hourly bargaining unit. Employees who work in those management and support areas are called "indirect" employees because they do not work directly on the aircraft. While layoffs are more common with direct employees based on fluctuating business cycles and the amount of aircraft in the facility, indirect employees are generally not included in layoffs.

1

4.      On May 27, 2005, Ray Bennett, President, informed all Pemco employees via memorandum that a reduction-in-force would be necessary to keep the company competitive and viable.  Bennett's memorandum stated that reductions would be made in the management and support areas, including the Facilities Maintenance Department.  A true and correct copy of the memorandum is attached hereto as Exhibit A.

5.      According to business records, Henry Ward retired from his Director of Facilities position on June 10, 2005, effective August 2, 2005.

6.      Pemco business records show that from May 27, 2005 to August 9, 2005, more than 165 Pemco employees were laid off indefinitely.  Of those, at least 25 were indirect employees.  Additional indirect employees left during that same time period voluntarily or because their work was completed.

7.      Pemco business records also show that 58 of the 105 employees who were laid off indefinitely between July 15 and August 9, 2005 were under the age of 45.

8.      According to business records, on August 11, 2005, Pemco initiated a lockout out the bargaining unit employees.

Executed this _24th_ day of September, 2007.

_Francis X. Henry_
Francis X. Henry

# EXHIBIT A





**WORLD AIR SERVICES**
*A Pemco Aviation Group Company*

100 Pemco Drive
Dothan, Alabama 36303
334-983-4571

May 27, 2005

To:     All Pemco World Air Services Employees

From:   Ray Bennett, President

Subj:   Re-Organization

---

The MRO business continues to be fiercely competitive, even more so in the touch labor sector in which Pemco World Air Services competes. In an effort to improve our efficiency, we have had to make some difficult decisions.

Beginning today, May 27 we will begin to reduce staffing of management and some support areas. These reductions are necessary to keep us competitive and viable. We understand our target staffing numbers and will get there quickly, allowing the business to continue with minimum disruption.

The organization has also been realigned to provide greater support of production and our customers. The following key organizational changes have been made:

Rich Godin has been re-assigned to business strategy and analysis. In this role Rich will provide much needed analytical support to help our company grow.

Dennis Johnson will assume the responsibility of Facility Maintenance and Greg Phillips will now report to the President and continue to be in charge of Material Management.

Grady Mixon has been promoted to Sr. Director – Contracts and Planning. This recognizes Grady's valuable contributions to the company. His group will now own the life cycle of the customer visit from estimating to final invoice. With Ken Tackett assisting, I expect great things from that group.

Ben Praytor will now report to the President and be responsible for Safety, Environmental and Security. The demands of reporting and monitoring are crucial and Ben will have a very active role.

I thank you in advance for your support and understanding as we continue to improve and grow our business.

cc: Ron Aramini
    John Lee
    Glenn Hess
    Doris Sewell

PEMCO / WRIGHT
00202

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| Roger Wright, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: 1:06-CV- 647-WKW |
| | ) |
| Pemco World Air Services, Inc. | ) |
| | ) |
|     Defendant. | ) |

## <u>DECLARATION OF DENNIS JOHNSON</u>

My name is Dennis Johnson.  I am over the age of 21 years.  I declare under the penalty of perjury that the matters contained herein are true and correct:

1.      I am the Vice President of Operations at Pemco World Air Services, Inc. ("Pemco").  I have personal knowledge of the facts set forth below.

2.      In 2005, due to business circumstances, including a decreasing workload and fewer aircraft coming into the facility for work leading up to the expiration of the collective bargaining agreement with the Union, Pemco was forced to permanently layoff many indirect employees.

3.      Roger Wright was originally notified that his Manager of Facilities position was being eliminated the week of July 4, 2005.  Instead of laying him off, I offered him a supervisor position that was available to support facilities production tooling requirements.  He accepted the position but asked for two weeks of vacation.

4.      Unfortunately, while Roger was out on vacation, our business situation got worse. Because the tooling supervisor position was not essential to working on aircraft, Roger's new position was ultimately included in the reduction in force and Roger was laid off indefinitely on

1

July 15, 2005.

5.　　　On July 20, 2005, Roger's attorney sent a letter to Ramona Segler, Pemco's Human Resources Manager at the time, stating "it appears that there have been a number of violations of federal and state law, including but not limited to the Family Medical Leave Act and the Age Discrimination in Employment Act.　At this point, however, Mr. Wright is interested in working out an appropriate severance package commensurate with his abilities and experience." A true and correct copy of that letter is attached hereto as Exhibit A.

6.　　　I interpreted the July 20, 2005 letter to mean that Roger was not interested in returning to work at Pemco before, during, or after the lockout because he was seeking severance and not asking to come back to work.

7.　　　As a result, I did not contact Roger during the period Pemco was bringing former managers and supervisors back to work.

8.　　　After he was laid off, Roger never contacted me to see about returning to work to Pemco.

9.　　　The decisions I made that affected Roger had nothing to do with his medical leave, age, or participation in Pemco's pension plan.


Executed this ___24___ day of September, 2007.


Dennis Johnson

# EXHIBIT A

FARMER, PRICE, HORNSBY & WEATHERFORD, L.L.P.

ATTORNEYS AT LAW

100 ADRIS PLACE

DOTHAN, ALABAMA 36303

PHONE (334) 793-2424

FAX (334) 793-6624

EDWARD M. PRICE, JR.*
ERNEST H. HORNSBY
JOEL W. WEATHERFORD
ELIZABETH B. GLASGOW*†
HARRY P. HALL, II†
J. VINCENT EDGE
GARY E. SULLIVAN
RUSSELL N. PARRISH*

*ALSO ADMITTED IN FLORIDA
†ALSO ADMITTED IN GEORGIA

J. HUBERT FARMER (1896-1976)
JAMES H. FARMER, JR. (1930-1999)

MAILING ADDRESS
P.O. DRAWER 2228
DOTHAN, ALABAMA 36302

TUSCALOOSA OFFICE
2216 14TH STREET, SUITE 100
TUSCALOOSA, ALABAMA 35401
PHONE (205) 750-8111
FAX (205) 750-8121

July 20, 2005

Ms. Ramona Segler
Human Resources Manager
Pemco
100 Pemco Drive
Dothan, AL 36303

Dear Ms. Segler:

This is to advise that our law firm represents Mr. Roger Wright who worked for Pemco for sixteen years and was the Manager of Facilities at Pemco for at least the last five and a half years. In reviewing Mr. Wright's employment history with Pemco, it appears that there have been a number of violations of federal and state law, including but not limited to the Family Medical Leave Act and the Age Discrimination in Employment Act.

At this point, however, Mr. Wright is interested in working out an appropriate severance package commensurate with his abilities and experience. If you would like to discuss a possible resolution of this matter, please contact me at the number above in the next seven days.

Sincerely,

Elizabeth B. Glasgow

EBG/amh

# EXHIBIT 4

1

```
 1  IN THE U. S. DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3            SOUTHERN DIVISION
 4
 5  ROGER WRIGHT,
 6       PLAINTIFF,
 7  VS.                    Civil Action No.:
                           1:06cv647-WKW
 8  PEMCO WORLD AIR
    SERVICES, INC.,
 9
         DEFENDANT.
10
11      The deposition of DENNIS JOHNSON, taken
12  by the Plaintiff, pursuant to the Federal
13  Rules of Civil Procedure, before Stacey
14  Watkins, RPR, and Notary Public, State at
15  Large, at the offices of Farmer, Price,
16  Hornsby & Weatherford, Dothan, Alabama, on
17  the 7th day of August, 2007, at 10:15 p.m.,
18  CDT, pursuant to notice.
19              * * * * *
20  APPEARANCES:
21  FOR THE PLAINTIFF:      FOR THE DEFENDANT:
22  MS. ELIZABETH B. GLASGOW  MR. JOHN B. HOLMES
    Attorney at Law          Attorney at Law
23  Dothan, Alabama          Birmingham, Alabama
24
25
```

2

### STIPULATION

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

3

DENNIS JOHNSON
having been first duly sworn, testified as
follows, to-wit:


EXAMINATION


BY MS. GLASGOW:
    Q   Would you state your name for the
record, please?
    A   Dennis Johnson.
    Q   Mr. Johnson, what's your address?
    A   116 Stonegate Road.
    Q   Is that Dothan?
    A   Headland.
    Q   Oh. Headland?
    A   Headland, Alabama, 36345.
    Q   Mr. Johnson, my name is Libby
Glasgow. I represent Roger Wright in this
lawsuit that's brought against Pemco. You
have sat in on a number of the depositions,
so, you know, I assume that you've witnessed
the question and answer that goes on.
    Our court reporter takes down everything
that's said, and so, you need to answer the
questions out loud. Let me finish my

4

question before you answer, so that, on the
record, it shows up clearly what the question
is and what the answer is.
    A   Okay.
    Q   If there are any questions you
don't understand, let me know. I'll be happy
to rephrase it for you, ask it again.
Otherwise, we'll assume you understand the
question that we're asking. Okay?
    A   Okay.
    Q   All right. Now, you are here in
two capacities for your deposition. I had
asked for your deposition as a witness, and
Pemco had also designated you as a corporate
representative to be deposed today.
    A   Okay.
    MS. GLASGOW: Is that right?
    MR. HOLMES: It is.
    MS. GLASGOW: John, let me give you
      the 30(b)(6), (5) and (6),
      deposition notice. Would you
      circle the things that you're
      designating him for?
    MR. HOLMES: Sure. Let me get my
      list.

5

1    Q    And while he's doing that, Mr.
2  Johnson, did you bring any documents with you
3  today?
4    A    No, ma'am.
5         (Whereupon, Plaintiff's Exhibit 1
6         marked for identification.)
7         MS. GLASGOW:  John, on the
8             deposition notice, you
9             designated items 5 through 10
10            for this witness?  Is that
11            correct?
12        MR. HOLMES:  That's right, although
13            5 is -- you know, we'll deal
14            with that as it comes.
15        MS. GLASGOW:  It's broad.  I
16            understand.
17   Q    All right, Mr. Johnson.  What have
18  you done to prepare for your deposition here
19  today?
20   A    Just a general review with John
21  over, you know, some of the events that have
22  transpired over the last couple of weeks with
23  the other two previous depositions.
24   Q    Have you reviewed any documents in
25  preparation of the deposition?

6

1    A    Just one or two.
2    Q    What were they?
3    A    I looked at the one that you just
4  had, Exhibit 1 there.
5    Q    The deposition notice?
6    A    Yes, ma'am.  I saw that one.
7    Q    Plaintiff's Exhibit 1?
8    A    Uh-huh.
9    Q    Okay.  Anything else?
10   A    I looked at these slides yesterday.
11   Q    Okay.  And these are documents
12  which John has handed to me for the first
13  time today.  And they are Pemco Bates stamps
14  736 through 756.  Did you review any other
15  documents?
16   A    I looked at one that had to do with
17  some basic head count-type numbers, you know,
18  back in 2005.
19   Q    And what was the head count of?
20   A    It was just various things.  John
21  has it.  I don't remember everything that was
22  on it.  Just some numbers.
23        MR. HOLMES:  Libby, they were -- I
24            understand you want him to
25            testify about this.  But we

7

1             went through some of the
2             documents that have already
3             been produced.
4         MS. GLASGOW:  Nothing that hasn't
5             already been produced --
6         MR. HOLMES:  Oh, no.  Not at all.
7         MS. GLASGOW:  -- other than the 736
8             to 756?
9         MR. HOLMES:  And other than what's
10            on the privilege log.
11   Q    (By Ms. Glasgow)  Any other
12  documents that you reviewed?
13   A    No, ma'am.
14        (Whereupon, Plaintiff's Exhibit 2
15        marked for identification.)
16   Q    Look through Exhibit No. 2, which
17  is Bates stamp number, again, 736 through
18  756, and tell me what these documents are?
19   A    There are some pictures on here
20  with a description of the picture off to the
21  left-hand side.
22   Q    Did you prepare that?
23   A    No, ma'am, I did not.
24   Q    Who did?
25   A    I believe Clark Briody took these

8

1  pictures.
2    Q    And what was the purpose of taking
3  those pictures?
4    A    We were doing some facility cleanup
5  items.  It's various pictures across the
6  plant.  That's all.
7    Q    And when was this cleanup done?
8    A    Some time during 2005, middle part.
9  This one's dated -- there's one in here dated
10  June the 10th, 2005.  There's one here June
11  the 6th.  So, early part of June, looks like.
12        MR. HOLMES:  All the photographs
13            are dated.
14   A    Yeah.  June the 20th.  During the
15  month of June.
16   Q    Okay.  And a slide presentation was
17  put together with those photographs?
18   A    Yes, ma'am.
19   Q    And what was the purpose of putting
20  the slide presentation together?
21   A    Just some documentation on what we
22  were doing around the facility to improve the
23  way the facility looked.  Aesthetics.
24   Q    Who would view the slide show?
25   A    I believe I put some of this stuff

9

1    together -- had Clark put it together for Ray
2    Bennett, just to show him some things that we
3    were doing to clean the facility up.
4        Q    Okay.  It looks like -- and correct
5    me if I'm wrong.  But it looks like the
6    pictures here are from Bates stamp 736 to
7    753?  Is that right?
8        A    Yes, ma'am.
9        Q    And then, what is Bates stamp 754?
10       A    It's a e-mail from Clark Briody
11   sent to Dennis Johnson on March 22nd, 2006,
12   at 12:01 p.m.  And then, there's a -- do you
13   want me to read it?
14       Q    No.  You don't need to read it.
15   But, tell me what it is?
16       A    Let me read it.  (Witness reviewing
17   document.)  Some of the things that Clark had
18   implemented either through his own doings, I
19   guess, or maybe some instructions I had given
20   him, during -- says "over the last year."
21   And there's about eight bullet points on here
22   describing various things that have changed.
23       Q    And why was he sending that e-mail
24   to you?
25       A    I have no idea.

10

1        Q    Did you request him to send that
2    information to you?
3        A    I don't remember.  I may have asked
4    him, you know -- just be conjecture on my
5    part -- "Hey, tell me something you've been
6    doing in the last year that we've done to the
7    facility."  Maybe somebody was preparing a
8    presentation.  I don't know.  I get hundreds
9    of e-mails.
10       Q    Did you ask him to put this
11   together for purposes of litigation --
12       A    No, ma'am.
13       Q    -- or with regard to an EEOC claim?
14       A    No, ma'am.
15       Q    But you don't recall why you asked
16   him to put that information together?
17       A    No, ma'am.
18       Q    Or if you did, I guess?
19       A    Yeah.  Or if I did.
20       Q    Let me show you Bates stamps 755
21   and 756.  Why don't you read over that?  You
22   can just read it to yourself.
23       A    (Witness reviewing documents.)  Do
24   I need to read it read it, or do I need just
25   to scan it?

11

1        Q    Just scan it.  I mean, you're
2    welcome to read it if you want to.
3        A    I get the gist of it.
4        Q    What are these two pages?
5        A    There was a issue with -- looks
6    like on one of the fire pumps, you know, for
7    the hangar facilities.  It needed some
8    repair.  And then, there was also a
9    suggestion in there that we do some infrared
10   sampling on transformers around the facility.
11       Q    It appears, from the date and time,
12   that this e-mail on 755 and 756 was sent
13   March 22nd at 10:47?
14       A    2006.  Uh-huh.
15       Q    2006.  And if you look at the time
16   on the previous one from Clark Briody, looks
17   like -- is it possible that Clark Briody's
18   was in reply to this e-mail on 755 and 756?
19       A    Doesn't look like it.  Looks like a
20   separate response.  Separate subjects.  That
21   one concerns the fire pumps and the infrared
22   testing.  This other one here just has to do
23   with some cleanup items that just has to be done around
24   the facility.
25       Q    What's the annual risk improvement

12

1    report?
2        A    It's insurance oversight.
3        Q    Who prepares that report?
4        A    It usually comes out of Birmingham,
5    out of the corporate office, between the guys
6    up there and a local entity.  Insurance
7    company, whoever we've got our insurance
8    with, you know, will come down and do a site
9    assessment.  I don't remember the name of the
10   company.
11       Q    Do they do a risk improvement
12   report for World Air Services here, the
13   Dothan facility, every year?
14       A    Yes, ma'am.
15       Q    And who would be in charge of
16   coordinating that report for the Dothan
17   facility?
18       A    It would be a combination between
19   the facilities folks and Birmingham.
20       Q    Would that go through you?
21       A    Usually doesn't.  I'm aware it
22   happens, but --
23       Q    Usually does or does not?
24       A    Does not.
25       Q    Does not.  Who would be the

13

1  custodian of the risk improvement report for
2  the Dothan facility? Who would have that
3  report?
4      A    If we had any communications, it
5  would be held by the facilities manager.
6      Q    Now, you came to Pemco in 2003? Is
7  that right?
8      A    Yes, ma'am.
9      Q    And you started -- what? -- in '03
10  or '04?
11      A    '03.
12      Q    Started in '03.
13      A    April.
14      Q    Has there been a risk improvement
15  report done every year that you've been
16  there, as far as you're aware?
17      A    As far as I'm aware.
18      Q    And you believe a copy of that
19  report would be kept with the facilities
20  manager?
21      A    Yes, ma'am.
22      Q    And who is the facilities manager
23  now?
24      A    Today?
25      Q    Yes.

14

1      A    Clark Briody.
2      Q    Who's Brad Pittenger,
3  P-i-t-t-e-n-g-e-r?
4      A    Don't know.
5      Q    You don't know?
6      A    No, ma'am, unless he was the guy
7  doing the site audit. Is that who signed it
8  off?
9      Q    Probably. It looks like this
10  e-mail address is from Zurich North American,
11  zurichna?
12      A    That's correct. That's our
13  insurance, facility insurance.
14      Q    Who is Danny Shiver?
15      A    Danny works in safety and EMT,
16  emergency response team.
17      Q    Does he have any other
18  responsibilities other than safety and
19  emergency response?
20      A    No, ma'am.
21      Q    And who is Jackie Tindale?
22      A    Jackie Tindale works in Birmingham,
23  somewhere in the accounting department.
24      Q    And what's her title?
25      A    Don't know.

15

1      Q    Do you know why she would be
2  included in this e-mail chain?
3      A    Unless she had something to do with
4  the Zurich folks. Never met the lady.
5      Q    Okay. And then,
6  rplumber@mcgriff.com?
7      A    Must be a consultant, if I had to
8  guess. I don't know for a fact.
9          MR. HOLMES: I can tell you McGriff
10          is a broker, insurance broker.
11          MS. GLASGOW: That was going to be
12          my guess.
13      Q    William D-e-s-P-r-e-s?
14      A    Don't know.
15      Q    Okay. But, when the risk
16  improvement report is done annually, you are
17  not really involved in that? Is that right?
18      A    That's correct.
19      Q    That's not part of your general
20  duties. All right. Any other documents that
21  you either looked at or you want to give me?
22      A    Not that I know of.
23      Q    Not that you have. Do you have any
24  documents at home that you've not turned over
25  to counsel, that might affect this case, such

16

1  as calendars, diaries?
2      A    No, ma'am.
3      Q    Supervisor's notebook?
4      A    No, ma'am.
5      Q    Telephone messages?
6      A    No, ma'am.
7      Q    Printouts of e-mail?
8      A    No, ma'am.
9      Q    Any other documents that you might
10  have that's not been turned over to counsel
11  concerning Roger Wright in any fashion
12  whatsoever?
13      A    Not that I'm aware of.
14      Q    Do you keep any records at your
15  house or, you know, away from the facility
16  itself concerning Pemco?
17      A    I have a employment agreement at
18  home.
19      Q    I assume that's your employment
20  agreement?
21      A    My employment agreement.
22      Q    All right. Anything else that you
23  keep at home as opposed to the facility?
24      A    I keep no daily notebooks. I do
25  not keep a diary. Delete my e-mails

17

1  regularly.
2      Q    Does Pemco have a record retention
3  policy?
4      A    On aircraft records. I'm sure the
5  corporate area has something in the corporate
6  office. But I've never been instructed on
7  what to keep and not to keep.
8      Q    Have you ever seen a policy on
9  record retention?
10     A    No, ma'am.
11     Q    I mean, other than the aircraft?
12     A    No, ma'am.
13     Q    How does your e-mail system work?
14 Are you networked with Birmingham?
15     A    We have a intranet, and then, we
16 have the internet.
17     Q    Who all is a part of the intranet?
18     A    Everybody that has a computer
19 access, pretty much.
20     Q    And that would include all
21 employees of World Air Services?
22     A    No. Would not include the
23 mechanics, certain number of the bargaining
24 unit people. Depends on what their job
25 description is.

18

1      Q    Would essentially all management
2  employees have access?
3      A    Yes, ma'am.
4      Q    And then, some bargaining employees
5  who need it?
6      A    Yes, ma'am.
7      Q    And who else would be part of that,
8  outside of World Air Services? Who else
9  would be part of the intranet?
10     A    I'm not for sure. I've never gone
11 through the entire listing.
12     Q    Are you linked, for example, to
13 people with Pemco Aeroplex?
14     A    Yes.
15     Q    Okay. And are you linked --
16     A    The intranet has got a directory in
17 it. So, everybody that's within the Pemco
18 site is on that directory.
19     Q    And would that also include Pemco
20 Aviation Group employees?
21     A    Yes, ma'am.
22     Q    Pemco Aeroplex?
23     A    Yes, ma'am.
24     Q    Pemco World Air Services?
25     A    Yes, ma'am.

19

1      Q    And then -- wasn't there another
2  one? Is there another company?
3      A    Space Vectors.
4      Q    Yes. That was it.
5      A    Uh-huh.
6      Q    Are they also part of that?
7      A    I believe so.
8      Q    And where is the intranet
9  maintained, you know, the main server
10 maintained?
11     A    It's in Birmingham.
12     Q    Okay. And do you know whose office
13 is in charge of that?
14     A    No, I don't.
15     Q    Do you have a technology guy here
16 in Dothan that helps you with things like
17 that?
18     A    Yes, we do.
19     Q    Who is that?
20     A    John Abraham.
21     Q    And so, then, is your e-mail sent
22 on the intranet?
23     A    Yes.
24     Q    And even when it's between people
25 here in Dothan, it still is part of that

20

1  intranet --
2      A    As far as I know.
3      Q    -- network. I understand.
4      A    I mean, there's a T1 line that runs
5  between here and Birmingham.
6      Q    Do you have access to documents,
7  for example, that are Pemco Aviation
8  documents, that might be on that intranet?
9      A    In the areas that are shared files,
10 yes.
11     Q    What areas are shared files?
12     A    I would have to pull my desktop up
13 to show them to you.
14     Q    Just give me some examples, if you
15 can?
16     A    The planning department may have
17 some, you know, planning-type material that's
18 accessible by everybody. Some daily status
19 reports, aircraft only, are located there.
20 Those type of documents. Documents that
21 multi departments would need access to.
22     Q    What does the planning department
23 do?
24     A    I'm trying to answer this without
25 being smart. They plan. They prepare the --

21

1   Q   What do they plan?

2   A   They prepare the paperwork for the

3   aircraft inspections.

4   Q   Like, FAA inspections and customer

5   inspections or --

6   A   The paper -- do you really want to

7   go through the whole -- all through that?

8   Q   I don't want a list of all the

9   paperwork.  But, do they plan for anything

10   else other than in anticipation of

11   inspections by customers or governmental

12   entities?

13   A   No, ma'am, they do not.  It's all

14   aircraft related only.

15   Q   They don't do any financial

16   planning, business planning, that sort of

17   thing?

18   A   Not really.

19   Q   Are they more a compliance wing,

20   that you're trying to get compliance?

21   A   They do aircraft planning, as far

22   as the structural inspections,

23   maintenance-type inspections, you know, per

24   the customer's request, and through the

25   customer's documentation, and they do a

22

1   certain amount of estimating for the length

2   of time that these documents will take to do.

3   Q   Estimating the jobs --

4   A   Yes, ma'am.

5   Q   -- for completion dates, that sort

6   of thing?

7   A   Yes, ma'am.

8   Q   Okay.  But, if I understand your

9   testimony, they do not do the financial

10   planning for the company, in terms of, here,

11   you know, we have these contracts and these

12   customers, and we're projecting out into the

13   future 12 months as to what the company is

14   going to look like 12 months from now, from a

15   financial perspective?

16   A   No, ma'am.

17   Q   And I assume that they do not do

18   any planning in terms of staffing, you know,

19   determining the number of employees that will

20   be needed for the next 12 months, that sort

21   of thing?  Is that right?

22   A   They associate, you know, a certain

23   amount of man-hour requirements linked to a

24   head count by skill.  And they will do a

25   projected amount of man-hours that we expect

23

1   to, you know, accomplish in the next month,

2   two months, six months, ever how long the

3   corporation wants us to plan that out for.

4   Q   When you say "the corporation," do

5   you mean the customer or the --

6   A   No.  The corporation.

7   Q   Pemco Aviation?

8   A   Uh-huh.

9   Q   And do they also do the planning

10   work for World Air Services here, the Dothan

11   facility?

12   A   That's all they do, is just World

13   Air Services.

14   Q   Oh, okay.  And are they located

15   here in Dothan?

16   A   Yes, they are.

17   Q   Who is in the planning department?

18   A   I don't understand.

19   Q   How many employees do you have in

20   the planning department in Dothan?

21   A   I'm counting.  Maybe eight.  That's

22   a guess.

23   Q   And who would be the head of that

24   department?

25   A   Ken Tackett.

24

1   Q   How do you spell Tackett?

2   A   T-a-c-k-e-t-t.

3   Q   And would the planning department

4   prepare reports forecasting, you know, the

5   labor that will be needed, the head count

6   that will be needed for certain skills, based

7   on the contracts that the company currently

8   had?

9   A   Yes, ma'am.

10   Q   Okay.  How often are those reports

11   generated?

12   A   It depends.

13   Q   Well, let me stop you before you

14   answer that.  What are the reports called?

15   A   Mostly just generic terms.  We'll

16   have a report that has "Aircraft schedule

17   12-month forecast."  Associated in that

18   12-month forecast will be the number of

19   airplanes that we expect to do and the

20   expected man-hours generated from those

21   inputs.  And that can be broken down into

22   skill levels required.

23   Q   Does it include management at all?

24   A   Does not.

25   Q   And is this aircraft schedule used

25

1    in preparing budgets or business plans?
2        A    Yes, ma'am.
3        Q    Okay.  Who would normally review
4    these schedules to prepare the business
5    plans?
6        A    The marketing department.
7        Q    Anybody else?
8        A    The finance department.
9        Q    Is that something that you would
10   review?
11       A    Yes, ma'am.  Contracts and
12   production.
13       Q    Is there a coordinated business
14   plan that's created, maybe on an annual basis
15   or quarterly basis or some kind of regular
16   basis, projecting the business plan for the
17   maybe short-term future and maybe long-term
18   future?
19       A    Yeah.  We're no different than any
20   other business in that aspect.
21       Q    Who actually prepares that business
22   plan?
23       A    The marketing department and the
24   accounting department.
25       Q    Okay.  What's the name of that

26

1    business plan?  What do you all call it?
2        A    Business plan.
3        Q    Okay.  And is that reduced to
4    writing in something that everybody can
5    review?
6        A    It's confidential.
7        Q    But it is reduced to writing?
8        A    Yes.
9        Q    And how often do these reports come
10   out?  The business plans?
11       A    I can't say how often the group
12   reviews those.  Some of them are looked at on
13   a daily basis.  Some of them are looked at on
14   a weekly basis.
15       Q    My question really, though, is, how
16   often are the business plans prepared?  Do
17   you do it quarterly?  Annually?
18       A    We have an ongoing business plan.
19   This is a very volatile business, and it can
20   change very rapidly.  So, it's not one that
21   you do today and put away for six weeks, and
22   then, pull it back out.
23       Q    Do you do annual business plans?
24       A    Yes, ma'am.
25       Q    And who would have copies of those?

27

1        A    The corporate office.
2        Q    Do you know who in the corporate
3    office?
4        A    It would come out of the accounting
5    department.
6        Q    And then, are quarterly plans also
7    done?
8        A    We have an ongoing business plan.
9        Q    I understand.  And it's probably
10   updated daily --
11       A    Yes, ma'am.
12       Q    -- based on differences in --
13       A    We have to.  I'm not trying to be
14   evasive here.
15       Q    No.  I understand.
16       A    I don't know if this will eliminate
17   any questions or not.  But the aircraft
18   schedules of our customers are constantly
19   changing depending on what season it is.
20   Airlines are very seasonal, and they move
21   airplanes quite often.  And they can very
22   easily drop a line of airplanes.
23           They require -- give us no notice other
24   than, we're not going to input an airplane
25   this week, this month, or whatever.  So, it

28

1    changes often.
2        Q    Is it a fair statement that, as the
3    customer needs change, this business plan
4    will be altered?
5        A    Yes, ma'am.
6        Q    Are there regular business planning
7    meetings between these department heads that
8    you talked about, marketing, finance,
9    contracts and production?
10       A    We have a weekly meeting.  It's not
11   dedicated to any one particular subject.
12   But, obviously, the business plan is usually
13   covered in that.
14       Q    And that's held here in Dothan?
15       A    Teleconference.
16       Q    Is marketing in Dothan or is that
17   Birmingham?
18       A    No.  They're in Dothan.
19       Q    Finance?
20       A    Dothan and Birmingham.
21       Q    Okay.  Contracts?
22       A    Dothan.
23       Q    And production?
24       A    Dothan.
25       Q    Do you all keep notes of these

29

1   weekly meetings?
2       A    Some guys do and some don't.
3       Q    Is there any official record kept,
4   like, minutes?
5       A    No, ma'am.
6       Q    Do you keep notes?
7       A    No, ma'am.
8       Q    Do you know anybody who does?
9       A    Grady Mixon, Kevin Casey.
10      Q    And what's Grady Mixon's position?
11      A    Senior director of contracts.
12      Q    And what's Kevin Casey's position?
13      A    Vice president of marketing.
14      Q    And they tend to keep notes during
15  each meeting as to what's discussed?
16      A    Yes, ma'am.
17      Q    If I wanted to see what the
18  business plan was for a particular date,
19  would that be possible to retrieve that?
20      A    I don't know for a particular date.
21  Over a particular time segment, yes, ma'am.
22      Q    So, if I wanted to get the business
23  plan for 2004-2005 period, who would I call
24  to get that?
25      A    From a airplane input aspect or a

30

1   financial aspect?
2       Q    Both.
3       A    You could start with Chris Walker.
4       Q    From the financial end?
5       A    Yes, ma'am.
6       Q    And what about from the aircraft
7   end?
8       A    Ken Tackett, if he has those
9   records.
10      Q    Have these weekly meetings been
11  going on as long as you've been at Pemco?
12      A    In some fashion, yes, ma'am.
13      Q    Were they going on before you got
14  there?
15      A    I don't know.
16      Q    Are the reports by the planning
17  department -- and you told me about the
18  aircraft schedule, like, a 12-month forecast.
19      A    Yes, ma'am.
20      Q    Is that different from the business
21  plan?  Is that a different document?  Do you
22  understand what I'm saying?
23      A    Yes, I do.  Yeah.  It's different.
24      Q    Okay.  Who would be the custodian
25  of those reports?

31

1       A    Which one?
2       Q    The reports by the planning
3   department.
4       A    Ken Tackett.
5       Q    Okay.  Who is the director of
6   planning?
7       A    Yes, ma'am.
8       Q    And he is in Dothan?
9       A    That's correct.
10      Q    Do you also do any forecasting in
11  terms of operations?
12      A    Yes, ma'am.
13      Q    Okay.  Who prepares that type of
14  report?
15      A    I do.
16      Q    And you're vice president of
17  operations?
18      A    That's correct.
19      Q    What do you call that type of
20  forecast report for operations?
21      A    It's a manpower report.
22      Q    How often is that done?
23      A    When I see a need for change in our
24  business.
25      Q    And who would have those reports

32

1   from past years?
2       A    No one.
3       Q    Have those records been destroyed?
4       A    No, ma'am.
5       Q    Do you know who would have them,
6   then?
7       A    I do.
8       Q    You do have them?
9       A    I do have them.
10      Q    Oh, okay.  I thought you said no
11  one had them.
12      A    Let me clarify that.  No one but me
13  has them.  How about that?
14      Q    Okay.
15      A    I don't know how many years they go
16  back.
17      Q    How many times have you done these
18  manpower reports?
19      A    Many.
20      Q    Can you quantify that?  I mean, I'm
21  not going to hold you to a specific number.
22  But if you can give me a guess?
23      A    It's part of my responsibility to
24  make sure that the manpower forecasts are
25  accurate and correct.

33

1  Q   Do you do them once a month?  Two
2  times a year?  You know, give me kind of an
3  idea of how often it would change?
4  A   As long as there's no significant
5  change in our outlook -- as I described
6  earlier, you know, customers change their
7  input schedules -- every three weeks.
8  Q   And do you have all the manpower
9  reports going back to the time when you first
10 took over this job?
11 A   No, ma'am, I do not.
12 Q   How far back do you have them?
13 A   Maybe two years.  That's a maybe.
14 There's no reason to keep them.
15 Q   Have you destroyed some?
16 A   I have deleted a lot of them
17 through the years.  Yeah.  There's no reason
18 to keep them.
19 Q   Again, as far as you're aware,
20 they're not part of any record retention
21 policy --
22 A   No, ma'am, they're not.
23 Q   -- with Pemco?
24 A   No, ma'am.  It's a personal
25 spreadsheet that I do.

34

1  Q   Do you share that spreadsheet with
2  anybody else within the company?
3  A   No, ma'am.
4  Q   It's just for your purposes?
5  A   My purposes only.
6  Q   Do you recall ever sending it to
7  anybody else on occasion?
8  A   I have occasionally passed them
9  out.  It's one of those documents that means
10 nothing to anybody but me.
11 Q   What do you look at in terms of
12 preparing these forecasts for operations?
13 A   Skill levels.  I look at the number
14 of heads required per skill level.
15 Q   Based on the contracts that you
16 have?
17 A   Either upcoming -- uh-huh.  Future
18 changes.  Changes that have occurred.
19 Q   So, when you get a new contract in,
20 would you review that, and then, project out
21 how many heads you're going to need --
22 A   That's right.
23 Q   -- to cover that contract?
24 A   That's correct.
25 Q   Does it include management at all,

35

1  in terms of numbers of heads you're going to
2  need for management positions?
3  A   This particular one only covers
4  supervisors.  Quantify that.  Aircraft
5  supervisors.  Does not include any of the
6  facility staffing.
7  Q   So, it would not include facilities
8  management, for example?
9  A   No, ma'am.
10 Q   And why would you not include
11 facilities management in with your manpower
12 reports?
13 A   Just because we increase or
14 decrease in aircraft doesn't necessarily mean
15 that some skill levels are required to
16 increase and decrease.
17 Q   In facilities management, for
18 example?
19 A   Anyplace in the facility.
20 Q   Have you ever incorporated in your
21 forecast the facilities management --
22 A   No, ma'am.
23 Q   -- in these reports?
24 A   No, ma'am.
25 Q   Even when you were going through

36

1  the layoffs in '05, it was never included in
2  these manpower reports?
3  A   No, ma'am.
4  Q   Are there any type of plans,
5  forecasts, reports, which would project needs
6  in things like facilities management --
7  A   No, ma'am.
8  Q   -- to your knowledge?
9  A   No, ma'am.
10 Q   If you would, try and wait 'til I
11 finish my question before you answer, so that
12 she can take it down.  Otherwise, on the
13 record, it looks like you're --
14 A   Cutting you off.
15 Q   -- cutting me off.
16 A   I have been.  Sorry.
17 Q   That's all right.  I tend to stop
18 halfway through a sentence, too.  Do you keep
19 any type of personnel records, either -- do
20 you have an office here in Dothan?
21 A   Yes, I do.
22 Q   Okay.  Do you keep any personnel
23 records in your office?
24 A   I have a few annual reviews.
25 Q   Do you have any annual reviews for

37

1    Roger Wright?
2        A    No, ma'am, I do not.
3        Q    Do you have any documents
4    pertaining to Roger Wright in your office?
5        A    Not that I'm aware of.
6        Q    Do you have any documents
7    pertaining to facilities management, you
8    know, going back the last several years --
9        A    No, ma'am.
10       Q    -- in your office?  Other than a
11   few annual reviews, do you have any other
12   personnel records in your office?
13       A    I don't think so.
14       Q    An example might be write-ups --
15       A    Yeah.  Give me an example.
16       Q    -- or notes, I need to watch
17   so-and-so, or, you know, general supervisor's
18   notes, things like that?
19       A    I may have one or two on some
20   things.  But any particular individual, I
21   would have to pull it out and take a look.  I
22   don't know.
23       Q    And I think you've said that you do
24   not have anything on Roger Wright, to your
25   knowledge?

38

1        A    Not that I'm aware of.
2        Q    What about Henry Ward?
3        A    No, ma'am, I do not.
4        Q    What about Clark Briody?
5        A    I probably have an annual review on
6    him in my office.
7        Q    What about Richard Miller?
8        A    I probably have an annual review on
9    him.
10       Q    Are these current reviews?
11       A    Yes, ma'am.
12       Q    And Ted Ball?
13       A    Probably.
14       Q    And do you rate Clark Briody,
15   Richard Miller and Ted Ball?
16       A    Clark Briody, but not Richard
17   Miller or Ted Ball.
18       Q    Are you, like, a senior rater over
19   them or --
20       A    I'm not senior to anybody.
21       Q    Clark answers directly to you,
22   though?
23       A    Yes, he does.
24       Q    And Ted Ball and Richard Miller
25   both answer to Clark?

39

1        A    They do.
2        Q    Okay.  Who else do you supervise
3    other than Clark Briody?  And by that, I mean
4    supervise directly.
5        A    Production managers and two
6    directors.
7        Q    How many production managers are
8    there?
9        A    I want to say six.
10       Q    And then, who are the two
11   directors?
12       A    Byron Kilgore.
13       Q    I'm sorry?
14       A    Byron Kilgore.
15       Q    What is he director of?
16       A    The Southwest program.
17       Q    And who else?
18       A    Shane King, Northwest program.
19       Q    And do you supervise anybody else
20   directly?
21       A    Roy Gulledge.
22       Q    What does he --
23       A    Avionics.
24       Q    I'm sorry?  What does Roy Gulledge
25   do?

40

1        A    Avionics.
2        Q    Anyone else?
3        A    Clark Briody.
4        Q    Got him.
5        A    Danny Fell, F-e-l-l.
6        Q    What does he do?
7        A    Back shops.  Dan Brooks.
8        Q    What does he do?
9        A    Evening shift manager.
10       Q    Anybody else?
11       A    How many is that?
12           MR. HOLMES:  12 people.
13       Q    12 people.
14       A    Okay.
15       Q    Is that it?
16       A    I think, without looking at a arc
17   chart.
18       Q    If you think of somebody else, let
19   me know.
20       A    I will.
21       Q    Mr. Johnson, why don't you give me
22   your educational background, formal
23   education?
24       A    Formal education?  Not much.
25       Q    How much is not much?

41

1    A   Where do you want to start?
2    Q   Did you graduate high school?
3    A   Yes, I did.
4    Q   Okay.  Where did you graduate from?
5    A   Irving High School, Irving, Texas.
6    Q   And what year?
7    A   1973.
8    Q   How old are you?
9    A   52.
10   Q   Date of birth?
11   A   12-1-54.
12   Q   Okay.  As far as education goes,
13   did you get any formal education beyond high
14   school?
15   A   I've been working on it for the
16   last 30-something years.
17   Q   All right.  Have you graduated?  Do
18   you have a degree?
19   A   No, ma'am, I do not.
20   Q   Tell me what kind of courses you've
21   taken, and where, and that sort of thing?
22   A   Mountain View College, Dallas,
23   Texas.  Aviation courses.
24   Q   Do you have a resume, by any
25   chance?

42

1    A   Yes, I do.
2        MS. GLASGOW:  Did you happen to --
3        MR. HOLMES:  I don't have it.
4        MS. GLASGOW:  Do you have that?
5        MR. HOLMES:  I don't.
6    Q   Go ahead.  You took some aviation
7    courses at Mountain View College?
8    A   Uh-huh.  Formal program.
9    Q   To be an aviator or work on
10   aircraft?
11   A   Work on aircraft.
12   Q   How many hours did you get, or
13   credits?
14   A   I would have to look it up.  I
15   don't know.
16   Q   Did you take more than a few
17   classes?
18   A   Oh, yeah.  I've taken a lot of
19   classes.  I've got 100-and-probably-40 hours
20   total, between there and University of
21   Phoenix and, you know, just various places.
22   Q   University of Phoenix, is that --
23   A   It's an online company.
24   Q   -- online?
25   A   Uh-huh.

43

1    Q   So, you took some courses at
2    Mountain View College, in Dallas.  Where
3    else?
4    A   The American Management
5    Association.  Continuing education-type
6    classes.
7    Q   Did you take that here?
8    A   No.  Actually, in New York and
9    Atlanta --
10   Q   I used to teach that course here.
11   A   -- in Hilton Head.  Really?
12   Q   Yeah.  How many of those courses
13   did you take?
14   A   Combined hours, I want to say it
15   was 100 -- talking about instructional hours
16   or credit hours?  Instructional hours?  160
17   or so instructional hours.  Four or five
18   weeks, total.
19   Q   You would go four to five weeks,
20   total?
21   A   No.  One week at a time, but, like,
22   five different classes.
23   Q   And what were those classes in?
24   A   They were all management classes.
25   Q   Okay.  Any other?

44

1    A   Flight instruction.
2    Q   Where was that?
3    A   Most of it in Dallas.
4    Q   Are you from Dallas?
5    A   Yes, I am.  I'm single-engine
6    rated, multi-engine rated, instrument rated.
7    Q   Do you still fly?
8    A   No, I don't.
9    Q   Any other course work?
10   A   Lean Manufacturing.
11   Q   I'm sorry?
12   A   Sigma Lean Manufacturing.
13   Q   What's Sigma?
14   A   Sig, S-i-g, Sigma.  It's management
15   pro -- just processes, planning, Lockheed
16   Martin.
17   Q   Were you working for Lockheed when
18   you took that?
19   A   Yes, ma'am.
20   Q   And was this on-the-job training or
21   was it --
22   A   Both.
23   Q   -- courses, formal courses?  All
24   right.  Any others?
25   A   Just your usual computer

45

1  skills-type stuff, Excel Word, PowerPoint.
2     Q    And you're taking some classes
3  through the University of Phoenix?  Are you
4  currently doing that?
5     A    Not today, no.
6     Q    But, are you in the process of
7  doing that?
8     A    I'll finish one of these days.
9     Q    What is your major, as it were?
10    A    Just business.
11    Q    Your concentration.  How many
12 business classes do you think you've taken
13 through the University of Phoenix?
14    A    Oh, gee.  I've been through all the
15 -- you know, just working through the normal
16 disciplines.  Psychology, history, you know,
17 various math courses.  Just the typical
18 stuff.
19    Q    I mean, have you concentrated in
20 business classes at all?  Have you taken
21 business classes?
22    A    Yes, I have.
23    Q    What kind of business classes have
24 you taken?
25    A    I would have to pull my sheet up to

46

1  give you an accurate --
2     Q    Any that you recall?
3     A    Not right off.
4     Q    Okay.  Any other business course
5  work during your time here?
6     A    I'm sure there is, but nothing I
7  can recall right offhand.
8     Q    Okay.  Let me take you through a
9  painful process of telling me about all your
10 jobs since 1973.
11    A    That's easy.
12    Q    Good.  All right.  Start with 1973.
13    A    Texas Instruments.
14    Q    Okay.  In Dallas?
15    A    Dallas, Texas.
16    Q    What did you do for them?
17    A    Machinist.
18    Q    And how long were you there?
19    A    I worked there twice between 1973
20 and 1976, I think.
21    Q    Did you take a period of time off?
22    A    Quit.
23    Q    How long were you off?
24    A    I don't remember.
25    Q    How long were you there when you

47

1  came back?
2     A    I don't remember.  It was 30 years
3  ago.
4     Q    But you left them for good in 1976?
5     A    I think so.  I think it was '76.
6     Q    And where did you go from there?
7  Well, why did you leave Texas Instruments the
8  second time?
9     A    Why do kids quit jobs when they're
10 18 years old?  Who knows.  If I could answer
11 that question, I would write a book.
12    Q    So, you quit both times?
13    A    Yes, ma'am.
14    Q    So, by 1976, where did you go then?
15    A    I worked at what's commonly called
16 job shops, small machine shops.
17    Q    As a machinist?
18    A    As a machinist.  I don't recall the
19 name of a couple of different places.
20    Q    How long did you do that?
21    A    Until 19 I want to say 78.  Just
22 beating around-type stuff.
23    Q    And then, in '78, where did you go?
24    A    I went to work for Otis
25 Engineering.

48

1     Q    In Dallas?
2     A    Carrollton, Texas.  Suburb.
3     Q    Uh-huh.  My brother lives in
4  Arlington.  And that was about 1978?
5     A    Yes, ma'am.
6     Q    And what did you do for them?
7     A    Worked as a prototype machinist.
8  And I also worked in their tool design
9  department.
10    Q    Okay.  How long were you there?
11    A    'Til 1986.
12    Q    Were you promoted while you were
13 working for Otis Engineering?
14    A    Many times.
15    Q    What did you rise to the level of?
16    A    To tool designer.  I guess you
17 could say from a floor machinist to the
18 engineering department.
19    Q    So, you were actually more into
20 design at that point?  Is that right?
21    A    Yes, ma'am.
22    Q    And why did you leave Otis
23 Engineering?
24    A    Oil industry was on a downturn.
25 They designed mostly oil well pressure

49

```
1  control systems.  I jumped ship before I got
2  laid off.  At least, I thought I was going to
3  get laid off.
4       Q    Okay.  And you think that happened
5  about 1986?
6       A    It was 1986.
7       Q    Okay.  And where did you go after
8  that?
9       A    Dalfort Aviation.
10       Q    Dalfort?
11       A    Yes, ma'am.
12       Q    D-a-l --
13       A    f-o-r-t.
14       Q    And where was that?
15       A    Dallas, Texas.
16       Q    Okay.  What did you do for them?
17       A    Aircraft mechanic.
18       Q    Was this your first time in
19  aircraft work?
20       A    Large aircraft work.
21       Q    When did you first get your pilot's
22  license?
23       A    That's a good question.  '78, '79.
24  Somewhere in that range.
25       Q    Okay.  And were you promoted while
```

50

```
1  you were at Dalfort?
2       A    Yes, ma'am.
3       Q    What were you promoted to?
4       A    Started as a mechanic.  Promoted to
5  lead mechanic.  Promoted to supervisor.
6  Promoted to manager.
7       Q    Manager of what?
8       A    Aircraft maintenance.
9       Q    Okay.  Is that it?
10       A    That's it.
11       Q    Okay.  How long were you at
12  Dalfort?
13       A    I'll say 'til 1992.
14       Q    How many people did you supervise
15  as the manager of aircraft maintenance?
16       A    Directly or indirectly?
17       Q    Directly.
18       A    Directly.  As an aircraft -- I can
19  start at aircraft supervisor.  15 to 30.  As
20  aircraft manager, I had the responsibility
21  for the facility.  I don't remember the
22  number of folks at that point in time.
23       Q    Okay.  But you had direct
24  supervision of how many?
25       A    Up to 30, as a supervisor.
```

51

```
1       Q    And then, as the manager, you --
2       A    Had the supervisors and the --
3       Q    You managed the supervisors -- or
4  supervised the supervisors?
5       A    Uh-huh.
6       Q    Why did you leave Dalfort?
7       A    Needed a change.
8       Q    Needed a change?
9       A    Yeah.  And a promotion.
10       Q    Where did you go after Dalfort?
11       A    AOG, Incorporated.
12       Q    Was there a gap in time between
13  Dalfort and going to AOG?
14       A    No.
15       Q    So, did you resign your position at
16  Dalfort?
17       A    Yes, I did.
18       Q    And where is AOG?
19       A    Dallas, Texas.
20       Q    And what do they do?
21       A    Aircraft fuel tank repair.
22       Q    And what did you do for them?
23       A    Director of operations.
24       Q    How long were you there?
25       A    'Til 1995.
```

52

```
1       Q    Did they do anything else other
2  than aircraft fuel tank repair?
3       A    No, ma'am.
4       Q    That's a very specialized area,
5  huh?
6       A    Specialized field.
7       Q    About how many people did you
8  supervise as director of operations?
9       A    I had responsibility of the
10  operations at various locations.  There was
11  no actual work done on site.  It's all done
12  at places like ours.  So, we had folks in
13  Louisville, Kentucky, Miami, Seattle,
14  Washington, Dallas.  Traveled.
15       Q    Where was the headquarters for AOG?
16       A    Dallas, Texas.
17       Q    And what does AOG stand for?
18       A    In the commercial world, it stands
19  for aircraft on ground.  But that's just an
20  acronym.
21       Q    Oh, I see.  And they just took
22  their name from that?
23       A    Uh-huh.
24       Q    Why did you leave in '95?
25       A    Got a promotion.
```

53

1    Q    You got a better job?
2    A    Yes, ma'am.
3    Q    Okay.  And where was that?
4    A    Lockheed Martin.
5    Q    And where was that?  Which
6    location?
7    A    Tucson, Arizona.
8    Q    And what did you do for Lockheed
9    Martin?
10   A    Director of operations.
11   Q    And what did they do at this
12   location?
13   A    Aircraft repair.  Commercial
14   aircraft.
15   Q    Okay.  And how long were you at
16   Lockheed Martin?
17   A    Which location?
18   Q    Okay.  Well, did you leave Tucson,
19   then?
20   A    Yes, I did.
21   Q    Okay.  Where did you go?
22   A    Lockheed Martin in Greenville,
23   South Carolina.
24   Q    How long were you in Tucson?
25   A    'Til 1996.

54

1    Q    And then, from '96 to how long in
2    Greenville?
3    A    2003.
4    Q    Okay.  And what were you doing in
5    Greenville?  What was your title?
6    A    Manager of operations.
7    Q    Okay.  And was this a promotion or
8    a lateral transfer to go from Tucson to
9    Greenville?
10   A    Lockheed Martin -- actually,
11   Lockheed merged with Martin in 1995.  They
12   reevaluated their, you know, duplication of
13   facilities and stuff like that.  They closed
14   down the facility in Greenville -- I mean --
15   excuse me -- in Tucson.
16   Q    So, was this a lateral move, then,
17   over to Greenville?
18   A    Yes, it was.  Bigger facility.
19   Q    All right.  And you were there
20   until 2003.  Were you promoted while you were
21   in Greenville?
22   A    I don't know if -- when you say
23   "promotion," talking about from a supervisory
24   standpoint, the number of people you had?
25   Salary?  I mean, I held various jobs.

55

1    Q    Really, job title.
2    A    I had many job titles.  Manager of
3    operations, manager of manufacturing and
4    engineering.  Just titles.  Just work.
5    Q    And are these lateral changes in
6    your title?
7    A    Most of them.
8    Q    Corporate America likes to rename
9    people sometimes.
10   A    Corporate America, you know,
11   renames stuff.  Look at the people around
12   you, and you put people where you need to, to
13   do whatever needs to be done.
14   Q    And you left in 2003 to go to
15   Pemco?
16   A    Upward management change-up in
17   2003.
18   Q    I'm sorry?
19   A    Management change.  Laid off.
20   Q    Oh, okay.  And were you out of work
21   for a period of time?
22   A    A couple of months.  I guess,
23   actually, four months.
24   Q    Okay.  And then, what was your next
25   position?

56

1    A    Pemco World Air Services.
2    Q    How did you get on at Pemco?
3    A    They actually hired a headhunter
4    firm to find somebody that had the right
5    qualifications.
6    Q    They hired or you hired?
7    A    They hired.
8    Q    Did you know any of the people at
9    Pemco before you came to start work?
10   A    No, ma'am.
11       (Recess in deposition.)
12   Q    I think we were up through 2003.
13   You started at Pemco World Air?
14   A    Yes, ma'am.
15   Q    And that was when?  April 2003?
16   Something like that?
17   A    I believe so.  First part of April.
18   Q    I had requested a copy of your
19   personnel file, Mr. Johnson, and was
20   essentially given these documents.  Why don't
21   you take a look at that?
22   A    (Witness reviewing documents.)  Is
23   that it?
24   Q    That's what I'm asking you.
25   A    I don't know.  I've never seen my

57

1 personnel file until now.

2    Q    And that was going to be my

3 question to you. Are there any other

4 documents that you're aware of that should be

5 in there?

6    A    I have never seen my personnel

7 file.

8    Q    Where would your personnel file be

9 kept?

10   A    I have no idea.

11   Q    Who was responsible for hiring you?

12   A    Frank Tucci.

13   Q    And he was the president of World

14 Air Services --

15   A    That's correct.

16   Q    -- at that time?

17   A    That's correct.

18       (Whereupon, Plaintiff's Exhibit 3

19       marked for identification.)

20   Q    I'm going to show you what's been

21 marked as Plaintiff's Exhibit No. 3. And

22 this is a copy of the document that was

23 produced to me. And the Bates number on

24 there is 626 and 627. Is that the employment

25 agreement that you were telling us about

58

1 earlier?

2    A    Yes, ma'am.

3    Q    Okay. And you have a copy of that

4 at home?

5    A    Yes, I do.

6    Q    Was there any formal contract other

7 than that Exhibit No. 3 written up for your

8 employment?

9    A    No, ma'am. I'm still at will at

10 the company.

11   Q    And you were hired as vice

12 president of operations? Right?

13   A    That's correct.

14   Q    And that's still your title today?

15   A    Yes, it is.

16   Q    And what's your salary level now?

17   A    At what point in time?

18   Q    Right now.

19       MR. HOLMES: Libby, can we go off

20       the record just a second?

21       MS. GLASGOW: Uh-huh.

22       (Off-record discussion held.)

23       MS. GLASGOW: With that in mind,

24       I'm going to mark it here as

25       confidential, and John and I

59

1       will come to an agreement

2       concerning the terms of a

3       confidentiality protective

4       order for the compensation and

5       benefit information of Mr.

6       Johnson.

7       THE WITNESS: And what all does

8       that cover?

9       MS. GLASGOW: I was just putting

10      that on the record, that John

11      and I are going to enter into

12      an agreement to keep it

13      confidential. And there will

14      be a number of business

15      documents, I assume, that he'll

16      also want to include in that.

17      MR. HOLMES: Right.

18   Q    (By Ms. Glasgow) So, what's your

19 current salary?

20   A    130,000.

21   Q    And do you have incentive

22 compensation?

23   A    Yes, ma'am.

24   Q    It looks like, in the original

25 agreement, it was 20 percent of your base

60

1 salary, plus the company's incentive bonus

2 plan? Is that right?

3    A    It hasn't changed any from that

4 agreement.

5    Q    Have there been any additional

6 incentives offered to you?

7    A    Only as described here.

8    Q    How do you earn the additional 20

9 percent?

10   A    Through goals and objectives.

11   Q    Who sets the goals and objectives?

12   A    They're in line with whatever the

13 corporation's goals and objectives are for

14 next year. They're in line within that

15 range.

16   Q    Do you get the goals and objectives

17 at the beginning of the year? I mean, do you

18 know what you're trying to hit?

19   A    We fill one out and submit it for

20 acceptance, and it's accepted. If it's

21 rejected for whatever reason, you know, it

22 won't align properly, then it's approved, and

23 that's what you work to.

24   Q    And what do you call that paperwork

25 that you submit?

61

```
1    A    Goals and objectives.
2    Q    And who do you submit it to?
3    A    In the past or currently?
4    Q    Well, let's start in 2003.
5    A    Frank Tucci.
6    Q    And then, after him?
7    A    Ray Bennett.
8    Q    And after him?
9    A    Ron Armini.
10   Q    And what's his role?
11   A    He's the chief executive officer.
12   Q    Of Pemco World Air Services?
13   A    Pemco Aviation Group.
14   Q    So, now you're submitting to the
15   CEO over the entire group?
16   A    That's correct.
17   Q    And after Mr. Armini?
18   A    That's currently who I report to.
19   Q    Okay.  Has a president ever been
20   hired after Ray Bennett left?
21   A    No.
22   Q    And when did he leave?  Do you
23   remember?
24   A    I don't remember.  I don't
25   remember.
```

62

```
1    Q    Do you remember when Frank Tucci
2    left?
3    A    As a matter of fact, I don't.
4    Q    Ray Bennett was president during
5    2005 and during that period of layoffs?  Is
6    that correct?
7    A    He was president during 2005.
8    That's correct.
9    Q    And throughout the labor dispute?
10   A    Through the labor dispute.  That's
11   correct.
12   Q    And then, did he leave shortly
13   after that?
14   A    You know, I really don't know if it
15   was the last part of 2005 or the first part
16   of 2006.  I really don't.
17   Q    And so, the goals and objectives is
18   a document that you prepare?  Is that right?
19   A    It's a very simple document.
20   Q    Okay.  What's on the document?
21   A    Usually, five or six items.
22   Q    And what would those items be?
23   Give me some examples?
24   A    Helping meet the corporate earnings
25   goal, productivity from a revenue standpoint
```

63

```
1    on our programs, safety.  Usually two on each
2    one of those.  So, it would be six.
3    Q    The first one, you said corporate
4    earnings goals?
5    A    Yes, ma'am.  All corporations have
6    earning goals.
7    Q    Right.
8    A    I'm sure y'all do, too.
9    Q    Don't assume anything.  Who sets
10   the earnings goals for the entire
11   corporation?
12   A    The board of directors, I would
13   think.
14   Q    And is that a number that is given
15   to you?
16   A    Yes, ma'am.  We're a
17   publicly-traded company.
18   Q    But, is it given to you in a
19   specific report?
20   A    It's given to me in EBITDA, you
21   know, earnings before taxes and interest.
22   Q    Right.
23   A    It's a number.  So, it's just a
24   number to plan to.
25   Q    And typically when do you get this
```

64

```
1    number?
2    A    I would have to go back and look at
3    the dates on the ones I've turned in.
4    Q    I mean, is it generally done at the
5    end of the year or at the fiscal year?
6    A    Our review period is typically --
7    we submit reviews in January.  And if there's
8    anything -- you know, any compensation
9    implemented after that, it's usually, I
10   think, in the first part of April.
11   Q    So, if you're going to receive your
12   bonus for the year, you get it in April?
13   A    Uh-huh.  That's correct.
14   Q    And have you turned in goals and
15   objectives for each year since you've been
16   there?
17   A    Yes, I have.
18   Q    Who sets the figure for
19   productivity on revenue?
20   A    I don't understand the question.
21   Q    You said one of the categories was
22   productivity based on revenue.  Did I not
23   understand that correctly?
24   A    I may not have understood -- I may
25   have given an answer.  I didn't understand
```

65

1    the question accurately.
2        Q    Well, I had asked you, what are
3    some of the items that you put on your goals
4    and objectives document, and you said
5    productivity, and you said that that's based
6    on revenue.
7        A    If you have -- I'll just give an
8    arbitrary number here.  If you're going to do
9    60 million dollars' worth of business, that
10   equates into "X" number of man-hours.  And,
11   obviously, if the man-hours are more than
12   what they should be, then you're going to
13   take a little loss, and if they're a little
14   better, you might make a little.
15       Q    So, you take the dollar amount in
16   terms of revenue received, and you compare
17   that to the man-hours that have been worked?
18       A    That's all we have to sell is
19   man-hours.
20       Q    Right.
21       A    We're a labor provider.  So, other
22   than, you know, revenue that's generated off
23   of freight, you know, selling a few spare
24   parts, the majority of our business is based
25   on man-hours.

66

1        Q    Okay.  And so, the goal of your
2    business, in terms of productivity, is to
3    raise the revenues and lower the manpower
4    hours to raise your productivity rate?
5        A    That's correct.
6        Q    And is there a general rule of
7    thumb that's a good productivity rate?
8        A    In our business or in any business?
9        Q    Yes.  For you.  On your goals and
10   objectives, what type of productivity rates
11   would you put down?
12       A    7 percent.
13       Q    And that 7 percent equals --
14       A    We can do a hypothetical.
15       Q    Okay.  We'll just do that.
16       A    If you have 100,000 man-hours, you
17   know, I would like to be, you know, 93
18   percent productive on those man-hours.
19       Q    Okay.  And how do you determine
20   whether man-hours are productive?
21       A    We take the bid rate on the
22   airplane -- once again, you know, if you bid
23   something to do it in 20,000 hours, and you
24   complete it in, you know, 19,500 hours, your
25   cost level is figured on that.

67

1        Q    I see.  Do manpower hours include
2    management at all?
3        A    No, they do not.
4        Q    So, in terms of your incentives in
5    productivity, you are not factoring in
6    management manpower hours?
7        A    No, ma'am.
8        Q    Have you met your incentive goals
9    to receive your bonus every year?
10       A    No, ma'am.
11       Q    Have you received it any years?
12       A    For 2006.
13       Q    Was that the first year you
14   actually got the bonus?
15       A    First year I got my full bonus.  I
16   think I got the full bonus.
17       Q    Is there a provision for paying
18   partial bonus?
19       A    Yes, there is.  I don't have that
20   criteria.  But it's possible to get, you
21   know, 1 percent or 2 percent.  Just because
22   you don't meet all your goals and objectives
23   doesn't necessarily mean that you will not
24   get a bonus.
25       Q    So, you may have gotten a partial

68

1    bonus in prior years?
2        A    Yeah.  But I'd have to look and
3    see.  I mean, nothing significant.
4        Q    Did you get a bonus in 2007?
5        A    The year is not up yet.
6        Q    That's right.
7        A    It would be paid in 2008.
8        Q    Who all participates in the
9    company's incentive bonus plan?
10       A    I'm not sure.
11       Q    Do you know of anyone else at World
12   Air Services here in Dothan that participates
13   in that?
14       A    That's all confidential.  I don't
15   know.  I know I participate in it.  I would
16   just be guessing if I said somebody else.
17       Q    Would facilities managers or
18   directors participate in that, to your
19   knowledge?
20       A    I don't know.  I know, currently,
21   the facilities guys do not.
22       Q    Are there any other incentive
23   bonuses that are offered to you other than
24   what's in Exhibit No. 3?
25       A    No, ma'am.

69

1    Q    And it looks like you got some
2    stock options, as well?
3    A    Yes, ma'am.  Worthless, but yes.
4    Q    I've seen the prices.  Have you
5    received any more stock in the corporation
6    since coming on board in '03?
7    A    Yes, I have.
8    Q    And has that been paid to you as
9    part of your compensation?
10    A    It's just stock options.
11    Q    Is that something that you
12    purchased, or is that something that was
13    awarded to you?
14    A    No.  It's awarded to me.
15    Q    About how many shares do you own
16    now?
17    A    I don't know.
18    Q    Have you exercised your option?
19    A    No, I have not.
20    Q    For any of it?
21    A    No, ma'am.
22    Q    Did you sign a confidentiality
23    nonsolicitation agreement?
24    A    Yes, I did.
25    Q    Do you know where that is?

70

1    A    No, I do not.
2    Q    Did you sign drug testing consent
3    forms?
4    A    Yes, I have.
5    Q    Do you participate in drug testing?
6    A    Yes, I do.
7    Q    Do you know where those forms are?
8    A    No, I do not.
9    Q    Do you recall signing any other
10    personnel documents, like, an I-9 form?
11    A    I may have signed an I-9.  I'm sure
12    I have.  You would have to ask the HR
13    department.  I don't know where that stuff is
14    kept.
15    Q    You don't know where it is?
16    A    I don't know where it's at.  You
17    have my file.
18    Q    Well, that's what I'm trying to
19    determine, whether I do have your file or
20    not.  When you received the bonuses and the
21    stock options, did you get a letter that goes
22    with it?
23    A    Yes, ma'am.
24    Q    Who would the letter be from?
25    A    The corporate controller.

71

1    Q    Okay.  And who is that?
2    A    Randy Shealy.
3    Q    And Randy Shealy is in --
4    A    Birmingham.
5    Q    In Birmingham.  Okay.  Do you know
6    if Birmingham keeps separate personnel
7    records, compensation records, on you?
8    A    I have no idea.
9    Q    When you submitted your goals and
10    objectives to the presidents, Frank Tucci and
11    Ray Bennett, do you know what they did with
12    your goals and objectives after that?
13    A    No, ma'am.
14    Q    Is there a president's office in
15    Dothan?
16    A    Yes, there is.
17    Q    Is anybody in that office now?
18    A    No, ma'am.
19    Q    Are there records in that office?
20    A    I don't know.
21    Q    Can you think of any other place
22    that might have some of these records
23    pertaining to your personnel matters?
24    A    Only the HR department.
25    Q    And that would be in Dothan,

72

1    wouldn't it?
2    A    That's correct.
3    Q    Have you taken any financial
4    courses during your continuing education, or
5    ongoing education, I should say?
6    A    Ongoing.  I haven't taken an
7    accounting class lately.  No, I don't think
8    so, other than -- I would have to look and
9    see.  I don't know.
10    Q    You've never taken accounting?
11    A    I have never taken accounting.
12    I've had no reason to take accounting.
13    Q    Did you ever take any HR training
14    or course work?
15    A    I had a lot of informal work in HR
16    at Lockheed Martin.
17    Q    What do you mean by "informal"?
18    A    Well, you know, nothing that I
19    could get additional, you know, continuing
20    education credit for.
21    Q    Would it be -- you know, I think
22    most large corporations like Lockheed would
23    have sexual harassment training for
24    supervisors and that sort of thing.
25    A    That's correct.

73

1    Q    My question really goes to more of
2    actual study of employment laws, HR policies,
3    that sort of thing.  Have you ever taken any
4    of those kind of specific courses?
5    A    I have read a lot of policies and
6    procedures in the last 25 years.
7    Q    But have you taken any course work
8    in --
9    A    No, ma'am.
10    Q    -- HR itself --
11    A    No, ma'am.
12    Q    -- or in employment law, for
13    example?
14    A    No, ma'am.
15    Q    All right.  Have you ever been
16    written up in all your various jobs for any
17    reason?
18    A    No, ma'am.
19    Q    Have you ever been demoted?
20    A    No, ma'am.
21    Q    Have you ever been terminated?
22    A    No, ma'am.
23    Q    Have you ever been convicted of a
24    crime?
25    A    No, ma'am.

74

1    Q    Have you ever been involved in any
2    civil lawsuits?
3    A    No, ma'am.
4    Q    Not divorces or anything like that,
5    but civil lawsuits for damages?
6    A    I don't think so.
7    Q    You've never brought suit against
8    anyone?
9    A    Not at all.
10    Q    And you've never been sued
11    personally?
12    A    No, ma'am.
13    Q    Tell me about your role as vice
14    president of operations.  What does the vice
15    president of operations do?
16    A    Responsible for the day-to-day
17    operation of an FAA 145 repair station.
18    Q    Now, you told me Frank Tucci was
19    there when you first came on at Pemco.
20    A    That's correct.
21    Q    And then, he left, and I think he
22    retired?  Is that right?
23    A    That's correct.
24    Q    And then, Ray Bennett was
25    president?

75

1    A    That's correct.
2    Q    And there has not been a president
3    since Ray Bennett left?
4    A    That's correct.
5    Q    Did you assume those duties as
6    president, you know, in the absence of a
7    president of World Air Services?
8    A    No, ma'am.
9    Q    Who did assume those duties as
10    president?
11    A    They're shared between three
12    people.
13    Q    Who is that?
14    A    Dennis Johnson.
15    Q    That's you?
16    A    That's me.  Kevin Casey, marketing.
17    Chris Walker.  He's our finance guy.
18    Q    And what duties that the president
19    would normally exercise have you assumed?
20    A    I don't think I really assumed
21    anything I wasn't doing before.  So, I mean,
22    I can't say that there's a specific segment
23    of the business, you know, that he dedicated
24    himself to, that has fallen on, you know, my
25    responsibility since he left.  There's no

76

1    change.
2    Q    Any additional reporting,
3    paperwork, that sort of thing, that has come
4    to you, that the president used to do?
5    A    No, ma'am.
6    Q    And since Ray Bennett left, have
7    you been reporting to Ron Armini?
8    A    That's correct.
9    Q    And have been doing so since
10    whenever Mr. Bennett left?
11    A    That's correct.
12    Q    And do Kevin Casey and Chris Walker
13    report to you, or do they report directly to
14    Mr. Armini?
15    A    They both report to Mr. Armini.
16    Chris, indirectly.  Actually, he reports to
17    Randy Shealy.  So, I guess he's a dotted
18    line-type guy.
19    Q    But neither of them report to you?
20    A    No, they do not.
21    Q    Other than marketing and finance,
22    do you supervise all the remaining
23    departments in the plant?
24    A    I supervise all the production
25    department, which is all the aircraft touch

77

1  labor.  I also have the facilities
2  department.  And I have indirect oversight
3  over the planning department.
4      Q    And I think you told me before
5  about all the other ones.
6      A    Yeah.
7      Q    I think we've talked about that.
8  Six production managers, two directors, Roy
9  Gulledge of avionics.  Is that a separate
10 department?
11     A    It's a separate discipline.  It's
12 not really a department.
13     Q    What is avionics?
14     A    Navigation equipment, utilitarian
15 systems on the aircraft, you know,
16 pressurization, lighting, that type of stuff.
17     Q    Is that a special skills set?
18     A    It's a different skills set.  It
19 can all fall through the same skills set.
20 But since we have a collective bargaining
21 agreement, we have some skills sets that are
22 broken down.
23     Q    And is that part of production?
24     A    Yes, it is.
25     Q    And then, you mentioned Danny Shell

78

1  was in charge of the back shops?
2      A    Fell.  Yes, ma'am.
3      Q    Fell?
4      A    Fell.  Uh-huh.
5      Q    F-e-l-l?
6      A    That's correct.
7      Q    And the back shops, is that under
8  facilities?
9      A    No.  That's under -- that falls
10 under production.  That's a support group for
11 component pieces that are removed.  Seats,
12 lavatories, galleys, those type of items go
13 to a separate shop to be refurbished.
14     Q    And then, Dan Brooks was the
15 evening shift manager --
16     A    That's correct.
17     Q    -- over all operations, or is he
18 just on a particular department?
19     A    He's a catch-all-type guy.  He's
20 just responsible for -- you know, if there's
21 any accidents or injuries, plane catches on
22 fire, you know, it's somebody to handle
23 whatever comes up.
24     Q    Do you have a Blackberry?
25     A    No, I do not.  I don't want one,

79

1  either.
2      Q    Are there any other vice presidents
3  of World Air other than yourself?
4      A    Yes, there is.  Chris Walker and
5  Kevin Casey.
6      Q    Has there ever been a discussion
7  about promoting one of the three vice
8  presidents, you, Kevin Casey or Chris Walker,
9  to the president position?
10     A    Not that I'm directly aware of.
11     Q    Okay.  Who would make that
12 decision?
13     A    The corporate office.
14     Q    Ron Armini?
15     A    That's correct.
16     Q    Now, do you attend the board
17 meetings?
18     A    No, I do not.
19     Q    How do the directions of the board
20 come down to you?
21     A    Through Ron Armini.
22     Q    And how often do you speak with
23 him?
24     A    Sometimes daily.  Sometimes, you
25 know, a couple of times -- you know, I talk

80

1  to him two or three times a week, every week.
2      Q    When you started, in 2003 -- or was
3  there ever a time that you attended board
4  meetings on a regular basis?
5      A    I've attended one board meeting,
6  and I believe that was in -- it may have been
7  in 2003, maybe 2004.  But one general board
8  meeting.
9      Q    And what was the purpose of your
10 attendance there?
11     A    It was just some general
12 presentations.  But it wasn't a formal -- I
13 think it was kind of an informal board
14 meeting brief, as far as the actual
15 presentations on which direction our company
16 is headed in, you know, those type of items.
17 I've never been involved in that.
18     Q    Do you have any hand in preparing
19 reports that are submitted to the board for
20 their meetings?
21     A    No, I do not.  At least, not that
22 I'm aware of.
23     Q    Right.  You do not specifically
24 task with preparing reports for the board?
25     A    No.

81

1    Q    Do you have any ongoing
2    communications with members of the board on a
3    regular basis?
4    A    No, ma'am.
5    Q    Most of your communication is
6    through Ron Armini, then?
7    A    That's correct.
8    Q    So, because you've never exercised
9    your stock options, you have no ownership
10    interest in the company?  Is that right?
11    A    That's correct.
12    Q    Did you receive any training when
13    you first came to Pemco, other than just a
14    general orientation?
15    A    I'm not for sure what you're
16    asking.
17    Q    Was there any specific training
18    program provided to you in any field?  As I
19    said, I'm not talking about showing you
20    around the shops and telling you where
21    everything is, but a specific training
22    program in safety --
23    A    The typical HR indoctrination
24    training that all companies have.
25    Q    For all employees?

82

1    A    For all employees.
2    Q    Was there anything specific in
3    terms of training you for vice president of
4    operations of World Air Services?
5    A    No, ma'am.
6    Q    At any time during your employment
7    with Pemco, have you had authorization to
8    call Doris Sewell directly?
9    A    When you say "authorization," I
10    don't understand.  Do I have to ask
11    permission to call Doris Sewell?
12    Q    Yes.
13    A    No, I do not.
14    Q    You could call her directly?
15    A    That's correct.
16    Q    You don't need to go through Ron
17    Armini to ask a question of Doris Sewell?
18    A    No, I do not.
19    Q    And World Air has its own HR
20    department?  Correct?
21    A    That's correct.
22    Q    And it has its own HR director?
23    A    That's correct.
24    Q    And who supervises the HR director?
25    A    You need to help me with that one.

83

1    Today?  Yesterday?  Last year?
2    Q    All right.  Well, let's start with
3    today.
4    A    Okay.
5    Q    Fred Hannering is, I understand,
6    the HR director.
7    A    That's correct.
8    Q    Who does he report to?
9    A    I believe he reports to Ron Armini.
10    Q    He does not go through you?
11    A    Does not.
12    Q    Has that changed, you know, since
13    2003, when you started?  Were they doing it a
14    different way then?
15    A    Yes, ma'am.
16    Q    How was it different?
17    A    The HR director reported to the
18    president.
19    Q    And when Ray Bennett left --
20    A    It changed.
21    Q    -- it changed.  And then, the HR
22    director, like you, reports to Ron Armini
23    directly?
24    A    I believe that there was an interim
25    time there where the HR director reported to

84

1    Doris Sewell.
2    Q    Was that after Ray Bennett left?
3    A    Yes.
4    Q    Do you need authorization to call
5    HR to ask questions or get information?
6    A    No, ma'am.
7    Q    Who prepares the financial reports
8    for Pemco World Air Services?
9    A    Chris Walker.
10    Q    Okay.  Are those financial records
11    made available to you?
12    A    If I care to look at them, yes,
13    ma'am.
14    Q    Are they sent to you on a regular
15    basis?
16    A    It's not required.
17    Q    I mean, how often do you take a
18    look at them?
19    A    Once a week.
20    Q    And the typical financial reports
21    that you take a look at once a week, what
22    kind of information do they have?
23    A    Direct labor man-hours, indirect
24    labor man-hours.
25    Q    Tell me the difference between

85

1  direct labor and indirect labor?
2      A   Indirect labor would be things like
3  training.  Indirect labor would be sick
4  leave.  Indirect labor would be vacation.
5  You know, things that aren't directly
6  chargeable to the aircraft out of the
7  production group.
8      Q   And who compiles this information
9  on the man-hour --
10      A   Chris Walker.
11      Q   Okay.  And is that done weekly?
12      A   Yes, it is.  He may do it more
13  often, but I see the reports weekly.
14      Q   And does he automatically send them
15  to you every week, or do you have to request
16  them every week?
17      A   I generally go over it with him.
18      Q   Do you play any kind of role in the
19  preparation of those financial records?
20      A   I don't understand the question.
21      Q   You've told me that Chris Walker
22  prepares the financial reports.  Do you have
23  any role in the preparation of those reports?
24      A   Not in the preparation of the
25  report.  The reports basically are an

86

1  overview of what -- I guess they're my
2  watchdog.  Most of them are based on what my
3  group is doing.
4      Q   Okay.  But in terms of preparing
5  the actual report itself, that's not part of
6  your job description?
7      A   No, it's not.
8      Q   Do you review the financial records
9  for accuracy, you know, to make sure they're
10  correct?
11      A   No, I don't.
12      Q   Now, I understand that some of the
13  records are kept by --
14      A   Can we go back to that question
15  just for a minute?  I'm not for sure -- let
16  me rephrase that.  I'm not for sure what you
17  mean when you say "accuracy."  You mean do I
18  go by line item and add the columns up and go
19  across and all that stuff, to see if the
20  number at the end of the page adds up
21  accurately, or what?
22      Q   Do you have any role in making sure
23  that those financial reports are accurate?
24      A   I don't audit the reports.
25      Q   That was really my question.

87

1      A   Okay.
2      Q   Do you review the reports to see
3  generally whether they're accurate or not?
4      A   Yes, I do.
5      Q   And because it's based on
6  information that comes from your department
7  and the operations of the plant itself --
8      A   That's correct.
9      Q   -- you would know if something was
10  significantly out of place?
11      A   That's correct.  If something was a
12  percent off, I wouldn't notice it.  If
13  something was 15 percent off, then I would
14  notice it probably.
15      Q   Right.  But it's not part of your
16  job description to make sure that those
17  financial records are correct?
18      A   That's correct.
19      Q   Now, we talked about that some
20  records are at the group level in Birmingham.
21  I think some of the financial records -- is
22  that right? -- are in Birmingham?
23      A   I don't know that to be a fact.
24      Q   Okay.  Do you ever have occasion to
25  request records from the Pemco Aviation Group

88

1  or Pemco Aeroplex?
2      A   I would never do that.
3      Q   Would you go through Ron Armini if
4  there was something that you needed from the
5  group level?
6      A   I can't see where I would ever need
7  any of that information.
8      Q   Is there a long-range planning
9  committee for World Air Services?
10      A   Like any company, you know, we have
11  a plan for the upcoming year.  And I'm sure
12  we have a two-year plan or a five-year plan.
13      Q   Are you on --
14      A   If I had to produce a five-year
15  plan today, I couldn't do that.
16      Q   Is there one, though?
17      A   I don't know.
18      Q   Have you ever seen five-year plans
19  that were prepared in the past?
20      A   No, I haven't.
21      Q   Have you ever been part of any
22  committee that does the long-range planning?
23      A   No, I have not.
24      Q   Do you know who would be on that
25  type of committee?

89

1    A    I do not.
2    Q    Okay. Is that something that would
3  be done in Dothan or Birmingham?
4    A    I don't know.
5    Q    When you started with the company,
6  in 2003, what was the general overall
7  financial outlook for Pemco World Air
8  Services at that time?
9    A    I guess you mean from a personal
10  standpoint of what I thought or from --
11    Q    Yeah. What did you think?
12    A    Well, I guess it's kind of obvious.
13  If I didn't think they didn't have a future,
14  I wouldn't have gone to work there.
15    Q    Did you consider them a company
16  that needed a lot of help or that they needed
17  to be doing some more things, or did you
18  consider that their operations were generally
19  going fairly well?
20    A    I think there were some
21  opportunities for improvement.
22    Q    In what particular areas did you
23  notice?
24    A    All areas, at least in the
25  production area.

90

1    Q    Did you have any particular
2  programs that you wanted to implement or did
3  implement to make those changes?
4    A    I don't understand.
5    Q    When you came in, in 2003, you
6  thought there were some areas that needed
7  improvement. Did you take any action,
8  implement any programs, to bring that
9  improvement --
10    A    Yes, I did.
11    Q    -- to being? What kind of programs
12  and changes did you make?
13    A    The manpower structure and
14  planning, policies and procedures. Those are
15  the two biggest ones.
16    Q    What changes did you make to
17  manpower structure?
18    A    The way it was planned and
19  forecasted.
20    Q    How did you change things there in
21  the way it was forecasted?
22    A    A different approach than what
23  either the past management or the current
24  management was taking. How they planned
25  their manpower.

91

1    Q    How was it different?
2    A    It was more structured.
3    Q    How were they doing it before?
4    A    Poorly.
5    Q    And what did you do to change it?
6    A    It was a guess before. I need six
7  Libbys and three Johns and two Dennises. You
8  know, why? Well, that's just what I think.
9  And not breaking it down by reviewing past
10  percentages, past manpower applied,
11  similar-type projects, indirect time charged,
12  nonproductive time, those type of things.
13    Q    So, did you have an opportunity, at
14  that point, to review what had been done by
15  Pemco in the past in terms of manpower hours
16  and all those things that you just mentioned?
17  Indirect --
18    A    Yes, I did.
19    Q    -- all the rest of that? And so,
20  has that been an ongoing thing for you to do
21  that, in order to forecast properly the
22  manpower structure?
23    A    That's correct.
24    Q    How did you change policies and
25  procedures?

92

1    A    Updating.
2    Q    What policies and procedures are
3  you talking about?
4    A    Just has to do with only the
5  operations side.
6    Q    In terms of what? Safety?
7    A    All areas. We have a complete set
8  of QWPs, quality work procedures. Policy and
9  procedures updating is an ongoing thing with
10  any company. We're nothing out of the
11  ordinary.
12    Q    Did you take on the HR policies and
13  procedures at all?
14    A    Did not.
15    Q    Any other changes, programs that
16  you implemented?
17    A    Throughout this time period?
18    Q    Well, start in the period 2003. I
19  understand it's an ongoing process.
20    A    It's an ongoing process. We have
21  made substantial improvements in the
22  operations -- production operations
23  department from 2003 to present.
24    Q    Okay. Are there any other major
25  programs that you have implemented since

93

1   coming in 2003?
2       A    When you say "programs," are you
3   talking about operational-type programs?  Are
4   you talking about customers?
5       Q    Yeah.  Along the same lines that we
6   have been talking about.
7       A    It's the same thing.  We've got a
8   much more structured approach to our daily
9   reporting, flow charts or Gantt charts, ever
10  how you want to put it, expectations.  You've
11  got policies and procedures on there,
12  constant updates.  You know, it's just the
13  basic stuff.
14          (Recess for lunch.)
15      Q    I think we were talking, Mr.
16  Johnson, a time period around 2003, when you
17  first came to Pemco.  At that time, how many
18  people were in management in facilities at
19  the Dothan location?
20      A    I don't know.
21      Q    Do you have any idea?
22      A    No, I don't.  I wasn't responsible
23  for the facilities department in 2003.
24      Q    Okay.  Henry Ward was the director
25  of facilities at that time?  Is that right?

94

1       A    That's correct.
2       Q    And who did he report to?
3       A    Frank Tucci.
4       Q    Okay.  And Roger Wright was the
5   manager of facilities at that time?  Is that
6   right?
7       A    I think so.
8       Q    And then, are you aware of any
9   other management positions in facilities?
10  Richard Miller, was he --
11      A    Richard Miller was there.  I don't
12  know the structure of facilities then, in
13  2003.
14      Q    At some point, did you become a
15  supervisor over the facilities department?
16      A    Facilities fell under my
17  responsibility during 2005.
18      Q    And was that after Ray Bennett left
19  or before?
20      A    Before Ray Bennett left.
21      Q    How did that come to fall under
22  your responsibilities?
23      A    They were just doing some
24  organizational changes from a reporting
25  structure standpoint.

95

1       Q    And who initiated those
2   organizational changes?
3       A    Ray Bennett.
4       Q    And do you remember when in 2005
5   that was initiated?
6       A    It was some time before the
7   lockout.  But I don't remember if it was
8   June, July.  Some time during the middle part
9   of the year.
10      Q    Was Henry Ward still there at that
11  time?
12      A    At the time of the changeover?
13      Q    At the time that facilities was
14  brought under your responsibility.
15      A    Yeah.  But it seems like it was
16  only just for -- you know, just a week, a
17  month.  I mean, it was a very short period of
18  time.
19      Q    And I assume Roger Wright was there
20  at that time?
21      A    That's correct.
22      Q    So, when you took over and
23  facilities came under your responsibility,
24  Henry Ward was in management there, Roger
25  Wright was in management there, and Richard

96

1   Miller was in management there?  Is that
2   right?
3       A    As far as I know, yeah.  I don't
4   know if there was anybody else.
5       Q    Ted Ball was not in facilities at
6   that time?  Is that right?
7       A    That's correct.
8       Q    And Clark Briody was not in
9   facilities at that time?
10      A    That's correct.
11      Q    And you can't think of anyone else
12  who would be in management in facilities at
13  the time you assumed responsibility?
14      A    No.
15      Q    Do you know how long Mr. Ward, Mr.
16  Wright and Mr. Miller had been the management
17  team for facilities?  How long they had been
18  working together?
19      A    No, I don't.
20      Q    Now, I know that there were some
21  layoffs in 2004 and 2005 for World Air
22  Services.  There's been some discussion about
23  a temporary layoff and an indefinite layoff.
24  What's the difference between those, as far
25  as Pemco's use of those terms?

97

```
1      A    To give the actual definition, I
2  would need the collective bargaining
3  agreement. It's described in there, I
4  believe.
5      Q    But the collective bargaining
6  agreement, it doesn't apply to management
7  employees? Correct?
8      A    No, it does not.
9      Q    Are there temporary layoffs of
10 management employees?
11     A    All management employees are at
12 will of the company.
13     Q    And so, my question is, are there
14 temporary layoffs for management employees?
15     A    I guess there could be. You know.
16 I guess I'm not for sure, you know, what
17 you're really asking me on that.
18     Q    I've seen the two terms, temporary
19 layoff and an indefinite layoff. And what
20 I'm trying to understand is, what's the
21 difference between the two?
22     A    The temporary layoffs and the
23 indefinite layoffs are for the bargaining
24 unit employees, and it's described in the
25 collective bargaining agreement.
```

98

```
1      Q    And would an indefinite layoff ever
2  be applied to management?
3      A    I would only have to speak from my
4  personal experience on that.
5      Q    Well, tell me what you know.
6  That's why we're here today.
7      A    If a management person is laid off,
8  they're at will of the company. And if you
9  get laid off, then you move on. You know.
10 If the company decides to call you back, then
11 they'll call you back. But circumstances
12 change in management all the time. That's
13 pretty standard everyplace.
14     Q    But, have you ever seen management
15 employees be given a temporary layoff?
16     A    I've seen management employees move
17 from one area to another. You know. And at
18 Pemco World Air Services, it's possible, if a
19 management person previously held seniority
20 in the bargaining unit, they could return to
21 the bargaining unit, and then, if they needed
22 to be called back up or a job was offered to
23 them again in the future, they would have the
24 opportunity to come back into management.
25 And we have done that before.
```

99

```
1      Q    I'm going to show you just a
2  document that was given to Roger Wright. And
3  the Bates number -- I'm not going to make
4  this an exhibit. But the Bates number is
5  128.
6      A    Okay.
7      Q    And it uses the term "indefinite
8  layoff" with regard to Roger. Now, he was
9  management? Correct?
10     A    That's correct. I think, like I
11 stated earlier, all management-type layoffs,
12 I mean, I consider as a -- you move on if
13 you're laid off, unless you came out of the
14 bargaining unit. You have a choice.
15     Q    It is a permanent layoff?
16     A    That's the way I interpret it.
17 Yes.
18     Q    All right. There were some layoffs
19 that occurred in 2004 and in 2005. Were you
20 part of the decision makers for those
21 layoffs?
22     A    Have you got some documentation on
23 the 2004 layoffs?
24     Q    Such as?
25     A    Help refresh my memory of 2004.
```

100

```
1      Q    What would you need to refresh your
2  memory?
3      A    Any documentation you have that
4  shows names or people or if they're
5  bargaining unit people or if they're
6  management people. I have no clear
7  recollection of layoffs in 2004.
8      Q    Okay. What about 2005?
9      A    2005. We did have some layoffs in
10 2005.
11     Q    Okay. Who were the decision makers
12 in terms of the initial decision to lay off
13 people in 2005?
14     A    It would be a combination of the
15 management group here in Dothan.
16     Q    And who would that be?
17     A    Some of the people that we
18 described earlier. It would be Grady Mixon.
19 At that time, the president was Ray Bennett.
20 Myself, Dennis Johnson. And finance would be
21 Chris Walker. And, also, the marketing group
22 would also be involved in that.
23     Q    And who was who?
24     A    Kevin Casey.
25     Q    Who first raised the thought that
```

101

1 layoffs would have to occur?
2     A    As we talked about earlier, I mean,
3 it depends on what the work load is.
4     Q    And I'm talking about specifically
5 for layoffs that occurred in 2005.
6     A    It was dependent upon work load.
7     Q    When did the first idea come about
8 or the problem be recognized that some
9 layoffs were going to have to occur?
10     A    We had a continuing decrease in
11 work in 2005.
12     Q    And what caused that?
13     A    I think the main basis behind it
14 was the upcoming collective bargaining
15 agreement.
16     Q    Your own?
17     A    Yes.
18     Q    I mean, Pemco's?
19     A    Pemco's.  That's correct.
20     Q    And why would that cause a decrease
21 in work?
22     A    Our customers, I'm sure, were under
23 the impression that if the collective
24 bargaining agreement did not go well, you
25 know, there was a possibility their airplanes

102

1 could be trapped at our facility and not be
2 worked on.
3     Q    Does that typically happen every
4 time that the collective bargaining agreement
5 comes up for renewal?
6     A    I think any time you have a union
7 environment, there's a possibility that, you
8 know, you could have a work force that votes,
9 you know, to do one thing or another, be it,
10 you know, a layoff -- excuse me -- not a
11 layoff, but a strike or a work slow-down.
12 All those type things that typically go along
13 with collective bargaining agreements.
14     Q    What's the normal term for the
15 bargaining agreements for World Air Services?
16     A    The term?
17     Q    Yeah.  Is it five years?
18     A    Three years.
19     Q    Three years?
20     A    Yeah.  Three years.
21     Q    And so, is there a slow-down in
22 work every three years, as this bargaining
23 agreement comes up, or was 2005 an unusual
24 year?
25     A    I can't speak for previous years

103

1 there.  I don't know.
2     Q    But, was there anything unusual in
3 the time period before the agreement was
4 about to expire?
5     A    Only our customers' concerns.  You
6 know, at the time, Northwest Airlines was
7 undergoing some difficult times in their
8 bargaining unit.  And they were our largest
9 customer at that time.
10     Q    What percentage of your work load
11 came from Northwest?  Any idea?
12     A    In what year?
13     Q    At that time, 2005.
14     A    70 percent.
15     Q    70 percent?
16     A    Uh-huh.  That's just a guess on my
17 part.  I don't know if that was the actual --
18     Q    I understand.  What other customers
19 did you have?  You mentioned Northwest,
20 Southwest.
21     A    Southwest -- we weren't working on
22 Southwest airplanes at the time.
23     Q    Did you have any other customers
24 other than Northwest?
25     A    ILFC, International Lease & Finance

104

1 Corporation.
2     Q    Okay.  Any others?
3     A    I think those were the only two
4 customers in the facility at the time.
5     Q    So, the main problem, then, was
6 caused by Northwest and their concerns?  Is
7 that right?
8     A    There was a concern, yeah, on both
9 parties' part.
10     Q    And do you normally sign contracts
11 with your customers?
12     A    Yes, we do.
13     Q    Is it based on a time period?
14 We're going to allow you to service our
15 airplanes for this year or five years or
16 whatever it is?
17     A    We have a basic agreement with most
18 of our customers, you know, that have
19 amendments to them.  But we don't have
20 anything that says, you know, we have an
21 exclusive right to work on your airplanes for
22 a period of time.  It's kind of at will.
23 They can pull their airplanes out at any
24 time.
25     Q    And I guess that makes projections

105

1 difficult?

2 A    Yes, it does.

3 Q    So, they don't have to provide you

4 with 30 airplanes a year, for example?

5 A    No, they do not.

6 Q    It's just, as they feel the need,

7 I'm going to send this one to you, I may send

8 another one to somebody else in Dallas or --

9 A    That's correct.

10 Q    What is the -- I mean, if you were

11 going full bore, how many airplanes a month

12 can you handle?

13 A    We do it in hours.  120,000 would

14 be full bore for our facility to date.

15 Q    And how many hours for a typical

16 airplane, or is there a typical airplane?

17 A    No.  There's a typical amount of

18 hours for a typical type of inspection and

19 repair.  If I had to give you a number of the

20 average airplane, it would be somewhere in

21 the 15,000-hour range.  But, you know, it can

22 vary from 15,000 hours to 45,000 hours.  But

23 if you had to average, it would be 15 to

24 20,000 hours.

25 Q    And so, during 2005, had Northwest

106

1 just quit sending airplanes to y'all for

2 service?

3 A    You know, Northwest was under a lot

4 of strain at that time.  And what their

5 rationale was, I don't know.  I do know,

6 internally, we were very concerned that the

7 collective bargaining unit agreement was

8 going to affect our business.

9 Q    Northwest's collective bargaining

10 agreement or your own?

11 A    Our own collective bargaining

12 agreement.

13 Q    And so, what steps did you take,

14 you know, based on that concern?

15 A    Scenarios.  If the collective

16 bargaining unit voted to strike, which they

17 had done, you know, what would we do if they

18 did strike.  If they didn't strike, and our

19 customers elected to protect themselves by

20 not putting an airplane in the facility, or

21 maybe just have one airplane in there or two

22 airplanes in there, you know, what would be

23 the work force size and requirements during

24 that point in time.  Those type of scenarios.

25 What happens if the whole thing goes away.

107

1 You know.  What are we going to do when we

2 build back up.  Typical questions you would

3 ask yourself in any business, if it's

4 fluctuating over -- largely over a small

5 period of time.

6 Q    When did the CBA expire?

7 A    You know, I would have to look that

8 up.

9 Q    You know, I don't know that I have

10 it.  It was in the summer of 2005?  Right?

11 A    Yes, it was.

12 Q    End of July?

13 A    Honestly, I would have to look it

14 up.

15 Q    And were there layoffs that

16 occurred in anticipation of this CBA

17 expiring?

18 A    All our layoffs occurring were

19 strictly related to work load.  It just had

20 to do with work load.  I mean, if we have

21 work, then you have to maintain a certain

22 number of, you know, different type of skill

23 levels to do that work.  We had some growing

24 concerns.

25 Q    Did you expect that there would be

108

1 some type of work stoppage when the agreement

2 expired?

3 A    We were hoping that, during the

4 negotiation period, that whatever the

5 differences were between what the collective

6 bargaining unit was asking for and what the

7 company was willing to sign up for, we were

8 hoping that would all be resolved.

9 Q    And eventually, Pemco did a lockout

10 of the employees?  Is that right?

11 A    Yes, we did.

12 Q    Do you remember when the lockout

13 started?

14 A    I think some time in the first part

15 of August.

16 Q    And how long did the lockout last?

17 Do you remember?

18 A    No, I don't.  It was 60 or 70 days.

19 I would have to look it up.

20 Q    And at the end of the lockout, all

21 of the employees came back?  Is that right?

22 A    No, they didn't all come back.  The

23 time after the lockout was just like the time

24 before the lockout.  It was a buildup.

25 Everybody that was required -- not everybody

109

1   was required to come back at that time.
2       Q    You made a large number of layoffs
3   of union employees before the lockout?  Is
4   that right?
5       A    We made a large number of layoffs,
6   you know, during that time with union
7   employees and management employees both.
8       Q    And do you know how many were laid
9   off during that time period, the summer of
10  2005?
11      A    Not without looking at some
12  documentation.  Obviously, all the employees
13  were locked out, you know, during the lockout
14  period, and we had a large number of
15  management reductions during that time frame
16  also.
17      Q    Did you keep going during the
18  lockout?
19      A    Yes, we did.
20      Q    How did you do that with all the
21  union employees gone?
22      A    All the management personnel that
23  were qualified on aircraft -- not all of
24  them.  All the ones that were necessary, you
25  know, to finish up -- I think we had two

110

1   airplanes still in work.  We utilized the
2   qualified management employees.  Qualified
3   being that you had previous aircraft
4   experience, working on aircraft.
5       Q    How many airplanes do you normally
6   have at one time, typically?
7       A    It varies.  Right now, we have
8   seven.  Through the first half of this year,
9   we had up to nineteen.
10      Q    At one time?
11      A    At one time.
12      Q    Okay.  So, almost all the airplanes
13  were taken out, then, before the lockout?
14      A    That's correct.
15      Q    Did you give Northwest a heads-up
16  that this was coming, that the lockout was
17  coming?
18      A    We gave Northwest a heads-up that
19  we had -- all our customers a heads-up, you
20  know, that we were having some internal
21  collective bargaining unit negotiations.  So,
22  it would not be fair to our customers not to
23  tell them what was going on.
24      Q    And so, during the lockout, you
25  used management personnel to keep going as

111

1   best you could?
2       A    Some management personnel.  That's
3   correct.
4       Q    Now, you had talked earlier and
5   said that, really, management personnel was
6   not included in a lot of your projections as
7   far as manpower needs and that sort of thing.
8       A    That's correct.
9       Q    When was the initial decision made
10  to begin layoffs of management employees?
11      A    The whole mid part of 2005, you
12  know, knowing this was coming, I mean,
13  like I said earlier, we had some
14  contingencies.  And I think we actually --
15  you know, I don't know when we actually
16  started with some reduction in management
17  personnel.  In the June time frame, April.
18  April-June time frame.
19      Q    When was the decision first made to
20  begin layoff of management employees?
21      A    I don't remember.
22      Q    Who made that decision?
23      A    The decision on the bargaining unit
24  personnel was probably made by me.
25      Q    I'm talking about management, now.

112

1       A    That would have been a collection,
2   probably, between Ray Bennett and myself
3   initially, since I have the largest group
4   there.  I had the largest management staff.
5       Q    Did you report to the board any
6   kind of information or recommendation that
7   this layoff occur of management employees?
8       A    I don't know if it went to the
9   board or not.  I'm sure Ray informed Mr.
10  Armini what we were going to do.
11      Q    And so, the decision really came
12  from you and Mr. Bennett, and was reported
13  up, rather than the board telling you that
14  these layoffs had to occur?  Is that right?
15      A    It was reported up.  Yeah.  On
16  those type of decisions, even today, you
17  know, with management personnel or the
18  bargaining unit, as it increases or
19  decreases, I have nobody I have to report to
20  on that if I decide to do something.
21      Q    Did the board give you any kind of
22  instructions or standards to follow
23  concerning layoffs?
24      A    The board has never given me any
25  instructions on anything.

115

```
1     Q    What about Mr. Armini?
2     A    I wouldn't know.
3     Q    He dealt with Mr. Bennett?  Is that
4  right?
5     A    That's correct.
6     Q    Did Mr. Bennett give you any
7  instructions or standards to use during the
8  layoffs of management employees?
9     A    I don't understand what you mean by
10 "standards."
11    Q    Well, did he tell you how to do the
12 layoffs?
13    A    No, he did not.
14    Q    Were there any particular documents
15 that you were reviewing in order to come to
16 the decision as to whether to lay off
17 management employees or not during this
18 period in 2005?  And I'm talking about the
19 initial decision to lay off management, as
20 opposed to bargaining unit employees?
21    A    All the layoffs were centered
22 around what was required, you know, to run
23 the facility with the work load that we had
24 at the time.
25    Q    And so, what documents were you
```

114

```
1  looking at, at that time?
2     A    The aircraft input schedules, and
3  then, the progress that we were or were not
4  making with the collective bargaining unit.
5     Q    Were you part of the negotiations
6  for the new CBA?
7     A    No, I was not.
8     Q    Who was your labor counsel?  Do you
9  know?
10    A    (No response.)
11    Q    That's all right.  If you don't
12 know, that's all right.
13    A    I mean, he probably knows his name.
14 I don't remember.
15    Q    If you don't remember, that's fine.
16    A    It will come to me.  I'm just at a
17 loss on that name.
18          MR. HOLMES:  It wasn't me.
19          (Off-record discussion held.)
20    Q    What is it?
21    A    Claude Sullivan.
22    Q    All right.  And where is he from?
23    A    I don't know.
24    Q    That's all right.
25          MR. HOLMES:  I believe it was Ford
```

```
1          & Harrison, out of Atlanta.
2     A    Yeah.  He's out of Atlanta.  That's
3  correct.
4     Q    Did you look at any other
5  documents?  Other than the aircraft input
6  schedules and as far as keeping up on the
7  progress of the negotiations of the
8  collective bargaining agreement, were there
9  any other documents that you looked at in
10 terms of trying to decide whether or not to
11 lay off management employees?
12    A    All the decisions were strictly
13 based on what was required, you know, to keep
14 our airplanes on schedule or back to our
15 customer if something did happen.
16    Q    And were you anticipating a
17 short-term interruption here?
18    A    We were hoping for no interruption
19 at all.  So, unfortunately, that didn't
20 happen.
21    Q    What's a normal recovery time, you
22 know, when you go through one of these, as
23 far as the business goes?
24          MR. HOLMES:  Object to the form.
25    A    I'm not qualified to answer that.
```

116

```
1     Q    Have you ever been through one of
2  these before?
3     A    Not a lockout.  No, ma'am.
4     Q    Before you came to Pemco, were you
5  ever a member of a union?
6     A    Yes, ma'am.
7     Q    Machinists union?
8     A    Teamsters.
9     Q    Where is Ray Bennett today?  Do you
10 know?
11    A    I think he lives in Saint
12 Augustine, Florida.
13    Q    Do you know what he's doing?
14    A    I think he's doing some consulting
15 work.
16    Q    How old is he?
17    A    Don't know.
18    Q    Best guess?
19    A    Early 40s.
20    Q    All right.  So, as I understand it,
21 you had the authority to decide about the
22 layoffs and to implement those layoffs
23 without going to the board for approval and
24 permission?  Is that right?
25    A    The way I understood it, yes,
```

117

1   ma'am.

2       Q    Okay.  And that was within your
3   authority given to you -- or is it joint,
4   with you and Ray Bennett, during that time?

5       A    I had all -- I had the authority in
6   the production organization to do what I felt
7   was best for the company.

8       Q    Were there any other factors that
9   entered into the decision to lay off
10  management employees at that time, other than
11  what we've talked about, the collective
12  bargaining agreement coming up for renewal
13  and the decrease in the number of airplanes
14  from customers?  Were there any other factors
15  that you looked at in making that decision?

16      A    No, ma'am.

17      Q    After the lockout was over, did you
18  continue to lay off employees after that
19  period in time?

20      A    No.  What we actually did was in
21  the recall process of the bargaining unit
22  folks.  As our work load increased, we
23  continued to call people back.

24      Q    But the recall program was only for
25  bargaining employees?  Right?

118

1       A    That's correct.

2       Q    What documents would I need to look
3   at to show the level of your work load
4   increase in this period of time from August
5   or September of '05 to the present?

6       A    It would be off of the aircraft
7   inputs during that span.

8       Q    And that would tell me how many
9   aircraft were in service?

10      A    Yes, ma'am.  It's a forecast.

11      Q    Did you work with the financial
12  directors at all in terms of projecting what
13  level of layoffs you would need in terms of
14  savings for dollars and that sort of thing?

15      A    No, ma'am.

16      Q    How did you go about deciding how
17  many people to lay off?

18      A    Depends on what the aircraft
19  requirements were.

20      Q    But in terms of management
21  employees --

22      A    Same.

23      Q    Tell me your thought process on
24  arriving at how many employees had to be laid
25  off?

119

1       A    Leading up to the lockout span time
2   -- there's no set formula on this.  Depending
3   on the work load.  In other words, the amount
4   of tasks, type of tasks on a given aircraft,
5   determines the level of supervision that we
6   think is required.  And it's strictly just a
7   what-I-think requirement.  If I think we need
8   one supervisor on it, one supervisor gets
9   assigned to it.  If we think we need two
10  supervisors or three supervisors, whatever
11  the number is, is kind of how it goes.

12      Q    So, you did not sit down and
13  project, I'm going to be able to save "X"
14  amount of dollars by laying off so many
15  people?

16      A    No, ma'am.

17      Q    Do you have any idea what that
18  figure actually was, in terms of cost savings
19  per employee laid off?

20      A    No, ma'am.

21      Q    Did you ever ask anybody to make
22  those calculations for you?

23      A    I didn't.

24      Q    In terms of the facilities
25  department, now, how did that function into

120

1   the decision in terms of aircraft needs, in
2   determining how many people to lay off in
3   facilities?

4       A    There's not a facilities
5   requirement.

6       Q    And then, how did you come to the
7   figure as to how many people to lay off in
8   facilities?

9       A    Laid them all off.  It's not a
10  requirement for the aircraft.

11      Q    You laid off all the facilities
12  employees?

13      A    Between the ones that didn't get
14  locked out -- during the whole span,
15  everybody ended up being gone by the lockout
16  time.  We were looking at strictly what was
17  required, you know, to do the work on the
18  airplane only.

19      Q    And so, you laid off all of
20  management in terms of facilities?  Is that
21  right?

22      A    We laid off a lot of people during
23  that point in time.

24      Q    But somebody had to be in charge of
25  facilities?  Is that right?

121

1    A    Not necessarily.

2    Q    Did you not bring in Clark Briody
3    to be the manager of facilities?

4    A    Clark Briody, at the time, during
5    that point in time, was the evening shift
6    manager. And he was brought to day shift to
7    do some facility things while one of the
8    facility guys went out on medical leave.

9    Q    When did you first decide to lay
10   off people in facilities?

11   A    Up until the time of the lockout,
12   -- I don't remember when Richard Miller was
13   laid off. I know I was present at the
14   deposition yesterday, but I didn't -- I was
15   in and out. So, I don't remember when he
16   actually got laid off.

17        The only other management person in
18   facilities at that time was Roger Wright.
19   And I think he got laid off right before the
20   lockout, or maybe it was after the lockout.
21   I don't remember, 'til we establish what day
22   the lockout actually occurred on.

23   Q    My question to you though, I think,
24   was, when did you first decide that a layoff
25   in management in the facilities department

122

1    was going to be necessary?

2    A    We stated earlier, you know, that
3    we were going to -- had contingency plans.

4    Q    Right.

5    A    And if we did go to a lockout or if
6    there was a strike or if our customers pulled
7    all their airplanes out, you know, we were
8    going to keep only the essential personnel
9    that could work on aircraft.

10   Q    Were these contingency plans put in
11   writing?

12   A    Not all of them. I think there may
13   be one or two that have some names on them
14   and maybe some numbers. But it wasn't a
15   formal keep-all-these-every-day type of deal,
16   keep a record of all this. I don't have that
17   information.

18   Q    All right. But the contingency
19   plan said that if you're going to have a
20   lockout or work stoppage -- let's just call
21   it that way. Work stoppage -- then you're
22   only going to keep essential personnel to
23   work on planes that you have? Is that right?

24   A    That's correct.

25   Q    And that everybody else would be

123

1    laid off?

2    A    That's correct. And if we went to
3    zero airplanes, you know, I guess, or if we
4    had some extended period of time, I mean,
5    there's a possibility that this could have,
6    you know, shut our whole company down. You
7    don't know what the outcome is going to be.
8    Nobody has a crystal ball.

9    Q    Right. And so, what would be the
10   plan if you went to zero airplanes?

11   A    Depending on how the bargaining
12   unit agreement talks were going at the time,
13   we would make that decision whether, you
14   know, to keep some folks on, you know, do
15   some work around the facility, whatever that
16   might be, lay everybody off. You know,
17   obviously -- you know, hopefully, if the
18   bargaining unit agreement was settled soon --
19   you certainly don't want to lose any
20   personnel. That's the only thing we have to
21   sell, is these guys' time.

22   Q    That's right.

23   A    It was a very difficult time. I
24   mean, it was very difficult for everybody.

25   Q    And did the plans also include a

124

1    recall of personnel once the work stoppage
2    was over?

3    A    Depending on what the requirements
4    were.

5    Q    And what about for management
6    employees in facilities?

7    A    It was the same with all management
8    personnel. Depending on whether there was a
9    requirement for them to return or not.

10   Q    Okay. And did a requirement for
11   them to return come about in management of
12   facilities?

13   A    We recalled some management people
14   that were laid off.

15   Q    In facilities?

16   A    Yes.

17   Q    And who was that?

18   A    Richard Miller was recalled.

19   Q    Anyone else?

20   A    No, ma'am.

21   Q    You said that you had laid off
22   everyone in facilities management around the
23   same time as the lockout, and that Clark
24   Briody was not really doing any facilities
25   work during that time? Is that right?

125

1          MR. HOLMES: Object to the form.

2      A    Clark Briody was doing some

3  facilities items because he was filling in

4  for Roger Wright. But he wasn't, you know,

5  assigned as the manager of facilities. He

6  was doing facilities stuff. In other words,

7  he was doing a dual role.

8      Q    And what was his other role, other

9  than facilities?

10     A    He was a production manager.

11     Q    And how many hours was he spending

12 as a production manager? Any idea?

13     A    Didn't track it that way. Don't

14 track it that way today with anybody.

15     Q    So, did Clark Briody later assume

16 more duties in facilities?

17     A    Before the lockout? After the

18 lockout? During the lockout? I mean, what

19 time frame?

20     Q    Well, I think you told me initially

21 that he had some duties. Did he later assume

22 more duties as the work load picked up?

23     A    During what time frame? I mean,

24 from then 'til now or --

25     Q    Yeah.

126

1      A    Okay. Yes.

2      Q    And were more duties given to him

3  in facilities?

4      A    I don't know what you mean by "more

5  duties."

6      Q    Well, maybe I need to ask him.

7  Were you the one responsible for deciding

8  what Clark Briody's duties were during that

9  time period?

10     A    Yes. During that time period,

11 everybody was doing, you know,

12 multifunctional roles, including myself.

13     Q    Are you aware of anyone other than

14 Richard Miller who was recalled into

15 facilities in terms of management?

16     A    No.

17     Q    Did you have any idea, at the time,

18 how much money the company would save by

19 laying off any particular employee?

20     A    No, ma'am.

21     Q    Did you have a dollar figure, like,

22 we can save, for example, $10.00 per employee

23 laid off?

24     A    No, ma'am.

25     Q    Did you have any figure that you

127

1  wanted to save as a whole, that we need to

2  cut our overhead by "X" amount?

3      A    No, ma'am.

4      Q    Do you know what the labor burden

5  is on an average basis for employees at Pemco

6  at that time?

7      A    Which labor burden?

8      Q    Benefits and that sort of thing.

9      A    Somewhere in the mid 30s.

10     Q    Mid 30s?

11     A    35, 36, 37, if I had to guess at

12 it.

13     Q    On average?

14     A    Yes. But that's not with some

15 additional burdens thrown in. We have a

16 labor -- you know, full facility all-up labor

17 burden rate that varies with our man-hours.

18     Q    Explain to me what the 35, 36

19 figure is?

20     A    It would be base salary and

21 benefits.

22     Q    So, annually, it would be about

23 35,000 per person?

24     A    No. Per hour.

25     Q    Oh. $35.00 per hour?

128

1      A    Yeah.

2      Q    Oh, I see.

3      A    35, $36.00 per hour. Somewhere in

4  that range.

5      Q    I see.

6      A    I'm just guessing at that. I don't

7  look at it that way. I look at it fully

8  burdened.

9      Q    What would the full burden be?

10     A    It varies.

11     Q    Do you have any idea of management?

12     A    Fully burdened, it's -- are you

13 asking me what the fully burdened rate is?

14     Q    Yes.

15     A    Somewhere between 48 to 51.

16     Q    And that includes everything?

17     A    That's all of it.

18     Q    All insurance, all pension, all --

19     A    All of it.

20     Q    -- 401(k)?

21     A    Corporate GNA. All-up number.

22     Q    Salary, wage, whatever it is,

23 everything?

24     A    Uh-huh. That's a confidential

25 number, too.

129

1    Q    Okay.  And do you know what the
2  labor burden was in 2005?
3    A    During what span?
4    Q    Summer of 2005.
5    A    It had to have been high, only
6  because it's based off the number of
7  man-hours.
8    Q    Right.  I see.  So, the figure that
9  you were giving me is really your
10  productivity?
11    A    Yes.
12    Q    It's the wages and benefits versus
13  the actual work hours --
14    A    That's right.
15    Q    -- production hours?
16    A    Correct.  Do I need to clarify?
17    Q    No.  You and I were talking about
18  two different things.
19    A    I'm sorry.
20    Q    What I was interested in --
21    A    I didn't know where you were going.
22    Q    And I understand.
23    A    I thought I knew where you were
24  going, but I wasn't for sure.
25    Q    I appreciate that.  That's why we

130

1  need to get this clarified.  Really, what I
2  was talking about is not so much the rate of
3  productivity per work hour, you know, but the
4  average labor burden per employee, not tied
5  to as a rate of work load, but just the
6  dollar amount.
7    A    It would be the -- you know,
8  somewhere in, I think, the 35 to 36-dollar
9  range, if you just look at basic bargaining
10  unit-type salaries, you know, with fringe
11  benefits.
12    Q    What was the total number in your
13  work force before you began the layoffs in
14  2005?
15    A    I'm thinking.  I would have to look
16  it up.  It's somewhere, I would say, in the
17  350 range.
18    Q    For World Air Services?
19    A    Yes, ma'am.  It had been on a
20  constant decline during 2005.
21    Q    And how many did you layoff?
22    A    I don't remember the number that
23  was actually laid off versus the number that
24  was locked out.  I don't remember those two
25  numbers.  When I give you that number there,

131

1  that's in the production -- basically the
2  production organization.  There was probably
3  another 75 to 100, you know, in support-type
4  functions.
5    Q    So, total work force at World Air
6  Services of about 425?
7    A    425 to 500 during that time.
8  Something like that.  Now, throughout the
9  year of 2005, it fluctuated a lot.
10    Q    Sure.  Now, when the -- and pardon
11  my ignorance here.
12    A    That's all right.
13    Q    When an employee is locked out,
14  they are not actually terminated?  Is that
15  right?
16    A    I would have to defer to counsel to
17  what the real answer to that is.
18    Q    Do you cease paying benefits to
19  employees that are locked out?  I mean, I
20  know you don't pay salary or wages, that sort
21  of thing.  But, do you stop all benefits,
22  too?
23    A    I'm not sure what the real answer
24  is on that.
25    Q    You had indicated that, as part of

132

1  organizational restructuring, the facilities
2  came under your responsibilities.
3    A    Around some time in the middle part
4  of 2005.
5    Q    And that this was shortly before
6  Henry Ward left?
7    A    If I remember correctly, I think
8  Henry -- it was just a couple of weeks.
9  Henry retired.
10    Q    Did the layoffs of management in
11  facilities management come as part of that
12  organizational restructuring, or was it more
13  a part about the issues that we've been
14  talking about in reduction of work force?
15    A    Anybody that got laid off during
16  the whole time there, it all had to do with
17  what's required to run the facility.
18    Q    It was not part of the
19  organizational restructuring that brought --
20    A    No.
21    Q    -- facilities under your
22  management?  It had more to do with what was
23  going on in productivity and customers and
24  that sort of thing?
25    A    That's correct.

133

1    Q    What was the initial plan in
2  dealing with the management employees in
3  facilities?
4    A    I can't look at it just as
5  facilities.  I have to look at it as the
6  management plan, you know, for the production
7  organization.  There's no one piece of that
8  that's picked out.  We looked at what was
9  required, you know, to maintain our
10  customers' aircraft.
11    And if we had to lay somebody off, you
12  know, we started looking at, you know, who
13  could go back to the bargaining unit.
14  Because, at that time, the lockout hadn't
15  occurred.  The negotiations were still going
16  on.  And I had several of my supervisors that
17  held bargaining unit seniority that was still
18  high enough to where they could return to the
19  bargaining unit.  Does that make sense?
20    Q    Uh-huh.  Yeah.  I'm with you.
21    A    You know, in an effort to save
22  every possible job that I could.  The last
23  thing in the world that I want to do at that
24  time or any time is to lay anybody off.  So,
25  we were looking for ways that we could, you

134

1  know, restructure with the number of
2  airplanes that we had on base, you know, that
3  would actually make sense if I had to go and
4  report that to Ray or if Ray had to report it
5  to Ron or if Ron had to report it to somebody
6  else.  These are all ifs --
7    Q    Right.
8    A    -- that would make sense.  So, the
9  guys that could go back to the bargaining
10  unit -- you know, our company is in trouble.
11  We have a risk here of a strike.  We have a
12  risk here of a lockout.  We have a risk here
13  that, you know, our customers are all going
14  to go away because of the issues that we're
15  faced.  And we were looking for ways to save
16  every possible job.
17    So, if that meant somebody had to change
18  classification, if somebody had to go back to
19  their prior, you know, job that they held,
20  you know, or if somebody was going to have to
21  leave the facility and maybe not ever return,
22  those are the type of things that we were
23  looking at and trying to decide on.
24    Q    And, really, I understand about
25  that.  But in terms of management employees,

135

1  some of them went back to the bargaining
2  unit.
3    A    Some were laid off.
4    Q    And some were laid off.
5    A    And it got worse.
6    Q    Did you head up the layoffs, in
7  general, in terms of implementing them and
8  going to the different department heads and
9  that sort of thing?
10    A    At the time, then and today, 90
11  percent of the work force falls under my
12  organization.
13    Q    So, you did head that up, then?
14    A    Yes, I did.
15    Q    Did you come to a number of layoffs
16  of management employees that would have to
17  occur during this time period?
18    A    Yeah.  But I don't think I have it
19  documented anyplace.  I mean, at the time, I
20  said, you know, I need this many supervisors,
21  you know, I need this many managers, I need
22  this.  Whatever it was.  You know.  There
23  were some contingency plans there.
24    Q    But that was never reduced to
25  writing?

136

1    A    I may have had a note pad similar
2  to the yellow one that you have in front of
3  you, you know, making notes on, if this
4  happens, I'm going to have to do that.  Just
5  idle thoughts to myself.  But nothing formal
6  that I would put in -- describe, you know, in
7  detail, this is what's going to happen
8  tomorrow, this is what's going to happen next
9  week.  I may have sent some e-mails.  I may
10  have had some phone conversations, that type
11  of stuff, that named, either by name or by
12  numbers, you know --
13    Q    Did you make the decision as to who
14  would be laid off?
15    A    In the operations group?  Yes.
16    Q    Okay.  In the various departments,
17  did you allow department heads to make
18  decisions within their departments as to who
19  to lay off, or did you determine who would be
20  laid off and who wouldn't?
21    A    Strictly was what's required to
22  keep the airplane.  So, if it was in the
23  planning department, you know, Grady Mixon or
24  Ken Tackett, you know, "We're only going to
25  have one airplane here or two airplanes here.

137

1   What are your requirements to keep the
2   planning packages up to speed, you know, to
3   get them done, finished, audited or whatever
4   the case might be? You know. How many
5   people do you need?" "I need three people."
6   If there was five others in there, then,
7   unfortunately, five people were laid off.
8        Q    My question to you, though, was,
9   you know, say, in the planning department,
10  you went to Grady Mixon. Did you give Grady
11  Mixon a number, saying, "You need to lay off
12  five employees," or did Grady come to you and
13  say, "I need to lay off five employees"? I
14  mean, how did that work?
15       A    "Grady, I have two airplanes here.
16  You're the planning department director. You
17  know. What are your requirements to support
18  these two airplanes?" And if he told me his
19  requirement was two people or three people,
20  then I think that it's pretty obvious that if
21  he had eight people in there, that, you know,
22  five people were going to be forced to, you
23  know, be laid off.
24       Q    And so, then, who decided which
25  five got laid off? Was that you or was that

138

1   Mr. Mixon?
2        A    In that case, it would be Mr.
3   Mixon.
4        Q    And was that true for most of the
5   departments that you dealt with?
6        A    Yes.
7        Q    Now, what about facilities? Was
8   that handled a little differently, because
9   that was now under your responsibility?
10       A    It was handled no different than
11  any of the rest of them.
12       Q    Okay. Did you go to Henry Ward and
13  have that discussion?
14       A    I believe Henry was in the process
15  of -- like I said, you know, he was only
16  there a couple of weeks.
17       Q    Right. Did you have any discussion
18  with Henry Ward about the layoffs that needed
19  to occur --
20       A    No. There was no --
21       Q    -- in facilities?
22       A    There was no reason to. He was
23  soon to be -- you know, to retire. So, the
24  future of the company, he had no say in that.
25       Q    So, you never met with him to

139

1   discuss the layoffs?
2        A    No. There was no reason to.
3        Q    Are you aware of anyone else that
4   met with him concerning the layoffs?
5        A    No, I'm not.
6        Q    Mr. Ward retired before the lockout
7   occurred? Right?
8        A    That's correct. When did he
9   retire? Do you have that?
10       Q    I was looking for that in the
11  personnel file, but it doesn't have that
12  information. But you recall him being there,
13  and then, retiring before the lockout?
14       A    He did retire before the lockout.
15  Yes.
16       Q    Does June 2005 sound --
17       A    Really, that period of time, I
18  don't know. I mean, there was a lot of
19  activity going on during that period of time.
20       Q    Do you have any recollection of the
21  conversation with Henry Ward about retiring
22  early?
23       A    No.
24       Q    Do you believe that Henry Ward
25  retired on schedule, or do you believe that

140

1   he retired early?
2        A    Henry had been there for a long
3   time. I don't know how many years it was.
4   It was a long time.
5        Q    But, do you have any information as
6   to whether he retired early or just took
7   normal retirement?
8        A    I don't know what retiring early
9   means. I mean, is that 62 or 65 or 55?
10       Q    Retiring earlier than he intended
11  to.
12       A    I have no idea of what Henry's
13  thoughts are.
14       Q    Do you know of any conversations
15  between Ray Bennett and Henry Ward concerning
16  his retirement and the timing of that
17  retirement?
18       A    No, I'm not.
19       Q    Do you ever recall Henry Ward
20  offering to retire early so that Roger Wright
21  could stay and not be laid off?
22       A    No, I do not.
23       Q    Are you familiar with the Warren
24  Act?
25       A    Yes, I am.

141

1    Q    Did you -- first of all, did you
2  review the provisions of the Warren Act in
3  terms of deciding how to do these layoffs?
4    A    I don't think the Warren Act
5  applies.
6    Q    And why was that?
7    A    I would have to get a little more
8  advice on that question.
9    Q    I don't want you to tell me what
10  your lawyers have said.
11    A    I would have to ask my lawyer about
12  that.
13    Q    If you have an understanding of
14  that --
15    A    I'm going to say no, right now, to
16  that.
17    Q    No, what?  I'm sorry?
18    A    That I'm not for sure what all the
19  Warren Act says.
20    Q    Is that something that you would go
21  to HR about?
22    A    Yes, it would be.
23    Q    Do you recall going to HR to
24  determine whether the Warren Act applied to
25  these layoffs?

142

1    A    No, I do not.
2    Q    And Jim Batcher was the director of
3  HR at that time?  Is that right?
4    A    Yes, he was.
5    Q    Did you have a good relationship
6  with Jim?
7    A    I think so.
8    Q    No reason why you couldn't call him
9  up and ask him?  Is that right?
10    A    That's correct.
11    Q    Now, with the union employees --
12    A    Can I clarify something?
13    Q    Sure.
14    A    Does the Warren Act apply in this
15  case?
16        MR. HOLMES:  Dennis, we can talk
17          about that later.
18        (Recess in deposition.)
19    Q    All right, Mr. Johnson.  We're back
20  on the record.  And we were talking, before
21  the break, about the decision-making process
22  for the layoffs in 2005.  And you were
23  telling me about how that worked for certain
24  departments.  And I had started asking you
25  about the decision-making process for layoffs

143

1  of management employees in facilities.  Who
2  made the decisions in terms of the layoff of
3  the management employees in facilities?
4    A    I did.
5    Q    Was anybody else involved in that
6  decision other than yourself?
7    A    No.
8    Q    When did you make the decision to
9  lay off management employees in facilities?
10    A    As we've talked about before, you
11  know, it's all related back to the number of
12  airplanes that were on base.
13    Q    I know.  And my question to you
14  really is, when, if you recall, was that
15  decision made?
16    A    Nonbargaining unit people, which
17  was Roger Wright and Richard Miller -- I
18  don't remember the exact dates that Roger or
19  Richard were laid off.
20    Q    Do you recall whether Roger had
21  already gone out on medical leave at the time
22  of the decision for the layoff?
23        MR. HOLMES:  Object to the form.
24    A    No, I don't believe so.
25    Q    Okay.  Did you have a conversation

144

1  with Roger Wright about his need for medical
2  leave?
3    A    Yes, I did.
4    Q    And you were aware he needed time
5  off for surgery?
6    A    That's correct.
7    Q    And if I represent to you that that
8  was in June of 2005, would that sound correct
9  to you?
10    A    That would sound correct to me.
11  Yes.
12    Q    Okay.  Did you inform Roger about
13  the layoffs before he left for his surgery?
14    A    I'm sure Roger was aware of what
15  was going on.  We had a decrease in business
16  during that time.  I don't remember when the
17  first layoffs started happening.  But if they
18  were -- if we laid somebody off in April, you
19  know, then I'm sure he was aware of that.
20    Q    Okay.  But in terms of laying off,
21  you know, the management employees in
22  facilities, which was Roger and Richard,
23  after Henry Ward retired, did you inform them
24  about the layoffs before Roger went out on
25  medical leave, to your recollection?

145

1    A    Are you saying inform him that he
2 was going to be laid off, or that Richard was
3 going to be laid off, or that other people
4 had been laid off?
5    Q    Let me just ask this a different
6 way.
7    A    Okay.
8    Q    In June 2005, Roger had his neck
9 surgery.  Okay.  Did you make the decision to
10 do the management layoffs in facilities while
11 Roger was out on medical leave?
12    A    No.
13    Q    Was that decision made before he
14 went out on medical leave?
15    A    No.
16    Q    Do you recall when the decision was
17 made?
18    A    If you can help me with when Roger
19 was actually laid off.  Was he on medical
20 leave when he was laid off, or was he on
21 vacation?  What was the -- it's been a long
22 time ago.
23    Q    I don't have another copy of this,
24 so I don't want to make it an exhibit.  But
25 this is the same letter from Ramona Segler

146

1 that we discussed earlier, which is Bates
2 stamp number 128.  Does that refresh your
3 recollection about when the termination
4 occurred?
5        MR. HOLMES:  Object to the form.
6    A    It says here, "Due to company
7 restructuring of the organization based on
8 business condition, a reduction in work force
9 is required.  Therefore, effective July 15,
10 2005, you have been placed on indefinite
11 layoff."
12    Q    Yes, sir.  I understand what it
13 says.
14    A    Okay.  That's July 15th, and it's
15 to Roger Wright from Ramona Segler.
16    Q    My question to you is, when did you
17 make the decision to lay off Roger Wright?
18    A    Probably on July the 15th.  That's
19 the only thing I have.  I mean, I can't say
20 if it was on July the 14th.
21    Q    Do you recall either way?
22    A    No, I don't.
23    Q    Do you recall talking with Roger
24 about his need to take some time off?
25    A    I recall, you know, Roger, you

147

1 know, said he was going to have to have some
2 surgery on his -- you said neck.  I
3 understood it to be his back.  But something
4 in the spine.
5    Q    He told you that he was going to
6 need to be off?
7    A    Yes.
8    Q    He needed to be off?
9    A    Uh-huh.
10    Q    And did you have a problem with him
11 taking some time off to have that surgery?
12    A    No.
13    Q    And, in fact, he was off a period
14 of weeks, wasn't he?
15    A    That's correct.
16    Q    Do you recall what the arrangements
17 were to fill his position while he was away?
18    A    No different than anybody else if
19 they've taken off on medical leave or if
20 somebody goes on vacation.  You've got to
21 find somebody to kind of fill in for those
22 responsibilities while they're gone.
23    Q    Do you recall a conversation with
24 Roger about having Richard Miller fill in for
25 Roger while he was out?

148

1    A    No, I do not.
2    Q    Are you saying that that did not
3 happen?
4    A    No.  I'm just saying I don't
5 remember the conversation.
6    Q    You just don't recall?
7    A    I mean, that would be a -- I would
8 think that would be the logical person, if
9 Richard was there, for him to fill in for
10 him.
11    Q    And do you recall, at some period
12 of time, that Clark Briody was brought in
13 instead of Richard Miller?
14    A    Yes, I do.
15    Q    Okay.  And who made that decision
16 to bring Clark Briody in?
17    A    I did.
18    Q    And why did you make that decision
19 to have Clark fill in as opposed to Richard
20 Miller?
21    A    Was Richard still on the payroll at
22 that time?  I don't remember when Richard
23 Miller was laid off.
24    Q    You were here for his deposition
25 yesterday, and I think he told us June 15th.

149

1  A   I left for part of it. I was gone
2  for 15 or 20 minutes.
3       MR. HOLMES: You just said June?
4       MS. GLASGOW: July 15th. Excuse
5       me. July 15th.
6       MR. HOLMES: July.
7  A   I mean, are we waiting for some
8  information?
9  Q   No. You had asked about --
10  A   Was it July 15th when Richard
11  Miller was laid off, too?
12  Q   That's what he testified to
13  yesterday, I believe. Yes, sir.
14       MR. HOLMES: That's right, I mean,
15       according to records.
16  A   I guess, then, they were both laid
17  off on the same day.
18  Q   All right. My question to you is,
19  you made the decision to bring in Clark
20  Briody rather than have Richard Miller fill
21  in for Roger while he was out. Roger went
22  out in June of 2005. Why did you have Clark
23  come in to fill in for Roger, rather than
24  Richard Miller?
25  A   I guess Richard was still on nights

150

1  at the time.
2  Q   Do you recall?
3  A   I don't -- no. I thought you were
4  looking for what do I think I might have
5  done. I don't know.
6  Q   So, you don't recall?
7  A   I don't recall a conversation or a
8  simple statement, "All right. Today, you
9  know, I'm going to have Richard Miller do it.
10  Tomorrow, I'm going to have Clark Briody do
11  it. The next day, I'm going to have Shane
12  King do it." I don't remember that. I don't
13  know.
14  Q   Do you recall why you would have
15  brought in Clark Briody to work in facilities
16  while Roger was out?
17  A   Like I said before, somebody had to
18  fill in for -- you know, fill in for people.
19  Q   And so, you don't recall why it was
20  Clark rather than Richard Miller?
21  A   No, I don't.
22  Q   Do you recall asking Roger to train
23  Clark Briody for the position?
24  A   I don't know if I used the word
25  "training." I mean, if somebody is filling

151

1  in for somebody else, you know, you get a
2  turnover. I asked Roger to give Clark or
3  whoever a turnover.
4  Q   Do you specifically recall that, or
5  is this -- you're guessing what you would
6  have done?
7  A   No. I think I asked Roger to give
8  Clark a turnover. I mean, it's no different
9  than any of the rest of my guys being out.
10  If Shane King is going to be out for two
11  weeks on vacation, I would ask him to give a
12  turnover to whoever is going to kind of fill
13  in for him or do double duty or triple duty
14  or whatever it might be. It's pretty
15  standard.
16  Q   And do you recall that Roger
17  actually did spend a couple of days working
18  with Clark on that?
19  A   I don't know how long he spent with
20  him.
21  Q   Okay. But you recall he did do
22  that?
23  A   I do.
24  Q   Roger had his surgery on June the
25  8th, if that helps you at all --

152

1  A   Okay. It doesn't.
2  Q   -- in terms of a time period. How
3  long a time period was it between the time
4  you made the decision for the layoffs and the
5  actual decision to lay off the employees?
6  A   No definite span.
7  Q   Okay. What about with regard to
8  Richard Miller and Roger Wright?
9  A   Don't know.
10  Q   Did you ever consult with legal
11  counsel concerning the layoffs of Roger or
12  Richard Miller?
13  A   They don't fall in any group than
14  anybody else around, people at the time.
15  Q   My question to you, though -- and
16  please try to listen to the question -- is,
17  did you consult with legal counsel before you
18  implemented these layoffs of Richard and
19  Roger, management facilities people?
20  A   No, I did not.
21  Q   And did you consult with HR
22  concerning the layoffs of these management
23  employees?
24  A   HR was aware of all the layoffs.
25  Q   Did you consult with them before

153

1  the layoff, or really before the decision to
2  lay off?
3      A    HR was aware of everybody that was
4  going to be laid off.
5      Q    I understand.  But, did you consult
6  with them before you made the decision to lay
7  them off?
8      A    What does "consult" mean in this
9  case?
10     Q    Get their advice, call on their
11  resources, that sort of thing.
12     A    No.
13     Q    Did you ever provide memoranda to
14  HR concerning who would be laid off and when?
15     A    I stated earlier, I mean, we had
16  some that was on yellow notebook paper.  And
17  there may have been an e-mail if somebody
18  asked a specific question, you know, rather
19  than picking up the phone and call.  But
20  y'all are in possession of all the e-mails, I
21  think, that I know about, that I received.
22     Q    Would the normal procedure have
23  been for you to e-mail HR and let them know
24  who would be laid off?
25     A    I don't know if that's normal or

154

1  not.
2      Q    Well, during this layoff period?
3      A    I may have called HR up and said,
4  you know, this number of folks, you know,
5  these names, you know, those type of things.
6  Maybe I sent an e-mail.  Maybe I made a phone
7  call.  Maybe it was discussed in a meeting
8  that we were having face-to-face, and we just
9  discussed it, and notes were taken down and
10  acted upon.  All the above.
11     Q    Okay.  And then, HR was tasked with
12  sending out the correspondence to notify the
13  employees of the layoff?
14     A    That's correct.
15     Q    Did you personally speak with Roger
16  about his employment situation while he was
17  out on leave?
18     A    I don't remember.  I talked to
19  Roger, you know, when he was -- at the point
20  when he was coming back at some time.  I
21  think I did.  I don't know if I called him,
22  he called me, he called HR, I returned a
23  call.  But there was something, you know,
24  going on at that point in time, when he was
25  coming back.  Roger was off on medical, and

155

1  maybe he heard about that we were having some
2  layoffs and called in.  I don't remember
3  exactly.
4      Q    Okay.  But you did talk to him at
5  some point while he was out on leave?
6      A    I think he came into HR one day, I
7  guess when he was getting ready to come back
8  off of leave, and I talked to him.
9      Q    Did you meet with him then?
10     A    I think so.
11     Q    And what did you discuss in that
12  meeting?
13     A    As stated earlier, you know, we
14  were trying to find jobs for different people
15  to do.  We had a need, at that point in time,
16  to do some tool room-type work on some --
17  let's call it equivalencies project that we
18  were working on.  And I offered him a job to
19  do this task, still be in facilities.  He was
20  still initially over the tool crib at that
21  point in time.  And it was a supervisor's job
22  rather than a manager's job.
23     Q    And there would be a pay cut?
24     A    And there would be a pay cut.
25     Q    All right.  When did you make that

156

1  decision to do away with the manager's
2  position that Roger was in?
3      A    I don't know if we were doing away
4  with any position.  You know.  We were
5  restructuring because of the number of
6  airplanes that we had on base.  And as stated
7  earlier, the facilities jobs, you know,
8  weren't a requirement to have.
9      Q    So, his position was not really
10  going away, then?
11     A    I don't know if it's his position.
12  I mean, there was positions within the
13  company.  I don't look at it as any one
14  person has a position.  We have slots
15  available on tasks that need to be done.  But
16  there's not a position that says the VP
17  of operations position belongs to Dennis
18  Johnson or that the president position
19  belongs to Ray Bennett.  Those are all
20  subject to change at any time.
21     Q    Roger was serving as manager of
22  facilities?  Is that right?
23     A    That's correct.
24     Q    And did the manager of facilities
25  position go away with the layoffs of this

157

1  time period of July 2005?
2      A    All the facility positions, along
3  with all the mechanic positions, went away at
4  the time of the lockout.  There were other
5  people that were being laid off.  I mean, a
6  lot of people were being laid off out of the
7  management positions during this point in
8  time.
9      Q    So, no one was going to be the
10  manager of facilities at that time?
11      A    No.
12      Q    And, again, do you have any
13  specific recollection as to how long a period
14  of time it was before you made the decision
15  to offer the supervisory position to Roger
16  and the time that you actually talked to him
17  about that position?
18      A    We had a need for some tooling
19  equivalency work to be done that was coming
20  from the FAA.  You know.  That was a task
21  that needed to be done.  That was a task that
22  could be done, you know, during this time
23  frame.  We're slow.  It was a good time to
24  start working on it.  And I wanted Roger to
25  do that, because Roger had been over the tool

158

1  cribs.
2      Q    I understand.  But my question to
3  you was really in terms of time frames.  How
4  long was it between the time you made the
5  decision to offer the supervisory position to
6  Roger and the time that you actually offered
7  it to him?  Do you recall?
8      A    I don't know.
9      Q    You don't know?
10      A    I don't know.
11      Q    Did you talk to anyone about making
12  that move before you actually talked to Roger
13  about it?
14      A    I talked -- probably talked to Ray
15  Bennett, because I'm having to justify all
16  the positions at that point in time.  So, I'm
17  sure I talked to Ray about it.
18      Q    Okay.  I'm trying to get an
19  understanding of the decision-making process.
20  Did you have any particular goals in terms of
21  this reduction in force in management of
22  facilities?
23      A    I don't understand what you mean by
24  "goals."  I mean, do we have a number that we
25  were trying to get to?

159

1      Q    Yes.
2      A    We were trying to get down to the
3  number to keep our airplanes that we had on
4  base, to finish those up, to keep enough
5  people there that, if we did have a lockout
6  or if we did have some extended period or we
7  did have a strike, you know, that we could
8  man the airplanes that we had on base by
9  management people.
10      There was no requirement to have any
11  specific group there other than qualified
12  aircraft mechanics and qualified aircraft
13  inspectors.  We are not required to have a
14  facilities department.  We're not required to
15  have a planning department.
16      Q    So, you got rid of everybody in
17  facilities?
18      A    We got rid of -- "got rid of" is a
19  bad term.  We reduced the number of head
20  count to what we had to have to operate our
21  facility during this point in time.  And that
22  was continually reduced during June, July, up
23  until the point of the final lockout that I
24  think took place in early August.
25      Q    When you offered the supervisory

160

1  position to Roger, what did he say?
2      A    Actually, if I remember right, he
3  told me he had to go think about it.
4      Q    Did he accept the position, though?
5      A    I think he called back, you know,
6  some days later, and accepted the position.
7      Q    If it was that day, would that
8  change your recollection?
9      A    I don't know, unless you have
10  something that says what day it actually was.
11  I know that we talked about it, and he told
12  me he had to think about.  I've got to tell
13  you, I thought that was odd, that he had to
14  think about it.
15      Q    If he says he called you back that
16  day, would you dispute that?
17      A    I have no reason to.  Did he?
18          MR. HOLMES:  He testified that he
19          did.
20      A    I mean, I don't know.
21      Q    Do you also recall talking to Roger
22  about him taking an additional period of time
23  off to continue his recovery from surgery?
24      A    I think he asked for some vacation
25  time after he returned or was released from

161

1  the doctor.
2      Q    And I guess my question is, do you
3  recall talking to him about his need for
4  additional time because of his surgery?
5          MR. HOLMES:  Object to the form.
6      A    I guess I don't understand the
7  question.
8      Q    Do you recall talking to Roger
9  about his request for additional time off?
10  Let me put it that way.
11      A    I remember Roger asking for some
12  additional vacation time.
13      Q    Okay.  Do you dispute that he told
14  you that it was to recover from his surgery?
15      A    Why would he do that?  I mean,
16  vacation time is vacation time.  And he was
17  on, you know, leave.  So, I mean --
18      Q    We're going to be here a long time.
19      A    I know.  I guess we are.
20      Q    I'm not trying to be smart or
21  anything.
22      A    I'm not, either.
23      Q    I'm trying to get to the --
24      A    And I'm honestly trying to answer
25  your question.  You know.  Roger came back,

162

1  to my best recollection, you know, and said
2  that he needed some additional vacation time.
3  And that's all I know.  The guy wanted to
4  take vacation time, so he got it.
5      Q    Are you saying that he did not tell
6  you that the purpose of that time off was to
7  continue recovering from his surgery?
8      A    No, I don't.
9      Q    You are disputing that he told you
10  that or not?
11      A    No.  I don't know what Roger has
12  said.
13      Q    What has he said to you?  I'm
14  trying to figure out what he has said to you.
15      A    I guess I don't remember.  What I
16  know is that the guy asked for vacation time.
17      Q    Okay.  And do you recall him asking
18  for vacation time so that he could continue
19  to recover from his surgery?
20      A    No.
21      Q    Do you dispute that he told you
22  that?
23      A    No.
24      Q    Did you approve the time off so
25  that he could take an additional two weeks

163

1  off?
2      A    I approved two weeks of vacation
3  time.
4      Q    And if I tell you that the expected
5  return to work date was July 25th of 2005,
6  and then, in this period, he receives the
7  notice of termination on July the 14th, does
8  that sound about right to you?
9          MR. HOLMES:  Object to the form.
10      A    Yes, ma'am.
11      Q    I'm just trying to orient you as to
12  the dates.
13      A    I understand.
14      Q    Did anything change in terms of a
15  business climate between July the 7th, 2005,
16  when you approved the time off for Roger, and
17  July 14th of 2005?
18      A    I know that our business continued
19  to decline through the month of July, you
20  know, up to the point of the lockout in the
21  first part of August.  I mean, things went
22  from bad to worse.
23      Q    Was there anything in particular
24  that you recall that occurred during that
25  period of time?

164

1      A    I think that, during that period of
2  time, that we were getting -- just trying to
3  recall -- you know, that we were getting
4  signals from basically the bargaining unit
5  that we weren't going to be able to make any
6  headway in the negotiations that were going
7  on.  So, we started planning for the worst.
8  And as unfortunate as that was, that
9  included, you know, some additional layoffs,
10  up to the point where, you know, everybody in
11  the facility may be laid off.  Everybody.
12  The whole place gone.
13      Q    And was Clark Briody filling in for
14  Roger during this time?
15      A    Yes.  But Clark's aircraft
16  qualified, too.
17      Q    And once Richard Miller was laid
18  off, was Clark Briody the only one in
19  management in facilities?
20          MR. HOLMES:  Object to the form.
21      A    Actually, we had no facilities
22  department.  After Roger was laid off and
23  after Richard Miller was laid off, there was
24  not a facilities department.
25      Q    Okay.  Did you send a memo out to

165

1  everyone announcing Clark Briody as the new
2  manager of facilities?
3      A   I may have sent a memo out saying,
4  if you have a facilities-type thing or an
5  airplane-type thing, you know, if you have
6  something that's going on and you need
7  somebody to look at it, somebody to come fix
8  it, you know, call Clark.
9      Q   Okay.  But he was not going to be
10 manager of facilities?
11     A   Nope.
12     Q   Other than just the tenor of the
13 bargaining agreement negotiations, was there
14 any other significant event that occurred
15 during that period of time between July 7,
16 2005, when you approved Roger's two weeks
17 leave, and July 14th, when he was terminated?
18         MR. HOLMES:  Libby, can I --
19         MS. GLASGOW:  Sure.
20         MR. HOLMES:  July 14 is coming out.
21         The letter that went to Roger
22         says July 15.
23         MS. GLASGOW:  Right.
24     A   I don't know the answer to that
25 question.

166

1      Q   Did you understand the question
2  that I was asking?
3      A   Yes, ma'am.
4      Q   Do you want me to rephrase it?
5      A   No, ma'am.  The only thing I know
6  is that, during the month of July, our
7  business was on the verge of collapsing.
8      Q   In that time period, again, are you
9  aware of any significant event that, boom,
10 had occurred during that time period, that
11 you recall, other than just a general
12 continued deterioration?
13     A   Other than the discussions that
14 were going on -- I don't remember the exact
15 date, but the bargaining unit had voted to be
16 able to strike.  So, that strike could occur
17 at any time.  I don't remember what the
18 notification period was.  You know.
19     Obviously, you know, we were talking
20 about things that happened on -- if this did
21 happen, were we going to be able to come to
22 an agreement, were they going to strike, you
23 know, are they going to get locked out.  You
24 know.  All this stuff is going around within
25 the management group on what to do next.  You

167

1  know.  We had, I think, one ILFC airplane on
2  base, one Northwest airplane on base.  And,
3  is the business going to be able to continue
4  or not?
5      Everything that we did during this whole
6  time period was to protect our business.  And
7  if that meant that people got laid off, be it
8  management people, bargaining unit people,
9  presidents, vice presidents, managers, people
10 sweeping the floor --
11     Q   But they didn't lay off the
12 presidents or the vice presidents, did they?
13     A   Been laid off before.
14     Q   When you talked with the various
15 department heads about the layoffs, did you
16 give them any type of standards to use in
17 determining who should be laid off in the
18 department, such as lay off based on
19 seniority, experience, anything like that?
20 Did you give them any specific instructions?
21     A   No, ma'am.
22     Q   Other than Henry Ward, who had the
23 most experience in facilities management?
24     A   In facilities management or in
25 management at that facility?

168

1      Q   Managing employees in the
2  facilities department at Pemco.
3      A   I guess it would be the guys that
4  run facilities.
5      Q   Okay.  And of the guys in
6  facilities, who had the most experience?
7      A   Henry Ward, I guess.
8      Q   And after Henry Ward?
9      A   Are you talking about day-to-day
10 management, or are you talking about the guys
11 that manage them?  I mean, I manage
12 facilities people and have been for some
13 time.
14     Q   Well, it's my understanding that
15 you had just taken over, and facilities had
16 just come under your responsibility about
17 this time.
18     A   At this facility.
19     Q   Right.
20     A   But I have facilities management at
21 other facilities.
22     Q   And it's my understanding that the
23 three employees in management at the time
24 that facilities came under your
25 responsibility were Henry Ward, Roger Wright

169

1    and Richard Miller. Okay?
2    A    Okay.
3    Q    Henry Ward retired. Between
4    Richard Miller and Roger Wright, who had the
5    most experience in working in facilities?
6    A    In facilities management at Pemco
7    or overall facility management experience?
8    Q    Either one.
9    A    I had more overall facility
10   management experience.
11   Q    We're not talking about you.
12   Between Richard Miller and Roger Wright, who
13   had the most experience?
14   A    I would have to look at the resumes
15   of everybody else in the facility to be able
16   to answer that question.
17   Q    Well, really just between the two.
18        MR. HOLMES: She's just asking
19             about between those two people.
20             Who had more experience, Roger
21             or Richard, if you know?
22   A    I don't know. I guess Roger would.
23   Q    Did you ever look at their record
24   to determine who had the most experience
25   before you decided who would be laid off?

170

1    A    No, ma'am.
2    Q    Now, a seniority system was used
3    for the layoffs of the union employees?
4    Correct?
5    A    That's correct.
6    Q    Was there any reason that you
7    didn't use a similar seniority system with
8    layoff of nonunion employees?
9    A    I've never been involved in a
10   management situation where seniority
11   determined who was laid off and who wasn't,
12   in management ranks.
13   Q    Is there any reason why you
14   couldn't?
15   A    I think it would be given upon
16   whatever the circumstances are.
17   Q    In these particular circumstances,
18   was there any reason why you couldn't use
19   seniority as a basis for the layoffs?
20   A    I don't know if there's any good
21   reason to do that.
22   Q    Are you aware of any good reason
23   not to do that, if you know?
24   A    I don't know.
25   Q    With Richard Miller, was there ever

171

1    any consideration of demoting him to a lower
2    level?
3    A    Meaning --
4    Q    During this same time period,
5    before he was laid off.
6    A    If I had demoted him to a lower
7    level, then he would have already been laid
8    off.
9    Q    He couldn't be demoted lower than
10   he was?
11   A    I don't know if his seniority would
12   have allowed him to stay, because we were
13   laying off, you know, bargaining unit people
14   by seniority. So, if there was another
15   person in the bargaining unit in facilities
16   that had -- this is an example only -- that
17   had ten years of seniority with facility, and
18   Richard bumped out of management, back into
19   the bargaining unit, and only had five years
20   of seniority, then he would automatically be
21   laid off.
22   Q    I see. Okay. Do you recall any
23   consideration about whether to do that with
24   Richard Miller or not at that time? I mean,
25   do you just recall it, either way?

172

1    A    The facilities department was all
2    going away. Only people that had aircraft
3    experience in the management ranks were the
4    ones that were first on the list to retain.
5    Q    Okay. Did you make any assessment
6    of what the cost would be of these layoffs,
7    in terms of giving two weeks' severance to
8    everyone?
9    A    I did not.
10   Q    Did you consider cost of retraining
11   people to new positions, that sort of thing?
12   A    We did not.
13   Q    It sounds like that there really
14   were not any financial calculations made in
15   terms of, we've got to lay off "X" number of
16   employees to save "X" dollars? Is that
17   right?
18   A    That's correct.
19   Q    Did you make the decisions in terms
20   of layoffs for employees in any other
21   department other than facilities, or did you
22   leave that to the department heads?
23   A    I made that decision for all the
24   operations group at that time, which included
25   facilities. But, you know, if you look at a

173

1  department like accounting or materials,
2  planning, those areas, they were all done by
3  the department heads.  The only one I may
4  have had some indirect input into was
5  planning.  And we discussed that earlier.
6      Q    Okay.  So, the departments that you
7  consider under operations are production
8  departments?
9      A    That's correct.
10      Q    Facilities?
11      A    That's all.
12      Q    Okay.  So, quality, that would not
13  be under yours?
14      A    That's separate.  Yes, ma'am.
15      Q    What was Clark Briody's position at
16  that time, in June of 2005?
17      A    Production supervisor -- excuse me
18  -- production manager.
19      Q    What does a production manager do?
20      A    They oversee the day-to-day
21  operations of the specific aircraft groups.
22  And for a period of time, Clark was the
23  production manager over the entire evening
24  shift.
25      Q    And he was brought over to do some

174

1  of the facilities work?  Is that right?
2      A    He was brought over to be the --
3  just do fill-in work for Roger while he was
4  on medical leave.
5      Q    And what about during the period of
6  time after Roger was offered the demotion to
7  supervisory position?  What was Clark's role
8  then?
9      A    It was going to be the same until
10  Roger got back.
11      Q    Well, not after he was demoted --
12  right? -- to supervisor?  Did Clark's role
13  change?
14      A    Would you say that again, please?
15      Q    Well, we know that Roger was
16  offered a supervisory position.
17      A    That's correct.
18      Q    Correct.  Did Clark Briody's role
19  change when Roger was not coming back as a
20  manager of facilities, he was only coming
21  back as a supervisor in facilities?
22      A    Roger never did come back.
23      Q    I understand that.  Did Clark
24  Briody's role change when Roger was going to
25  come back into the supervisory role?

175

1      A    We didn't have a facilities
2  department after Roger did not return.  We
3  continued doing facility-type work, but we
4  did not have a facilities department.
5      Q    Right.
6      A    Facilities department was not
7  required --
8      Q    I understand that.
9      A    -- to work on airplanes.
10      Q    But, did Clark Briody's role in
11  facilities change during this time?
12      A    He just kept doing what he was
13  doing.
14      Q    And then, after Roger was
15  terminated, did Clark's role change at all?
16      A    Clark kept doing what he was doing.
17      Q    And at some point, did Clark
18  Briody's role in facilities change?
19      A    Yes.
20      Q    Okay.  At what point did it change?
21      A    I don't remember.
22      Q    Was it in 2005?
23      A    Some time during 2005, I think.
24      Q    What was the change to his role?
25      A    He moved from being full time in

176

1  the aircraft production department to full
2  time working in the facilities department.
3      Q    When did that change occur?
4      A    I don't remember.
5      Q    Was it after the labor dispute was
6  resolved or before?
7      A    I know it wasn't before, and it
8  wasn't during.  So, it must have been after
9  some time.
10      Q    Do you recall about how long after?
11      A    No, ma'am, I do not.
12      Q    Was it still in 2005?
13      A    I think it was in 2005.
14      Q    And has his role changed since that
15  time to the present day?
16      A    No, ma'am, it has not.
17      Q    And what's his title now?
18      A    I don't know if he's officially
19  listed as a production manager or a
20  facilities manager.
21      Q    But he's full time in facilities
22  now?
23      A    He falls under my organization of
24  operations.
25      Q    Right.

177

1    A   So, he could be a facilities guy
2  today or he could be an aircraft supervisor
3  or aircraft manager tomorrow.
4        Q   Right.  But, as of right now, he's
5  full time in facilities, and has been since
6  2005?
7        A   Since some time during 2005.
8        Q   Okay.  Did you play any role in the
9  decision to bring Richard Miller back after
10  his layoff?
11       A   I'm sure I did.  All the guys that
12  were in operations, you know, as we needed
13  people, they were recalled.
14       Q   And so, you did recall Richard
15  Miller?
16       A   Yes.  Somebody did.  I don't know
17  if we used Richard Miller by name.  But, you
18  know, if I needed a, you know, diesel
19  mechanic, then I probably called Richard
20  Miller.
21       Q   What is Ted Ball's current role in
22  facilities?
23       A   He does some tooling things for me.
24       Q   Is he full time in facilities now?
25       A   He still maintains a aircraft

178

1  supervisor position.  But he's been doing
2  tooling work for some time.
3        Q   And is that a management position?
4        A   Yes, it is.
5        Q   He's over the tool cribs?  Is that
6  right?
7        A   He does tool crib work.  But his
8  main responsibility has been for tooling
9  equivalencies.
10       Q   And tell me what that is?
11       A   Talked about it a little bit
12  earlier.  It's when you manufacture,
13  in-house, slings or a piece of tooling to do
14  a specific job, you have to show conformity
15  that it meets the same criteria as something
16  that you would buy from a manufacturer.  It's
17  an FAA requirement.
18       Q   When did Ted Ball start assuming
19  some duties in facilities?
20       A   Some time -- it was after the
21  lockout.  I don't remember.
22       Q   Do you think it was in 2005?
23       A   I think so.  May have been 2006.  I
24  don't remember.
25       Q   So, as of 2006, we have three

179

1  full-time people in facilities that are
2  management employees?  Right?  And that's
3  Clark Briody, Richard Miller and Ted Ball?
4        A   That's correct.  We had three
5  full-time management people in facilities in
6  2005, also.
7        Q   Right.  Anybody else come into
8  facilities other than those three?  We've
9  talked about Henry Ward, Roger, Richard
10  Miller, Clark Briody, Ted Ball.
11       A   In management?
12       Q   In management.  Yes, sir.  Anybody
13  else?
14       A   Only one admin assistant that's
15  been there, is Connie Goodson.  Has been
16  there for some time.
17       Q   All right.  And is she considered
18  -- well, she's nonbargaining?
19       A   Yeah.  She's nonbargaining.  She's
20  an indirect person.
21       Q   Does she do clerical work?
22       A   Yes, she does.
23       Q   And was she laid off during that
24  2005 period?
25       A   No, I don't think so.

180

1        Q   Do you have any reason to believe
2  that Roger's need for surgery was not a
3  serious health condition?
4            MR. HOLMES:  Object to the form.
5        A   No, I do not.
6        Q   Did you ever have any conversations
7  with Roger concerning his termination?
8        A   No, ma'am.
9        Q   Were there any other people present
10  in your conversation with Roger when you
11  discussed with him accepting the supervisory
12  position, or was it just you and Roger?
13       A   I think that HR was aware, you
14  know, what we were doing with that.
15       Q   But, was there anybody else in the
16  conversation with y'all?
17       A   I don't think so.  I think it was
18  conducted over in the HR office, but I don't
19  remember anybody else being there.
20       Q   Okay.  Were you also the decision
21  maker as to who was recalled for positions
22  after the labor dispute was resolved?
23       A   From a number standpoint, yes.
24       Q   Okay.  And I understand you've got
25  department heads who would probably fill in

181

1   the gaps for their departments. But, in
2   facilities, would you have made the decision
3   concerning recalls for people in facilities
4   management, the management employees in
5   facilities?
6      A   Since it falls under operations, I
7   would have to say yes.
8      Q   That would not have been Clark
9   Briody's decision? That would have been your
10  decision?
11     A   That's correct.
12     Q   Did you have any particular
13  standards as to who would be recalled for
14  facilities work?
15     A   Well, there was only two guys over
16  there, I mean, so, no. I don't know what
17  standard I would be comparing them to.
18     Q   Did you make the decision to recall
19  Richard Miller as opposed to Roger Wright?
20         MR. HOLMES: Object to the form.
21     A   I don't remember who was called
22  back first.
23     Q   Are you saying Roger was called
24  back?
25     A   I don't know.

182

1     Q   Did you call him back?
2     A   I don't remember calling him back.
3   Was he interested in coming back?
4         MR. HOLMES: Dennis, she's here to
5         ask you questions.
6         THE WITNESS: Yes, sir. Sorry.
7         MR. HOLMES: That's all right.
8         THE WITNESS: I apologize.
9         MR. HOLMES: You can ask me all the
10       questions you want when we get
11       done.
12        THE WITNESS: I apologize. Maybe
13       we should take a break.
14        MR. HOLMES: Okay.
15        MS. GLASGOW: That's fine.
16        (Recess in deposition.)
17     Q   Before 2005 -- you know, I know you
18  were only there a couple of years. But, did
19  Pemco have much of a turnover rate, in terms
20  of employees leaving and coming and going?
21     A   We do have a turnover rate.
22  There's a certain amount of opportunity in
23  the area, you know, for aircraft mechanics.
24  We're kind of -- we're a little isolated down
25  here. So, there's -- I guess Fort Rucker is

183

1   one of the largest employers in the area.
2     Q   And I assume there's probably some
3  turnover of the bargaining employees,
4  aircraft mechanics and that sort of thing?
5     A   Yes, ma'am.
6     Q   Was there much turnover in terms of
7  management, nonbargaining people?
8     A   I can't compare Pemco with any of
9  the other places I've worked.
10     Q   Different beast, isn't it?
11     A   Yeah. It's different. Uh-huh.
12     Q   Did you consider turnover to be a
13  problem in the years up to 2005?
14     A   In the bargaining unit or in the
15  management area?
16     Q   Really, more in management.
17     A   I don't think so. Not any worse
18  than anyplace else, probably.
19     Q   Did you have difficulty recruiting
20  people into management positions at Pemco?
21     A   Yes, we do.
22     Q   For management positions, you do?
23     A   I think so.
24     Q   What was the reason for that
25  difficulty? Do you know?

184

1     A   I think -- I can only speak -- can
2  I speak personally on this?
3     Q   Yeah. Just your opinion.
4     A   My opinion, okay, is what you're
5  looking for. I think there's somewhat of a
6  -- at Pemco, from a security standpoint, the
7  bargaining unit people feel like that they're
8  more secure, for some reason, than what the
9  management people are. I don't know why they
10  think that. But I think that's -- speaking
11  personally.
12     Q   And you think that's one of the
13  reasons why you had difficulty recruiting for
14  management employees?
15     A   Speaking personally, not from the
16  corporation?
17     Q   Yeah.
18     A   Yeah, I think that. I think they
19  believe that they're secure.
20     Q   If they're bargaining employees?
21     A   Yes.
22     Q   And not secure if they're not?
23     A   That's correct.
24     Q   And I know we've mentioned this.
25  But, did you participate in any type of

185

1  long-range planning for the company, in terms
2  of, like, a strategic planning committee,
3  long-range planning committee? You mentioned
4  five-year plans. But I'm not sure I got
5  whether you were on any committee to draft
6  those plans or not.
7      A    No, I've not been.
8      Q    You've not been. Okay. Has your
9  role and job duties changed significantly
10 since, say, August 2005, or after the labor
11 dispute was resolved, say, that's September
12 2005? Have your duties changed
13 significantly?
14     A    My work load has increased.
15     Q    And why has that increased?
16     A    Our facility has grown.
17     Q    You mentioned that you had two
18 airplanes at the facility when this was at
19 its worst. What's the best that you've done
20 since 2005?
21     A    As far as number of airplanes in
22 the facility.
23     Q    Yeah.
24     A    We kept 16 to 19 airplanes on the
25 base during the first part of 2007. And

186

1  we've averaged about 10 airplanes, 10 to 12
2  airplanes, on base all this year. And we've
3  had a significant increase in our bargaining
4  unit head count due to the increase of work.
5      Q    Have your duties changed in any
6  other way, in any other significant way,
7  other than just general increase in the work
8  load?
9      A    No, I don't think so.
10     Q    You're still doing what you were
11 doing? You're just doing more of it?
12     A    Just doing more of it.
13     Q    Do you have any plans to add any
14 other management positions in facilities?
15     A    No.
16     Q    Did you know Ray Bennett before he
17 came to Pemco?
18     A    No, ma'am.
19     Q    Do you know where he came from?
20     A    Delta Airlines.
21     Q    And why did he leave? Do you know?
22     A    Like most of the major carriers,
23 they've been downsizing through the years.
24 Obviously, he looked at it as an opportunity.
25 I don't know what his reasons were.

187

1      Q    I'm sorry. I wasn't clear about
2  that. Why did he leave Pemco?
3      A    I don't know.
4      Q    Do you know whether he resigned or
5  whether he was terminated?
6      A    No, I do not.
7      Q    Did you ever have any discussion
8  with him about his departure before he left?
9      A    No, ma'am.
10     Q    How did you find out he wasn't
11 going to be there?
12     A    Ron Armini informed me.
13     Q    Did he give you any details about
14 why Ray Bennett was leaving?
15     A    No, ma'am.
16     Q    Was Ray Bennett ever reprimanded
17 for any reason that you're aware of?
18     A    It was none of my business.
19     Q    Okay. But, are you aware of any
20 reason for a reprimand for Ray Bennett?
21     A    No, ma'am.
22     Q    What about Jim Batcher? Was he
23 already HR director when you came on in '03?
24     A    Yes, ma'am.
25     Q    And he was terminated? Is that

188

1  right?
2      A    I don't know.
3      Q    Do you have any information as to
4  whether he resigned or was terminated?
5      A    No, ma'am, I do not.
6      Q    During the layoffs, were there any
7  cutbacks in HR?
8      A    I don't remember.
9      Q    Okay. But you were not over the HR
10 department? Is that right?
11     A    That's correct.
12     Q    Who would be your counterpart in
13 Birmingham, for the Birmingham facility?
14     A    I don't know. Birmingham is a
15 different type of operation.
16     Q    And I understand that. It's all
17 military planes? Is that right?
18     A    Yes, it is. That's correct.
19     Q    And you all just do commercial
20 airlines? Is that right?
21     A    That's correct.
22     Q    And I guess that was going to be my
23 next question, is, do you ever have any
24 discussions with a counterpart in Birmingham
25 on operations, how to do things, that sort of

189

1    thing?

2    A    None, no.

3    Q    Are you familiar at all with the
4    retirement plan for Pemco as it applies to
5    employees other than yourself?  Are you
6    involved with the retirement plan at all?

7    A    My plan is the same as everybody
8    else's.

9    Q    But, do you have any part in the
10    administration of that pension plan?

11    A    No, ma'am, I do not.

12    Q    Does World Air Services make a
13    contribution to the Pemco pension plan for
14    World Air Services' employees?

15    A    I'm not qualified to answer that.

16    Q    Okay.  But, is there a line item on
17    the budget for making contributions to the
18    pension plan for World Air Services'
19    employees or on behalf of those employees?

20    A    I can't answer that question.

21    Q    I mean, have you ever noticed that
22    as part of the financial records that you've
23    reviewed?

24    A    No, ma'am.

25    Q    I know you've testified that the HR

190

1    department was not under your responsibility.
2    But, did you have any input into what HR
3    functions would be or what they were going to
4    be involved in, in any way?

5    A    No, ma'am.

6    Q    Did you ever receive any training
7    from the HR people in Dothan while at Pemco?

8    A    We've covered this.  Just the
9    normal indoctrination training.

10    Q    But no other specific HR training
11    from them?

12    A    No, ma'am.

13    Q    And no other specific HR training
14    from anybody at the group level?

15    A    No, ma'am.

16    Q    Were you ever given any kind of
17    discrimination training?

18    A    Annually.  Drug and alcohol.

19    Q    Did that also include
20    discrimination?

21    A    Yes.

22    Q    Sex, race?

23    A    Yeah.  Sex, race, sexual
24    harassment.  All those fall in the same type
25    of training.  Yes.

191

1    Q    And is all that done once a year?

2    A    Yes, it is.

3    Q    And who usually does that training?

4    A    The HR department.

5    Q    Would that be Jim Batcher himself
6    or other people?

7    A    I don't -- you know, in the last
8    five years, I can't recall who did the
9    specific training.

10    Q    Do you have to sign an
11    acknowledgment form when you go to these
12    training sessions, that you were there?

13    A    Yes.

14    Q    Have you ever had any training on
15    family medical leave?

16    A    Not in detail.

17    Q    Have you ever attended a formal
18    training session specifically on family
19    medical leave itself?

20    A    I don't remember.

21    Q    Who is in charge of sending out the
22    family medical leave forms?  Is that you or
23    HR?

24    A    I don't understand.  When you say
25    sending out the forms, what do you mean?

192

1    Q    Yeah.  The forms for family medical
2    leave.  Are you aware that there are any
3    forms to send out?

4    A    There's forms.  When you say "send
5    out," help me there.  Are you talking
6    about --

7    Q    Send to the employee.

8    A    After they apply for it, or just as
9    formal notification that we have a plan or
10    there is such a plan, or what?

11    Q    I assume that you've got a policy
12    in your handbook?

13    A    Yes, we do.

14    Q    Okay.  When an employee -- or the
15    company becomes aware of the need for family
16    medical leave, do you send out those forms or
17    does HR do that?

18        MR. HOLMES:  Object to the form.

19    Q    To the employee.

20    A    I have never sent one out.

21    Q    If somebody under your supervision
22    needs family medical leave, what will you
23    normally do?

24    A    I would ask them to go to the HR
25    department and make sure that their needs are

193

1  taken care of or let them explain the
2  benefits.
3      Q    Did Roger Wright's work performance
4  play any role in the decision to demote him
5  or to terminate him, or was that decision
6  strictly based on needs of the company?
7          MR. HOLMES:  Object to the form.
8      A    Actually, Roger never really worked
9  for me.  When I took over the department, or
10 the department was assigned to me, it was at
11 the same time Henry Ward was retiring, that
12 time frame right there.  So, to be able to
13 make a judgment on Roger's work performance,
14 I can't do that.
15     Q    Okay.  As you sit here today, do
16 you have any reason to believe that his work
17 performance was poor or unacceptable?
18     A    (No response.)
19     Q    And I'm talking about your
20 knowledge.
21     A    I don't know how to judge that.
22     Q    Because he did not ever work
23 directly for you?
24     A    That's correct.
25     Q    Okay.  So, the decisions concerning

194

1  his employment were not based upon his work
2  performance?
3          MR. HOLMES:  Object to the form.
4      Q    Is that right?
5      A    I've stated before that, you know,
6  everything that happened during the lockout,
7  the bad year that we had in 2005, was based
8  on the requirements to support the aircraft
9  and work.
10     Q    So, Roger's work performance,
11 whether he did his job well or poor, did not
12 factor into the decision concerning his
13 employment?
14     A    That's correct.
15     Q    Okay.  Have you talked to Roger at
16 all since he left Pemco?
17     A    In your office.
18     Q    Other than that?
19     A    No, ma'am.
20     Q    Do you have any reason to believe
21 that Roger could not perform his job
22 physically?
23     A    I don't think so.  I mean, not that
24 I know about.
25     Q    Okay.  Do you have any reason to

195

1  believe that he could not do the supervisory
2  position because of any physical, medical
3  condition or limitation?
4      A    In 2005?
5      Q    Yes, sir.
6      A    No.
7      Q    I mean, did you consider him
8  disabled?
9      A    No.
10     Q    Do you have any reasons to believe
11 that he was not eligible for family medical
12 leave, or do you have any knowledge about
13 that one way or the other?
14     A    No, ma'am.
15     Q    Let me go to Plaintiff's Exhibit
16 No. 2, which, again, is Bates numbers 736
17 through 756.  It looks like there's some --
18         MS. GLASGOW:  Do you have the
19              originals, by any chance?
20         MR. HOLMES:  I don't.  I have a
21              copy that may be slightly
22              better than that, and we can
23              try to make a better copy with
24              what I have.
25         MS. GLASGOW:  I just wanted to show

196

1          Mr. Johnson.
2      Q    You see that there are some dates
3  on some of these pictures?  Like, on Bates --
4  what is that? -- 739, what's the date on that
5  picture?  Can you see it?
6      A    Looks like June the 10th, 2005.
7      Q    And what's that a picture of?
8      A    A dumpster full of trash.  There's
9  a notation bullet beside the picture that
10 says, "One of three roll-offs filled with
11 junk from the wastewater treatment building."
12 I think there's a description by each picture
13 of what it is.
14     Q    And so, it's your understanding
15 that these are all projects taken on by Clark
16 Briody concerning facilities?
17     A    That's correct.
18     Q    Did you ask him to do an assessment
19 of the facilities when he switched over the
20 roles?
21     A    When the facilities department, you
22 know, fell under my responsibility, I was
23 taking the opportunity to clean up some areas
24 that I thought needed attention.
25     Q    Yeah.

197

1    A    And I assigned those duties to
2  Clark.
3    Q    Okay.  How often did you and Ray
4  Bennett talk or meet?
5    A    Daily.
6    Q    There's a notation in one of the
7  board minutes of a board meeting dated --
8  well, I'm not sure of the date.  It says May
9  10th through the 11th, and then, in the text,
10  it says May the 12th.  And I'll let you take
11  a look at this in a second.  Let me ask my
12  question first.  Oh, here it is.  It appears
13  that there was a board meeting on May the
14  11th, 2005.  And let me just read to you.
15  This is Bates stamp number 323.
16    "A quorum was determined to be present.
17  Mr. Bennett opened the meeting with an
18  operations report on Dothan's commercial
19  business, an update on lean events at the
20  facility, an announcement that the suggestion
21  program would be incorporated with the lean
22  team's initiative."
23    What is, if you're aware, the lean
24  events and lean team's initiatives?
25    A    Has to do with manufacturing

198

1  processes.
2    Q    Okay.  Tell me about that?
3    A    It's removing waste from a product
4  line.  Has nothing to do with people.  Do you
5  want me to go on?
6    Q    Yeah.
7    A    If you have a lean event, or what
8  can be commonly known as a Kaizen-type event,
9  you take a particular product line, be it at
10  a manufacturing facility or a facility like
11  ours, and if you want to get the bottle of
12  water from the kitchen to this conference
13  room, you know, what steps do you go through
14  to make that happen?
15    So, you go from here to the
16  refrigerator, get your bottle of water, and
17  come back to this conference room.  And then,
18  you might determine, you know, how many
19  bottles of water do you use a day, and would
20  it be more efficient to move a mini
21  refrigerator into this room.  So, if Libby
22  drinks, you know, a bottle of water every
23  five minutes, then she'd go over here to the
24  corner and get your bottle of water, rather
25  than leaving the office area, walking down

199

1  the hall to the kitchen area, and coming
2  back.  So, it's removing wasted steps from
3  any particular process.
4    Q    But it's strictly in production,
5  not in terms of manpower?
6    A    Has nothing to do with manpower at
7  all.  Hopefully, the objective also is -- I
8  guess you could figure manpower into it.  If
9  it takes, you know, two Libbys to do this,
10  then the other Libby could work on another
11  task.  But as far as a reduction in work
12  force, you know, future plans to reduce, you
13  know, head count or anything like that, it
14  has nothing to do with that.
15    Q    A lean team initiative has nothing
16  to do with the layoffs?
17    A    No.
18    Q    Okay.  Are you aware, through your
19  conversations with Ray Bennett, as to whether
20  he actually went to the board with his plan
21  for layoffs in Dothan --
22    A    I don't know.
23    Q    -- at any time prior to the time
24  the layoffs occurred?
25    A    I have no idea about that.  It was

200

1  a very dynamic time.  Like I've said before,
2  the work was changing daily.
3    Q    How long -- and I'm not sure that
4  you know the answer to this question.  Let's
5  take Northwest, for example.  Once your labor
6  problems were resolved, how long does it take
7  for a commercial airliner to, you know, make
8  the decision to bring airplanes back to Pemco
9  for service?  Is it on a regular rotation
10  that they come in and out, or how does that
11  work?
12    A    Most airlines have got their
13  airplanes set up on a cycle for various types
14  of inspections.  Okay.  The range of these,
15  depending on what your approved maintenance
16  program is, which can be a variety of
17  maintenance programs -- but, let's take one
18  that's --
19    Q    And then, the FAA requires certain
20  maintenance programs?  Right?
21    A    That's correct.  Your maintenance
22  program has to be approved by the FAA.  So,
23  if we take a particular airplane, and say
24  this particular airplane is on a maintenance
25  schedule for this type of check every, you

200

1  know, 18 months or five years, whatever, they
2  have a way to defer a certain amount of that
3  maintenance for a period of time. So, that's
4  all done in a planning and scheduling at the
5  airline. So, they'll have "X" number of
6  airplanes out of service at some point in
7  time. Some airlines have spare planes. Some
8  don't.
9      Q    How long is the deferral period?
10  How long can they defer before they've got to
11  -- if Pemco is shut down, how long can they
12  defer 'til they've got to go somewhere else?
13     A    Sometimes it can be, you know, a
14  short period of time. Sometimes you may be
15  able to get a 30-day-type extension. But if
16  the work wasn't performed at our facility,
17  there's multiple facilities in the U. S. they
18  could take their airplane to.
19     Q    But you think the longest would be
20  a 30-day period?
21     A    Usually -- I've not heard of many
22  extensions past 30 days.
23     Q    And do you have to get an extension
24  from the FAA?
25     A    You have to have an extension in

202

1  writing, and explain in detail, you know,
2  what pieces it's going to affect, how you're
3  going to operate the airplane for the next 30
4  days. Usually, when that comes into play,
5  that airplane may go on the spare list, so
6  it's not flying very much, or you have to
7  say, all right, they can do it also a number
8  of cycles or hours.
9         (Recess in deposition.)
10     Q    Mr. Johnson, was there anything in
11  particular about Clark Briody's background
12  that prompted you to bring him over into
13  facilities to fill in for Roger?
14     A    No. He just got tagged.
15     Q    Have you ever talked with Ray
16  Bennett since he left?
17     A    Yes, I have.
18     Q    Do you stay in touch with him?
19     A    Not really. I've talked to him a
20  few times.
21     Q    When was the last time you spoke
22  with him?
23     A    I don't recall.
24     Q    Have you ever spoken to him about
25  this lawsuit or about being a witness in this

203

1  case?
2      A    No, ma'am.
3      Q    Is he aware that the case is
4  pending --
5      A    I don't know.
6      Q    -- to your knowledge?
7      A    I don't know.
8      Q    Did you have any scenarios in place
9  for what would happen if the labor dispute
10  turned out to be fairly short lived?
11     A    I think the scenario was the same.
12  It was more so if it became longer, rather
13  than shorter. You know, shorter would have
14  been better for everybody.
15     Q    Sure.
16     A    It would have been better for us.
17  It would have been better for our customers.
18  It would have been better for the employees.
19     Q    Did the scenarios include how to
20  get back up to speed in the event that there
21  was a short dispute?
22     A    It was depending how soon the
23  customers brought their airplanes back.
24     Q    And I assume you've got salespeople
25  out there to work with the customers, let

204

1  them know, "Hey, we're back in business"?
2      A    Yes. That's correct.
3      Q    And would those be World Air
4  Services employees, or is that out of
5  Birmingham?
6      A    No. It's World Air Services
7  employees.
8      Q    And is that the marketing
9  department that would do that?
10     A    That's correct. Uh-huh. The
11  marketing department would notify them, and
12  also the contracts department.
13     Q    But, did your scenarios, you know,
14  have a plan for getting back up to speed?
15     A    Yes, we did. It's just based on --
16  once again, on head count. If Northwest, as
17  an example -- and we've used Northwest as an
18  example a couple of times here. Nothing
19  except an example.
20     Q    Right. I understand that.
21     A    All right. You know, if Northwest
22  said, "We're going to bring -- you guys are
23  back up and running. We're going to bring
24  you this particular type of check," then our
25  ramp-up would be in accordance with what

205

1  skill levels were required to do that one
2  airplane.  If they brought two airplanes, it
3  would be what would be required for two.
4     Q    How much notice do you get before
5  they bring in an airplane?
6     A    On our standard customers?
7     Q    Yes, sir.
8     A    Anywhere from, you know, 30 days to
9  -- a 120-day outlook is about as far as we
10 usually have a firm commitment on.
11    Q    Oh, okay.  And so, you have 30 days
12 minimum to hire and get ramped up for that
13 work?
14    A    Usually.  And we do have other
15 customers, like our leasing customers, that
16 can be -- I can be surprised in the morning.
17    Q    Oh, okay.  Does that type of work
18 take much to get ramped up for?
19    A    It's more difficult.  Yes, uh-huh.
20    Q    Because of the short time frame?
21    A    Short time frame.
22    Q    How much of your work load is for
23 these leasing customers?
24    A    In the last two years, it's been
25 very little.  Previously, 2003, 2004, you

206

1  know, the first part of 2005, we had more.
2  It's a cyclic event, also.
3     Q    What's the cycle based on?
4     A    How many airplanes they have in
5  service, the leasing company.  Generally,
6  when an airplane is leased, whoever the
7  leaser is maintains the airplane someplace.
8     And ILFC is an example.  If they have an
9  airplane that's being returned off of lease,
10 or if they have an airplane they've had to
11 repossess, they'll come in for a check,
12 usually, and they'll repaint it.  And
13 whatever the next customer's requirements
14 are, those are fulfilled, and it goes back in
15 service.
16    Q    Who, from the company, was involved
17 in the negotiations with the union on the
18 labor dispute?
19    A    Jim Batcher, Grady Mixon.  I don't
20 know if Ray attended any of those or not.  He
21 may have attended some of the initial ones,
22 if I remember right.  But that's it, that I
23 know about.  And counsel was Claude Sullivan,
24 who was the attorney from Atlanta.
25    Q    I understand the company has now

207

1  been sold, World Air Services has been sold?
2  Is that right?
3          MR. HOLMES:  Object to the form.
4     A    We have a pending agreement.
5          (Brief off-record.)
6     Q    To your knowledge, is the potential
7  purchaser in the same line of business as
8  Pemco currently, in terms of the Dothan
9  facility?
10    A    I think this is -- they're a
11 venture capital group.  This is their first
12 venture, as far as I know, into this type of
13 industry.  They bought Boston Market from
14 McDonald's last weekend.  I mean, they've
15 acquired several companies in the last month.
16          MS. GLASGOW:  All right, Mr.
17       Johnson.  I think I've put you
18       through enough today.
19       Appreciate it, sir.
20       THE WITNESS:  You're welcome.
21       MS. GLASGOW:  That will be it.
22       John, do you have anything?
23       MR. HOLMES:  I don't.
24
25          END OF DEPOSITION

208

1          PLAINTIFF'S EXHIBIT NO. 1

209

```
1                    PLAINTIFF'S EXHIBIT NO. 2
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

211

```
1          STATE OF ALABAMA
2          HOUSTON COUNTY
3
4               I, Stacey Watkins, RPR, and Notary
5          Public, State at Large, do hereby certify
6          that the foregoing transcript, pages 1
7          through 210, is a true and correct transcript
8          of the testimony and proceedings taken at
9          said time and place; and that the same was
10         taken down by me in stenograph shorthand,
11         and transcribed by me personally or under
12         my personal supervision.
13              I further certify that I have no
14         interest in this matter, financial or
15         otherwise, or how it may develop or what
16         its outcome may be.  I further certify that
17         I am not of counsel for any of the parties,
18         nor am I related to counsel or litigants or
19         associated with anyone connected with this
20         cause to my knowledge.
21              Witness my hand this 20th day of
22         August, 2007.
23
24              _____
25         _____RPR, Notary Public,
                        State at Large
```

210

```
1                    PLAINTIFF'S EXHIBIT NO. 3
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT 5

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2           FOR THE MIDDLE DISTRICT OF ALABAMA
3                    SOUTHERN DIVISION
4
5  ROGER WRIGHT,              )
6        Plaintiff,           )
7  VS.                        ) CA NO.: 1:06 CV 647-WKW
8  PEMCO WORLD AIR SERVICES,  )
   INC.,                      )
9                             )
        Defendant.            )
10
11
12        The deposition of CLARKE E. BRIODY, taken
13  by the Plaintiff, pursuant to the Federal Rules of
14  Civil Procedure, before Kimberly B. Faucette, Certified
15  Court Reporter and Notary Public in and for the State of
16  Alabama at Large, at the law offices of Farmer, Price,
17  Hornsby & Weatherford, Dothan, Alabama, on the 16th day
18  of August, 2007, at 10:00 a.m., pursuant to notice.
19
20              *    *    *    *    *
21  APPEARANCES:
22  FOR THE PLAINTIFF:        FOR THE DEFENDANT:
23  MS. ELIZABETH GLASGOW     MR. JOHN HOLMES
    Attorney at Law           Attorney at Law
24  Dothan, Alabama           Birmingham, Alabama
25
```

**Page 2**

```
1            S T I P U L A T I O N S
2        It is stipulated by and between counsel for
3  the parties that this deposition is taken at this time
4  by Kimberly B. Faucette, Court Reporter and Notary
5  Public, State at Large, who is to act as commissioner
6  without formal issuance of commission to her; that said
7  deposition shall be taken down stenographically,
8  transcribed, and certified by the commissioner.
9        Except for objections as to the form
10  of questions, no objections need be made at the time of
11  the taking of the deposition by either party, but may be
12  interposed by either party at the time the deposition is
13  read into evidence, which shall be ruled upon by the
14  Court on the trial of the cause upon the grounds of
15  objection then and there assigned.
```

**Page 3**

```
1                   CLARKE E. BRIODY
2  having been first duly sworn, testified as follows,
3  to-wit:
4                    EXAMINATION
5  BY MS. GLASGOW:
6     Q    Would you state your name for the record,
7  please?
8     A    Clarke Edward Briody.
9     Q    Mr. Briody, my name is Libby Glasgow.  I
10  represent Roger Wright in this lawsuit that we brought
11  against Pemco.  I am going to be asking you a number of
12  questions today.
13        Our court reporter here is here to take down
14  everything we say.  So you need to answer all of the
15  questions out loud.  You can't just nod or shake your
16  head, because that it is very difficult for her to take
17  down.
18     A    I understand.
19     Q    Give me your current address.
20     A    I live at 100 Cumberland Drive, Dothan,
21  Alabama 36301.
22     Q    And are you currently working?
23     A    Yes, ma'am.
24     Q    Who do you work for?
25     A    I work for Pemco World Air Services, Dothan,
```

**Page 4**

```
1  Alabama.
2     Q    And what do you do for them?
3     A    I am currently assigned as the facilities
4  manager.
5     Q    All right.  Can you -- Well, first of all,
6  have you brought any documents or reviewed any documents
7  in preparation for your deposition today?
8     A    No, ma'am, I have not brought any documents.
9  I have looked at documents.
10     Q    What have you looked at?
11     A    I have seen a copy of Mr. Wright's, I guess,
12  complaint, would be the word.
13     Q    Anything else?
14     A    At various times, I was asked to gather
15  information for HR, relevant to my time in facilities,
16  and I did that and carried those to HR.
17     Q    What information did you gather?
18     A    Things that related to the time to the
19  predecessor to Mr. Wright's time at facilities, issues
20  that were on the table that I continued with --
21     Q    And what were those?
22     A    -- in my tenure.
23     Q    I am sorry.  What were those?
24     A    There were some build-outs required in one of
25  the hangars.
```

5

1    Q    And what is a build-out?

2    A    That is where you take a blank open space that

3 has walls and put interior furnishing type walls and

4 doors, et cetera, sprinkler system.  We were needing the

5 office space for our reps, our customer reps.

6    Q    Okay.

7    A    And there had been quotes done, and I had been

8 asked to scale down the scope of the work.  Because the

9 cost had been prohibitive, had not -- the work had not

10 been done.

11    Q    Because of costs?

12    A    Yes, ma'am.  The corporate headquarters had

13 not signed off on it with our process, which was

14 required, before we could proceed.

15    Q    And corporate office, meaning Pemco Aviation

16 Group?

17    A    Yes, ma'am, in Birmingham, which required

18 levels of financial approval higher than the facility

19 because of the cost, in excess of ten thousand dollars.

20 During researching which groups or vendors had quoted

21 the original bid for the original work scope, I ran

22 across a quote that was substantially lower, from a

23 company that had not been considered for the work, which

24 I found to be extremely unusual.

25    Q    Who was the company?

6

1    A    Danco.

2        And as it turned out, we downsized the scope and

3 Danco was the lowest bidder.

4    Q    Did you rebid the project?

5    A    Yes, ma'am.  I attempted to rebid the project.

6 I did not get a formal quote from two of the bidders.

7 One of them came and looked, which was Faulkner, which

8 were the people that were originally going to be given

9 the project, but they failed to provide an actual

10 written quote.  They gave me a ballpark figure, which I

11 told them I needed it in writing to go before corporate,

12 and they failed to do that, period.

13    Q    Okay.

14    A    The third company that had previously bid

15 actually called me and scolded me for asking them to bid

16 it again and wasting their time, because they had not

17 done any work for Pemco, and they told me they thought

18 that was a wrong thing to do.

19    Q    What is this time period where you are going

20 through these previous bids and considering this

21 project?

22    A    I think it would have been shortly after the

23 lock-out.  During that time frame, I know that Mr.

24 Bennett was our president at that time.  To put it in a

25 time frame, I don't remember the exact dates.  I

7

1 probably have those in the paperwork.

2    Q    July or August '05, does that sound about

3 right?

4    A    I am not positive that I could nail it down to

5 that degree.

6        MR. HOLMES:  The lock-out began in August, and

7        I think ended the end of August of '05.

8    Q    I can get those specific dates for you.

9    A    But that time frame went very fast for me, the

10 lock-out particularly.  I was one busy individual.

11    Q    I understand.  But you were going through --

12 When had they first approached you about looking at this

13 project?

14    A    Our Northwest customer had gone away, and then

15 we had finished the lock-out, as I recollect, and we

16 were looking at building back up the business space with

17 both Northwest, and we were courting Southwest at that

18 time.  The intent was to open up more office space for

19 either of the two customers.  I think in the original

20 concept of my predecessors, it was being looked at for

21 Northwest.  Then it was being looked at, in one of the

22 two renditions I did, which I downsized it twice before

23 we finally built it, it was being looked at for

24 Southwest.  And then in the final rendition, which it

25 was actually built, it was for Northwest Airlines, which

8

1 was probably a course of about a year lapse during that.

2        But in any case, at one point in that time frame, I

3 ran across this document that had not been even

4 considered in the first quote.  I found that highly

5 irregular, because they were substantially lower.

6        We have a procedure for doing amendments to our

7 process, to at least account for it, for business

8 ethics.  This was a lower price, but I didn't select it

9 because... that keeps you honest and ethical.  I was

10 surprised that was not done.

11    Q    And do you have a copy of that Danco bid?

12    A    Yes, ma'am.  I turned that over to HR at the

13 time I was asked for anything pertinent that I thought

14 might be pertinent or relevant that we were being sued.

15    Q    And how do you feel that is pertinent to this

16 case?

17        MR. HOLMES:  Object to the form.

18    A    In my estimation, I am not sure if I

19 understood at that time what all of this case was

20 relevant to this case.  But for my purposes, I thought

21 that was irregular.  So for that reason, I put that in

22 the stack.

23    Q    And how do you think that relates to Roger

24 Wright?

25    A    Again, I find it highly unusual that that

9

1  quote was not put in context with the other quotes.

2    Q    And do you know why that was done or not done?

3    A    No, ma'am, I do not.  I asked the people that

4  might have known then, and they didn't know either.

5    Q    Did you ask Dennis Johnson about that?

6    A    I did speak to Dennis about it.  He also found

7  it highly irregular.

8    Q    Did you speak with Roger Wright about that?

9    A    No, ma'am.

10   Q    What about Henry Ward?

11   A    No, ma'am.

12   Q    Do you know who was in charge of that project?

13   A    At that point in time, no, ma'am, I do not.

14   Q    So as far as your information goes, you don't

15 know that Roger Wright was actually in charge of that

16 project?

17   A    There were communications that were addressed

18 to him and there were communications probably addressed

19 to Henry, probably both in that stack.

20   Q    From who?

21   A    From those construction companies.

22   Q    When was the project originally bid?

23   A    It was prior to my going to the department.  I

24 believe it was probably in the neighborhood of six

25 months to a year previous to my going over there, that

10

1  it was originally bid.

2    Q    And, then, in what time frame did Northwest --

3  strike that.

4         You said the project was originally designed to

5  accommodate Northwest; is that right?

6    A    Yes, ma'am.

7    Q    At what point did Northwest begin to pull its

8  planes out and reduce its work at Pemco?

9    A    I am not exactly positive of the exact dates.

10 But in the months leading up to the lock-out, they

11 started to wane off and not bring aircraft in.  I know

12 that previous to the lock-out, there was quite a bit of

13 downsizing to the whole facility.

14   Q    As far as you are aware, did anybody ask Roger

15 Wright for an explanation of why the Danco bid was not

16 considered?

17   A    No.  I have no idea.

18   Q    Have you heard anything from somebody else

19 about why it may or may not have been considered?

20   A    No, ma'am.  I have not asked anybody, really.

21   Q    Let me say this:  You said that the project

22 and the scope of the project was downsized how many

23 times?

24   A    Two times.

25   Q    By yourself?

11

1    A    Yes, ma'am.  And that was on the direction

2  from my superiors.

3    Q    And who was that?

4    A    This was too much build-out.  We can't spend

5  that much.  Build half of it, which I did that.  And

6  then it was downsized, half of it still, but less

7  elegant.  Take the bathroom out, is what it turned out

8  to be.

9    Q    So the original bid of Danco was never

10 accepted; is that right?

11   A    That's correct.

12   Q    The whole thing was rebid, redesigned?

13   A    Correct.

14   Q    And who finally got the bid then?

15   A    Danco.  But I guess what I am saying, they

16 were on the original full scope and they were

17 substantially lower than the other two companies that

18 bid.

19   Q    Did you gather any other information other

20 than on that build-out project?

21   A    There were other indications of things that,

22 at that time, I thought pertinent.  Again, not knowing

23 what our lawsuit was about, I was told that he was suing

24 us.

25        There was a longstanding belief of the FAA that we

12

1  were not in compliance with tool equivalency

2  requirements under the FARs; that we did not have a

3  program that made our tools legal to use on aircraft, if

4  they weren't the exact part number tool.

5         And there was documentation where the department

6  had stated they had only been successful at getting one

7  or two equivalencies on tools, and there are literally

8  tens of thousands of tools that belong to the company.

9         It was a very pointed letter to the president of

10 the company from the FAA saying, you need to get a

11 handle on this.

12   Q    When did that letter come out?

13   A    It was during the time frame that Mr. Tucci

14 was the president.  It was addressed to Henry Ward.

15 There was some paperwork associated with that on the

16 tool equivalencies, but there were actually no

17 equivalencies found, no files, that substantiated that

18 we had proven any tools equivalent, which I saw as a

19 huge risk to the department and the company, and engaged

20 the president to that.

21   Q    At what period of time are you looking for

22 this information?

23   A    I believe that would have been after the

24 lock-out.  And I believe it would have been the time

25 after the lock-out that Mr. Batcher was still around the

13

1  facility, as best I recollect. I have thought about
2  that. I am thinking it was Mr. Batcher that informed me
3  we were being sued.
4      Q    And you think it was in the period soon after
5  the lock-out?
6      A    I believe that is roughly when it was.
7      Q    So you began gathering this information around
8  the August, September time frame, around there, and I
9  understand, I am not trying to be exact --
10     A    I don't believe that I made a concerted effort
11 to go secure that documentation then.
12         When Mr. Henry mentioned again that we were being
13 sued, sometime this year, he asked me to collect
14 documentation. I had thrown these things in files and
15 threw them off to the side. At that point, they were
16 relevant. I wasn't throwing anything away. I knew we
17 were -- at one point, was told we were being sued. I
18 didn't know if that was actually accurate, you know, for
19 my purposes.
20         But when Mr. Henry said, any documentation you have
21 on Roger, I need it, I took him what I found that had
22 Roger's name on the face. In all honesty, I threw some
23 things away.
24     Q    But the initial start of this was under Mr.
25 Batcher in the period after the lock-out?

14

1      A    I believe Mr. Batcher informed me we were
2  being sued. And at that point, I guess my brain said,
3  Clarke, you are being accused of wrongdoing. Anything
4  that seems like someone else was doing wrong and not
5  you, save it, and I did so.
6      Q    I understand.
7      A    In a nutshell.
8      Q    Was there anything else that you found?
9      A    There were a couple of things. I don't recall
10 anything specific. I had files and notes from my first
11 days in the department. I probably gave him those.
12 Some clean-up efforts that we were adamantly directed to
13 go take care of immediately when I filled in for Roger,
14 prior to the lock-out. I think that was most of it.
15     Q    So when you first came over to facilities, is
16 it a fair statement that there was quite a bit to do?
17     A    Yes, ma'am.
18     Q    And you were tasked with a number of projects
19 from the beginning?
20     A    Yes, ma'am.
21     Q    Clean-up projects, I think you said?
22     A    Yes, ma'am.
23     Q    And who gave you those tasks?
24     A    Mr. Johnson.
25     Q    And you said you kept notes during that time

15

1  period?
2      A    I actually typically keep a notebook. I don't
3  keep them in order or anything. I keep notes to not
4  forget all of the things I need to do in a day. And in
5  those first days, everything being relatively new to me
6  as an assignment, I kept all of my notes from the first
7  couple of days. I called it notes for the first days
8  and threw them in a file.
9      Q    And did you turn those over to HR or to
10 counsel?
11     A    Yes, ma'am, I believe I did. And if I did
12 not, I do have them in my files in the office. Just
13 certain things that were going on; people asking for
14 different things. Some of it relevant, maybe.
15     Q    What other projects were you tasked with early
16 on?
17     A    Roger had left a list of several things that
18 were ongoing. There was a cage, which was basically a
19 chicken wire/wood affair, that was going to be used for
20 storing aircraft parts and needed to be built with
21 expanded steel, a much more solid structure. There was
22 a breakroom. We were, at that point, preparing for
23 Alaska Airlines inductions, and Roger had had the floor
24 painted. I think my assignment was to fix some places
25 that weren't yet correct to my boss's liking, and to

16

1  finish the cleaning up and painting of the breakroom.
2  There were some gutters that were being worked on by an
3  outside vendor that I was supposed to finish up on.
4      Q    And these were on Roger Wright's list?
5      A    I think those, probably, as best I recollect,
6  were on Roger's list. I know the breakroom was on
7  Roger's list to finish up the breakroom, you know, keep
8  working on the cage. At that time, I thought Roger was
9  going out, as best I recollect, for six weeks, and he
10 would be back, and I would go back to production. So I
11 was basically trying to keep the fires burning while he
12 was out. That's all.
13         But Mr. Johnson had a bunch of other assignments.
14 The clean-up, that was a big clean-up, throw a lot of
15 things away, a lot. That was a big clean-up.
16     Q    And clean-up is the responsibility of
17 facilities?
18     A    Yes, ma'am.
19     Q    And like the building of the boxes and the
20 floor painting, that is all facilities department, plant
21 maintenance, that sort of thing; is that right?
22     A    The building of the cage, yes, ma'am, that was
23 a facilities' task.
24     Q    And the gutters and the breakroom and all of
25 that are facilities' tasks?

17

```
1    A     When it is within the scope of the facilities'
2  mechanics.  This particular guttering was ten or twelve
3  inches across, and it was given to a roofing outfit that
4  had done the resealing of the roof.  The roof was
5  continuing to leak, and the gutters were required to
6  stop the leakage.  Improved guttering, I guess, is the
7  word for it.
8    Q     And were there any other projects that you
9  were tasked with right away during this first time
10 period?
11   A     I don't recall anything specifically in that
12 time frame, no.
13   Q     You had clean-up projects, you said.  Was that
14 in several different areas around the facility?
15   A     There were several different areas in the
16 facility, particularly waste water.
17         The Hangar 12 area had approximately fifteen-feet
18 deep, ten-feet deep of junk piled in a mountain, in one
19 area, that was completely unusable stuff, that was
20 basically a fire hazard.  And Dennis let me know in no
21 uncertain terms that he had asked to have it cleaned,
22 and he wanted it cleaned now.  And we did.
23   Q     How many man hours did that take?
24   A     My best recollection -- I don't know the man
25 hours, to answer your question.  But my best
```

18

```
1  recollection is I had 80 percent of the crew assigned
2  full time for several weeks prior to the lock-out, until
3  people were laid off.  I started losing people at an
4  alarming rate, just as business tapered off going into
5  the lock-out.  There just flat weren't people to
6  continue that effort.  We finished it when they came
7  back.  There was some left to be done.
8    Q     And what were your work hours during that
9  time?
10   A     Prior to the lock-out?
11   Q     Yes.
12   A     As best I recollect, I worked an eight-hour
13 day.  I may have worked nine, charged eight, because we
14 are supposed to be there a half hour early, a half hour
15 late.  I may have given up a few half hours free beyond
16 that, but, essentially, a normal day.
17   Q     What is your normal start time?
18   A     My normal day is 6:30 to 4:00, sometimes 4:30.
19 I try to be out of there by 4:30 in a day.
20   Q     Any weekend work at all?
21   A     Occasionally, but not much.  I am not
22 encouraged to work overtime.  I am encouraged to not
23 work overtime; get the job done without overtime.
24   Q     And are you compensated for overtime?
25   A     I am compensated for beyond that nine hours in
```

19

```
1  a day, if I put in for it.
2    Q     How are you compensated?
3    A     When it is approved, paid by the hour.
4    Q     Is it just regular straight pay?  It's not
5  time and a half?
6    A     Straight pay, yes, ma'am.
7    Q     All right.  So during this first period, are
8  you working then pretty much full time in facilities?
9    A     Yes, ma'am.
10   Q     All your time was being devoted to these
11 clean-up projects?
12   A     Yes, ma'am.
13   Q     The breakroom, the gutters, and all of the
14 things we have talked about?
15   A     Yes, ma'am.  And, additionally, just
16 day-to-day operation of the facility, and a lot of
17 finding out how things were done.  To make sure I didn't
18 violate any policies, reading the corporate policies,
19 reading the policies that were relevant to the
20 facilities department.
21   Q     Had you ever worked in facilities before?
22   A     I have had dealings in similar skill sets
23 before.
24   Q     But had you ever worked in that facilities
25 department for Pemco before?
```

20

```
1    A     No, ma'am.
2    Q     Any other projects -- I think we got started
3  on this, talking about information you were gathering.
4  Is there any other information that you were gathering
5  or documents that you reviewed in preparation for your
6  deposition today?
7    A     Not other than what I gave HR, that I am aware
8  of.
9    Q     And so if I understand it, you gave HR your
10 notebook; is that right?
11   A     I would characterize it as a couple of sheets.
12 I am not sure I actually pulled the sheets out of every
13 notebook.  But at some point, a week or two in to my
14 tenure of filling in, I said I might want to keep notes
15 on those first couple of days, because it was very
16 hectic, trying to drink from the firehose of
17 information.  So I thought, I will put those notes away
18 for future reference.
19   Q     So a few pages of notes, handwritten notes?
20   A     Correct.
21   Q     Not typed or anything?
22   A     Yes.  Just basically little reminders to self,
23 take care of this, take care of that.
24   Q     And information about the Danco bid?
25   A     That, I do believe, he had a copy of that.
```

21

1  Q   And the letter from the FAA?

2  A   Yes, ma'am.

3  Q   Anything else?

4  A   And some relevant facts regarding that.  I

5  think at that point, when Mr. Henry asked me for it, I

6  gave him a couple of things I had been asked to do about

7  maybe -- I'm not accurate on the time frame -- but maybe

8  a year in, I was asked to characterize what things I had

9  improved in the department, kind of a

10  pat-myself-on-the-back thing.

11  Q   Okay.

12  A   And I did a list of things we had improved,

13  corrected.  There were some, I guess, fairly relevant

14  safety issues within the waste water area:  Signage,

15  railings, culverts.  There was one ditch ADEM had

16  demanded be concreted.  We got that accomplished.  As I

17  said, there were certain things that I felt relevant,

18  these are some good things we did in our department this

19  year, and I listed those.  I think he had a copy of

20  that.

21  Q   These were ongoing projects that you did

22  throughout the year of what, 2005 or 2006; is that

23  right?

24  A   It would be sometime in late 2005, maybe 2006.

25  Somewhere in that time frame.

22

1  Q   Is this a handwritten list or a typewritten

2  list?

3  A   That was a typewritten list.

4  Q   Were there pictures that went with that?

5  A   I don't believe so, no.

6  Q   Anything else that you gave to Mr. Henry, or

7  to anyone else concerning this case?

8  A   Not that I recall.  Everything was given to

9  Mr. Henry, that I had.

10  Q   And you are referring to Fran Henry, I assume?

11  A   Yes, ma'am.

12  Q   So with these other projects added on to the

13  initial things that we have talked about, it sounds like

14  you were pretty much full time in facilities; is that

15  right?

16  A   For the most part.  I have done a few things

17  aircraft related over the course of the last two years.

18  I filled in for the night manager for one week while he

19  took a vacation and continued to carry oversight over

20  facilities.  I have worked on a couple of different

21  aircraft projects that were in trouble.

22  Q   When you say "worked on," what do you mean?

23  A   Management.  Went down and tried to get the

24  aircraft moving, schedule-wise.  There were problems on

25  the aircraft.  It wasn't moving.  People were being

23

1  yelled at.  My boss said go down there and help any way

2  you can.

3  Q   How many hours did you do that?

4  A   I would say those were long days, probably

5  three or four days; probably two times on two different

6  aircraft.

7  Q   Three or four days each?

8  A   Consecutively.

9  Q   On two different times?

10  A   Yes, ma'am.

11  Q   An you were still working in facilities in

12  addition to this?

13  A   Correct.

14  Q   Any other non-facilities' work that you have

15  done since '05?

16  A   No.  I think facilities probably has increased

17  its aircraft -- some of its aircraft responsibilities a

18  little more.  More things relevant to aircraft have come

19  to facilities.  However, it is still within facilities.

20  Q   As I understand, business has improved, you

21  are getting more aircraft in?

22  A   Yes, ma'am.

23  Q   So that leads to more work for facilities?

24  A   Yes, ma'am.

25  Q   I understand.  Give me a rundown on your

24

1  educational background, would you?

2  A   I graduated high school at Thurston Senior

3  High School in Springfield, Oregon, in 1973.

4  Q   That's my brother's age.

5  A   I did a couple of college not-for-credit

6  courses over the course of my military career such as a

7  typing course at Boston Community College in '75, maybe.

8  Several classes with Greenville Community College in

9  Greenville, South Carolina, Greenville Tech, management

10  courses that Lockheed-Martin sent me to.  Several tech

11  schools with the United States Air Force.

12  Q   Can you speak up?  I am sorry.

13  A   Several tech schools with the United States

14  Air Force.

15  Q   Anything else?

16  A   That is it.

17  Q   Your college courses, did you take any courses

18  to pursue a degree?

19  A   No, ma'am.

20  Q   And so you said, initially, you took some

21  non-credit courses through the military such as typing.

22  Anything else?

23  A   Yes, ma'am.  Management courses, and that was

24  with Lockheed-Martin.

25  Q   At Greenville Tech?

25

```
 1      A    Yes, ma'am.
 2      Q    How many courses in management did you take?
 3      A    I am not really sure exactly.  They weren't
 4 what you would call a course.  It was they taught the
 5 school at their campus.  If I recollect, we went like a
 6 week at the time.  There were probably six or eight of
 7 them, various different themes -- management or
 8 leadership.
 9      Q    But just for a week at a time?
10      A    Yes, ma'am.
11      Q    Forty hours a week?
12      A    Probably a forty-hour type thing, or less.
13 Something around that neighborhood.
14      Q    But continuing education type things?
15      A    Correct.  Management training.
16      Q    And then you went to some technical courses
17 with the Air Force?
18      A    Yes, ma'am, I was an electronic warfare
19 systems repair technician.  I was an honor grad class
20 leader, seven months, at Keesler Air Force Base.
21      Q    This was a seven-month course?
22      A    Electronic warfare.
23      Q    When was that?
24      A    That would have been 1982.  And then I did
25 eleven hundred and sixty-seven hours, I think it was.
```

27

```
 1 of weeks, but I wouldn't swear to that in court.  It was
 2 long.  It was brutal.  I remember that.
 3      Q    Where was that?
 4      A    That was at Myrtle Beach Air Force Base, South
 5 Carolina.
 6      Q    Is that like the war college?
 7      A    It has some elements of that, but, no, it is
 8 more first-line management type stuff:  Leadership,
 9 discipline, and there is some military heritage thrown
10 in there, for sure.
11      Q    When did you first go in the military?
12      A    That would have been October of 1973.
13      Q    And you went in the Air Force?
14      A    Yes, ma'am.
15      Q    And when did you get out?
16      A    The first time I got out would have been, I
17 think, May of 1978.  Then, I went back in and got out
18 again.
19      Q    I am going show you what has been Bates
20 stamped 153.
21      A    I think it was July of 1980 that I went back
22 in and got out in March of '89.  This one is for the
23 last enlistment.  It was actually two times overall.
24 Because of re-enlistments, it makes it look strange.  I
25 got in, in '73, and got out in '78, which was four years
```

26

```
 1 I'm not sure of the exact number of hours.
 2      Q    Not being precise or anything.
 3      A    Eleven hundred and something hours on a
 4 specific warfare system that I was assigned to on a
 5 special duty assignment.
 6      Q    As far as maintenance on aircraft?
 7      A    It was a maintenance on aircraft job, yes,
 8 ma'am.
 9      Q    And the first one at Keesler, was that --
10      A    That is also on aircraft, yes, ma'am.  On
11 fighter aircraft and electronic warfare aircraft.
12      Q    Any other schools?
13      A    Other small Air Force courses for particular
14 systems, HAZMAT safety course and those type things.
15 The Air Force is pretty high on those.
16      Q    Any other management courses through the
17 military, or business courses?
18      A    I went through leadership school, and I think
19 they have a couple of different phases.  I went through
20 two phases.  I went through everything except the
21 academy.  I went through end-residence leadership
22 school.
23      Q    And how does that work?
24      A    It is basically professional military
25 education.  It lasts -- I want to say it lasted a couple
```

28

```
 1 and seven months.  And, then, I went back in, in 1980,
 2 and I believe it was July, and I got out in 1989.
 3      Q    In March of '89?
 4      A    Yes, ma'am.
 5      Q    And it says you were electronic warfare
 6 systems, six years, ten months, electronic warfare
 7 systems technician?
 8      A    Yes, ma'am.  That is the period of the tech
 9 school, from then until I got out.
10      Q    And that is in the '80s?
11      A    Yes, ma'am.  1982 to 1989.
12      Q    And then it has vehicle operator/dispatcher
13 for six years and five months?
14      A    Yes, ma'am.  That would have been the period
15 from 1973 until 1982, when I went to tech school at
16 Keesler.  I changed career fields, thankfully.
17      Q    This one says eleven hundred and sixty hours.
18      A    I was a little off.  That was a tough course.
19      Q    All right.  What did you do once you got out
20 of the Air Force in '78?  What did you do between '78
21 and '80?
22      A    I went back to Oregon, which was my home of
23 record, and tried to find employment there, failed to do
24 so, moved to Texas and worked in a plywood plant as an
25 electrician, fixing plywood manufacturing equipment.
```

29

```
1    Q    When did you move to Texas?
2    A    It would have been, I believe, sometime around
3  July of '78.  I worked for a company there in
4  Huntsville, Texas, New Waverly, Texas.
5    Q    And how long did you do that?
6    A    Until the point in time in '80 that I went
7  back in the service.
8    Q    Were you in the guard or the reserves during
9  that time?
10   A    I was inactive reserve for some period of that
11 time, until six years would have been up, I believe.  A
12 year and five months of it would have been considered
13 inactive reserve.
14   Q    So you got out of the military in 1989?
15   A    That's right.
16   Q    And then where did you go?
17   A    I worked as a crew lead on a telephone
18 installation contract at the University of Arizona for a
19 contractor.  Oh, boy.
20   Q    1989?
21   A    D.O. Creaseman was the company.  That would
22 have been in 1989, yes.
23   Q    Doing telephone installation.  What were you
24 actually doing?
25   A    We were installing large telephone cable,
```

30

```
1  1800-pair telephone cable down to 25-pair telephone
2  cable, installing conduits.  Basically running the cable
3  and conduits to the points they would be terminated,
4  through various structures within the University of
5  Arizona, including the tunnels, buildings, et cetera.
6    Q    Now, were you an employee of the university,
7  then?
8    A    We were a subcontracted employee.  Our company
9  contracted to do the work, along with several other
10 companies, Southwestern Bell and several other
11 companies.  It was a large contract.
12   Q    Was this for new construction?
13   A    It was a complete telephone system upgrade,
14 and several companies were in on it.  We were
15 subcontracted to Southwest Bell, I believe.
16   Q    So all of your work was on the university
17 campus?
18   A    Yes, ma'am.
19   Q    How long did you stay there?
20   A    As best I recollect, that was about seven
21 months.
22   Q    And where did you go after that?
23   A    The next place I hired on was right at the
24 beginning of the following year, 1990, right after New
25 Year's.  I hired on at Evergreen Air Services, I think
```

31

```
1  it is called.  It is Evergreen, but I am not exactly
2  sure what comes after that.  It was at Marana Air Park,
3  just outside of Tucson.
4    Q    What did you do there?
5    A    I started out as an avionics technician.  I
6  stayed an avionics technician until I left there.
7    Q    Why did you leave the telephone installation
8  job?
9    A    At the telephone installation company, we were
10 working around a lot of asbestos, and I had knocked some
11 asbestos loose up in the ceiling in the student union
12 building.  I collected it, because I was fairly certain
13 it was asbestos, and bagged it up and got it out of
14 there and sent it for lab results.  That afternoon, I
15 was told I didn't need to bring so much, that they could
16 make a sample with much less.  I said, well, maybe you
17 don't understand.  I wasn't going to throw it in the
18 trash.  I was terminated.  They said I was laid off.
19   Q    Did you file any kind of complaint about that?
20   A    No.  I just wanted to get another job and pay
21 the bills.
22   Q    Have you ever made a complaint or a claim for
23 asbestos inhalation or anything like that?
24   A    No.
25   Q    How long were you actually -- Oh, you said
```

32

```
1  seven months.  So you were an avionics technician with
2  Evergreen?
3    A    Yes, ma'am.
4    Q    How long were you there?
5    A    From '90 until -- I am not exactly sure on the
6  months there, but more than a year, less than two.
7  Somewhere between one and two years.  And then a
8  facility opened up across town, Lockheed-Martin, and I
9  went to work for them.
10   Q    And what did you do for Lockheed?
11   A    A number of different things.  I started out
12 as an avionics technician, and then became a crew lead
13 for avionics.  After a couple of years, I became a
14 supervisor of avionics for a short period.  Then, I
15 became a project manager over a United A-320 line of
16 business.
17   Q    What is an avionics technician?
18   A    Somebody that corrects discrepancies on
19 anything with wires going to it on the aircraft,
20 essentially.  Anything that runs flight controls,
21 electronic part of the flight controls, indications,
22 flight control indications, instrumentation.
23   Q    You are essentially an electrician for the
24 aircraft; is that right?
25   A    Essentially.
```

33

1    Q    And I think I interrupted you.  You said you
2  moved to supervisor for a short time and then you were a
3  project manager?
4    A    Yes, ma'am.
5    Q    And then?
6    A    During my tenure as a project manager, they
7  issued the WARN Act to the facility, and I was offered
8  an opportunity to transfer to the Lockheed-Martin
9  facility in South Carolina to continue as project
10  manager on that contract, which I accepted that.
11    Q    Did you tell me they had opened this new
12  Lockheed-Martin in Tucson in 1991?
13    A    Yes, ma'am.
14    Q    And when did they give you the WARN Act that
15  they were laying everybody off?
16    A    I believe it was 1991.
17    Q    Yes.  You said it was '91 or '92, I think.
18    A    It was 1995 when -- I think that is probably
19  right, because the facility was open about four
20  years.  I worked there about four years before I moved
21  on to Lockheed in Greenville.
22    Q    Did they shut down the facility in Tucson?
23    A    To the best of my knowledge.  I mean, I left.
24  But to the best of my knowledge, they did, yes.  I think
25  it has been inhabited a couple of times, but not by a

34

1  maintenance operation like ours.
2    Q    What was the purpose of the facility in
3  Tucson?
4    A    It was maintenance repair overhaul of
5  passenger class aircraft, large aircraft.
6    Q    Any military planes?
7    A    I think, if I recall, we may have had one,
8  maybe one.  I know we had one.  I don't know if we had
9  more than one, a KC-10 came in for some type of
10  operations.
11    Q    But primarily commercial aircraft?
12    A    Yes, ma'am.  It was predominantly commercial.
13    Q    And in Greenville, South Carolina, what was
14  that facility?
15    A    That was a mix of military and commercial
16  work.  When I first went there, it was more commercial.
17  The military had essentially taken a hiatus from there
18  with some of their programs, but they did, over the
19  course of the years I was there, wean off from the
20  commercial work and go solely with military work.
21    Q    And what were you doing once you transferred
22  to Greenville?
23    A    Initially, project manager on a couple of
24  different projects.  I finished the United project.  And
25  then I was the manager of a Sun Country 727 line and

35

1  then I was assigned to the night manager position for
2  approximately seventeen months.
3    Q    Was that a promotion?
4    A    No.  It was -- I didn't see it as a promotion.
5  I saw it as a lateral.  I didn't get any more money.
6    Q    You had been on day shift, though, and they
7  switched you to night shift?  I mean, were you doing the
8  same thing, only on night shift?
9    A    I was doing a lot less hours on night shift
10  than I was on day shift as the manager of a particular
11  project.  So it was in some ways more responsibility,
12  because it was the entire facility.  At that time,
13  fifteen hangars.
14    Q    And, then, how long --
15    A    After seventeen months, right about the time
16  of Value Jet, and I can't tell you exactly when that
17  was, we reorganized and all of the director level went
18  away and everybody below the director level stepped down
19  a notch, or quite a few did.  I was bumped down from
20  manager to supervisor at that time.
21    Q    How did your job duties change?
22    A    In some respects, they didn't, at least in the
23  short term.  I was assigned four other supervisors,
24  which I was a supervisor, working on Value Jet, working
25  on, I think it was, five airplanes of Value Jet that we

36

1  had at the time, under a barrage of FAA inspection.
2  There was, I want to say, twenty or thirty FAA
3  inspectors on site at the time, really looking at Value
4  Jet.
5    Q    That was after that bad crash?
6    A    Yes, ma'am.  And I was overseeing the other
7  supervisors, which I thought was kind of odd, being a
8  supervisor.
9    Q    Were you paid hourly?
10    A    Actually, at that time, I was paid time and a
11  half, and my pay was not reduced when I was dropped
12  down.  And I got several other assignments to work on
13  some P-3s.  I worked on the C-9 project, which is
14  essentially a military DC-9.  I did that probably a year
15  and a half, rough speak.
16    Q    You said in the short term your duties did not
17  change.  Over the long term, were they reduced to
18  supervisor level?
19    A    Over the long term, yes.  I essentially picked
20  up anything between two to five airplanes, but they were
21  my airplanes and I didn't have other supervisors working
22  for me.
23    Q    And how long did you do that?
24    A    Rough speak, about a year and a half, and I
25  was offered another manager position, interim.  I was

37

1  asked to run a line of modifications, called Roto-Dome,
2  with customs airplanes that have the big round antenna
3  that rotates on top of the aircraft. We were modifying
4  those. I had three of those.
5      Q   Were you a project manager?
6      A   It was not called a project manager at that
7  time. It was just called a production manager.
8      One of the differences, I guess, between that
9  facility and Tucson, Tucson had project managers,
10 Greenville had program managers and production managers.
11 They did not have project managers.
12     Q   Okay. But was this a promotion then or more
13 just a lateral change in duties?
14     A   That was an interim promotion, I guess, is the
15 best way to put it.
16     Q   What do you mean by "interim"?
17     A   I was sent down there because there was
18 another gentleman trying to run way too much stuff, and
19 he was overwhelmed. We were also bidding a contract,
20 and I was told this is an interim position. It is not a
21 permanent position. That is the way it was dealt with.
22 I think it lasted seventeen months, and then it went
23 away.
24     We lost a contract, and the manager of that
25 contract no longer had an airplane or a program. And he

38

1  took my place, and I went back to supervisor again. Up
2  and down. And at that time, I was assigned a C-130
3  speed line, what they call speed line. I did roughly
4  ninety-nine airplanes. I didn't do all of them myself.
5  I think I had some help from another supervisor for one
6  period of time. But over the course of a year or two,
7  we did ninety-nine aircraft, a safety upgrade on their
8  bleed-air system.
9      Q   And you are the one doing the work?
10     A   Supervising the work.
11     Q   In terms of scheduling?
12     A   Assigning the crew, supervising the work,
13 making sure we had all the parts ahead of time, making
14 sure the overtime is worked correctly, trying to reduce
15 the cost, everything that a typical aircraft supervisor
16 would do.
17     Q   But not actually doing the safety upgrades
18 yourself?
19     A   No. That was done by the mechanics assigned
20 to me. I had a variety of skill levels under me that
21 did that work.
22     Q   And then how long were you supervisor that
23 time?
24     A   That was until I was laid off. I am a little
25 sketchy. It was such a painful time, I probably tried

39

1  to block it out. It would have been, I want to say, the
2  March or April time frame of 2003, maybe.
3      It was the same year I went to work at Pemco, and
4  probably a couple of months before I came to Pemco. I
5  came to Pemco July 8th.
6      Q   Of '03?
7      A   I think it was '03. I worked there until I
8  started looking when they laid me off there.
9      Q   Did you have any warning about the lay-off?
10     A   No, ma'am.
11     Q   Any WARN Act notices or anything like that?
12     A   No, ma'am. They cut 25 percent of the
13 management staff, which was ten supervisors. We were
14 coincidently the high tenure employees.
15     Q   You were what? I am sorry.
16     A   The high tenure employees. I guess that would
17 save more money.
18     Q   All right. So the total time you were with
19 Lockheed is from about 1991 or 1992 to 2003, then?
20     A   That's correct. It would have been twelve
21 years.
22     Q   You were with Lockheed during that entire
23 time?
24     A   Right.
25     Q   Even though you transferred, you weren't

40

1  necessarily considered terminated at Tucson and rehired?
2  Was it continuous service?
3      A   I got credit for the entire time frame. I
4  don't know if it was considered continuous. I kind of
5  vaguely recall being terminated and rehired, but I think
6  my time all counted. If I am not mistaken, that is the
7  way that worked. I was credited for twelve years.
8      Q   During that twelve years, were you in
9  management that entire time?
10     A   No. No. My initial years at Lockheed in
11 Tucson, I was an avionics technician and an avionics
12 crew lead, which was completely hands-on.
13     Q   So when you became project manager, or when
14 you became supervisor, is that when you went into
15 management?
16     A   That is when my hands, for the most part,
17 stopped touching the aircraft. I still was involved in
18 operational checks, trouble-shooting to some degree with
19 the crew leads. It was a non-union shop. Both of the
20 Lockheed assignments were non-union shops. So I could
21 go out and touch the aircraft without getting beat up
22 for it. I still had opportunities, just not as
23 frequent. A lot more paperwork.
24     Q   All right. How did you come to Pemco?
25     MS. GLASGOW:  Do you want to take a break?

41

1          (Thereupon, a break was taken.)
2     Q    I think I had asked you before the break how
3 you got to Pemco.
4     A    There was a group of us, as I said, ten of us,
5 that were laid off.  We were offered transition
6 counseling, training.  We attended, at Lockheed expense,
7 I think, about a week-long seminar.  At that time, at
8 that seminar, Mr. Johnson had e-mailed them.
9     Apparently, he had been through the same company
10 when he was laid off, and he kept in contact with them.
11 He was looking for supervisors at Pemco.  He had left
12 word there that he was looking for supervisors, and they
13 briefed that.  Pemco.  I know somebody there.  So I
14 contacted him.
15    Q    Did you know Dennis Johnson before?
16    A    I did.
17    Q    When did you first meet him?
18    A    I met Dennis initially in Tucson, shortly
19 after I had become project manager.  I would say within
20 a month after I became project manager, he was hired
21 there in Tucson.
22    Q    And then were you social friends?
23    A    No, ma'am.  We were not friends at all.  To
24 characterize it, we did not get along for the first
25 couple of years.

42

1     Q    And then have you ever become social friends
2 since that time?
3     A    No, ma'am, not social friends.  I have had
4 lunch with Dennis probably two or three times, company
5 dinners maybe once or twice.  All of those were
6 essentially relevant to work or working type deals.
7     Q    What brought you to Pemco was Dennis going
8 back to Lockheed, saying, we need supervisors?
9     A    Right.  We had had some associations at
10 Greenville.  He had come to Greenville after I went to
11 Greenville, and when Greenville closed down, I assume.
12    We had -- At one point, I had cleared the air with
13 him.  There were some things that happened in Tucson
14 that I didn't feel comfortable with.  I sat down with
15 him and said, look, I am an individual, and you will
16 need to respect me.  We made peace with each other.  We
17 really didn't work together a whole lot in Greenville.
18 I currently would say that I have a good professional
19 relationship with Dennis, and I consider him, quote, a
20 friend.  That wasn't always so.
21    Q    What was the disagreement in Tucson?
22    A    Management philosophy, as I saw it.  Later,
23 when we cleared the air, Dennis explained that he had a
24 mandate when he went to Tucson, and it was to
25 essentially put everybody under the most extreme

43

1 pressure to see who crumbled.  That was his mandate when
2 he was sent there.  I didn't know that at the time.
3     Q    And did he do that?
4     A    There were a number of uncomfortable people in
5 Tucson, yes, ma'am.
6     Q    How did he tend to bring pressure on y'all?
7     A    There were a number of instances in meetings
8 where I felt demeaned.  I don't know if I could give
9 exact quotations, but felt very demeaned.  At one point,
10 I quit.  I went to HR and said, I quit.  I won't take it
11 anymore.  They told me to take a couple of days off.
12 Don't worry about it.  Come back to work and everything
13 will be right.  When I came back, things seemed better.
14    Q    Are you aware of anyone else who had similar
15 problems with Mr. Johnson?
16        MR. HOLMES:  Object to the form.
17    A    I have not the best of hearing being around
18 airplanes my whole life.
19    I am sure there are people who haven't gotten along
20 with him over the course of the years.  I guess at the
21 time I decided to come to Pemco, I had known Dennis at
22 that time for maybe six or eight years.  And I said, you
23 know, I know what this guy is about.  I know what he is
24 driving to.  There is a methodology that maybe everybody
25 doesn't like, but he is going to get results and who I

44

1 am I going to tie my star to.  If I go to Pemco, am I
2 going to be looking for work two months down the road or
3 is he going to get the place in shape?  And I basically
4 made the decision that that was a decision I was willing
5 to do before I called him to even approach him about a
6 job.  To be honest with you, I didn't know if he still
7 didn't like me.
8     Q    I understand.
9     A    It was a very difficult decision to call him.
10 I felt as though I was swallowing a lot of pride, but he
11 has treated me fairly.
12    Q    Did you tell him about your concerns about
13 coming to Pemco and it not working out, you know, before
14 you came?
15    A    I don't think I did.  I was swallowing a lot
16 of pride, as I said, at the time.  He was very cordial.
17 Come down, take a look at the place.  I need help down
18 here.  Quite honestly, I did not believe that he had
19 that high of an opinion of me, and I was a little
20 startled and reassured that, you know, maybe this could
21 work out.  So I didn't bring that up.
22    Q    Did he give you any assurances about long-term
23 employment, that sort of thing?
24    A    No.  He gave me some assurances that -- well,
25 he gave me an idea, I guess, of what his plan was.  I

45

1  actually would say I interviewed him as much as he
2  interviewed me.
3      When I came down, the place was an absolute mess.
4  I was used to a much higher standard of cleanliness and
5  repair of the facility and equipment from Lockheed.
6  Spoiled. And as I walked around, I said, oh, my gosh,
7  or something like that. This is a mess. This would
8  really be work. What are you going to do to fix this?
9  I think I asked him something very close to that. What
10 is your plan to fix this? Because I was, at that point,
11 definitely not willing -- I had not been out of work
12 that long to be that desperate at that time. He assured
13 me that he intended to get a few right-headed people
14 that knew how to change with the times and could push
15 aside the old guard, if you will, that were unwilling to
16 accept change and get some changes afoot. And I said,
17 okay. And I didn't take the job.
18     Q    You did not take the job?
19     A    Not for several more weeks. And continued --
20 I think I had a job offer when I arrived back at home in
21 Greenville that subsequently fell through. After I was
22 packed up and ready to go, they said, oops, change of
23 plans. CEO changed his mind. Something along those
24 lines. The CEO of the other company had come back from
25 England and he had reviewed it and said, no, not going

46

1  to do it. So I was told, sorry. Sorry to have your
2  bags packed, but never mind. I was really demoralized
3  at that point. I said, well, I am going to call Dennis
4  and take the job, is pretty much what I did.
5      Q    Was it a pay cut to come to Pemco from
6  Lockheed?
7      A    Huge pay cut. Huge pay cut.
8      Q    How much were you making at Lockheed?
9      A    A little over thirty dollars an hour.
10     Q    And how much were you going to make at Pemco?
11     A    According to Dennis, I was going to make
12 twenty. I ended up making twenty-one when I talked to
13 Mr. Batcher. I think it was twenty-one.
14     Q    To start?
15     A    Yes, ma'am, as a supervisor.
16     Q    And in which department did you start in?
17     A    I was production department, over the aircraft
18 supervisors, or production department. I did
19 supervision over structures, at least initially, over a
20 Dormot project on second shift, which evolved in to
21 overall supervision. At about that time, I think we got
22 the Northwest contract back. And the mechanical -- I
23 was doing structures, another gentleman was doing
24 mechanical, and the other gentleman was taken to go work
25 on Northwest, and I was left with the entire aircraft at

47

1  that point, for the duration of the aircraft.
2      Q    When you first interviewed with Dennis
3  Johnson, what did he tell you about what you would be
4  doing?
5      A    He said I need a structure supervisor. That
6  was it, pretty much verbatim. I told him, well, Dennis,
7  you know I have supervised every skill and worked with
8  every skill, and I have structures' people assigned to
9  me, but structures was not my strongest suit. He said,
10 well, I need a structures' guy. I said, Well, I am
11 adaptable. And we really didn't talked about I was
12 coming at that point. So we really didn't go beyond
13 that, I don't believe.
14     Q    Did you talk about facilities in your
15 interview?
16     A    I don't recall, other than it was a dump. I
17 told him, man, this place is bad. At one point, I think
18 Dennis told me, quit stopping and picking stuff up. You
19 are going to go crazy. I was used to the military
20 mindset, and I was picking up screws and hardware and
21 safety wire, and it was, oh, man, bad.
22     Q    So when you started, you were at twenty-one
23 dollars an hour?
24     A    I believe it was twenty-one.
25     Q    And were you in management to start?

48

1      A    Supervision.
2      Q    Not a member of the union?
3      A    I am sorry?
4      Q    Not in the union bargaining unit?
5      A    No, not at all.
6      Q    And you have never worked in the bargaining
7  unit positions for Pemco?
8      A    I have never worked in a bargaining unit ever.
9  Never been in a bargaining unit.
10     Q    And the question, really, is not whether you
11 were a member of the union, but were you working in a
12 position that was part of a bargaining unit?
13     A    No.
14     Q    So what was your title when you started?
15     A    Supervisor, aircraft supervisor, or structures
16 supervisor. I don't know.
17     Q    And who was your supervisor?
18     A    I had different people at different times. I
19 think, initially, it might have been Ted Ball, and it
20 was either Ted Ball first and then Rusty, Rusty Nelson,
21 or it was Rusty Nelson and then Ted Ball. I think it
22 was Ted Ball first and then Rusty Nelson. That's been a
23 while ago.
24     Q    What was Ted Ball's position then?
25     A    He was either assistant manager or manager,

49

1  but he was thought of as a manager by all of the
2  supervisors.
3      Q    And what was Rusty Nelson's position?
4      A    Manager of structures.
5      Q    What does it mean when you are talking about
6  structures?  What is that?
7      A    The structural components of the aircraft such
8  as the framework, the skin, all of the metal.  Other
9  than moving components, the structural things that keep
10  the aircraft in one shell.  Rivets, sheet metal.
11     Q    Had you ever worked in the structural aspect
12  of maintenance before?
13     A    I had supervised people working in structures
14  for a number of years.  Much of the work we did at
15  Lockheed and all of the work as a manager exposes you
16  greatly to structures.  It is an integral part of
17  working on the aircraft.  I had done some with my own
18  hands in slow times, when there wasn't enough avionics
19  when I was an avionics technician.  I had done some
20  structural work and also airframe and engine work.
21     I used to go and ask for work, when there was no
22  avionics work, to get exposure.
23     Q    How long were you in the supervisor's
24  position?
25     A    At Pemco?

50

1      Q    At Pemco.
2      A    Let's see.  It would have been from when I
3  hired in, which was July 8th, until, I think it was,
4  January, January or February of the following year.
5      Q    Of '04?
6      A    Of '04.  I was asked to take the night manager
7  position.
8      Q    And what department were you in?
9      A    Production.
10     Q    And what are the duties of a night manager in
11  production?
12     A    Essentially, oversight of all things on the
13  facility at night, from the facility operation, the
14  safety aspects, fueling of aircraft, making sure people
15  are taken to the hospital when they are injured, making
16  sure the boss is called if there is an injury, making
17  sure all of the aircraft stay on schedule, that all of
18  the objectives that all of the managers have on all the
19  aircraft get met, a number of reporting functions that
20  happen, setting of assignments and priorities.  When
21  there is a deadlock between two aircraft needing the
22  same piece of equipment, the night manager makes that
23  call.  Quite frequently, assisting work.  Actually being
24  the bad guy when someone is being terminated, escorting
25  them out.

51

1      Q    Is that second shift or third shift?
2      A    Second shift.  Approximately two hundred and
3  fifty people, at that time, I think, on night shift.
4      Q    And how long were you the night manager?
5      A    Roughly, sixteen or seventeen months;
6  something like that.
7      Q    And then what happened after that?
8      A    Well, at that time, I was asked to come to
9  days and go fill in for Roger Wright, who was going to
10  go out for about six weeks for back surgery.
11     Q    And when did they first approach you for that?
12     A    I think two days or one day before I went.
13  Tomorrow I need you on days, I think is the way it
14  went.
15     Q    Who told you what was going on?
16     A    Dennis gave me the assignment.
17     Q    And what did he tell you?
18     A    Something along the lines of, hey, I need you
19  to go fill in for Roger.  Go see Roger Wright.  He is
20  going to need you to fill in for him for a while, while
21  he goes and has back surgery.
22     Q    Anything else?
23     A    No.  It was pretty much short and sweet.  Go
24  fill in for Roger.  Go get with him.  He will give you
25  everything you need to know, something like that.

52

1      Q    Who was going to fill in for your position as
2  night manager on the second shift?
3      A    What occurred at that point was I gave my keys
4  to one of the supervisors, and Dennis essentially
5  decreed that they would take turns filling the position
6  for a week at a time until he could find somebody to do
7  that.
8      Q    And who did he find?
9      A    Eventually, another gentleman was hired.  I
10  don't recall when it occurred.  A gentleman by the name
11  of Paul Weeks came on board for a short period of time.
12  I don't think he was there a real long time, but he was
13  there for a while.  I couldn't really tell you when that
14  occurred.  I don't know if that was before the lock-out
15  or not.
16     Q    And then he left the company?
17     A    At some point he did, yes.
18     Q    Was he still night manager when he left?
19     A    Yes.  I think he was there for a few months,
20  maybe, when he left.
21     Q    But he was hired for the night manager's
22  position that you had, you just don't remember when, you
23  said?
24     A    At some point, he was.  I don't know when that
25  occurred.  That might have been during lock-out.  I

53

1 really don't know. I don't remember. I am trying to
2 remember what context I remember seeing the guy, but I
3 don't remember. I mean, I remember seeing him, but I
4 don't remember what we were doing at the time,
5 business-wise time frame.
6    Q    But he had not been a Pemco employee; he was
7 hired from the outside?
8    A    No. That's correct.
9    Q    Did Dennis Johnson tell you anything else
10 about what you would be doing in Roger's position?
11   A    Just that those issues that had not been
12 corrected that he had asked to be corrected, that he
13 expected me to go fix them.
14   Q    And that was done as soon as you took the
15 position; is that right?
16   A    I started it. It was a long list of desires.
17   Q    Let me rephrase the question. When you
18 started the position, did Dennis give you a list of what
19 things he wanted done? Or did that come later?
20   A    That came days later, starting days later and
21 has never stopped. There is still things he wants to
22 this day and needs. Things come up.
23   Q    But he was giving you additional tasks to do
24 from the beginning?
25   A    From very early on such as the clean-up. I

54

1 think probably -- I don't know the exact number of days.
2 But several days in, I was getting my feet on the
3 ground, kind of understanding kind of how everything
4 worked in that department, which some of it I was fairly
5 familiar with from being night manager. I worked with
6 the facility's guys. They were under my charge at
7 night. I would guess you say they had a dual
8 responsibility to their department. But anybody on the
9 facility, if I needed whatever at night, then I had that
10 authority. So I interacted with the facilities
11 department on a regular basis. I knew how some of it
12 worked, but some of it was new. Once I started getting
13 my feet on the ground, two, three, four, five days in,
14 something like that, Dennis said, I have asked to get
15 this stuff thrown away, and I want it thrown away. That
16 was the first assignment.
17   Q    Did Roger help you with that at all, in terms
18 of training you or working with you a couple of days
19 before he left?
20   A    Roger worked with me a very, very scant period
21 of time. One day and maybe part of another day.
22 Essentially, he gave me the list of things that needed
23 to be done, showed me how he did his overtime, gave me
24 some keys. I think we walked around a little bit.
25   Q    Was he able to walk much at that point?

55

1    A    From my perspective, he looked okay to walk,
2 but I am not saying he wasn't in pain. He was probably
3 in a lot of pain, but I wouldn't have known that had he
4 not said. I don't recall him complaining a lot. I
5 mean, he had this thing, surgery he needed to do.
6    Q    But he showed you around, gave you a list of
7 the ongoing projects, that sort of thing?
8    A    He gave me the list. You can use my desk.
9 That kind of thing. You know, told me, essentially,
10 what the administrative assistant, how she interacted
11 with assignments and kind of how the radio system
12 worked; they called out the jobs; and what they used for
13 the work order forms. Like I said, there wasn't a whole
14 lot that could be shared with me in like a day and part
15 of another day. And I really don't recall. Other than
16 the list of these things have got to get done, that is
17 mostly what I recall, to be honest with you, is that
18 list.
19   Q    Just going over those projects that had to be
20 done?
21   A    Right.
22   Q    Did your compensation change at all at this
23 point?
24   A    As far as my rate of pay?
25   Q    Yes, sir.

56

1    A    No. My salary for the year, yes. It went
2 down drastically. I have consistently lost money from
3 being in facilities.
4    Q    How is that?
5    A    Much less overtime. Aircraft demands a
6 significantly larger amount of overtime to keep the
7 aircraft on track.
8    Q    So did your rate of pay change at all, or was
9 it to change at all for this period you were filling in
10 for Roger?
11   A    During the time I was filling in for Roger, my
12 rate of pay did not change, but the amount of overtime I
13 have worked has gone down drastically. It continues to
14 be at a very low level.
15   Q    Do you have to get approval before you work
16 overtime?
17   A    Yes, I do.
18   Q    And who does that?
19   A    Dennis Johnson. Or if he is not there, Chris
20 Walker, and sometimes both intervene. Because Chris
21 Walker does the finances, he has a say in who spends his
22 money.
23   Q    Has your rate of pay changed at all since
24 then?
25   A    I have had raises every year.

57

1   Q    What is your current salary?
2   A    I can't tell you that. I don't know.
3   Q    Have you gotten any raises other than fiscal
4 year raises or annual raises?
5   A    No, ma'am.
6   Q    When is that normally done, as far as annual
7 raises?
8   A    I believe it is in February, perhaps.
9   Q    So did you get a raise then in February of
10 '06?
11   A    Yes, ma'am.
12   Q    And did you get a raise in February of '07?
13   A    Yes, ma'am.
14   Q    How much of a raise did you get? Do you
15 recall?
16   A    A dollar or a dollar-something, perhaps. I am
17 not sure.
18   Q    Is it computed on an hourly basis?
19   A    It is based on a month or whatever. I am sure
20 it is computed on an hourly basis, though, because I am
21 paid forty hours unless I am working overtime.
22   Q    I think we talked about it before. When you
23 work overtime, you turn it in and you get paid a regular
24 hourly rate, not time and a half?
25   A    Straight hourly rate, yes.

58

1 When I am approved to work overtime, say, Saturday,
2 I get eight extra hours in my paycheck.
3   Q    Okay.
4   A    Staying over on Tuesday because there is
5 business, if it doesn't go into two or three hours, I
6 don't get paid for it because I don't put in for it
7 because it wasn't pre-approved.
8   Q    I am going to show you -- I don't know that we
9 need to mark these. I am going to refer to Bates page
10 numbers.
11    Pages 573 through 591, do you recognize those
12 documents?
13   A    Yes, sure.
14   Q    And what are those?
15   A    That is where I worked one Sunday. This is
16 where I worked one Sunday. This one is where I worked
17 two hours of overtime. This is where I worked some time
18 on a holiday.
19   Q    So these are the types of sheets that you
20 would turn in for your overtime?
21   A    Yes, ma'am. Sure is.
22   Q    Did you have to turn in this kind of sheet in
23 order to get paid your overtime?
24   A    Yes, ma'am. Sure did.
25   Q    So have you turned in a sheet for all the

59

1 times you worked overtime?
2   A    Yes, ma'am. Sure did.
3   Q    And that is Dennis Johnson's signature?
4   A    Yes, ma'am. I guess that is Dennis Johnson's
5 initials, since he would have been my boss at that
6 time.
7   Q    And you continue to turn in these sheets for
8 overtime now; is that right?
9   A    The times that I do work overtime, yes, I do.
10 But to clarify, as I said, there is a lot less overtime
11 than I worked as a supervisor on the aircraft. That
12 would have been a much larger number.
13   Q    Sure. Who is the night manager now? The one
14 who took Paul Weeks' place?
15   A    Dan Brooks.
16   Q    Was he hired internally or was he hired from
17 the outside?
18   A    He was hired from outside, as best I know. I
19 think he was brought specifically to be the night
20 manager. I don't think he was already here.
21   Q    Have you ever applied to go back into
22 production, for any production positions?
23   A    I haven't applied to go back. There is no
24 applying. I have repeatedly expressed my desire to go
25 back to aircraft. I am an aircraft person at heart.

60

1   Q    Who do you express those desires to?
2   A    Mr. Johnson.
3   Q    And what has he said?
4   A    Mr. Bennett, Mr. Walker.
5   Q    What did Mr. Johnson say?
6   A    You are doing a good job. You need to stay
7 where you are at. I need you to continue doing that
8 job.
9   Q    I think I asked you this. You don't recall
10 what your current salary is?
11   A    No, ma'am. I know I did receive a raise, but
12 I don't recall what it is.
13   Q    More than fifty-two thousand?
14   A    My wife actually pays the bills. I don't even
15 look at the check, to be honest with you, if I haven't
16 worked any overtime. It is not indicated how much you
17 make per hour. You have to do the math. I know what I
18 am used to getting, and if I get that, I am okay.
19    (Thereupon, Plaintiff's Exhibit No. 1
20 was marked for identification.)
21   Q    Mr. Briody, I am going to show you what has
22 been marked as Plaintiff's Exhibit Number 1. I will
23 just represent to you this was given as an earning
24 statement, but it looks like the date is April of '05;
25 is that right?

61

```
1     A    That is a change that occurred in 2006, where
2 I was given this increase, that 5.268172 percent
3 increase, I believe, over my 2005 salary, whatever that
4 was.
5     Q    To bring your salary up to fifty-two thousand,
6 one twelve, zero four?
7     A    That is how I would look at that.
8     Q    But does that sound about right to you?
9     A    Yes, I think so.
10    Q    And you have gotten an additional raise since
11 that time?
12    A    When is that dated, April of '05 to April of
13 '06?
14    Q    Well, it says the change date is April of '06.
15    A    There has probably been one since then, I
16 would guess.
17    Q    Do you remember what the percentage increase
18 was?
19    A    No, but I think it was somewhere along the
20 lines of three point something, but I don't know that
21 for a fact. I think that is what it was.
22    Q    Okay. Mr. Briody, let me show you what has
23 been marked as Plaintiff's Exhibit Number 2. Do you
24 recognize that document. And that is Bates Stamp Number
25 -- can you read that for me?
```

62

```
1     A    Pemco-Wright 0166. I don't recognize it, no.
2 I don't know exactly what that is.
3          Let's see. That is July, 2006. I honestly don't
4 know what that is.
5     Q    All right. But it is your testimony that your
6 salary did not change with the move from the night
7 manager's position to facilities?
8     A    No, ma'am, it did not.
9     Q    And you did not get an increase until the next
10 annual increase?
11    A    That is correct. I don't know the time frame
12 of those or when we got those or if they were in
13 suspense until after the lock-out, or whatever, but I
14 got no out-of-cycle raise.
15    Q    But you do recall that there was another raise
16 in '07?
17    A    Yes, ma'am. I did receive a raise this year.
18    Q    So you have gotten two raises since you have
19 moved over to facilities?
20    A    I believe so.
21    Q    How much vacation time do you get?
22    A    Two weeks per year.
23    Q    And what about health insurance, disability,
24 that sort of thing?
25    A    I have the standard supervisor manager health
```

63

```
1 insurance. Not very good. It is what it is.
2     Q    But you get disability insurance?
3     A    I don't subscribe to any extra insurances.
4 There are some offered. I don't have any of them.
5     Q    You have the standard health insurance
6 package?
7     A    Yes, ma'am.
8     Q    Life insurance?
9     A    Not unless the company is providing it for
10 free as they would to any supervision person. I don't
11 have any extra.
12    Q    Sick leave days?
13    A    Lots and lots. I don't know how many.
14    Q    How many do you earn a year?
15    A    Six days a year, I think.
16    Q    And are you vested in the pension plan?
17    A    That is debatable. I do not know. Depending
18 on a number of factors with the company right now, I may
19 or may not be.
20    Q    Why do you say that?
21    A    The factors that they use in determining what
22 counts as a year is open to interpretation right now,
23 because our company is for sale. And how they determine
24 whether you get credit for that year, I don't know if I
25 fall in or out. And that hasn't been determined yet.
```

64

```
1     Q    How many years does it to take to vest in the
2 pension?
3     A    Five years. But it may be that I have five
4 years' credit, because I have enough hours worked in the
5 first and last years, but I don't know that. And I
6 think there is probably other people in my shoes that
7 are waiting for that same answer, that they don't know.
8     Q    Well, normally, you wouldn't vest -- I mean,
9 it is five years and you started in '03. You wouldn't
10 vest until '08; is that right?
11    A    Well, I have heard that different ways. I
12 have heard if you have enough hours worked in 2003, you
13 get credit for '03. If you worked enough hours in 2007,
14 you get credit for '07, if and when our purchase becomes
15 final. So there are a number of factors. I don't know
16 if I will vest, I guess is what I am saying, depending
17 on what happens.
18    Q    So you came on to facilities and you said
19 Roger was there a day or two and then went out for his
20 surgery; right?
21    A    A day and a half or so, and then was gone,
22 yes, ma'am.
23    Q    And you were given tasks to perform in
24 facilities, and as I understand your testimony, you were
25 working basically full time in facilities during this
```

**65**

1  period?
2      A    That's correct.
3      Q    Who else was working in facilities with you at
4  that time?
5      A    As far as in supervision?
6      Q    In management, yes, sir.
7      A    No one.
8      Q    Did they have anyone on second shift?
9      A    Yes, they did.
10     Q    Okay.
11     A    They had Richard Miller.  He was second shift
12 supervisor, and on day shift, there was no one.
13     Q    At some point, did that change?  Were
14 additional management people hired in facilities?
15     A    It changed in that as we approached the
16 lock-out, Richard, I had to lay him off.  I was given
17 the assignment to tell Richard he has got to go away.
18     Q    And who gave you that assignment?
19     A    My boss.
20     Q    Dennis Johnson?
21     A    Yes, ma'am.
22     Q    And what did Mr. Johnson tell you?
23     A    That we would -- that we were downsizing and
24 that Richard needed to go away.
25     Q    Did you make the decision to lay off Richard

**66**

1  Miller or did Dennis Johnson make that decision?
2      A    I can't say who made that decision.  I don't
3  know.  I was given the instruction from Dennis.
4      Q    It wasn't your decision to lay him off?
5      A    No, ma'am.
6      Q    That was my question.
7      A    At that time, there was significant planning
8  by people above my head relevant to how we would
9  approach the union negotiations, and there were a lot of
10 contingency plans that were being put in to place.
11     I felt like at the time I was being placed over
12 where Roger was because of my relevant past experiences
13 that had some relevance.
14     Q    Well, let me just ask questions.  The decision
15 to lay off Richard Miller was not yours?
16     A    No, ma'am, it was not.
17     Q    Once you moved over to facilities, were you
18 considered the head of that department, the facilities
19 department?
20     A    I considered myself in charge of that
21 department the day that Roger wasn't there.
22     Q    That is what I needed to know.
23     A    I was filling in for Roger while he was gone.
24 So my job, at that point, was manager of facilities,
25 acting for Roger.

**67**

1      Q    And you were considered a department head at
2  that point?
3      A    Yes, ma'am.
4      Q    So Richard Miller was laid off?
5      A    Yes, ma'am.
6      Q    Was there any other person in management in
7  facilities at that point in time?
8      A    No, ma'am.
9      Q    Okay.  Now, when did you start adding people
10 back in to management in facilities?
11     A    Let me qualify that.  In management, there was
12 an indirect employee, but not in management, the
13 administrative assistant, just to clarify.
14     The question again?
15     Q    At some point, other management employees were
16 brought in; is that right?
17     A    As I recall, yes.
18     Q    When did that happen and who was brought in?
19     A    My recollections are a little foggy.  I don't
20 know if it was just before or just after the lock-out
21 started.  There was a time frame that I was -- I cannot
22 recall exactly when the time frame was.
23     Probably just before the lock-out, we were trying
24 to get tool boxes.  I went on a trip downtown with
25 Dennis one day to look at tools at Sears.  We could

**68**

1  build a little tool kit, and if we brought a supervisor
2  over here, he could work on the airplane if the guys go
3  on strike.  There was all kinds of contingency type
4  stuff.  And at that point in time, I recall a few of the
5  supervisors, aircraft people, were being invited to come
6  back, that had been laid off.  There were a number of
7  aircraft supervisors that had been laid off, and they
8  were called and asked --
9      Q    During the lock-out?
10     A    No, I think this is prior to the lock-out.
11     Q    Preceding the lock-out, okay.
12     A    We had downsized.  We had no more airplanes.
13 There were just a couple.  And several of the guys that
14 had been supervisors on aircraft had been asked to
15 leave.  They were called and told, do you want to come
16 back.  Some did; some didn't.  Some were -- they had
17 come up from the union, resigned their union status,
18 become supervisors, then were laid off as supervisors,
19 asked to come back as supervisors.  Some of them had a
20 problem with that.  They felt like -- I guess they felt
21 like they were crossing the line.  So some of them did;
22 some of them didn't.  But they were inviting some of the
23 aircraft people to come back to physically work the
24 airplanes.
25     Q    My question to you, really, was about

69

```
1   facilities and hiring people back into facilities.  Who
2   was hired first?
3       A    I actually don't remember, to be honest with
4   you.  I don't know if Richard Miller came back first.  I
5   kind of feel like Richard Miller came back first and
6   then Ted Ball, but I don't actually remember.
7       Q    Both about the same time frame?
8       A    Similar time frame.
9       Q    And was that during the lock-out or around
10  that time?
11      A    I think it was during the lock-out.  I think
12  we were actually in the lock-out.
13           Again, a little vague.  If I remember right, most
14  of the activity was happening on day shift for a while,
15  and then Richard -- it is kind of vague.  I don't really
16  recall, but I think Richard was brought back because I
17  needed help on second shift, because we were going to be
18  doing more work on second shift, and he would be the
19  only guy.  I was doing essentially everything in
20  facilities at that time, during the lock-out.
21      Q    And you brought Richard Miller back to work in
22  facilities and to do these projects that you have been
23  talking about?
24      A    To actually fix things.
25      Q    Yes.
```

70

```
1       A    Well, actually, there was quite a bit of
2   sabotage in the beginning of the lock-out.  In the days
3   right after the lock-out, there was feces smeared on
4   handles of commodes and urinals that I personally had to
5   go clean.  There was wiring that had been maliciously
6   folded back into connectors where it would never make
7   contact.  There were other wires that were intentionally
8   cut.  Many of the pieces of equipment I had to fix,
9   trouble-shoot and repair.  Some of them were beyond my
10  technical capability, because I had not worked large
11  diesels, and Richard was brought back specifically for
12  that, to help out with the diesel workload.
13      Q    But, again, all facilities work, because there
14  was so much to do in facilities?
15      A    At that time, yes.
16      Q    And then Ted Ball was added about the same
17  time?
18      A    I don't recall exactly when Ted came along.  I
19  don't honestly know exactly when Ted came along.  I know
20  when he came along I was instructed how I was going to
21  use him.  He was to be for tools.  His mission in life
22  was for tools and it has been.
23           He has added some things to that, but his primary
24  mission in life is tooling and the tooling equivalency
25  program has been his primary responsibility.
```

71

```
1       Q    So he works day shift?
2       A    Correct.
3       Q    And has since he was brought into facilities?
4       A    Yes, ma'am.
5       Q    Now, he had work at Pemco before, working in
6   facilities, though; right?
7       A    In facilities?
8       Q    He had worked in other positions at Pemco; is
9   that right?
10      A    Yes, ma'am.
11      Q    Before he was brought to facilities?
12      A    Yes, ma'am.  Supervision and management.
13      Q    Which department was he in?
14      A    Production department.  He is a top-notch
15  structure supervisor and mechanical supervisor.
16      Q    All right.
17      A    And has, on occasion, helped airplanes since
18  he has been in facilities.  I have had to loan him out a
19  couple of times.
20      Q    So since you moved into facilities, you have
21  not made any lay-off decisions of people yourself; is
22  that right?
23      A    No.
24      Q    Dennis Johnson has made all of those?
25      A    I'm not sure they all came directly from
```

72

```
1   Dennis, but people above me have made those.  I have
2   been directed through Dennis, and all of those have
3   happened previous to the lock-out.  I was told the
4   number to lay off and went through the seniority list,
5   and then some of these folks that I have, have worked in
6   other departments.
7       Q    Let me stop you.
8            You went through the seniority list?
9       A    Yes, ma'am.
10      Q    And these were for bargaining unit employees?
11      A    Yes, ma'am.
12      Q    Who made the decision to rehire Richard
13  Miller?
14      A    Dennis Johnson, I guess, the best I know.
15      Q    That was not coming from you?
16      A    At one point, I was told I could hire Richard
17  Miller back.  It was not my decision, no.
18      Q    What about Ted Ball and the decision to put
19  Ted Ball in facilities?
20      A    The same thing.
21      Q    That was made by Dennis Johnson?
22      A    Yes, ma'am.
23      Q    And so the three management people in
24  facilities now continue to be you, Richard Miller, and
25  Ted Ball; is that right?
```

73

1    A    Yes, ma'am.

2    Q    Were you aware that a supervisor's position

3  had been offered to Roger Wright?

4    A    I have been made aware of that in recent

5  times.

6    Q    Back in 2005, were you made aware that a

7  supervisory position was offered to him?

8    A    No, ma'am.

9    Q    What were you told about his status during

10  this period when you were filling in?

11    A    At one point, I was asked, do you want Roger

12  Wright back?  Something along the lines of, sure.  Well,

13  if you could have him or Ted Ball, who would you take?

14  I think I replied something to the effect of, well, I

15  know Ted is a great guy.  He's got a heart of gold, but

16  Roger knows where the bodies are buried.  I can put that

17  in context, if you like.

18    Q    Yes.

19    A    There was not enough clarity in the business

20  processes within the department, and I felt like there

21  was need for some clarity.  Some of the stuff just

22  didn't have enough notes or justification why decisions

23  were made that I felt could be questionable ethically.

24        There was a union grievance against the department

25  for promoting these two and not promoting those two, and

74

1  those two had seniority, which I got left having to

2  answer.

3    Q    First of all, who were you having this

4  discussion with?

5    A    The union, at that time.

6    Q    No.  I mean, concerning Roger?

7    A    That was Dennis.  Dennis had asked me.

8    Q    Do you remember about when that conversation

9  occurred?

10    A    No, I don't recall that, but I do recall being

11  asked by Dennis, and I think I told him, I probably had

12  to say Roger.  I know Ted is great.  You will meet Ted.

13  Ted is the genuine thing.  But Roger knows where the

14  bodies are buried.  So as much as I like Ted, like

15  working with Ted, working for Ted, I think I have to say

16  Roger.

17    Q    What did Dennis say to that?

18    A    He took that, I guess, and I often, in later

19  months, wondered whatever happened with that.

20    Q    Was Ted Ball already working for you at that

21  time or not?

22    A    No, I don't believe so.  I think that was

23  before Ted was being brought back or was thought about

24  being brought back.  I don't know if my opinion -- I

25  don't know how it was used.

75

1    Q    Do you recall any other discussions with

2  Dennis Johnson about Roger Wright or his status during

3  that time period?

4    A    Yes, to the first part.  No, to the second

5  part.  I recall discussions about Roger and the

6  condition of the department, things Dennis was

7  displeased about, but not about his status.

8    Q    So at some point were you informed that you

9  would no longer be just filling in for Roger?

10    A    Yes, I was.

11    Q    And when were you made aware of that?

12    A    Again, I am not clear on the dates.

13    I had started, I guess, a dialog with Dennis that I

14  was ready to go back to production.  This was a new

15  challenge.  I thought I was doing okay.  However, I sure

16  missed airplanes.

17        At some point -- and Dennis had continually

18  reassured me, you just need to hang in there.  You are

19  doing a good job.  There was one point, and I don't

20  recall when it was, I think it was after the lock-out,

21  because I am pretty sure all of my mechanics were back

22  or most of them were back.  Maybe not all of them.  But

23  I think probably the majority of them were back.  I have

24  a recollection of telling my crew lead, one of my crew

25  leads, I am stuck, or something along those lines.

76

1    Q    But you think that was after the lock-out?

2    A    I think it was, yes, because I believe all of

3  my mechanics were back at that period of time.

4    Q    Did you have a discussion with Dennis Johnson

5  that Roger had been laid off?

6    A    I recall him telling me Roger had been laid

7  off, at some point.  Again, I don't know exactly when

8  that was.  Sometime around the lock-out.

9        To be honest with you, the times kind of ran

10  together.  I don't recall exactly when Roger was

11  supposed to be back to know when he was -- because

12  things got very hectic going in to the lock-out.  For

13  one person, it was a lot.

14    Q    Was Ted Ball back in facilities before the

15  lock-out?

16    A    I don't believe so.  I don't think so.

17    Q    Was an announcement made about you assuming

18  the duties as manager of facilities?  Do you recall

19  that?

20    A    There was at some point a memorandum or

21  something sent out that I would be assuming those duties

22  permanently.  I don't recall when that occurred.

23        (Thereupon, Plaintiff's Exhibit No. 3

24        was marked for identification.)

25    Q    Mr. Briody, let me show you what has been

77

```
1  marked as Plaintiff's Exhibit Number 3.  Do you
2  recognize that note?
3       A    Sure.  That's it.
4       Q    Is that the announcement?
5       A    Yeah.  That puts a time frame on it for me.
6       Q    Good.  And the date on that announcement is
7  July 8th?
8       A    Yes.
9       Q    Is that correct?
10      A    Yes.
11      Q    And so this is the announcement that you are
12 permanently assuming manager of facilities' duties; is
13 that correct?
14      A    That is correct.
15      Q    Let's just do this one, too.  And just for the
16 record, Exhibit Number 3 is Bates stamped 172; is that
17 correct?
18      A    Yes.
19               (Thereupon, Plaintiff's Exhibit No. 4
20               was marked for identification.)
21      Q    And let me show you what has been marked as
22 Plaintiff's Exhibit Number 4.  Is this also an
23 announcement, essentially the same verbiage as Exhibit
24 3?
25      A    It appears so.
```

78

```
1       Q    Just appears to be on two different
2  letterhead?
3       A    Right.
4       Q    But the date is the same?
5       A    Correct.
6       Q    And is this handwritten mark Dennis Johnson's
7  initials?
8       A    It appears to be.
9       Q    You would know his handwriting, would
10 recognize that?
11      A    It looks like his.
12      Q    Do you know why two different memos would be
13 sent out?
14      A    No idea.  I do know he has an administrative
15 assistant, and at that time, Mr. Bennett had an
16 administrative assistant.  It might be they were both
17 told to do the same thing at the same time.  I don't
18 know.
19      Q    They are both from Dennis Johnson, though?
20      A    Correct.  I remember seeing it, but I couldn't
21 recall when or didn't have a copy of it.
22      Q    I know it's been a couple of years.  I don't
23 blame you.
24           Did you have any part of the decision to lay off
25 Roger Wright?
```

79

```
1       A    No, ma'am, none at all.
2       Q    It was not at your level?
3       A    Not at all.
4       Q    Did anyone consult with you about laying off
5  Roger, other than the discussion we previously talked
6  about?
7       A    No, ma'am.
8       Q    How were you made aware that he was laid off
9  or that your role in there was going to be permanent?
10      A    I don't recall specifically, and I don't think
11 that happened at the same time or the same day, or at
12 least not that I was aware of.
13           I recall Roger coming out and clearing out his
14 desk, vaguely.  It was uncomfortable and painful for me
15 as well.  I had been there and had a great deal of
16 empathy for him.  I don't know that that was before or
17 after this.  I really don't honestly remember.  I
18 remember him coming and clearing out his desk, and you
19 know, wishing him well.
20      Q    I know this sounds like a stupid question.
21           Pemco is an entirely separate company from
22 Lockheed-Martin; correct?
23      A    As far as I know, it is.
24      Q    Pemco would not give you credit for your years
25 in service at Lockheed, in terms of pension plans and
```

80

```
1  that sort of thing?
2       A    No.  No.
3       Q    So when you went to Pemco, you started
4  completely fresh in terms of vesting for a pension; is
5  that right?
6       A    Yes.
7       Q    And as we talked about, you would have to work
8  five years, depending on how they count the years, in
9  order to vest in the pension plan?
10      A    Correct.
11      Q    In your work as facilities manager, do you
12 have any interaction with the facilities manager in
13 Birmingham?
14      A    Limited.  Some limited.  Their structure is
15 different.  I'm not quite so certain they have one
16 manager.  They have a number of managers over a number
17 of different things.  I have assisted them on a number
18 of occasions.
19      Q    Do you work with each other in terms of
20 comparing notes, or, hey, how did you do this, or we
21 tried this and this worked?  Do you share information in
22 that way?
23      A    To some degree.  Not on a daily basis.  They
24 have asked specifically for our help in securing a
25 contract.  They had to put their system for tooling in a
```

81

1  computer like we have, with bar coded tooling, and they
2  asked specifically if I would help them train each of
3  their tool crib managers and keep personnel out of their
4  tool cribs, which they brought people down three or four
5  times. I sat down with them, gave them a briefing on
6  bar coded tooling and a tooling system in the computer,
7  what it provides to them, how it can help them, and how
8  to manage the system. The administrative assistant
9  walked around the facility with them and showed them the
10 actual system at work.
11     Q    So there is information shared back and forth
12 between you and Birmingham?
13     A    Correct. Some. Limited from their end to me.
14 Very limited from their end to me.
15     Q    But you have been helping them, providing
16 documents as they needed?
17     A    Yes, ma'am.
18     Q    And if you needed help, I assume you could
19 call them and they would help you?
20     A    No, ma'am.
21     Q    No?
22     A    No. I have made attempts to get help from
23 them, but it has always been a failed attempt.
24     Q    Why won't they help you?
25     A    They are big brother and I am little brother,

82

1  is the only thing I can assume. It has been a one-way
2  street, the best way to put it.
3      Q    Have you ever withheld information that they
4  had requested from you, for any reason?
5      A    No, not that I am aware of. I see the
6  Birmingham facility as the corporate headquarters, so I
7  feel I have an obligation to help my corporation. That
8  is how I viewed each request that I have had for
9  assistance from Birmingham. I haven't always been able
10 to help them, though.
11     Q    In the course of working at Pemco, have you
12 ever been written up or any reprimands, anything like
13 that?
14     A    I don't recall being written up. I recall
15 being scolded on occasion.
16     Q    Who were you scolded by?
17     A    Mr. Johnson.
18     Q    For what?
19     A    On one occasion, I was directed to go fire an
20 employee. I fired the employee. I was reporting back
21 that I had fired the employee, and I maybe had a few
22 extra comments that Mr. Johnson didn't need at the
23 moment. End of story. A production supervisor who was
24 not doing a good job.
25     Q    Who was that?

83

1      A    I don't recall the gentleman's name. Steve
2  something. I don't recall Steve's last name.
3      Q    Any other scoldings from Mr. Johnson?
4      A    No. I think that probably was most of it. I
5  have had scoldings from him, but not at Pemco, as we
6  talked about earlier. At Pemco, it has been
7  professional.
8      Q    Were you ever written up or reprimanded while
9  you were at Lockheed?
10     A    Written up or reprimanded. I don't recall any
11 reprimands at Lockheed. I don't recall any.
12     Q    Have you ever been involved in any other
13 lawsuit or given depositions before?
14     A    I have given one deposition before in a
15 lawsuit on a motorcycle accident, that I was run over by
16 a car.
17     Q    Did you bring a civil lawsuit?
18     A    I brought a lawsuit. I guess it was civil.
19     Q    Was that here in Houston County?
20     A    No.
21     Q    Where was that?
22     A    It was in Greenville, South Carolina.
23     Q    Did that case go to trial or did you get it
24 resolved?
25     A    It was settled.

84

1      Q    Do you have any criminal convictions of any
2  kind?
3      A    I had a DUI while I was in the Air Force. I
4  don't know if it was criminal or misdemeanor. I have no
5  idea.
6      Q    When was that?
7      A    1987 or '88.
8      Q    Any other criminal convictions of any kind?
9      A    No.
10         MR. HOLMES:  Do you want to take a quick
11            break?
12         MS. GLASGOW:  We can. I am just about
13            finished.
14         (Thereupon, a break was taken.)
15                    EXAMINATION
16 BY MR. HOLMES:
17     Q    Clarke, there are a couple of areas I want to
18 cover with you that you testified about already today.
19 The first is the conversations which you had with Dennis
20 Johnson when you were essentially interviewing, or you
21 had come down to visit Pemco. Do you remember that
22 testimony?
23     A    Vaguely.
24     Q    You testified to this earlier today that you
25 asked Dennis, What are you going to do to fix this?

85

```
1     A    Correct.
2     Q    And you were talking about the condition of
3  the facility?
4     A    Correct.  I was startled at the dilapidated
5  condition of the buildings and the tooling and the
6  entire facility and the amount of FOG, foreign objects
7  on the ground.
8     Q    You testified that in response to your
9  question to Dennis that Dennis said he intended to get
10 some right-headed people and to get rid of the old guard
11 who were unwilling to change.  Do you remember that
12 testimony?
13    A    I am not sure I said it exactly as such.
14 However, that is my characterization of obstinates, I
15 guess is what I was saying.
16    Q    Did Dennis use the phrase or the words "old
17 guard"?
18    A    I don't recall that he did.
19    Q    And did you get the sense in any way that his
20 description of getting right-headed people was in any
21 way related to the age of current employees of Pemco?
22    A    No.
23    Q    Have you ever heard Dennis say anything about
24 an employee's age relative to an employment decision he
25 was making?
```

86

```
1     A    No.
2     Q    You also testified about another conversation
3  that you had with Dennis Johnson at some point in and
4  around this relevant time period in 2005, where Dennis
5  asked you about Roger Wright or Ted Ball coming back to
6  work.  Do you remember that testimony?
7     A    Yes, sir, I do.
8     Q    And did you know what position Dennis was
9  asking you about?
10    A    I assumed it was to be in charge of tooling
11 and tool equivalency.
12    Q    And your testimony about your answer to Dennis
13 when he asked you who would you call back was that
14 Ted was really good and a great guy -- and I am
15 paraphrasing --
16         MS. GLASGOW:  I want to object to the form.
17    Q    I am paraphrasing here.  The transcript says
18 what it does.  -- but that Roger knows where the bodies
19 are buried; correct?
20         MS. GLASGOW:  Object to form.
21    Q    Do you remember your testimony about that
22 conversation?
23    A    I do recall, I think, the testimony fairly
24 well.
25    Q    And did you have a sense that Ted was better
```

87

```
1  qualified for the position?
2         MS. GLASGOW:  Object to form.
3     A    I knew Ted's work ethic to be extraordinarily
4  good, and I knew he was very capable, particularly with
5  tooling.  But with regards to a lot of things within the
6  facility, I felt like Roger, as I said, knew where the
7  bodies were buried, and I am pretty sure I used those
8  exact words with Dennis.
9         MR. HOLMES:  That is all I've got.
10            EXAMINATION
11 FURTHER BY MS. GLASGOW:
12    Q    You said you started at Pemco in July of '03?
13    A    I believe it was July of '03.
14    Q    Around that time?
15    A    Yes.
16    Q    How long had Dennis Johnson been at Pemco when
17 you came on board?
18    A    I don't know for a fact.  I know it had not
19 been a long time.  As I stated before, he had been
20 through the training seminar at the same place in
21 Greenville when he had departed and was still in
22 communication with them, looking for supervisors, once
23 he hired on at Pemco.  I honestly don't know.
24    Q    A short time, a few months maybe?
25    A    I am not sure I would know that for sure.
```

88

```
1     Q    Are you aware that he was laid off at
2  Lockheed?
3     A    I did know that.
4     Q    And was the facility in South Carolina shut
5  down?
6     A    No, ma'am, at least not to my knowledge.
7     Q    And, Mr. Briody, what is your date of birth?
8     A    9/7/1955.  September 7th.
9         MS. GLASGOW:  Okay.  I think that is all I
10        have.  Thank you, sir.  I appreciate it.
11            END OF DEPOSITION
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

89

```
 1              PLAINTIFF'S EXHIBIT NO. 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

91

```
 1              PLAINTIFF'S EXHIBIT NO. 3
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

90

```
 1              PLAINTIFF'S EXHIBIT NO. 2
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

92

```
 1              PLAINTIFF'S EXHIBIT NO. 4
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

93

```
 1              REPORTER'S CERTIFICATE
 2 STATE OF ALABAMA
 3 HOUSTON COUNTY
 4         I, Kimberly B. Faucette, Certified Court
 5 Reporter and Notary Public for the State of Alabama at
 6 Large, do hereby certify that the foregoing
 7 transcript, pages 1 through 92, is a true and correct
 8 transcript of the testimony and proceedings taken at
 9 said time and place; and that the same was taken down by
10 me in stenograph shorthand, and transcribed by me
11 personally or under my personal supervision.
12         I further certify that I have no interest in
13 this matter, financial or otherwise, or how it may
14 develop or what its outcome may be.  I further certify
15 that I am not of counsel or litigants or associated with
16 anyone connected with this cause to my knowledge.
17         Witness my hand this 20th day of August,
18 2007.
19
20
21
22         _____
23         Certified Court Reporter and Notary
24         Public, State at Large
25         AL-CSR-440
```



**WORLD AIR SERVICES**
*A PEMCO AVIATION GROUP COMPANY*

**July 8, 2005**

**To:**        **All PWAS Dothan Employees**

**From:**      **Dennis Johnson, Vice President Operations**

**Subject:**   **Management Appointment**

---

Effective Monday, July 11, 2005 Clarke Briody will assume duties and responsibilities of Facilities Manager. Clarke's 20+ years of aircraft maintenance experience and his vast knowledge of the aviation industry will be a tremendous asset as we move forward to streamline our operations and improve efficiencies.

Please give him your complete support and cooperation.



PLAINTIFF'S
EXHIBIT
3

PEMCO / WRIGHT
00172

# EXHIBIT 6

# FREEDOM COURT REPORTING

| Page 1 | Page 3 |
|---|---|
| 1  IN THE UNITED STATES DISTRICT COURT | 1  IT IS FURTHER STIPULATED AND AGREED |
| 2  FOR THE MIDDLE DISTRICT OF ALABAMA | 2  that the signature to and the reading of |
| 3  SOUTHERN DIVISION | 3  the deposition by the witness is waived, |
| 4  CASE NUMBER | 4  the deposition to have the same force and |
| 5  1:06CV647-WKW | 5  effect as if full compliance had been had |
| 6 | 6  with all laws and rules of Court relating |
| 7  ROGER WRIGHT, | 7  to the taking of depositions. |
| 8  PLAINTIFF, | 8  IT IS FURTHER STIPULATED AND AGREED |
| 9  VS. | 9  that it shall not be necessary for any |
| 10  PEMCO WORLD AIR | 10  objections to be made by counsel as to any |
| 11  SERVICES, INC., | 11  questions, except as to form or leading |
| 12  DEFENDANT. | 12  questions, and that counsel for the |
| 13 | 13  parties may make objections and assign |
| 14  DEPOSITION OF: | 14  grounds at the time of the trial, or at |
| 15  JACKIE TINDLE | 15  the time said deposition is offered in |
| 16 | 16  evidence or prior thereto. |
| 17  STIPULATION | 17  IT IS FURTHER STIPULATED AND AGREED |
| 18  IT IS STIPULATED AND AGREED by and | 18  that notice of filing of this deposition |
| 19  between the parties through their | 19  by the Commissioner is waived. |
| 20  respective counsel, that the deposition of | 20 |
| 21  JACKIE TINDLE, may be taken before Donna | 21 |
| 22  Winters, Commissioner and Notary Public, | 22 |
| 23  State of Alabama at Large, at the law | 23 |

| Page 2 | Page 4 |
|---|---|
| 1  offices of Maynard, Cooper & Gale, 2400 | 1  EXHIBITS |
| 2  AmSouth/Harbert Plaza, 1901 Sixth Avenue | 2  EXHIBIT PG DESCRIPTION |
| 3  North, Birmingham, Alabama 35203, on the | 3  PX-1  8 Notice of Deposition Duces |
| 4  9th day of August 2007 commencing at 11:30 | 4  Tecum |
| 5  a.m. | 5  PX-2  17 Pension Plan Contributions - |
| 6  DEPOSITION OF: JACKIE TINDLE | 6  Made |
| 7 | 7  PX-3  50 retiree list |
| 8 | 8  PX-4  51 retiree list |
| 9 | 9  PX-5  52 Statement of Financial |
| 10 | 10  Accounting Standards No. 158 |
| 11 | 11  PX-6  53 Pension Plan Benefits Payments |
| 12 | 12  PX-7  55 Pro Forma Consolidated |
| 13 | 13  Statements of Operations |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20  EXAMINATION BY:  PAGE NUMBER |
| 21 | 21  Ms. Glasgow  6 - 104 |
| 22 | 22  106 - 107 |
| 23 | 23  Mr. Holmes  104 - 105 |

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

**Page 5**

```
 1        A P P E A R A N C E S :
 2      FARMER, PRICE, HORNSBY &
 3   WEATHERFORD, by Ms. Elizabeth B. Glasgow,
 4   100 Adris Place, Dothan, Alabama 36303,
 5   appearing for the Plaintiff.
 6      MAYNARD, COOPER & GALE, by Mr. John
 7   B. Holmes, III, 2400 AmSouth/Harbert
 8   Plaza, 1901 Sixth Avenue North,
 9   Birmingham, Alabama 35203, appearing for
10   the Defendant.
11
12
13      I, Donna Winters, a Court Reporter
14   of Birmingham, Alabama, acting as
15   Commissioner, and a Notary Public for the
16   State of Alabama at Large, certify that on
17   this date, as provided by Rule 30 of the
18   Alabama Rules of Civil Procedure, and the
19   foregoing stipulation of counsel, there
20   came before me, JACKIE TINDLE, witness in
21   the above cause, for oral examination,
22   whereupon the following proceedings were
23   had:
```

**Page 6**

```
 1        JACKIE TINDLE,
 2   having been first duly sworn, was examined
 3   and testified as follows:
 4
 5      COURT REPORTER:  Usual stipulations?
 6      MR. HOLMES:  That's fine.
 7      MS. GLASGOW:  Sure.
 8
 9   EXAMINATION BY MS. GLASGOW:
10   Q.   Would you state your name for the
11   record, please?
12   A.   Jacqueline Tindle.
13   Q.   Ms. Tindle, my name is Libby
14   Glasgow.  I represent Roger Wright in this
15   lawsuit.  I'm going to be taking your
16   deposition today and asking you a number
17   of questions.  Have you ever had your
18   deposition taken before?
19   A.   Yes.
20   Q.   So you're familiar with the process?
21   A.   Yes.
22   Q.   I get to ask the questions.  Dennis
23   Johnson, you know, always wanted to ask me
```

**Page 7**

```
 1   questions day before yesterday, but I get
 2   to ask the questions; and if you would,
 3   give me your answers to them.  If there
 4   are any questions that you don't
 5   understand or if I'm not clear about
 6   something, stop me, and I'll be happy to
 7   rephrase them.  If you need to take a
 8   break any time, let me know.  But,
 9   otherwise, we're going to generally assume
10   you understand the questions I'm asking,
11   and that you'll give a truthful answer.
12   The court reporter is taking down
13   everything that we say today, so you need
14   to answer out loud, and try not to cut off
15   the end of my question, if you can help
16   it.  I have a bad tendency to stop halfway
17   through and then people want to answer,
18   but I really do need to finish the
19   question for purposes of the record.
20   A.   Sure.
21      MS. GLASGOW:  John, you have given
22   me a three-page document, which is Bates
23   stamped 758, 759, and 761.  And are you
```

**Page 8**

```
 1   telling me that 760 was inadvertently
 2   omitted, not that the page was omitted,
 3   but that the number was incorrect?
 4      MR. HOLMES:  Correct.
 5      MS. GLASGOW:  As I understand it,
 6   this list that you're providing me is a
 7   list of the retirees of Pemco World Air
 8   Services from 2001 to the present date,
 9   which is August 9, 2007; is that correct?
10      MR. HOLMES:  Correct.
11      MS. GLASGOW:  Then you have also
12   produced to me today a one-page document
13   that is Bates stamped 757, and this is
14   pertinent to Ms. Tindle's deposition
15   today; is that right?
16      MR. HOLMES:  Yes.
17   Q.   Ms. Tindle, have you brought any
18   other documents with you, other than the
19   ones that we've just mentioned?
20   A.   No.
21      (Whereupon, Plaintiff's Exhibit
22   Number 1 was marked for identification, a
23   copy of which is attached to the original
```

2  (Pages 5 to 8)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 9

1  of the transcript.)
2      MS. GLASGOW:  John, I'm going to
3  show you what has been marked as
4  Plaintiff's Exhibit 1. That's the
5  30(b)(6) deposition notice.  Would you
6  designate which items Ms. Tindle is here
7  to testify about?
8      MR. HOLMES:  2, 3, and 4.
9      MS. GLASGOW:  Thank you very much.
10  **Q.   Ms. Tindle, who is your employer?**
11  A.   Pemco Aviation Group, Inc.
12  **Q.   How long have you worked for them?**
13  A.   Thirty-seven years.
14  **Q.   And what is your job title?**
15  A.   Director of corporate services.
16  **Q.   How long have you been in that**
17  **position?**
18  A.   Approximately fifteen years.
19  **Q.   And what does the director of**
20  **corporate services do?**
21  A.   Oversee the payrolls for the Pemco
22  Aeroplex, Pemco Aviation.
23  **Q.   Do you also receive payroll for**

Page 10

1  **World Air Services?**
2  A.   Not at this time.
3  **Q.   Did you previously?**
4  A.   We have, yes.
5  **Q.   What is the period of time that you**
6  **handled their payroll?**
7  A.   We handled their payroll up to 2007.
8  **Q.   When in 2007?**
9  A.   January 1st.
10  **Q.   What was the reason for shifting the**
11  **payroll to Dothan?**
12  A.   Dothan has always prepared the
13  hours. All we did was process the
14  payroll.
15  **Q.   How many people do you have working**
16  **for you in your department?**
17  A.   Presently, there's five including
18  myself.
19  **Q.   And can you give me their general**
20  **job titles?**
21  A.   We've got the manager of payroll,
22  and we have two payroll clerks, and then
23  we have manager of corporate services.

Page 11

1  **Q.   Was that an assistant to you?**
2  A.   Yes.
3  **Q.   One more?**
4  A.   And myself.
5  **Q.   And yourself, you're including**
6  **yourself in that.  Can you give me a brief**
7  **rundown on your educational history?**
8  A.   I attended Avondale Elementary in
9  Birmingham; Woodlawn High School in
10  Birmingham; and UAB in Birmingham, with a
11  degree in accounting.
12  **Q.   Are you a CPA?**
13  A.   No.
14  **Q.   Have you worked anywhere else during**
15  **the last thirty-seven years, other than**
16  **working for Pemco?**
17  A.   No.
18  **Q.   Have you always been in the**
19  **accounting-bookkeeping end of the**
20  **business?**
21  A.   Yes.
22  **Q.   Where did you start?  What office**
23  **did you start in?**

Page 12

1  A.   I started posting the general ledger
2  when I first started to work for Pemco.
3  **Q.   And you've worked your way up from**
4  **there?**
5  A.   Yes.
6  **Q.   Have you taken any other outside**
7  **college courses, business courses,**
8  **anything like that?**
9  A.   Through the years I've taken several
10  courses pertaining to taxes and payroll
11  and accounting, yes.
12  **Q.   Have you ever sought after another**
13  **degree since your master's?**
14  A.   No.
15  **Q.   Do you help with the tax returns for**
16  **the corporations?**
17  A.   Only the payroll taxes.
18  **Q.   You're being tendered as a witness**
19  **today as the person with the most**
20  **knowledge concerning payment of retirement**
21  **benefits.  Is that a specialty that you**
22  **handle yourself, or is that something that**
23  **you oversee?**

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1  A.  I oversee.
2  Q.  Who is the person that actually is
3  the one most responsible for the
4  retirement plan for Pemco?
5  A.  "Responsible," meaning?
6  Q.  Administration, that sort of thing.
7  A.  Well, I would be one of those that
8  would be included.  There's three people.
9  Q.  Who are the other two?
10  A.  Debra Smith.
11  Q.  What does she do?
12  A.  When an employee calls to retire,
13  she would calculate or ask for wages, in
14  the case of a salaried person from the
15  Dothan facility, and calculate the pension
16  based on the pension document.  And Brad
17  McClure.
18  Q.  What does he do?
19  A.  The same.
20  Q.  And what is your role with regard to
21  the pension plan?
22  A.  I check each one of them once they
23  have completed the calculation.

Page 14

1  Q.  Are you responsible at all for
2  determining the calculations for the
3  amount of payment by Pemco into the
4  retirement plan?  Is that part of your
5  responsibilities?
6  A.  I'm not sure the meaning of your
7  question.
8  Q.  The pension plan has to be funded?
9  A.  Correct.
10  Q.  And is it part of your
11  responsibilities to determine how much the
12  corporation needs to put into the pension
13  plan to fund?
14  A.  No.  We use an actuarial service for
15  that.
16  Q.  What is the actuarial service?
17  A.  Mass Mutual.
18  Q.  And how do they determine what the
19  specific payment is?
20  A.  I don't know.  You would have to ask
21  them.
22  Q.  Do they request any particular
23  report or forms from you?

Page 15

1  A.  We send them an annual report of all
2  employees who have retired or are vested
3  and active, once a year.
4  Q.  When you say you send them the list
5  of employees who are vested and active,
6  it's just for those who retired in a given
7  calendar year?
8  A.  No.  We send them everyone.  We send
9  them everyone.
10  Q.  Who is --
11  A.  Who are active.
12  Q.  Who are active employees?
13  A.  Who are active employees who are
14  retired and who are vested, and the vested
15  person is one that has terminated but has
16  not retired.
17  Q.  So once someone is retired, then
18  they are no longer considered vested;
19  they're actually actively in the system
20  and receiving retirement?
21  A.  Retired; correct.
22  Q.  So the people who are vested have
23  not yet retired; but they have, what,

Page 16

1  enough years in service to qualify for
2  retirement?
3  A.  Correct.
4  Q.  Who at Mass Mutual do you usually
5  deal with?
6  A.  David Woodmansee.
7  Q.  Could you spell that last name?
8  A.  W-O-O-D-M-A-N-S-E-E.  I think that's
9  correct.
10  Q.  And where is Mass Mutual?
11  A.  They're in Massachusetts.
12  Q.  How long has Mass Mutual provided
13  the actuarial services for you?
14  A.  I think since 2002.
15  Q.  Who did it before then?
16  A.  Towers Perrin.
17  Q.  Towers, what is the last name?
18  A.  P-E-R-R-I-N.
19  Q.  And they're just another actuarial
20  service?
21  A.  Correct.
22  Q.  Where are they located?
23  A.  The office that we used was in

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1  Atlanta.
2  **Q.   I assume both of these are national**
3  **companies?**
4  A.   Yes.
5  **Q.   Mass Mutual, is that the insurance**
6  **company, the very large corporation?**
7  A.   Right.
8      (Whereupon, Plaintiff's Exhibit
9  Number 2 was marked for identification, a
10 copy of which is attached to the original
11 of the transcript.)
12 **Q.   Ms. Tindle, I want to show you what**
13 **has been marked as Plaintiff's Exhibit**
14 **Number 2, with a Bates stamp of page 757**
15 **on it. Can you identify this document for**
16 **me?**
17 A.   Yes.  These are the contributions
18 that have been made by the company to the
19 defined benefit plan since 2001.
20 **Q.   And what is encompassed in the**
21 **defined benefit plan?**
22 A.   I'm not sure of your question.
23 **Q.   Does it include health insurance,**

Page 18

1  life insurance, things other than the
2  pension?
3  A.   No, just pension.
4  **Q.   Does it also include 401-K?**
5  A.   No.
6  **Q.   Is this defined benefit plan for**
7  **World Air Services employees?**
8  A.   Not in total, no.
9  **Q.   Let me ask that a little better. I**
10 **understand World Air Services employees**
11 **have been participants in a defined**
12 **benefit plan provided by Pemco?**
13 A.   Correct.
14 **Q.   And is this Exhibit Number 2 just**
15 **for the World Air Services employees, or**
16 **is this for all employees within the**
17 **defined benefit plan?**
18 A.   All of them.
19 **Q.   Who all would be included within**
20 **this defined benefit plan?**
21 A.   Pemco World Air Services, Pemco
22 Aeroplex, Pemco Aviation.
23 **Q.   Aviation Group?**

Page 19

1  A.   Yes.
2  **Q.   Anybody else?**
3  A.   No.
4  **Q.   Does the defined benefit plan have a**
5  **name?**
6  A.   Yes.
7  **Q.   What is the name of it?**
8  A.   Pemco Aeroplex Pension Plan.
9  **Q.   And how long has the Pemco Aeroplex**
10 **Pension Plan been in existence?**
11 A.   Probably the early sixties
12 originally.
13 **Q.   Does it include pension benefits for**
14 **both union and nonunion employees?**
15 A.   Yes.
16 **Q.   Can you explain what these numbers**
17 **mean, in 2001?**
18 A.   This is a contribution in 2001 that
19 was made on December 26th, for $3,000,000.
20 In 2002 there were two contributions, one
21 July 15th and one October 10th, for a
22 total of $1,590,000.
23 **Q.   Let me stop you there.  The first**

Page 20

1  column is the date of the contribution?
2  A.   Yes.
3  **Q.   The first column on your left-hand**
4  **side is the date of the contribution?**
5  A.   Yes.
6  **Q.   The next column over is the amount**
7  **of the contribution?**
8  A.   Correct.
9  **Q.   So the second column from the left**
10 **is the amount of the specific contribution**
11 **made on the given date?**
12 A.   Correct.
13 **Q.   Then the third column, what is that?**
14 A.   That is the total for the year.
15 **Q.   Then what is the fourth column?**
16 A.   The cumulative total.
17 **Q.   What do you mean by "cumulative**
18 **total"?**
19 A.   There was $3,000,000 in 2001; there
20 was $3,000,000 in 2001; and there was a
21 total of $3,000,000 beginning in 2001.  In
22 2002 there was $1,590,000 contributed to
23 the plan, and there had been $3,000,000

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1  million in 2001, so then it becomes
2  year-to-date $5,590,000, and it has
3  accumulated up to 2007. This is for the
4  current year, and this is adding the years
5  together.
6  Q.    From 2001 through 2007?
7  A.    Correct.
8  Q.    Why did you begin in 2001?
9  A.    That was the first contribution that
10 had to be made in a number of years, and
11 we started accumulating and keeping track
12 of what contributions we were making based
13 on our actuary --
14 Q.    What had happened in prior years?
15 A.    In prior years the pension plan was
16 a hundred percent funded, and no pension
17 contribution was required.
18 Q.    Because contributions had been made
19 earlier, and the investment and the
20 interest on those contributions funded the
21 continuing contributions up through the
22 year 2001?
23 A.    Yes.

Page 22

1  Q.    What is the total amount that is in
2  the pension fund now; do you have any
3  idea?
4  A.    No. I thought I gave that to you
5  all.
6       MR. HOLMES: I can get that.
7  A.    I think it's about $108,000,000, but
8  I'm not positive.
9  Q.    That's fine. So in 2001, if I
10 understand, the company for the first
11 time, at least in many years, had to begin
12 taking money out of revenue and putting it
13 into the pension in order to make sure
14 that the pension was fully funded?
15 A.    Correct.
16 Q.    Are there any years in which the
17 pension was not fully funded, you know,
18 going back in 2001 to the present? Do you
19 understand my question?
20 A.    No.
21 Q.    Are there any years between 2001 and
22 the present where the contribution by
23 Pemco was not enough to fully fund the

Page 23

1  pension?
2  A.    No, there were no years.
3  Q.    At least between 2001 to present?
4  A.    Correct.
5  Q.    And if I understand your testimony,
6  going back previously, the pension had
7  always been fully funded through the
8  investments and that sort of thing?
9  A.    Correct. And there had been
10 contributions made, but it hadn't been
11 made in a number of years.
12 Q.    How long have you been involved in
13 this pension plan?
14 A.    Probably twenty, twenty-five years.
15 Q.    So going back at least to the
16 1980's, is probably when you got involved?
17 A.    Yes. And I can remember having to
18 make contributions.
19 Q.    In the 1980's?
20 A.    Yes. But there was a period of time
21 where we did not have to.
22 Q.    So if I understand this, if the
23 total amount of the pension fund is around

Page 24

1  $108,000,000 -- and I'm not holding you to
2  that; I understand that's an approximate
3  figure -- is it correct to say that almost
4  half of that has been made since 2001, in
5  terms of contributions?
6  A.    I couldn't answer that.
7  Q.    Who is the administrator of the
8  plan?
9  A.    Administrator?
10 Q.    Yes. There is a formal plan
11 administrator. Are you familiar with that
12 term?
13 A.    I'm not sure. There's a trustee,
14 which is Mass Mutual; and Pemco
15 administers the plan.
16 Q.    So who is responsible for investing
17 the contributions that are made?
18 A.    There is a committee that consists
19 of board members with the Pemco Aviation
20 Group who determine the investments.
21 Q.    Who are the board members on that
22 committee?
23 A.    I don't know.

6 (Pages 21 to 24)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 25

1  Q.   Do you play any role in the
2  investment end of the contributions in
3  terms of dealing with brokers or
4  investment advisors, anything like that?
5  A.   No.
6  Q.   Is there an investment company that
7  advises the committee as to where to place
8  these investments?
9  A.   I'm not on the committee, so I don't
10  know.
11  Q.   Have you ever heard who might be
12  giving any financial advice?
13  A.   I don't know.
14  Q.   Do you have any ownership interest
15  in the company?
16  A.   No.
17  Q.   No stock options?
18  A.   150 shares of stock options, yes.
19  Q.   Have you ever exercised those
20  options?
21  A.   No.
22  Q.   Are you paid on a straight salary,
23  or is there also incentives built into

Page 26

1  your compensation?
2  A.   Straight salary.
3  Q.   Do you ever receive bonuses based on
4  profit sharing or any type of incentives,
5  such as costs or general operation of the
6  business?
7  A.   I have received bonuses based on
8  incentive, goals established that I have
9  met.
10  Q.   Can you tell me about those?  I
11  don't need to know the amount of the
12  bonus, but can you tell me about what
13  years -- I take it you no longer have
14  goals set where you have to make it in
15  order to receive a bonus; is that right?
16  Or are you still under that plan?
17  A.   Yes, I'm still under that plan.
18  Q.   What kind of goals are given to you?
19  A.   Well, you set your own goals, such
20  as programming the payroll so that it
21  functions more easy, getting new and
22  cheaper pricing on life insurance, those
23  kinds of things.

Page 27

1  Q.   Who determines whether you've met
2  those goals or not?
3  A.   My superior.
4  Q.   And who is that?
5  A.   Randy Shealey.
6  Q.   Do you go over these goals with him?
7  A.   Yes.
8  Q.   And then how is the bonus
9  calculated?  Is it a percentage of the
10  savings that you receive?
11  A.   I'm not sure how it's determined.
12  Q.   How do you find out what your bonus
13  is going to be?
14  A.   I'm just told an amount.
15  Q.   And how often does that occur in a
16  year?
17  A.   Once a year, if it happens at all.
18  It's not a routine.
19  Q.   When is that typically paid out?
20  A.   Usually in April-May time frame.
21  Q.   Do you generally get a bonus every
22  year?
23  A.   No, not every year.

Page 28

1  Q.   Did you get a bonus in 2007?
2  A.   No.
3  Q.   2006?
4  A.   Yes, I think I did in 2006.
5  Q.   What about 2005?
6  A.   I don't think I did, but I'm not
7  positive of that.
8  Q.   2004?
9  A.   I don't know whether I did or
10  didn't.
11  Q.   I understand that's going back
12  several years.
13  A.   Yes.
14  Q.   When Randy Shealey reviews your
15  performance in order to determine this
16  bonus, do you provide any documents to
17  him, saying "Randy, this is what I've done
18  this year; here are my goals; this is how
19  I met my goals"?
20  A.   We are asked to establish our goals
21  for the year, and it's given to your boss.
22  I'm not sure how it works beyond that,
23  honestly.

7  (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1   Q.   Do you ever go back to him and give
2   him a document that says, "Okay, I had
3   five goals this year, and I've met four of
4   them"?
5   A.   We are asked to.
6   Q.   And do you do that?
7   A.   Yes.
8   Q.   Is this bonus system used for senior
9   management, for most senior management
10  employees?
11  A.   Yes, I think directors and above.
12  But I'm not positive if that's entirely
13  true.
14  Q.   Yes, I understand. Has this kind of
15  incentive bonus been in place for a while?
16  A.   Probably since 2003.
17  Q.   Have any of your goals ever been
18  with regard to the pension plan so far?
19  A.   Yes, they have been. When we
20  changed our computer system, we had to get
21  the programming done with the new system,
22  and that was one of my goals.
23  Q.   What did the new program do for you?

Page 30

1   A.   Well, we had to input everybody that
2   had retired, and their retirement date and
3   the years of service. It was a
4   labor-intensive task.
5   Q.   Did you get some temps to come in
6   and help you with that?
7   A.   Yes.
8   Q.   What does the new computer program
9   do with respect to the pension plan?
10  A.   Nothing more than what it did
11  before. It just keeps track of the
12  employees, and we have to keep track of
13  the employees in order to provide the
14  actuary information at the end of the
15  year, as well as calculating the pension
16  for the individual employees.
17  Q.   Well, that's what I was going to ask
18  you. Is this a special program that will
19  calculate the pension?
20  A.   No, it does not. No, it just gives
21  us data, such as a hire date, birth date,
22  that sort of thing, years of service.
23  Q.   And does it allow you to reorganize

Page 31

1   that information so that you can get,
2   like, name, date of hire, whatever the
3   columns you need to have?
4   A.   Yes.
5   Q.   How do you go about calculating the
6   pension benefits for a particular
7   employee?
8   A.   It depends on what plan he's in.
9   Q.   How many different plans are there?
10  A.   There's multiple ones. There's a
11  salaried plan for the Dothan facility. If
12  we're speaking to the Pemco World Air
13  Services, then there's a union plan. And
14  they are each calculated differently.
15  Q.   Is there a different plan for
16  Aeroplex employees?
17  A.   Yes. There is not a different plan,
18  no. The answer is "No, there is not a
19  different plan."
20  Q.   It's all part of the same plan?
21  A.   There's a different formula.
22  Q.   I see. Is there a different formula
23  for Aeroplex employees versus World Air?

Page 32

1   A.   Yes.
2   Q.   And is there a different formula for
3   Aviation Group employees versus the other
4   two?
5   A.   No.
6   Q.   Is Aviation Group the same as
7   Aeroplex?
8   A.   Correct.
9   Q.   Why is World Air Services figured
10  differently?
11  A.   I can't answer that question. I
12  don't know.
13  Q.   So for Aeroplex and Aviation Group
14  formulas, is there a salaried formula and
15  a union formula?
16  A.   There is.
17  Q.   Is there any other type of formula?
18  A.   No.
19  Q.   And for World Air employees, there's
20  a salaried and union. Is there any other
21  type of formula?
22  A.   No.
23  Q.   Do you know what these formulas are?

8 (Pages 29 to 32)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 33

1    A.    I can tell you basically.
2    Q.    Okay.  Since we're concerned with
3    salaried employees of World Air Services,
4    tell me about the formula for that.
5    A.    The formula for the salaried World
6    Air Services is the last five-year
7    earnings averaged, times one percent,
8    times years of service, less $6,600.  And
9    a hundred years ago that was social
10    security.  That was where that number came
11    from.
12    Q.    I see.
13    A.    Then the second part of the formula,
14    I think it's $120 times years of service.
15    I would have to look at the plan to tell
16    you, but I think that's correct.  And the
17    combination of the two is the amount of
18    the annual pension benefit.
19    Q.    That's the annual benefit?
20    A.    Yes.
21    Q.    And it's usually paid out monthly?
22    A.    Yes.  Then you divide twelve by that
23    to determine the monthly.  Now, that's

Page 34

1    what it is presently.
2    Q.    How long has this formula been in
3    place?
4    A.    A number of years.
5    Q.    Before 2001?
6    A.    I'm pretty sure before 2001.
7          MR. HOLMES:  What was the figure you
8    subtracted from the first part of the
9    formula, $6,600?
10         THE WITNESS:  Yes.
11         MR. HOLMES:  Thank you.
12    Q.    You said on the second part of the
13    formula it was $120 times years of
14    service?
15    A.    Correct.  But I said I think it's
16    $120.  I would have to look at the pension
17    plan to make sure that's correct.
18    Q.    I understand.
19    A.    It doesn't spell it out in either.
20    It's a table, and it's probably a table in
21    this.  Here is the formula for DSE, which
22    is Dothan salaried employee; and I bet
23    there's a table back here.  And it is

Page 35

1    $120.
2    Q.    Where do you see that?
3    A.    Right there.
4    Q.    Oh, okay.
5    A.    This describes just exactly what I
6    said.
7    Q.    And DSE stands for Dothan salaried
8    employee?
9    A.    Correct.
10    Q.    So if they retired after September
11    1, 1982, then the rate is $120?
12    A.    That's right.
13    Q.    If you need to refer to these at any
14    time, feel free, during the deposition.
15    For Dothan employees, Pemco bought a
16    company called Hayes Aircraft, sometime I
17    think in the 1970's, early 1980's?  I
18    don't have the exact date for that.  Do
19    those years with Hayes Aircraft count
20    toward the retirement plan that we've been
21    talking about here, in terms of the years
22    in service?
23    A.    I'm not clear on your question.

Page 36

1    Q.    Some employees in Dothan worked for
2    Hayes Aircraft before Pemco bought Hayes.
3    A.    That's correct.
4    Q.    Do the years in service with Hayes
5    count toward the years in service for the
6    Pemco retirement plan?
7    A.    Yes, they do.  Yes, they do.
8    Q.    If there is an interruption in
9    employment, for example, Roger Wright
10    worked approximately 1968 to 1972 for
11    Hayes Aircraft, and then came back in
12    1989.  Would that affect whether those
13    earlier years were counted as part of his
14    years in service?
15    A.    It could, yes.  There may not --
16    now, I don't know this for a fact.  There
17    may not have been a plan during those
18    early years, because Pemco World Air
19    Service did not have a pension plan until,
20    I'm guessing, somewhere around the
21    seventies.
22    Q.    Okay.
23    A.    So there may not have been a pension

9  (Pages 33 to 36)

## FREEDOM COURT REPORTING

| | |
|---|---|
| Page 37 | Page 39 |

Page 37

1 for the Pemco World Air Services.
2 **Q.  I'm going to show you a document**
3 **that was produced to us by Pemco, and that**
4 **is Bates stamped page 291.  It is not a**
5 **chart that is labeled, except it states**
6 **"original date of hire" in this column in**
7 **the middle.  I'm on page 272.  If you flip**
8 **back to 291 and find Roger Wright, his**
9 **date of hire is February 13, 1989?**
10 A.   Yes.
11 **Q.   Let me ask you, first of all, is**
12 **this a document that would have come from**
13 **your office?**
14 A.   No.
15 **Q.   Are your computer records integrated**
16 **to the extent that this is the official**
17 **hire date for purposes of the pension, as**
18 **well as for all other purposes?  Do you**
19 **understand my question?**
20 A.   Yes.
21 **Q.   Is this the official hire date?**
22 A.   That is the official hire date, yes.
23 **Q.   And would that also be the official**

Page 38

1 **hire date for pension benefits as well?**
2 A.   Not necessarily.
3 **Q.   Okay.  Tell me.**
4 A.   If an employee is vested in a
5 benefit and leaves the company, he has a
6 benefit saved at that point.  If he
7 returns, then it starts again with a new
8 benefit.
9 **Q.   Does the prior time count as years**
10 **in service, though?**
11 A.   Back years ago it took ten years to
12 be vested, and it's possible that those
13 years of service were not calculated.  Or
14 as I said before, there may not have been
15 a plan during those years.
16 **Q.   And you can't be vested unless**
17 **there's a plan?**
18 A.   Exactly.
19 **Q.   And would they have gone back, when**
20 **they instituted the plan, to count the**
21 **years in service for years worked prior to**
22 **the plan?**
23 A.   I don't know.  I don't know whether

Page 39

1 they were given credit or not.  You mean
2 when the plan was established, a new plan?
3 **Q.   Yes.**
4 A.   I don't know.  I can't answer that
5 question, because I'm not sure.
6 **Q.   And I realize we're stretching back**
7 **a number of years.**
8 A.   Exactly.
9 **Q.   But you believe that the plan was**
10 **started in the 1970's?**
11 A.   I'm pretty sure that the Dothan plan
12 was -- well, Dothan wasn't established
13 until the seventies, period.  There was no
14 Pemco World Air Services or Hayes
15 International until the seventies, I'm
16 just about positive; because a lot of the
17 people, I know, were moved from the
18 Birmingham facility to Dothan when it was
19 opened.  So there was not a plan.
20 **Q.   Okay.  So even the plan that was**
21 **started whenever, in the 1970s, it took**
22 **ten years to vest anyway?**
23 A.   Exactly.  I cannot remember what

Page 40

1 year ERISA changed it from ten years to
2 five.  I'm not positive about it.
3 **Q.   I understand.  That was going to be**
4 **my next question.  What is the vesting**
5 **period now?**
6 A.   Five.
7 **Q.   And how long has it been five years?**
8 A.   I don't know.
9 **Q.   Quite awhile?**
10 A.   Yes.
11 **Q.   And that was due to a change in**
12 **ERISA?**
13 A.   Yes.
14    (Off-the-record discussion.)
15    (Whereupon, at this time a short
16 break was taken.)
17 **Q.   Ms. Tindle, what is the name of your**
18 **department?**
19 A.   Corporate Services.
20 **Q.   And you're the department head?**
21 A.   Yes.
22 **Q.   Do you attend board meetings or give**
23 **any reports directly to the board?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 41

1  A.   No.
2  Q.   Do you provide any information to
3  Randy Shealey so he can prepare reports to
4  give to the board?
5  A.   Yes.
6  Q.   What kind of information does he
7  normally ask of you?
8  A.   Insurance premiums we've paid.
9  That's about it.  That's the only thing I
10  can think of.  That doesn't mean he
11  doesn't ask me for other things.  That's
12  the only thing I can think of
13  specifically.
14  Q.   On a routine basis?
15  A.   On routine, yes.
16  Q.   Is administration of the health
17  insurance, disability, life insurance
18  plan, is that also within your department?
19  A.   The "administration" meaning?
20  Q.   You know, signing people up for
21  health insurance and cover notices.
22  A.   No.  That's done in your HR
23  departments.

Page 42

1  Q.   Do you have any responsibility for
2  life insurance premiums, disability
3  insurance premiums, anything like that?
4  A.   Other than the negotiation of prices
5  that the insurance companies charge us.
6  Q.   And that's your responsibility to
7  negotiate those prices?
8  A.   Yes.
9  Q.   The cafeteria plan, is that what it
10  is?
11  A.   No.
12  Q.   What kind of plan is it?
13  A.   They are all separate.  We have a
14  life insurance; we have short-term
15  disability; we have health insurance.
16  Q.   And is World Air Services included
17  in all those different plans?
18  A.   Yes.
19  Q.   And do they have a separate, for
20  example, life insurance plan from what
21  Aeroplex employees have?
22  A.   No, same.
23  Q.   What about Aviation Group employees?

Page 43

1  A.   The same.
2  Q.   So everybody is under the same life
3  insurance plan?
4  A.   Correct.
5  Q.   Is everybody under the same
6  short-term disability plan?
7  A.   Yes.
8  Q.   And same health insurance plan?
9  A.   Yes.
10  Q.   How often do you have to renegotiate
11  these plans?
12  A.   We usually get bids about every two
13  to three years.
14  Q.   Do you end up changing that often?
15  A.   Not necessarily.  No, we don't
16  change that often.
17  Q.   Is that something that every two to
18  three years you just go ahead and do that
19  on your own, or is that something that
20  you're tasked with by Randy Shealey or
21  someone else?
22  A.   I do it on my own.
23  Q.   Do you do any type of negotiating

Page 44

1  with anyone concerning the pension plan?
2  A.   No.
3  Q.   I wouldn't think so.
4  A.   No.
5  Q.   That's not the same type of service
6  at all; is it?
7  A.   Right.
8  Q.   Who manages these other benefits,
9  such as the life insurance, health
10  insurance?
11  A.   Presently, it's Prudential.
12  Q.   I'm sorry.  I don't think my
13  question was clear.  Is that HR that
14  manages those aspects of those plans?
15  A.   "Managing," meaning what?
16  Q.   As I said, administering plans.
17  A.   Yes.  As far as signing someone up?
18  A.   Yes.
19  A.   Yes.
20  Q.   And providing them copies of
21  whatever information they need?
22  A.   Yes.
23  Q.   And all of that is done through HR?

11 (Pages 41 to 44)

# FREEDOM COURT REPORTING

| | |
|---|---|
| Page 45 | Page 47 |

**Page 45**

1 A. Yes.

2 Q. And for World Air Services, that
3 would be HR in Dothan?

4 A. Yes.

5 Q. Is there anyone in the Aviation
6 Group office that is tasked with
7 overseeing these other benefit plans?

8 A. "Overseeing," meaning?

9 Q. Just general supervision of them, to
10 your knowledge.

11 A. Well, the senior management, when
12 there's negotiations done, they review the
13 quotes. Collectively a decision is made
14 of which company we use.

15 Q. And who would make that decision?

16 A. Collectively. It's several people
17 involved; the CFO, the CEO, myself.

18 Q. That's not a board level decision?

19 A. Not usually.

20 Q. Do you play a role in preparation of
21 the annual reports?

22 A. Annual reports? What annual
23 reports?

**Page 46**

1 Q. For the corporation, the whole group
2 itself.

3 A. No.

4 Q. Does Randy Shealey ask you for any
5 particular information for preparation of
6 annual reports?

7 A. If he does, I can't tell you what it
8 is, because I don't know.

9 Q. It's not something that you go
10 through every year?

11 A. No.

12 Q. Who puts all that together as far as
13 the annual reports? I assume Randy
14 Shealey does.

15 A. Yes.

16 Q. Who assists him with that?

17 A. I'm sure that our CPA firm, Grant,
18 Thornton, plays a major role in it.

19 Q. Do you provide any regular reporting
20 on the pension plan to Randy or to board
21 members or to anyone else?

22 A. What kind of reports? There's no
23 reports -- the actuary provides reports,

**Page 47**

1 and that would be Mass Mutual; benefit
2 payments made, the balance in the pension
3 plan, that sort of thing.

4 Q. Do they ever look at the workforce
5 and project into the future what next
6 year's liability may be?

7 A. Yes.

8 Q. And who would have a copy of these
9 reports?

10 A. Probably Randy Shealey.

11 MS. GLASGOW: John, do you have
12 those, by any chance?

13 MR. HOLMES: What I have would be
14 something like this, which we produced;
15 but as far as a separate report from the
16 actuarials, I don't.

17 MS. GLASGOW: What you were pointing
18 to, what is the Bates page number?

19 MR. HOLMES: 224.

20 MS. GLASGOW: Let me just ask
21 Ms. Tindle.

22 Q. Could you take a look at document
23 224? Is that a document that is prepared

**Page 48**

1 by Pemco, to your knowledge? Do you know
2 what that document is?

3 A. This document probably is prepared
4 by Pemco, based on actuarial information
5 received from Mass Mutual, I would think.

6 Q. I see.

7 A. But I didn't prepare it, so I don't
8 know for sure.

9 Q. Do you know who did prepare it?

10 A. Probably Randy Shealey.

11 Q. How far back do those Mass Mutual
12 reports go; do you know?

13 A. There would only be an annual
14 report. They do an actual report
15 annually.

16 Q. Do you know if Randy keeps it for
17 previous years?

18 A. I don't know.

19 Q. Any other information on those
20 reports besides the benefit payments, the
21 balance, the projections?

22 A. I don't know without having one in
23 front of me.

12 (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1  Q.  I understand.  Anything else that
2  you can recall that is included within
3  those reports?
4  A.  No.
5  Q.  What time of year do those reports
6  usually come out?
7  A.  It varies.  Usually anywhere from
8  July to October time frame.
9  Q.  What is your fiscal year?
10  A.  We're on a calendar year.
11  Q.  Is there any reason why these
12  reports come out sometime between July and
13  October?
14  A.  I don't know why.
15  Q.  And how long did you say Mass Mutual
16  has been your actuary?
17  A.  I think since 2002, I think.
18  Q.  Ms. Tindle, we asked for and have
19  been given a number of documents for
20  purposes of this litigation.  Have you
21  played any role in the preparation of any
22  of these documents and getting them to Mr.
23  Holmes?

Page 50

1  A.  Either directly or indirectly, yes.
2  Q.  Do you know which documents you had
3  a hand in the preparation of?
4  A.  I probably had to have copied the
5  pension plan.  I probably had to have
6  copied the summary plan description.
7  Q.  Anything else as far as charts and
8  lists of names, that sort of thing?
9  A.  That, that came from my office, yes,
10  that address list.
11  (Whereupon, Plaintiff's Exhibit
12  Number 3 was marked for identification, a
13  copy of which is attached to the original
14  of the transcript.)
15  Q.  And you are pointing at Plaintiff's
16  Exhibit Number 3; is that right?
17  A.  Correct.
18  Q.  That came from your office?
19  A.  Yes.
20  Q.  And that's Bates stamp 758, 759, and
21  761.  Anything else that you can recall
22  preparing?
23  MR. HOLMES: Libby, she's pointing

Page 51

1  to Plaintiff's Exhibit 2.
2  MS. GLASGOW:  Okay.
3  A.  That came from my office.
4  MR. HOLMES:  There is also the prior
5  retiree list that we provided, Bates 658
6  through 666.
7  (Whereupon, Plaintiff's Exhibit
8  Number 4 was marked for identification, a
9  copy of which is attached to the original
10  of the transcript.)
11  Q.  Ms. Tindle, let me show you what has
12  been marked as Exhibit Number 4.
13  A.  That did come from my office, yes.
14  Q.  Read those Bates numbers for me,
15  please.
16  A.  00658.
17  Q.  Through?
18  A.  666.
19  Q.  What is this list?
20  A.  That's a list of all retirees.
21  Q.  In the system?
22  A.  In the system.
23  Q.  And that is not broken down into

Page 52

1  World Air versus Aeroplex?
2  A.  No, it is not.
3  Q.  It's for everybody?
4  A.  Yes.
5  MR. HOLMES:  From 2001.  It doesn't
6  predate 2001.
7  A.  2001 through 2007.
8  Q.  So it's not a complete list of
9  everyone in the system?
10  MR. HOLMES:  No.
11  A.  No, it is not.
12  Q.  It's just those who retired from
13  January 2001 to the present?
14  A.  Correct.
15  Q.  And the last date is on June 30,
16  '07?
17  A.  That's right.
18  Q.  Any other documents that you had a
19  hand in preparing, Ms. Tindle?
20  MR. HOLMES:  224, what I identified.
21  (Whereupon, Plaintiff's Exhibit
22  Number 5 was marked for identification, a
23  copy of which is attached to the original

13  (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  of the transcript.)
2  Q.   Let me show you what has been marked
3  as Plaintiff's Exhibit Number 5, which is
4  Bates stamped 224.  What is this document?
5  A.   I had no part of the preparation of
6  this.  That did not come from my office.
7  Q.   Do you know who did prepare it?
8  A.   Randy Shealey.
9  Q.   And how do you know he prepared it?
10  A.   I don't know that for a fact, but I
11  assume that he did.
12  Q.   Since it's under accounting
13  standards?
14  A.   Exactly.
15       (Whereupon, Plaintiff's Exhibit
16  Number 6 was marked for identification, a
17  copy of which is attached to the original
18  of the transcript.)
19  Q.   Let me show you what has been marked
20  as Exhibit Number 6, which is Bates
21  stamped what?
22  A.   657.
23  Q.   Do you recognize that document?

Page 54

1  A.   Yes.  I prepared this.
2  Q.   And what is that document?
3  A.   That is the benefits payments made
4  to retirees by year.
5  Q.   When the checks are issued, do they
6  actually come from Pemco Aeroplex?
7  A.   No.  They come from Mass Mutual.
8  Q.   And what did you look at in order to
9  prepare this Exhibit Number 6?
10  A.   They give us a list of the total
11  payments made that year.
12  Q.   Is that information that you
13  specifically request from Mass Mutual, or
14  was that on a report that you already had?
15  A.   It was on a report I already had.
16  Q.   And was that the same reports that
17  we talked about earlier?
18  A.   I don't know.
19  Q.   I thought you told me that Mass
20  Mutual sent out an annual report sometime
21  between July and October every year.
22  A.   No, that is a different report.
23  This is a benefit payment report.  It is

Page 55

1  the total of the benefits paid and a
2  listing of employees, and how much each
3  individual got a check for.
4  Q.   And how often do you get a benefits
5  payment report from Mass Mutual?
6  A.   Once a month, because the benefits
7  payments are made once a month.
8  Q.   So the contributions that are made
9  by Pemco Aeroplex into the plan are paid
10  to Mass Mutual; is that right?
11  A.   That's correct.
12  Q.   And then Mass Mutual distributes the
13  funds, invests the funds according to the
14  plan?
15  A.   Right.
16  Q.   But Mass Mutual doesn't make any
17  decisions as far as where the funds are
18  actually invested?
19  A.   No.
20       (Whereupon, Plaintiff's Exhibit
21  Number 7 was marked for identification, a
22  copy of which is attached to the original
23  of the transcript.)

Page 56

1  Q.   Ms. Tindle, let me show you what has
2  been marked as Exhibit Number 7.  Can you
3  read the Bates number on that for me,
4  please?
5  A.   226, 234.
6  Q.   Do you recognize this document?
7  A.   No.
8  Q.   That's not something that you
9  prepared?
10  A.   No, I did not.
11  Q.   Are there any other documents that
12  you assisted in the preparation of for
13  purposes of this litigation?
14  A.   Not that I'm aware of.
15       (Whereupon, at this time a lunch
16  break was taken.)
17  Q.   Ms. Tindle, do you have any
18  responsibility for preparing the 5500
19  reports?
20  A.   Indirectly.  Our auditors, Grant,
21  Thornton, prepare the reports; but we
22  provide the information, certain ones of
23  them.

14  (Pages 53 to 56)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  Q.   What information do you normally put
2  together for them?
3  A.   The 5500 asks for head counts,
4  contributions, payments made.  We provide
5  whatever that is for certain of the
6  reports.  Now, Mass Mutual provides the
7  5500's for the pension plan.
8  Q.   Do you play any role in the
9  preparation of that report, providing
10  information to Mass Mutual?
11  A.   No.  They have the information.
12  Q.   Do you have any responsibility for
13  making sure that those 5500 reports get
14  filed?
15  A.   Yes.
16  Q.   How do you keep that on task?
17  A.   I just know the deadline.  If they
18  haven't provided it, I bug them until they
19  do.
20  Q.   What is the deadline for you all?
21  A.   The extension is October 15th.
22  That's the final date, and that's usually
23  when we file.

Page 58

1  Q.   And that's an annual report;
2  correct?
3  A.   Correct.
4  Q.   About how much in advance do you
5  start bugging Mass Mutual to get it done?
6  A.   This time of the year, about August.
7  Q.   Who receives copies of the 5500
8  reports within your company?
9  A.   Receives them?
10  Q.   Yes.
11  A.   They're just maintained in a file.
12  Q.   Is that something that is maintained
13  in your office?
14  A.   Yes.
15  Q.   How far back do you have those 5500
16  reports?
17  A.   I have no idea.
18  Q.   Years?
19  A.   Several years, yes.
20  Q.   Further than 2001?
21  A.   I don't know.  Without looking, I
22  don't know.
23  Q.   It's been a requirement, though, to

Page 59

1  file those forms?
2  A.   For a number of years, yes.
3  Q.   Is there a summary annual report
4  done on the pension plan?
5  A.   Yes.
6  Q.   Who does that?
7  A.   I do, based off the information that
8  Mass Mutual provides us.  I mean, they
9  actually do it with the numbers.  All we
10  do is put our -- put it on our letterhead.
11  Q.   Who is that then distributed to?
12  A.   All retirees, all vested employees,
13  all active employees in the case of the
14  pension plan.
15  Q.   And are copies kept of the summary
16  annual reports?
17  A.   Yes.
18  Q.   Would, like, an employee of World
19  Air Services get the same annual report as
20  an employee of Aeroplex?
21  A.   Yes.
22  Q.   So it wouldn't matter if they were
23  salaried or union, or which formula?

Page 60

1  A.   No.
2  Q.   They all get the same summary annual
3  report?
4  A.   Right.
5  Q.   Do you have copies of the past years
6  for the summary annual report?
7  A.   I have some, yes.
8  Q.   Going back to 2001?
9  A.   I don't know.
10  Q.   What kind of information is in that
11  summary annual report?
12  A.   It just tells where the pension plan
13  is, the status of the pension plan; the
14  funding, the assets, the liabilities.
15  Q.   And when is that usually sent out?
16  A.   October, November.
17  Q.   Is there a deadline for that?
18  A.   December.
19  Q.   It has to be sent out every calendar
20  year?
21  A.   Correct.
22  Q.   Are you familiar with a letter of
23  determination from the IRS?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1  A.   Yes.
2  Q.   How often is that given?
3  A.   Just one time, unless you restate
4  the plan.
5  Q.   Do you have that letter of
6  determination from the IRS?
7  A.   Yes.
8  Q.   For this pension plan we've been
9  talking about?
10  A.   Yes.
11  Q.   And do you know when that was
12  issued?
13  A.   No.
14  Q.   What is the letter of determination?
15  A.   It just says that the IRS has
16  approved it as a qualified plan.
17  Q.   In going back to Exhibit Number 2
18  and the contributions made by Pemco, for
19  example in 2001 they made a contribution
20  of $3,000,000?
21  A.   Correct.
22  Q.   Is that money that comes out of
23  profit for that year?

Page 62

1  A.   It comes out of the funds, the
2  corporation funds, yes.
3  Q.   Is there an account that is set up
4  to deposit those funds so they can be
5  transferred into the pension contribution?
6  A.   No, not a separate account.  No.
7  Q.   Does it just come out of general
8  funds?
9  A.   General funds, yes.
10  Q.   Are you aware of any years in which
11  Pemco had to borrow to make their pension
12  contributions?
13  A.   No.  I'm not aware of any year.
14  Q.   Is that something that you would
15  have been aware of?
16  A.   Possibly, but maybe not.
17  Q.   To your knowledge, they've never had
18  to borrow to make the pension
19  contributions?
20  A.   To my knowledge, no.
21  Q.   Do you yourself project the number
22  of employees that will be entering the
23  retirement system in the future?

Page 63

1  A.   No.
2  Q.   Is that something that Mass Mutual
3  does?
4  A.   Yes.
5  Q.   Are you aware of how they make those
6  projections?
7  A.   No.
8  Q.   That's completely outside of your
9  job responsibilities?
10  A.   I'm not an actuary.
11  Q.   In determining those projections, do
12  they ask you for information such as
13  turnover rates, extraordinary business
14  circumstances, anything like that, to your
15  knowledge?
16  A.   No.
17  Q.   And the basic information that you
18  provide them is the employees that are
19  retiring that year and their hire date,
20  and that sort of status, for those
21  employees that retired in that year; is
22  that right?
23  A.   Yes.

Page 64

1  Q.   Is there any other information that
2  you provide to Mass Mutual to allow them
3  to make projections into the future?
4  A.   Yes, their birth date.
5  Q.   Anything else other than that?
6  A.   Years of service; hire date, which
7  would calculate the years of service.
8  Q.   But you're doing that for the
9  employees who retired during that calendar
10  year, not for all employees; correct?
11  A.   Everybody.
12  Q.   Oh, for all employees?
13  A.   All employees.
14  Q.   Regardless of whether an employee in
15  Dothan, in Birmingham, or for any
16  corporation, you give them all that
17  information every year?
18  A.   Yes, we do, once a year.
19  Q.   Do you keep copies of the
20  information that you provide to Mass
21  Mutual?
22  A.   Yes.
23  Q.   And how far back do you keep those

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 65

1  copies?
2  A.   I can't tell you how many years I
3  have. I don't know.
4  Q.   Going back to at least 2001?
5  A.   Probably.
6  Q.   When do you usually provide that
7  information to Mass Mutual?
8  A.   As soon after the end of the year as
9  possible. Most of the time it's probably
10  mid-February before it can be sent.
11  Q.   Is that part of your process of
12  closing out the books for the year and
13  sending that on?
14  A.   Yes, it is.
15  Q.   And is that why you needed the new
16  computer program, so that you could store
17  all that data?
18  A.   That's correct.
19  Q.   And that would make the transfer
20  fairly easy to Mass Mutual; is that right?
21  I mean, to transfer that information?
22  A.   Yes.
23  Q.   Do you send it by e-mail now?

Page 66

1  A.   No. The file is too big for that.
2  Q.   I see. Is it on a disk, or do you
3  print it out?
4  A.   It's on a disk.
5  Q.   How many employees does the whole
6  Pemco company have at present?
7  A.   Active employees; is that what
8  you're referring to?
9  Q.   Yes, not retired.
10  A.   Probably less than 1,000, but I
11  don't know that for a fact. There may be
12  1,000, but I'm not sure.
13  Q.   It's around that figure, as far as
14  you're aware?
15  A.   Yes. I would say somewhere around
16  that figure, yes.
17  Q.   Would it be difficult to find that
18  information to get a head count?
19  A.   No, it would not be difficult.
20  Q.   Is the pension plan contribution
21  budgeted?
22  A.   I'm sure that it is. I have nothing
23  to do with the budgets, so I don't know.

Page 67

1  Q.   And who does; is that Randy Shealey?
2  A.   Yes.
3  Q.   And I think you told me that it's
4  not put into a separate account, but is
5  money kind of set aside on a monthly basis
6  for the pension?
7  A.   No.
8  Q.   Do you have any responsibility for
9  determining the amount of the
10  contribution?
11  A.   No.
12  Q.   How do you arrive at a figure?
13  A.   From the actuary.
14  Q.   And Mass Mutual gives you that
15  figure each year?
16  A.   Yes, they do.
17  Q.   And do they give it to you in
18  advance?
19  A.   Yes.
20  Q.   At what point in the calendar year
21  would you receive that report from Mass
22  Mutual?
23  A.   Usually in the September-October

Page 68

1  time frame, because you have to start
2  funding for the current year in October;
3  so it's somewhere around that time.
4  Q.   So for 2007 you would get a report
5  from Mass Mutual saying "This is the
6  amount that you're going to need for
7  contributions for 2007"?
8  A.   Correct.
9  Q.   When would that report come to
10  Pemco?
11  A.   Sometime in the September time
12  frame, August-September.
13  Q.   Of '07?
14  A.   Of '07, for the next year.
15  Q.   For '08?
16  A.   Correct. No, it would be for '07.
17  Q.   I see.
18  A.   The pension funding for '07 begins
19  in October of '07.
20  Q.   And ends in December?
21  A.   And ends in September of '08, the
22  required funding.
23  Q.   So for example, the $3,000,000, the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 69

1  contribution for '01, sometime -- and I'm
2  not asking you to testify exactly what
3  happened in '01 -- but as an example, you
4  would get a report from Mass Mutual around
5  September or October of '01 saying that
6  $3,000,000 will be needed to be
7  contributed for the pension fund for '01?
8  A.   No, it would probably be in 2000.
9  Q.   So sometime in September-October of
10  2000 --
11  A.   Right.
12  Q.   -- you would get a report from Mass
13  Mutual that says $3,000,000 will be needed
14  to be contributed for '01?
15  A.   Correct.
16  Q.   And then it must be paid by when?
17  A.   There's various dates that are
18  required; and they are January, April,
19  July, September, and October. Now, in
20  this year there was only one requirement.
21  Q.   I see. And is this because the
22  regulations have now changed to require
23  more contributions?

Page 70

1  A.   Correct. Right.
2  Q.   So in the last quarter example of
3  2000, Mass Mutual would give you a
4  projection as to what the contribution
5  will be needed for '01?
6  A.   Yes.
7  Q.   And then do you ever -- I say you --
8  Pemco ever make contributions more
9  frequently than what is required by the
10  IRS or ERISA?
11  A.   Not usually, no.
12  Q.   You hit it on the required dates?
13  A.   Yes.
14  Q.   Does the IRS or ERISA require
15  specific percentages of the contribution
16  to be made at certain times? I notice the
17  amounts of the contributions are
18  different; it's not just the same amount
19  every time.
20  A.   I don't know. That is strictly an
21  actuarial calculation. I don't know. I
22  know that there are certain dates for
23  certain requirements of sums, but I don't

Page 71

1  know what percentage. I don't know that.
2  Q.   But it is a set percentage that is
3  required?
4  A.   I don't know that.
5  Q.   Fair enough. Are you aware of any
6  formula for determining how much the
7  contribution will be on a per-employee
8  basis?
9  A.   No.
10  Q.   Do you know how that is figured?
11  A.   No.
12  Q.   That is all Mass Mutual?
13  A.   Yes.
14  Q.   Has there ever been a situation
15  between 2001 and the present when Pemco
16  went back to Mass Mutual and said, "Look,
17  our circumstances have changed now; we
18  need to re-figure these contributions"?
19  A.   Not that I'm aware of.
20  Q.   Once Mass Mutual sets the amount of
21  contribution, that's it; is that right?
22  A.   As far as I know.
23  Q.   Who deals the most with Mass Mutual;

Page 72

1  is that you or Randy Shealey?
2  A.   Probably Randy for analytical type
3  stuff.
4  Q.   Would he be the better person to ask
5  these questions to?
6  A.   Probably, yes.
7  Q.   When there is a salaried employee
8  who is laid off but they have already been
9  vested in the retirement system, are they
10  normally eligible to receive their
11  retirement right away, or do they have to
12  wait until a certain age?
13  A.   Not necessarily. They have to wait
14  until a certain age.
15  Q.   And what is that age?
16  A.   55.
17  Q.   So anyone who is 55 and older can
18  begin receiving their retirement benefits
19  immediately?
20  A.   Yes, they can, if they choose to.
21  It's their decision.
22  Q.   Is it like social security, that you
23  get a lower amount?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 73

1  A.  Correct.
2  Q.  Do you have to have so many years in
3  service also?  I mean is it age 55 and so
4  many years in service?
5  A.  Yes, ten.  You mean to get it early;
6  is that the question?
7  Q.  Right.
8  A.  Okay.  Yes.
9  Q.  Do you have any idea what the
10  typical age is for retirement from Pemco?
11  A.  It varies.  It really does.
12  Q.  Are there additional benefits the
13  longer one is actively employed?
14  A.  Not additional benefits, no.  The
15  formula is still the same.
16  Q.  The formula does take into account
17  the years of service; correct?
18  A.  That's correct.
19  Q.  So the longer the years of service,
20  the greater the pension?
21  A.  Correct.
22  Q.  And that's in both step one of the
23  formula and step two?

Page 74

1  A.  Yes.
2  Q.  Is there some reporting form that
3  reports the amount of contributions?  I'm
4  thinking in terms of IRS reporting forms.
5  A.  No.
6  Q.  Are any of the board members
7  involved with the pension plan more than
8  others?
9  A.  I don't know.  I don't know who is
10  involved.
11  Q.  I think you told me you weren't sure
12  who was on that committee.
13  A.  That's correct.
14  Q.  Do you have many dealings with board
15  members?
16  A.  Very little.
17  Q.  I think I asked you; but you don't
18  have any responsibility for preparation of
19  tax records or income tax returns, that
20  sort of thing?
21  A.  No.
22  Q.  I think you told me that the HR
23  Department for World Air Services would be

Page 75

1  the one to handle the enrollment, et
2  cetera, for the other insurance policies,
3  the health insurance, life insurance, that
4  sort of thing?
5  A.  That's correct.
6  Q.  And if they were to need assistance
7  from you, would they call you or someone
8  in your department for assistance on some
9  of those things?
10  A.  Assistance how?
11  Q.  Well, if they had questions about a
12  particular insurance policy or how to do
13  the enrollment, or that sort of thing,
14  would they call you?
15  A.  Yes.
16  Q.  Or is there somebody else that they
17  would call?
18  A.  No, they would call me.
19  Q.  And you would provide that
20  information to them on request?
21  A.  Right.
22  Q.  And that's part of your job?
23  A.  Right.  That's correct.

Page 76

1  Q.  To be a resource for them?
2  A.  Right.
3  Q.  And you would do that for Pemco
4  Aeroplex, Pemco World Air Services, Pemco
5  Aviation, whatever it is?
6  A.  That's correct.
7  Q.  Do you have any responsibility for
8  being part of the preparation of the
9  business plan at all?
10  A.  No.
11  Q.  I know there's no president now for
12  World Air Services, but Ray Bennett was
13  the president of World Air Services from
14  2005.  Did you have any direct dealings
15  with him?
16  A.  From time to time.  Not on a regular
17  basis, no.
18  Q.  Would he request information from
19  you?
20  A.  Yes.
21  Q.  What kind of information would he
22  request?
23  A.  I can't think of anything specific

19 (Pages 73 to 76)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 77

1   off the top of my head.  He might request
2   a list of employees, you know.  I can't
3   think of anything specific.
4   **Q.    But on occasion he would call you?**
5   A.    He might, yes.
6   **Q.    And Frank Tucci, did he also call**
7   **you from time to time?**
8   A.    He could have, yes.
9   **Q.    Do you know Dennis Johnson?**
10  A.    Yes.
11  **Q.    Has he ever called you asking for**
12  **any help or information of any kind?**
13  A.    No.
14  **Q.    Have you ever met him?**
15  A.    No.
16  **Q.    Have you ever talked to him on the**
17  **phone?**
18  A.    Yes.
19  **Q.    Do you recall the reason why you**
20  **talked to him on the phone?**
21  A.    No.  No, I don't.
22  **Q.    But you've never met him**
23  **face-to-face?**

Page 78

1   A.    No.
2   **Q.    Has he ever requested information**
3   **from you, either directly or indirectly?**
4   A.    No.
5   **Q.    Or through e-mail, or something like**
6   **that?**
7   A.    No.
8   **Q.    I understand Ron Aramini has been**
9   **involved with World Air Services.  Has he**
10  **requested any particular information from**
11  **you for World Air Services?**
12  A.    Not that I can recall, no.
13  **Q.    There were a number of layoffs that**
14  **occurred at World Air Services in 2005.**
15  **assume that information was given to you**
16  **at some time?**
17  A.    Right.
18  **Q.    What information was given to you,**
19  **in terms of the layoffs?**
20  A.    I wouldn't have necessarily known
21  that they were laid off; but at the end of
22  the year when we have to prepare the data
23  to go to Mass Mutual, we would have had to

Page 79

1   have pulled that information to record
2   that on the individual employee.
3   **Q.    So at least by the end of the year,**
4   **you would have pulled that information?**
5   A.    Yes.
6   **Q.    And how would you have pulled that?**
7   **Is that on the computer system, or would**
8   **you request it?**
9   A.    Yes, it is on the computer system.
10  **Q.    You did not have to request it from**
11  **someone in Dothan?**
12  A.    No.
13  **Q.    How were you first made aware of the**
14  **layoffs in 2005?**
15  A.    I don't remember.
16  **Q.    Was there any formal meeting or**
17  **anything like that?**
18  A.    Not that I'm aware of.  I wasn't
19  involved.
20  **Q.    It didn't affect you in any way?**
21  A.    No.
22  **Q.    So from your perspective, the change**
23  **would not have really affected what you do**

Page 80

1   **until the end of the year when you had to**
2   **make that report to Mass Mutual?**
3   A.    That's correct.
4   **Q.    And are you aware, during that time**
5   **frame, of anyone going to Mass Mutual and**
6   **asking them whether the same contributions**
7   **had to be made to the pension plan?**
8   A.    The contribution is already set, so
9   there would be no change.
10  **Q.    So with the layoffs of 2005, the**
11  **contributions for 2005 would be made by**
12  **the end of the year; correct?**
13  A.    Correct.
14  **Q.    And that contribution would be based**
15  **on the numbers determined by Mass Mutual**
16  **in 2004?**
17  A.    Correct.
18  **Q.    So the first effect on the pension,**
19  **then, would not come until 2006; is that**
20  **right?**
21  A.    There wouldn't be any effect on the
22  pension.
23  **Q.    Why is that?**

20 (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1   A.  Because if you froze the entire
2 pension plan, it would take five to ten
3 years before the pension contribution
4 requirement would drop. You've got all of
5 these active people who are vested, and it
6 would not change the pension contribution
7 at all.
8   Q.  **Well, let me ask you this. Isn't**
9 **the contribution determined by the number**
10 **of employees?**
11   A.  It's determined by the number of
12 employees, yes. But in the case of a
13 layoff, they're still a part of that
14 calculation, because those that are vested
15 are still entitled to a benefit.
16   Q.  **If they are vested?**
17   A.  That's correct.
18   Q.  **And if they were not vested, then**
19 **they would not be entitled?**
20   A.  They would not be entitled then, but
21 you would keep their record; because if
22 they returned, then they would still be
23 entitled. So it's still part of the

Page 82

1 formula of calculation to determine what
2 contributions you make. So you don't lose
3 that data. You don't just throw that data
4 away.
5   Q.  **Right, I understand. I think you**
6 **told me that if they come back after a**
7 **period of time, they keep those years in**
8 **service?**
9   A.  That's exactly right, so it doesn't
10 affect the pension contribution at all.
11   Q.  **But there's no pension liability for**
12 **an employee who is not vested?**
13   A.  There is a pension liability
14 recorded for an employee who is not
15 vested, yes. You begin reporting a
16 pension liability on day one of
17 employment, with the potential that they
18 would then become vested. You've got to
19 calculate those people in your formula.
20   Q.  **Right. But if they are terminated**
21 **before they're vested, and they don't**
22 **return to the company, there is no**
23 **pension --**

Page 83

1   A.  There is no pension benefit; that is
2 correct.
3   Q.  **-- liability for that?**
4   A.  That is true.
5   Q.  **You don't have any responsibility**
6 **for family medical leave; correct?**
7   A.  No.
8   Q.  **That's HR?**
9   A.  Yes.
10   Q.  **About how many employees are added**
11 **to the retirement system every year; does**
12 **it vary much?**
13   A.  It varies depending on the workload
14 at various facilities.
15   Q.  **You don't get a general, you know,**
16 **so many, or a certain percentage every**
17 **year retire?**
18   A.  If you've got a lot of aircraft,
19 you're going to have more employees, and
20 they're going to be added. If you have
21 fewer aircraft from customers, then you're
22 not going to have as many employees.
23 That's a hard question to answer,

Page 84

1 particularly in our industry, because
2 employment is up and down.
3   Q.  **But as far as people actually**
4 **retiring and receiving benefits, is there**
5 **any particular trend that you see?**
6   A.  No.
7   Q.  **As far as a percentage, or anything**
8 **like that?**
9   A.  No.
10   Q.  **Is there an account balance for each**
11 **retiree?**
12   A.  No.
13   Q.  **Now, Pemco has a 401-K?**
14   A.  They do.
15   Q.  **And is that in addition to this**
16 **pension plan?**
17   A.  That's in addition to.
18   Q.  **And when did they first start**
19 **offering that?**
20   A.  I'm not positive, but I'm thinking
21 the late eighties. It may have been the
22 early nineties.
23   Q.  **It's been around for a while,**

21 (Pages 81 to 84)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 85

1 though?
2 A.   Yes.
3 Q.   Has the plan -- I'm talking about
4 the pension benefit plan -- has that been
5 amended at all in the last six years?
6 A.   Probably for contract,
7 union-negotiated contract reasons, and/or
8 IRS reasons; but nothing other than that,
9 that I can think of.
10 Q.   Do you have on file copies of the
11 old plans, before these amendments?
12 A.   Yes.
13 Q.   Do you recall when these amendments
14 occurred?
15 A.   No.
16 Q.   Is it every year; did they amend it
17 every year?
18 A.   There could be a tax change, and
19 there is an amendment every year.  There
20 may be years when there's not any at all.
21 Q.   When there's an amendment to the
22 plan, how does that affect people who are
23 still actively employed?  Does it affect

Page 86

1 them at all?
2 A.   It depends on what the amendment is.
3 No, it wouldn't affect them unless you're
4 changing the formula for calculating the
5 pension.
6 Q.   That was not a very clear question.
7 I think what I really wanted to ask was,
8 when an employee retires, is the plan then
9 set in stone for that employee?  For
10 example, Roger Wright who retired and
11 started receiving benefits in 2005, okay,
12 is the plan that was in effect at that
13 time the one that he has to go by from
14 here on?
15 A.   Yes.
16 Q.   So if an amendment was made in 2006
17 or 2007, it would not apply to him,
18 because he is already retired as of 2005?
19 A.   That's correct.
20 Q.   The pension plan that has been
21 provided here, this says January 2002.
22 Have there been any other amendments, that
23 you're aware of, since then?

Page 87

1 A.   There have been some tax amendments,
2 I know, yes.  There have not been any
3 formula amendments, no.
4 Q.   Do you have a copy of the plan and
5 the summary plan description for the
6 retirement that was in effect at the time
7 Roger Wright began to receive pension
8 benefits?
9 A.   In 2005?
10 Q.   In 2005.
11 A.   This is the plan.
12 Q.   That's it?
13 A.   That is the plan, yes.
14 Q.   But you think there may have been
15 IRS amendments to it after this?
16 A.   But it would not have affected his
17 pension benefit.
18 Q.   What would it have affected?
19 A.   It would not have affected anything
20 as far as he's concerned.
21 Q.   But what would --
22 A.   Because I know of no changes that
23 were made to the Dothan salaried plan.

Page 88

1 Q.   Give me an example of what the
2 amendment would be.
3 A.   There may be an amendment for --
4 seems like we had a union contract in
5 Dothan in 2004.  Do you know?
6    MR. HOLMES:  A change in 2005.
7 A.   And that would be an amendment, but
8 it would not affect him at all because he
9 was not a Dothan union employee.
10 Q.   Right, I understand that.
11 A.   There have been no changes to the
12 salaried plan.
13 Q.   What I'm trying to figure out is, is
14 this the plan that Roger Wright's benefits
15 are controlled by?
16 A.   Yes.
17 Q.   Or are there some amendments that
18 have been changed, and this is not the
19 effective plan for him?
20 A.   That is the plan that affects him.
21    (Off-the-record discussion.)
22 Q.   Do you have to file copies of the
23 plan with the IRS or with the SEC?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 89

1    A.   With the IRS, in order to get a
2    determination letter.
3    Q.   And if there are amendments made to
4    the plan after that time, is that also
5    filed with the IRS?
6    A.   If it's directly related to taxes,
7    no.  If it's a change in the way in which
8    we calculate the pension, then yes; and
9    there haven't been.
10   Q.   So you've only had the one letter of
11   determination?
12   A.   Right.
13   Q.   If you're going to change the way
14   you calculate the benefits, then you would
15   have to get a new letter of determination?
16   A.   That's correct.
17   Q.   How far out does Mass Mutual project
18   the pension liability for future years?
19   A.   I don't know.  I don't know.
20   Q.   On the reports that you've seen, how
21   far out did they go?
22   A.   Most of the time, maybe three to
23   five years, and they may do a guesstimate

Page 90

1    based on a five or ten-year period.  I
2    think that form that I did not provide did
3    go up to 2012, right here.
4    Q.   And you're referring to Exhibit
5    Number 5?
6    A.   Yes.
7    Q.   And you had no part in the
8    preparation of this?
9    A.   No, I did not.
10   Q.   So in your database in your office,
11   you've got the name of all the employees,
12   their hire date; correct?
13   A.   Yes.
14   Q.   Years in service?
15   A.   Yes.
16   Q.   Date of birth?
17   A.   Yes.
18   Q.   And you would also have their
19   termination date; is that right?
20   A.   Correct, and their retire date.
21   Q.   And on your database, does it
22   indicate that they retired or were
23   otherwise terminated?

Page 91

1    A.   There is a difference, yes.
2    Q.   Does it have the reason for the
3    termination on there?
4    A.   No.
5    Q.   They were just terminated out of the
6    system, regardless of whether they quit or
7    were fired or laid off, or whatever?
8    A.   Right, it doesn't matter.
9    Q.   So you would have the date of the
10   termination there?
11   A.   Correct.
12   Q.   Do you also have their address in
13   that?
14   A.   Yes.
15   Q.   And I think you said you can
16   manipulate that data to prepare these kind
17   of charts based upon whatever information,
18   out of those fields, that we need?
19   A.   Correct.
20   Q.   So if I just wanted the names and
21   the ages, you could give me that?
22   A.   Correct.
23   Q.   Or if I wanted names, ages, hire

Page 92

1    dates, termination dates, you could give
2    me that?
3    A.   Correct.
4    Q.   And that's not hard to do?
5    A.   It may require some programming,
6    yes, because I'm not sure whether we have
7    a report that can be run exactly like
8    that; but I'm sure that we could get one.
9    Q.   If I wanted to get all the retirees
10   who retired in 2001, we could limit the
11   field for that?
12   A.   Yes.
13   Q.   And then in 2002?
14   A.   Yes.
15       MR. HOLMES:  Separate from what has
16   been provided today, that is organized by
17   date.
18       MS. GLASGOW:  Yes.  I'm just asking
19   about capabilities of the system.
20   Q.   Is Randy Shealey's office near
21   yours?
22   A.   Yes.
23   Q.   Are you all in the same area?

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  A.  We're in the same building, yes.
2  Q.  Do you recall any communications
3  directly with Roger Wright?
4  A.  No.
5  Q.  Do you know him?
6  A.  No.
7  Q.  Have you talked with any other
8  employees about him?
9  A.  No.
10  Q.  Do you all have any type of
11  personnel records in your office?
12  A.  We get the personnel files when
13  someone retires.
14  Q.  What do you do with that?
15  A.  We keep them.
16  Q.  You keep the hard copy?
17  A.  Yes.
18  Q.  Is that stored on-site?
19  A.  Yes.  Some of them are off-site.
20  Q.  How far back do you have on-site?
21  A.  Anybody that's retired presently.
22  Q.  And still alive?
23  A.  And still alive.

Page 94

1  Q.  Do you have any other personnel
2  records of active employees?
3  A.  No.  They're kept in Human
4  Resources.
5  Q.  You don't keep any separate files on
6  any active employees for any reason, like
7  I-9 forms, anything like that?
8  A.  No.
9  Q.  What about enrollment data?
10  A.  No.  That's in HR.
11  Q.  Do you keep any medical records of
12  any kind?
13  A.  No.
14  Q.  Does HR keep medical records, to
15  your knowledge?
16  A.  If there are any, yes, they would
17  keep them.
18  Q.  That would be an HR responsibility,
19  not yours?
20  A.  Correct.
21  Q.  Are you aware of any personnel
22  records, any employment contracts, that
23  are not kept in HR?

Page 95

1  A.  I'm not aware.
2  Q.  I mean, can you think of any reason
3  why Randy Shealey or anybody else would
4  have records on active employees that are
5  not in HR?
6  A.  I can think of no reason why they
7  would have them, no.
8  Q.  Do you have any information as to
9  whether Ray Bennett is vested in the
10  retirement system?
11  A.  I don't think he was with the
12  company long enough, but I don't know that
13  for a fact without looking.
14  Q.  So even a president would have to be
15  vested?
16  A.  Correct.
17  Q.  Or be there five years?
18  A.  Yes.  That has nothing to do with
19  the company.  That's the ERISA
20  regulations.
21  Q.  Right, I understand.  I have heard
22  from other testimony that payroll
23  deductions are made for the various

Page 96

1  insurance, health insurance, that sort of
2  thing.  Who handles that, as far as
3  deducting from payroll and then
4  transferring to insurance companies?
5  A.  The HR Department keys it into the
6  system; and then when the payroll is run,
7  it deducts whatever HR has keyed in.
8  Q.  And then is it your office that
9  would then take that money and forward it
10  to the insurance company?
11  A.  No.  It would be the Accounting
12  Department of the facility.
13  Q.  I see.  So World Air Services'
14  Accounting Department would take care of
15  that?
16  A.  Paying premiums, yes.
17  Q.  So it doesn't even go through your
18  office?
19  A.  No.
20  Q.  You said that you've got the
21  personnel files of all the employees that
22  have retired.  Do you add to those
23  personnel files in terms of maybe keeping

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  copies of the summary reports that are
2  sent in every year, or anything like that?
3  A.   No.
4  Q.   Does your office add any documents
5  to those personnel files?
6  A.   No.  Once the retirement papers are
7  done, that's all that is put in the file,
8  unless a retiree calls and gives us a
9  change of address or changes of
10 beneficiary, if there was a beneficiary
11 change to be made; and that would be put
12 in the file.  Other than that, no, not
13 anything else.
14 Q.   But you don't keep copies of
15 correspondence or anything like that in
16 their file?
17 A.   If there was correspondence written
18 pertaining to the pension plan, yes.
19 Q.   But not the summary report?
20 A.   No, that does not go in the file.
21 Q.   Ms. Tindle, I had requested copies
22 of personnel files from, for example,
23 Henry Ward.  Since he's retired, that

Page 98

1  would be from your office; is that right?
2  A.   I don't remember it coming from my
3  office, no.  That doesn't mean anything,
4  to be honest.
5  Q.   Take a look at that and see whose
6  office that would have come from.
7  A.   This probably did, because this is
8  retirement.  This is from the pension
9  system.  This probably did.  I don't
10 remember it.
11 Q.   Call out the page number.
12 A.   That's 559.  And that is showing
13 that he retired.
14 Q.   And that's from your database?
15 A.   Yes.  This is a payroll record on
16 560.  That could or could not have come
17 out of our --
18 Q.   Who else has access to that
19 database?
20 A.   The Payroll Department in Dothan,
21 and that's what this is.  This 561 is a
22 statement of earnings.  HR or Payroll
23 could have given this, 562, 563, 564, so

Page 99

1  I'm not sure who would have given it to
2  you.
3  Q.   What about this one?  Would that
4  have been from HR?
5  A.   Probably from HR, 565, 566, 567, if
6  they kept a copy of the HR file; 568, 569.
7  Q.   But you don't recall putting those
8  documents together?
9  A.   I do not recall getting these
10 documents together, no.
11 Q.   Would somebody else in your
12 department have done that?
13 A.   It's possible, but I do not recall
14 having anyone request Henry Ward's
15 personnel file, no.
16 Q.   Is it possible that these records
17 came from Dothan, and that you have a
18 personnel file on Henry Ward in your
19 office?
20 A.   It's possible.
21 Q.   And what about Roger Wright?  He is
22 also no longer with the company.  You
23 don't have to call out all the names for

Page 100

1  that, but look through that.
2  A.   Is this supposed to be his personnel
3  file?
4  Q.   Those are the documents that have
5  been produced to me.
6  A.   But I'm asking, is it supposed to be
7  the personnel file?  You don't know.
8  Q.   That's what I'm trying to find out.
9  I'm trying to find out if I have all the
10 documents and whether there are documents
11 that may be in your office that possibly
12 have not been produced.
13      MR. HOLMES:  Libby, we'll check.
14 A.   I don't recall making a copy of
15 Roger Wright's file that we have in our
16 office, no.
17      MR. HOLMES:  Libby, do you care if I
18 ask a question?
19      MS. GLASGOW:  No, go ahead.
20      MR. HOLMES:  Jackie, when you all
21 get copies of the personnel files of
22 retirees, do you know if the facility also
23 keeps a copy of the personnel file?

25  (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1    THE WITNESS: I don't know that for
2  a fact. The practice in Birmingham has
3  been once an employee retires, the
4  personnel file is maintained with the
5  retirement papers. Now, whether Dothan
6  keeps a copy of the file when they send it
7  to us for the retirement, I don't know.
8    MR. HOLMES: Thank you.
9  **Q. Do you get personnel files on all**
10 **terminated employees?**
11 A. No. Only those who retire.
12 **Q. So only those who are vested at the**
13 **time that they are terminated will come to**
14 **you?**
15 A. Correct.
16 **Q. Do you have a resume or curriculum**
17 **vitae or anything?**
18 A. No.
19 **Q. When an employee is terminated, how**
20 **is that information conveyed to you? What**
21 **is the process for doing that?**
22 A. They enter it into the system, and
23 that's how we know that they're

Page 102

1  terminated. The HR department does.
2  **Q. And the system is all networked, so**
3  **what they enter in Dothan, you see here in**
4  **Birmingham?**
5  A. Right.
6  **Q. Is there any particular report that**
7  **is prepared monthly, quarterly, or**
8  **anything like that?**
9  A. No.
10 **Q. Do you have any documents which**
11 **pertain to the layoffs that occurred in**
12 **Dothan in 2005?**
13 A. No, not that I know of.
14 **Q. Have you been part of any**
15 **investigation in terms of this lawsuit or**
16 **the allegations in the Complaint itself?**
17 A. No.
18 **Q. Do you have a job description? Is**
19 **there a job description for what you do?**
20 A. Yes.
21 **Q. And who would have that?**
22 A. It would be in HR.
23 **Q. Was there a director of corporate**

Page 103

1  **services before you?**
2  A. No.
3  **Q. So you're the only one that's ever**
4  **been?**
5  A. I'm it.
6  **Q. Did you draft your own job**
7  **description?**
8  A. No, I didn't.
9  **Q. Does the HR Department in Dothan**
10 **have its own payroll people?**
11 A. Yes.
12 **Q. So your payroll clerks handle what,**
13 **then?**
14 A. Aeroplex and Aviation.
15 **Q. I had asked you about family medical**
16 **leave, but your office really does not**
17 **have anything to do with family medical**
18 **leave; is that right?**
19 A. No.
20 **Q. Do you keep any records or logs**
21 **concerning family medical leave, or is**
22 **that all HR?**
23 A. That's all kept in HR.

Page 104

1  **Q. Does Pemco have a record retention**
2  **policy?**
3  A. They're working on one, I know.
4  **Q. Has one ever been in place until**
5  **now?**
6  A. Not that I'm aware of.
7  **Q. Does your office prepare year-end**
8  **financial statements?**
9  A. No.
10 **Q. And Randy Shealey is really not in**
11 **your department; is that right? I mean,**
12 **there's a separate accounting department?**
13 A. Correct.
14   MS. GLASGOW: Ms. Tindle, I think
15 that's all I have got. John, do you have
16 anything?
17   MR. HOLMES: Jackie, I have just a
18 couple questions.
19
20 EXAMINATION BY MR. HOLMES:
21 **Q. I know you testified earlier that**
22 **you don't know Roger Wright personally,**
23 **but are you aware that he applied for**

26 (Pages 101 to 104)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 105

1  retirement benefits in 2005?
2  A.  Yes.
3  Q.  And was Mr. Wright vested when he
4  applied for retirement benefits?
5  A.  Yes.  He was, yes.
6  Q.  And when he applied for retirement
7  benefits in 2005, he was younger than the
8  age 65?
9  A.  He was.
10  Q.  And there is a penalty associated
11  with applying for benefits prior to age
12  65?
13  A.  There is.
14  Q.  You testified earlier about the
15  liability on the pension plan, or on the
16  fund, if you have people who are
17  terminated but vested, or terminated and
18  not vested, and you were explaining that
19  process.  Just to be clear, if an employee
20  is terminated but vested, would that have
21  any impact on pension plan liability?
22  A.  No.
23      MR. HOLMES:  That's all I have.

Page 106

1  RE-EXAMINATION BY MS. GLASGOW:
2  Q.  What is the amount of penalty for
3  taking it at an age earlier than 65?
4  A.  There's a chart at the back of the
5  pension plan, depending on the age.  Early
6  Retirement Benefit Reduction Factors.
7  Q.  And you're looking at Bates page
8  524?
9  A.  Right.
10  Q.  There is a column here labeled
11  "factor."  What is that?
12  A.  If you're 55 years zero months, you
13  multiply this times the benefit, and
14  that's the reduction.  In other words, 46
15  percent, they would get about 50 percent
16  of their -- I'm going to round that to 50.
17  He would get 50 percent of his pension at
18  55 years zero months.  At 65 years, he
19  gets 100 percent.  There is no factor.
20  Q.  I see.  It is graduated per month?
21  A.  Right.  The older you get, the more
22  benefit you get.
23  Q.  Once an employee starts receiving

Page 107

1  the early retirement benefit, are they
2  then locked in forever at that rate?
3  A.  They're locked in forever.
4  Q.  Regardless of their employment
5  status elsewhere?
6  A.  Right.
7  Q.  Or even, again, with Pemco?  What if
8  they come back and work again?
9  A.  If they come back, then his benefit
10  would stop; and then it would be
11  calculated when he retired the second
12  time, taking into account how long he had
13  taken the benefit previously.
14  Q.  So if someone like Roger Wright came
15  back and then took benefit at age 65,
16  would he get 100 percent of his pension?
17  A.  Of the pension when he returned.
18  There would be an actuarial calculation
19  for the period of time he collected a
20  benefit from 2005 to whenever he comes
21  back to work.
22  Q.  So he would still not get the
23  full --

Page 108

1  A.  He would not get the full of the
2  portion that he was taking previously.
3      MS. GLASGOW:  All right, Ms. Tindle.
4  I think that's it.
5      FURTHER DEPONENT SAITH NOT.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 109

```
 1        C E R T I F I C A T E
 2
 3   STATE OF ALABAMA)
 4   JEFFERSON COUNTY
 5
 6       I hereby certify that the above and
 7   foregoing deposition was taken down by me
 8   in stenotype and the questions and answers
 9   thereto were reduced to typewriting under
10   my supervision and that the foregoing
11   represents a true and correct record of
12   the testimony/evidence given by the
13   deponent.
14          I further certify that I am neither of
15   counsel nor of kin to any of the parties to the
16   action, nor am I in anywise interested in the results
17   of said cause.
18
19
20
21
22
23       Donna L. Winters, Commissioner
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# EXHIBIT 7

1

```
1  IN THE U. S. DISTRICT COURT
2        FOR THE MIDDLE DISTRICT OF ALABAMA
3            SOUTHERN DIVISION
4
5  ROGER WRIGHT,
6        PLAINTIFF,
7  VS.                   Civil Action No.:
8  PEMCO WORLD AIR           1:06cv647-WKW
   SERVICES, INC.,
9
10       DEFENDANT.
11       The deposition of RICHARD MILLER, taken
12  by the Plaintiff, pursuant to the Federal
13  Rules of Civil Procedure, before Stacey
14  Watkins, RPR, and Notary Public, State at
15  Large, at the offices of Farmer, Price,
16  Hornsby & Weatherford, Dothan, Alabama, on
17  the 6th day of August, 2007, at 2:05 p.m.,
18  CDT, pursuant to notice.
19                    * * * * *
20  APPEARANCES:
21  FOR THE PLAINTIFF:      FOR THE DEFENDANT:
22  MS. ELIZABETH B. GLASGOW  MR. JOHN B. HOLMES
    Attorney at Law          Attorney at Law
23  Dothan, Alabama          Birmingham, Alabama
24  ALSO PRESENT:
25  DENNIS JOHNSON
```

2

STIPULATION

It is stipulated by and between counsel
for the parties that this deposition be taken
at this time by Stacey Watkins, RPR, and
Notary Public, State at Large, who is to act
as commissioner without formal issuance of
commission to her; that said deposition shall
be taken down stenographically, transcribed,
and certified by the commissioner. The
signature of the witness is waived.

Except for objections as to the form of
questions, no objections need be made at the
time of the taking of the deposition by
either party, but objections may be
interposed by either party at the time the
deposition is read into evidence, which
shall be ruled upon by the Court on the
trial of the cause upon the grounds of
objection then and there assigned.

3

RICHARD MILLER

having been first duly sworn, testified as
follows, to-wit:

EXAMINATION

BY MS. GLASGOW:

Q   Can you state your name for the
record, please?

A   Richard Miller.

Q   Mr. Miller, my name is Libby
Glasgow. I represent Roger Wright in a
lawsuit that we've brought against Pemco
World Air Services. I'm going to be asking a
lot of questions today, and this is on the
record.

Our court reporter here, Stacey, is
taking down everything that we say. So, you
need to answer my questions out loud. You
can't just nod or shake your head, because
she can't take that down very well. All
right?

A   All right.

Q   If I don't ask a question that's
clear or if you don't understand the question

4

that I'm asking you, just go ahead and stop
me, and I'll be happy to rephrase it.
Otherwise, we're going to assume that you
understand the question that's being asked.
Okay?

A   Okay.

Q   Give me your address, please?

A   3256 Gene Terry Road. G-e-n-e.

Q   T-e-r-r-y?

A   Uh-huh. Road. Ashford, Alabama.

Q   And how long have you lived there?

A   Five years, six years.

Q   Okay. Where are you from
originally?

A   Oregon is where I was born.

Q   Oregon. How long have you lived in
Alabama?

A   About 30 years, I guess.

Q   30 years.

A   I got out of the service in '77.
That would be 30 years, wouldn't it?

Q   Uh-huh. Were you stationed here at
Fort Rucker?

A   No, ma'am. I came here from
Mobile.

5

1 Q Oh, okay. Where did you graduate
2 from high school?
3 A Scio, Oregon. S-c-i-o.
4 Q Oregon. Okay. And what did you do
5 after you got out of high school?
6 A Went in the military.
7 Q Okay. And how long were you in the
8 military?
9 A Eleven years and eight months.
10 Q Which branch of the service were
11 you in?
12 A U. S. Army.
13 Q And what did you do for them?
14 A I was in maintenance.
15 Q Aircraft maintenance?
16 A No. Vehicle maintenance.
17 Q So, you went into the military
18 about 1966 and got out about 1977?
19 A '65. Yeah.
20 Q '65?
21 A Yes.
22 Q Did you work on any aircraft at all
23 while you were in the military?
24 A No, ma'am.
25 Q What kind of vehicles did you work

6

1 on?
2 A Trucks, tanks.
3 Q Okay. What rank did you rise to?
4 A E-7.
5 Q Did you have any supervisory
6 experience in the military?
7 A Yes, ma'am.
8 Q What kind of experience did you
9 have as far as supervising other soldiers?
10 A I run motor pool. I was an
11 instructor for three years in automotive
12 school.
13 Q Okay?
14 A I was a platoon sergeant out at
15 Fort Knox for three years. Of course, my NCO
16 academy and all that before that.
17 Q Okay. What's the most number of
18 employees that you supervised at one time?
19 A When I was at Fort Knox, I had
20 about 70.
21 Q And you said you were a platoon
22 sergeant at that time?
23 A Yes, ma'am.
24 Q And what was your unit assigned to
25 do at Fort Knox?

7

1 A We took care of vehicle
2 maintenance.
3 Q What did you do when you got out of
4 the military?
5 A A number of things.
6 Q Okay. Did you start in Mobile --
7 A Yeah.
8 Q -- once you got out of the service?
9 A That's where I went. Left Fort
10 Knox and went to Mobile. Tried roofing for a
11 while, did a little shrimping for a while,
12 car sales for a little while. And then,
13 finally, I got in -- worked at Colonial
14 Trailways bus company.
15 Q What were you doing for them?
16 A Bus mechanic, and then, shop
17 foreman.
18 Q Why did you get out of the
19 military?
20 A It was for personal reasons,
21 really. They were going to send me back to
22 Germany. And my wife at the time was
23 pregnant, and she wasn't going to be able to
24 go, 'cause they didn't have any housing over
25 there.

8

1 Q Right.
2 A And she wasn't going to be able to
3 come, and I was going to be two years over
4 there, and so, I just decided that wasn't the
5 right thing to do.
6 Q Okay. About when did you start
7 with Colonial Trailways?
8 A It was in '85.
9 Q And how long did you work for them?
10 A It wasn't in '85, either. I'm
11 sorry. It was 1980. I'm sorry.
12 Q 1980?
13 A Yes, ma'am.
14 Q Okay?
15 A Well, I worked there off and on.
16 Q Okay. How long did you work there
17 the first time?
18 A A couple of years. And then, I
19 went to work at the Detroit diesel place in
20 Mobile, Saunders Engine Company. And I
21 worked there about nine months, and they come
22 and asked me if I would come back. And so,
23 they gave me more money, and I went back. I
24 worked there 'til '85.
25 Q So, between '80 and '85, you were

9

1  at Colonial, except for the nine months you
2  were at Detroit diesel, Saunders Aircraft?
3      A    Right.
4      Q    What did you do for Saunders -- I'm
5  sorry.  What was it?  Saunders what?
6      A    Engine Company.
7      Q    Engine.
8      A    We rebuilt diesel -- Detroit
9  engines in boats and trucks.  It was a
10  Detroit CAT dealership in Mobile.
11      Q    Okay.  And then, why did you leave
12  Colonial the second time?
13      A    Well, I went back home.  Went to
14  Oregon.  That was a poor move, too.
15      Q    That was a poor move?
16      A    Poor move.  Very poor.
17      Q    How long were you at Oregon?
18      A    About seven months.
19      Q    Okay.  Why was that a poor move?
20      A    Well, during that time period, in
21  '85, it was very poor as far as jobs are
22  concerned.  Lumber mills and all were being
23  shut down.  Just a real bad time.  Couldn't
24  find a job.
25      Q    So, what did you do during that

10

1  seven months?
2      A    Well, my grandmother helped me get
3  out of there.  I told her she needed to quit
4  supporting me.  I had to go take care of
5  myself.  I mean, I just --
6      Q    Yeah.
7      A    But I got to see my mom and dad,
8  which I hadn't seen in a long, long, long
9  time.  Anyway, I went to South Carolina for a
10  while and did a little carpentry work.  And
11  then, I --
12      Q    So, this is about -- what? -- '85,
13  '86, that you're in South Carolina?
14      A    Yeah.
15      Q    Okay.  How long were you over
16  there?
17      A    Probably seven or eight months.
18  Just a vagabond, aren't I?
19      Q    I understand.  I understand.  I'm
20  married to one of those.  And so, you did
21  some carpentry work in South Carolina for a
22  while?
23      A    Yeah.  I had a good friend that I
24  had met while I was in Mobile.  We went to
25  church together.  Anyway, he was living up

11

1  there, and he told me I could come up there
2  and work with him and see if I could find
3  something to do up there.  But that didn't
4  pan out, either.
5      Q    All right.  So, where did you end
6  up next?
7      A    Then I went to -- I think I went to
8  Bonifay, Florida, then.  Had a stepdaughter
9  living there.
10      Q    Okay.  Were you able to find work
11  there?
12      A    Yeah.  I went to work for Jenkins
13  concrete place.
14      Q    Is that Jenkins Building Supply?
15      A    Yeah.  They was in Bonifay.
16      Q    Yeah.  Okay.  What did you do for
17  them?
18      A    Mechanic on the trucks.
19      Q    Okay?
20      A    And then, I was there about -- I
21  don't know -- seven months, eight months, I
22  guess.  Anyway, I had an opportunity to open
23  a gas station in Chipley, to rent it.
24      Q    Did you own it or --
25      A    No.  I ran it.

12

1      Q    Just managed it?
2      A    Well, actually rented the building
3  from the gas company.  And they had a bay
4  there, and I did mechanic work and service
5  work and tires.  I just had to pay the rent
6  and the utilities.
7      Q    Did you have any employees there,
8  or was it just you?
9      A    No.  Just me and my wife.  Another
10  bad move.
11      Q    We're not going to make a list of
12  all of them.
13      A    You'll see there's a lot of bad
14  moves in there.
15      Q    No.  I understand.  My husband was
16  in the military.  We moved quite a bit
17  ourselves.  About what year do you think you
18  were in Chipley?  About '87?  '86?
19      A    Yeah.  '87, '88.  And I'm thinking
20  that -- when I had the gas station, I'm
21  thinking that the president from Trailways,
22  now that I think about it, he came and asked
23  me if I would come back down there, and he
24  would pay for my expenses to move my family,
25  house and all, back down there.

13

1    Q    Back to Mobile?

2    A    Back to Mobile. I think that was

3 in '89, probably, or '88. '89, probably.

4 '88, '89. Somewhere in there.

5    Q    And again, going back to be a

6 mechanic on the buses?

7    A    No. I was shop foreman. Well,

8 working foreman. Shop foreman/mechanic.

9    Q    You still had to do mechanic work?

10    A    Yeah. I had to do the electrical

11 and AC, because they really didn't have

12 anybody that knew that. Everybody that --

13 the mechanics that were there, they were -- I

14 assigned them the work to do and did all the

15 parts ordering and all that.

16    Q    How many mechanics did they have

17 in --

18    A    We had about eight.

19    Q    -- your shop then?

20    A    We had eight.

21    Q    Okay. Well, sounds like they liked

22 you at Trailways.

23    A    They did. Just the money. Just

24 the money. They wouldn't pay you.

25    Q    How much were you making back at

14

1 that time?

2    A    Around 25,000.

3    Q    Paying you salary?

4    A    Yeah.

5    Q    Okay. So, how long were you there

6 this time?

7    A    I'm thinking into '91, 'cause I

8 went through a divorce.

9    Q    How many times have you been

10 married, Mr. Miller?

11    A    Four times.

12    Q    So, about 1991, what happened?

13    A    I went through a divorce, and I

14 lost everything, and started driving a truck.

15    Q    Who were you driving for?

16    A    R. M. Black.

17    Q    And where are they?

18    A    Loxley, Alabama.

19    Q    Was this an eighteen-wheeler?

20    A    Yeah. Yes, ma'am.

21    Q    Were you driving interstate?

22    A    Yes, ma'am. Miami to California.

23    Q    Great. How often did you have to

24 do that?

25    A    Every week.

15

1    Q    Were you terminated or did you quit

2 Trailways?

3    A    Quit.

4    Q    So, you think you started driving

5 for R. M. Black when? About 1991?

6    A    Yes, ma'am.

7    Q    And were you living in Mobile?

8    A    Yes, ma'am. Loxley is just right

9 outside of Mobile, about ten miles. That's

10 where the hub was where they kept the trucks.

11    Q    By the interstate there?

12    A    Yeah.

13    Q    How long did you drive a truck for

14 R. M. Black?

15    A    I think it was about eight months.

16 Whenever they came out with the CDL license,

17 where you had to get a CDL, I couldn't pass

18 the eye exam, and so, I had to quit driving.

19    Q    Why couldn't you pass the eye exam?

20    A    Because my left eye is 200 vision,

21 noncorrectable. Lazy eye from birth.

22    Q    Okay. So, eight months there. Out

23 into 1992? Around there?

24    A    I was in Chipley. Back in Chipley.

25    Q    Chipley.

16

1    A    Actually, I was in Bonifay. I went

2 to work for the landfill company out there,

3 Waste Management, working on garbage trucks.

4    Q    As a mechanic?

5    A    Yes, ma'am.

6    Q    Okay. Working for Waste

7 Management?

8    A    Yes, ma'am.

9    Q    And how long were you there?

10    A    About a year, I think.

11    Q    Okay. What happened then?

12    A    Well, then we came to Pemco, in

13 '93, July of '93.

14    Q    And which Pemco were you working

15 for then?

16    A    It was -- it wasn't Hayes then. It

17 was -- it wasn't Pemco World, either. It was

18 Pemco Aeroplex.

19    Q    How did you get on with Pemco

20 Aeroplex?

21    A    Wanda Bibie was my wife's sister,

22 and she told me they had an opening in

23 maintenance, and she told me I needed to go

24 to the employment office and put an

25 application in.

17

1    Q    And so, what did you start out at
2  Pemco?
3    A    As a plant mechanic.
4    Q    And what does a plant mechanic do?
5    A    Carpentry, plumbing, electrical.
6  Anything they need done in the facility that
7  is really not any specific job. It's
8  whatever needs to be done on the facility.
9  And when you go in for the interview, they
10 ask you if you've got any experience in
11 electrical and plumbing and maintenance and
12 all that kind of stuff.
13   Q    But you were not working on the
14 aircraft itself? Right?
15   A    No, ma'am.
16   Q    So, you were working on equipment?
17   A    Yes, ma'am.
18   Q    Trucks, vehicles, that sort of
19 thing?
20   A    Yes, ma'am.
21   Q    Forklifts?
22   A    Yes, ma'am.
23   Q    But not necessarily related to
24 production?
25   A    No, ma'am.

18

1    Q    How much were you making as a plant
2  mechanic? Is it plant maintenance or plant
3  mechanic?
4    A    Plant mechanic is what it was.
5    Q    Okay. I wrote it down wrong. Do
6  you remember?
7    A    $8.50 is what they started me out
8  at.
9    Q    And who supervised you?
10   A    Well, Glenda Crumpler was the --
11 when I first started, in July, she was the
12 director. And Roger was my supervisor. And
13 also -- Well, Dean White was there, too, at
14 the same time. And so, really, Dean or Roger
15 could tell me what to do, and I had to -- you
16 know, I had to do what they said.
17   Q    What was Roger's position then?
18   A    He was supervisor.
19   Q    Okay. And then, Dean White's
20 position was also supervisor?
21   A    Supervisor.
22   Q    Okay. And how long did you stay as
23 a plant mechanic?
24   A    Until 1999, August '99.
25   Q    And then, were you promoted at that

19

1  time to supervisor?
2    A    Yes, ma'am.
3    Q    And whose position did you take
4  when you were promoted?
5    A    I guess I took Roger's position,
6  because Glenda had left and Dean had left.
7    Q    Do you know why Glenda left?
8    A    No, ma'am. I had just hired in in
9  July, and I think they let her go in August
10 or September.
11   Q    Oh, okay.
12   A    I really don't know the
13 particulars. You know, I was brand new
14 in the company at that time.
15   Q    Back in '93?
16   A    Yes.
17   Q    She left in '93?
18   A    Yes, ma'am.
19   Q    Okay. What are the duties as a
20 supervisor?
21   A    It's to plan work for the
22 mechanics, supervise them, check on them,
23 make sure they do what you told them to do
24 and it was done right, train them if they
25 need training in certain areas, if you have

20

1  expertise in that area.
2    Q    Anything else? Did you set their
3  schedules?
4    A    Like, when they would come in and
5  all?
6    Q    Yes, sir.
7    A    No, ma'am.
8    Q    Who would do that?
9    A    Roger.
10   Q    And what was Roger's position at
11 that time?
12   A    He was the manager.
13   Q    Manager of facilities?
14   A    In '99, yes, ma'am.
15   Q    All right. And then, after August
16 1999, did you have any other changes to your
17 position?
18   A    Well, I was on day shift when I
19 first made -- when they first made me
20 supervisor. And I think I was on days a
21 year, year and a half, maybe two years, and
22 then, they put me on night shift. And I've
23 been on night shift ever since.
24   Q    So, you think about the year 2000?
25   A    '1. Yeah. 2000, 2001.

21

1    Q    2001 --
2    A    Yes, ma'am.
3    Q    -- put you on that shift?
4    A    Yeah.
5    Q    And has there been any other change
6  in your duties since then?
7    A    No, ma'am.
8    Q    How much do you currently make, Mr.
9  Miller?
10    A    I'm thinking it's about 40, 41,000.
11  Something like that.
12    Q    And you're salaried?
13    A    Yes, ma'am.
14    Q    What kind of benefits do you get?
15    A    We have medical.
16    Q    Health insurance?
17    A    Yeah.  Health insurance, dental,
18  eye.
19    Q    Pension?
20    A    Yes, pension.
21    Q    And a 401 --
22    A    Retirement, yeah.
23    Q    You get a 401(k)?
24    A    I'm not involved in it.  No, ma'am.
25  I don't put no money in it.

22

1    Q    Any other benefits that you get?
2  Life insurance?
3    A    Yeah.  There is a life insurance
4  policy.
5    Q    Anything else that you can think of
6  in terms of benefits?  Disability insurance?
7    A    I don't know if there's -- I don't
8  know if there's disability or not.
9    Q    Okay.  How many days vacation do
10  you get?
11    A    I get three weeks right now.
12    Q    And do you get overtime?
13    A    Yes, ma'am.
14    Q    How does that work for a salaried
15  employee?
16    A    You have to turn in a thing after
17  40 hours.
18    Q    Turn in a sheet?
19    A    Yeah.
20    Q    Who do you turn that in to?
21    A    It goes to Dennis.
22    Q    And who is your supervisor now?
23    A    Clark Briody.
24    Q    How long has Clark Briody been your
25  supervisor?

23

1    A    Since 2005.
2    Q    But you turn in your overtime sheet
3  to Dennis Johnson?
4    A    Well, it goes through Clark first.
5    Q    Oh, okay.
6    A    I'm sorry.
7    Q    And are you paid time and a half
8  for overtime?
9    A    No, ma'am.  Straight time.
10    Q    Straight time.  So, you get a
11  salary up to 40 hours, and then, you get an
12  hourly amount for everything over 40 hours?
13    A    Yes, ma'am.
14    Q    How much overtime do you normally
15  get?
16    A    I don't get any.
17    Q    You don't get any?
18    A    No, ma'am.
19        (Dennis Johnson present in the
20         deposition room.)
21    Q    Have you gotten more overtime in
22  the past?
23    A    No.  There never was a lot of
24  salaried overtime in maintenance.  At one
25  time, we didn't get paid, you know, for

24

1  overtime.
2    Q    When was that?  Do you remember?
3    A    Well, since Dennis has been here,
4  we've got, you know, overtime.  But, prior to
5  that, we didn't get it.  I can't remember
6  what -- I can't recall when -- you know, just
7  exactly when it was.
8    Q    And so, since Dennis has come, have
9  you turned in requests for overtime?
10    A    A few times.  That's just real
11  rare.  I've probably turned it in four or
12  five times.
13    Q    Oh, okay.
14    A    I mean, I just --
15    Q    Ever?
16    A    I don't work overtime.  We just
17  don't have overtime on night shift, you know,
18  really.
19    Q    So, most weeks, you work a straight
20  40-hour week?
21    A    Right.  Normally, you know, we come
22  in a half hour early.  So, we're actually
23  putting in more than 40 hours.
24    Q    How many hours a week do you
25  normally work?

**25**

1  A   It would be about 42 and a half, 43
2  hours.
3  Q   When do you normally come in?
4  A   3:00 o'clock.
5  Q   And you work 'til when?
6  A   12:00.
7  Q   And you get a half an hour for
8  lunch?
9  A   Yes, ma'am.
10  Q   Do you get to leave the premises
11  for that, or do you have to eat there?
12  A   You can leave.
13  Q   How many sick leave days do you get
14  a year?
15  A   Ten. 80 hours.
16  Q   Have you had any raises since 2005?
17  A   Yes, ma'am.
18  Q   How much have you gone up?
19  A   Five or $6,000.00. I think I was
20  at 36,000.
21  Q   And do you remember when you got
22  your raise?
23  A   I just got one here not long ago.
24  Let's see. Must have been in June. May or
25  June.

**26**

1  Q   Of this year?
2  A   Yes.
3  Q   Oh, okay.
4  A   Maybe it was April. I really don't
5  know just exactly, but I did get one.
6  Q   Yeah. In 2007?
7  A   Yes, ma'am.
8  Q   Did you get one in 2006?
9  A   Yes, ma'am.
10  Q   Do you remember how much you got in
11  2006?
12  A   We got 3 percent.
13  Q   Have you always gotten about a
14  3-percent raise every year?
15  A   Yes, ma'am. There was one year
16  that we didn't, that nobody got none. For
17  the most part, we always got a cost-of-living
18  raise.
19  Q   Okay. Did you get a raise in 2005?
20  Was that the year, or was it earlier than
21  that?
22  A   I don't know. I can't remember
23  whether I got one in 2005 or not. I know
24  they made us start paying on our health
25  benefits. It may have been 2005 when all

**27**

1  that happened. But that same year that we
2  had to start paying our medical, we didn't
3  get a raise. They really put it to us.
4  Q   How much do you pay for health
5  insurance?
6  A   I'm thinking it's 75 every two
7  weeks, I'm thinking. $150.00 a month, I'm
8  thinking.
9  Q   Do you know for sure?
10  A   No. I don't know for sure. I
11  would have to look at my pay stub. They just
12  automatically take it out.
13  Q   And it's just gone, isn't it?
14  A   It's just gone. I don't have it,
15  so --
16  Q   Have they cut back on holidays at
17  all in the last couple of years? Do y'all
18  still get the standard holidays?
19  A   No. We still get the same
20  holidays. Can I go back?
21  Q   Sure.
22  A   I'm thinking maybe the supervisors
23  get time and a half now for overtime. I'm
24  not sure, because I don't get it.
25  Q   But you think day shift supervisors

**28**

1  may get --
2  A   No. I mean, nighttime on
3  production, you know, that work over, over
4  there in production, the ones that do work,
5  they may be getting time and a half. I don't
6  know for sure. And we may have got straight
7  time prior to. I know it's different from
8  what it used to be.
9  Q   Do you remember when it changed?
10  A   Well, just -- it ain't been -- I
11  think in 2006.
12  Q   So, if you were to have overtime
13  and submit it, do you think you would get
14  time and a half, or do you think you would
15  get straight time?
16  A   Well, I don't know. If they're
17  paying time and a half --
18  Q   That's fair.
19  A   If they're paying time and a half,
20  I would get time and a half. I would get
21  what everybody else got. But I'm thinking --
22  well, I'm thinking they get time and a half,
23  now that I think about it.
24  Q   But night shift people just don't
25  have enough work to work more than the

29

1  standard work day?
2      A    No.  They do on the planes, now, on
3  production.
4      Q    On production.
5      A    Where they work on the planes, on
6  the production side, they work overtime all
7  the time.  I mean, they just -- all the time.
8      Q    But not on your side?
9      A    But not on the facility side.
10     Q    How many facility supervisors are
11  there now?
12     A    Two.
13     Q    One day shift and one night shift?
14     A    Yes, ma'am.
15     Q    Do you run a third shift, or is it
16  just the two shifts?
17     A    Well, we have -- they have started
18  a third shift, and we only have two people.
19  Soon going to have three people on that
20  shift, just to support the aircraft and the
21  tool cribs.
22     Q    But there's no active production on
23  third shift?  Is that right?
24     A    Yeah.  They're working on the
25  airplanes.

30

1      Q    Oh, they are.  Okay.
2      A    We're supporting -- there's not a
3  whole bunch of people.  I don't know exactly
4  how many people is on the third shift working
5  on airplanes.  But we have to have people in
6  the tool cribs.  So, we have to man the tool
7  cribs until they --
8      Q    I see.
9      A    And so, we've got a couple of
10  people that are on third shift out of
11  facilities.
12     Q    When you say "we," you mean the
13  facilities --
14     A    Right.
15     Q    -- department has a couple of
16  people in the tool cribs on third shift?
17     A    Yes, ma'am.
18     Q    But there's no facilities
19  supervisor --
20     A    No, ma'am.
21     Q    -- for that third shift?
22     A    No, ma'am.
23     Q    Who is the day shift supervisor?
24     A    Ted Ball.
25     Q    Since you've been at Pemco, Mr.

31

1  Miller, have you had any significant time off
2  from work other than vacation, you know,
3  holidays, regular days off?
4      A    I've been laid off twice.
5      Q    When was that?
6      A    I can't remember back -- I didn't
7  even think about checking on that time.  But
8  there was a time -- I was only out about a
9  month, I think, or it may have only been
10  three weeks.  But I can't remember exactly
11  what year it was.  I would have to go back
12  and look in my file and see.
13     Q    You think one time for about a
14  month?
15     A    Yes, ma'am.  I just can't remember
16  what year it was.
17     Q    Okay.  And then, what about the
18  other time?
19     A    In 2005, in July.
20     Q    How long were you off then?
21     A    From July 15th to August 22nd.
22     Q    The first time that you got laid
23  off, for about a month, were you given a
24  temporary layoff or an indefinite layoff?
25     A    I believe it was temporary.

32

1      Q    What about in 2005, then?  Was that
2  a temporary?
3      A    Well, I was management then.  I
4  wasn't management the first time.  There's no
5  such thing in management as temporary.  I
6  don't think there is, anyway.
7      Q    So, did you get an indefinite
8  layoff, then, in July of '05?
9      A    Yeah.  They gave me severance pay.
10  They paid me two weeks' pay, I think.
11     Q    Who did the layoff, or who told you
12  about it?
13     A    Clark Briody.
14     Q    And what did he tell you at that
15  time?
16     A    He said that they were cutting
17  management at that time, and he didn't know
18  if they were going to hire us back.
19     Q    And you said that was on July 15th?
20     A    Yes, ma'am.
21     Q    Did Clark tell you on the 15th, or
22  did he tell you before then?
23     A    I think it was the -- if I remember
24  right, I think it was the same day.  I mean,
25  I left the same day I came in that he told

33

1    me.
2        Q    Oh, okay.
3        A    There wasn't no prior -- I don't
4    believe there was no prior notice.  I don't
5    remember it that way.
6        Q    Okay.  When he talked to you on the
7    15th, did he hold open the possibility that
8    you would come back?
9        A    No, ma'am, not right at that time.
10    A couple of weeks after that I got laid off,
11    I called him and asked him if they had any
12    intentions of bringing me back, 'cause if
13    they wasn't, just go ahead and tell me, and
14    then, I can go find me another job.  But if
15    they -- you know, if they felt like maybe
16    they was going to do that, then I would just
17    -- you know, I'd wait and see.  And so,
18    anyway, he told me that he would call me back
19    the next day.
20            And he called me back and said that they
21    had all intentions of bringing me back.  And
22    I said, "Okay.  Then I'll just -- I'll wait."
23        Q    Do you remember when that
24    conversation happened?  You said a couple of
25    weeks after the layoff?

34

1        A    Yeah.  It was two or three weeks
2    after the layoff.
3        Q    About the end of July, maybe?
4        A    Yeah, could be.  You know.  First
5    part of August.  I really don't recollect,
6    you know, the very day.
7        Q    No.  I understand.  But you had
8    been off a couple of weeks by that time?
9        A    Yes, ma'am.  Yeah.
10        Q    Okay.  And then, you were brought
11    back to your same position August the 22nd --
12        A    Yes, ma'am.
13        Q    -- of '05?
14        A    Yes, ma'am.
15        Q    And did they restore you to the
16    same salary?
17        A    Yes, ma'am.
18        Q    And same benefits?
19        A    Yes, ma'am.
20        Q    Did you have to give back the
21    severance pay?
22        A    No, ma'am.
23        Q    Did Clark Briody tell you anything
24    else, you know, around July 15th, when he was
25    talking to you about the layoff?  Did he tell

35

1    you anything about why the layoffs were
2    occurring or anything else?
3        A    Other than it was just -- the
4    contract was coming up, and it was pretty --
5    I think it was a pretty up-in-the-air type.
6    A lot of changes going on in the company.
7        Q    Do you know who did your position
8    while you were laid off for that month, five
9    weeks?
10        A    No, ma'am.  I really don't.  I
11    don't know if they had anybody on nighttime.
12    I really don't.
13        Q    When you got back, in August, had
14    anybody done anything since you had been
15    gone, you know, as far as your duties?
16        A    Well, you know, the employees were
17    locked out, so there wasn't -- I mean, the
18    supervisors and secretarial people -- they
19    had some people that they was bussing in to
20    work on -- you know, working on the aircraft.
21        But, in facility maintenance, there was
22    just -- like it had always been whenever they
23    was on strike or whatever, the management
24    took care of facilities, doing the work in
25    facilities, keeping the vehicles up and

36

1    running the tool crib.
2        Q    Were the employees still locked
3    out --
4        A    Yes, ma'am.
5        Q    -- when you were brought back in
6    August?
7        A    Yes, ma'am.
8        Q    Okay.  And so, what did you do
9    then, in August, when you came back?
10        A    Worked on vehicles, trying to get
11    them back running, and support the aircraft
12    with equipment, stands, whatever.  Whatever
13    they needed.
14        Q    The plant mechanics that do the
15    mechanical work on the vehicles, are they
16    part of the union?
17        A    Yes, ma'am.
18        Q    And were you a member of the union
19    when you started?
20        A    Yes, ma'am.
21        Q    And then, when you were promoted to
22    supervisor, you were in management?  Right?
23        A    Yes, ma'am.
24        Q    So, how long was it until the
25    employees actually came back and the labor

37

1    issues were resolved?
2        A    Well, it seems like it was in
3    September, probably.  The latter part of
4    September.  Seems like it was about a month.
5    It's hard to exactly remember.  I think I was
6    back about a month.  Or it may have been the
7    first of October.  It was in that area.
8        Q    Did you get any extra pay for
9    taking on this other work during that period
10   from August 'til September?
11       A    No, ma'am.
12       Q    Did you get any bonuses or anything
13   for coming back to work?
14       A    No, ma'am.
15       Q    Were you paid at your straight
16   salary for doing mechanical work?
17       A    Yes, ma'am.
18       Q    Did you put in overtime hours
19   during that time?
20       A    No, ma'am.
21       Q    Just straight 40 hours a week?
22       A    Yes, ma'am.
23       Q    So, once the employees came back
24   and the labor issues were resolved, did you
25   then go back to your supervisory duties --

38

1        A    Yes, ma'am.
2        Q    -- as the night shift supervisor?
3        A    Yes, ma'am.
4        Q    And those duties were the same ones
5    that you told me about earlier?  Right?
6        A    Yes, ma'am.
7        Q    And your duties have not changed
8    significantly since September of '05?  Is
9    that right?
10       A    No, ma'am.
11       Q    Has Clark Briody been your
12   supervisor during all this time --
13       A    Yes, ma'am.
14       Q    -- since you came back?
15       A    Yes, ma'am.
16       Q    What are Clark Briody's duties?  Do
17   you know?
18       A    Well, he's the manager over the
19   facility.  Reports to Dennis.  He takes care
20   of all the bills and stuff that come in the
21   office.  Any planning that has to be done, as
22   far as building stands and, you know,
23   whatever they -- whatever projects that need
24   to be done, he's over all that.  Budget.
25       Q    Budget for facilities?

39

1        A    Yes, ma'am.
2        Q    Anything else?
3        A    He's over the tool cribs.  Which,
4    Ted Ball is actually -- he's directly in
5    charge of the tool cribs, as far as tooling
6    and equivalency for tools that we had, that
7    we had made ourself, getting drawings and
8    paperwork made up for all that.
9        Q    Does Clark also supervise Ted Ball?
10       A    Yes, ma'am.
11       Q    Any other duties that you're aware
12   of that Clark Briody does?
13       A    Well, he signs all the -- he has to
14   sign all the requests for anything that we
15   need in the facility, as far as parts and,
16   you know, whatever we have to -- need.  It
17   all goes through him to be approved.
18       Q    Any requisitions --
19       A    Right.
20       Q    -- would have to go through him?
21       A    Yes, ma'am.
22       Q    Anything else that you're aware of?
23       A    No, ma'am, not right off.
24       Q    Okay.  About how many hours does
25   Clark Briody work during a week?  Do you

40

1    know?  I guess he's on a different shift than
2    you are?
3        A    Right.  But he's -- he comes in
4    early and he leaves late, mostly.  He puts a
5    lot of -- it's not uncommon for him to be
6    there 'til 5:00 o'clock.
7        Q    When does he come in, usually?
8        A    5:30, 6:00.
9        Q    Are you aware of any duties that
10   Clark Briody has outside of facilities?
11       A    No, ma'am.
12       Q    How many employees do you supervise
13   on night shift?
14       A    I have ten right now.
15       Q    Has that stayed the same pretty
16   much since 2005?
17       A    No, ma'am.  No, ma'am.  We've just
18   added two people, I know, for the third
19   shift.
20       Q    About how many were you supervising
21   when you came back in 2005?
22       A    I think we had about five or six.
23   This is after lockout, now --
24       Q    Right.
25       A    -- you know, when they came back.

41

1    Q    Yeah.  After the lockout was
2  over --
3    A    Right.
4    Q    -- then they came back in?
5    A    Right.
6    Q    About five or six?
7    A    Yes, ma'am.
8    Q    What position did Ted Ball hold
9  before 2005?
10    A    He was in aircraft production.  He
11  was a supervisor.
12    Q    And he had not been in facilities
13  at all?  Is that right?
14    A    No, ma'am.
15    Q    And when did he come over and
16  become the facilities supervisor?
17    A    I don't know.
18    Q    Was it before the layoffs in 2005
19  or after?  Do you remember?
20    A    It was after -- well, it was after
21  my layoff.  I don't know just exactly when.
22    Q    Is it after you came back in 2005?
23  Was he back as the day shift facilities
24  supervisor?
25    A    That's what he was when I came

42

1  back.  Yes.
2    Q    When you came back?
3    A    He was already there.
4    Q    But he wasn't there when you left?
5    A    No, ma'am.
6    Q    Did you have any responsibility as
7  far as laying off any employees yourself?
8    A    Not directly, no, ma'am.
9    Q    Did you have indirect input into
10  layoff decisions?
11    A    Yes, ma'am.  Well, on my people on
12  second shift.
13    Q    Tell me about that?
14    A    I never had to -- I never had to
15  lay anybody off directly.
16    Q    Did someone come to you and say,
17  "There's going to be some layoffs in your
18  department"?
19    A    Yes, ma'am.
20    Q    Who was that?
21    A    Well, prior to 2005 or after 2005?
22    Q    Well, let's start prior to 2005.
23    A    Well, Roger would come.
24    Q    And he would talk to you about the
25  layoffs?

43

1    A    Right.  You know, he'd say, "We've
2  got to let" -- in the union, you go by
3  seniority.  So, you really -- when they have
4  a layoff, low seniority people go.
5    Q    It's very straightforward --
6    A    Right.  There's no --
7    Q    -- with seniority?  Right?
8    A    Yes, ma'am.
9    Q    There's no discretion whatsoever?
10    A    No, ma'am.
11    Q    Did you supervise anybody who was
12  not in the union, as their night shift
13  facility supervisor?
14    A    I don't know whether they were all
15  in the union or not.  I mean, all the people,
16  you're talking about, that worked under me?
17    Q    Yes.  Not necessarily whether
18  they're union members, but whether they're
19  under the collective bargaining agreement.
20    A    Yeah.  They were all under the
21  collective bargaining agreement, right, on
22  second shift.
23    Q    You did not supervise anybody else
24  in management?
25    A    No, ma'am.  No, ma'am.

44

1    Q    All right.  Yeah.  That was a bad
2  question.  I wasn't really asking whether
3  they were members of the union or not.  But
4  their positions were subject to the
5  bargaining agreement?
6    A    Right.
7    Q    What about after 2005?  Have there
8  been any layoffs in your department since
9  then?
10    A    No, ma'am.
11    Q    Has anybody come to you to get your
12  input concerning any of the layoffs that
13  occurred in 2004 or 2005?
14    A    No, ma'am.
15    Q    Did anyone come to you and talk to
16  you about changes in your job during that
17  layoff period in 2005, other than Clark
18  Briody, which we've already talked about?
19    A    No, ma'am.
20    Q    Did you have any conversation with
21  Dennis Johnson about the layoffs?
22    A    No, ma'am.
23    Q    Did you have any conversations with
24  Ray Bennett about the layoffs in 2005?
25    A    No, ma'am.

45

1  Q   When you had layoffs, did you have
2  any contact with the HR directors or people
3  in HR about how to do the layoffs?
4  A   No, ma'am.
5  Q   I don't think I asked you this.
6  But, has there been anybody in your
7  department laid off since 2005?
8  A   No, ma'am.
9  Q   Okay.  And, in fact, you've hired
10 people?
11 A   Yeah.  We're still short.  Trying
12 to hire.
13 Q   Who are you trying to hire?  What
14 position are you trying to hire for?
15 A   We're trying to get another
16 janitorial person for nights and another tool
17 crib attendant for third shift.
18 Q   How much does the tool crib
19 attendant pay?
20 A   It's all maintenance mechanic.
21 There's no differentiation.  It's whatever
22 they place down in HR they're going to start
23 them out at.
24 Q   Any idea what they make now to
25 start?

46

1  A   I wish I could make as much as some
2  of these they just hired make when I started.
3  Lord have mercy.  They're starting them out
4  good, around 14, $15.00 an hour.  Now, I
5  don't know what they're starting the
6  janitorial people out.  But that's
7  maintenance mechanic.
8  Because it really isn't tool crib, per
9  se, 'cause it's all under facility
10 maintenance.  And so, when they're hired in,
11 they work in the tool crib, but they also --
12 that ain't their only job they'll have.  So,
13 they have to be qualified to do all the other
14 stuff, too.  In fact, I rotate my tool crib
15 attendants every week, so they don't have to
16 stay in there every week, on second shift.
17 Q   Is that a boring job?
18 A   Yeah.  Well, if you don't like it.
19 If you don't like being inside.  And plus, I
20 think it helps in cross-training people, so
21 you'll have a better work force when you get
22 done.  If you just put somebody in a tool
23 crib and let them stay in there, they don't
24 know nothing else.  That way, they get a
25 chance to learn everything else.

47

1  Q   How many positions do you have open
2  for maintenance mechanics?
3  A   One that I know of.
4  Q   And we're just talking about night
5  shift here?  Right?
6  A   No.  That's in the facility.  What
7  will happen is, because of the -- they'll
8  come to days when they hire in, for 90 days.
9  They can stay on days for 90 days for
10 training, a temporary employee -- I mean, not
11 a temporary, but a probationary employee.
12 And they can stay -- according to the
13 bargaining agreement, they can stay 90 days
14 on first shift.
15 So, normally, they keep them on first
16 shift 90 days.  Sometimes not that long.
17 Just depends how quick they pick things up.
18 But, then, they'll move them, like, to third
19 shift, and they'll have to replace them.
20 Somebody will have to come to days.  And that
21 will go by seniority.  So, it's not really --
22 they're not being hired in specifically for a
23 -- but that's where they'll end up, will be
24 on third, because of seniority.
25 Q   Because they don't have seniority?

48

1  A   Right.
2  Q   Okay.  Are all the maintenance
3  mechanics paid -- or at least start the same,
4  regardless of whether they're going to end up
5  on day shift or night shift?
6  A   No, ma'am.
7  Q   Let me ask it this way.  Is there
8  any premium that's paid to night shift
9  employees to work night shift --
10 A   Yes, ma'am.
11 Q   -- as opposed to day shift?
12 A   Yes, ma'am.
13 Q   How much more are they paid to work
14 night shift?
15 A   15 cents.
16 Q   Do you get more compensation
17 because you're working night shift --
18 A   No, ma'am.
19 Q   -- for your supervisor job?
20 A   No, ma'am.
21 (Recess in deposition.)
22 Q   What was Clark Briody's background
23 before he became manager over facilities?  Do
24 you remember?
25 A   He was the nighttime

49

1    superintendent.

2        Q    He was what?

3        A    He was the nighttime manager over

4    the aircraft on the production side.

5        Q    What does a nighttime

6    superintendent do?

7        A    He oversees all the production

8    projects.

9        Q    On night shift?

10       A    Yes, ma'am.

11       Q    Had he worked in facilities, to

12   your knowledge, before 2005?

13       A    No, ma'am.

14       Q    I asked you, at one point, if you

15   had taken off any significant time from work,

16   and you said you had been laid off twice.

17   Did you ever have any other significant

18   periods of time off of work for any reason

19   other than layoffs and normal vacation, sick

20   leave, that sort of thing?

21       A    No, ma'am, not that I can --

22       Q    Have you ever had to take medical

23   leave for any reason --

24       A    No, ma'am.

25       Q    -- while at Pemco?

50

1        A    No, ma'am.

2        Q    How old are you, Mr. Miller?

3        A    60.

4        Q    I assume you knew Roger Wright?

5        A    Yes, ma'am.

6        Q    And you worked with him?

7        A    Yes, ma'am.

8        Q    Did you have any problems working

9    with Roger?

10       A    No, ma'am.

11       Q    Were you aware of any problems with

12   Roger's work performance?

13       A    No, ma'am.

14       Q    Do you know of any problem with his

15   work ethic of any kind?

16       A    No, ma'am.

17       Q    I mean, did he put in the hours

18   that he needed to put in?

19       A    Yes, ma'am.

20       Q    Do you know of any reason why Roger

21   would be demoted?

22            MR. HOLMES:  Object to the form.

23       Q    You can go ahead and answer.

24       A    No, ma'am.

25       Q    Do you know of any reason why he

51

1    would be terminated?

2        A    No, ma'am.

3        Q    Have you ever talked to Dennis

4    Johnson about Roger Wright?

5        A    No, ma'am.

6        Q    Have you ever talked with Clark

7    Briody about Roger Wright?

8        A    No, ma'am, not -- no, ma'am.

9        Q    Have you ever talked with Ted Ball

10   about Roger Wright?

11       A    No, ma'am.

12       Q    Or to anybody in management about

13   Roger and his demotion and termination?

14       A    No, ma'am.

15       Q    Did you talk with anyone in

16   preparation of your deposition here today?

17       A    We just went over, you know, kind

18   of how it was going to be, how the setup was

19   going to be.

20       Q    Who is "we"?

21       A    Me and Mr. Holmes.

22       Q    Okay.  Was anybody else present at

23   that meeting?

24       A    Dennis.

25       Q    Okay.  About how long did you meet?

52

1        A    It was about 15, 20 minutes.

2        Q    Do you know who the decision maker

3    was with regard to Roger Wright's demotion?

4        A    Not a matter of -- you know, not a

5    matter of fact.  But I know he had to -- I

6    know he had to go see Dennis.  So, I don't

7    know who all was involved in, you know, the

8    decision.

9        Q    I assume, at some point, you heard

10   that Roger had been demoted?  Is that right?

11       A    Yes, ma'am.  I had heard that he

12   was going to be made a supervisor.

13       Q    Okay.  And who did you hear that

14   from?

15       A    It was just the talk of people in

16   the -- on the floor and people in

17   maintenance.

18       Q    Did Dennis Johnson ever come to you

19   and talk to you about the change in the

20   status?

21       A    No, ma'am.

22       Q    Did Ray Bennett?

23       A    No, ma'am.

24       Q    Did Clark Briody?

25       A    He might have mentioned it, but it

53

1  wasn't nothing, you know, formal or anything.
2  I think we were just -- he was talking about,
3  you know, when he come back, he was going to
4  be over the tool crib, what Ted was doing --
5  or what Ted is doing now. I mean, that's
6  what I had, you know, heard. I don't know
7  for sure if Clark told me or if it was just
8  on the -- you know, that's what I heard.
9      Q  Okay. And did you hear that before
10  you were laid off?
11     A  No, ma'am.
12     Q  When did you first hear it, to your
13  knowledge?
14     A  It was after I come back, right
15  after the people had come back. It was after
16  the contract had been taken care of.
17     Q  So, you think either August or
18  September of '05 is when you first heard
19  about it?
20     A  Yes, ma'am.
21     Q  By then, Roger had been terminated?
22  Is that right?
23     A  Not that I know of. Not when I
24  first came back, he hadn't been terminated.
25  I remember him coming out to the facility to

54

1  see Dennis, but I don't remember, you know,
2  what date it was exactly. But it was after I
3  had come back.
4      Q  Okay. And you knew then that he
5  had been demoted to a supervisory position?
6      A  Yeah. I had heard that's what they
7  was going to -- you know, that's what they
8  had planned to do.
9      Q  And you were working there at the
10  time you heard that?
11     A  Yes, ma'am.
12     Q  Okay. Was anyone else in the
13  facilities department laid off other than
14  Roger, in terms of management, in that period
15  of 2005?
16         MR. HOLMES: Other than Richard?
17     A  Me. I was laid off.
18     Q  Right.
19     A  Well, Henry retired. Henry Ward
20  retired.
21     Q  Right.
22     A  But, I mean, that's all there is in
23  facilities. There were no other management
24  people, I mean, other than Connie, and she
25  wasn't laid off.

55

1      Q  And was Ted Ball in management
2  before 2005?
3      A  Yes, ma'am.
4      Q  What was he doing?
5      A  He was on aircraft. He was a
6  supervisor on aircraft.
7      Q  So, they brought him over to
8  facilities in 2005? Is that right?
9      A  Yes, ma'am.
10     Q  So, you think between 2005 and now,
11  there have been about five or six maintenance
12  mechanics that have been hired in facilities?
13     A  Yes, ma'am.
14     Q  Are you aware of any idea of
15  recalling formerly laid off employees to be
16  hired into these positions?
17     A  State the question again.
18     Q  I know. It wasn't a very good
19  question. Has anyone in management expressed
20  to you the idea that Pemco was recalling
21  formerly laid off employees to be hired into
22  these positions that were now available?
23     A  In facilities?
24     Q  Yes, in facilities.
25     A  No, ma'am. Nobody has -- I have

56

1  no --
2      Q  Nobody has ever said that to you?
3      A  No, ma'am.
4      Q  So, the five or six employees that
5  have been hired in facilities since 2005 --
6      A  Are brand new.
7      Q  -- are brand new?
8      A  Yes, ma'am.
9      Q  Are any of them people who were
10  laid off previously and been recalled, that
11  you're aware of?
12     A  The ones that were laid off or were
13  locked out, when they come back to work, they
14  came back to work.
15     Q  Right.
16     A  These five or six that I'm talking
17  about are brand new. They weren't laid off.
18  These were new hire people to fill new -- you
19  know, fill slots that we -- because of the
20  growth of the company, we needed more people
21  to take care of the facility.
22     Q  Okay. And all of these are new
23  hires, and not people that had been
24  previously employed by Pemco?
25     A  Yes, ma'am.

57

1    Q   Has there been growth in the
2  company since 2005?
3    A   Yes, ma'am.
4    Q   And tell me about that growth.
5  What has generated that growth?
6    A   Well, the contract with Southwest
7  Airlines.
8    Q   When did that start to create some
9  growth in the company?
10    A   2006.
11    Q   And how long is that expected to
12  last?
13    A   There's no -- I mean, if we can do
14  the work, we'll keep the work.  I mean, I
15  don't know.  I hope it will be here.
16    Q   Me, too.  Have you given a
17  deposition before, Mr. Miller?
18    A   No, ma'am.
19    Q   Have you ever had any write-ups or
20  reprimands?
21    A   I had one.
22    Q   Tell me about that?
23    A   That was prior to management.  It
24  was for child support, where they was taking
25  out.  That's automatic.  You get a write-up

58

1  for that automatically.  You did back in '93,
2  '94, anyway.  I think they've probably
3  changed that now.  I don't know whether they
4  still do that or not.  I don't think they
5  can, legally, 'cause everything goes through
6  the court now.
7    Q   Any other write-ups?
8    A   No, ma'am.  Not that I can
9  remember.
10    Q   Have you ever been suspended --
11    A   No, ma'am.
12    Q   -- for any discipline reasons?
13    A   No, ma'am.
14    Q   Have you ever been convicted of any
15  crimes?
16    A   No, ma'am.
17    Q   Have you ever had any civil
18  lawsuits against anyone, other than the
19  divorces?
20    A   No, ma'am.
21    Q   How many employees is Ted Ball
22  supervising?  Do you know?
23    A   Not right off the top of my head, I
24  don't know.
25    Q   Has day shift also grown in the

59

1  number of employees in facilities?
2    A   Well, right now, it's deficient
3  from what it was.  It's hard to
4  differentiate.  What they done, when they
5  hired these people, really, they built up
6  second shift, which was always short.  And
7  so, most of it is kind of the second shift.
8  But they're deficient right now, because they
9  had -- one employee went to supply, and so --
10    Q   Have they added more positions to
11  day shift since 2005, I mean, if you're
12  aware?  If you're not aware, that's fine.
13    A   I don't know what you're talking
14  about.  There's only one -- in the bargaining
15  agreement, there's only one position.  That's
16  maintenance mechanic.
17    Q   Yeah.  What I mean is number of
18  employees.  You said about five or six had
19  been added to night shift.
20    A   Yes, ma'am.
21    Q   Have additional employees been
22  added to day shift, too?
23    A   No, ma'am.  No.  That's just --
24  we've had five or six in the whole
25  department, because they -- you know, they

60

1  moved because of seniority.  So, we've had
2  about five or six people added --
3    Q   I see.
4    A   -- to the overall department since
5  2005.
6    Q   Not just on night shift?
7    A   Right.
8    Q   Okay.  And they go back and
9  forth --
10    A   Right.
11    Q   -- depending on seniority?
12    A   Yes, ma'am.
13    Q   All right.  Got you.  When you were
14  promoted to supervisor, how did you get that
15  job?  Did you have to apply for it?
16    A   Yes, ma'am.
17    Q   Did they hire supervisors based on
18  seniority?
19    A   No, ma'am.
20    Q   Were you asked to apply for it, or
21  how did that work?  Do you remember?
22    A   Yes, ma'am.  Roger told me that
23  that job was going to be available, and that
24  if I wanted to apply, because they couldn't
25  -- they couldn't get me a pay raise.  And so,

61

1  he told me about the supervisor job, and he
2  said that I needed to apply for it if I --
3  you know, if I felt like I wanted to do that.
4  And he told Jeremy Bess the same thing. I
5  think me and him was the only two that
6  applied.
7      Q    And you got the job?
8      A    Yes, ma'am.
9      Q    Did you have more seniority than
10 Jeremy Bess?
11     A    No, ma'am.
12         MR. HOLMES: Is that Best, B-e-s-t?
13         THE WITNESS: No. B-e-s-s, Bess.
14     Q    What was Jeremy Bess' position at
15 that time?
16     A    He was a maintenance mechanic.
17     Q    Just like you were?
18     A    Well, I was a plant mechanic.
19 There was two -- there was plant mechanic and
20 maintenance mechanic at that time in the
21 bargaining agreement.
22     Q    I see.
23     A    And that was changed in one of the
24 bargaining agreements, where we just had
25 maintenance mechanics.

62

1      Q    And everybody was a maintenance
2  mechanic?
3      A    Everybody was a maintenance
4  mechanic.
5      Q    What was the difference between
6  plant mechanic and maintenance mechanic back
7  then?
8      A    A plant mechanic is where you
9  started. No matter how much experience you
10 had, that's where you started at. And you
11 didn't have to have as many tools, and you
12 didn't have to have as much training. But it
13 didn't make no difference how much training
14 you had. You were going to start plant
15 mechanic.
16     And then, they only authorized --
17 allowed so many maintenance mechanics within
18 facilities at the time. And you could not
19 get to be a maintenance mechanic until
20 somebody retired or died or left. So, you
21 was pretty well locked into plant mechanic.
22 And I think that's the reason why they --
23 'cause you couldn't get a pay raise. I mean,
24 there was no way to promote them.
25     Q    Oh, I see.

63

1      A    There was no way to promote.
2      Q    And you were a plant mechanic at
3  that time or a maintenance mechanic?
4      A    Plant mechanic.
5      Q    You were a plant mechanic?
6      A    Yes, ma'am.
7      Q    You've never taken family medical
8  leave? Correct?
9      A    No, ma'am.
10     Q    How long was it between the time
11 that Clark Briody told you that there might
12 be a chance of you coming back to work and
13 the time that you actually started back to
14 work in August of '05?
15     A    It seems like it was about three
16 weeks. Something like that.
17     Q    Are you aware of any other person
18 in management who was laid off in July of '05
19 that was brought back after that, other than
20 yourself?
21     A    No, ma'am. There may have been
22 some production people. I don't know for
23 sure. I don't work over there. But there
24 wasn't anybody in maintenance, in facility.
25     Q    Who was the day shift facilities

64

1  supervisor before Ted Ball? Do you remember?
2      A    Prior to 2005?
3      Q    Yes, sir.
4      A    I don't believe we had one, not on
5  day shift. I believe Roger was the manager,
6  and Henry was the director, and I was on
7  nights. That's all there was.
8      Q    And so, then, Ted Ball came over as
9  what position? Is he considered a
10 supervisor?
11     A    Yes, ma'am. He's supervisor.
12     Q    So, that position was created for
13 Ted Ball when he came over? Is that right?
14         MR. HOLMES: Object to the form.
15     Q    I mean, it didn't exist before he
16 had it?
17         MR. HOLMES: Object to the form.
18     A    Well, when I was on day shift,
19 before I went to nights, I was the
20 supervisor. But, whenever they made Henry a
21 director, then they kept Roger as the
22 manager. And, actually, Roger was being a
23 manager and a supervisor at the same time.
24 And I was on night shift. So, actually,
25 Roger was doing -- he was being supervisor

65

1  plus manager, or he might have been being
2  supervisor and getting manager pay. I don't
3  know how it was. But, anyway, he was doing
4  that job as a -- he was taking care of the
5  people on day shift just like he always had.
6      Q    And then, when Ted Ball came over
7  to facilities, he was considered a
8  supervisor, and not a manager? Right?
9      A    That's the way I understand. Yes,
10  ma'am.
11      Q    And he does the same thing that you
12  do, only he does it on day shift?
13      A    Yes, ma'am.
14      Q    Do you have any type of employment
15  agreement that's in writing, like, a written
16  employment contract?
17      A    No, ma'am.
18      Q    I didn't think you did. Just
19  asking. Have you had any other education,
20  formal education, as far as going back to
21  school and getting degrees or anything like
22  that?
23      A    No, ma'am.
24      Q    Did we talk about all the jobs that
25  you have had in your career?

66

1      A    Yes, ma'am, I think we did, at the
2  beginning.
3      Q    You've not had any other businesses
4  on the side or other jobs on the side, other
5  than what we've talked about?
6      A    Well, now, I do mechanic work on
7  the side.
8      Q    Is that something you've always
9  done?
10      A    No. But I've always had two or
11  three jobs. Two jobs, at least. I mean,
12  I've always had part-time jobs. When I
13  worked at Trailways, I drove a bus on the
14  weekends.
15      Q    For Trailways?
16      A    Yeah. I mean, I've always did
17  something. I've always worked. That's what
18  it took for me to live, pay child support,
19  and all kind of mess. Anyway --
20      Q    Do you do mechanical work on the
21  side now?
22      A    Yes, ma'am.
23      Q    Just on cars? Work on cars?
24      A    Yes, ma'am.
25      Q    Do you work for somebody, or do you

67

1  just have your own shop?
2      A    I just do it at my house.
3      Q    I mean, do you have a formal shop
4  that's open, or is it just --
5      A    No.
6      Q    -- word of mouth?
7      A    Word of mouth. Just part time.
8      Q    How many hours a week do you do
9  that, that mechanical work?
10      A    Probably about 15 to 20 hours.
11      Q    Have you worked for any of the
12  other, you know, repair shops around in
13  Ashford or here?
14      A    No, ma'am.
15      Q    During your time at Pemco, have you
16  had any other jobs other than working for
17  Pemco and doing this part-time work at your
18  house on the side?
19      A    No, ma'am.
20      MS. GLASGOW: Okay, Mr. Miller. I
21      think that's all I have. I
22      appreciate you coming in.
23      MR. HOLMES: I just have one
24      question.
25

68

1          EXAMINATION
2
3  BY MR. HOLMES:
4      Q    Richard, who made the decision to
5  promote you to supervisor in 1999?
6      A    I guess Roger did. I don't know.
7  I mean, I don't know if -- I don't really
8  know what all the process was. I know he
9  told me I got promoted.
10      Q    And he also told you to apply for
11  the job?
12      A    Yes.
13      MR. HOLMES: That's all I have.
14      MS. GLASGOW: That's it. Thank you
15      very much. I appreciate you
16      coming and doing this.
17      THE WITNESS: All right.
18
19          END OF DEPOSITION
20
21
22
23
24
25

```
 1          STATE OF ALABAMA
 2          HOUSTON COUNTY
 3
 4              I, Stacey Watkins, RPR, and Notary
 5          Public, State at Large, do hereby certify
 6          that the foregoing transcript, pages 1
 7          through 68, is a true and correct transcript
 8          of the testimony and proceedings taken at
 9          said time and place; and that the same was
10          taken down by me in stenograph shorthand,
11          and transcribed by me personally or under
12          my personal supervision.
13              I further certify that I have no
14          interest in this matter, financial or
15          otherwise, or how it may develop or what
16          its outcome may be.  I further certify that
17          I am not of counsel for any of the parties,
18          nor am I related to counsel or litigants or
19          associated with anyone connected with this
20          cause to my knowledge.
21              Witness my hand this 17th day of
22          August, 2007.
23
24          _____
25          _____ RPR, Notary Public,
                              State at Large
```

# EXHIBIT 8

1

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE MIDDLE DISTRICT OF ALABAMA
 3                 SOUTHERN DIVISION
 4
 5  ROGER WRIGHT,            )
 6       Plaintiff,          )
                             )
 7  VS.                      ) CA NO.: 1:06 CV 647-WKW
 8  PEMCO WORLD AIR SERVICES,)
    INC.,                    )
 9                           )
         Defendant.          )
10
11
12       The deposition of TED BALL, taken by the
13  Plaintiff, pursuant to the Federal Rules of Civil
14  Procedure, before Kimberly B. Faucette, Certified
15  Court Reporter and Notary Public in and for the State of
16  Alabama at Large, at the law offices of Farmer, Price,
17  Hornsby & Weatherford, Dothan, Alabama, on the 16th day
18  of August, 2007, at 1:00 p.m., pursuant to notice.
19
20                *    *    *    *    *
21  APPEARANCES:
22  FOR THE PLAINTIFF:        FOR THE DEFENDANT:
23  MS. ELIZABETH GLASGOW     MR. JOHN HOLMES
    Attorney at Law           Attorney at Law
24  Dothan, Alabama           Birmingham, Alabama
25
```

2

```
 1          S T I P U L A T I O N S
 2          It is stipulated by and between counsel for
 3  the parties that this deposition is taken at this time
 4  by Kimberly B. Faucette, Court Reporter and Notary
 5  Public, State at Large, who is to act as commissioner
 6  without formal issuance of commission to her; that said
 7  deposition shall be taken down stenographically,
 8  transcribed, and certified by the commissioner.
 9          Except for objections as to the form
10  of questions, no objections need be made at the time of
11  the taking of the deposition by either party, but may be
12  interposed by either party at the time the deposition is
13  read into evidence, which shall be ruled upon by the
14  Court on the trial of the cause upon the grounds of
15  objection then and there assigned.
16
17
18
19
20
21
22
23
24
25                *    *    *    *    *
```

3

```
 1                    TED BALL
 2  having been first duly sworn, testified as follows,
 3  to-wit:
 4                   EXAMINATION
 5  BY MS. GLASGOW:
 6       Q    Mr. Ball, my name is Libby Glasgow.  I
 7  represent Roger Wright in this lawsuit that Mr. Wright
 8  has brought against Pemco.  I am going to be asking a
 9  number of questions today, and we are on the record.
10  The court reporter is taking down everything that we
11  say.  So when I ask a question, you need to answer the
12  question out loud.  You can't shake your head or nod
13  your head or anything like that, all right?
14       A    Okay.
15            MR. HOLMES:  You can, as long as you speak out
16                 loud at the same time.
17       Q    You can do whatever you want, as long as you
18  speak out loud.
19       A    As long as you are verbal with it.
20       Q    That's right.  This is not a video deposition.
21  Give me your current address.
22       A    927 Honeysuckle Road, Apartment J-126.
23       Q    In Dothan?
24       A    Yes, ma'am.
25       Q    That is 36301?
```

4

```
 1       A    36305.
 2       Q    Okay.  And I understand you are employed at
 3  Pemco?
 4       A    Yes, ma'am.
 5       Q    How long have you been there?
 6       A    This last time, since 1988.
 7       Q    Did you work for Hayes before then?
 8       A    Yes, ma'am.  1960 to 1963.
 9       Q    What did you do for Hayes in the 1960s?
10       A    I was a sheet metal tank sealer worker.
11       Q    And then what did you do between the time
12  period when you worked for Pemco?
13       A    I went to Lake City, Florida, and worked with
14  Aero Corporation.
15       Q    With who?
16       A    Aero, A-E-R-O, Corporation.
17       Q    And what does Aero Corporation do?
18       A    Aircraft overhaul modifications.
19       Q    And what did you do for them?
20       A    Well, I started off as a leadman, went to
21  supervisor, foreman, general foreman, wound up being the
22  project manager to the C-130 program.
23       Q    And that is in production as far as working on
24  the aircraft itself; is that right?
25       A    Yes, ma'am.
```

5

1    Q    And then what did you do when you switched
2  over and started at Pemco in the 1980s?
3    A    I was a supervisor in production, again
4  supervising people on airplanes, aircraft work.
5    Q    And that is a management position?
6    A    Yes, ma'am.
7    Q    Have you ever been part of the bargaining unit
8  of Pemco?
9    A    From '60 to '63, I was.
10   Q    But not when you came back?
11   A    No, ma'am.
12   Q    And so how long did you stay in the
13 supervisor's position at Pemco?
14   A    Here?
15   Q    Yes.
16   A    This last time, I am still in supervision.  I
17 came here in '88, and I was in supervision.  I am still
18 in supervision.
19   Q    But you are no longer in production, you are
20 in facilities now, I understand.
21   A    I am working in the facilities department now,
22 yes, ma'am.
23   Q    But take me back.  You were a supervisor in
24 production when you first came back in the 1980s; right?
25   A    Yes, ma'am.

6

1    Q    Did you have any other job titles between then
2  and the time you moved into facilities?
3    A    I moved up to assistant manager.
4    Q    And who was your manager?
5    A    It varied.  Most of the time it was Shane
6  King, and part of the time, it was Rusty Nelson.
7    Q    Have you always been on day shift?
8    A    I have worked some night shift, yes, ma'am.
9    Q    And how long were you assistant manager?
10   A    I don't know exactly.  It was several years.
11   Q    And then did you have any other positions
12 before you moved into facilities?
13   A    Just aircraft.  That is all.
14   Q    And as an aircraft assistant manager, what
15 were your duties?
16   A    Mostly supervising supervisors.
17   Q    And how do you do that?
18   A    Well, you give them instructions what has
19 to be done, how to do it.  You try to educate them on
20 the ways of proper procedures.
21   Q    So a little bit of training, education?
22   A    And seeing that the work is done.
23   Q    And follow up to make sure that it is done
24 right?
25   A    On time and in budget, yes, ma'am.

7

1    Q    About how many people did you supervise?
2    A    Here or Lake City or what?
3    Q    As an assistant manager at Pemco?
4    A    Around a hundred, I imagine.  It varies
5  according to how many aircraft you have at the time.  It
6  goes up and down constantly.
7    Q    But you are not actually working on the
8  aircraft yourself?
9    A    We are not allowed to in supervision.
10   Q    When was the last time you actually worked on
11 the aircraft itself?
12   A    Back in Pemco -- I mean, Aero, when I first
13 got there.  Ever since then, I have been in management.
14   Q    And you said you worked for Shane King and
15 Rusty Nelson?
16   A    Yes, ma'am.
17   Q    When did you move over into facilities?
18   A    It was probably around August, probably of
19 '05.
20   Q    And what prompted that move into facilities?
21   A    Well, I was in the lay-off like the rest of
22 them was.
23   Q    Were you actually laid off?
24   A    Yes, ma'am.
25   Q    When were you laid off?

8

1    A    Around July 15th.  Somewhere in that
2  neighborhood.  I am not sure about the exact date, but
3  it was around the middle of July.
4    Q    Go ahead.  I interrupted you.
5    A    And they called me back sometime around the
6  middle of August.  Somewhere in that neighborhood.
7    Q    Who called you back?
8    A    It was on my answering machine.
9    Q    Who left the message?
10   A    Human resources.
11   Q    And who was that at the time?
12   A    I can't remember the name.
13   Q    Jim Batcher?
14   A    Just one of his assistants.  One of the girls
15 there in the office.
16   Q    Ramona Siegler?
17   A    No.
18   Q    Jerry Paulk?
19   A    I don't remember if it was Jerry or not, but
20 she was there at the time.
21   Q    But someone from HR called you?
22   A    Yes.  They left it on my answering machine,
23 because I was down in Lake City.  I called home and it
24 was on my answering machine.  So I came back.
25   Q    And what did they tell you?

9

```
1      A    Report back to work on a certain date.
2      Q    And did you know that you were going back into
3  facilities rather than in production?
4      A    I didn't have any idea at that time where I
5  was going.  I just called back.
6      Q    Who did you talk to when you called back?
7      A    HR, human resources.
8      Q    And what did they tell you?
9      A    They just told me to come in.  I had to go
10  take all of the drug tests again and wait until they
11  were all approved before I could actually start back.
12  It was just like hiring back in.
13      Q    And when did you find out what you were going
14  to be doing?
15      A    Probably a couple of days after I got back, I
16  was told I was going to be working tooling.
17      Q    In the facilities department?
18      A    Yes, ma'am.
19      Q    You said that was a couple of days after you
20  got back?
21      A    Yes, ma'am.
22      Q    Where did you start?
23      A    I just played around on the aircraft with the
24  other managers and helping them out.
25      Q    Was the lock-out going on when you came back?
```

10

```
1      A    About a couple of days after I came back, two
2  or three days after I came back is when it happened,
3  yes, ma'am.
4      Q    So you spent how many days in production then?
5      A    Two to three days, just helping them out.
6      Q    And then you were moved into facilities?
7      A    Yes, ma'am.  I went in to operate the tool
8  room when the lock-out started.
9      Q    Who had been doing that work before you came
10  back to facilities to do the tooling?
11      A    People that work in the facilities department.
12  It is an hourly position.
13      Q    And so the bargaining unit employees had been
14  doing the tooling work?
15      A    Yes, ma'am.
16      Q    Were you brought back at an hourly rate or as
17  a supervisor?
18      A    As a supervisor.
19      Q    And when the lock-out occurred, what did you
20  do then?
21      A    I moved in to the -- I was told to operate the
22  tool room, so I went in and issued tooling, reworked the
23  tool room, you know, just made improvements.
24      Q    Did your pay change when you came back?
25      A    No, ma'am.  It remained the same.
```

11

```
1      Q    And how long did you operate the tool room?
2      A    Until the lock-out was over.
3      Q    And then what did you do after the lock-out
4  was over?
5      A    I went over into facilities.
6      Q    You were already in facilities; right?
7      A    Yes, ma'am.  But at that point, I was not in
8  the office in facilities.  I was just working the tool
9  crib every day.
10      Q    Were they paying you the same amount as a
11  supervisor, though, to operate the tool room during the
12  lock-out?
13      A    Yes, ma'am.
14      Q    You didn't take a cut in pay to operate the
15  tool room?
16      A    No, ma'am.
17      Q    Do you remember what your pay was during that
18  time?
19      A    Probably twenty-four something an hour, I
20  would imagine.  Somewhere in that neighborhood.
21      Q    What are you making now?
22      A    Right around twenty-seven.
23      Q    Do you know what that means in terms of an
24  annual salary?
25      A    Somewhere around forty-five, I think it is.
```

12

```
1      Q    Okay.  So after the lock-out was over, you
2  became a supervisor in facilities?
3      A    That is the job I was doing, yes, ma'am, on
4  the tool equivalency.
5      Q    So you supervise the people who are doing the
6  tooling now?
7      A    Yes, ma'am.
8      Q    And have you continued to do that to the
9  present time?
10      A    Yes, ma'am.
11      Q    Had you ever worked in facilities before they
12  brought you back in August of '05?
13      A    No, ma'am.  I have always been in aircraft.
14      Q    Have you worked production at all since they
15  moved you over to facilities?
16      A    Yes, ma'am.  I have been called back not too
17  long ago to work a aircraft for, I think it was, two
18  days.
19      Q    Other than those two days, have you worked any
20  other production?
21      A    No, that is the most I have done.  The best I
22  recall, that is all I have done.
23      Q    And that was recently?
24      A    Within the last year.
25      Q    Have you been employed full time in facilities
```

13

```
 1   then since you came on in August of '05?
 2      A    Yes, ma'am.
 3      Q    You don't have any trouble having enough work
 4   to do to fill forty hours a week, do you?
 5      A    No, ma'am.  The tool equivalency program is a
 6   job within itself.
 7      Q    How many hours a week does it normally take?
 8      A    A regular week would be forty.  We work quite
 9   a few Saturdays.
10      Q    Do you?
11      A    And sometimes we work a Sunday.
12      Q    Do you get paid overtime for that?
13      A    We get regular pay.
14      Q    How often do you get the overtime?  And I know
15   it is not time and a half; it is regular pay.  But how
16   often do you work overtime?
17      A    Some months we don't work.  Sometimes we may
18   work for several weeks in a row.  It is according to
19   what we have got going on at the time.  Here recent, we
20   have been working to get the paperwork and all done.  So
21   we have worked several Saturdays and Sundays here
22   recently.
23      Q    Mr. Ball, can you tell me about your
24   educational background?
25      A    I graduated from high school.  Then I went to
```

14

```
 1   George C. Wallace Trade School and took business
 2   administration and basic accounting.  I didn't graduate.
 3   I got near it, and my dad got sick and I quit and went
 4   back to help him.  Then down in Lake City, we went to
 5   numerous courses at night on management, human
 6   relations.  We went quite often there to the college at
 7   night for further education.
 8      Q    Okay.  And what is your date of birth, sir?
 9      A    10/26/39.
10      Q    You said you were laid off July 15th?
11      A    Somewhere around that date.
12      Q    Okay.  Were you aware of Roger Wright getting
13   laid off during that time period?
14      A    Yes, ma'am.  There was quite a few of us who
15   got laid off.
16      Q    Have you talked with Dennis Johnson about
17   Roger Wright at all?
18      A    No, ma'am.
19      Q    Or about his coming back to work in
20   facilities?
21      A    No, ma'am.
22      Q    Have you talked to Clarke Briody about that
23   at all?
24      A    No, ma'am.
25      Q    Who made the decision, as far as you know, to
```

15

```
 1   bring you back in August of '05?
 2      A    I would think it would have been Mr. Johnson.
 3   He was the head of the department.
 4      Q    He made those decisions, didn't he?
 5      A    I would think.  I couldn't be absolutely sure.
 6   That would be my guess.
 7      Q    Did you have any conversations with him about
 8   what you were going to do in facilities?
 9      A    The tool equivalency.  We were way behind on
10   tool equivalency.
11      Q    Did he talk to you directly about that, about
12   what you were going to be doing?
13      A    Yes, ma'am.  Tool equivalency.  That is an FAA
14   mandated requirement.
15      Q    Had you ever done any type of tool equivalency
16   work before starting that in August of '05?
17      A    No, ma'am.  This is a new program.
18      Q    New program for Pemco?
19      A    For most everybody.
20      Q    This was a new mandate from FAA?
21      A    It had been out a little while, but very few
22   people had done much about it.
23      Q    Did you know Roger Wright?
24      A    Yes, ma'am.  Sure.
25      Q    Have you ever had any problem with his work
```

16

```
 1   performance in any way?
 2      A    No, ma'am.
 3      Q    Is he known to be a hard worker?
 4      A    As far as I know.  He worked facilities.  I
 5   worked the aircraft.  I have had no problems.
 6      Q    Did you ever have any problems with him
 7   yourself?
 8      A    No, ma'am.
 9           MS. GLASGOW:  Mr. Ball, I think that is all I
10           have.  I appreciate it.
11           MR. HOLMES:  I just have a couple of
12           questions.
13                          EXAMINATION
14   BY MR. HOLMES:
15      Q    You testified, since you have been a
16   supervisor, you haven't been allowed to work on the
17   aircraft because the bargaining unit employees work on
18   the aircraft, y'all don't touch the aircraft?
19      A    We don't work aircraft.  We can supervise it,
20   instruct them, but we don't actually do hands-on work.
21   That is part of the bargaining unit.
22      Q    During the lock-out, you did spend a couple of
23   days helping on the aircraft?
24      A    No, sir.  I was in the tool crib.
25      Q    Before you went to the tool crib, that first
```

17

1    day or two you were back?

2        A    I went around with the managers.  The people

3    were still there.  So it was just like a supervision job

4    like I had been doing before.

5        Q    Are you qualified to work on aircraft?

6        A    Yes, sir.  I have an A&P license.

7        Q    You testified that the tool equivalency work

8    was a relatively new program from the FAA.  Had you had

9    experience with tooling prior to going to the tool crib,

10   though?

11       A    Yes, sir.  I had designed a lot of tooling,

12   had tooling made, equipment made, in the past to get

13   jobs done.

14       Q    And had you done some of that yourself?

15       A    Yes, sir.  I didn't make it.  I would just

16   make the drawings and the guys in the shops make it.

17       Q    And was Dennis Johnson, to your knowledge,

18   aware of your experience in tooling?

19       A    I am reasonably sure he was.

20           MR. HOLMES:  That is all I have got.  Thank

21               you.

22           MS. GLASGOW:  Thank you, Mr. Ball.  I

23               appreciate it.

24               END OF DEPOSITION

25

18

1                    REPORTER'S CERTIFICATE

2    STATE OF ALABAMA

3    HOUSTON COUNTY

4            I, Kimberly B. Faucette, Certified Court

5    Reporter and Notary Public for the State of Alabama at

6    Large, do hereby certify that the foregoing

7    transcript, pages 1 through 17, is a true and correct

8    transcript of the testimony and proceedings taken at

9    said time and place; and that the same was taken down by

10   me in stenograph shorthand, and transcribed by me

11   personally or under my personal supervision.

12           I further certify that I have no interest in

13   this matter, financial or otherwise, or how it may

14   develop or what its outcome may be.  I further certify

15   that I am not of counsel or litigants or associated with

16   anyone connected with this cause to my knowledge.

17           Witness my hand this 20th day of August,

18   2007.

19

20

21

22           _____

23           Certified Court Reporter and Notary

24           Public, State at Large

25           AL-CSR-440