**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **Roger Wright,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 1:06-CV- 647-WKW** |
| | ) | |
| **Pemco World Air Services, Inc.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S BRIEF IN SUPPORT OF</u>**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

UNDISPUTED MATERIAL FACTS ....................................................................2

Plaintiff's Work History .......................................................................................2

Plaintiff's Back Surgery and Leave ......................................................................3

2005 Layoffs .........................................................................................................5

Plaintiff's Demand for Severance and Retirement ...............................................8

2005 Lockout .........................................................................................................9

Plaintiff's EEOC Charge......................................................................................10

Pemco's Pension Plan ..........................................................................................10

SUMMARY JUDGMENT STANDARD ............................................................11

ARGUMENT .......................................................................................................11

I.     DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
       CLAIM THAT PEMCO VIOLATED THE FMLA. .......................................11

       A. Plaintiff's FMLA "Interference Claim" Fails as a Matter of Law ...............12

       B. Plaintiff's FMLA Retaliation Claim Also Fails as a Matter of Law ............15

II.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
       OUTRAGE CLAIM..........................................................................................19

III.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
       AGE DISCRIMINATION CLAIM ...................................................................21

       A.     Plaintiff's *Prima Facie* Case..................................................................22

       B.     Pemco's Legitimate, Nondiscriminatory Reasons...................................23

       C.     Plaintiff Cannot Rebut Defendant's Legitimate and
              Nondiscriminatory Reasons .....................................................................24

IV.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S
       ERISA CLAIM .................................................................................................26

CONCLUSION.....................................................................................................28

i

## <u>INTRODUCTION</u>

In 2005, Pemco World Air Service, Inc. ("Pemco") was faced with a rapid decline in the number of aircraft coming into the facility, largely due to the uncertainty surrounding labor contract negotiations over an expiring collective bargaining agreement. As a result of the reduced work load, during the Spring and Summer of 2005, Pemco had to realign some of its departments and conduct a series of reductions in force. Those reductions affected not only bargaining unit employees, but eventually included many indirect employees, or employees who do not work directly on the aircraft. Unfortunately for Roger Wright (hereinafter "Plaintiff"), he was one such employee and one of more than 25 indirect employees who were reduced or laid off between May 27, 2005 and August 9, 2005. Unfortunately for Pemco, Plaintiff had been on paid medical leave beginning in June 2005.

Plaintiff now brings this action against Pemco under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), Alabama common law, the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").[1] Plaintiff essentially alleges Pemco acted in an intentionally outrageous, unlawful manner by willfully demoting him and then terminating his employment while he was on medical leave and replacing him with a substantially younger individual, ultimately denying him retirement benefits to which he would otherwise be entitled.

However, Pemco violated no law, statutory or common, when it included Plaintiff in the July 2005 reductions in force as Plaintiff's recent paid medical leave, age, or participation in the pension fund had absolutely nothing to do with the jobs that were eliminated or Plaintiff's subsequent layoff. Because Plaintiff offers no evidence of retaliatory or discriminatory intent

---

[1] In an email dated September 17, 2007, counsel for Plaintiff expressly agreed that Plaintiff's perceived disability claim under the ADA is due to be dismissed. As a result, Pemco will not address Count IV in this brief.

and cannot rebut Pemco's legitimate, nondiscriminatory and nonretaliatory reasons for realigning its departments and laying Plaintiff off indefinitely, he cannot prevail on any of his claims as a matter of law.

## UNDISPUTED MATERIAL FACTS[2]

### Plaintiff's Work History

Plaintiff (DOB 11/28/49) first began working for Pemco's predecessor, Hayes International, in 1968 as a Flight line B mechanic and worked in that capacity for approximately four years. (Deposition of Plaintiff ("Pl. Depo.") at 6:2-3, 9:17-10:3). In 1972, Plaintiff quit his job at Hayes and began working as a carpenter for Daniel Construction. (Pl. Depo. at 10:4-18). From 1972 until 1989, Plaintiff worked as a carpenter and ran a small convenience store. (Pl. Depo. at 10:11-13:5).

In 1989, Plaintiff was hired by Pemco in the Facilities Department as a plant mechanic, an hourly position which he held for approximately one month. (Pl. Depo. at 13:12-14:4). As a plant mechanic, Plaintiff did carpentry, brick masonry, pipe fitting, electrical, and janitorial work. (Pl. Depo. at 13:22-14:2). Plaintiff was then promoted to a Supervisor of Facilities position on second shift, a position which he held for approximately 2 ½ years. (Pl. Depo. at 14:7-15:10). Plaintiff then moved to the same supervisor position on first shift. (Pl. Depo. at 21:2-9).

Although Plaintiff did not join the International Association of Machinists and Aerospace Workers, AFL-CIO, Local No. 1632 ("the Union") as an hourly employee, he later supervised bargaining unit members and was familiar with labor issues and with the Collective Bargaining Agreement ("CBA") between Pemco and the Union, including the layoff process set forth therein. (Pl. Depo. at 14:12-16; 24:15-20, 42:16-43:4). From time to time, Plaintiff had to layoff

---

[2] The "undisputed" facts recited herein are presented for purposes of summary judgment and Pemco reserves the right to dispute these facts if necessary in later stages of this case.

employees he supervised.  (Pl. Depo. at 50:8-18).  As a member of management for several years, Plaintiff was familiar with Pemco's policies and procedures, including Pemco's anti-discrimination and FMLA policies.  (Pl. Depo. at 8:1-9:3, 44:14-21, 118:18-119:11).

In 1997, Plaintiff was promoted to the position of Manager of Facilities.  (Complaint ¶ 6).  As Manager of Facilities, Plaintiff was responsible for the requisition material, budgeting for the department, constructing work stands, fabrication work, overseeing the waste water facility, all ground support equipment, equipment in the hydraulic shop, general facilities maintenance, and working with outside vendors.  (Pl. Depo. at 27:15-28:9).  In 2003, Plaintiff reported to Henry Ward, Director of Facilities, and supervised Facilities Supervisors, among others.  (Pl. Depo. at 46:2-3).

On June 10, 2005, Henry Ward retired from his position as Director.  (Declaration of Francis X. Henry (hereinafter "Henry Decl.") ¶ 5).  At that time, Dennis Johnson (DOB 12/1/54), Vice President of Operations, assumed the responsibility of overseeing all Facilities Maintenance in addition to his regular production management position.  (Deposition of Dennis Johnson ("Johnson Depo.") at 41:10-11, 94:14-95:18).

**<u>Plaintiff's Back Surgery and Leave</u>**

Beginning in 2004, Plaintiff began to have trouble with his back.  (Pl. Depo. at 73:10-75:18).  He sought treatment over time, and eventually required surgery on his lower back.  (Id.).  In early June, Plaintiff informed management that he was going to have surgery on June 8, 2005.  (Id.).  On Friday, June 3, 2005, Plaintiff talked to Johnson about his surgery and rode around the facility identifying his work that was ongoing.  (Pl. Depo. at 76:7-18).  Plaintiff informed Johnson he was going to be off for four weeks and would be taking his accrued sick leave.  (Id., 77:17-78:1).  Johnson did not have a problem with Plaintiff taking sick leave.  (Johnson Depo. at

146:25-147:12).  Plaintiff did not discuss FMLA leave with Johnson or Human Resources at that time, or ever.  (Pl. Depo. at 79:1-11).

While Plaintiff was out, Pemco needed someone to fill in for Plaintiff.  (Johnson Depo. at 147:16-22).  Johnson decided that Clarke Briody (DOB 9/7/55), a production manager, was going to cover for Plaintiff.  (Deposition of Clarke Briody ("Briody Depo.") at 88:7-8; Johnson Depo. at 148:11-17).  Johnson informed Plaintiff that Briody would be filling in for Plaintiff while he was out, and asked Plaintiff to meet with Briody before his surgery to discuss all ongoing work.  (Pl. Depo. at 76:7-18).  On June 6 and 7, 2005, Briody worked with Plaintiff to get up to speed on what was going on in the department and what needed to be done.  (Pl. Depo. at 76:19-22; Briody Depo. at 54:17-55:21).

Plaintiff underwent surgery on his back on June 8, 2005.  (Pl. Depo. at 76:22).  While he was out on leave, Plaintiff sought and received short-term disability benefits in addition to his paid sick leave.  (Pl. Depo. at 90:10-12, 105:21-106:8).  During his recovery, Plaintiff walked and exercised per his doctor's instructions.  (Pl. Depo. at 90:1-9).  Plaintiff returned to the doctor on or around July 6, 2005.  (Pl. Depo. at 92:2-6).  Plaintiff asked the doctor if he could return to work on July 11, 2005 because he wanted to return to work – "laying around the house wasn't for me."  (Pl. Depo. at 92:15-93:13).  The doctor approved his request to return to work, but put Plaintiff on limited duty of 6 hours maximum per day for two weeks with limited stair climbing.  (Id.).

Plaintiff called Johnson and told him he could return to work on July 11, 2005, and Johnson told him to check in with Human Resources before then.  (Pl. Depo. at 94:12-95:10).  Plaintiff went to Pemco's Human Resources' office on July 7, 2005.  (Pl. Depo. at 95:3-4).  Plaintiff met with Johnson that day and they discussed Plaintiff's employment status in light of what was happening with the business.  (Pl. Depo. at 97:6-101:7).

4

**2005 Layoffs**

Pemco is in the business of performing maintenance work on commercial aircraft. (Henry Decl. ¶ 1). The amount of work at Pemco at any given time is dependent on the existing contracts with customers. (Pl. Depo. at 18:17-20, 39:20-40:7). In 2005, Pemco was faced with a rapid decline in the number of aircraft coming into the facility and management personnel feared that layoffs were going to have to occur in all departments. (Johnson Depo. at 101:7-11). The main basis for the decrease in work was due to the upcoming expiration of the CBA with the Union. (Johnson Depo. at 101:12-15). The contract was due to expire on August 9, 2005, and Pemco had warned its customers that it was engaged in contract negotiations with the Union. (Henry Decl. ¶ 2, Johnson Depo. at 110:18-23). Pemco's customers, including Pemco's largest customer at the time – Northwest Airlines, were also going through difficult times and were concerned that their planes could be trapped at Pemco with no one to work on them if the contract negotiations did not go well. (Johnson Depo. at 101:20-103:14, 104:5-9).

Based on the uncertainty of the near future and the concern that contract negotiations were going to effect business, Pemco management began working on potential scenarios and plans for handling those scenarios. (Johnson Depo. at 106:3-107:5). The scenarios were based on differing amounts of work (i.e., number of aircraft in the facility), and the work force size needed for the different scenarios. (Id.). In the event of a strike or a lockout, only essential management personnel who were qualified to work on aircraft would remain employed. (Johnson Depo. at 122:5-9).

As the expiration of the contract got nearer, the work load continued to decrease, and a large number of union and indirect employees were laid off. (Pl. Depo. at 52:7-53:6; Johnson Depo. at 109:5-16). On May 27, 2005, Ray Bennett, President, informed all Pemco employees that a reduction in force would be necessary to keep the company competitive and viable.

(Henry Decl. ¶ 4).    Bennett's memorandum stated that reductions would be made in the management and support areas, including the Facilities Maintenance Department.  (Exhibit A to Henry Decl.).    Management reductions began around June.  (Johnson Depo. at 111:9-18). Bennett and Johnson made the decision to begin management layoffs.  (Johnson Depo. at 111:22-112:15).  All of the decisions regarding layoffs centered around the number of employees required to run the facility with the existing work load and keep the airplanes on schedule. (Johnson Depo. at 113:21-24, 115:12-15, 136:21-137:7).

Johnson was responsible for making the layoff decisions in his departments in the production organization, including the management employees in facilities.  (Johnson Depo. at 117:5-7, 133:5-134:23, 143:1-4).    With regard to the Production Department, Johnson determined how many management employees he would need, and then let the others go. (Johnson Depo. at 119:1-11).   Johnson did not calculate the cost savings of the layoffs, collectively or by employee.  (Johnson Depo. at 119:12-23).   With regard to the Facilities Department, Johnson laid off every hourly employee and all but one of the indirect employees. (Johnson Depo. at 119:24-121:1).  Only the administrative assistant remained.  (Briody Depo. at 67:11-130).  All management employees were asked to perform multifunctional roles throughout the facility.  (Johnson Depo. at 126:10-12).

It was a very difficult time for Pemco employees.   (Johnson Depo. at 123:23-24). Johnson tried to save every job he could and find jobs for management employees, even if it meant rolling back to a lower level job or even to a bargaining unit position prior to the lockout. (Johnson Depo. at 133:11-134:23).  One task that had been mandated by the Federal Aviation Administration involved tooling equivalency work.  (Johnson Depo. at 157:18-21).  Johnson wanted Plaintiff to do it because work elsewhere was slowing and it needed to be done and Plaintiff had been over the tool crib department.  (Johnson Depo. at 157:21-158:1).

On July 7, 2005, when Johnson and Plaintiff met to discuss Plaintiff's employment status, Johnson offered Plaintiff a Facilities Tooling Supervisor position. (Pl. Depo. at 97:20-98:23, Johnson Depo. at 155:13-22). The supervisor position provided less pay than Plaintiff had previously received as Facilities Manager. (Pl. Depo. at 98:6-8, Johnson Depo. at 155:24). Johnson also informed Plaintiff that Briody would be assuming the duties of the Facilities Manager position. (Pl. Depo. at 97:20-98:2; Declaration of Dennis Johnson ("Johnson Decl.") ¶ 3). Plaintiff said he needed to think about the job offer, later accepted the job, and then asked to take two weeks of vacation. (Pl. Depo. at 98:14-17, 106:16-107:2; Johnson Decl. ¶ 3). According to Plaintiff, he wanted the additional vacation time to further recover so he could return to work without any restrictions. (Pl. Depo. at 98:14-17, 102:23-103:12). Johnson approved his request for vacation. (Pl. Depo. at 98:18, Johnson Depo. at 163:2-3).

On July 11, 2005, Briody assumed the duties and responsibilities of the Facilities Manager position. (Exhibit 3 to Briody Depo.; Briody Depo. at 66:23-25; Johnson Depo. at 125:2-10, 165:3-11). In the following days, Pemco's situation went from bad to worse and additional reductions became necessary as the parties were not making headway with contract negotiations. (Johnson Depo. at 163:18-164:12). The bargaining unit had voted to be able to strike at any time. (Johnson Depo. at 166:14-18). Pemco was on the verge of collapsing. (Johnson Depo. at 166:5-7).

Unlike the layoff process required by the CBA, the non-bargaining unit, indirect employees were laid off not by seniority. (Johnson Depo. at 167:14-21). Instead, all nonessential job positions were eliminated prior to the impending lockout and only management employees who had aircraft experience were at the top of the list to retain. (Johnson Depo. at 172:2-4). Management kept only the most versatile employees who would be capable of

working on aircraft if there was a lockout or a strike. (Id.). During this time period, everything that was done was to protect Pemco's business and keep it afloat. (Johnson Depo. at 167:5-10).

When it was determined that Plaintiff's tooling supervisor position was not absolutely essential to maintaining operations, it too was eliminated on July 14, 2005, effective July 15, 2005. (Pl. Depo. at 107:6-11; Johnson Depo. at 159:2-24; Johnson Decl. ¶ 4). Plaintiff was sent a letter notifying him that he had been laid off indefinitely. (Pl. Depo. 107:10). Although Plaintiff went to Pemco to clear out his personal items, he made no effort to talk with anyone or meet with anyone find out why he had been laid off because he "didn't figure there was any use to." (Pl. Depo. 109:20-111:6).

Richard Miller (then age 58), the evening shift Facilities Supervisor, was also laid off on July 15, 2005. (Deposition of Richard Miller ("Miller Depo.") at 31:21-32:20, 50:2-3). Ted Ball (DOB 10/26/39), an Aircraft Assistant Manager, was also laid off on July 15, 2005. (Deposition of Ted Ball ("Ball Depo.") at 7:25-8:3, 14:8-9). All of the facility positions, hourly and salary, went away at the time of the lockout. (Johnson Depo. at 157:2-8). Briody, who was aircraft qualified, continued to cover all facilities work during that time. (Johnson Depo. at 164:13-24).

From May 27, 2005 to August 9, 2005, more than 165 Pemco employees were laid off indefinitely. (Henry Decl. ¶ 6). Of those, at least 25 were indirect employees. (Id.). Additional indirect employees left during that same time period voluntarily or because their work was completed. (Id.).

**Plaintiff's Demand for Severance and Retirement**

On July 20, 2005, Plaintiff's attorney sent a letter to Ramona Segler, Pemco's Human Resources Manager, stating "it appears that there have been a number of violations of federal and state law, including but not limited to the Family Medical Leave Act and the Age Discrimination in Employment Act. At this point, however, Mr. Wright is interested in working out an

appropriate severance package commensurate with his abilities and experience." (Exhibit A to Johnson Decl.).

Pemco interpreted the July 20, 2005 letter to mean that Plaintiff was not interested in returning to work at Pemco before, during, or after the lockout because he was seeking severance and not asking to come back to work. (Johnson Decl. ¶ 6). As a result, Pemco did not contact Plaintiff during the period it was bringing former managers and supervisors back to work. (Johnson Decl. ¶ 7).

When asked at his deposition whether he was trying to get his job back or whether he just trying to get more severance than he had already been paid, Plaintiff answered: "At the time, I wanted severance more than two weeks, because like I say, I don't feel there's any use for me to go back to Pemco." (Pl. Depo. at 114:22-115:5).[3]

On August 1, 2005, Plaintiff applied for his retirement benefits under the pension plan. (Pl. Depo. at 116:2-7; Deposition of Jackie Tindle ("Tindle Depo.") at 104:21-105:2).

## 2005 Lockout

The CBA expired on August 9, 2005. (Henry Decl. ¶ 2). On August 11, 2005, Pemco locked out the bargaining unit employees. (Henry Decl. ¶ 8). Immediately prior to and during the lockout, Pemco brought back numerous indirect employees – former managers and supervisors – who had been laid off. (Briody Depo. at 67:9-71:19). Ted Ball was recalled to fill the work the toolcrib and eventually fill the Facilities Tooling Supervisor position that Plaintiff had been offered. (Ball Depo. at 8:5-6, 9:15-16, 11:1-13). Richard Miller returned to his prior position on August 22, 2005. (Miller Depo. at 31:21, 33:10-34:22).

Briody officially took the Manager of Facilities position after the lockout ended. (Briody Depo. at 75:8-76:3; Johnson Depo. at 175:14-176:13).

---

[3] When asked whether he would return to Pemco now, Plaintiff stated he would not as long as Dennis Johnson was there (despite asking for reinstatement and promotion in his request for relief). (Pl. Depo. at 117:1-2).

**Plaintiff's EEOC Charge**

Plaintiff filed an EEOC charge on October 11, 2005, which states:

I would like to request an investigation of Pemco Aviation Group, Inc. concerning my termination of July 15, 2005. I believe that I have been discriminated against on the basis of age and/or disability and that my rights under the Family Medical Leave Act have been violated.

I started with Pemco on February 13, 1989 as a plant mechanic and had worked as the Manager of Facilities since approximately 1997.

One June 7, 2005, I was forced to take Family Medical Leave due to an ongoing back problem and had surgery on June 8, 2005. On July 6, 2005, I asked the doctor to allow me to go back to work. He told me that I needed to be off for at least another two weeks, but he reluctantly allowed me to go back in a limited capacity.

On July 7, 2005, I called the company and informed them that I would be back to work on Monday with medical restrictions. They told me then that there had been some changes and that I had been demoted with a $3.77 per hour pay cut. I therefore asked for two additional week's vacation time in order to continue to recover from my surgery. This was approved as of July 7, 2005.

On July 14, 2005, Pemco notified me that I was laid off. My position did not go away, however, and the person who replaced me is a younger individual with no history of disability.

I believe that I have been discriminated against on the basis of my age and/or disability or perceived disability in violation of the Age Discrimination in Employment Act and the American with Disabilities Act. I also believe that my rights under the Family and Medical Leave Act have also been violated.

**Pemco's Pension Plan**

Pemco maintains a pension plan for its employees. (Tindle Depo. at 18:19-19:15). Pemco uses an actuarial service to determine how the plan is to be funded. (Tindle Depo. at 14:8-15). The plan has been fully funded since 2001. (Tindle Depo. at 22:21-23:11). Employees with vested benefits can begin withdrawing retirement at age 55, although there is a penalty for doing so. (Tindle Depo. at 72:7-74:1, 105:6-13). Plaintiff was fully vested in 2005. (Tindle Depo. at 105:3-5). Employees who are terminated but vested have no impact on the pension plan liability. (Tindle Depo. at 105:14-22).

10

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure authorizes entry of summary judgment when the pleadings and supporting materials demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case, and on which the plaintiff will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A plaintiff cannot defeat a properly supported motion for summary judgment without an affirmative presentation of specific facts showing a genuine issue, and may not merely rely on the general allegations of the pleadings. *Anderson*, 477 U.S. at 248. A mere "scintilla" of evidence supporting the plaintiff's position is not enough to survive summary judgment; the plaintiff must produce evidence so a jury could reasonably find for him. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)(citing *Anderson*, 477 U.S. at 242). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Davis v. Albany, Intl.*, 2006 U.S. Dist. LEXIS 75778 *12 (M.D. Ala. 2006).

## LEGAL ARGUMENT[4]

## I.  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM THAT PEMCO VIOLATED THE FMLA.

Courts interpreting the FMLA have identified two types of claims under 29 U.S.C. § 2615(a), interference with substantive rights and discriminatory retaliation. *Strickland v. Water Works and Sewer Board of the City of Birmingham*, 239 F. 3d 1199, 1206 n.9 (11th Cir. 2001). Where an employee states a claim of interference with a substantive right, an objective test

applies, requiring the employee to show, by a preponderance of the evidence, that he was entitled to the benefit denied. *Id.* at 1206-07; *O'Connor v. PCA Family Health Plan*, Inc., 200 F. 3d 1349, 1353-54 (11th Cir. 2000). To succeed on a claim for discriminatory retaliation, in contrast, the "employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F. 3d at 1206-07. In the absence of direct evidence that the employer's actions "were motivated by an impermissible retaliatory or discriminatory animus,"[5] courts apply the familiar burden-shifting analysis set forth in *McDonnell Douglas*. *Id.* Ultimately, in a claim brought pursuant to the FMLA, the plaintiff bears the burden of proving that FMLA leave was the determinative factor in the employment decision at issue. 29 U.S.C. § 2615(a)(2); *Verbraeken v. Westinghouse Electric Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

It is unclear from Plaintiff's Complaint whether he is making an interference claim in addition to his retaliation claim. In "Count One" of his Complaint, Wright alleges that Pemco "unlawfully discriminated and retaliated against the Plaintiff for taking federally protected leave under the FMLA by failing to restore the plaintiff to his position following the leave and then demoting and terminating him." (Complaint ¶ 15). In his deposition, Plaintiff further stated that Pemco failed to give him FMLA forms to carry to his doctor to get filled out. (Pl. Depo. at 117:19-23). Regardless, Pemco is entitled to summary judgment as a matter of law.

### A.    Plaintiff's FMLA "Interference Claim" Fails as a Matter of Law.

Assuming Plaintiff is making an interference claim based on his allegation that Pemco failed to give him FMLA paperwork and failed to restore him to his position following his paid medical leave, Plaintiff's claim cannot succeed. Assuming, for the sake of summary judgment only, Plaintiff was eligible to take FMLA leave, had a serious health condition, provided

---

[4] Pemco addresses Plaintiff's remaining claims in the order set out in his Complaint.

sufficient notice of his condition and desire to take FMLA leave, completed and timely submitted medical certification forms, complied with Pemco's FMLA policy in every respect, or was otherwise entitled to a benefit denied, Pemco has clearly established Plaintiff would have been laid off in July 2005 irrespective of any FMLA qualifying leave.

While the FMLA makes it illegal for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" that law, 29 U.S.C. § 2612(a)(1), Pemco's necessary reductions in force superseded Plaintiff's reinstatement right to any position. The regulations provide, in relevant part:

> (a) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example:

> (1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration.

29 CFR § 825.216. Similarly, 29 CFR § 825.312 provides, in relevant part:

> (d) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. Thus, **an employee's rights to continued leave, maintenance of health benefits, and restoration cease under FMLA if and when the employment relationship terminates (e.g., layoff),** unless that relationship continues, for example, by the employee remaining on paid FMLA leave. If the employee is recalled or otherwise re-employed, an eligible employee is immediately entitled to further FMLA leave for an FMLA-qualifying reason. An employer must be able to show, when an employee requests restoration, that the employee would not otherwise have been employed if leave had not been taken in order to deny restoration to employment.

(emphasis added).

---

[5] In this matter, there is no direct evidence of retaliatory or discriminatory intent.

Irrespective of the fact that Plaintiff sought and took paid medical leave, including short-term disability, sought and took vacation, and never sought unpaid FMLA leave before, during, or after his recovery from surgery (despite having some familiarity with Pemco's FMLA Policy as a manager), Pemco cannot be liable because it did not reinstate Plaintiff for reasons wholly unrelated to the FMLA.  *See Strickland*, 239 F.3d at 1208 ("An employer can deny the right to reinstatement … if it can demonstrate that it would have discharged the employee had he not been on FMLA leave.").  Plaintiff was on paid medical leave for four weeks, and then sought two weeks of vacation to continue his recovery from surgery.  According to Plaintiff, he would have returned to work on July 25, 2005 fully recovered with no work restrictions.  On July 7, 2005, Johnson informed Plaintiff that his manager position was being eliminated and the duties would be covered by Briody, but there was a tooling crib supervisor position available for him.  Plaintiff accepted and asked for two weeks of vacation.  One week later, when further cuts were required and virtually all nonessential jobs were eliminated, the tooling supervisor job was included in the reduction.  The fact that facilities work was being covered by a production manager would not change the outcome for Plaintiff.  Either as Facilities Manager or a tooling supervisor, Plaintiff would have been laid off in July 2005 because he was not qualified to work on aircraft.  As such, Pemco has clearly satisfied the requirements set forth in 29 CFR §§ 825.216 and 825.312.

Similarly, if Pemco's failure to provide Plaintiff with medical certification forms to take to his doctor did somehow violate the FMLA, Pemco cannot be liable for a violation of the FMLA or the regulations because Plaintiff was not prejudiced or harmed by the violation.  *Ragsdale v. Wolverine Worldwide, Inc.*, 535 U.S. 81, 89 (2002)(holding that the statute "provides no relief unless the employee has been prejudiced by the violation" and that "[t]he remedy is tailored to the harm suffered").  It is undisputed that Plaintiff was not denied the leave (or

vacation) he sought, and his only true complaint with regard to an FMLA benefit is that he was denied reinstatement, which was obviously justified in light of Pemco's decline in business in July 2005. By not being required to submit medical certification paperwork for his paid medical leave, Plaintiff was neither prejudiced nor harmed. Accordingly, to the extent Plaintiff is making an interference claim, Plaintiff's claim fails as he was no longer entitled to reinstatement to any position after being laid off indefinitely.

### B.    Plaintiff's FMLA Retaliation Claim Also Fails as a Matter of Law.

To state a claim of retaliation under the FMLA, a plaintiff must prove three elements: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision. *Wascura v. City of South Miami, et. al,* 257 F.3d 1238, 1248 (11th Cir. 2001). Upon this showing, the burden shifts to the defendant to present a legitimate, non-retaliatory reason for the plaintiff's termination. *Rizzo v. Sheahan*, 266 F.3d 705, 715 (7th Cir. 2001). Once the defendant establishes a reason, the burden shifts back to the plaintiff to demonstrate that the defendant's stated reason for terminating him was merely a pretext for retaliation. *Id*. A plaintiff asserting a retaliation claim under the FMLA must demonstrate his or her employer's actions were motivated by an impermissible retaliatory animus. *Strickland*, 239 F. 3d at 1207.

### i.    Plaintiff Cannot Establish a *Prima Facie* Case

For the sake of summary judgment only, where the record is viewed in a light most favorable to Plaintiff, Pemco does not dispute that Plaintiff can establish the first two elements of a *prima facie* FMLA retaliation case. However, Plaintiff has completely failed to establish the third required element – a causal connection between his medical leave and any adverse employment action.

Initially, Plaintiff testified that he has no evidence that Pemco intentionally violated the FMLA. (Pl. Depo. at 119:16-22). Instead, Plaintiff's only evidence of a causal connection is the fact that he had not returned to work when the decisions were made to offer him the tooling supervisor position and later lay him off indefinitely. However, the Eleventh Circuit has held that temporal proximity between the protected activity and the adverse employment decision does not, standing alone, establish the third element of a *prima facie* case. *Strickland*, 239 F.3d at 1207 (citing *Brungart v. BellSouth Telecomm. Inc.,* 231 F.3d 791, 799 (11th Cir. 2000)).

Plaintiff simply has no other evidence to establish any connection between his medical leave and being included in the layoffs. Plaintiff's unsupported suggestion that Pemco terminated him for having back surgery and taking time to recover rings hollow in light of the circumstances Pemco was facing as a business in July 2005. It is illogical to suggest that Plaintiff was added to the long list of indirect employees who were laid off because he took paid medical leave. In fact, Plaintiff himself contends that his medical leave had nothing to do with his termination, other than to provide Dennis Johnson the opportunity to get rid of Henry Ward and Plaintiff "to put a friend and younger guy in his position." (Pl. Depo. at 129:17-130:8). Of course, the record is clear that Johnson and Briody were not exactly friends. (Briody Depo. at 41:15-42:20).

As such, Plaintiff has wholly failed to produce substantial evidence from which a reasonable jury could conclude that Pemco retaliated against him because he engaged in activity protected by the FMLA. *See Garner v. Gwinnett County*, 1999 U.S. Dist. LEXIS 6370 at *12 (N.D. Ga. 1999)(finding that plaintiff failed to make out a prima facie case under the FMLA where plaintiff presented "no evidence whatsoever of a causal connection" between his FMLA leave and the county's refusing to reinstate him as a police officer because it perceived him as

unfit for duty"). Therefore, he cannot establish a *prima facie* case under the FMLA, and Pemco is entitled to summary judgment as to this claim.

### ii. Pemco's Legitimate, Nonretaliatory Reasons

Assuming *arguendo* Plaintiff somehow establishes a *prima facie* case of FMLA retaliation, Pemco has articulated a legitimate, nondiscriminatory reason for the challenged employment actions. *Chapman v. A.I. Transport*, 229 F.3d 1012 (11th Cir. 2000). The employer's burden here is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). "Unlike the plaintiff, defendant's burden [is] neither one of proof nor persuasion. Likewise, defendant . . . need not meet its burden by a preponderance of the evidence." *Morgan v. City of Jasper*, 959 F.2d 1542, 1548 (11th Cir. 1992). Further, the burden is only one of production; the plaintiff still bears the ultimate burden of proving that the employment action was the result of intentional discrimination. *Mayfield v. Patterson Pump Co.,* 101 F. 3d 1371, 1375 (11th Cir. 1996).

Plaintiff was laid off, along with many other direct and indirect Pemco employees, because business had all but stopped leading up to the expiration of the CBA. Plaintiff was included in the mass layoffs, and thus not reinstated, when all nonessential job positions were eliminated prior to the impending strike or lockout and only management employees who had aircraft experience were retained. Whether an employee had taken prior medical leave was simply not a factor.

Moreover, Pemco did not recall Plaintiff following the layoffs because Pemco reasonably believed Plaintiff had no interest in returning to work in any position at Pemco. Within days of being laid off, Plaintiff's attorney sent a letter to Pemco seeking not to return to work, but "a severance more commensurate with his years of service." The letter made no reference to reinstatement, and Plaintiff did not contact anyone in Pemco's management seeking to come

back to work despite having numerous opportunities to do so.  As a result, Pemco did not contact Plaintiff during the period it was bringing former managers and supervisors back to work.

### iii.     Plaintiff's Failure to Rebut Pemco's Legitimate and Nondiscriminatory Reasons

Even if Plaintiff can establish a *prima facie* retaliation case, Plaintiff offers no significant evidence to establish that the legitimate and nonretaliatory reasons for the decision to offer him the tooling supervisor position and subsequent layoff are a pretext for unlawful retaliation.  To show pretext, a plaintiff must "'come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman*, 229 F.3d at 1024.  Fundamentally, the inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions.  *Holifield*, 115 F.3d at 1565; *Billet v. CIGNA Corp.*, 940 F.2d 812, 818-22 (3rd Cir. 1991).  The Eleventh Circuit has stated that a court's role is to prevent unlawful employment practices, "not to act as a super personnel department' that second-guesses employers' business judgments." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2000).  Moreover, Plaintiff is not allowed to recast Pemco's proffered nondiscriminatory reasons or substitute his business judgment for that of Pemco – provided that the proffered reasons are ones that might motivate a reasonable employer, Plaintiff must meet that reason head on and rebut it, and cannot succeed by simply quarreling with the wisdom of that reason.  *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1341 (11th Cir. 2000).

As discussed above, there is simply no evidence of any retaliatory intent related to Plaintiff's medical leave.  Plaintiff testified that Pemco allowed him to take paid medical leave and short-term disability leave without incident for the time he requested.  (Pl. Depo. at 75:15-76:22, 77:17-78:21, 95:23-96:21, 137:11-138:22).  Plaintiff also testified that he was aware the amount of work was decreasing and that layoffs, demotions, and departmental realignments had

18

commenced during this same time. (Pl. Depo. at 71:12-19, 97:20-101:7). Other than speculating that his work hour restriction was "a consideration" in the decision to lay him off (Pl. Depo. at 102:4-9), Plaintiff provides no evidence to rebut the fact that Pemco decided that it would only retain people who could work on aircraft. Moreover, Plaintiff cannot dispute he was not qualified to work on aircraft, which was a reasonable qualification for the personnel retained.

That leaves Plaintiff with only one piece of evidence – the temporal proximity between his leave and his demotion and termination. Once again though, while close temporal proximity may be evidence of pretext, it is insufficient to establish pretext by itself. *Wascura*, 257 F.3d at 1244-45. Apart from time, Plaintiff provides no evidence that true reason for the comprehensive downsizing at Pemco was due to his medical leave. In fact, Plaintiff's conspiracy theory that his medical leave merely provided Johnson the opportunity to get rid of him and put a friend and younger guy in his position further undercuts any argument of pretext. As such, Pemco should be granted summary judgment as a matter of law as to Plaintiff's FMLA retaliation claim.

## II.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S OUTRAGE CLAIM.

In "Count II" of his Complaint, Plaintiff alleges Pemco should be liable for the tort of outrage because Pemco "engaged in extreme and outrageous conduct by unlawfully denying the plaintiff his rights under federal and state law and by intentionally dealing with Plaintiff in a way as to intentionally cause the most distress possible." (Complaint ¶ 20). As a threshold matter, this claim clearly fails as a matter of law because Plaintiff fails to allege facts that rise to the level of actionable outrage under Alabama law. *Hardesty v. CPRM Corp.*, 391 F. Supp. 2d 1067, 1073-74 (M.D. Ala. 2005)(citing *Potts v. Hayes*, 771 So. 2d 462 (Ala. 2000)).

In *Potts v. Hayes*, the Alabama Supreme Court provided that the tort of outrage has been lawfully applied to only three kinds of conduct: "(1) wrongful conduct in the family burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious

sexual harassment." *Potts*, 771 So. 2d at 465. In reversing the jury verdict and rendering a judgment the Alabama Supreme Court further held that "[i]n order to recover, a plaintiff must demonstrate that the defendant's conduct '(1) was intentional and reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.'" *Id*. (quoting *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990)). Liability may only ensue when the conduct is extreme, defining extreme as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id*. (quoting *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1980)). Further, "[m]ere insults, indignities, threats, annoyances, petty oppression, or other trivialities" will not support a finding of the tort of outrage. *Inmon*, 394 So. 2d at 365. The conduct must be "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized society." *Id*.

Simply put, Plaintiff alleges no facts in his Complaint or deposition testimony to support a claim of outrage. Plaintiff's case does not resemble any of the limited number of cases in which the Alabama Supreme Court has recognized viable outrage claims. Instead, this is a case involving the indefinite layoff of one at-will employee during worsening business conditions—a claim that has been rejected by Alabama courts to establish a claim of outrage. *See Harrell v. Reynolds Metals Co.*, 495 So.2d 1381, 1387 (Ala. 1986)(holding that "it would be intolerable in a civilized society to hold that an employer is guilty of outrageous conduct for merely discharging an employee at will. That is what the plaintiff is asking this Court to do, for the termination is not for a reason which contravenes public policy, and there is no evidence that the termination was accompanied with the sound of fury").

Even if Plaintiff's allegations (that Pemco unlawfully denied Plaintiff his rights under state and federal laws) were accepted as true, they fail to rise to the requisite level of wrongful

conduct needed to sustain a claim of outrage against Pemco. Any "unlawful denial of rights" is far better addressed through the specific laws about which Plaintiff is complaining. Each law about which the Plaintiff complains has a well-defined statutory framework to deal with any violation, including those deemed intentional or willful. Beyond reciting the words in his Complaint, Plaintiff fails to allege any actual conduct on the part of Pemco that is "beyond all possible bounds of decency," "atrocious," and "utterly intolerable in a civilized society." *Inmon*, 394 So. 2d at 365. Plaintiff's allegations fall well short of the egregious standards contemplated by the Alabama Supreme Court. As such, his outrage claim fails as a matter of law and is due to be dismissed.

## III.  DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S AGE DISCRIMINATION CLAIM.

Plaintiff's age discrimination claim also fails as a matter of law. In "Count III" of his Complaint, Plaintiff alleges that Pemco "willfully violated" the ADEA "by intentionally and/or willfully demoting and then terminating plaintiff because of his age, and then replacing him with a substantially younger individual." (Complaint ¶ 24).

An employee bringing a claim under the ADEA must initially establish a *prima facie* case through one of three methods: direct evidence, circumstantial evidence, or statistical evidence. *Schweers v. Montgomery Public Schools*, 2007 U.S. Dist. LEXIS 1759, *16 (M.D. Ala. 2007). In this matter, Plaintiff offers no direct evidence of age discrimination and no statistical evidence. As such, Plaintiff's age claim is properly analyzed under the circumstantial evidence framework of *McDonnell Douglas*.[6] To prove discriminatory treatment through circumstantial evidence, Plaintiff must first make out a *prima facie* case of discrimination. *McDonnell Douglas*

---

[6] It is widely accepted that the *McDonnell Douglas* framework applies to claims of age discrimination under the ADEA. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-42 (2000). When a plaintiff alleges disparate treatment under the ADEA, liability depends on whether age actually played a role in the employer's decision-making process and had a determinative influence on the outcome. *Reeves*, 530 U.S. at 141.

*Corp. v. Green*, 411 U.S. 792, 802-04 (1973). The burden of production then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to establish that the reasons for the employment action established by the defendant are pretextual. *McDonnell Douglas*, 411 U.S. at 802-804.

### A.    <u>Plaintiff's *Prima Facie* Case.</u>

A plaintiff states a *prima facie* case of age discrimination upon showing that he (1) is a member of the protected age group between the ages of forty and seventy, (2) was subject to an adverse employment action, (3) was replaced by a person outside the protected group, and (4) was qualified to do the job. *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996). For the purposes of summary judgment, Pemco concedes that Plaintiff has established the first, second, and fourth elements.

As for the third element, it is undisputed that Plaintiff was 55 years old in July 2005 and that Briody was also a member of the protected class at the age of 49 – less than two months shy of 50 – in July 2005. Similarly, Ball and Miller, the management employees in the Facilities Department, were 65 and 58, respectively. As a result, the only alleged comparator who is younger than Plaintiff is Briody. Plaintiff has clearly failed to establish a *prima facie* case of age discrimination with regard to positions held by Ball and Miller (to the extent he is even making claims related to their positions).

With regard to Briody, Pemco concedes that Briody is younger than Plaintiff, although he is well within 10 years of Plaintiff's age. Nevertheless, Pemco acknowledges that the Eleventh Circuit has held that a plaintiff in an age discrimination case may establish a *prima facie* case merely by establishing that his replacement was younger than he. *Carter v. City of Miami,* 870 F.2d 578, 583 (11th Cir. 1989).

### B.    Pemco's Legitimate, Nondiscriminatory Reasons.

Assuming Plaintiff has established a *prima facie* case of age discrimination, Pemco has articulated legitimate, nondiscriminatory reasons for the challenged employment actions.  As set forth above, Plaintiff was laid off, along with many other direct and indirect Pemco employees, because business had all but stopped leading up to the expiration of the CBA.   Plaintiff was included in the mass layoffs, and thus not reinstated, when all nonessential job positions were eliminated prior to the impending strike or lockout and only management employees who had aircraft experience were at the top of the list to retain.  The age of the employees who were laid off was not a factor, as evidenced by the fact that 58 of the 105 employees who were laid off indefinitely between July 15 and August 9, 2005 were under the age of 45.  (Henry Decl. ¶ 7).

Moreover, Pemco did not rehire Plaintiff because Pemco reasonably believed Plaintiff had no interest in returning to work in any position at Pemco.  Within days of being laid off, Plaintiff's attorney sent a letter to Pemco seeking "a severance more commensurate with his years of service."  The letter made no reference to returning to work, and Plaintiff did not contact anyone in Pemco's management seeking to come back to work.  As a result, Pemco did not contact Plaintiff during the period it was bringing former managers and supervisors back to work.

Although Clark Briody had assumed the duties of the Facilities Manager position on July 11, 2005, and covered those duties throughout the rest of the month and into August, in part due to his aircraft qualifications, he did not permanently replace Plaintiff until after the lockout. (Briody Depo. at 75:8-76:3; Johnson Depo. at 175:14-176:13).  Briody's temporary coverage of the Manager of Facilities position and Plaintiff's layoff leading up to the lockout had absolutely nothing to do with age.

C.    **Plaintiff Cannot Rebut Defendant's Legitimate and Nondiscriminatory Reasons.**

Because Pemco has articulated legitimate, non-discriminatory reasons for offering Plaintiff the tooling supervisor position and Plaintiff's inclusion in the layoffs, Plaintiff must show that Pemco's reason was pretext.  Plaintiff bears the burden of establishing pretext for discrimination, and he "must present 'significant probative' evidence on the issue to avoid summary judgment."  *Mayfield*, 101 F. 3d at 1376.  "[C]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions."  *Carter*, 870 F.2d at 585.  A plaintiff's burden is even more substantial where the decisionmaker is well over age forty (in this case 50) and within the class of persons protected by the ADEA.  *Elrod v. Sears, Roebuck and Co.*, 939 F. 2d 1466, 1471 (11th Cir. 1991).

Plaintiff clearly lacks substantial evidence with which to demonstrate pretext and his age claim cannot survive summary judgment.  Plaintiff has not submitted any evidence demonstrating that Pemco's decision to downsize facilities and lay off Plaintiff was based on age considerations.  First, there is absolutely no evidence of negative attitudes towards age on the part of Johnson or anyone else.  Importantly, Johnson was 50 years old at the time he made the decision to layoff Plaintiff and had numerous employees under his supervision who were older, laid off, and returned to work shortly thereafter.  In fact, Plaintiff's only evidence of a negative attitude towards age on the part of Pemco is that Briody, only 6 years his junior, eventually assumed the job duties of the Facility Manager position after the lockout.

Moreover, Plaintiff's testimony demonstrates the uncertainty of his claim against Pemco and lack of evidence to establish pretext:

Q:    …. My understanding, based on your testimony today, is that your age claim – the evidence of your age claim is that Clarke Briody is doing the job that you once held and that he's younger than you?

A:     Yes.

Q:     Do you have any other evidence, other than that contention, to support your age discrimination claim?

A:     No.

Q:     Did anyone ever make a comment to you about your age while you were at Pemco?

A:     No.

Q:     Did Dennis Johnson ever say anything to you about your age?

A:     I had very little contact with him.  No, sir.

Q:     And I believe you testified earlier that Clarke Briody, you think, is in his 40s?

A:     I think so.

Q:     I just want to be clear what your position is, that he's younger than you, probably in his 40s?

A:     And probably a lot more inexperienced.

Q:     Other than his age and his experience level, any other things you have to say about Clarke Briody?

A:     No.

(Pl. Depo. at 125:3-126:6).  As is clear from Plaintiff's testimony, his only evidence is merely a restatement of an element of a *prima facie* case - that Briody is doing his job and is younger (of course, Briody was retained during the relevant period because he was qualified to work on aircraft as a production manager).  Such "evidence," without more, cannot constitute pretext. Lacking any evidence that the decision to retain only management employees who were qualified to work on aircraft was grounded in age animus, Plaintiff is essentially asking this Court to second-guess Pemco's business decisions, which is not the Court's responsibility. *Elrod*, 939 F.2d at 1470.  Again, Plaintiff is not allowed to recast Pemco's proffered

nondiscriminatory reasons or substitute his business judgment for that of Pemco.  *Alexander*, 207 F.3d at 1341.

Second, all of the management personnel in the Facilities Department following the lockout are well within the protected age group.  The two management employees in the Facilities Department who returned after being the layoff were both older than Plaintiff (Ted Ball - 65 and Richard Miller - 58).

In summary, Plaintiff's complaint is grounded in the fact that he disagrees with Pemco's decisions made during an extremely difficult time.  Specifically, Plaintiff disagrees with Pemco's decisions: (1) to downsize, if not eliminate, the Facilities Department, (2) to lay off Plaintiff because he was unqualified to work on aircraft, and (3) not to recall Plaintiff because they reasonably believed he did not want to return to work.  Age was not a factor when Pemco made all of these business decisions.  Plaintiff's disagreement with those decisions is simply insufficient evidence to establish pretext.  For these reasons, Plaintiff's age claim fails as a matter of law.

## IV.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S ERISA CLAIM.

Plaintiff's allegation that Pemco violated ERISA by terminating his employment also fails as a matter of law.  In "Count V" of his Complaint, Plaintiff alleges Pemco violated ERISA by "wrongfully discriminating against Wright for the purpose of interfering with the attainment of an ERISA right or benefit to which he would otherwise be entitled."  (Complaint ¶ 35).  When asked for clarification at his deposition, Plaintiff conceded that his ERISA claim is based entirely on his claim that he missed out on the retirement he would have received but for being laid off, as well as his social security benefit being reduced as a result of being laid off.  (Pl. Depo. at 127:22-129:16).

Section 510 of ERISA, 29 U.S.C. § 1140 makes it unlawful:

> to discharge ... a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled.

The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights. *Seaman v. Arvida Realty Sales,* 985 F.2d 543, 546 (11th Cir. 1993). A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222-23 (11th Cir. 1993). This burden can be shown either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by *McDonnell Douglas. Id*. Here, Plaintiff has presented no direct evidence of discrimination based upon his entitlement to pension benefits, therefore his claim must be evaluated using the *McDonnell Douglas* analysis.

In the context of a § 510 claim alleging unlawful discharge, a plaintiff establishes a *prima facie* case of discrimination by showing (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. *Id*. at 1223-24. To satisfy the last element the plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights was a motivating factor. *Id.* at 1224. A plaintiff, however, cannot establish a prima facie case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits. *Id.* Moreover, measures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent. *Id*. Instead, the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular. *Id*.

27

Pemco does not dispute that Plaintiff was a participant in a plan covered by ERISA and therefore entitled to its protection. Nor does it contest Plaintiff's qualifications for his position. However, Plaintiff has completely failed to introduce any evidence that would suggest his layoff was motivated by a desire to interfere with his ERISA rights. At his deposition, Plaintiff readily admitted he has no evidence that his participation in Pemco's retirement plan was even a factor in the decision to lay him off. (Pl. Depo. at 128:22-129:6). Moreover, Plaintiff does not offer any evidence that this reduction in future benefits would result in a substantial savings for Pemco. In fact, the only evidence in the record is that the termination of one or even several employees has no effect on Pemco's pension expenses, much less a significant one. Jackie Tindle testified that Plaintiff's layoff had virtually no impact on Pemco's pension plan liabilities. (Tindle Depo. at 105:14-22).

As a result, Plaintiff has failed to establish a *prima facie* case and Count V is due to be dismissed as a matter of law. *Clark*, 990 F.2d at 1226; *Davis*, 2006 U.S. Dist. LEXIS 75778 at *25-26 (holding that conclusory arguments by the plaintiff that her termination directly affected her benefits under the pension plan, short-term disability, and long-term disability, without more, are insufficient to withstand summary judgment); *Stephens v. Regions Bank*, 2005 U.S. Dist. LEXIS 35455 *34-38 (M.D. Ala. 2005)(granting summary judgment where the plaintiff did establish a *prima facie* case of discrimination based on her right to receive pension benefits because she provided no evidence that her termination has resulted in substantial savings to the employer).

## **CONCLUSION**

For all of the foregoing separate and independently adequate reasons, Pemco is due summary judgment with respect to all of Plaintiff's claims.

Respectfully submitted,


 s/ John B. Holmes, III
JEFFREY A. LEE
JOHN B. HOLMES, III
Attorneys for Defendant

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama  35203-2618
Telephone:    205.254.1000
Facsimile:    205.254.1999
Emails:        jlee@maynardcooper.com
                jholmes@maynardcooper.com


## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Elizabeth B. Glasgow
Farmer, Price, Hornsby & Weatherford, L.L.P.
100 Adris Place (36303)
Post Office Drawer 2228
Dothan, Alabama  36302


 s/ John B. Holmes, III
OF COUNSEL