## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| Roger Wright, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.: 1:06 cv 647-WKW |
| | § | |
| Pemco World Air Services, Inc., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

| | | |
|---|---|---:|
| I. | THE SUMMARY JUDGMENT STANDARD | 3 |
| II. | STATEMENT OF FACTS | 4 |
| III. | FMLA | 13 |
| | A.   FMLA Intro | 13 |
| | B.   Interference | 16 |
| | C.   Retaliation | 17 |
| | D.   Pretext | 20 |
| IV. | INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (TORT OF OUTRAGE) | 23 |
| V. | ADEA | 25 |
| VI. | ERISA | 28 |
| VII. | CONCLUSION | 28 |

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| Roger Wright, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.: 1:06 cv 647-WKW |
| | § | |
| Pemco World Air Services, Inc., | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Comes now, the Plaintiff, through counsel, and hereby opposes Defendant's Motion for Summary Judgment on the grounds that there is a triable issue of fact with respect to whether the Defendant violated Plaintiff's federally protected rights.

**I.    THE SUMMARY JUDGMENT STANDARD**

In determining whether there is a genuine issue of material fact the court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal citations and quotations omitted).

Under summary judgment, the burden is on the moving party to establish the absence of a triable fact.  It is <u>not</u> the law that whoever has the burden at trial must bear the burden in summary judgment. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Plaintiff has no burden to come forward whatsoever until the defendant shows that, with regard to material facts, there is no inference which can be drawn in the plaintiff's favor.

If the defendant is able to make that showing, then non-moving party may "avail itself of all facts and justifiable inferences in the record taken as a whole. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

## II.     STATEMENT OF FACTS

1.     In July 2005, while on federally protected Family and Medical Leave for back surgery, Roger Wright was first demoted and then terminated from his position as the Facilities Manager at Pemco. (Ex. B, termination ltr.; Ex. A, Wright dep. at 98:6-17, 107:5-8).   At the time, he was 55 years old, had 16 years experience with Pemco and a clean record.   (Ex. A, Wright dep. at 6:2-3).  He was well thought of by his supervisor and co-workers (Ex. C, Ward Aff. ¶ at 3; Ex. D, Battcher Aff. at ¶ 5). The Defendant has not attempted to justify the demotion and termination based on the plaintiff's work performance or record.

2.     Plaintiff was entitled to Family Medical Leave because Pemco employs more than 50 people; plaintiff had been there more than a year; plaintiff had a serious health condition for purposes of the Act and he gave all statutorily required notices to his employer concerning his need for leave.  There is no dispute that both plaintiff's supervisor, Dennis Johnson, and the Human Resources Department knew of and approved plaintiff's medical leave. (Ex. D, Battcher Aff. at ¶ 2).   For purposes of Summary Judgment, Defendant does not dispute the issues of Plaintiff's eligibility for leave, the existence of a serious health condition or that Plaintiff gave appropriate notice. (Def. brief at 12-13).

3.    Defendant did not issue its required notices under 29 CFR 825.301(b)(1)(vii) which informs Plaintiff of his right to "restoration to the same or an equivalent job upon return from leave." (Ex. A, Wright dep. at 117:21-23).

4.    During 2005, Pemco was going through the pangs of reorganization due to the uncertainty of its contracts and labor agreement. Plaintiff does not dispute that many employees were laid off. (Ex. A, Wright dep. at 48:10-49:7).    In early June 2005, there were three management employees in the facilities department: Henry Ward, the Director of Facilities; Roger Wright, Manager of Facilities and Richard Miller, Night Shift Supervisor of Facilities. (Ex. A, Wright dep. at 69:12-19, 71:7-72:10).

5.    Ward's affidavit indicates that, "In 2005, when Pemco began to cut back on its labor, I met with Ray Bennett, President of Pemco World Air Services, Inc., and Rich Godin about layoffs within my department. Bennett told me that they wanted to eliminate the Director of Facilities position and move me to the Manager's position. I told them that I was about to retire anyway and I recommended that they leave Roger Wright as the Manager of Facilities and I would retire. Bennett agreed to that plan and I told Roger about that agreement. There was never, to my knowledge, any plan to eliminate the Manager of Facilities position." (Ex. C, Ward Aff. at ¶4). See also, (Ex. A, Wright dep. at 69:12-19, 71:7-72:10).

The plan for reorganization of the Facilities Department prior to Plaintiff leaving for medical leave was that the Director of Facilities position would be eliminated, leaving Wright and Miller in place. (Ex. A, Wright dep. at 69:12-19, 71:7-72:10; Ex. C, Ward Aff. at ¶ 4).

6.    Ward did retire on June 10, 2005. Dennis Johnson, Vice President of Operations, then became plaintiff's supervisor.  (Def. brief at 3).

7.      In June 2005, Wright's doctor told him that he must have surgery in order to avoid permanent spinal damage.  Surgery was therefore scheduled for June 8, 2005.  (Ex. A, Wright dep. at 74:13-75:13; Ex. E, Medical Records Dr. Bernard dated June 1st and 8th, 2005).  Wright immediately informed management of the need for leave.  (Ex. A, Wright dep. at 75:14-77:3).  Wright also informed Dennis Johnson, Vice President of Operations that he needed time off for surgery.  (Ex. D, Johnson deposition at 143:25-144:6).

8.      In planning for the leave, Wright spoke with Johnson prior to the surgery about staffing his position and Johnson agreed to move Miller, the evening shift facilities supervisor, to temporarily cover for Wright. (Ex. A, Wright dep. at 76:3-15).   On June 3, 2005, however, Johnson indicated that he had changed his mind and that he would instead bring in Clarke Briody, a younger individual with no experience in the facilities department to fill the job.  (Ex. A, Wright dep. at 76:16-18, 81:6-12, 82:21-85:16).   Johnson then asked Wright to train Briody for the position, which Wright did on June 6 and June 7, 2005.  (Ex. A, Wright dep. at 81:3-82:16).

9.      Wright's qualifications and experience are summarized as follows:

- Wright's date of birth is 11/28/49 (Ex. A, Wright dep. at 6:2-3);
- Wright worked for four years as an aircraft mechanic with Pemco's predecessor, Hayes aircraft, from 1968 to 1972 (Ex. A, Wright dep. at 9:17-10:3).  An aircraft mechanic is considered a production type of job;
- Wright returned to work for Pemco in 1989 as a plant mechanic in the Facilities Department and was quickly promoted to Supervisor of Facilities. (Ex. A, Wright dep. at 13:6-14:11);
- In 1995, he was promoted again to Production Support Manager which was still in Facilities.  (Ex. A, Wright dep. at 23:7-12).  While working as Production Support Manager, there were no grievances filed against him and he had a good relationship with the workers he supervised.  (Ex. A, Wright dep. at 26:1-6).
- In the late 1990s, he was promoted to the position of the Manager of Facilities.  (Ex. A, Wright dep. at 27:4-8).
- Wright's supervisor, Henry Ward stated in his affidavit, "In the years that I worked with Roger at Pemco, I considered him to be very capable, loyal and a hard worker. He was at the facility in storms when he should have been home. He

was very knowledgeable about upgrades, repairs and wiring in the facility.  He had a good attitude and work ethic, and came to work even when he had a great deal of back pain." (Ex. C, Ward Aff. at¶ 3).

10.     Briody's background and qualifications are:

- Briody's date of birth is September 7, 1955 (Ex. F, Briody dep. at 88:8);
- Briody came to Pemco on July 8, 2003 (Ex. F, Briody dep. at 39:3-4); Prior to that, he worked twelve years at Lockheed in various capacities until he was laid off. (Ex. F, Briody dep. at 32:7-40:23);
- Briody never worked in facilities before and had not worked in Facilities at Pemco before moving into Wright's position in June 2005.  (Ex. F, Briody dep. at 19:21-20: 1);
- Wright spent one day and part of another day with Briody before leaving for medical leave (Ex. F, Briody dep. at 54:17-21);
- On July 8, 2005 there was an announcement made that Briody was assuming the duties of Facilities Manager.  Briody identified this as coinciding with the time that he permanently assumed the duties of Facilities Manager.  (Ex. G, July 8, 2005 memoranda; Ex. H, July 8, 2005 memoranda; Ex. F, Briody dep. at 76:25-78:11).
- From the beginning of Briody's time in Facilities, there was quite a bit to do. Johnson gave him projects and assignments. (Ex. F, Briody dep. at 14:15-17:12). Briody was devoting all of his time to these projects and he was working in facilities full time. (Ex. F, Briody dep. at 19:7-11).  There were other projects that followed and Briody consistently worked full time in facilities through 2005 and 2006 and continues to be the Facilities Manager to the present. (Ex. F, Briody dep. at 4:2-4, 21:12-22:16, 53:9-54:16, 64:23-65:7).
- Once Briody moved to Facilities he was considered the Head of the Facilities Department. (Ex. F, Briody dep. at 66:17-67:3).
- His time spent in production over a two year period was limited to three to four days on two occasions. (Ex. F, Briody dep. at 22:12-23:10).
- When Briody moved to Facilities, Pemco hired another employee to fill Briody's previous position as the Night Manager. (Ex. F, Briody dep. at 52:3-11).

11.     Wright had surgery on June 8, 2005. The normal recovery time for this surgery is six to eight weeks.  (Ex. A, Wright dep. at 103:3-6; Ex. E, Medical Records Dr. Bernard dated July 6, 2005 and August 10, 2005).  At his four week follow up on July 6, 2005, Wright requested that he be allowed to go back to work and the doctor reluctantly agreed after they discussed Mr. Wright's duties in management.  (Ex. A, Wright dep. at 92:7-93:3. See also, Ex. E, Medical Records Dr. Bernard dated July 6, 2005 August 10, 2005).  The doctor allowed Wright

to return to work effective July 11, 2005, but restricted him to six hour days. (Ex. A, Wright dep. at 93:9-11; Ex. E, Medical Records Dr. Bernard dated July 6, 2005). Wright phoned Johnson on July 6, 2005 and informed him that he would be back to work on Monday July 11, 2005, but on restricted status. (Ex. A, Wright dep. at 94:5-14). Johnson told him to report to HR on Thursday, July 7th for a drug screen. (Ex. A, Wright dep. at 94:15-95:7).

12.     Wright reported to HR on July 7, 2005, but HR said that no drug screen was required. (Ex. A, Wright dep. Id). Instead, Johnson informed Wright that Briody was permanently replacing him and that Wright would be demoted to a supervisory position with a pay cut. (Ex. A, Wright dep. at 97:20-98:10). Wright reluctantly accepted the lower position. (Ex. A, Wright dep. at 98:11-18). During this conversation on July 7, 2005, Wright also stated that since he would be on six hour days for the next two weeks and since he was not returning to his former job as a manager, he wanted to take the two weeks as suggested by his doctor to fully recover and come back to the supervisor's position on full eight hour days. (Ex. A, Wright dep. at 98:14-17, 102:18-104:16). Johnson approved the leave and agreed that the return to work date would be Monday July 25, 2005. (Ex. A, Wright dep. at 98:18, 106:16-107:6).

13.     The next day, on July 8, 2005, two separate memoranda were sent by Dennis Johnson to all Pemco employees declaring that Clarke Briody would assume the position of Facilities Manager as of July 11, 2005. (Ex. G, July 8, 2005 memoranda; Ex. H, July 8, 2005 memoranda; Ex. F, Briody deposition at 76:17-78:11). His deposition testimony also established him as the Head of the Facilities Department at this time. (Ex. F, Briody dep. at 64:23-65:2).

The effect of these employment decisions was that Wright would take a pay cut and be subordinate to Briody even though Briody had less experience in facilities and also less seniority.

14.     On July 14, 2005, while still on leave and without explanation, Wright was terminated. He received a call that day from HR informing him that he was on indefinite layoff, and he received a letter the next day stating the same. (Ex. A, Wright dep. at 107:5-12; Ex. B, termination letter).

15.     In its April 4, 2006, response to Wright's EEOC charge, Pemco asserts through its attorney that Roger Wright's position of Facilities Manager was "eliminated as part of the reduction-in-force." (Ex. I, Defendant's EEOC response). Similarly, Dennis Johnson's declaration in support of Summary Judgment also avers that the Facilities Manager position was eliminated. (Def. Brief, Johnson Dec. Exhibit J). In its Motion for Summary Judgment, the Defendant states that the facilities duties were only "being covered by a production manager." (Def. Brief at 14).

The evidence, contemporaneous with the events in 2005, indicates that the Facilities Manager's position was never eliminated at all:

   a.     From the time that Briody came into the Facilities department, he worked full time doing facilities work. (Ex. F, Briody Dep. at 4:2-4, 21:12-22:16, 53:9-54:16, 64:23-65:7);

   b.     At the time that Johnson allegedly eliminated the Facilities Manager's position, Johnson was giving Briody numerous facilities related projects to do. (Ex. J, slide presentation of facilities work done by Briody); (Ex. K, Johnson dep. at 7:16-9:4; Ex. L, email 3/22/06 detailing facility work done by Briody; Ex. K, Johnson dep. at 9:9-10:9).

   c.     A memo dated July 8, 2005, one day after Wright's demotion, declared that Briody to be the new Facilities Manager and Briody testified that this is when he permanently assumed the job. (Ex. G, July 8, 2005 memoranda; Ex. H, July 8, 2005 memoranda; Ex. F, Briody dep. at 76:25-78:11).

   d.     Briody considered himself the Department Head and supervised Richard Miller and Ted Ball who were also rehired to work in facilities (Ex. F, Briody dep. at 66:17-73:3).

   e.     After assuming the facilities position Briody's production work was de minimis. His time spent in production over a two year period was limited to three to four days on two occasions. (Ex. F, Briody dep. at 22:12-23:10).

    f.      Briody is still serving as the Facilities Manager to this day. (Ex. F, Briody dep. at 4).

    g.      Three people worked in Facilities before Wright went on medical leave (Ward, Wright and Miller). Within a month of Wright's termination, three people were again working in facilities:  Briody, Miller and Ball. Briody recalled that Miller and Ball were rehired during the period of the lockout which defendant reports to be August 2005 (Ex. F, Briody dep. at 69:3-24). Richard Miller was rehired on August 22, 2005.  (Ex. N, Miller dep. at 31:21-22, 34:10-12).  A computer printout produced by Pemco confirms this, noting "Date Start" as "22-AUG-2005."  (Ex. R, Miller Computer Record).  An identical printout for Ted Ball shows his return date as August 9, 2005.  (Ex. S, Ball Computer Record).

    h.      According to Henry Ward, who was employed with Pemco for 43 years, Pemco's business is cyclical and the company has often gone through periods of layoffs and rehiring. In all of his time at Hayes and Pemco, he could not recall a time when the Manager of Facilities position was eliminated. Because of the size of the department and the duties as to safety and security as well as the grounds, buildings and rolling stock of equipment, it was always necessary to have someone in charge of Facilities.  After the Director of Facilities position was eliminated, it would not have been feasible to also eliminate the Manager of Facilities position.  (Ex. C, Ward Aff. at ¶ 5).

    i.      According to James Battcher, the Facilities Manager's position is one that is not usually affected by layoffs.  Because of the size of the facility, safety requirements, environmental issues, etc. there was always someone who needed to be in charge of the facility.  Therefore, it would have been highly unusual to eliminate the Facilities Manager's position completely, particularly with Director of Facilities position already being gone.  (Ex. D, Battcher Aff. at ¶ 6).

16.     Finally, Dennis Johnson states now, in his declaration in support of Motion for Summary Judgment, that he would have reinstated the plaintiff if he had not received a letter from counsel indicating that Wright wanted a severance. (Ex. M, letter from counsel).  Since there is nothing in the letter about *not* wishing to be reinstated, a more accurate inference from this fact is that Johnson decided not to reinstate the plaintiff after being notified by counsel of the FMLA and ADEA violations.

17.     Within a few weeks following Wright's termination, Richard Miller was reinstated to his position as a supervisor in Facilities and Ted Ball was also moved into facilities.

(Ex. D, Miller dep. at 38:8-23; Ex. O, Ball Dep. at 7:17-19). Around this time, Clarke Briody recalls, he was asked whether he would prefer to have Wright or Ted Ball back. (Ex. F, Briody dep. at 73:11-12). His response was that, although Ted is a "great guy," Wright "knows where the bodies are buried." (Ex. F, Briody dep. at 73:14-16, 74:12-14). As much as Briody liked Ted, his choice would have been for Roger Wright to return. (Ex. F, Briody dep. at 74:14-16).

18. With respect to the age discrimination claims, James Battcher, the Director if Human Resources for Pemco during this period in 2005, complained that Johnson was prejudiced against older workers. His sworn statement presented to the EEOC reported the following:

- "During my tenure at Pemco, there was an ongoing discussion in manpower meetings and among upper management as to how to handle replacement of an aging work force. In the past, this had primarily been handled by natural attrition.
- "In the last year [2005], there were numerous discussions among Pemco upper management including the President, Ray Bennett and Vice President of Operations, Dennis Johnson, that the age of the current work force was a problem.
- "In supervising recruiting efforts, I passed several resumes to Dennis Johnson for supervisory positions where the applicants had retired from the military and Johnson rejected them because they were "too old." He stated that he needed "younger people". "Younger Blood" was common statement from this individual as well…."
- "Johnson told me several times that I should think about retiring and that someone my age should want to do something else. During a recruiting trip to Tampa, Florida in early May 2005, he made several comments to me about me retiring. He also stated several times about the average age level of our employees and that he needed younger workers and supervisors. He stated that he was tired of his workers moving too slow and not being able to work on several projects at one time due to being too old…."
- Over the summer of 2005, the company went through a period of mass layoffs. The union layoffs were by seniority, but the non-union layoffs were not by seniority and included a high percentage of people over 50. I expressed my concern to Bennett, Johnson and others that the people being laid off seemed to be older individuals. Also, there were a number of older non-union individuals who were demoted and received cuts in pay. Nothing was done to correct this situation."

(Ex. P, Battcher EEOC statement).

Mr. Battcher's attached affidavit further describes Johnson's behavior, stating that Johnson was irritated any time an employee could not work a full shift due to medical reasons. Johnson also made comments about "old farts" being too slow and not being able to do more than one thing at a time.  (Ex. D, Battcher Aff.).

19.    The decision with regard to Wright's employment was made entirely by Johnson. There is no evidence that any other person was involved in the decision concerning Wright.

20.    The decision-making process regarding the layoffs at Pemco is vague and unstructured.  Doris Sewell, Vice President of legal and corporate affairs for Pemco's holding group, is the only in-house counsel for Pemco.  (Ex. Q, Sewell dep. at 12:21-13:9).  According to Ms. Sewell, no direction was given by the board members regarding how layoffs were to occur, the number of people laid off, or whether to lay off anyone at all.  (Ex. Q, Sewell dep. at 50:23-51:11).  No standards were established for how the layoffs were to be performed, and no layoff guidance training was provided by Ms. Sewell.  (Ex. Q, Sewell dep. at 55:19-56:4).

21.    Dennis Johnson similarly affirms that there was "no set formula" for layoffs, although he was the one who is in charge of layoffs.  (Ex. K, Johnson dep. at 119:2, 135:6-14). He did not perform any calculations as to the amount of money that would be saved by performing a layoff, and he has no idea what—if any—cost savings per laid off employee Pemco realized, nor did he have anyone else make those calculations.  (Ex. K, Johnson dep. at 119:12-23).  Furthermore, Johnson never consulted with legal counsel or with HR concerning the layoffs.  (Ex. K, Johnson dep. at 152:10-153:12).  To Jim Battcher, Johnson referred to the laying off the "dead wood"; there was no other standard for salaried, non-union employees than that. (Ex. D, Battcher Affidavit ¶ 4).

### III.    FMLA

#### A.    FMLA Intro

The FMLA was specifically passed by Congress to give security to workers with serious health conditions. One of the enumerated findings of Congress was "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods." 29 USCS § 2601(a)(4). It was therefore the stated purpose of the Act to lend federal protection to injured or ill employees and "*entitle* employees to take reasonable leave for medical reasons." 29 USCS § 2601(b)(2).

The statute states specifically that, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period …[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee. 29 USCS § 2612(a)(1)(D). This includes the period of recovery following treatment for a serious health condition. See, 29 CFR 825.114(a)(2)(i) A serious health condition includes, "a period of incapacity (i.e. , inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, *or recovery therefrom*")(Emphasis added).

The employee must give due notice of the need for leave, "except that if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable. 29 USCS § 2612(e)(2)(B).  Here, there is no dispute that the plaintiff gave timely notice of the need for leave.  "Where the need for leave is unforeseeable, the employee need only provide [the] employer with notice sufficient to make the employer aware that [his] absence is due to a potentially qualifying FMLA  reason. *Gay v. Gilmore Paper Co*., 125 F. 3d 1432, 1436 (11th  Cir.  1997).  The  employee  need  not  even  mention  FMLA." *Bailey v. Miltope Corp.*, 2007 U.S. Dist. LEXIS 1760 (M. D. Ala. 2007).  Additional FMLA

implementing regulations provide that "in all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, based on information provided by the employee." 29 C.F.R. § 825.208(a)(2) (1993). *Gay v. Gilman Paper Co.*, 125 F.3d 1432, 1434 (11th Cir. 1997). Further, the employer has a duty under 29 CFR 825.301 to notify the employee of his right to restoration of his job.

Even if the employee's notice is not timely, it does not alter plaintiff's rights under the statute. *Id.* Here Pemco did not deny the leave when plaintiff requested to be off for surgery, nor did it deny the leave when the plaintiff requested an additional two weeks to fully recover. Therefore, Defendant has waived any objection to notice.

The statute also specifically allows an eligible employee "to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for [unpaid] leave." 29 USCS § 2612(d)(2). It also provides that, "The rights established for employees under this Act or any amendment made by this Act <u>shall not</u> be diminished by any collective bargaining agreement <u>or any employment benefit program or plan</u>." 29 USCS § 2652 (emphasis added). Therefore, the plaintiff's request to use paid leave such as short term disability payments and accrued vacation does not affect his entitlement or his protected status under the Act.

At several points in defendant's Motion for Summary Judgment defendant refers to medical certifications. Under 29 USCS § 2613, it is clear that medical certification is simply an option of the employer. It has no relevance to any issue in this case except to show that Defendant apparently did not doubt plaintiff's explanation of the need for medical leave and that the employer did not bother with normal FMLA procedures. Employers are entitled to require that the need for leave be supported by the certification of a health care provider, 29 U.S.C. § 2614(c)(3), but they must provide written notice regarding requirements for providing medical

certification and the consequences of failing to do so, 29 C.F.R. §§ 825.301(b), 825.305. *Bailey v. Miltope Corp.*, 2007 U.S. Dist. LEXIS 1760, 17-18 (D. Ala. 2007).  Again it has no affect here on plaintiff's substantive rights since the employer never requested any medical certification.

The central issue in this case is that  the FMLA requires the employer  to restore  the employee "to the position of employment held by the employee when the leave commenced" or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 USCS § 2614(a)(1)-(2).

Further the Act states, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title [29 USCS §§ 2611 et seq.]…   It shall [also] be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title [29 USCS §§ 2611 et seq.].  29 USCS § 2615.

Although Defendant seeks to divide the analysis into separate threads, in the unique facts of the present case, it is an artificial distinction since the failure to restore the plaintiff to his position following protected leave was both interference with an explicit right under the statute and also retaliation for taking the leave.   Defendant's decision not to reinstate the plaintiff following the letter from counsel informing them of the potential FMLA violations (Ex. M, July 20, 2005 letter from counsel) is also evidence of retaliation against the Plaintiff, "for opposing any practice made unlawful by this title."

The FMLA is a "remedial statute" and "as such should be construed broadly to effect its purposes." *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 164 (1st Cir. 1998) *quoting Tcherepnin v. Knight*, 389 U.S. 332, 336, 19 L. Ed. 2d 564, 88 S. Ct. 548 (1967)).

### B.    Interference

"To establish an interference claim, [the employee] must show: "(1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1291 (10th Cir. 2007). "To state a claim that his employer has interfered with a substantive FMLA right, a plaintiff need only demonstrate that he was entitled to but denied the right. He does not have to allege that his employer intended to deny the right; the employer's motives are irrelevant. *Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1208 (11th Cir. 2001).

Once the plaintiff establishes that his rights under FMLA were interfered with, the burden shifts to the employer to show, "that an employee would not otherwise have been employed at the time reinstatement is requested 29 CFR 825.216.

"If an employee is laid off during the course of taking FMLA leave and employment is terminated…[a]n employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration.

(2) If a shift has been eliminated, or overtime has been decreased, an employee would not be entitled to return to work that shift or the original overtime hours upon restoration. **However, if a position on, for example, a night shift has been filled by another employee, the employee is entitled to return to the same shift on which employed before taking FMLA leave.**
29 CFR 825.216 (a)(1)-(2)(emphasis added).

Therefore, under the regulations, if the position or an equivalent was filled by another employee, the person taking leave is entitled to come back to that position or its equivalent.  In other words, if the position is still there, then the employee is entitled to it even if it has been filled by someone else.

In this case, there is ample evidence that the statute was violated by the defendant's failure to restore the plaintiff to his former position, a position which existed at the time that he was ready to return to work and was simply filled by another, less experienced person. The evidence that supports the fact that the job title and duties were still there is set out in paragraph 15 of the statement of facts. It is clear that the position was never eliminated, but rather exists to this day.

Defendant also states that Plaintiff was laid off because he was not qualified to work on aircraft, but there is no evidence that this was the standard used to fill the position. When Briody stepped into the Facilities Department Johnson gave him facilities work to do not production work. Two more employees, Ball and Miller were recalled during the lockout of August 2005 because of the volume of facilities work to be done.

If Defendant was allowed to deny Plaintiff his federal rights, not based on qualities needed for the work at hand, but on the mere possibility that some other quality might some day be needed then the entire purpose of the Act would be subverted.

The hard evidence that existed at the time was that Briody was the new head of the Facilities Department and that Johnson was loading him up with Facilities work. There is no justification here for defendant's failure to return the plaintiff to his position.

## C.    Retaliation

The FMLA also prohibits employers from discriminating against employees, "for exercising or attempting to exercise the rights" under the Act. 29 U.S.C. § 2615; 29 C.F.R. § 825.220(c). Analysis follows the McDonnell Douglas burden shifting procedure.

> In order to establish a prima facie case of retaliatory discharge or retaliation using the McDonnell Douglas framework, a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and

> (3) there is a causal connection between the protected conduct and the adverse employment action. See Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir.2000); Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir.2000) (Title VII); Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir.1999) (ADA).

Brungart v. Bellsouth Telecommunications, Inc., 231 F. 3d 791, 798 (11th Cir. 2000).

Here there is no dispute that the plaintiff engaged in statutorily protected conduct. Plaintiff had a serious health condition which required surgery and there was a lengthy period of time necessary for plaintiff to recover from that surgery. There is also no dispute that plaintiff suffered an adverse employment action, was demoted and then terminated while he was still on leave.  Defendant only questions the third issue in its brief:  whether there is a triable issue on causation.

> "To establish the causal connection element, "a plaintiff need only show 'that the protected activity and the adverse action were not wholly unrelated.' " Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir.1999) (quoting Simmons v. Camden County Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir.1985)). In order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action. See Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir.1993); Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir.1997).

Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (emphasis added).

" 'Plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action.'" Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322 (11th Cir. 1999)." Hill v. IGA Food Depot, 2006 U.S. Dist. LEXIS 80455 (M. D. Ala. 2006); Gupta v. Florida Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000). 'The prima facie burden is not onerous." See, Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (U.S. 1981). No smoking gun memo is required.

Here, there is no question that Dennis Johnson, the decision maker, knew of the need for leave since plaintiff informed him directly that he would be gone and they discussed how to meet the needs of the position during plaintiff's leave. Johnson also knew of the need for two more weeks in order for the plaintiff to fully recover. On both occasions Johnson approved the leave himself. therefore the first element is satisfied in that Johnson was aware of the protected conduct.

With regard to establishing the close temporal proximity, the timing of each of the decisions concerning Wright's employment was closely linked to his request for leave.

First, there was a plan in place before Wright requested leave which would allow Ward to retire and Wright to assume his duties. This would have left two people in management positions in Facilities and would not have required anyone to be hired. There was also a plan for Richard Miller, to fill in for Wright during the leave period. When Plaintiff requested leave, both plans were altered.

Second, when Wright notified Pemco of his intent to return to work, he was demoted the next day. The day after Wright's demotion, July 8, 2005, Johnson issued a memo announcing that Briody was the new Facilities Manager, permanently replacing Wright.

Four days after that, without explanation, Wright was notified that he was terminated. Defendant has never produced any evidence concerning any intervening event which would have prompted this change of plans.

Defendant claims that the letter from counsel (Ex. M) was the reason as to why Plaintiff was not reinstated. An inference in Plaintiff's favor, however, is that the lack of reinstatement was due to Plaintiff's opposition to violations of the Act stated out in the letter. Thus, when Plaintiff opposed the violations of the Act, he lost his chance at reinstatement.

It would be a mistake to minimize the evidence of temporal proximity in evaluating causation here. Every time Plaintiff exercised his rights under the FMLA an employment action was taken against him. This by definition is the cause and effect required by statute.

### D.    Pretext

If the defendant is able to articulate a non-discriminatory reason for the conduct, the plaintiff is given the opportunity to show that there is an issue of fact with respect to pretext. The reason articulated by the employer is that plaintiff was just part of the mass layoffs going on at the time. (Def. Brief at 17). It is clear, however, that the mere fact of reduction in force ("a RIF") cannot form the basis of summary judgment.

"[A]n employer may not use its RIF/reorganization/improved-efficiency rationale as a pretext to mask actual discrimination or retaliation; the mere incantation of the mantra of "efficiency" is not a talisman insulating an employer from liability for invidious discrimination."

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 166 (1st Cir. 1998).

> "Because of the availability of seemingly neutral rationales under which an employer can hide its discriminatory intent, and because of the difficulty of accurately determining whether an employer's motive is legitimate or is a pretext for discrimination, there is reason to be concerned about the possibility that an employer could manipulate its decisions to purge employees it wanted to eliminate. See Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990) (**Subjective evaluations of performance "are more susceptible of abuse and more likely to mask pretext" than objective job qualifications**.) (internal quotation marks omitted). The law does not permit this. Even if an employer's actions and articulated reasons are facially neutral (e.g., a RIF), if in reality the employer acted for a prohibited reason (e.g., retaliation for exercising a protected right), then its asserted legitimate reason for the RIF and its ostensibly nondiscriminatory selection criteria as to who gets RIFed cannot insulate it from liability. As Judge Posner wrote in the context of ADA disability discrimination, **"[a] RIF is not an open sesame to discrimination against a disabled person. Even if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of its disabled workers." Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1195 (7th Cir. 1997) (citation omitted). Nor can it be an opportunity to**

**get rid of workers who exercise their FMLA right to take medical leave for serious medical conditions.** See 29 U.S.C. § 2615(a).

This means that, plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be "particularly cautious" about granting the employer's motion for summary judgment. …

The nonmoving plaintiff may demonstrate pretext either indirectly by showing that the employer's stated reasons for its adverse action were not credible, or directly by showing that that action was more likely motivated by a discriminatory reason. [citation omitted] Thus, one way an employee may succeed is to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfact finder could rationally find them unworthy of credence and [with or without additional evidence and inferences properly drawn therefrom] infer that the employer did not act for the asserted non-discriminatory reasons." Hilti, Inc., 108 F.3d at 1323 (internal quotation marks omitted); Weldon, 896 F.2d at 798 (courts should be sensitive to myriad of ways such an inference can be created).

In addition, close temporal proximity between two events may give rise to an inference of causal connection. Thus, "protected conduct closely followed by adverse action may justify an inference of retaliatory motive." Marx, 76 F.3d at 329; see Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988) ("A showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation.…

In assessing discriminatory motive, a court may also consider other factors, including "among other things, 'the historical background of the . . . decision'; 'the specific sequence of events leading up to the challenged decision'; 'departures from the normal procedural sequence'; . . . '[any] contemporary statements by members of the decision making body,'" [citations omitted], and "substantive departures . . ., particularly if the factors usually considered important by the decision maker strongly favor a decision contrary to the one reached," …In addition, "doubts about the fairness" of an employer's decision or an employer's "'misjudging'" of an employee's qualifications, while not necessarily dispositive, "'may be probative of whether the employer's reasons are pretexts for discrimination.'"

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168-169 (1st Cir. 1998)

Therefore, as the Hodgen's case demonstrates, even where the RIF may seem wholly justified by business conditions, the real inquiry is whether, within the context of the RIF, the decision to terminate this particular employee violated federal law.

Based on the evidence in the record as a whole, the jury could readily find for the plaintiff on the issue of pretext based on the discrepancy between what the employer says it intended and what it actually did. Many of these issues have been discussed above.

Into this mix, the Court should consider the fact that there were no set standards for the lay off, no attempt at determining cost savings and although Johnson now says he did that based on production experience, Jim Battcher says it was based on trimming "dead wood." Johnson's actions at the time contradict his current position.

Defendant also maintains that they needed a "Production Manager." There is no evidence, however, which existed in 2005, that this was the case. The title of "Production Manager" was never used at the time and once Briody went into the Facilities Department his production work was minimal.

Pretext is shown by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable fact finder could find them unworthy of credence." … (citations omitted). The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 120 S. Ct. 2097, 2108, 147 L. Ed. 2d 105 (2000). In other words, the prima facie case, plus sufficient grounds for disbelieving the defendant's proffered reasons, may "demonstrate the existence of a genuine issue of fact …" *Hamilton v. Montgomery County Bd. of Educ.*, 122 F. Supp. 2d 1273, 1281

(M.D. Ala. 2000).  For these reasons Defendant's motion for Summary Judgment should be denied.

## IV.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (TORT OF OUTRAGE)

The tort of outrage provides a remedy for "extreme and outrageous conduct." To be actionable under the tort of outrage, the conduct must be "so outrageous in character and so extreme in degree as to be beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *American Road Service Society v. Inmon*, 394 So. 2d 361, 365 (Alabama. 1980) (citing Restatement 2d of Torts 46, comment d., at 73[1965]; *McIsaac v. WZEM-FM Corporation*, 495 So. 2d 649 (1986).

To recover under the tort of outrageous conduct in Alabama, a plaintiff must prove that: 1) the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from the conduct; 2) the defendant's conduct was extreme and outrageous; and 3) the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it. *Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1434 (1998) quoting *Jackson v. Alabama Power Co.*, 630 So.2d 439, 440 (Ala. 1993).

It is <u>not</u> the law that the tort may only be invoked in one of the three situations set out in defendant's brief, i.e. 1) wrongful conduct associated with burials; 2) coercion of insurance settlements; and 3) egregious sexual harassment. (Def. brief at 19 citing *Potts v. Hayes,* 771 So. 2d 462 (Ala. 2000).

The elements of the tort as set above are well established and if there is a triable issue of fact concerning these elements, then summary judgment should be denied.

The three situations do illustrate an important point as to when this tort becomes a jury issue. This tort is invoked when there is intentional conduct that wrongs a person who is in a particularly vulnerable situation such as a grief stricken family, a victim of insurance company tactics and, in employment cases, where the misconduct is done by someone who holds the employee's livelihood in their hands. Intentional infliction of emotional distress is engaging in misconduct that is recklessly harmful and humiliating to a vulnerable person.

Here, taking the inferences in favor of the non-moving party in this case, the facts show that at the time the plaintiff was 55 years old and faced with the choice of having surgery or suffer permanent injury. He cannot stay at work. He informs everyone of his need for leave. He trains his replacement and he goes through surgery. He knows he needs to be back at work and gives notice of his intent to return even though it will be on limited duty. He is told to come in for a drug screen, but this is a ruse. No drug screen is required; instead he is demoted to a position he held a decade ago and must work under the supervision of a man who will be doing his former job. This is from a company that he has been loyal to and faithfully served for sixteen years. Swallowing all pride, he accepts the position because he knows that he would not be able to immediately find another position because of his physical limitation.

The new position requires more strenuous activity and so plaintiff asks to take two more weeks to fully recover from his surgery so that he can come back full strength. His request for additional leave is granted, but this too is a ruse because he is terminated just a few days later. Recklessly engaging in unlawful conduct against a vulnerable person is intentional infliction of emotional distress and a jury should therefore be able to decide this count.

## V.    ADEA

"[I]n unlawful termination claims under the ADEA this court has permitted plaintiffs to establish a prima facie case by showing that:(1) [he] was within the protected group; (2) [he] was discharged; (3) [the employer] sought to replace him with a younger person; and (4) he was replaced with a younger person outside the protected group. Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730, 735-36 (5th Cir.1977); see also Rosenfield v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1495 (11th Cir.1987); Pace, 701 F.2d at 1386 n. 7. Although this formulation of the McDonnell Douglas scheme does not require an employee who has held a position for some time to prove qualification, the employee must show that the employer specifically sought to replace him with someone younger." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 note 2 (11th Cir. 1993); *Tuttle v. Metro. Gov't*, 474 F.3d 307, 317 (6th Cir. 2007).

The fact that plaintiff's replacement was also within the protected class does not preclude a finding of age discrimination. *Buckley v. Hospital Corp. of America, Inc.*, 758 F.2d 1525, 1530 (11th Cir. 1985).

Defendant here has tried to make the argument that Briody did not really replace the plaintiff. Defendant states, "Although Briody had assumed the duties of the Facilities Manager position on July 11, 2005, and covered those duties throughout the rest of the month and into August, in part due to his aircraft qualifications, he did not permanently replace Plaintiff until after the lockout." (Def. Brief at 23). This is clearly contradicted by Briody's testimony that he permanently assumed the duties of Facilities manager on July 11, 2005.

From a practical standpoint, Briody was handling the duties of Facilities Manager from the time of the plaintiff's medical leave on. There is no evidence contemporaneous with the events that this was a temporary situation.

In *Tuttle v. Metro. Gov't*, 474 F.3d 307 (6th Cir. 2007), the defendant also argued that step four of the prima facie case requiring the plaintiff to show replacement by a younger individual could not be met where the replacement was temporary. The Court of Appeals disagreed, however, stating that the fourth element of the prima facie case in an age discrimination case can be met even where the new hire has the title of "temporary" employee. In cases where the new hire takes on the plaintiff's former job responsibilities, merely designating the new hire "temporary" will not defeat the fourth element. *Tuttle v. Metro. Gov't*, 474 F.3d 307, 318 (6th Cir. 2007).

Plaintiff here has satisfied this initial burden because at age 55 he was a member of a protected class, was well qualified for the position which he had been serving in for some years and was replaced by Clarke Briody, an individual who was younger than plaintiff and who did not have his experience and knowledge.

Once the prima facie case is established, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its adverse employment action. If the defendant articulates such a reason, the plaintiff must demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for age discrimination. The burden of proving pretext merges with the plaintiff's ultimate burden of proving that age was a determining factor in his discharge, and it can be met by showing that a discriminatory reason more likely than not motivated the employer's decision, or by discrediting the employer's proffered explanation."

*Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993); *Tuttle v. Metro. Gov't*, 474 F.3d 307, 317 (6th Cir. 2007).

Here, assuming that the employer has articulated a legitimate non-discriminatory reason, the plaintiff is also able to demonstrate pretext due to the evidence set out above. Additionally, James Battcher, Pemco's Human Resource Director in 2005 has presented sworn testimony concerning Johnson's prejudices against older individuals. See paragraph 18 of the Statement of Facts. The inferences that can be drawn from this evidence is that Wright's termination was due to an impermissible prejudice against older individuals and the medical problems that are often associated with aging.

Such comments can be direct evidence of prejudice and for this reason summary judgment is avoided. See, *Buckley v. Hospital Corp. of America, Inc*., 758 F.2d 1525, 1530 (11th Cir. 1985)(Court found direct evidence of discrimination in comments such as the hospital needed "new blood" and there was an intent to recruit younger doctors and nurses, and his comment on plaintiff's "advanced age"). Such evidence may also be considered in the pretext stage of the burden shifting analysis of circumstantial evidence.

Also, for the first time in this case, Johnson gives his sworn statement that he decided not to reinstate the plaintiff after he received a letter from plaintiff's counsel opposing the violations of the FMLA and the ADEA. (Ex. N, letter from counsel; See also Johnson Declaration). Instead of investigating the alleged violations of federal law, Johnson made the determination not to reinstate the plaintiff. This is absolute evidence of unlawful retaliation for engaging in conduct which is protected by the statute. Plaintiff will seek an amendment to his complaint in order to bring count for retaliation under the ADEA.

## VI.    ERISA

Section 510 of the Employment retirement Income Security Program ("ERISA") makes it unlawful to discharge … any beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan … or for the purpose of interfering with the attainment of any right to which such participant may become entitled.      29 U.S.C. § 1140.

Plaintiff agrees that although his termination resulted in substantial loss of benefits through his ERISA pension plan, this ERISA claim is due to be dismissed.

## VII.    CONCLUSION

WHEREFORE,  based on the evidence presented through deposition testimony and affidavits as set out above as well as considering the positions taken by the Defendant in its response to the EEOC charge and in its Motion for Summary Judgment, the Plaintiff respectfully submits that there are multiple issues of fact to be decided by the Jury in this matter and that the Defendant has not and cannot meet the high burden required to deprive the Plaintiff of his right to a trial on the merits of his claims.  Accordingly the Plaintiff respectfully requests this court deny the Motion for Summary Judgment filed by the Defendant.

Respectfully submitted,

_s/ Elizabeth B. Glasgow_____
Elizabeth B. Glasgow
ASB-8348- S58E
Attorney for Plaintiff
P.O. Box 2228
Dothan, Alabama 36302
(334) 793-2424
F. (334) 793-6624
eglasgow@fphw-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 22, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

John Holmes, Esq.
Maynard, Cooper & Gale, P.C.
1901 Sixth Avenue North, Suite 2400
Birmingham, AL 35203

**__s/ Elizabeth B. Glasgow_____**

# FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    SOUTHERN DIVISION

4

5    ROGER WRIGHT,

6          Plaintiff,

7    vs.                    CASE NO. 1:06-cv-647-WKW

8    PEMCO WORLD

     AIR SERVICES, INC.,

9

          Defendant.

10

11

12

13              * * * * * * * * * *

14          DEPOSITION OF ROGER MAXWELL WRIGHT, taken

15    pursuant to stipulation and agreement before Sherry

16    McCaskey, Court Reporter and Commissioner for the

17    State of Alabama at Large, in the Law Offices of

18    Farmer, Price, Hornsby & Weatherford, 100 Adris Place,

19    Dothan, Alabama, on July 11, 2007, commencing at

20    approximately 1:20 p.m.

21              * * * * * * * * * * *

          EXHIBIT
          A

22

23

# FREEDOM COURT REPORTING

Page 6

```
 1        36350.
 2   Q.   And your date of birth is November 28, 1949?
 3   A.   Yes.
 4   Q.   Have you ever been in a dispute with an
 5        employer other than Pemco?
 6   A.   No, sir.
 7   Q.   Have you ever seen the complaint filed in this
 8        case?
 9   A.   Yes, sir.
10   Q.   How far did you get in school, Mr. Wright?
11   A.   I graduated.  I've got probably a year
12        in -- in Wallace College EMT training.  I was
13        intermediate EMT.  I went on through some
14        various training through Pemco, management
15        training.  I don't know exact quarters or
16        whatever on that.
17   Q.   What kind of management training did you
18        receive at Pemco?
19   A.   Modern management.  I don't remember the exact
20        name of the course, but it was two different
21        courses at Wallace.
22   Q.   The management training was at Wallace as
23        well?
```

# FREEDOM COURT REPORTING

Page 9

1    employee, you were responsible for being aware

2    of various policies and procedures at Pemco?

3  A.  Yes, sir.

4  Q.  Have you ever been terminated from a position

5    with any employer other than Pemco?

6  A.  No, sir.

7  Q.  When did you graduate high school?

8  A.  1968.

9  Q.  If it's easy to do, can you walk me through,

10    just generally, the chronology of jobs that

11    you've had prior to working for Pemco?

12  A.  Okay.  I worked with a -- is that from now

13    back or from Pemco back?

14  Q.  We can go -- we can do it -- whatever is

15    easiest for you, but maybe from high school

16    going forward, if that works.

17  A.  Okay.  I hired on with Hayes Aircraft in

18    1968.  I worked four years to 1972.

19  Q.  And what did you do at Hayes?

20  A.  Flight line B mechanic on aircraft.

21  Q.  And was that in Dothan?

22  A.  Yes, sir.

23  Q.  Is that where Pemco is now?

## FREEDOM COURT REPORTING

Page 10

1     A.    Pemco bought Hayes out.

2     Q.    Right.  Same facility?

3     A.    Same facility.

4     Q.    Okay.  And what happened in 1972?

5     A.    I went to Daniel Construction at Farley

6           Nuclear Plant.

7     Q.    Why did you leave Hayes?

8     A.    More money.

9     Q.    And what were you doing at Daniel

10          Construction?

11    A.    I started off as a beginner carpenter, worked

12          on up to a journeyman carpenter.

13    Q.    And how long were you with Daniel

14          Construction?

15    A.    '72 to -- '72 to '78.

16    Q.    And what happened in 1978?

17    A.    The job was finishing up over there.  The

18          plant was getting complete.

19    Q.    And where did you go next?

20    A.    I was in business for myself.  I had a small

21          convenience store.

22    Q.    Did you open that in 1978?

23    A.    I actually opened it in 1977 I think it was.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 13

1    Q.   From a lack of work?

2    A.   Yes, sir.

3    Q.   Were you the only person laid off?

4    A.   No.  There was four or five of us, laborers

5         included.

6    Q.   And what did you do in 1989 after being laid

7         off?

8    A.   I hired on with Pemco.

9    Q.   So in the interim, Pemco has purchased Hayes

10        Aircraft?

11   A.   Yes, sir.

12   Q.   And was that in 1989 when you hired on with

13        Pemco?

14   A.   I think it was March or January, January or

15        March, one of the other.  I'm not sure.

16   Q.   Of 1989?

17   A.   Yes, sir.

18   Q.   And what position did you have when you hired

19        on at Pemco in 1989?

20   A.   Plant mechanic for one month.

21   Q.   What does a plant mechanic do?

22   A.   Carpenter work, brick mason, pipe fitter,

23        janitorial, electrician.  There was just a

## FREEDOM COURT REPORTING

Page 14

```
1          thin line between plant mechanic and

2          maintenance mechanic at that time.

3    Q.    Was that an hourly position?

4    A.    Yes, sir.

5    Q.    Who was your supervisor?

6    A.    Roy A. Woodham.

7    Q.    And you mentioned you were only in that

8          position for a month?

9    A.    Yes, sir.

10   Q.    Did you switch to a different job?

11   A.    I was offered a supervisor of facilities.

12   Q.    During the month that you worked as a plant

13         mechanic, were you eligible to join the union?

14   A.    Yes, sir.

15   Q.    Did you?

16   A.    No.

17   Q.    And the supervisor of facilities position that

18         you were offered, was that -- had that been

19         vacated by somebody else?

20   A.    They were increasing the department.  They had

21         two supervisors already.  They made me

22         supervisor, and I went to second shift.

23   Q.    So it was a new position?
```

## FREEDOM COURT REPORTING

Page 23

```
 1    Q.   And did you report to him?

 2    A.   No, sir.  We worked together.  As far as him

 3         being over me, no, sir.

 4    Q.   Y'all were equals?

 5    A.   Yes, sir.

 6    Q.   And what was your job title?

 7    A.   Production support manager.

 8    Q.   When did you become production support

 9         manager?

10    A.   I don't remember what year it was.

11    Q.   Sometime after 1995?

12    A.   Yes, sir.

13    Q.   Do you remember how long you were in that

14         position?

15    A.   Again, I don't remember what year.  It was a

16         couple of years.  Dean left and they put the

17         departments back together again.  And I

18         reported to Greg Phillips also when Dick Young

19         was not there.  Dick Young was the one I had

20         to report my budget to and also report to Greg

21         Phillips.

22    Q.   Who was Greg Phillips?

23    A.   He was over material control at that time or
```

## FREEDOM COURT REPORTING

Page 26

```
1    Q.   Did you ever have any grievances filed against
2         you while you were production support manager?
3    A.   I don't believe so.
4    Q.   Did you have a good relationship with the
5         folks you supervised?
6    A.   Yes, sir.
7    Q.   I want to make sure I've got this right.  I'm
8         not clear on -- and I think because you're not
9         clear on the dates.  You were production
10        support manager for at least a year, maybe two
11        years?
12   A.   I'm not -- yes, it was that long at least.
13   Q.   Do you remember what your next position was?
14   A.   After Dean left, Dan Hatcher, the vice
15        president then, asked me to take the position
16        of facilities manager -- manager of
17        facilities.  I'm sorry.
18   Q.   Do you know why Dean left?
19   A.   He went to Arkansas.  They started a new
20        aircraft refurbish plant up there, and he left
21        to go there.
22   Q.   Do you have any idea when you became the
23        manager of facilities?
```

FREEDOM COURT REPORTING

Page 27

1    A.    No, sir, I don't.

2    Q.    And were you in that position up until 2005?

3    A.    Yes, sir.

4    Q.    Did anything change with your job title

5          between sometime in the late 90s to 2005?

6    A.    Like I say, I don't know what -- what year it

7          was that he asked me to take the facilities

8          manager -- manager of facilities.  I just

9          don't know.

10   Q.    Let's assume it was in the 1990s.  Was there

11         anything different?  Did you have any other

12         job titles other than manager of facilities up

13         until 2005?

14   A.    No, sir.

15   Q.    What were you job duties as manager of

16         facilities?

17   A.    Requisition material, maintain a -- a budget,

18         also calculate the budget, work stands,

19         construct, fabricate.

20   Q.    Was that work-stand work any different than

21         what you had done as the production manager?

22   A.    Not really.

23   Q.    Did you also have waste water

## FREEDOM COURT REPORTING

Page 48

```
 1            of any names of somebody that --

 2    A.   No, I don't.

 3    Q.   Has any Pemco manager ever said anything to

 4            you about the claims that you're making in

 5            this lawsuit?

 6    A.   No, sir.

 7    Q.   What about any non-management employees at

 8            Pemco?

 9    A.   No, sir.

10    Q.   You state in your complaint that Pemco began

11            cutting back on labor in 2005, and I know

12            we've talked a little bit about that.

13               Tell me specifically about what was going

14            on in 2005.

15    A.   Well, work was getting slack again.  Also, the

16            labor was coming back up.

17    Q.   The labor contract?

18    A.   Yes, sir.

19    Q.   It was about to expire?

20    A.   Yes, sir.

21    Q.   And as far as the work getting slack, do you

22            have any idea what kind of drop-off there

23            was?  I mean, for example, there were 40
```

## FREEDOM COURT REPORTING

Page 49

```
1        planes in 2004 and 10 planes in 2005, or do

2        y'all think about it that way?

3   A.   I think some of it was due to the contract

4        coming up, the labor contract coming up.  They

5        were holding back, not trying to get any new

6        contracts in until after the labor dispute was

7        settled.

8   Q.   And I want to hear more about that.  But as

9        far as percentage of work decrease, do you

10       have any in mind, a figure in mind, of how

11       much the work was slacking off?

12  A.   No, I don't.

13  Q.   And you said that you thought that this was a

14       strategic move on the part of the company to

15       not have any contracts?

16  A.   Yes, sir.  It had been done before.

17  Q.   What evidence do you have to support that

18       belief that Pemco --

19  A.   None.

20  Q.   I'm sorry?

21  A.   None.  Not as far as statistics or any

22       figures, whatever, on that.

23  Q.   Had you heard this idea from somewhere?
```

**FREEDOM COURT REPORTING**

Page 69

1    Q.   Do they have a retirement plan that you're not

2         eligible for yet?

3    A.   They've got a 401K is all.  I think it's

4         coming up sometime in September or something.

5         They're supposed to have a meeting on that.

6    Q.   Mr. Wright, you provide in your complaint in

7         this lawsuit that at some point in 2005, after

8         or during the time Pemco began to cut back on

9         its labor, your immediate supervisor, Henry

10        Ward, was leaving at some point.  That's

11        not what -- I can read this.

12             It says that, "Wright's immediate

13        supervisor was the director of facilities,

14        Henry Ward.  Wright was informed that the

15        initial plan was to do away with the

16        director's position and keep the manager of

17        facilities position."

18             Was that accurate?

19   A.   Yes, sir.

20   Q.   Who informed you of the initial plan?

21   A.   Mr. Ward.

22   Q.   And tell me about the -- what I'll call the

23        "Henry Ward situation."

## FREEDOM COURT REPORTING

Page 71

1    to come back to the conversation that you had

2    with Henry.

3        Did he tell you anything more about the

4    meeting that was held when you were gone?

5    A.   No.  He just told me that, you know, they had

6        a meeting, him and Mr. Bennett.  And I think

7        Mr. Johnson was there.  I'm not sure.  But

8        said they wanted to cut me back to supervisor

9        and him back to manager.  And him, at his age,

10       he was going to go ahead and retire.  He had

11       been there 45 years.

12   Q.   Did Henry tell you if they provided any

13       explanation as to why they wanted to roll

14       y'all back?

15   A.   It was due to the layoffs, I guess.

16   Q.   It was your understanding that the decision to

17       roll y'all back was related to the amount of

18       work at Pemco --

19   A.   Yes, sir.

20   Q.   -- at that time?

21   A.   Yes, sir.

22   Q.   And had Mr. Ward been considering retiring

23       prior to this time, to your knowledge?

### FREEDOM COURT REPORTING

Page 72

```
 1    A.    I think he said, in a year or so.

 2    Q.    Does that mean he was thinking about 2006?

 3    A.    Yes, sir.

 4    Q.    And it just happened a little earlier with

 5          this change?

 6    A.    Yes, sir.  He did that for my benefit.

 7    Q.    And was it your understanding from him that

 8          Ray and Dennis were agreeable to keeping you

 9          in the manager position if he would retire?

10    A.    Yes, sir.

11    Q.    Did you ever have any discussions with Dennis

12          or Ray or anyone else about that?

13    A.    No, sir.

14    Q.    At anytime?

15    A.    No, sir.

16    Q.    Do you have any reason to believe that

17          Mr. Ward was discriminated against?

18                    THE WITNESS:  I don't know how to

19                 answer that.

20                 MS. GLASGOW:  Just tell him.

21    A.    I don't really know how to answer that.  I

22          mean, he -- he did that for my benefit, to

23          save my job, or to keep from having to cut me
```

## FREEDOM COURT REPORTING

Page 74

1      dragging it around for the next year, doing my

2      job.  And I went to various doctors here in

3      Dothan.  I had two epidurals, one foramal

4      (sic).

5              And I went to Dr. Sherrer.  He give me

6      several injections to deaden the pain, you

7      know, for a while.  But it didn't -- it

8      didn't -- it didn't last.  And the epidural

9      didn't last.

10             After I had gone to these physicians here

11     in Dothan, I wanted a second opinion.  I had

12     to -- you know, I had to have some relief

13     somewhere.  So I called Dr. Bernard and made

14     appointment in Columbus.

15             He put me through several tests of nerve

16     reflex which is pins sticking all over you and

17     set me up to scans.  And then wound up, I

18     think it was, May the 31st when I took my

19     myelogram.  He got results from that.  Told me

20     I would have to have surgery sooner rather

21     than later or I'd have permanent damage.

22  Q.  Can you tell what the diagnosis was, why you

23     were going to have to have surgery?

## FREEDOM COURT REPORTING

Page 75

1    A.    I had the lower, I think, two, three, four,

2          something like that.  My lower back was

3          flattened out.  He removed one disk, fused

4          three of them together with part of my hip

5          bone, my left hip bone.

6                And I stayed out of work the next day.

7          He -- he suggested I should stay out -- out of

8          work the next day.  So I went back the rest of

9          June -- let's see -- June the 2nd I think it

10         was.

11               And I got a call from Hughston Hospital.

12         Told me that I would -- my surgery was set up

13         for June the 8th.

14               And I went back the next day and

15         informed -- well, that day I called -- I

16         informed management that I was going to have

17         surgery.  I talked to HR and told Henry, you

18         know, that I was going to have surgery.

19   Q.    Who all did you talk to?

20   A.    I talked to HR and talked to Ms. Gerri Paulk.

21         I talked to Kim there.  I talked to -- I think

22         I saw Jim Batcher also.

23   Q.    Did any of the people you told about having to

## FREEDOM COURT REPORTING

Page 76

1        have surgery give you any problems about that?

2   A.    No.

3   Q.    Did you talk to Dennis Johnson before you had

4        your surgery?

5   A.    Yes, sir.

6   Q.    And did --

7   A.    I went back the next day, Friday, the 3rd, or

8        whatever it was.  Mr. Johnson and I rode

9        around in his truck, looking at various things

10       to clean up.  And I discussed with him the

11       surgery, that it would be four weeks, and I

12       was going to take my sick live.

13           And I had suggested that Richard Miller

14       come from second shift to first to take my

15       place, which was okay, until later that day.

16       He called me back and told me that Clarke

17       Briody was going to stand in for me, and I was

18       to tie in with him.  This was on a Friday.

19           So the next Monday, the 6th ad 7th, I

20       tied in with Clarke.  I left a written work

21       scope of what I had going on and what needed

22       to be done.  Then my surgery was the 8th.

23           Oh, on the way out that afternoon, Clarke

## FREEDOM COURT REPORTING

Page 77

| | | |
|---|---|---|
| 1 | | told me that when I returned, things would be |
| 2 | | 180 degrees out, which I didn't know what he |
| 3 | | was talking about. |
| 4 | Q. | Things would be 180 degrees out? |
| 5 | A. | Yes, sir. |
| 6 | Q. | And you didn't know what that meant, than |
| 7 | | didn't mean anything to you? |
| 8 | A. | No. |
| 9 | Q. | Does that mean anything to you now? |
| 10 | A. | Oh, yeah. |
| 11 | Q. | What does it mean to you now? |
| 12 | A. | It means, I don't have a job there; he's got |
| 13 | | my position. |
| 14 | Q. | And you think Clarke knew that the day you |
| 15 | | left for surgery? |
| 16 | A. | I'm pretty sure he did. |
| 17 | Q. | I think you said when you were riding with |
| 18 | | Dennis Johnson, looking at different issues |
| 19 | | and you mentioned your surgery, you said that |
| 20 | | you would take sick leave? |
| 21 | A. | Yes, sir.  I had four weeks sick leave built |
| 22 | | up. |
| 23 | Q. | And is that paid sick leave? |

## FREEDOM COURT REPORTING

Page 78

```
 1    A.    Yes, sir.

 2    Q.    Did you discuss that with Gerri Paulk?

 3    A.    Yes, sir.

 4    Q.    And is that different from disability leave?

 5    A.    I had paid disability insurance since 1989

 6          when I first hired on.

 7    Q.    But is that what you're referring to, the four

 8          weeks of disability leave, or is that

 9          something different?

10    A.    It's something different.

11    Q.    Okay.  So the paid sick leave was just days

12          that you had that you had accrued over time?

13    A.    The years -- the years I had worked there and

14          built there, it carried over and over.  That's

15          how many days I had -- you know, I had built

16          up, was four weeks.

17    Q.    And when you told Dennis Johnson that you

18          would take your sick leave, at that time, you

19          had contemplated using your four weeks of paid

20          sick leave?

21    A.    Yes, sir.

22    Q.    Any other leave?

23    A.    I had two weeks of vacation left.
```

## FREEDOM COURT REPORTING

Page 81

1        your situation?

2    A.    No.

3    Q.    Tell me a little bit more about the training

4        or the interaction you had with Clarke Briody

5        on June 6 and 7.

6    A.    Okay.  I tried to explain to him what was

7        going on in our department.  He was -- you

8        know, he was unaware.  He had worked over in

9        hanger two, helping to -- or supervising the

10       tool marking of employees' tools, which was

11       FAA reg to -- to their last four numbers of

12       their social security number or whatever.

13    Q.    He'd been a tool crib supervisor?

14    A.    No.

15    Q.    Or is this a different --

16    A.    It was just different.  He was just working

17       there in hanger two, getting all the

18       production workers in there, supervising them

19       to make sure they mark their tools.  Also, he

20       was taking up any excess tools they had, which

21       he would come get me and ask me.  And we would

22       take them back to the tool crib.

23    Q.    You had interacted with him before?

## FREEDOM COURT REPORTING

Page 82

1    A.   This was a couple of months before or

2        whatever.

3    Q.   All right.

4    A.   And I told him -- I told him what I could in

5        two days time.  I mean, you know, I worked

6        there till four o'clock that Tuesday afternoon

7        before I went to Columbus the next morning.  I

8        had wrote a tie-in of what we had going on.

9        We had stand modifications, whatever, you

10       know, and we had the monthly printouts for the

11       update of the equipment.

12           And my administrative assistant was

13       supposed to got all of that for him.  And I

14       had asked my people -- several of my guys to

15       do what they could to help him out, take care

16       of the facility until I returned.

17    Q.   Did you get along with Clarke in the time that

18       you'd spent with him the months before and on

19       those two days?

20    A.   Yes, I -- I got along.

21    Q.   You didn't have any problems with him?

22    A.   No.  He just didn't know what was going on,

23       the main thing.

## FREEDOM COURT REPORTING

Page 83

```
 1    Q.    Your complaint says that he's younger.  Do you

 2          know how old he is?

 3    A.    No, sir.

 4    Q.    Can you guess how old he is?

 5    A.    I'd say late 40s.

 6    Q.    And you indicated you'd had some interaction

 7          with him in the couple months before.  At that

 8          time, did you know anything about his work

 9          experience?

10                MS. GLASGOW:  At what time, John?

11    Q.    I'm sorry.  On the days of June 6 and 7 when

12          you were telling him about what your job was,

13          what did you know about his work experience?

14    A.    From listening to him, he hadn't been in

15          facilities.  He didn't know what really, you

16          know, what was what, which you can't -- you

17          can't learn it in two days.  It's too much to

18          do.  It's not an eight-hour job, not eight

19          hours a day.

20    Q.    Do you know what kind of work experience he

21          had other than facilities work?

22    A.    Aircraft.

23    Q.    Do you know how long he had been at Pemco?
```

FREEDOM COURT REPORTING

Page 84

1    A.    Now or then?

2    Q.    Then.

3    A.    Probably a year or so.  Right after Dennis

4          came there, Mr. Johnson came there.

5    Q.    Other than the interaction that you've already

6          talked about, had you worked with Clarke at

7          all?

8    A.    I don't remember.  I worked with -- during

9          different time, years, layoffs, whatever, I

10         had almost every supervisor out there working

11         for me at one time or another.  And I don't

12         know whether the past year I had -- I think he

13         would spend me somebody to work when they got

14         slack, you know, during the day or whatever,

15         send them over to work.  But -- and -- and I

16         don't think so.  No.

17   Q.    Did you have an opinion about whether or not

18         he was a good worker?

19   A.    I had no idea.

20   Q.    And your impression after talking with him for

21         those next two days was that he didn't have

22         any experience in facilities work?

23   A.    Yes, sir.  He wanted me to hurry and get back,

## FREEDOM COURT REPORTING

Page 85

1          is what he said.

2     Q.   When did he tell you he wanted you to hurry up

3          and get back?

4     A.   Before I left.

5     Q.   Was that before or after he told you about 180

6          degrees out?

7     A.   Before.

8     Q.   Do you remember anything else he told you?

9     A.   That he really didn't want to be over there,

10         that he'd rather be in aircraft.

11    Q.   Did you understand from him that he wasn't

12         going to have any aircraft responsibility

13         while he was in facilities?

14    A.   Well, he didn't say that much.  He -- he had

15         to go to a meeting every afternoon, you know,

16         as far as being up to date on the aircraft.

17    Q.   Did you know whether or not he would be

18         pulling double duty?

19    A.   No.

20    Q.   Did you have any conversations with Richard

21         Miller before you left for your surgery?

22    A.   Just to say goodbye.

23    Q.   Did you tell him that you had recommended him

## FREEDOM COURT REPORTING

Page 92

```
1    A.   Be returning, yes, hopefully.

2    Q.   Your complaint says that you went to your

3         four-week doctor's appointment on July 6th,

4         2005; is that right?

5    A.   It sounds -- sounds like the date, yes.  Yes,

6         sir, it was the 6th.

7    Q.   And the complaint goes on to say that you

8         requested that you be allowed to go back to

9         work two weeks early.

10             Tell me --

11   A.   He --

12   Q.   -- about that.

13   A.   -- did an x-ray that day and said the surgery

14        looked successful and I was healing real

15        well.  And I asked him when could I go back to

16        work.

17             And he said, when do you want to go back?

18             I said, Monday, which would've been the

19        11th.

20             He really didn't like the idea, but we

21        discussed what I had to do or -- there was no

22        lifting involved, you know, no manual labor or

23        whatever.  And he was -- he was really
```

**FREEDOM COURT REPORTING**

Page 93

1      concerned about that.  So he reluctantly

2      okayed me to go back.

3          So I came back that afternoon.  I called

4      Mr. Johnson. .

5   Q.  Let me stop you there before -- we're going to

6      get to that.

7          Why did you want to go back on July 11?

8   A.  That was the following Monday; it had been

9      four weeks, you know.  He was going to put me

10      on limited duty of six hours per day for two

11      weeks with limited stair climbing.  I wanted

12      to return to my job.  I -- laying around the

13      house wasn't for me.

14   Q.  Were you worried about losing your job?

15   A.  No.  I just wanted to return.

16   Q.  Four weeks at home was enough?

17   A.  Yes.

18   Q.  Did you have any work restrictions from the

19      doctor other than the amount of hours that you

20      could work?

21   A.  Just limited to stair climbing.  I explained

22      to them about the stairs at the administration

23      building, that maybe I'd have to go up them

**FREEDOM COURT REPORTING**

Page 94

1        once or twice a day.  And there were, I think

2        at that time, 28 steps up.

3   Q.   And no elevator?

4   A.   No elevator.

5   Q.   The complaint says that you phoned Johnson on

6        that day, July 6th, 2005, and informed him

7        that you would be back to work on July 11 with

8        restricted status.

9             Do you remember that?

10  A.   July the 6th, you're talking about?

11  Q.   Yes, sir.

12  A.   Yes, sir.  The day I got back from Columbus,

13       back from my four-week checkup, I called him

14       and told him I could go back to work the 11th.

15  Q.   And what did you tell you?

16  A.   He told me I would probably have to have a

17       drug screen or test.

18            I said, fine.  I haven't taken anything

19       for pain for two weeks, which I had a

20       prescription for Darvocet.

21            So he said I would need to contact Human

22       Resources about what I would have to do, if

23       I'd have to have a test or not.  And like I

## FREEDOM COURT REPORTING

Page 95

1   said, this was after -- around four o'clock or

2   something that afternoon.

3    The next morning, I called -- no.  I went

4   to HR.  I talked to Ms. Gerri Paul.  She said

5   a drug test wasn't required, found out I

6   didn't have to have one, you know, whatever.

7   I showed them my prescription.  And so --

8 Q. So that wasn't unusual, that Mr. Johnson told

9   you that you might have to have a drug screen?

10 A. No, I don't think so.

11 Q. Had you had any pain in your back in those two

12   weeks where you had stopped taking pain

13   killers?

14 A. I had -- how did he call it -- spasms which

15   was -- they just jump on you and start, you

16   know, all of a sudden and they quit, you

17   know.  And like I said, I wasn't doing

18   anything but walking, laying around, sat

19   around, whatever.  And that's all I was

20   doing.  So I would stay off of those as much

21   as I could.  I didn't -- I didn't like having

22   to take medicine, so I wouldn't take it.

23 Q. When you told Mr. Johnson that you were going

## FREEDOM COURT REPORTING

Page 97

1      No drug test was required.

2  Q.  Did y'all talk about anything else?

3  A.  No.

4  Q.  Did she get on the phone and let somebody know

5      that you were there?

6  A.  She called Mr. Johnson, and he was to come

7      down in 10 or 15 minutes, 15 or 20 or

8      whatever, and talk to me.  So, later, he came

9      down, asked her for -- if there was somewhere

10     he and I could have a conversation.  And she

11     said, the conference room.

12          So at that time, we went into the

13     conference room, which was halfway down the

14     hallway between her office and the accounting

15     office.

16  Q.  The training room?

17  A.  It was a training room, conference room.  They

18     were all made together, you know.

19  Q.  Okay.  All right.  What happened next?

20  A.  He told me there had been some realignment

21     since -- in our department since I had been

22     gone, and that Pemco's payroll didn't have

23     enough for two managers in facility, that

## FREEDOM COURT REPORTING

Page 98

1    Clarke Briody was going to assume the -- the

2    manager position.

3        I told him, he had a manager, myself.

4        And he said, I knew it was going to be

5    tough to swallow.

6        But then he made me an offer of a

7    facilities special tooling supervisor at $3.77

8    an hour cut rate.  So I told him to let me

9    think about it and I would call him back that

10   day.

11       So I went by the bank where my wife

12   worked, and we talked things over.  And I

13   called him back around four o'clock that

14   afternoon.  Told him I would accept the

15   position he had offered, but I would like to

16   take my other two weeks vacation, to come back

17   full eight hours, full capacity.

18       He said, fine, fine, everything is okay.

19       So I signed a vacation slip there

20   before -- at Human Resources before I left.  I

21   don't know whether he signed it or who signed

22   the slip for me.  But I signed in -- for my

23   other two weeks vacation.

## FREEDOM COURT REPORTING

Page 99

```
 1    Q.   So you went back to HR after calling him on
 2         the phone at four o'clock?
 3    A.   No.
 4    Q.   Or did you call him from HR?
 5    A.   That was the day we was -- we was in HR at
 6         that time when he told me this.  It wasn't on
 7         the phone.
 8    Q.   I'm sorry.  I thought that -- I guess you left
 9         me.  I got lost when you were at the bank with
10         your wife and that you had decided that you
11         were going to take the job.
12              How did you communicate that you were
13         going to take the job?
14    A.   Oh, that -- that afternoon, I called him back
15         on the phone.
16    Q.   Right.
17    A.   And told him I would accept -- accept the
18         job.
19    Q.   Okay.  And then at some point, you went to HR
20         to fill out a vacation form?
21    A.   Yes.  I think it was the next day I stopped by
22         there or something.
23    Q.   All right.  Let me go back and ask you a
```

## FREEDOM COURT REPORTING

Page 102

```
 1        time?

 2   A.   Well, it -- like I said, you can't learn it in

 3        two days.  I just, you know, --

 4   Q.   Well, do you think the fact that you had back

 5        surgery had anything to do with it?

 6   A.   I think it was a consideration.  Then put me

 7        on limited duty, say, well, you know, for --

 8        even for two weeks, then what's going to

 9        happen after two weeks or a month?

10   Q.   When you and your wife discussed the job offer

11        of the facilities supervisor position, did you

12        consider not taking it?

13   A.   No.

14   Q.   Were you having to convince her that you were

15        going to take it?

16   A.   No, I just wanted to discuss it.  We discuss

17        everything we do with each other.

18   Q.   You mentioned that when you told Dennis that

19        you would accept the position, that you wanted

20        to take two weeks of vacation?

21   A.   Yes, sir.

22   Q.   Why did you want to do that?

23   A.   I didn't feel comfortable with going back six
```

## FREEDOM COURT REPORTING

Page 103

```
 1        hours a day.  I didn't feel like it was right

 2        for the company.  I couldn't serve in my full

 3        capacity.  So I thought, I'd take the two

 4        weeks to, you know, to get back to full

 5        capacity and satisfy my doctor also, which he

 6        wanted six or eight weeks.  And I just

 7        didn't -- didn't feel right, you know, going

 8        back that way.

 9   Q.   You felt bad about coming back in a part-time

10        status as opposed to being able to work a full

11        eight hours?

12   A.   Yes, sir.

13   Q.   Would you have taken vacation if you were

14        coming back as the manager of facilities?

15   A.   At some point.

16             Or right then?  What is the question?

17   Q.   I'm asking about right then.  I'm not asking

18        about use it or lose it at the end of the

19        year.  And here's what I'm getting at.

20             Prior to July 7, you're planning on

21        coming back to work on July 11th, back on

22        restricted duty?

23   A.   Yeah.
```

# FREEDOM COURT REPORTING

Page 104

1    Q.   And you think you're coming back into your

2          manager position and you're going to work that

3          restricted duty?

4    A.   Uh-huh (positive response).

5    Q.   But something changed, and then you decided

6          that you wanted to take two weeks of vacation?

7    A.   I thought if I stayed -- if I came back -- if

8          I came back as manager of facilities, it

9          would've been easier on me than, I figured,

10         tooling supervisor which is standing on a tool

11         crib, which it had one desk and one chair or

12         whatever, you know.  The environment would

13         have been a lot better on me, you know, being

14         able to sit down and all when I wanted to

15         instead of having to be out running around all

16         the time, you know.

17    Q.   Did you discuss the differences that you

18         perceived between the two jobs with Dennis

19         Johnson?

20    A.   No.

21    Q.   Did you talk to your doctor about it?

22    A.   Yes, sir.

23    Q.   Did you talk to Gerri Paulk about it or

## FREEDOM COURT REPORTING

Page 106

1    A.    I had received two weeks on disability,

2          short-term disability.

3    Q.    You had already?

4    A.    Yes.

5    Q.    During your four-week period --

6    A.    Yes.

7    Q.    -- that you were out?

8    A.    Uh-huh (positive response).

9    Q.    So did that mean, you weren't eligible for any

10        more time?

11    A.    Not actually.  The doctor said I could go back

12        to work.

13    Q.    Gotcha.

14    A.    And once he said I could go back the 11th,

15        that was it.

16    Q.    Did you tell Dennis why you wanted to take

17        vacation?

18    A.    I think I did.

19    Q.    Or did you just tell him that you will take

20        the position but wanted to take two weeks of

21        vacation, if you know?

22    A.    I don't remember.

23    Q.    Either way, Dennis agreed for you to take two

## FREEDOM COURT REPORTING

1       weeks of vacation?

2   A.   Yes, sir.  Yes, sir.

3   Q.   And then you did that; you took two weeks of

4       vacation?

5   A.   I went on two-week vacation leave on the 14th

6       of July.  Ms. Ramona Seigler called me, said

7       I'd been put on indefinite layoff and I'd

8       being getting a letter in the mail.

9           I received the letter the 15th, telling

10      me that I was on indefinite layoff and I would

11      receive two weeks severance pay.  So I went

12      out to Pemco --

13  Q.   Let me -- before we get there, if I can, let

14      me stop you.

15         What did you do between the time you

16      started vacation and July 14?

17  A.   I started vacation on -- what was it, the

18      7th?

19  Q.   Or the 11th, whatever that day is.  I'm just

20      asking, what did you do on those days that you

21      were on vacation before you got the phone call

22      from Ramona?

23  A.   Well, I was on vacation then.  I had taken my

**FREEDOM COURT REPORTING**

Page 117

1                Dennis Johnson were there.

2     A.    If he leaves, I'll come back.

3     Q.    But as long as he's there, you won't?

4     A.    I don't feel they're going to offer me a job

5           anyway.

6     Q.    I'm sorry?

7     A.    I don't feel they're offer me a job anyway.

8     Q.    You testified earlier that you had read your

9           complaint that had been filed in this case.

10    A.    Yes.

11    Q.    And I can show it to you.  But as far you

12          know, without looking at it, does it contain

13          all the clams you're making in this lawsuit?

14    A.    Yes.

15    Q.    Your complaint alleges that Pemco violated the

16          Family and Medical Leave Act.  You're aware of

17          that?

18    A.    Yes.

19    Q.    Tell me what evidence that you have that Pemco

20          violated the FMLA?

21    A.    There were no forms given to me whatsoever or

22          offered to me to carry to my doctor to have

23          filled out and brought back to them.  My job

**PEMCO**
WORLD AIR SERVICES
*A PEMCO AVIATION GROUP COMPANY*
*Dothan Facility*

100 PEMCO DRIVE
DOTHAN, AL 36303

PHONE: (334) 983-7007
FAX:   (334) 983-7046

Date:       July 15, 2005

To:         Roger Wright

From:      Ramona Segler

Subject:    Indefinite Lay-Off

Due to a company restructuring of the organization based on business conditions a reduction in the work force is required. Therefore, effective July 15, 2005 you have been placed on indefinite lay-off.

You will receive two (2) weeks severance paid upon separation by the company.

You will be required to report to the Human Resources Department for out-processing to include but not limited to turning in any company keys, your ID badge, stamps, your vehicle parking permit, your cell phone and any manuals or documents belonging to the company.

If desired, at a mutually agreed time and date, you may make additional arrangements with the HR Department to remove from your desk or work area any personal property.

We regret this unfortunate event and we want to thank you for your contributions to this company.

*Ramona Segler*
Ramona Segler
Human Resources Manager
Pemco World Air Services

File



EXHIBIT
B

## AFFIDAVIT OF HENRY WARD

**STATE OF ALABAMA**                          )
                                             )
**HOUSTON COUNTY**                            )

Before me, the undersigned authority in and for said County in said State, personally appeared Henry Ward who is known to me and who being first duly sworn, deposes and says as follows:

1.  My name is Henry Ward and I am a resident of Newton, Alabama. I have full knowledge of the facts to which I am testifying and I am competent to testify.

2.  Before my retirement in 2005, I worked for Pemco and its predecessor, Hayes Aircraft, for 43 years. At the time of my retirement, I was the Director of Facilities and Roger Wright's supervisor.

3.  In the years that I worked with Roger at Pemco, I considered him to be very capable, loyal and a hard worker. He was at the facility in storms when he should have been home. He was very knowledgeable about upgrades, repairs and wiring in the facility. He had a good attitude and work ethic, and came to work even when he had a great deal of back pain.

4.  In 2005, when Pemco began to cut back on its labor, I met with Ray Bennett, President of Pemco World Air Services, Inc., and Rich Godin about layoffs within my department. Bennett told me that they wanted to eliminate the Director of Facilities position and move me to the Manager's position. I told them that I was about to retire anyway and I recommended that they leave Roger Wright as the Manager of Facilities and I would retire. Bennett agreed to that plan and I told Roger about that



EXHIBIT

C

agreement.  There was never, to my knowledge, any plan to eliminate the Manager of Facilities position.

5.    Pemco's business is cyclical and the company has often gone through periods of layoffs and rehiring. In all of my time at Hayes and Pemco, I could not recall a time when the Manager of Facilities position was eliminated. Because of the size of the department and the duties as to safety and security as well as the grounds, buildings and rolling stock of equipment, it was always necessary to have someone in charge of Facilities.  After the Director of Facilities position was eliminated, it would not have been feasible to also eliminate the Manager of Facilities position.

6.    I handled all of the work with respect to soliciting bids, but there was oversight by the Corporate Director of Facilities in Birmingham.  All bids had to be presented to the corporate office for approval. Once that was done, the decision whether to accept or reject the bids would be made jointly between the Corporate Director of Facilities and myself. Roger Wright did not have any part in handling the bid work.

Further, Affiant saith not.

**IN WITNESS WHEREOF**, we have hereunto set our hands and seals this the 22nd day of October 2007.

_Henry Ward_
**Henry Ward**

**SWORN TO AND SUBSCRIBED** before me this the 22nd day of October 2007, by Henry Ward.

_NOTARY PUBLIC_
**NOTARY PUBLIC**
**MY COMMISSION EXPIRES:** 11/30/08

STATE OF NORTH CAROLINA)
CATAWBA COUNTY.)

### AFFIDAVIT OF JAMES W. BATTCHER, SR.

**BEFORE ME,** the undersigned authority, personally appeared James W. Battcher, Sr., who being by me first duly sworn, deposes and says as follows:

1.      My name is James W. Battcher and I was the Director of Human Resources for Pemco World Air Services, Inc. from January 13, 2003 through October 2005. I had the responsibility of managing the employee/labor relations for the company and I was in charge of the Human Resources Department. I have 40 years experience in management and I spent the last 25 years of my career in Human Resources.

2.      In 2005 Roger Wright notified the HR department of his need for medical leave in order to have surgery and we understood that Wright would need some weeks to recover from his surgery. We did not dispute his need for leave and approved it. Dennis Johnson was also aware of Wright's need for leave.

3.      Johnson's personality was such that he was irritated any time any employee could not work a full day/shift for medical reasons. He made comments about "old farts, "over the hill gang" and "retirement age" employees" being too slow, and not being able to do more than one task at a time.

4.      When Johnson began to talk about the lay offs of salaried workers, his plan was to lay off what he called the "dead wood." There was no other standard for the salaried, non-union employees other than that. Johnson never mentioned needing someone with production qualifications to fill the Facilities Manager position. I cautioned him to be careful about how he went about doing the layoffs of the non-union employees.

5.      When Johnson mentioned that he anticipated laying off Wright, I reviewed Wright's file and found nothing in it which would justify termination based on performance and I told Johnson this. From working with Roger, I know of no legitimate reason why Roger Wright should have been



terminated. His work performance had been good; his supervisor thought highly of him and he had valuable experience in Facilities Management.

6.      The Facilities Manager's position is one that is not usually affected by layoffs. Because of the size of the facility, safety requirements, environmental issues, etc. there was always someone who needed to be in charge of the facility. Therefore, it would have been highly unusual to eliminate the Facilities Manager's position completely, particularly with Director of Facilities position already being gone.

7.      Johnson did not consult with me the day Mr. Wright was terminated.

Signed and sworn to this 23rd day of October, 2007 in Dothan Alabama.

_James W. Battcher_
James W. Battcher, Sr.

STATE OF ALABAMA )
COUNTY OF HENRY)

### ACKNOWLEDGEMENT

I, the undersigned authority, in and for said County in said State, hereby certify that **James W. Battcher, Sr.**, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day, that, being informed of the contents of this instrument, he executed the foregoing, voluntarily on the day the same bears date.

Given under my hand and official seal this the 23rd day of October 2007.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES: 8/2/2009

# CERTIFICATION

*Discovery Support Services Use Only*

The undersigned certifies that he/she is a representative of Discovery Support Services,

and states that they made true reproductions of the applicable original records.  These original

items, documents and/or records were provided to Discovery Support Services by the custodian of

records for the Healthcare Provider identified within the enclosed records.

8/18/05

Date

_Signature – Discovery Representative_

---

The undersigned certifies that he/she is the Custodian of Records and a person responsible for keeping the requested

items, documents, and/or records for the Healthcare Provider identified within the enclosed records,  and that the

enclosed records are true and correct reproductions of the requested items, documents, and/or records

concerning _WRIGHT, ROGER_ , and that the said requested items, documents, and/or

records were kept as reasonably necessary for documentation.

This 18 day of AUGUST , 20 05

By: JOAN P. MEARES (custodian)

Signature: _Joan P. Meares_

Sworn to and subscribed before
me this 18 day of
AUGUST , 20 05

NOTARY PUBLIC

My commission expires: _____

TAMARA BROWN
MY COMMISSION EXPIRES
FEB
22
2009
MUSCOGEE CO. GEORGIA
NOTARY PUBLIC

**EXHIBIT**

3



932410_20050810

WRIGHT, ROGER
MR# 932410
MAIN CLINIC
08/10/05

DIAGNOSIS:                    LUMBAR SPONDYLOSIS.

HISTORY:                    This patient is in for follow-up, having undergone surgery June 8, 2005. Having some bone graft donor site pain on the left side. He related to me some distressing news. Apparently, it is my understanding he was going to go back to work on July 11, 2005. He said he talked with his employer, and they were going to let him come back in a modified fashion. He accepted this even though it entailed a pay cut, then about a week later he got a message stating that he had been terminated. He is investigating all of this. He was on his disability policy up until I let him go back to work. Had I known ahead of time that his employer was going to want him to be 100% to come back, then we would have just kept him out for two or three months in order to reach that potential. I let him go back with good intentions, however. This did not materialize at work. In any event, he will investigate this, and I suggested that he should get into a lighter job profile where he is limiting his bending and lifting activities.

RADIOGRAPHS:                    AP and lateral of the lumbar spine show continued maturation of fusion.

PLAN:                    He is still smoking. We discussed this. Robaxin 750 for muscle relaxant. Follow up visit in two months.


_____
THOMAS N. BERNARD, JR., M.D.

081005tnbmain
T:08/12/05/0536 ad/ss

HUGHSTON

932410_20050706

WRIGHT, ROGER
MR# 932410
MAIN CLINIC
07/06/05

DIAGNOSIS:                    LUMBAR SPONDYLOSIS.

HISTORY:                       This patient is in for follow up for his postoperative visit
from a decompression-stabilization on 06/08/05, doing well. Not taking any medicines. Using
his brace. He wants to go back to work next Monday. He is walking a mile a day. Wound is
well healed.

RADIOGRAPHIC EVALUATION:     AP and lateral of lumbar spine showing good position of
internal fixation devices, good presence of fusion mass.

IMPRESSION:                   SATISFACTORY LUMBAR FUSION.

PLAN:                          I do not want him to overdo it. I would recommend six
hours per day initially, gradually increasing as tolerated, but no more than eight hours per day.
We will see him back in six weeks for follow up. We will let him return to work on 07/11/05. He
has a light support he might use that as well. He is having problems sleeping. I have
suggested some Benadryl. Thus far, excellent response to treatment.


_____
THOMAS N. BERNARD, JR., M.D.

070605tnbmain
T:07/07/05/2545  bmg



932410_20050608

WRIGHT, ROGER
MR# 932410
MAIN CLINIC
06/08/05

DIAGNOSES:

1. SPINAL STENOSIS.
2. DEGENERATIVE LUMBAR DISC DISEASE.

HISTORY:                    This patient is in for pre-admit visit for surgery today.  We went over the risks, benefits, and expectations for a decompression at L4-L5, L5-S1 and a stabilization procedure.  We went through the informed consent process.

PLAN:                    We will fit him with a post-fusion orthosis and dispatch him to the hospital.

_____

THOMAS N. BERNARD, JR., M.D.

060805tnbmain
T:06/10/05/2248  bmg



932410_20050601

WRIGHT, ROGER
MR# 932410
MAIN CLINIC
06/01/05

CHART ENTRY NOTE:          This patient underwent lumbar myelogram and CT scan, which demonstrates a large disc protrusion, central to the left side L4-L5. He has a degenerative disc at L5-S1. The pain has switched from side to side. It has gotten a good bit worse since last July. He works as a maintenance supervisor for Pemco World Air, which refurbishes aircraft. He has missed a few days of work recently because of this. It is activity related. He has had epidural injections and physical therapy. At this point, definitive treatment would be a bilateral discectomy and decompression at L4-L5 and stabilization L4 to sacrum. We will consider all this. We talked about it in general terms and he will let me know if he would like to proceed in this direction. I do not think a simpler remedy limited procedure is going to do the job for fear of instability will be created at that level.

_____
THOMAS N. BERNARD, JR., M.D.

060105tnbmain
T:06/02/05/2100  bmg

**1**

1  UNITED STATES DISTRICT COURT

2  FOR THE MIDDLE DISTRICT OF ALABAMA

3  SOUTHERN DIVISION

4

5  ROGER WRIGHT,                    )
                                    )
6      Plaintiff,                   )
                                    )
7  VS.                             )  CA NO.: 1:06 CV 647-WKW
                                    )
8  PEMCO WORLD AIR SERVICES,)
   INC.,                            )
9                                   )
       Defendant.                   )
10

11

12      The deposition of CLARKE E. BRIODY, taken

13  by the Plaintiff, pursuant to the Federal Rules of

14  Civil Procedure, before Kimberly B. Faucette, Certified

15  Court Reporter and Notary Public in and for the State of

16  Alabama at Large, at the law offices of Farmer, Price,

17  Hornsby & Weatherford, Dothan, Alabama, on the 16th day

18  of August, 2007, at 10:00 a.m., pursuant to notice.

19

20              *   *   *   *   *   *

21  APPEARANCES:

22  FOR THE PLAINTIFF:          FOR THE DEFENDANT:

23  MS. ELIZABETH GLASGOW       MR. JOHN HOLMES
    Attorney at Law             Attorney at Law
24  Dothan, Alabama             Birmingham, Alabama

25

---

**2**

1       S T I P U L A T I O N S

2       It is stipulated by and between counsel for

3  the parties that this deposition is taken at this time

4  by Kimberly B. Faucette, Court Reporter and Notary

5  Public, State at Large, who is to act as commissioner

6  without formal issuance of commission to her; that said

7  deposition shall be taken down stenographically,

8  transcribed, and certified by the commissioner.

9       Except for objections as to the form

10  of questions, no objections need be made at the time of

11  the taking of the deposition by either party, but may be

12  interposed by either party at the time the deposition is

13  read into evidence, which shall be ruled upon by the

14  Court on the trial of the cause upon the grounds of

15  objection then and there assigned.

16

17

18

19

20                EXHIBIT
                    F
21
22
23
24

25              *   *   *   *   *

---

**3**

1                  CLARKE E. BRIODY

2  having been first duly sworn, testified as follows,

3  to-wit:

4                  EXAMINATION

5  BY MS. GLASGOW:

6      Q    Would you state your name for the record,

7  please?

8      A    Clarke Edward Briody.

9      Q    Mr. Briody, my name is Libby Glasgow.  I

10  represent Roger Wright in this lawsuit that we brought

11  against Pemco.  I am going to be asking you a number of

12  questions today.

13      Our court reporter here is here to take down

14  everything we say.  So you need to answer all of the

15  questions out loud.  You can't just nod or shake your

16  head, because that it is very difficult for her to take

17  down.

18      A    I understand.

19      Q    Give me your current address.

20      A    I live at 100 Cumberland Drive, Dothan,

21  Alabama 36301.

22      Q    And are you currently working?

23      A    Yes, ma'am.

24      Q    Who do you work for?

25      A    I work for Pemco World Air Services, Dothan,

---

**4**

1  Alabama.

2      Q    And what do you do for them?

3      A    I am currently assigned as the facilities

4  manager.

5      Q    All right.  Can you -- Well, first of all,

6  have you brought any documents or reviewed any documents

7  in preparation for your deposition today?

8      A    No, ma'am, I have not brought any documents.

9  I have looked at documents.

10      Q    What have you looked at?

11      A    I have seen a copy of Mr. Wright's, I guess,

12  complaint, would be the word.

13      Q    Anything else?

14      A    At various times, I was asked to gather

15  information for HR, relevant to my time in facilities,

16  and I did that and carried those to HR.

17      Q    What information did you gather?

18      A    Things that related to the time to the

19  predecessor to Mr. Wright's time at facilities, issues

20  that were on the table that I continued with --

21      Q    And what were those?

22      A    -- in my tenure.

23      Q    I am sorry.  What were those?

24      A    There were some build-outs required in one of

25  the hangars.

13

1  facility, as best I recollect. I have thought about
2  that. I am thinking it was Mr. Batcher that informed me
3  we were being sued.
4      Q    And you think it was in the period soon after
5  the lock-out?
6      A    I believe that is roughly when it was.
7      Q    So you began gathering this information around
8  the August, September time frame, around there, and I
9  understand, I am not trying to be exact --
10     A    I don't believe that I made a concerted effort
11 to go secure that documentation then.
12         When Mr. Henry mentioned again that we were being
13 sued, sometime this year, he asked me to collect
14 documentation. I had thrown these things in files and
15 threw them off to the side. At that point, they were
16 relevant. I wasn't throwing anything away. I knew we
17 were -- at one point, was told we were being sued. I
18 didn't know if that was actually accurate, you know, for
19 my purposes.
20         But when Mr. Henry said, any documentation you have
21 on Roger, I need it, I took him what I found that had
22 Roger's name on the face. In all honesty, I threw some
23 things away.
24     Q    But the initial start of this was under Mr.
25 Batcher in the period after the lock-out?

14

1      A    I believe Mr. Batcher informed me we were
2  being sued. And at that point, I guess my brain said,
3  Clarke, you are being accused of wrongdoing. Anything
4  that seems like someone else was doing wrong and not
5  you, save it, and I did so.
6      Q    I understand.
7      A    In a nutshell.
8      Q    Was there anything else that you found?
9      A    There were a couple of things. I don't recall
10 anything specific. I had files and notes from my first
11 days in the department. I probably gave him those.
12 Some clean-up efforts that we were adamantly directed to
13 go take care of immediately when I filled in for Roger,
14 prior to the lock-out. I think that was most of it.
15     Q    So when you first came over to facilities, is
16 it a fair statement that there was quite a bit to do?
17     A    Yes, ma'am.
18     Q    And you were tasked with a number of projects
19 from the beginning?
20     A    Yes, ma'am.
21     Q    Clean-up projects, I think you said?
22     A    Yes, ma'am.
23     Q    And who gave you those tasks?
24     A    Mr. Johnson.
25     Q    And you said you kept notes during that time

15

1  period?
2      A    I actually typically keep a notebook. I don't
3  keep them in order or anything. I keep notes to not
4  forget all of the things I need to do in a day. And in
5  those first days, everything being relatively new to me
6  as an assignment, I kept all of my notes from the first
7  couple of days. I called it notes for the first days
8  and threw them in a file.
9      Q    And did you turn those over to HR or to
10 counsel?
11     A    Yes, ma'am, I believe I did. And if I did
12 not, I do have them in my files in the office. Just
13 certain things that were going on; people asking for
14 different things. Some of it relevant, maybe.
15     Q    What other projects were you tasked with early
16 on?
17     A    Roger had left a list of several things that
18 were ongoing. There was a cage, which was basically a
19 chicken wire/wood affair, that was going to be used for
20 storing aircraft parts and needed to be built with
21 expanded steel, a much more solid structure. There was
22 a breakroom. We were, at that point, preparing for
23 Alaska Airlines inductions, and Roger had had the floor
24 painted. I think my assignment was to fix some places
25 that weren't yet correct to my boss's liking, and to

16

1  finish the cleaning up and painting of the breakroom.
2  There were some gutters that were being worked on by an
3  outside vendor that I was supposed to finish up on.
4      Q    And these were on Roger Wright's list?
5      A    I think those, probably, as best I recollect,
6  were on Roger's list. I know the breakroom was on
7  Roger's list to finish up the breakroom, you know, keep
8  working on the cage. At that time, I thought Roger was
9  going out, as best I recollect, for six weeks, and he
10 would be back, and I would go back to production. So I
11 was basically trying to keep the fires burning while he
12 was out. That's all.
13         But Mr. Johnson had a bunch of other assignments.
14 The clean-up, that was a big clean-up, throw a lot of
15 things away, a lot. That was a big clean-up.
16     Q    And clean-up is the responsibility of
17 facilities?
18     A    Yes, ma'am.
19     Q    And like the building of the boxes and the
20 floor painting, that is all facilities department, plant
21 maintenance, that sort of thing; is that right?
22     A    The building of the cage, yes, ma'am, that was
23 a facilities' task.
24     Q    And the gutters and the breakroom and all of
25 that are facilities' tasks?

19

1    A    When it is within the scope of the facilities'
2  mechanics. This particular guttering was ten or twelve
3  inches across, and it was given to a roofing outfit that
4  had done the resealing of the roof. The roof was
5  continuing to leak, and the gutters were required to
6  stop the leakage. Improved guttering, I guess, is the
7  word for it.
8    Q    And were there any other projects that you
9  were tasked with right away during this first time
10 period?
11   A    I don't recall anything specifically in that
12 time frame, no.
13   Q    You had clean-up projects, you said. Was that
14 in several different areas around the facility?
15   A    There were several different areas in the
16 facility, particularly waste water.
17      The Hangar 12 area had approximately fifteen-feet
18 deep, ten-feet deep of junk piled in a mountain, in one
19 area, that was completely unusable stuff, that was
20 basically a fire hazard. And Dennis let me know in no
21 uncertain terms that he had asked to have it cleaned,
22 and he wanted it cleaned now. And we did.
23   Q    How many man hours did that take?
24   A    My best recollection -- I don't know the man
25 hours, to answer your question. But my best

18

1  recollection is I had 80 percent of the crew assigned
2  full time for several weeks prior to the lock-out, until
3  people were laid off. I started losing people at an
4  alarming rate, just as business tapered off going into
5  the lock-out. There just flat weren't people to
6  continue that effort. We finished it when they came
7  back. There was some left to be done.
8    Q    And what were your work hours during that
9  time?
10   A    Prior to the lock-out?
11   Q    Yes.
12   A    As best I recollect, I worked an eight-hour
13 day. I may have worked nine, charged eight, because we
14 are supposed to be there a half hour early, a half hour
15 late. I may have given up a few half hours free beyond
16 that, but, essentially, a normal day.
17   Q    What is your normal start time?
18   A    My normal day is 6:30 to 4:00, sometimes 4:30.
19 I try to be out of there by 4:30 in a day.
20   Q    Any weekend work at all?
21   A    Occasionally, but not much. I am not
22 encouraged to work overtime. I am encouraged to not
23 work overtime; get the job done without overtime.
24   Q    And are you compensated for overtime?
25   A    I am compensated for beyond that nine hours in

19

1  a day, if I put in for it.
2    Q    How are you compensated?
3    A    When it is approved, paid by the hour.
4    Q    Is it just regular straight pay? It's not
5  time and a half?
6    A    Straight pay, yes, ma'am.
7    Q    All right. So during this first period, are
8  you working then pretty much full time in facilities?
9    A    Yes, ma'am.
10   Q    All your time was being devoted to these
11 clean-up projects?
12   A    Yes, ma'am.
13   Q    The breakroom, the gutters, and all of the
14 things we have talked about?
15   A    Yes, ma'am. And, additionally, just
16 day-to-day operation of the facility, and a lot of
17 finding out how things were done. To make sure I didn't
18 violate any policies, reading the corporate policies,
19 reading the policies that were relevant to the
20 facilities department.
21   Q    Had you ever worked in facilities before?
22   A    I have had dealings in similar skill sets
23 before.
24   Q    But had you ever worked in that facilities
25 department for Pemco before?

20

1    A    No, ma'am.
2    Q    Any other projects -- I think we got started
3  on this, talking about information you were gathering.
4  Is there any other information that you were gathering
5  or documents that you reviewed in preparation for your
6  deposition today?
7    A    Not other than what I gave HR, that I am aware
8  of.
9    Q    And so if I understand it, you gave HR your
10 notebook; is that right?
11   A    I would characterize it as a couple of sheets.
12 I am not sure I actually pulled the sheets out of every
13 notebook. But at some point, a week or two in to my
14 tenure of filling in, I said I might want to keep notes
15 on those first couple of days, because it was very
16 hectic, trying to drink from the firehose of
17 information. So I thought, I will put those notes away
18 for future reference.
19   Q    So a few pages of notes, handwritten notes?
20   A    Correct.
21   Q    Not typed or anything?
22   A    Yes. Just basically little reminders to self,
23 take care of this, take care of that.
24   Q    And information about the Danco bid?
25   A    That, I do believe, he had a copy of that.

21

```
 1    Q    And the letter from the FAA?
 2    A    Yes, ma'am.
 3    Q    Anything else?
 4    A    And some relevant facts regarding that.  I
 5  think at that point, when Mr. Henry asked me for it, I
 6  gave him a couple of things I had been asked to do about
 7  maybe -- I'm not accurate on the time frame -- but maybe
 8  a year in, I was asked to characterize what things I had
 9  improved in the department, kind of a
10  pat-myself-on-the-back thing.
11    Q    Okay.
12    A    And I did a list of things we had improved,
13  corrected.  There were some, I guess, fairly relevant
14  safety issues within the waste water area:  Signage,
15  railings, culverts.  There was one ditch ADEM had
16  demanded be concreted.  We got that accomplished.  As I
17  said, there were certain things that I felt relevant,
18  these are some good things we did in our department this
19  year, and I listed those.  I think he had a copy of
20  that.
21    Q    These were ongoing projects that you did
22  throughout the year of what, 2005 or 2006; is that
23  right?
24    A    It would be sometime in late 2005, maybe 2006.
25  Somewhere in that time frame.
```

22

```
 1    Q    Is this a handwritten list or a typewritten
 2  list?
 3    A    That was a typewritten list.
 4    Q    Were there pictures that went with that?
 5    A    I don't believe so, no.
 6    Q    Anything else that you gave to Mr. Henry, or
 7  to anyone else concerning this case?
 8    A    Not that I recall.  Everything was given to
 9  Mr. Henry, that I had.
10    Q    And you are referring to Fran Henry, I assume?
11    A    Yes, ma'am.
12    Q    So with these other projects added on to the
13  initial things that we have talked about, it sounds like
14  you were pretty much full time in facilities; is that
15  right?
16    A    For the most part.  I have done a few things
17  aircraft related over the course of the last two years.
18  I filled in for the night manager for one week while he
19  took a vacation and continued to carry oversight over
20  facilities.  I have worked on a couple of different
21  aircraft projects that were in trouble.
22    Q    When you say "worked on," what do you mean?
23    A    Management.  Went down and tried to get the
24  aircraft moving, schedule-wise.  There were problems on
25  the aircraft.  It wasn't moving.  People were being
```

23

```
 1  yelled at.  My boss said go down there and help any way
 2  you can.
 3    Q    How many hours did you do that?
 4    A    I would say those were long days, probably
 5  three or four days; probably two times on two different
 6  aircraft.
 7    Q    Three or four days each?
 8    A    Consecutively.
 9    Q    On two different times?
10    A    Yes, ma'am.
11    Q    An you were still working in facilities in
12  addition to this?
13    A    Correct.
14    Q    Any other non-facilities' work that you have
15  done since '05?
16    A    No.  I think facilities probably has increased
17  its aircraft -- some of its aircraft responsibilities a
18  little more.  More things relevant to aircraft have come
19  to facilities.  However, it is still within facilities.
20    Q    As I understand, business has improved, you
21  are getting more aircraft in?
22    A    Yes, ma'am.
23    Q    So that leads to more work for facilities?
24    A    Yes, ma'am.
25    Q    I understand.  Give me a rundown on your
```

24

```
 1  educational background, would you?
 2    A    I graduated high school at Thurston Senior
 3  High School in Springfield, Oregon, in 1973.
 4    Q    That's my brother's age.
 5    A    I did a couple of college not-for-credit
 6  courses over the course of my military career such as a
 7  typing course at Boston Community College in '75, maybe.
 8  Several classes with Greenville Community College in
 9  Greenville, South Carolina, Greenville Tech, management
10  courses that Lockheed-Martin sent me to.  Several tech
11  schools with the United States Air Force.
12    Q    Can you speak up?  I am sorry.
13    A    Several tech schools with the United States
14  Air Force.
15    Q    Anything else?
16    A    That is it.
17    Q    Your college courses, did you take any courses
18  to pursue a degree?
19    A    No, ma'am.
20    Q    And so you said, initially, you took some
21  non-credit courses through the military such as typing.
22  Anything else?
23    A    Yes, ma'am.  Management courses, and that was
24  with Lockheed-Martin.
25    Q    At Greenville Tech?
```

29

1    Q    When did you move to Texas?

2    A    It would have been, I believe, sometime around

3    July of '78.  I worked for a company there in

4    Huntsville, Texas, New Waverly, Texas.

5    Q    And how long did you do that?

6    A    Until the point in time in '80 that I went

7    back in the service.

8    Q    Were you in the guard or the reserves during

9    that time?

10   A    I was inactive reserve for some period of that

11   time, until six years would have been up, I believe.  A

12   year and five months of it would have been considered

13   inactive reserve.

14   Q    So you got out of the military in 1989?

15   A    That's right.

16   Q    And then where did you go?

17   A    I worked as a crew lead on a telephone

18   installation contract at the University of Arizona for a

19   contractor.  Oh, boy.

20   Q    1989?

21   A    D.O. Creaseman was the company.  That would

22   have been in 1989, yes.

23   Q    Doing telephone installation.  What were you

24   actually doing?

25   A    We were installing large telephone cable,

30

1    1800-pair telephone cable down to 25-pair telephone

2    cable, installing conduits.  Basically running the cable

3    and conduits to the points they would be terminated,

4    through various structures within the University of

5    Arizona, including the tunnels, buildings, et cetera.

6    Q    Now, were you an employee of the university,

7    then?

8    A    We were a subcontracted employee.  Our company

9    contracted to do the work, along with several other

10   companies, Southwestern Bell and several other

11   companies.  It was a large contract.

12   Q    Was this for new construction?

13   A    It was a complete telephone system upgrade,

14   and several companies were in on it.  We were

15   subcontracted to Southwest Bell, I believe.

16   Q    So all of your work was on the university

17   campus?

18   A    Yes, ma'am.

19   Q    How long did you stay there?

20   A    As best I recollect, that was about seven

21   months.

22   Q    And where did you go after that?

23   A    The next place I hired on was right at the

24   beginning of the following year, 1990, right after New

25   Year's.  I hired on at Evergreen Air Services, I think

31

1    it is called.  It is Evergreen, but I am not exactly

2    sure what comes after that.  It was at Marana Air Park,

3    just outside of Tucson.

4    Q    What did you do there?

5    A    I started out as an avionics technician.  I

6    stayed an avionics technician until I left there.

7    Q    Why did you leave the telephone installation

8    job?

9    A    At the telephone installation company, we were

10   working around a lot of asbestos, and I had knocked some

11   asbestos loose up in the ceiling in the student union

12   building.  I collected it, because I was fairly certain

13   it was asbestos, and bagged it up and got it out of

14   there and sent it for lab results.  That afternoon, I

15   was told I didn't need to bring so much, that they could

16   make a sample with much less.  I said, well, maybe you

17   don't understand.  I wasn't going to throw it in the

18   trash.  I was terminated.  They said I was laid off.

19   Q    Did you file any kind of complaint about that?

20   A    No.  I just wanted to get another job and pay

21   the bills.

22   Q    Have you ever made a complaint or a claim for

23   asbestos inhalation or anything like that?

24   A    No.

25   Q    How long were you actually -- Oh, you said

32

1    seven months.  So you were an avionics technician with

2    Evergreen?

3    A    Yes, ma'am.

4    Q    How long were you there?

5    A    From '90 until -- I am not exactly sure on the

6    months there, but more than a year, less than two.

7    Somewhere between one and two years.  And then a

8    facility opened up across town, Lockheed-Martin, and I

9    went to work for them.

10   Q    And what did you do for Lockheed?

11   A    A number of different things.  I started out

12   as an avionics technician, and then became a crew lead

13   for avionics.  After a couple of years, I became a

14   supervisor of avionics for a short period.  Then, I

15   became a project manager over a United A-320 line of

16   business.

17   Q    What is an avionics technician?

18   A    Somebody that corrects discrepancies on

19   anything with wires going to it on the aircraft,

20   essentially.  Anything that runs flight controls,

21   electronic part of the flight controls, indications,

22   flight control indications, instrumentation.

23   Q    You are essentially an electrician for the

24   aircraft; is that right?

25   A    Essentially.

33

1    Q    And I think I interrupted you.  You said you
2  moved to supervisor for a short time and then you were a
3  project manager?
4    A    Yes, ma'am.
5    Q    And then?
6    A    During my tenure as a project manager, they
7  issued the WARN Act to the facility, and I was offered
8  an opportunity to transfer to the Lockheed-Martin
9  facility in South Carolina to continue as project
10  manager on that contract, which I accepted that.
11    Q    Did you tell me they had opened this new
12  Lockheed-Martin in Tucson in 1991?
13    A    Yes, ma'am.
14    Q    And when did they give you the WARN Act that
15  they were laying everybody off?
16    A    I believe it was 1991.
17    Q    Yes.  You said it was '91 or '92, I think.
18    A    It was 1995 when -- I think that is probably
19  right, because I think the facility was open about four
20  years.  I worked there about four years before I moved
21  on to Lockheed in Greenville.
22    Q    Did they shut down the facility in Tucson?
23    A    To the best of my knowledge.  I mean, I left.
24  But to the best of my knowledge, they did, yes.  I think
25  it has been inhabited a couple of times, but not by a

34

1  maintenance operation like ours.
2    Q    What was the purpose of the facility in
3  Tucson?
4    A    It was maintenance repair overhaul of
5  passenger class aircraft, large aircraft.
6    Q    Any military planes?
7    A    I think, if I recall, we may have had one,
8  maybe one.  I know we had one.  I don't know if we had
9  more than one, a KC-10 came in for some type of
10  operations.
11    Q    But primarily commercial aircraft?
12    A    Yes, ma'am.  It was predominantly commercial.
13    Q    And in Greenville, South Carolina, what was
14  that facility?
15    A    That was a mix of military and commercial
16  work.  When I first went there, it was mostly commercial.
17  The military had essentially taken a hiatus from there
18  with some of their programs, but they did, over the
19  course of the years I was there, wean off from the
20  commercial work and go solely with military work.
21    Q    And what were you doing once you transferred
22  to Greenville?
23    A    Initially, project manager on a couple of
24  different projects.  I finished the United project.  And
25  then I was the manager of a Sun Country 727 line and

35

1  then I was assigned to the night manager position for
2  approximately seventeen months.
3    Q    Was that a promotion?
4    A    No.  It was -- I didn't see it as a promotion.
5  I saw it as a lateral.  I didn't get any more money.
6    Q    You had been on day shift, though, and they
7  switched you to night shift?  I mean, were you doing the
8  same thing, only on night shift?
9    A    I was doing a lot less hours on night shift
10  than I was on day shift as the manager of a particular
11  project.  So it was in some ways more responsibility,
12  because it was the entire facility.  At that time,
13  fifteen hangars.
14    Q    And, then, how long --
15    A    After seventeen months, right about the time
16  of Value Jet, and I can't tell you exactly when that
17  was, we reorganized and all of the director level went
18  away and everybody below the director level stepped down
19  a notch, or quite a few did.  I was bumped down from
20  manager to supervisor at that time.
21    Q    How did your job duties change?
22    A    In some respects, they didn't, at least in the
23  short term.  I was assigned four other supervisors,
24  which I was a supervisor, working on Value Jet, working
25  on, I think it was, five airplanes of Value Jet that we

36

1  had at the time, under a barrage of FAA inspection.
2  There was, I want to say, twenty or thirty FAA
3  inspectors on site at the time, really looking at Value
4  Jet.
5    Q    That was after that bad crash?
6    A    Yes, ma'am.  And I was overseeing the other
7  supervisors, which I thought was kind of odd, being a
8  supervisor.
9    Q    Were you paid hourly?
10    A    Actually, at that time, I was paid time and a
11  half, and my pay was not reduced when I was dropped
12  down.  And I got several other assignments to work on
13  some P-3s.  I worked on the C-9 project, which is
14  essentially a military DC-9.  I did that probably a year
15  and a half, rough speak.
16    Q    You said in the short term your duties did not
17  change.  Over the long term, were they reduced to
18  supervisor level?
19    A    Over the long term, yes.  I essentially picked
20  up anything between two to five airplanes, but they were
21  my airplanes and I didn't have other supervisors working
22  for me.
23    Q    And how long did you do that?
24    A    Rough speak, about a year and a half, and I
25  was offered another manager position, interim.  I was

39

1  asked to run a line of modifications, called Roto-Dome,
2  with customs airplanes that have the big round antenna
3  that rotates on top of the aircraft. We were modifying
4  those. I had three of those.
5      Q    Were you a project manager?
6      A    It was not called a project manager at that
7  time. It was just called a production manager.
8      One of the differences, I guess, between that
9  facility and Tucson, Tucson had project managers,
10 Greenville had program managers and production managers.
11 They did not have project managers.
12     Q    Okay. But was this a promotion then or more
13 just a lateral change in duties?
14     A    That was an interim promotion, I guess, is the
15 best way to put it.
16     Q    What do you mean by "interim"?
17     A    I was sent down there because there was
18 another gentleman trying to run way too much stuff, and
19 he was overwhelmed. We were also bidding a contract,
20 and I was told this is an interim position. It is not a
21 permanent position. That is the way it was dealt with.
22 I think it lasted seventeen months, and then it went
23 away.
24     We lost a contract, and the manager of that
25 contract no longer had an airplane or a program. And he

---

39

1  to block it out. It would have been, I want to say, the
2  March or April time frame of 2003, maybe.
3      It was the same year I went to work at Pemco, and
4  probably a couple of months before I came to Pemco. I
5  came to Pemco July 8th.
6      Q    Of '03?
7      A    I think it was '03. I worked there until I
8  started looking when they laid me off there.
9      Q    Did you have any warning about the lay-off?
10     A    No, ma'am.
11     Q    Any WARN Act notices or anything like that?
12     A    No, ma'am. They cut 25 percent of the
13 management staff, which was ten supervisors. We were
14 coincidently the high tenure employees.
15     Q    You were what? I am sorry.
16     A    The high tenure employees. I guess that would
17 save more money.
18     Q    All right. So the total time you were with
19 Lockheed is from about 1991 or 1992 to 2003, then?
20     A    That's correct. It would have been twelve
21 years.
22     Q    You were with Lockheed during that entire
23 time?
24     A    Right.
25     Q    Even though you transferred, you weren't

---

38

1  took my place, and I went back to supervisor again. Up
2  and down. And at that time, I was assigned a C-130
3  speed line, what they call speed line. I did roughly
4  ninety-nine airplanes. I didn't do all of them myself.
5  I think I had some help from another supervisor for one
6  period of time. But over the course of a year or two,
7  we did ninety-nine aircraft, a safety upgrade on their
8  bleed-air system.
9      Q    And you are the one doing the work?
10     A    Supervising the work.
11     Q    In terms of scheduling?
12     A    Assigning the crew, supervising the work,
13 making sure we had all the parts ahead of time, making
14 sure the overtime is worked correctly, trying to reduce
15 the cost, everything that a typical aircraft supervisor
16 would do.
17     Q    But not actually doing the safety upgrades
18 yourself?
19     A    No. That was done by the mechanics assigned
20 to me. I had a variety of skill levels under me that
21 did that work.
22     Q    And then how long were you supervisor that
23 time?
24     A    That was until I was laid off. I am a little
25 sketchy. It was such a painful time, I probably tried

---

40

1  necessarily considered terminated at Tucson and rehired?
2  Was it continuous service?
3      A    I got credit for the entire time frame. I
4  don't know if it was considered continuous. I kind of
5  vaguely recall being terminated and rehired, but I think
6  my time all counted. If I am not mistaken, that is the
7  way that worked. I was credited for twelve years.
8      Q    During that twelve years, were you in
9  management that entire time?
10     A    No. No. My initial years at Lockheed in
11 Tucson, I was an avionics technician and an avionics
12 crew lead, which was completely hands-on.
13     Q    So when you became project manager, or when
14 you became supervisor, is that when you went into
15 management?
16     A    That is when my hands, for the most part,
17 stopped touching the aircraft. I still was involved in
18 operational checks, trouble-shooting to some degree with
19 the crew leads. It was a non-union shop. Both of the
20 Lockheed assignments were non-union shops. So I could
21 go out and touch the aircraft without getting beat up
22 for it. I still had opportunities, just not as
23 frequent. A lot more paperwork.
24     Q    All right. How did you come to Pemco?
25     MS. GLASGOW: Do you want to take a break?

---

49

1  but he was thought of as a manager by all of the
2  supervisors.
3      Q    And what was Rusty Nelson's position?
4      A    Manager of structures.
5      Q    What does it mean when you are talking about
6  structures?  What is that?
7      A    The structural components of the aircraft such
8  as the framework, the skin, all of the metal.  Other
9  than moving components, the structural things that keep
10 the aircraft in one shell.  Rivets, sheet metal.
11     Q    Had you ever worked in the structural aspect
12 of maintenance before?
13     A    I had supervised people working in structures
14 for a number of years.  Much of the work we did at
15 Lockheed and all of the work as a manager exposes you
16 greatly to structures.  It is an integral part of
17 working on the aircraft.  I had done some with my own
18 hands in slow times, when there wasn't enough avionics
19 when I was an avionics technician.  I had done some
20 structural work and also airframe and engine work.
21     I used to go and ask for work, when there was no
22 avionics work, to get exposure.
23     Q    How long were you in the supervisor's
24 position?
25     A    At Pemco?

51

1      Q    Is that second shift or third shift?
2      A    Second shift.  Approximately two hundred and
3  fifty people, at that time, I think, on night shift.
4      Q    And how long were you the night manager?
5      A    Roughly, sixteen or seventeen months;
6  something like that.
7      Q    And then what happened after that?
8      A    Well, at that time, I was asked to come to
9  days and go fill in for Roger Wright, who was going to
10 go out for about six weeks for back surgery.
11     Q    And when did they first approach you for that?
12     A    I think two days or one day before I went.
13 Tomorrow I need you on days, I think is the way it
14 went.
15     Q    Who told you what was going on?
16     A    Dennis gave me the assignment.
17     Q    And what did he tell you?
18     A    Something along the lines of, hey, I need you
19 to go fill in for Roger.  Go see Roger Wright.  He is
20 going to need you to fill in for him for a while, while
21 he goes and has back surgery.
22     Q    Anything else?
23     A    No.  It was pretty much short and sweet.  Go
24 fill in for Roger.  Go get with him.  He will give you
25 everything you need to know, something like that.

50

1      Q    At Pemco.
2      A    Let's see.  It would have been from when I
3  hired in, which was July 8th, until, I think it was,
4  January, January or February of the following year.
5      Q    Of '04?
6      A    Of '04.  I was asked to take the night manager
7  position.
8      Q    And what department were you in?
9      A    Production.
10     Q    And what are the duties of a night manager in
11 production?
12     A    Essentially, oversight of all things on the
13 facility at night, from the facility operation, the
14 safety aspects, fueling of aircraft, making sure people
15 are taken to the hospital when they are injured, making
16 sure the boss is called if there is an injury, making
17 sure all of the aircraft stay on schedule, that all of
18 the objectives that all of the managers have on all the
19 aircraft get met, a number of reporting functions that
20 happen, setting of assignments and priorities.  When
21 there is a deadlock between two aircraft needing the
22 same piece of equipment, the night manager makes that
23 call.  Quite frequently, assisting work.  Actually being
24 the bad guy when someone is being terminated, escorting
25 them out.

52

1      Q    Who was going to fill in for your position as
2  night manager on the second shift?
3      A    What occurred at that point was I gave my keys
4  to one of the supervisors, and Dennis essentially
5  decreed that they would take turns filling the position
6  for a week at a time until he could find somebody to do
7  that.
8      Q    And who did he find?
9      A    Eventually, another gentleman was hired.  I
10 don't recall when it occurred.  A gentleman by the name
11 of Paul Weeks came on board for a short period of time.
12 I don't think he was there a real long time, but he was
13 there for a while.  I couldn't really tell you when that
14 occurred.  I don't know if that was before the lock-out
15 or not.
16     Q    And then he left the company?
17     A    At some point he did, yes.
18     Q    Was he still night manager when he left?
19     A    Yes.  I think he was there for a few months,
20 maybe, when he left.
21     Q    But he was hired for the night manager's
22 position that you had, you just don't remember when, you
23 said?
24     A    At some point, he was.  I don't know when that
25 occurred.  That might have been during lock-out.  I

53

1  really don't know.  I don't remember.  I am trying to
2  remember what context I remember seeing the guy, but I
3  don't remember.  I mean, I remember seeing him, but I
4  don't remember what we were doing at the time,
5  business-wise time frame.
6      Q     But he had not been a Pemco employee; he was
7  hired from the outside?
8      A     No.  That's correct.
9      Q     Did Dennis Johnson tell you anything else
10  about what you would be doing in Roger's position?
11      A     Just that those issues that had not been
12  corrected that he had asked to be corrected, that he
13  expected me to go fix them.
14      Q     And that was done as soon as you took the
15  position; is that right?
16      A     I started it.  It was a long list of desires.
17      Q     Let me rephrase the question.  When you
18  started the position, did Dennis give you a list of what
19  things he wanted done?  Or did that come later?
20      A     That came days later, starting days later and
21  has never stopped.  There is still things he wants to
22  this day and needs.  Things come up.
23      Q     But he was giving you additional tasks to do
24  from the beginning?
25      A     From very early on such as the clean-up.  I

54

1  think probably -- I don't know the exact number of days.
2  But several days in, I was getting my feet on the
3  ground, kind of understanding kind of how everything
4  worked in that department, which some of it I was fairly
5  familiar with from being night manager.  I worked with
6  the facility's guys.  They were under my charge at
7  night.  I would guess you say they had a dual
8  responsibility to their department.  But anybody on the
9  facility, if I needed whatever at night, then I had that
10  authority.  So I interacted with the facilities
11  department on a regular basis.  I knew how some of it
12  worked, but some of it was new.  Once I started getting
13  my feet on the ground, two, three, four, five days in,
14  something like that, Dennis said, I have asked to get
15  this stuff thrown away, and I want it thrown away.  That
16  was the first assignment.
17      Q     Did Roger help you with that at all, in terms
18  of training you or working with you a couple of days
19  before he left?
20      A     Roger worked with me a very, very scant period
21  of time.  One day and maybe part of another day.
22  Essentially, he gave me the list of things that needed
23  to be done, showed me how he did his overtime, gave me
24  some keys.  I think we walked around a little bit.
25      Q     Was he able to walk much at that point?

55

1      A     From my perspective, he looked okay to walk,
2  but I am not saying he wasn't in pain.  He was probably
3  in a lot of pain, but I wouldn't have known that had he
4  not said.  I don't recall him complaining a lot.  I
5  mean, he had this thing, surgery he needed to do.
6      Q     But he showed you around, gave you a list of
7  the ongoing projects, that sort of thing?
8      A     He gave me the list.  You can use my desk.
9  That kind of thing.  You know, told me, essentially,
10  what the administrative assistant, how she interacted
11  with assignments and kind of how the radio system
12  worked; they called out the jobs; and what they used for
13  the work order forms.  Like I said, there wasn't a whole
14  lot that could be shared with me in like a day and part
15  of another day.  And I really don't recall.  Other than
16  the list of these things have got to get done, that is
17  mostly what I recall, to be honest with you, is that
18  list.
19      Q     Just going over those projects that had to be
20  done?
21      A     Right.
22      Q     Did your compensation change at all at this
23  point?
24      A     As far as my rate of pay?
25      Q     Yes, sir.

56

1      A     No.  My salary for the year, yes.  It went
2  down drastically.  I have consistently lost money from
3  being in facilities.
4      Q     How is that?
5      A     Much less overtime.  Aircraft demands a
6  significantly larger amount of overtime to keep the
7  aircraft on track.
8      Q     So did your rate of pay change at all, or was
9  it to change at all for this period you were filling in
10  for Roger?
11      A     During the time I was filling in for Roger, my
12  rate of pay did not change, but the amount of overtime I
13  have worked has gone down drastically.  It continues to
14  be at a very low level.
15      Q     Do you have to get approval before you work
16  overtime?
17      A     Yes, I do.
18      Q     And who does that?
19      A     Dennis Johnson.  Or if he is not there, Chris
20  Walker, and sometimes both intervene.  Because Chris
21  Walker does the finances, he has a say in who spends his
22  money.
23      Q     Has your rate of pay changed at all since
24  then?
25      A     I have had raises every year.

61

1    A    That is a change that occurred in 2006, where
2  I was given this increase, that 5.268172 percent
3  increase, I believe, over my 2005 salary, whatever that
4  was.
5    Q    To bring your salary up to fifty-two thousand,
6  one twelve, zero four?
7    A    That is how I would look at that.
8    Q    But does that sound about right to you?
9    A    Yes, I think so.
10   Q    And you have gotten an additional raise since
11 that time?
12   A    When is that dated, April of '05 to April of
13 '06?
14   Q    Well, it says the change date is April of '06.
15   A    There has probably been one since then, I
16 would guess.
17   Q    Do you remember what the percentage increase
18 was?
19   A    No, but I think it was somewhere along the
20 lines of three point something, but I don't know that
21 for a fact.  I think that is what it was.
22   Q    Okay.  Mr. Briody, let me show you what has
23 been marked as Plaintiff's Exhibit Number 2.  Do you
24 recognize that document.  And that is Bates Stamp Number
25 -- can you read that for me?

62

1    A    Pemco-Wright 0166.  I don't recognize it, no.
2  I don't know exactly what that is.
3       Let's see.  That is July, 2006.  I honestly don't
4  know what that is.
5    Q    All right.  But it is your testimony that your
6  salary did not change with the move from the night
7  manager's position to facilities?
8    A    No, ma'am, it did not.
9    Q    And you did not get an increase until the next
10 annual increase?
11   A    That is correct.  I don't know the time frame
12 of those or when we got those or if they were in
13 suspense until after the lock-out, or whatever, but I
14 got no out-of-cycle raise.
15   Q    But you do recall that there was another raise
16 in '07?
17   A    Yes, ma'am.  I did receive a raise this year.
18   Q    So you have gotten two raises since you have
19 moved over to facilities?
20   A    I believe so.
21   Q    How much vacation time do you get?
22   A    Two weeks per year.
23   Q    And what about health insurance, disability,
24 that sort of thing?
25   A    I have the standard supervisor manager health

63

1  insurance.  Not very good.  It is what it is.
2    Q    But you get disability insurance?
3    A    I don't subscribe to any extra insurances.
4  There are some offered.  I don't have any of them.
5    Q    You have the standard health insurance
6  package?
7    A    Yes, ma'am.
8    Q    Life insurance?
9    A    Not unless the company is providing it for
10 free as they would to any supervision person.  I don't
11 have any extra.
12   Q    Sick leave days?
13   A    Lots and lots.  I don't know how many.
14   Q    How many do you earn a year?
15   A    Six days a year, I think.
16   Q    And are you vested in the pension plan?
17   A    That is debatable.  I do not know.  Depending
18 on a number of factors with the company right now, I may
19 or may not be.
20   Q    Why do you say that?
21   A    The factors that they use in determining what
22 counts as a year is open to interpretation right now,
23 because our company is for sale.  And how they determine
24 whether you get credit for that year, I don't know if I
25 fall in or out.  And that hasn't been determined yet.

64

1    Q    How many years does it to take to vest in the
2  pension?
3    A    Five years.  But it may be that I have five
4  years' credit, because I have enough hours worked in the
5  first and last years, but I don't know that.  And I
6  think there is probably other people in my shoes that
7  are waiting for that same answer, that they don't know.
8    Q    Well, normally, you wouldn't vest -- I mean,
9  it is five years and you started in '03.  You wouldn't
10 vest until '08; is that right?
11   A    Well, I have heard that different ways.  I
12 have heard if you have enough hours worked in 2003, you
13 get credit for '03.  If you worked enough hours in 2007,
14 you get credit for '07, if and when our purchase becomes
15 final.  So there are a number of factors.  I don't know
16 if I will vest, I guess is what I am saying, depending
17 on what happens.
18   Q    So you came on to facilities and you said
19 Roger was there a day or two and then went out for his
20 surgery; right?
21   A    A day and a half or so, and then was gone,
22 yes, ma'am.
23   Q    And you were given tasks to perform in
24 facilities, and as I understand your testimony, you were
25 working basically full time in facilities during this

65

```
1  period?
2     A    That's correct.
3     Q    Who else was working in facilities with you at
4  that time?
5     A    As far as in supervision?
6     Q    In management, yes, sir.
7     A    No one.
8     Q    Did they have anyone on second shift?
9     A    Yes, they did.
10    Q    Okay.
11    A    They had Richard Miller.  He was second shift
12 supervisor, and on day shift, there was no one.
13    Q    At some point, did that change?  Were
14 additional management people hired in facilities?
15    A    It changed in that as we approached the
16 lock-out, Richard, I had to lay him off.  I was given
17 the assignment to tell Richard he has got to go away.
18    Q    And who gave you that assignment?
19    A    My boss.
20    Q    Dennis Johnson?
21    A    Yes, ma'am.
22    Q    And what did Mr. Johnson tell you?
23    A    That we would -- that we were downsizing and
24 that Richard needed to go away.
25    Q    Did you make the decision to lay off Richard
```

67

```
1     Q    And you were considered a department head at
2  that point?
3     A    Yes, ma'am.
4     Q    So Richard Miller was laid off?
5     A    Yes, ma'am.
6     Q    Was there any other person in management in
7  facilities at that point in time?
8     A    No, ma'am.
9     Q    Okay.  Now, when did you start adding people
10 back in to management in facilities?
11    A    Let me qualify that.  In management, there was
12 an indirect employee, but not in management, the
13 administrative assistant, just to clarify.
14    The question again?
15    Q    At some point, other management employees were
16 brought in; is that right?
17    A    As I recall, yes.
18    Q    When did that happen and who was brought in?
19    A    My recollections are a little foggy.  I don't
20 know if it was just before or just after the lock-out
21 started.  There was a time frame that I was -- I cannot
22 recall exactly when the time frame was.
23    Probably just before the lock-out, we were trying
24 to get tool boxes.  I went on a trip downtown with
25 Dennis one day to look at tools at Sears.  We could
```

66

```
1  Miller or did Dennis Johnson make that decision?
2     A    I can't say who made that decision.  I don't
3  know.  I was given the instruction from Dennis.
4     Q    It wasn't your decision to lay him off?
5     A    No, ma'am.
6     Q    That was my question.
7     A    At that time, there was significant planning
8  by people above my head relevant to how we would
9  approach the union negotiations, and there were a lot of
10 contingency plans that were being put in to place.
11    I felt like at the time I was being placed over
12 where Roger was because of my relevant past experiences
13 that had some relevance.
14    Q    Well, let me just ask questions.  The decision
15 to lay off Richard Miller was not yours?
16    A    No, ma'am, it was not.
17    Q    Once you moved over to facilities, were you
18 considered the head of that department, the facilities
19 department?
20    A    I considered myself in charge of that
21 department the day that Roger wasn't there.
22    Q    That is what I needed to know.
23    A    I was filling in for Roger while he was gone.
24 So my job, at that point, was manager of facilities,
25 acting for Roger.
```

68

```
1  build a little tool kit, and if we brought a supervisor
2  over here, he could work on the airplane if the guys go
3  on strike.  There was all kinds of contingency type
4  stuff.  And at that point in time, I recall a few of the
5  supervisors, aircraft people, were being invited to come
6  back, that had been laid off.  There were a number of
7  aircraft supervisors that had been laid off, and they
8  were called and asked --
9     Q    During the lock-out?
10    A    No, I think this is prior to the lock-out.
11    Q    Preceding the lock-out, okay.
12    A    We had downsized.  We had no more airplanes.
13 There were just a couple.  And several of the guys that
14 had been supervisors on aircraft had been asked to
15 leave.  They were called and told, do you want to come
16 back.  Some did; some didn't.  Some were -- they had
17 come up from the union, resigned their union status,
18 become supervisors, then were laid off as supervisors,
19 asked to come back as supervisors.  Some of them had a
20 problem with that.  They felt like -- I guess they felt
21 like they were crossing the line.  So some of them did;
22 some of them didn't.  But they were inviting some of the
23 aircraft people to come back to physically work the
24 airplanes.
25    Q    My question to you, really, was about
```

69

1  facilities and hiring people back into facilities. Who
2  was hired first?
3      A   I actually don't remember, to be honest with
4  you. I don't know if Richard Miller came back first. I
5  kind of feel like Richard Miller came back first and
6  then Ted Ball, but I don't actually remember.
7      Q   Both about the same time frame?
8      A   Similar time frame.
9      Q   And was that during the lock-out or around
10 that time?
11     A   I think it was during the lock-out. I think
12 we were actually in the lock-out.
13     Again, a little vague. If I remember right, most
14 of the activity was happening on day shift for a while,
15 and then Richard -- it is kind of vague. I don't really
16 recall, but I think Richard was brought back because I
17 needed help on second shift, because we were going to be
18 doing more work on second shift, and he would be the
19 only guy. I was doing essentially everything in
20 facilities at that time, during the lock-out.
21     Q   And you brought Richard Miller back to work in
22 facilities and to do these projects that you have been
23 talking about?
24     A   To actually fix things.
25     Q   Yes.

70

1      A   Well, actually, there was quite a bit of
2  sabotage in the beginning of the lock-out. In the days
3  right after the lock-out, there was feces smeared on
4  handles of commodes and urinals that I personally had to
5  go clean. There was wiring that had been maliciously
6  folded back into connectors where it would never make
7  contact. There were other wires that were intentionally
8  cut. Many of the pieces of equipment I had to fix,
9  trouble-shoot and repair. Some of them were beyond my
10 technical capability, because I had not worked large
11 diesels, and Richard was brought back specifically for
12 that, to help out with the diesel workload.
13     Q   But, again, all facilities work, because there
14 was so much to do in facilities?
15     A   At that time, yes.
16     Q   And then Ted Ball was added about the same
17 time?
18     A   I don't recall exactly when Ted came along. I
19 don't honestly know exactly when Ted came along. I know
20 when he came along I was instructed how I was going to
21 use him. He was to be for tools. His mission in life
22 was for tools and it has been.
23     He has added some things to that, but his primary
24 mission in life is tooling and the tooling equivalency
25 program has been his primary responsibility.

71

1      Q   So he works day shift?
2      A   Correct.
3      Q   And has since he was brought into facilities?
4      A   Yes, ma'am.
5      Q   Now, he had work at Pemco before, working in
6  facilities, though; right?
7      A   In facilities?
8      Q   He had worked in other positions at Pemco; is
9  that right?
10     A   Yes, ma'am.
11     Q   Before he was brought to facilities?
12     A   Yes, ma'am. Supervision and management.
13     Q   Which department was he in?
14     A   Production department. He is a top-notch
15 structure supervisor and mechanical supervisor.
16     Q   All right.
17     A   And has, on occasion, helped airplanes since
18 he has been in facilities. I have had to loan him out a
19 couple of times.
20     Q   So since you moved into facilities, you have
21 not made any lay-off decisions of people yourself; is
22 that right?
23     A   No.
24     Q   Dennis Johnson has made all of those?
25     A   I'm not sure they all came directly from

72

1  Dennis, but people above me have made those. I have
2  been directed through Dennis, and all of those have
3  happened previous to the lock-out. I was told the
4  number to lay off and went through the seniority list,
5  and then some of these folks that I have, have worked in
6  other departments.
7      Q   Let me stop you.
8      You went through the seniority list?
9      A   Yes, ma'am.
10     Q   And these were for bargaining unit employees?
11     A   Yes, ma'am.
12     Q   Who made the decision to rehire Richard
13 Miller?
14     A   Dennis Johnson, I guess, the best I know.
15     Q   That was not coming from you?
16     A   At one point, I was told I could hire Richard
17 Miller back. It was not my decision, no.
18     Q   What about Ted Ball and the decision to put
19 Ted Ball in facilities?
20     A   The same thing.
21     Q   That was made by Dennis Johnson?
22     A   Yes, ma'am.
23     Q   And so the three management people in
24 facilities now continue to be you, Richard Miller, and
25 Ted Ball; is that right?

73

```
1    A    Yes, ma'am.
2    Q    Were you aware that a supervisor's position
3  had been offered to Roger Wright?
4    A    I have been made aware of that in recent
5  times.
6    Q    Back in 2005, were you made aware that a
7  supervisory position was offered to him?
8    A    No, ma'am.
9    Q    What were you told about his status during
10 this period when you were filling in?
11   A    At one point, I was asked, do you want Roger
12 Wright back?  Something along the lines of, sure.  Well,
13 if you could have him or Ted Ball, who would you take?
14 I think I replied something to the effect of, well, I
15 know Ted is a great guy.  He's got a heart of gold, but
16 Roger knows where the bodies are buried.  I can put that
17 in context, if you like.
18   Q    Yes.
19   A    There was not enough clarity in the business
20 processes within the department, and I felt like there
21 was need for some clarity.  Some of the stuff just
22 didn't have enough notes or justification why decisions
23 were made that I felt could be questionable ethically.
24       There was a union grievance against the department
25 for promoting these two and not promoting those two, and
```

74

```
1  those two had seniority, which I got left having to
2  answer.
3    Q    First of all, who were you having this
4  discussion with?
5    A    The union, at that time.
6    Q    No.  I mean, concerning Roger?
7    A    That was Dennis.  Dennis had asked me.
8    Q    Do you remember about when that conversation
9  occurred?
10   A    No, I don't recall that, but I do recall being
11 asked by Dennis, and I think I told him, I probably had
12 to say Roger.  I know Ted is great.  You will meet Ted.
13 Ted is the genuine thing.  But Roger knows where the
14 bodies are buried.  So as much as I like Ted, like
15 working with Ted, working for Ted, I think I have to say
16 Roger.
17   Q    What did Dennis say to that?
18   A    He took that, I guess, and I often, in later
19 months, wondered whatever happened with that.
20   Q    Was Ted Ball already working for you at that
21 time or not?
22   A    No, I don't believe so.  I think that was
23 before Ted was being brought back or was thought about
24 being brought back.  I don't know if my opinion -- I
25 don't know how it was used.
```

75

```
1    Q    Do you recall any other discussions with
2  Dennis Johnson about Roger Wright or his status during
3  that time period?
4    A    Yes, to the first part.  No, to the second
5  part.  I recall discussions about Roger and the
6  condition of the department, things Dennis was
7  displeased about, but not about his status.
8    Q    So at some point were you informed that you
9  would no longer be just filling in for Roger?
10   A    Yes, I was.
11   Q    And when were you made aware of that?
12   A    Again, I am not clear on the dates.
13   I had started, I guess, a dialog with Dennis that I
14 was ready to go back to production.  This was a new
15 challenge.  I thought I was doing okay.  However, I sure
16 missed airplanes.
17   At some point -- and Dennis had continually
18 reassured me, you just need to hang in there.  You are
19 doing a good job.  There was one point, and I don't
20 recall when it was, I think it was after the lock-out,
21 because I am pretty sure all of my mechanics were back
22 or most of them were back.  Maybe not all of them.  But
23 I think probably the majority of them were back.  I have
24 a recollection of telling my crew lead, one of my crew
25 leads, I am stuck, or something along those lines.
```

76

```
1    Q    But you think that was after the lock-out?
2    A    I think it was, yes, because I believe all of
3  my mechanics were back at that period of time.
4    Q    Did you have a discussion with Dennis Johnson
5  that Roger had been laid off?
6    A    I recall him telling me Roger had been laid
7  off, at some point.  Again, I don't know exactly when
8  that was.  Sometime around the lock-out.
9    To be honest with you, the times kind of ran
10 together.  I don't recall exactly when Roger was
11 supposed to be back to know when he was -- because
12 things got very hectic going in to the lock-out.  For
13 one person, it was a lot.
14   Q    Was Ted Ball back in facilities before the
15 lock-out?
16   A    I don't believe so.  I don't think so.
17   Q    Was an announcement made about you assuming
18 the duties as manager of facilities?  Do you recall
19 that?
20   A    There was at some point a memorandum or
21 something sent out that I would be assuming those duties
22 permanently.  I don't recall when that occurred.
23            (Thereupon, Plaintiff's Exhibit No. 3
24            was marked for identification.)
25   Q    Mr. Briody, let me show you what has been
```

77

1  marked as Plaintiff's Exhibit Number 3.  Do you
2  recognize that note?
3      A    Sure.  That's it.
4      Q    Is that the announcement?
5      A    Yeah.  That puts a time frame on it for me.
6      Q    Good.  And the date on that announcement is
7  July 8th?
8      A    Yes.
9      Q    Is that correct?
10     A    Yes.
11     Q    And so this is the announcement that you are
12 permanently assuming manager of facilities' duties; is
13 that correct?
14     A    That is correct.
15     Q    Let's just do this one, too.  And just for the
16 record, Exhibit Number 3 is Bates stamped 172; is that
17 correct?
18     A    Yes.
19          (Thereupon, Plaintiff's Exhibit No. 4
20          was marked for identification.)
21     Q    And let me show you what has been marked as
22 Plaintiff's Exhibit Number 4.  Is this also an
23 announcement, essentially the same verbiage as Exhibit
24 3?
25     A    It appears so.

78

1      Q    Just appears to be on two different
2  letterhead?
3      A    Right.
4      Q    But the date is the same?
5      A    Correct.
6      Q    And is this handwritten mark Dennis Johnson's
7  initials?
8      A    It appears to be.
9      Q    You would know his handwriting, would
10 recognize that?
11     A    It looks like his.
12     Q    Do you know why two different memos would be
13 sent out?
14     A    No idea.  I do know he has an administrative
15 assistant, and at that time, Mr. Bennett had an
16 administrative assistant.  It might be they were both
17 told to do the same thing at the same time.  I don't
18 know.
19     Q    They are both from Dennis Johnson, though?
20     A    Correct.  I remember seeing it, but I couldn't
21 recall when or didn't have a copy of it.
22     Q    I know it's been a couple of years.  I don't
23 blame you.
24          Did you have any part of the decision to lay off
25 Roger Wright?

79

1      A    No, ma'am, none at all.
2      Q    It was not at your level?
3      A    Not at all.
4      Q    Did anyone consult with you about laying off
5  Roger, other than the discussion we previously talked
6  about?
7      A    No, ma'am.
8      Q    How were you made aware that he was laid off
9  or that your role in there was going to be permanent?
10     A    I don't recall specifically, and I don't think
11 that happened at the same time or the same day, or at
12 least not that I was aware of.
13          I recall Roger coming out and clearing out his
14 desk, vaguely.  It was uncomfortable and painful for me
15 as well.  I had been there and had a great deal of
16 empathy for him.  I don't know that that was before or
17 after this.  I really don't honestly remember.  I
18 remember him coming and clearing out his desk, and you
19 know, wishing him well.
20     Q    I know this sounds like a stupid question.
21          Pemco is an entirely separate company from
22 Lockheed-Martin; correct?
23     A    As far as I know, it is.
24     Q    Pemco would not give you credit for your years
25 in service at Lockheed, in terms of pension plans and

80

1  that sort of thing?
2      A    No.  No.
3      Q    So when you went to Pemco, you started
4  completely fresh in terms of vesting for a pension; is
5  that right?
6      A    Yes.
7      Q    And as we talked about, you would have to work
8  five years, depending on how they count the years, in
9  order to vest in the pension plan?
10     A    Correct.
11     Q    In your work as facilities manager, do you
12 have any interaction with the facilities manager in
13 Birmingham?
14     A    Limited.  Some limited.  Their structure is
15 different.  I'm not quite so certain they have one
16 manager.  They have a number of managers over a number
17 of different things.  I have assisted them on a number
18 of occasions.
19     Q    Do you work with each other in terms of
20 comparing notes, or, hey, how did you do this, or we
21 tried this and this worked?  Do you share information in
22 that way?
23     A    To some degree.  Not on a daily basis.  They
24 have asked specifically for our help in securing a
25 contract.  They had to put their system for tooling in a

85

```
 1      A    Correct.
 2      Q    And you were talking about the condition of
 3  the facility?
 4      A    Correct.  I was startled at the dilapidated
 5  condition of the buildings and the tooling and the
 6  entire facility and the amount of FOG, foreign objects
 7  on the ground.
 8      Q    You testified that in response to your
 9  question to Dennis that Dennis said he intended to get
10  some right-headed people and to get rid of the old guard
11  who were unwilling to change.  Do you remember that
12  testimony?
13      A    I am not sure I said it exactly as such.
14  However, that is my characterization of obstinates, I
15  guess is what I was saying.
16      Q    Did Dennis use the phrase or the words "old
17  guard"?
18      A    I don't recall that he did.
19      Q    And did you get the sense in any way that his
20  description of getting right-headed people was in any
21  way related to the age of current employees of Pemco?
22      A    No.
23      Q    Have you ever heard Dennis say anything about
24  an employee's age relative to an employment decision he
25  was making?
```

86

```
 1      A    No.
 2      Q    You also testified about another conversation
 3  that you had with Dennis Johnson at some point in and
 4  around this relevant time period in 2005, where Dennis
 5  asked you about Roger Wright or Ted Ball coming back to
 6  work.  Do you remember that testimony?
 7      A    Yes, sir, I do.
 8      Q    And did you know what position Dennis was
 9  asking you about?
10      A    I assumed it was to be in charge of tooling
11  and tool equivalency.
12      Q    And your testimony about your answer to Dennis
13  when he asked you who would you call back was that
14  Ted was really good and a great guy -- and I am
15  paraphrasing --
16           MS. GLASGOW:  I want to object to the form.
17      Q    I am paraphrasing here.  The transcript says
18  what it does.  -- but that Roger knows where the bodies
19  are buried, correct?
20           MS. GLASGOW:  Object to form.
21      Q    Do you remember your testimony about that
22  conversation?
23      A    I do recall, I think, the testimony fairly
24  well.
25      Q    And did you have a sense that Ted was better
```

87

```
 1  qualified for the position?
 2           MS. GLASGOW:  Object to form.
 3      A    I knew Ted's work ethic to be extraordinarily
 4  good, and I knew he was very capable, particularly with
 5  tooling.  But with regards to a lot of things within the
 6  facility, I felt like Roger, as I said, knew where the
 7  bodies were buried, and I am pretty sure I used those
 8  exact words with Dennis.
 9           MR. HOLMES:  That is all I've got.
10                    EXAMINATION
11  FURTHER BY MS. GLASGOW:
12      Q    You said you started at Pemco in July of '03?
13      A    I believe it was July of '03.
14      Q    Around that time?
15      A    Yes.
16      Q    How long had Dennis Johnson been at Pemco when
17  you came on board?
18      A    I don't know for a fact.  I know it had not
19  been a long time.  As I stated before, he had been
20  through the training seminar at the same place in
21  Greenville when he had departed and was still in
22  communication with them, looking for supervisors, once
23  he hired on at Pemco.  I honestly don't know.
24      Q    A short time, a few months maybe?
25      A    I am not sure I would know that for sure.
```

88

```
 1      Q    Are you aware that he was laid off at
 2  Lockheed?
 3      A    I did know that.
 4      Q    And was the facility in South Carolina shut
 5  down?
 6      A    No, ma'am, at least not to my knowledge.
 7      Q    And, Mr. Briody, what is your date of birth?
 8      A    9/7/1955.  September 7th.
 9           MS. GLASGOW:  Okay.  I think that is all I
10           have.  Thank you, sir.  I appreciate it.
11                 END OF DEPOSITION
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



**PEMCO**
## WORLD AIR SERVICES
*A PEMCO AVIATION GROUP COMPANY*

**July 8, 2005**

**To:**          **All PWAS Dothan Employees**

**From:**      **Dennis Johnson, Vice President Operations**

**Subject:**    **Management Appointment**

---

Effective Monday, July 11, 2005 Clarke Briody will assume duties and responsibilities of Facilities Manager. Clarke's 20+ years of aircraft maintenance experience and his vast knowledge of the aviation industry will be a tremendous asset as we move forward to streamline our operations and improve efficiencies.

Please give him your complete support and cooperation.



EXHIBIT
G7

PEMCO / WRIGHT
00172



**PEMCO**

WORLD AIR SERVICES
*A Pemco Aviation Group Company*

100 Pemco Drive
Dothan, Alabama 36303
334-983-4571

July 8, 2005

To:        **All PWAS Dothan Employees**

From:      Dennis Johnson, Vice President Operations

Subject:   Management Appointment

---

Effective Monday, July 11, 2005 Clarke Briody will assume duties and responsibilities of Facilities Manager. Clarke's 20+ years of aircraft maintenance experience and his vast knowledge of the aviation industry will be a tremendous asset as we move forward to streamline our operations and improve efficiencies.

Please give him your complete support and cooperation.



EXHIBIT
H

PEMCO / WRIGHT
00167



MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

**John B. Holmes, III**
DIRECT 205.254.1107
EMAIL jholmes@maynardcooper.com



April 4, 2006

**VIA FACSIMILE AND U.S. MAIL**

Ms. Jeanne Walker
Investigator
U.S. Equal Employment Opportunity
Commission
Birmingham District Office
Ridge Park Place
Suite 2000
Birmingham, AL 35205

    **Re:    Roger W. Wright, Charge No.: 130-2005-07067**

Dear Ms. Walker:

    Pemco World Air Services ("Pemco") submits this letter in response to the Commission's request for Pemco's position with regard to the above-referenced charge. The information outlined in this response is based on our initial investigation and understanding of the facts at the present time. Pemco submits this position statement without prejudice to its right to present new, different, or additional facts based upon subsequently acquired information.

    In his Charge, Roger W. Wright ("Charging Party") claims that Pemco discriminated against him in violation of the Family and Medical Leave Act ("FMLA"), Age Discrimination in Employment Act ("ADEA"), and the Americans with Disabilities Act ("ADA"). Because the alleged violation of FMLA is beyond the purview of EEOC, that allegation is not addressed herein. As such, Pemco will focus on Charging Party's allegations that he was discriminated against because of his age and alleged disability.

    Pemco categorically denies that Charging Party has been subjected to discrimination at any time during his employment. Despite his claim to the contrary, Charging Party's inclusion in Pemco's 2005 reduction-in-force was completely unrelated to his age or alleged disability. Pemco is willing to cooperate fully with this investigation and is confident that the EEOC will understand the lack of merit in Charging Party's charge once it considers all of the relevant facts that follow.

    On May 27, 2005, Ray Bennett, President, informed all Pemco employees that a reduction-in-force would be necessary to keep the company competitive and viable. A copy of that Memo is attached. As provided in the Memo, reductions were made in the management and support areas, including the Facility Maintenance Department. At this time, Pemco's indirect/management personnel were all asked to do more with less.

Jeanne Walker
April 4, 2006
Page 2

Charging Party was one member of the management team offered such an opportunity. Prior to May 2005, Charging Party was day shift Facilities Manager. At that time, Charging Party reported to Henry Ward, Director of Facilities, and supervised Facilities Supervisors, among others. On June 10, 2005, Henry Ward retired from his position as Director.[1] At the time, Dennis Johnson, Vice President of Operations, had assumed the responsibility of overseeing all Facilities Maintenance in addition to his regular management position. The position of Director of Facilities was eliminated in the downsizing. Charging Party's position, day shift Facilities Manager, was also eliminated as part of the reduction-in-force.

Charging Party's former duties of Facilities Manager would be temporarily assumed by Clark Briody, a Production Manager. Mr. Briody, also a member of the protected age class, would essentially hold two management positions – Acting Facilities Manager and Production Manager. A Memo detailing this change is attached.

Rather than laying off Charging Party, on July 7, 2005, Dennis Johnson offered Charging Party a Facility/Aircraft Maintenance Tooling Supervisor position to begin July 25, 2005. Admittedly, the supervisor position provided less pay than Charging Party had previously received as Facilities Manager, but he was offered a management position when many others were being laid off indefinitely without any alternative offer. Importantly, during this time when Pemco was making difficult decisions, Charging Party told Mr. Johnson that he was not sure if he was interested in the supervisor position and wanted to take his vacation to think about it. At the time, no one was allowed to take vacation because of the difficult financial position Pemco was in. Charging Party, however, was afforded this benefit. At no time did Charging Party ask for any accommodation for his temporary back problem.

Throughout July 2005, Pemco's business continued to be stressed and additional reductions were necessary. When it was determined that the tooling supervisor position was not absolutely essential to maintaining operations, it too was eliminated on July 15, 2005. In fact, the evening shift Facilities Supervisor position was also eliminated on July 15, 2005. The evening shift Facilities Supervisor position had been held by Richard Miller, also a member of the protected class. At that time, the only available position for which Charging Party might qualify was a mechanic position. Because Charging Party was noncommittal about the supervisor job, Pemco assumed Charging Party would not be interested in a mechanic position, which was a further reduction in pay and responsibility from the supervisor position Charging Party was unsure about. Accordingly, Pemco did not offer Charging Party a mechanic position, the only available job for which he may have been qualified.

After July 15, 2005, only two people had responsibilities over facilities maintenance – Dennis Johnson, who was primarily performing the position of Vice President of Operations, and Clark Briody, who was primarily performing the position of Production Manager. Charging Party was not replaced by anyone, although his job duties were being carried out by a Production Manager.

---

[1]  This was the effective date of Mr. Ward's retirement following his use of all accrued paid time off.


MAYNARD COOPER
& GALE PC
ATTORNEYS AT LAW

Jeanne Walker
April 4, 2006
Page 3

All in all, forty-nine (49) Pemco employees were laid off in July 2005 alone. Ultimately, over sixty indirect (non-production support) employees were laid off during the downturn in business. Charging Party's medical leave was not a factor in any way in the decision to downsize, the timing of his leave is merely coincidental.

Pemco categorically denies Charging Party's allegation that age and disability discrimination were responsible for his lay off. Charging Party had no reasonable basis for believing that he was being discriminated against on the basis of his age when the other employees at issue who assumed the facilities maintenance responsibilities were also members of the protected class. Similarly, Charging Party has no reasonable basis for believing he was being discriminated against on the basis of his back injury because he was not disabled as defined by the ADA and he did not ask for any kind of accommodation. Charging Party simply cannot demonstrate that his unsupported allegations give rise to an age or disability discrimination claim.

For the reasons set forth herein, Charging Party's claim is without merit, Pemco respectfully requests a "no cause" determination to be issued.

Please feel free to contact me if you require more detail of if I can be of any further assistance.

Sincerely,

John B. Holmes, III

JBH/brt
cc:    Jeffrey A. Lee, Esq.



PEMCO / WRIGHT
00736

# Hangar 7 and 8 Upgrade



- This area was a waterfall over the electrical power panel when it rained. Photo shows newly installed downspout addition. Roof has also been repaired.



EXHIBIT
J-1

PEMCO / WRIGHT
00737

# Hangar 7 and 8 Upgrade







- Roof had leaked into break area. Photos show work underway.

PEMCO / WRIGHT
00738

# Hangar 7 and 8 Upgrade



- Break room after ceiling tile replacements, floor resurfacing and paint.

PEMCO / WRIGHT
00739

# WWTF

- One of three roll offs filled with junk from Waste Water Treatment Building.



PEMCO / WRIGHT
00740

# WWTF

 

- Metal Only roll off dumpster filled to capacity and a pipe rack in process of clean up.

PEMCO / WRIGHT
00741

# WWTF



- Outside Waste Water Building after removal of pipe rack.

PEMCO / WRIGHT
00742

# WWTF Inside






PEMCO / WRIGHT
00743

# Hangar 10 Prior to Cleaning and Organizing






# More Hangar 10 "Before"





PEMCO / WRIGHT
00744

PEMCO / WRIGHT
00745

# Hangar 10 "In Work" Reorganizing







EXHIBIT
J-2

PEMCO / WRIGHT
00746

# Hangar 6 Parts Cage Before Upgrade







# Cabinets For Hangar 6 Upgrade "In Work"





PEMCO / WRIGHT
00747

PEMCO / WRIGHT
00748

# Hangar 6 "After" Upgrade





PEMCO / WRIGHT
00749

# More Hangar 6 cage Upgrade





PEMCO / WRIGHT
00750

# Hangar 5 "Before" Cleanup







PEMCO / WRIGHT
00751

# Hangar 5 After Cleanup






PEMCO / WRIGHT
00752

# Hangar 9 "Before"





PEMCO / WRIGHT
00753



JUN 27 2005



# Hangar 9 "After"

1 IN THE U. S. DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3          SOUTHERN DIVISION

4

5 ROGER WRIGHT,

6      PLAINTIFF,

7    VS.                    Civil Action No.:
                            1:06cv647-WKW

8 PEMCO WORLD AIR
  SERVICES, INC.,

9      DEFENDANT.

10

11      The deposition of DENNIS JOHNSON, taken

12 by the Plaintiff, pursuant to the Federal

13 Rules of Civil Procedure, before Stacey

14 Watkins, RPR, and Notary Public, State at

15 Large, at the offices of Farmer, Price,

16 Hornsby & Weatherford, Dothan, Alabama, on

17 the 7th day of August, 2007, at 10:15 p.m.,

18 CDT, pursuant to notice.

19                    * * * * *

20 APPEARANCES:

21 FOR THE PLAINTIFF:      FOR THE DEFENDANT:

22 MS. ELIZABETH B. GLASGOW  MR. JOHN B. HOLMES
   Attorney at Law           Attorney at Law

23 Dothan, Alabama           Birmingham, Alabama

24

25

---

**2**

STIPULATION

It is stipulated by and between counsel for the parties that this deposition be taken at this time by Stacey Watkins, RPR, and Notary Public, State at Large, who is to act as commissioner without formal issuance of commission to her; that said deposition shall be taken down stenographically, transcribed, and certified by the commissioner. The signature of the witness is waived.

Except for objections as to the form of questions, no objections need be made at the time of the taking of the deposition by either party, but objections may be interposed by either party at the time the deposition is read into evidence, which shall be ruled upon by the Court on the trial of the cause upon the grounds of objection then and there assigned.

EXHIBIT

K

---

**3**

DENNIS JOHNSON

having been first duly sworn, testified as follows, to-wit:

EXAMINATION

BY MS. GLASGOW:

Q    Would you state your name for the record, please?

A    Dennis Johnson.

Q    Mr. Johnson, what's your address?

A    116 Stonegate Road.

Q    Is that Dothan?

A    Headland.

Q    Oh. Headland?

A    Headland, Alabama, 36345.

Q    Mr. Johnson, my name is Libby Glasgow.  I represent Roger Wright in this lawsuit that's brought against Pemco.  You have sat in on a number of the depositions, so, you know, I assume that you've witnessed the question and answer that goes on.

Our court reporter takes down everything that's said, and so, you need to answer the questions out loud.  Let me finish my

---

**4**

question before you answer, so that, on the record, it shows up clearly what the question is and what the answer is.

A    Okay.

Q    If there are any questions you don't understand, let me know.  I'll be happy to rephrase it for you, ask it again.  Otherwise, we'll assume you understand the question that we're asking.  Okay?

A    Okay.

Q    All right.  Now, you are here in two capacities for your deposition.  I had asked for your deposition as a witness, and Pemco had also designated you as a corporate representative to be deposed today.

A    Okay.

MS. GLASGOW:  Is that right?

MR. HOLMES:  It is.

MS. GLASGOW:  John, let me give you the 30(b)(6), (5) and (6), deposition notice.  Would you circle the things that you're designating him for?

MR. HOLMES:  Sure.  Let me get my list.

1    Q    And while he's doing that, Mr.
2    Johnson, did you bring any documents with you
3    today?
4    A    No, ma'am.
5        (Whereupon, Plaintiff's Exhibit 1
6        marked for identification.)
7    MS. GLASGOW:  John, on the
8        deposition notice, you
9        designated items 5 through 10
10       for this witness?  Is that
11       correct?
12   MR. HOLMES:  That's right, although
13       5 is -- you know, we'll deal
14       with that as it comes.
15   MS. GLASGOW:  It's broad.  I
16       understand.
17   Q    All right, Mr. Johnson.  What have
18   you done to prepare for your deposition here
19   today?
20   A    Just a general review with John
21   over, you know, some of the events that have
22   transpired over the last couple of weeks with
23   the other two previous depositions.
24   Q    Have you reviewed any documents in
25   preparation of the deposition?

1        went through some of the
2        documents that have already
3        been produced.
4    MS. GLASGOW:  Nothing that hasn't
5        already been produced --
6    MR. HOLMES:  Oh, no.  Not at all.
7    MS. GLASGOW:  -- other than the 736
8        to 756?
9    MR. HOLMES:  And other than what's
10       on the privilege log.
11   Q    (By Ms. Glasgow)  Any other
12   documents that you reviewed?
13   A    No, ma'am.
14       (Whereupon, Plaintiff's Exhibit 2
15       marked for identification.)
16   Q    Look through Exhibit No. 2, which
17   is Bates stamp number, again, 736 through
18   756, and tell me what these documents are?
19   A    There are some pictures on here
20   with a description of the picture off to the
21   left-hand side.
22   Q    Did you prepare that?
23   A    No, ma'am, I did not.
24   Q    Who did?
25   A    I believe Clark Briody took these

---

6

1    A    Just one or two.
2    Q    What were they?
3    A    I looked at the one that you just
4    had, Exhibit 1 there.
5    Q    The deposition notice?
6    A    Yes, ma'am.  I saw that one.
7    Q    Plaintiff's Exhibit 1?
8    A    Uh-huh.
9    Q    Okay.  Anything else?
10   A    I looked at these slides yesterday.
11   Q    Okay.  And these are documents
12   which John has handed to me for the first
13   time today.  And they are Pemco Bates stamps
14   736 through 756.  Did you review any other
15   documents?
16   A    I looked at one that had to do with
17   some basic head count-type numbers, you know,
18   back in 2005.
19   Q    And what was the head count of?
20   A    It was just various things.  John
21   has it.  I don't remember everything that was
22   on it.  Just some numbers.
23   MR. HOLMES:  Libby, they were -- I
24       understand you want him to
25       testify about this.  But we

8

1    pictures.
2    Q    And what was the purpose of taking
3    those pictures?
4    A    We were doing some facility cleanup
5    items.  It's various pictures across the
6    plant.  That's all.
7    Q    And when was this cleanup done?
8    A    Some time during 2005, middle part.
9    This one's dated -- there's one here dated
10   June the 10th, 2005.  There's one here June
11   the 6th.  So, early part of June, looks like.
12   MR. HOLMES:  All the photographs
13       are dated.
14   A    Yeah.  June the 20th.  During the
15   month of June.
16   Q    Okay.  And a slide presentation was
17   put together with those photographs?
18   A    Yes, ma'am.
19   Q    And what was the purpose of putting
20   the slide presentation together?
21   A    Just some documentation on what we
22   were doing around the facility to improve the
23   way the facility looked.  Aesthetics.
24   Q    Who would view the slide show?
25   A    I believe I put some of this stuff

1 together -- had Clark put it together for Ray
2 Bennett, just to show him some things that we
3 were doing to clean the facility up.
4     Q    Okay.  It looks like -- and correct
5 me if I'm wrong.  But it looks like the
6 pictures here are from Bates stamp 736 to
7 753?  Is that right?
8     A    Yes, ma'am.
9     Q    And then, what is Bates stamp 754?
10     A    It's a e-mail from Clark Briody
11 sent to Dennis Johnson on March 22nd, 2006,
12 at 12:01 p.m.  And then, there's a -- do you
13 want me to read it?
14     Q    No.  You don't need to read it.
15 But, tell me what it is?
16     A    Let me read it.  (Witness reviewing
17 document.)  Some of the things that Clark had
18 implemented either through his own doings, I
19 guess, or maybe some instructions I had given
20 him, during -- says "over the last year."
21 And there's about eight bullet points on here
22 describing various things that have changed.
23     Q    And why was he sending that e-mail
24 to you?
25     A    I have no idea.

---
10
---

1     Q    Did you request him to send that
2 information to you?
3     A    I don't remember.  I may have asked
4 him, you know -- just be conjecture on my
5 part -- "Hey, tell me something you've been
6 doing in the last year that we've done to the
7 facility."  Maybe somebody was preparing a
8 presentation.  I don't know.  I get hundreds
9 of e-mails.
10     Q    Did you ask him to put this
11 together for purposes of litigation --
12     A    No, ma'am.
13     Q    -- or with regard to an EEOC claim?
14     A    No, ma'am.
15     Q    But you don't recall why you asked
16 him to put that information together?
17     A    No, ma'am.
18     Q    Or if you did, I guess?
19     A    Yeah.  Or if I did.
20     Q    Let me show you Bates stamps 755
21 and 756.  Why don't you read over that?  You
22 can just read it to yourself.
23     A    (Witness reviewing documents.)  Do
24 I need to read it read it, or do I need just
25 to scan it?

---

1     Q    Just scan it.  I mean, you're
2 welcome to read it if you want to.
3     A    I get the gist of it.
4     Q    What were these two pages?
5     A    There was an issue with -- looks
6 like on one of the fire pumps, you know, for
7 the hangar facilities.  It needed some
8 repair.  And then, there was also a
9 suggestion in there that we do some infrared
10 sampling on transformers around the facility.
11     Q    It appears, from the date and time,
12 that this e-mail on 755 and 756 was sent
13 March 22nd at 10:47?
14     A    2006.  Uh-huh.
15     Q    2006.  And if you look at the time
16 on the previous one from Clark Briody, looks
17 like -- is it possible that Clark Briody's
18 was in reply to this e-mail on 755 and 756?
19     A    Doesn't look like it.  Looks like a
20 separate response.  Separate subjects.  That
21 one concerns the fire pumps and the infrared
22 testing.  This other one here just has to do
23 with some cleanup items that were done around
24 the facility.
25     Q    What's the annual risk improvement

---
12
---

1 report?
2     A    It's insurance oversight.
3     Q    Who prepares that report?
4     A    It usually comes out of Birmingham,
5 out of the corporate office, between the guys
6 up there and a local entity.  Insurance
7 company, whoever we've got our insurance
8 with, you know, will come down and do a site
9 assessment.  I don't remember the name of the
10 company.
11     Q    Do they do a risk improvement
12 report for World Air Services here, the
13 Dothan facility, every year?
14     A    Yes, ma'am.
15     Q    And who would be in charge of
16 coordinating that report for the Dothan
17 facility?
18     A    It would be a combination between
19 the facilities folks and Birmingham.
20     Q    Would that go through you?
21     A    Usually doesn't.  I'm aware it
22 happens, but --
23     Q    Usually does or does not?
24     A    Does not.
25     Q    Does not.  Who would be the

1  ma'am.

2  Q  Okay. And that was within your
3  authority given to you -- or is it joint,
4  with you and Ray Bennett, during that time?

5  A  I had all -- I had the authority in
6  the production organization to do what I felt
7  was best for the company.

8  Q  Were there any other factors that
9  entered into the decision to lay off
10  management employees at that time, other than
11  what we've talked about, the collective
12  bargaining agreement coming up for renewal
13  and the decrease in the number of airplanes
14  from customers? Were there any other factors
15  that you looked at in making that decision?

16  A  No, ma'am.

17  Q  After the lockout was over, did you
18  continue to lay off employees after that
19  period in time?

20  A  No. What we actually did was in
21  the recall process of the bargaining unit
22  folks. As our work load increased, we
23  continued to call people back.

24  Q  But the recall program was only for
25  bargaining employees? Right?

---

118

1  A  That's correct.

2  Q  What documents would I need to look
3  at to show the level of your work load
4  increase in this period of time from August
5  or September of '05 to the present?

6  A  It would be off of the aircraft
7  inputs during that span.

8  Q  And that would tell me how many
9  aircraft were in service?

10  A  Yes, ma'am. It's a forecast.

11  Q  Did you work with the financial
12  directors at all in terms of projecting what
13  level of layoffs you would need in terms of
14  savings for dollars and that sort of thing?

15  A  No, ma'am.

16  Q  How did you go about deciding how
17  many people to lay off?

18  A  Depends on what the aircraft
19  requirements were.

20  Q  But in terms of management
21  employees --

22  A  Same.

23  Q  Tell me your thought process on
24  arriving at how many employees had to be laid
25  off?

---

1  A  Leading up to the lockout span time
2  -- there's no set formula on this. Depending
3  on the work load. In other words, the amount
4  of tasks, type of tasks on a given aircraft,
5  determines the level of supervision that we
6  think is required. And it's strictly just a
7  what-I-think requirement. If I think we need
8  one supervisor on it, one supervisor gets
9  assigned to it. If we think we need two
10  supervisors or three supervisors, whatever
11  the number is, is kind of how it goes.

12  Q  So, you did not sit down and
13  project, I'm going to be able to save "X"
14  amount of dollars by laying off so many
15  people?

16  A  No, ma'am.

17  Q  Do you have any idea what that
18  figure actually was, in terms of cost savings
19  per employee laid off?

20  A  No, ma'am.

21  Q  Did you ever ask anybody to make
22  those calculations for you?

23  A  I didn't.

24  Q  In terms of the facilities
25  department, now, how did that function into

---

120

1  the decision in terms of aircraft needs, in
2  determining how many people to lay off in
3  facilities?

4  A  There's not a facilities
5  requirement.

6  Q  And then, how did you come to the
7  figure as to how many people to lay off in
8  facilities?

9  A  Laid them all off. It's not a
10  requirement for the aircraft.

11  Q  You laid off all the facilities
12  employees?

13  A  Between the ones that didn't get
14  locked out -- during the whole span,
15  everybody ended up being gone by the lockout
16  time. We were looking at strictly what was
17  required, you know, to do the work on the
18  airplane only.

19  Q  And so, you laid off all of
20  management in terms of facilities? Is that
21  right?

22  A  We laid off a lot of people during
23  that point in time.

24  Q  But somebody had to be in charge of
25  facilities? Is that right?

133

1   Q    What was the initial plan in
2   dealing with the management employees in
3   facilities?
4   A    I can't look at it just as
5   facilities. I have to look at it as the
6   management plan, you know, for the production
7   organization. There's no one piece of that
8   that's picked out. We looked at what was
9   required, you know, to maintain our
10  customers' aircraft.
11  And if we had to lay somebody off, you
12  know, we started looking at, you know, who
13  could go back to the bargaining unit.
14  Because, at that time, the lockout hadn't
15  occurred. The negotiations were still going
16  on. And I had several of my supervisors that
17  held bargaining unit seniority that was still
18  high enough to where they could return to the
19  bargaining unit. Does that make sense?
20  Q    Uh-huh. Yeah. I'm with you.
21  A    You know, in an effort to save
22  every possible job that I could. The last
23  thing in the world that I want to do at that
24  time or any time is to lay anybody off. So,
25  we were looking for ways that we could, you

134

1   know, restructure with the number of
2   airplanes that we had on base, you know, that
3   would actually make sense if I had to go and
4   report that to Ray or if Ray had to report it
5   to Ron or if Ron had to report it to somebody
6   else. These are all ifs --
7   Q    Right.
8   A    -- that would make sense. So, the
9   guys that could go back to the bargaining
10  unit -- you know, our company is in trouble.
11  We have a risk here of a strike. We have a
12  risk here of a lockout. We have a risk here
13  that, you know, our customers are all going
14  to go away because of the issues that we're
15  faced. And we were looking for ways to save
16  every possible job.
17  So, if that meant somebody had to change
18  classification, if somebody had to go back to
19  their prior, you know, job that they held,
20  you know, or if somebody was going to have to
21  leave the facility and maybe not ever return,
22  those are the type of things that we were
23  looking at and trying to decide on.
24  Q    And, really, I understand about
25  that. But in terms of management employees,

135

1   some of them went back to the bargaining
2   unit.
3   A    Some were laid off.
4   Q    And some were laid off.
5   A    And it got worse.
6   Q    Did you head up the layoffs, in
7   general, in terms of implementing them and
8   going to the different department heads and
9   that sort of thing?
10  A    At the time, then and today, 90
11  percent of the work force falls under my
12  organization.
13  Q    So, you did head that up, then?
14  A    Yes, I did.
15  Q    Did you come to a number of layoffs
16  of management employees that would have to
17  occur during this time period?
18  A    Yeah. But I don't think I have it
19  documented anyplace. I mean, at the time, I
20  said, you know, I need this many supervisors,
21  you know, I need this many managers, I need
22  this. Whatever it was. You know. There
23  were some contingency plans there.
24  Q    But that was never reduced to
25  writing?

136

1   A    I may have had a note pad similar
2   to the yellow one that you have in front of
3   you, you know, making notes on, if this
4   happens, I'm going to have to do that. Just
5   idle thoughts to myself. But nothing formal
6   that I would put in -- describe, you know, in
7   detail, this is what's going to happen
8   tomorrow, this is what's going to happen next
9   week. I may have sent some e-mails. I may
10  have had some phone conversations, that type
11  of stuff, that named, either by name or by
12  numbers, you know --
13  Q    Did you make the decision as to who
14  would be laid off?
15  A    In the operations group? Yes.
16  Q    Okay. In the various departments,
17  did you allow department heads to make
18  decisions within their departments as to who
19  to lay off, or did you determine who would be
20  laid off and who wouldn't?
21  A    Strictly was what's required to
22  keep the airplane. So, if it was in the
23  planning department, you know, Grady Mixon or
24  Ken Tackett, you know, "We're only going to
25  have one airplane here or two airplanes here.

1  Q    Did you -- first of all, did you
2  review the provisions of the Warren Act in
3  terms of deciding how to do these layoffs?
4  A    I don't think the Warren Act
5  applies.
6  Q    And why was that?
7  A    I would have to get a little more
8  advice on that question.
9  Q    I don't want you to tell me what
10  your lawyers have said.
11  A    I would have to ask my lawyer about
12  that.
13  Q    If you have an understanding of
14  that --
15  A    I'm going to say no, right now, to
16  that.
17  Q    No, what?  I'm sorry?
18  A    That I'm not for sure what all the
19  Warren Act says.
20  Q    Is that something that you would go
21  to HR about?
22  A    Yes, it would be.
23  Q    Do you recall going to HR to
24  determine whether the Warren Act applied to
25  these layoffs?

142

1  A    No, I do not.
2  Q    And Jim Batcher was the director of
3  HR at that time?  Is that right?
4  A    Yes, he was.
5  Q    Did you have a good relationship
6  with Jim?
7  A    I think so.
8  Q    No reason why you couldn't call him
9  up and ask him?  Is that right?
10  A    That's correct.
11  Q    Now, with the union employees --
12  A    Can I clarify something?
13  Q    Sure.
14  A    Does the Warren Act apply in this
15  case?
16  MR. HOLMES:  Dennis, we can talk
17      about that later.
18  (Recess in deposition.)
19  Q    All right, Mr. Johnson.  We're back
20  on the record.  And we were talking, before
21  the break, about the decision-making process
22  for the layoffs in 2005.  And you were
23  telling me about how that worked for certain
24  departments.  And I had started asking you
25  about the decision-making process for layoffs

1  of management employees in facilities.  Who
2  made the decisions in terms of the layoff of
3  the management employees in facilities?
4  A    I did.
5  Q    Was anybody else involved in that
6  decision other than yourself?
7  A    No.
8  Q    When did you make the decision to
9  lay off management employees in facilities?
10  A    As we've talked about before, you
11  know, it's all related back to the number of
12  airplanes that were on base.
13  Q    I know.  And my question to you
14  really is, when is, if you recall, was that
15  decision made?
16  A    Nonbargaining unit people, which
17  was Roger Wright and Richard Miller -- I
18  don't remember the exact dates that Roger or
19  Richard were laid off.
20  Q    Do you recall whether Roger had
21  already gone out on medical leave at the time
22  of the decision for the layoff?
23  MR. HOLMES:  Object to the form.
24  A    No, I don't believe so.
25  Q    Okay.  Did you have a conversation

144

1  with Roger Wright about his need for medical
2  leave?
3  A    Yes, I did.
4  Q    And you were aware he needed time
5  off for surgery?
6  A    That's correct.
7  Q    And if I represent to you that that
8  was in June of 2005, would that sound correct
9  to you?
10  A    That would sound correct to me.
11  Yes.
12  Q    Okay.  Did you inform Roger about
13  the layoffs before he left for his surgery?
14  A    I'm sure Roger was aware of what
15  was going on.  We had a decrease in business
16  during that time.  I don't remember when the
17  first layoffs started happening.  But if they
18  were -- if we laid somebody off in April, you
19  know, then I'm sure he was aware of that.
20  Q    Okay.  But in terms of laying off,
21  you know, the management employees in
22  facilities, which was Roger and Richard,
23  after Henry Ward retired, did you inform them
24  about the layoffs before Roger went out on
25  medical leave, to your recollection?

149

1  A   I left for part of it. I was gone
2  for 15 or 20 minutes.
3      MR. HOLMES:  You just said June?
4      MS. GLASGOW: July 15th. Excuse
5          me.  July 15th.
6      MR. HOLMES:  July.
7  A   I mean, are we waiting for some
8  information?
9  Q   No.  You had asked about --
10  A   Was it July 15th when Richard
11  Miller was laid off, too?
12  Q   That's what he testified to
13  yesterday, I believe.  Yes, sir.
14      MR. HOLMES:  That's right, I mean,
15          according to records.
16  A   I guess, then, they were both laid
17  off on the same day.
18  Q   All right.  My question to you is,
19  you made the decision to bring in Clark
20  Briody rather than have Richard Miller fill
21  in for Roger while he was out.  Roger went
22  out in June of 2005.  Why did you have Clark
23  come in to fill in for Roger, rather than
24  Richard Miller?
25  A   I guess Richard was still on nights

151

1  in for somebody else, you know, you get a
2  turnover.  I asked Roger to give Clark or
3  whoever a turnover.
4  Q   Do you specifically recall that, or
5  is this -- you're guessing what you would
6  have done?
7  A   No.  I think I asked Roger to give
8  Clark a turnover.  I mean, it's no different
9  than any of the rest of my guys being out.
10  If Shane King is going to be out for two
11  weeks on vacation, I would ask him to give a
12  turnover to whoever is going to kind of fill
13  in for him or do double duty or triple duty
14  or whatever it might be.  It's pretty
15  standard.
16  Q   And do you recall that Roger
17  actually did spend a couple of days working
18  with Clark on that?
19  A   I don't know how long he spent with
20  him.
21  Q   Okay.  But you recall he did do
22  that?
23  A   I do.
24  Q   Roger had his surgery on June the
25  8th, if that helps you at all --

150

1  at the time.
2  Q   Do you recall?
3  A   I don't -- no.  I thought you were
4  looking for what do I think I might have
5  done.  I don't know.
6  Q   So, you don't recall?
7  A   I don't recall a conversation or a
8  simple statement, "All right.  Today, you
9  know, I'm going to have Richard Miller do it.
10  Tomorrow, I'm going to have Clark Briody do
11  it.  The next day, I'm going to have Shane
12  King do it."  I don't remember that.  I don't
13  know.
14  Q   Do you recall why you would have
15  brought in Clark Briody to work in facilities
16  while Roger was out?
17  A   Like I said before, somebody had to
18  fill in for -- you know, fill in for people.
19  Q   And so, you don't recall why it was
20  Clark rather than Richard Miller?
21  A   No, I don't.
22  Q   Do you recall asking Roger to train
23  Clark Briody for the position?
24  A   I don't know if I used the word
25  "training." I mean, if somebody is filling

152

1  A   Okay.  It doesn't.
2  Q   -- in terms of a time period.  How
3  long a time period was it between the time
4  you made the decision for the layoffs and the
5  actual decision to lay off the employees?
6  A   No definite span.
7  Q   Okay.  What about with regard to
8  Richard Miller and Roger Wright?
9  A   Don't know.
10  Q   Did you ever consult with legal
11  counsel concerning the layoffs of Roger or
12  Richard Miller?
13  A   They don't fall in any group than
14  anybody else around, people at the time.
15  Q   My question to you, though -- and
16  please try to listen to the question -- is,
17  did you consult with legal counsel before you
18  implemented these layoffs of Richard and
19  Roger, management facilities people?
20  A   No, I did not.
21  Q   And did you consult with HR
22  concerning the layoffs of these management
23  employees?
24  A   HR was aware of all the layoffs.
25  Q   Did you consult with them before

153

1 the layoff, or really before the decision to
2 lay off?
3     A   HR was aware of everybody that was
4 going to be laid off.
5     Q   I understand. But, did you consult
6 with them before you made the decision to lay
7 them off?
8     A   What does "consult" mean in this
9 case?
10     Q   Get their advice, call on their
11 resources, that sort of thing.
12     A   No.
13     Q   Did you ever provide memoranda to
14 HR concerning who would be laid off and when?
15     A   I stated earlier, I mean, we had
16 some that was on yellow notebook paper. And
17 there may have been an e-mail if somebody
18 asked a specific question, you know, rather
19 than picking up the phone and call. But
20 y'all are in possession of all the e-mails, I
21 think, that I know about, that I received.
22     Q   Would the normal procedure have
23 been for you to e-mail HR and let them know
24 who would be laid off?
25     A   I don't know if that's normal or

154

1 not.
2     Q   Well, during this layoff period?
3     A   I may have called HR up and said,
4 you know, this number of folks, you know,
5 these names, you know, those type of things.
6 Maybe I sent an e-mail. Maybe I made a phone
7 call. Maybe it was discussed in a meeting
8 that we were having face-to-face, and we just
9 discussed it, and notes were taken down and
10 acted upon. All the above.
11     Q   Okay. And then, HR was tasked with
12 sending out the correspondence to notify the
13 employees of the layoff?
14     A   That's correct.
15     Q   Did you personally speak with Roger
16 about his employment situation while he was
17 out on leave?
18     A   I don't remember. I talked to
19 Roger, you know, when he was -- at the point
20 when he was coming back at some time. I
21 think I did. I don't know if I called him,
22 he called me, he called HR, I returned a
23 call. But there was something, you know,
24 going on at that point in time, when he was
25 coming back. Roger was off on medical, and

155

1 maybe he heard about that we were having some
2 layoffs and called in. I don't remember
3 exactly.
4     Q   Okay. But you did talk to him at
5 some point while he was out on leave?
6     A   I think he came into HR one day, I
7 guess when he was getting ready to come back
8 off of leave, and I talked to him.
9     Q   Did you meet with him then?
10     A   I think so.
11     Q   And what did you discuss in that
12 meeting?
13     A   As stated earlier, you know, we
14 were trying to find jobs for different people
15 to do. We had a need, at that point in time,
16 to do some tool room-type work on some --
17 let's call it equivalencies project that we
18 were working on. And I offered him a job to
19 do this task, still be in facilities. He was
20 still initially over the tool crib at that
21 point in time. And it was a supervisor's job
22 rather than a manager's job.
23     Q   And there would be a pay cut?
24     A   And there would be a pay cut.
25     Q   All right. When did you make that

156

1 decision to do away with the manager's
2 position that Roger was in?
3     A   I don't know if we were doing away
4 with any position. You know. We were
5 restructuring because of the number of
6 airplanes that we had on base. And as stated
7 earlier, the facilities jobs, you know,
8 weren't a requirement to have.
9     Q   So, his position was not really
10 going away, then?
11     A   I don't know if it's his position.
12 I mean, there was positions within the
13 company. I don't look at it as any one
14 person has a position. We have slots
15 available on tasks that need to be done. But
16 there's not a position that says that the VP
17 of operations position belongs to Dennis
18 Johnson or that the president position
19 belongs to Ray Bennett. Those are all
20 subject to change at any time.
21     Q   Roger was serving as manager of
22 facilities? Is that right?
23     A   That's correct.
24     Q   And did the manager of facilities
25 position go away with the layoffs of this

## Dennis Johnson

**From:** Clarke Briody [clarke.briody@pemcoair.com]
**Sent:** Wednesday, March 22, 2006 12:01 PM
**To:**   Johnson, Dennis

Dennis,
Some of the major improvements to the facility over the last year or so are as follows:

- Major clean up last year and relocation of 90 day waste storage.  Scrapped and sold tons of unused heavy garbage.
- Reconfiguration of hangar 6 to accommodate 4 aircraft which included upgrades to parts cage and splitting two work docks into four.  Also included relocation of existing occupants.
- Improved oversight of vendor services and prices charged resulting in reduced charges and rebates.
- Improved oversight of utility charges resulting in reduced costs versus a year ago.
- In this period the tool equivalency issue went from the period of my predecessor with virtually no tools proven and put on file to our current status of 75 proven equivalencies with 30 more in work.  This while we continue to grow our customer base both in quantity and variety.  We are in near constant communication with our customers to provide necessary tooling by acquiring or proving equivalent.  The previous regime was characterized by letters from the FAA and failed audit findings on this subject.  We consistently pass audits now with our ongoing process.  Several customers have applauded our program.  Delta noted a marked improvement in our program direction on their most recent audit visit.
- We have eliminated underutilized equipment to reduce lease costs.  We removed one leased double wide trailer and pared down from 13 reader printers to 4.
- We have improved the communication with our production customers resulting in improved support of aircraft objectives.

Clarke Briody
Manager of Facilities
Pemco World Air Services
Phone 334-983-4571, Ext. 7088

This e-mail transmission and the information contained in this communication is confidential and may be legally privileged, proprietary information intended for the individual or entity to whom it is addressed.  If you have received it in error, you are on notice of its status. The unauthorized use, distribution or disclosure of this communication is strictly prohibited.  Please notify us immediately by reply e-mail and then delete this message from your system.  Thank you for your cooperation.



PEMCO / WRIGHT
00754

3/24/2006

FARMER, PRICE, HORNSBY & WEATHERFORD, L.L.P.

ATTORNEYS AT LAW

100 ADRIS PLACE

DOTHAN, ALABAMA 36303

PHONE (334) 793-2424

FAX (334) 793-6624

EDWARD M. PRICE, JR.*
ERNEST H. HORNSBY
JOEL W. WEATHERFORD
ELIZABETH B. GLASGOW*†
HARRY P. HALL, II†
J. VINCENT EDGE
GARY E. SULLIVAN
RUSSELL N. PARRISH*

*ALSO ADMITTED IN FLORIDA
†ALSO ADMITTED IN GEORGIA

J. HUBERT FARMER (1896-1976)
JAMES H. FARMER, JR. (1930-1999)

MAILING ADDRESS
P.O. DRAWER 2228
DOTHAN, ALABAMA 36302

TUSCALOOSA OFFICE
2216 14TH STREET, SUITE 100
TUSCALOOSA, ALABAMA 35401
PHONE (205) 750-8111
FAX (205) 750-8121

July 20, 2005

Ms. Ramona Segler
Human Resources Manager
Pemco
100 Pemco Drive
Dothan, AL 36303

Dear Ms. Segler:

This is to advise that our law firm represents Mr. Roger Wright who worked for Pemco for sixteen years and was the Manager of Facilities at Pemco for at least the last five and a half years. In reviewing Mr. Wright's employment history with Pemco, it appears that there have been a number of violations of federal and state law, including but not limited to the Family Medical Leave Act and the Age Discrimination in Employment Act.

At this point, however, Mr. Wright is interested in working out an appropriate severance package commensurate with his abilities and experience. If you would like to discuss a possible resolution of this matter, please contact me at the number above in the next seven days.

Sincerely,

Elizabeth B. Glasgow

EBG/amh



**Page 1**

1  IN THE U. S. DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3              SOUTHERN DIVISION
4
5  ROGER WRIGHT,
6      PLAINTIFF,
7      VS.                    Civil Action No.:
                              1:06cv647-WKW
8  PEMCO WORLD AIR
   SERVICES, INC.,
9
       DEFENDANT.
10
11      The deposition of RICHARD MILLER, taken
12  by the Plaintiff, pursuant to the Federal
13  Rules of Civil Procedure, before Stacey
14  Watkins, RPR, and Notary Public, State at
15  Large, at the offices of Farmer, Price,
16  Hornsby & Weatherford, Dothan, Alabama, on
17  the 6th day of August, 2007, at 2:05 p.m.,
18  CDT, pursuant to notice.
19                  * * * * *
20  APPEARANCES:
21  FOR THE PLAINTIFF:      FOR THE DEFENDANT:
22  MS. ELIZABETH B. GLASGOW  MR. JOHN B. HOLMES
    Attorney at Law          Attorney at Law
23  Dothan, Alabama          Birmingham, Alabama
24  ALSO PRESENT:
25  DENNIS JOHNSON

**Page 2**

1              STIPULATION
2
3      It is stipulated by and between counsel
4  for the parties that this deposition be taken
5  at this time by Stacey Watkins, RPR, and
6  Notary Public, State at Large, who is to act
7  as commissioner without formal issuance of
8  commission to her; that said deposition shall
9  be taken down stenographically, transcribed,
10  and certified by the commissioner. The
11  signature of the witness is waived.
12      Except for objections as to the form of
13  questions, no objections need be made at the
14  time of the taking of the deposition by
15  either party, but objections may be
16  interposed by either party at the time the
17  deposition is read into evidence, which
18  shall be ruled upon by the Court on the
19  trial of the cause upon the grounds of
20  objection then and there assigned.
21
22  EXHIBIT
23  D
24
25

**Page 3**

1              RICHARD MILLER
2  having been first duly sworn, testified as
3  follows, to-wit:
4
5              EXAMINATION
6
7  BY MS. GLASGOW:
8      Q   Can you state your name for the
9  record, please?
10     A   Richard Miller.
11     Q   Mr. Miller, my name is Libby
12  Glasgow.  I represent Roger Wright in a
13  lawsuit that we've brought against Pemco
14  World Air Services.  I'm going to be asking a
15  lot of questions today, and this is on the
16  record.
17     Our court reporter here, Stacey, is
18  taking down everything that we say.  So, you
19  need to answer my questions out loud.  You
20  can't just nod or shake your head, because
21  she can't take that down very well.  All
22  right?
23     A   All right.
24     Q   If I don't ask a question that's
25  clear or if you don't understand the question

**Page 4**

1  that I'm asking you, just go ahead and stop
2  me, and I'll be happy to rephrase it.
3  Otherwise, we're going to assume that you
4  understand the question that's being asked.
5  Okay?
6      A   Okay.
7      Q   Give me your address, please?
8      A   3256 Gene Terry Road.  G-e-n-e.
9      Q   T-e-r-r-y?
10     A   Uh-huh.  Road.  Ashford, Alabama.
11     Q   And how long have you lived there?
12     A   Five years, six years.
13     Q   Okay.  Where are you from
14  originally?
15     A   Oregon is where I was born.
16     Q   Oregon.  How long have you lived in
17  Alabama?
18     A   About 30 years, I guess.
19     Q   30 years.
20     A   I got out of the service in '77.
21  That would be 30 years, wouldn't it?
22     Q   Uh-huh.  Were you stationed here at
23  Fort Rucker?
24     A   No, ma'am.  I came here from
25  Mobile.

1  standard work day?
2      A   No.  They do on the planes, now, on
3  production.
4      Q   On production.
5      A   Where they work on the planes, on
6  the production side, they work overtime all
7  the time.  I mean, they just -- all the time.
8      Q   But not on your side?
9      A   But not on the facility side.
10     Q   How many facility supervisors are
11  there now?
12     A   Two.
13     Q   One day shift and one night shift?
14     A   Yes, ma'am.
15     Q   Do you run a third shift, or is it
16  just the two shifts?
17     A   Well, we have -- they have started
18  a third shift, and we only have two people.
19  Soon going to have three people on that
20  shift, just to support the aircraft and the
21  tool cribs.
22     Q   But there's no active production on
23  third shift?  Is that right?
24     A   Yeah.  They're working on the
25  airplanes.

---

30

1      Q   Oh, they are.  Okay.
2      A   We're supporting -- there's not a
3  whole bunch of people.  I don't know exactly
4  how many people is on the third shift working
5  on airplanes.  But we have to have people in
6  the tool cribs.  So, we have to man the tool
7  cribs until they --
8      Q   I see.
9      A   And so, we've got a couple of
10  people that are on third shift out of
11  facilities.
12     Q   When you say "we," you mean the
13  facilities --
14     A   Right.
15     Q   -- department has a couple of
16  people in the tool cribs on third shift?
17     A   Yes, ma'am.
18     Q   But there's no facilities
19  supervisor --
20     A   No, ma'am.
21     Q   -- for that third shift?
22     A   No, ma'am.
23     Q   Who is the day shift supervisor?
24     A   Ted Ball.
25     Q   Since you've been at Pemco, Mr.

---

1  Miller, have you had any significant time off
2  from work other than vacation, you know,
3  holidays, regular days off?
4      A   I've been laid off twice.
5      Q   When was that?
6      A   I can't remember back -- I didn't
7  even think about checking on that time.  But
8  there was a time -- I was only out about a
9  month, I think, or it may have only been
10  three weeks.  But I can't remember exactly
11  what year it was.  I would have to go back
12  and look in my file and see.
13     Q   You think one time for about a
14  month?
15     A   Yes, ma'am.  I just can't remember
16  what year it was.
17     Q   Okay.  And then, what about the
18  other time?
19     A   In 2005, in July.
20     Q   How long were you off then?
21     A   From July 15th to August 22nd.
22     Q   The first time that you got laid
23  off, for about a month, were you given a
24  temporary layoff or an indefinite layoff?
25     A   I believe it was temporary.

---

32

1      Q   What about in 2005, then?  Was that
2  a temporary?
3      A   Well, I was management then.  I
4  wasn't management the first time.  There's no
5  such thing in management as temporary.  I
6  don't think there is, anyway.
7      Q   So, did you get an indefinite
8  layoff, then, in July of '05?
9      A   Yeah.  They gave me severance pay.
10  They paid me two weeks' pay, I think.
11     Q   Who did the layoff, or who told you
12  about it?
13     A   Clark Briody.
14     Q   And what did he tell you at that
15  time?
16     A   He said that they were cutting
17  management at that time, and he didn't know
18  if they were going to hire us back.
19     Q   And you said that was on July 15th?
20     A   Yes, ma'am.
21     Q   Did Clark tell you on the 15th, or
22  did he tell you before then?
23     A   I think it was the -- if I remember
24  right, I think it was the same day.  I mean,
25  I left the same day I came in that he told

---

33

1  me.

2      Q    Oh, okay.

3      A    There wasn't no prior -- I don't

4  believe there was no prior notice.  I don't

5  remember it that way.

6      Q    Okay.  When he talked to you on the

7  15th, did he hold open the possibility that

8  you would come back?

9      A    No, ma'am, not right at that time.

10  A couple of weeks after that I got laid off,

11  I called him and asked him if they had any

12  intentions of bringing me back, 'cause if

13  they wasn't, just go ahead and tell me, and

14  then, I can go find me another job.  But if

15  they -- you know, if they felt like maybe

16  they was going to do that, then I would just

17  -- you know, I'd wait and see.  And so,

18  anyway, he told me that he would call me back

19  the next day.

20      And he called me back and said that they

21  had all intentions of bringing me back.  And

22  I said, "Okay.  Then I'll just -- I'll wait."

23      Q    Do you remember when that

24  conversation happened?  You said a couple of

25  weeks after the layoff?

34

1      A    Yeah.  It was two or three weeks

2  after the layoff.

3      Q    About the end of July, maybe?

4      A    Yeah, could be.  You know.  First

5  part of August.  I really don't recollect,

6  you know, the very day.

7      Q    No.  I understand.  But you had

8  been off a couple of weeks by that time?

9      A    Yes, ma'am.  Yeah.

10      Q    Okay.  And then, you were brought

11  back to your same position August the 22nd --

12      A    Yes, ma'am.

13      Q    -- of '05?

14      A    Yes, ma'am.

15      Q    And did they restore you to the

16  same salary?

17      A    Yes, ma'am.

18      Q    And same benefits?

19      A    Yes, ma'am.

20      Q    Did you have to give back the

21  severance pay?

22      A    No, ma'am.

23      Q    Did Clark Briody tell you anything

24  else, you know, around July 15th, when he was

25  talking to you about the layoff?  Did he tell

1  you anything about why the layoffs were

2  occurring or anything else?

3      A    Other than it was just -- the

4  contract was coming up, and it was pretty --

5  I think it was a pretty up-in-the-air type.

6  A lot of changes going on in the company.

7      Q    Do you know who did your position

8  while you were laid off for that month, five

9  weeks?

10      A    No, ma'am.  I really don't.  I

11  don't know if they had anybody on nighttime.

12  I really don't.

13      Q    When you got back, in August, had

14  anybody done anything since you had been

15  gone, you know, as far as your duties?

16      A    Well, you know, the employees were

17  locked out, so there wasn't -- I mean, the

18  supervisors and secretarial people -- they

19  had some people that they was bussing in to

20  work on -- you know, working on the aircraft.

21      But, in facility maintenance, there was

22  just -- like it had always been whenever they

23  was on strike or whatever, the management

24  took care of facilities, doing the work in

25  facilities, keeping the vehicles up and

36

1  running the tool crib.

2      Q    Were the employees still locked

3  out --

4      A    Yes, ma'am.

5      Q    -- when you were brought back in

6  August?

7      A    Yes, ma'am.

8      Q    Okay.  And so, what did you do

9  then, in August, when you came back?

10      A    Worked on vehicles, trying to get

11  them back running, and support the aircraft

12  with equipment, stands, whatever.  Whatever

13  they needed.

14      Q    The plant mechanics that do the

15  mechanical work on the vehicles, are they

16  part of the union?

17      A    Yes, ma'am.

18      Q    And were you a member of the union

19  when you started?

20      A    Yes, ma'am.

21      Q    And then, when you were promoted to

22  supervisor, you were in management?  Right?

23      A    Yes, ma'am.

24      Q    So, how long was it until the

25  employees actually came back and the labor

37

1  issues were resolved?

2      A    Well, it seems like it was in

3  September, probably.  The latter part of

4  September.  Seems like it was about a month.

5  It's hard to exactly remember.  I think I was

6  back about a month.  Or it may have been the

7  first of October.  It was in that area.

8      Q    Did you get any extra pay for

9  taking on this other work during that period

10 from August 'til September?

11     A    No, ma'am.

12     Q    Did you get any bonuses or anything

13 for coming back to work?

14     A    No, ma'am.

15     Q    Were you paid at your straight

16 salary for doing mechanical work?

17     A    Yes, ma'am.

18     Q    Did you put in overtime hours

19 during that time?

20     A    No, ma'am.

21     Q    Just straight 40 hours a week?

22     A    Yes, ma'am.

23     Q    So, once the employees came back

24 and the labor issues were resolved, did you

25 then go back to your supervisory duties --

39

1      A    Yes, ma'am.

2      Q    Anything else?

3      A    He's over the tool cribs.  Which,

4  Ted Ball is actually -- he's directly in

5  charge of the tool cribs, as far as tooling

6  and equivalency for tools that we had, that

7  we had made ourself, getting drawings and

8  paperwork made up for all that.

9      Q    Does Clark also supervise Ted Ball?

10     A    Yes, ma'am.

11     Q    Any other duties that you're aware

12 of that Clark Briody does?

13     A    Well, he signs all the -- he has to

14 sign all the requests for anything that we

15 need in the facility, as far as parts and,

16 you know, whatever we have to -- need.  It

17 all goes through him to be approved.

18     Q    Any requisitions --

19     A    Right.

20     Q    -- would have to go through him?

21     A    Yes, ma'am.

22     Q    Anything else that you're aware of?

23     A    No, ma'am, not right off.

24     Q    Okay.  About how many hours does

25 Clark Briody work during a week?  Do you

38

1      A    Yes, ma'am.

2      Q    -- as the night shift supervisor?

3      A    Yes, ma'am.

4      Q    And those duties were the same ones

5  that you told me about earlier?  Right?

6      A    Yes, ma'am.

7      Q    And your duties have not changed

8  significantly since September of '05?  Is

9  that right?

10     A    No, ma'am.

11     Q    Has Clark Briody been your

12 supervisor during all this time --

13     A    Yes, ma'am.

14     Q    -- since you came back?

15     A    Yes, ma'am.

16     Q    What are Clark Briody's duties?  Do

17 you know?

18     A    Well, he's the manager over the

19 facility.  Reports to Dennis.  He takes care

20 of all the bills and stuff that come in the

21 office.  Any planning that has to be done, as

22 far as building stands and, you know,

23 whatever they -- whatever projects that need

24 to be done, he's over all that.  Budget.

25     Q    Budget for facilities?

40

1  know?  I guess he's on a different shift than

2  you are?

3      A    Right.  But he's -- he comes in

4  early and he leaves late, mostly.  He puts a

5  lot of -- it's not uncommon for him to be

6  there 'til 5:00 o'clock.

7      Q    When does he come in, usually?

8      A    5:30, 6:00.

9      Q    Are you aware of any duties that

10 Clark Briody has outside of facilities?

11     A    No, ma'am.

12     Q    How many employees do you supervise

13 on night shift?

14     A    I have ten right now.

15     Q    Has that stayed the same pretty

16 much since 2005?

17     A    No, ma'am.  No, ma'am.  We've just

18 added two people, I know, for the third

19 shift.

20     Q    About how many were you supervising

21 when you came back in 2005?

22     A    I think we had about five or six.

23 This is after lockout, now --

24     Q    Right.

25     A    -- you know, when they came back.

```
                                          1
1           UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3                SOUTHERN DIVISION

4

5  ROGER WRIGHT,              )
                              )
6       Plaintiff,            )
                              )
7  VS.                        ) CA NO.: 1:06 CV 647-WKW
                              )
8  PEMCO WORLD AIR SERVICES,  )
   INC.,                      )
9                             )
        Defendant.            )
10

11

12      The deposition of TED BALL, taken by the

13 Plaintiff, pursuant to the Federal Rules of Civil

14 Procedure, before Kimberly B. Faucette, Certified

15 Court Reporter and Notary Public in and for the State of

16 Alabama at Large, at the law offices of Farmer, Price,

17 Hornsby & Weatherford, Dothan, Alabama, on the 16th day

18 of August, 2007, at 1:00 p.m., pursuant to notice.

19

20              *    *    *    *    *

21 APPEARANCES:

22 FOR THE PLAINTIFF:        FOR THE DEFENDANT:

23 MS. ELIZABETH GLASGOW     MR. JOHN HOLMES
   Attorney at Law          Attorney at Law
24 Dothan, Alabama           Birmingham, Alabama

25
```

```
                                          2
1          S T I P U L A T I O N S

2      It is stipulated by and between counsel for

3 the parties that this deposition is taken at this time

4 by Kimberly B. Faucette, Court Reporter and Notary

5 Public, State at Large, who is to act as commissioner

6 without formal issuance of commission to her; that said

7 deposition shall be taken down stenographically,

8 transcribed, and certified by the commissioner.

9      Except for objections as to the form

10 of questions, no objections need be made at the time of

11 the taking of the deposition by either party, but may be

12 interposed by either party at the time the deposition is

13 read into evidence, which shall be ruled upon by the

14 Court on the trial of the cause upon the grounds of

15 objection then and there assigned.

16

17

18

19              EXHIBIT

20

21              O

22

23

24

25              *    *    *    *    *
```

```
                                          3
1                 TED BALL

2 having been first duly sworn, testified as follows,

3 to-wit:

4                EXAMINATION

5 BY MS. GLASGOW:

6     Q    Mr. Ball, my name is Libby Glasgow.  I

7 represent Roger Wright in this lawsuit that Mr. Wright

8 has brought against Pemco.  I am going to be asking a

9 number of questions today, and we are on the record.

10 The court reporter is taking down everything that we

11 say.  So when I ask a question, you need to answer the

12 question out loud.  You can't shake your head or nod

13 your head or anything like that, all right?

14    A    Okay.

15         MR. HOLMES:  You can, as long as you speak out

16              loud at the same time.

17    Q    You can do whatever you want, as long as you

18 speak out loud.

19    A    As long as you are verbal with it.

20    Q    That's right.  This is not a video deposition.

21 Give me your current address.

22    A    927 Honeysuckle Road, Apartment J-126.

23    Q    In Dothan?

24    A    Yes, ma'am.

25    Q    That is 36301?
```

```
                                          4
1     A    36305.

2     Q    Okay.  And I understand you are employed at

3 Pemco?

4     A    Yes, ma'am.

5     Q    How long have you been there?

6     A    This last time, since 1988.

7     Q    Did you work for Hayes before then?

8     A    Yes, ma'am.  1960 to 1963.

9     Q    What did you do for Hayes in the 1960s?

10    A    I was a sheet metal tank sealer worker.

11    Q    And then what did you do between the time

12 period when you worked for Pemco?

13    A    I went to Lake City, Florida, and worked with

14 Aero Corporation.

15    Q    With who?

16    A    Aero, A-E-R-O, Corporation.

17    Q    And what does Aero Corporation do?

18    A    Aircraft overhaul modifications.

19    Q    And what did you do for them?

20    A    Well, I started off as a leadman, went to

21 supervisor, foreman, general foreman, wound up being the

22 project manager to the C-130 program.

23    Q    And that is in production as far as working on

24 the aircraft itself; is that right?

25    A    Yes, ma'am.
```

5

```
1    Q   And then what did you do when you switched
2  over and started at Pemco in the 1980s?
3    A   I was a supervisor in production, again
4  supervising people on airplanes, aircraft work.
5    Q   And that is a management position?
6    A   Yes, ma'am.
7    Q   Have you ever been part of the bargaining unit
8  of Pemco?
9    A   From '60 to '63, I was.
10   Q   But not when you came back?
11   A   No, ma'am.
12   Q   And so how long did you stay in the
13 supervisor's position at Pemco?
14   A   Here?
15   Q   Yes.
16   A   This last time, I am still in supervision.  I
17 came here in '88, and I was in supervision.  I am still
18 in supervision.
19   Q   But you are no longer in production, you are
20 in facilities now, I understand?
21   A   I am working in the facilities department now,
22 yes, ma'am.
23   Q   But take me back.  You were a supervisor in
24 production when you first came back in the 1980s; right?
25   A   Yes, ma'am.
```

6

```
1    Q   Did you have any other job titles between then
2  and the time you moved into facilities?
3    A   I moved up to assistant manager.
4    Q   And who was your manager?
5    A   It varied.  Most of the time it was Shane
6  King, and part of the time, it was Rusty Nelson.
7    Q   Have you always been on day shift?
8    A   I have worked some night shift, yes, ma'am.
9    Q   And how long were you assistant manager?
10   A   I don't know exactly.  It was several years.
11   Q   And then did you have any other positions
12 before you moved into facilities?
13   A   Just aircraft.  That is all.
14   Q   And as an aircraft assistant manager, what
15 were your duties?
16   A   Mostly supervising supervisors.
17   Q   And how do you do that?
18   A   Well, you give them instructions what has
19 to be done, how to do it.  You try to educate them on
20 the ways of proper procedures.
21   Q   So a little bit of training, education?
22   A   And seeing that the work is done.
23   Q   And follow up to make sure that it is done
24 right?
25   A   On time and in budget, yes, ma'am.
```

7

```
1    Q   About how many people did you supervise?
2    A   Here or Lake City or what?
3    Q   As an assistant manager at Pemco?
4    A   Around a hundred, I imagine.  It varies
5  according to how many aircraft you have at the time.  It
6  goes up and down constantly.
7    Q   But you are not actually working on the
8  aircraft yourself?
9    A   We are not allowed to in supervision.
10   Q   When was the last time you actually worked on
11 the aircraft itself?
12   A   Back in Pemco -- I mean, Aero, when I first
13 got there.  Ever since then, I have been in management.
14   Q   And you said you worked for Shane King and
15 Rusty Nelson?
16   A   Yes, ma'am.
17   Q   When did you move over into facilities?
18   A   It was probably around August, probably of
19 '05.
20   Q   And what prompted that move into facilities?
21   A   Well, I was in the lay-off like the rest of
22 them was.
23   Q   Were you actually laid off?
24   A   Yes, ma'am.
25   Q   When were you laid off?
```

8

```
1    A   Around July 15th.  Somewhere in that
2  neighborhood.  I am not sure about the exact date, but
3  it was around the middle of July.
4    Q   Go ahead.  I interrupted you.
5    A   And they called me back sometime around the
6  middle of August.  Somewhere in that neighborhood.
7    Q   Who called you back?
8    A   It was on my answering machine.
9    Q   Who left the message?
10   A   Human resources.
11   Q   And who was that at the time?
12   A   I can't remember the name.
13   Q   Jim Batcher?
14   A   Just one of his assistants.  One of the girls
15 there in the office.
16   Q   Ramona Siegler?
17   A   No.
18   Q   Jerry Paulk?
19   A   I don't remember if it was Jerry or not, but
20 she was there at the time.
21   Q   But someone from HR called you?
22   A   Yes.  They left it on my answering machine,
23 because I was down in Lake City.  I called home and it
24 was on my answering machine.  So I came back.
25   Q   And what did they tell you?
```

I respectfully request an investigation of Pemco World Air Services, a division of Pemco Aviation Group, Inc. located at 100 Pemco Drive, Dothan, Alabama.

Pemco hired me as the Director of Human Resources on January 13, 2003 with the responsibility of managing all Labor Relations and Employee Relations for a workforce of over 700 employees. I have been in management for 39 years with the last 25 years devoted to Human Resources. I am well qualified in both education and work experience to have been placed in this position. My date of birth is May 27, 1940 and I am 65 years old.

During my tenure at Pemco, there was an ongoing discussion in manpower meetings and among upper management as to how to handle replacement of an aging work force. In the past, this had primarily been handled by natural attrition.

In the last year, there were numerous discussions among Pemco upper management including the President, Ray Bennett and Vice President of Operations, Dennis Johnson, that the age of the current work force was a problem.

In supervising recruiting efforts, I passed several resumes to Dennis Johnson for supervisory positions where the applicants had retired from the military and Johnson rejected them because they were "too old." He stated that he needed "younger people". "Younger Blood" was common statement from this individual as well.

In my 2005 Goals and Objectives, I was given tasks and/or projects with unreachable goals. The management team placed a goal of hiring at 100% of required workers, which has never been accomplished to my knowledge. My department then was reduced by 50% in the summer of 2005, but my goals and work requirements were not adjusted.

Johnson told me several times that I should think about retiring and that someone my age should want to do something else. During a recruiting trip to Tampa, Florida in early May 2005, he made several comments to me about me retiring. He also stated several times about the average age level of our employees and that he needed younger workers and supervisors. He stated that he was tired of his workers moving too slow and not being able to work on several projects at one time due to being too old.

Also on the trip to Tampa, Johnson talked about an employee, Ted Ball, who was demoted from Production Assistant Manager to Supervisor. Johnson said that since Ball was retirement age, he could not do multiple tasks any more. Ball had been with the company many years and was an extremely hard-working individual.

Over the summer of 2005, the company went through a period of mass layoffs. The union layoffs were by seniority, but the non-union layoffs were not by seniority and included a high percentage of people over 50. I expressed my concern to Bennett, Johnson and others that the people being laid off seemed to be older individuals. Also, there were a number of older non-union individuals who were demoted and received cuts in pay. Nothing was done to correct this situation.



On May 27, 2005 the HR Department gave me a birthday party and during the event my age was discussed with comments such as, "We did not know you were 65 years old." Prior to that time, few people knew my age. From that time forward the attitude toward me changed by the management group at the Dothan facility.

During the summer of 2005, the company went through a labor strike and I was working twelve to fourteen hours a day while also coping with all the layoffs in the company and then the rehiring of employees as they returned to work.

On October 27, 2005, without prior warning, I was terminated and replaced by a younger individual, Bobby Granger, who did not have the background and experience that I had in human resource management. I had never received any written reprimands in the time I was employed by Pemco and my yearly performance reviews were well within accepted standards.

On October 27, 2005, Ray Bennett told me that I had been terminated. There was no discussion of any specific reasons for the termination other than he was generally not happy with me. There was no specific example given of poor work performance and, until that time, the only criticism of my work performance was in not meeting the hiring goals, which had been unrealistic from the beginning.

Based upon my knowledge of the prejudices and attitudes at this company, I feel strongly that I was discriminated against on the basis of my age in violation of federal and state law.

Sincerely,

James W. Battcher Sr.

Signed this __18__ day of __NOV__ , 2005

# FREEDOM COURT REPORTING

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  SOUTHERN DIVISION
4  CASE NUMBER
5  1:06CV647-WKW
6
7  ROGER WRIGHT,
8      PLAINTIFF,
9  VS.
10  PEMCO WORLD AIR
11  SERVICES, INC.,
12      DEFENDANT.
13
14  DEPOSITION OF:
15      DORIS SEWELL
16
17      S T I P U L A T I O N
18  IT IS STIPULATED AND AGREED by and
19  between the parties through their
20  respective counsel, that the deposition of
21  DORIS SEWELL, may be taken before Donna
22  Winters, Commissioner and Notary Public,
23  State of Alabama at Large, at the law

Page 2

1  offices of Maynard, Cooper & Gale, 2400
2  AmSouth/Harbert Plaza, 1901 Sixth Avenue
3  North, Birmingham, Alabama 35203, on the
4  16th day of July 2007 commencing at 1:00
5  p.m.
6  DEPOSITION OF:  DORIS SEWELL
7
8
9
10
11
12
13
14
15
16
17
18  EXHIBIT
19  Q
20
21
22
23

Page 3

1      IT IS FURTHER STIPULATED AND AGREED
2  that the signature to and the reading of
3  the deposition by the witness is waived,
4  the deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating
7  to the taking of depositions.
8      IT IS FURTHER STIPULATED AND AGREED
9  that it shall not be necessary for any
10  objections to be made by counsel as to any
11  questions, except as to form or leading
12  questions, and that counsel for the
13  parties may make objections and assign
14  grounds at the time of the trial, or at
15  the time said deposition is offered in
16  evidence or prior thereto.
17      IT IS FURTHER STIPULATED AND AGREED
18  that notice of filing of this deposition
19  by the Commissioner is waived.
20
21
22
23

Page 4

1      E X H I B I T S
2  EXHIBIT PG DESCRIPTION
3  PX-1  9 Prvilege Log
4  PX-2  80 Internal Audit Report Status
5
6      I N D E X
7  EXAMINATION BY:  PAGE NUMBER
8  Ms. Glasgow  5 - 95
9
10
11
12
13
14      A P P E A R A N C E S:
15  FARMER, PRICE, HORNSBY &
16  WEATHERFORD, by Ms. Elizabeth B. Glasgow,
17  100 Adris Place, Dothan, Alabama 36303,
18  appearing for the Plaintiff.
19      MAYNARD, COOPER & GALE, by Messrs.
20  Jeffrey A. Lee and John B. Holmes, III,
21  2400 AmSouth/Harbert Plaza, 1901 Sixth
22  Avenue North, Birmingham, Alabama 35203,
23  appearing for the Defendant.

1 (Pages 1 to 4)

# FREEDOM COURT REPORTING

| | Page 9 |
|---|---|
| 1 | log of documents that she received. |
| 2 | MS. GLASGOW: Okay. |
| 3 | (Whereupon, Plaintiff's Exhibit |
| 4 | Number 1 was marked for identification, a |
| 5 | copy of which is attached to the original |
| 6 | of the transcript.) |
| 7 | (Off-the-record discussion.) |
| 8 | **Q. Ms. Sewell, let me show you what has** |
| 9 | **been marked as Plaintiff's Exhibit Number** |
| 10 | **1, and I'll represent to you that that is** |
| 11 | **a privilege log that Mr. Holmes and** |
| 12 | **Mr. Lee gave me this afternoon just before** |
| 13 | **the deposition started. Are there any** |
| 14 | **other documents in your file other than** |
| 15 | **what is listed on that privilege log, to** |
| 16 | **your knowledge?** |
| 17 | A. Not other than correspondence with |
| 18 | counsel, with Maynard, Cooper. |
| 19 | **Q. So this privilege log here covers** |
| 20 | **all the other documents in your file,** |
| 21 | **other than the correspondence with** |
| 22 | **Maynard, Cooper?** |
| 23 | A. The only other thing that I know |

| | Page 10 |
|---|---|
| 1 | that I have in my file is a reservation of |
| 2 | rights letter from our insurance company. |
| 3 | **Q. And who is the insurance company?** |
| 4 | A. AIG National Union. |
| 5 | **Q. And what is the basis of the** |
| 6 | **reservation of rights?** |
| 7 | A. Benefits, definition of loss. |
| 8 | **Q. On the ERISA claim?** |
| 9 | A. Correct. |
| 10 | **Q. Any other reservation of coverage?** |
| 11 | A. I would have to go back and review |
| 12 | that. I don't recall. |
| 13 | (Off-the-record discussion.) |
| 14 | **Q. We're back on the record. Did you** |
| 15 | **talk with any witnesses other than** |
| 16 | **counsel, in preparation for your** |
| 17 | **deposition here today?** |
| 18 | A. I have spoken with two witnesses, |
| 19 | and those are on the privilege log. |
| 20 | **Q. Who did you speak with?** |
| 21 | MR. LEE: I think Libby means in |
| 22 | preparation of your deposition, not back |
| 23 | at the time. |

| | Page 11 |
|---|---|
| 1 | A. Oh, no. No, I did not. I'm sorry. |
| 2 | **Q. You did not speak with anyone in** |
| 3 | **your office, I'm talking about witnesses** |
| 4 | **that would have factual knowledge of this** |
| 5 | **case, concerning this case in preparation** |
| 6 | **for your deposition here today?** |
| 7 | A. No. |
| 8 | **Q. Give me a rundown on your education.** |
| 9 | A. I went to school at Samford |
| 10 | University. I have a business |
| 11 | administration degree from Samford. I |
| 12 | went from there to law school at |
| 13 | Cumberland. After a law degree, I got a |
| 14 | simultaneous MBA from Samford University |
| 15 | at that time. |
| 16 | **Q. How long have you been out of law** |
| 17 | **school?** |
| 18 | A. Since 1984. |
| 19 | **Q. And did you practice law after** |
| 20 | **graduating from law school?** |
| 21 | A. I worked on a part-time basis. I |
| 22 | moved. I married a man who went directly |
| 23 | into the Army from law school. So when |

| | Page 12 |
|---|---|
| 1 | you say "practice," it was here, there, |
| 2 | and everywhere until we got settled back |
| 3 | in. |
| 4 | **Q. Tell me where you practiced and your** |
| 5 | **moves.** |
| 6 | A. York, Virginia, just on a part-time |
| 7 | basis with a small law firm there; and |
| 8 | then when we moved back to Alabama, I was |
| 9 | at the MICOM office, which is the legal |
| 10 | office for Redstone Arsenal. |
| 11 | **Q. How long were you there?** |
| 12 | A. I was there about a year-and-a-half |
| 13 | until we were transferred back here to |
| 14 | Birmingham, and I went to work in-house |
| 15 | with Bruno's. |
| 16 | **Q. And how long were you with Bruno's?** |
| 17 | A. For five years. I left there and |
| 18 | went in-house with Just for Feet for five |
| 19 | years. I left there in April of 2000, and |
| 20 | joined Pemco. |
| 21 | **Q. And what is your position with Pemco** |
| 22 | **currently?** |
| 23 | A. Vice president legal and corporate |

3 (Pages 9 to 12)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 13

1  affairs for the holding group.
2  Q.  **Is that the position that you have**
3  **always held since April 2000?**
4  A.  Yes.
5  Q.  **How many lawyers are actually in the**
6  **Legal Department at Pemco?**
7  A.  Me.
8  Q.  **You; that's it?**
9  A.  Me.
10  Q.  **Did you replace someone else who was**
11  **in-house counsel in 2000?**
12  A.  I don't know.  They had been without
13  counsel for about a year, I believe, when
14  I came in; and I did not know the former
15  administration.  I came in with the new
16  owners.
17  Q.  **And when you were at Redstone**
18  **Arsenal, who was your actual employer?**
19  A.  The Army.
20  Q.  **And you said you were there about**
21  **eighteen months?**
22  A.  Right.
23  Q.  **What are your job duties as vice**

Page 14

1  **president of legal and corporate affairs?**
2  A.  I receive the subsidiaries in terms
3  of legal compliance, litigation.  I review
4  all contracts for all four companies.
5  Public relations; I handle all the public
6  relations for the company, for the holding
7  company.
8  Q.  **But you provide legal advice to the**
9  **subsidiaries, as well as to the holding**
10  **company itself; is that right?**
11  A.  Correct.
12  Q.  **And that is directly to the officers**
13  **of these subsidiaries?**
14  A.  If requested.
15  Q.  **And they do not have their own**
16  **separate legal counsel to whom they would**
17  **go for legal advice; is that right?**
18  A.  No.
19  Q.  **Do you have an employment agreement**
20  **with Pemco?**
21  A.  I don't have a, [quote],
22  "agreement." I have an employment letter
23  with the original company, Precision

Page 15

1  Standard.
2  Q.  **I'll get to that in a minute, and**
3  you can explain to me how all that came
4  about; but you don't have a specific
5  employment contract with the holding
6  company now, as such?
7  A.  No, I do not.
8  Q.  **Is there a compensation agreement,**
9  **something akin to an employment agreement?**
10  A.  The original employment letter is
11  all that anybody has, except for the CEO.
12  The CEO is the only one with an agreement.
13      MS. GLASGOW:  Do you all have an
14  organizational chart, by any chance?
15      MR. LEE:  Us?
16      MS. GLASGOW:  Yes.
17      THE WITNESS:  For what?  It's kind
18  of a big organization, and it's split, so
19  you need to tell us --
20      MR. LEE:  She's just trying to
21  streamline it.
22      MS. GLASGOW:  I am.  I'm just trying
23  to get through things a little more

Page 16

1  quickly.
2      MR. LEE:  I don't know that I have
3  one I can put my hands on, Libby.
4  Q.  **Let me provide you with paper and**
5  **pen if you need to chart things out.**
6  **Sometimes that's a little easier.  We've**
7  **talked about the holding company.  Start**
8  **at the top.  What is the name of the**
9  **holding company?**
10  A.  Pemco Aviation Group.
11  Q.  **Inc.?**
12  A.  Inc.
13  Q.  **And does Pemco Aviation Group, Inc.**
14  **have subsidiaries?**
15  A.  It does.
16  Q.  **And could you name those**
17  **subsidiaries for me?**
18  A.  Pemco Aeroplex, Inc.; Pemco World
19  Air Services, Inc.; Pemco Engineers, Inc.;
20  Space Vector Corporation.
21  Q.  **And are all of those wholly-owned**
22  **subsidiaries?**
23  A.  Yes.

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 49

1 notified by the Air Force that we were not
2 going to have additional KC-135's coming
3 in that we expected. They pulled back all
4 of their aircraft for that year.
5 **Q.  And that affected Aeroplex up here**
6 **in Birmingham; is that right?**
7 A.  Correct, significantly.
8 **Q.  That did not affect World Air**
9 **Services in Dothan?**
10 A.  No. But, remember, we're a
11 consolidated company. And then Northwest
12 had notified us that they were going to be
13 going into bankruptcy and pulling their
14 aircraft back.
15 **Q.  When you say "a consolidated**
16 **company," what do you mean by that?**
17 A.  Our returns are consolidated.
18 **Q.  So is it a fair statement that World**
19 **Air Services is a disregarded entity?**
20    MR. LEE: I object to the form.
21 **Q.  Are you familiar with that term?**
22 A.  No.
23 **Q.  So your tax returns are all**

Page 50

1 consolidated?
2 A.  That's my understanding.
3 **Q.  When did Northwest notify you of**
4 **bankruptcy?**
5 A.  It was probably January or February
6 of '05. I'm guessing at that, but I know
7 that we started trying to put contingency
8 plans in place at that time for how we
9 were going to handle it.
10 **Q.  When did the first idea come up that**
11 **layoffs would have to occur?**
12 A.  That would probably be the first
13 idea anytime you have a significant
14 downturn in business that way. I couldn't
15 give you an exact time.
16 **Q.  Tell me about the decision-making**
17 **process for the layoffs.**
18 A.  I was not involved in the
19 decision-making process. That would have
20 been between Ron Aramini and Ray Bennett,
21 if you're speaking specifically of Pemco
22 World Air Services.
23 **Q.  Was there any direction given by the**

Page 51

1 board as to how these layoffs were to
2 occur?
3 A.  No, they would not give -- they
4 wouldn't work at that level.
5 **Q.  Would there be any direction from**
6 **the board concerning the number of people**
7 **laid off?**
8 A.  No, they wouldn't do that either.
9 **Q.  Would the board make the decision as**
10 **to whether to lay off anyone or not?**
11 A.  No.
12 **Q.  When was the board informed that**
13 **layoffs would occur; do you know?**
14 A.  I don't know the answer to that. I
15 know that we had layoffs occurring during
16 that spring of '05 through the summer, so
17 I would assume they were probably notified
18 in March or May.
19 **Q.  Did Ron Aramini or Ray Bennett**
20 **consult you, in terms of compliance for**
21 **the layoffs?**
22 A.  No. That would have been handled at
23 their HR department.

Page 52

1 **Q.  So who would have reviewed the**
2 **financial numbers to make the decision on**
3 **the layoffs, Ron Aramini and Ray Bennett?**
4 A.  Probably Ray Bennett would have been
5 the one to bring some type of plan to Ron.
6 **Q.  And then Ron would approve it?**
7 A.  Correct.
8 **Q.  Are you aware of any specific**
9 **reports that were prepared in anticipation**
10 **of the layoffs, a summary of "This is the**
11 **numbers that we're facing"?**
12 A.  I would assume there are reports. I
13 couldn't testify to that, though.
14 **Q.  Would Chris Walker, you think, have**
15 **those?**
16 A.  He might.
17 **Q.  What about Ron Aramini, does he keep**
18 **records of reports which other officers,**
19 **such as Ray Bennett, might give to him**
20 **concerning financial matters?**
21 A.  I wouldn't think so. They're pretty
22 decentralized in terms of their
23 operations. They come to him for final

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  approval on a plan.
2  **Q.   Are you aware of any documents that**
3  **were prepared concerning the projected**
4  **savings which the company might realize**
5  **from these layoffs?**
6  A.   No.
7  **Q.   Did you ever speak with Ray Bennett**
8  **about the layoffs in 2005 or earlier?**
9  A.   If I did, it would have been an
10  informal conversation.  I don't recall
11  anything specific.
12  **Q.   Primarily he was dealing with Ron**
13  **Aramini?**
14  A.   Correct.
15  **Q.   Would any of the other board members**
16  **be brought in as consultants to oversee**
17  **the layoffs in 2005?**
18  A.   No.
19  **Q.   Are you aware of any board members**
20  **that exercised any supervision of the**
21  **layoffs?**
22  A.   No.
23  **Q.   Other than Ron Aramini, are there**

Page 54

1  **any other employees of the holding company**
2  **or Aeroplex who would be involved with the**
3  **particulars of the layoff for World Air**
4  **Services?**
5  A.   No.  Layoffs on a cyclical basis are
6  very common in our industry.  Layoffs for
7  this purpose, you know, would have been
8  deeper and more significant because of the
9  type of downturn in the business that we
10  had at the time.
11  **Q.   How often would you normally go**
12  **through a cyclical type of layoff?**
13  A.   Well, for instance, the airlines
14  don't like to have the airplanes in during
15  the summer, because they fly three times
16  as much as they would during the rest of
17  the year, so they don't like to have them
18  in there.  At that time, if they didn't
19  schedule that many in, then your layoffs
20  could take place at that point.
21  **Q.   Would those be temporary layoffs?**
22  A.   I don't know what they call it.
23  **Q.   So would there be cyclical layoffs**

Page 55

1  **on an annual basis?**
2  A.   No.
3  **Q.   Just with the flow of business?**
4  A.   It would depend on what happened at
5  the time.  I just know that during this
6  time period it was very significant,
7  because we got hit, you know, in both
8  directions with the military and the
9  commercial at the same time, which was a
10  big threat to the viability of the
11  company.
12  **Q.   But as far as you are aware, were**
13  **there layoffs in the summertime in**
14  **previous years for World Air Services?**
15  A.   I believe there were.
16  **Q.   Just with the normal ebb and flow of**
17  **business?**
18  A.   Correct.
19  **Q.   In terms of compliance, did you**
20  **establish standards for these layoffs, as**
21  **to how they were to be performed?**
22  A.   No.  I don't have any standards that
23  were set up for it.

Page 56

1  **Q.   Did you provide any training or**
2  **guidance to the HR directors, in terms of**
3  **how to do a layoff, that sort of thing?**
4  A.   No.  They did that locally, I would
5  assume.
6  **Q.   And as you sit here today, you're**
7  **not aware of the particulars with regard**
8  **to the savings which would be realized**
9  **from the layoffs, the projected savings?**
10  A.   I don't have any particulars on
11  that.
12  **Q.   Who would have that?**
13  A.   I would assume Chris Walker might,
14  if he was there during that time.
15  **Q.   When the auditors come in, the**
16  **outside auditors, do they also audit the**
17  **books for World Air Services?**
18  A.   Yes.
19    MR. LEE:  You're talking about
20  Grant, Thornton?
21    MS. GLASGOW:  Yes, Grant, Thornton
22  and their predecessor.
23  A.   Correct.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

Terminate(Miller, Richard D)

**Length of Service**

**This Service**
Years: 2
Months: 0

**Total Service**
Years: 14
Months: 0

Date Start: 22-AUG-2005
Leaving Reason:

**Termination Dates**

Notified:
Projected:
Last Standard Process:
Actual:
Final Process:

**Person Type and Assignment Status for Terminated Employee**

Type:
Status:

**Termination Accepted By**

Date:
Name:
Number:

Terminate        Reverse Termination



EXHIBIT
B

PEMCO / WRIGHT
1264

Terminate: 30-DEC-2005(Ball, Louie T)

**Length of Service**

**This Service**

| Years | Months |
|-------|--------|
| 0 | 4 |

**Total Service**

| Years | Months |
|-------|--------|
| 17 | 11 |

Date Start **09-AUG-2005**

Leaving Reason

**Termination Dates**

Notified

Projected

Last Standard Process

Actual

Final Process

**Person Type and Assignment Status for Terminated Employee**

Type

Status

**Termination Accepted By**

Date

Name

Number

[ Terminate ]  [ Reverse Termination ]



EXHIBIT

S

PEMCO / WRIGHT
1208